1                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF ARKANSAS
2                       FAYETTEVILLE DIVISION

3

4   UNITED STATES OF AMERICA                    PLAINTIFF

5   v.                        CASE NO. 5:21-MJ-05001-001

6   RICHARD BARNETT                            DEFENDANT

7   _____

8

9         VIDEOCONFERENCE DETENTION HEARING

10                 JANUARY 15, 2021

11       BEFORE THE HONORABLE ERIN L. WIEDEMANN

12          UNITED STATES MAGISTRATE JUDGE

13             FAYETTEVILLE, ARKANSAS

14
    _____
15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3
    MR. CLAY FOWLKES
 4  MS. KIMBERLY NICOLE DAVIS HARRIS
    United States Attorney's Office
 5  414 Parker Avenue
    Fort Smith, Arkansas 72901
 6  (479)783-5125
    clay.fowlkes@usdoj.gov
 7  kimberly.harris@usdoj.gov

 8  FOR THE DEFENDANT:

 9  MR. ANTHONY J. SIANO
    Attorney at Law
10  333 Westchester Avenue, Suite S302
    White Plains, New York 10604
11  (914)997-0100
    tonysiano@aol.com
12

13  FOR TAMMY AND ASHLEE NEWBURN:

14  MR. JOHN B. SCHISLER
    MR. BRUCE D. EDDY
15  Federal Defender's Office
    112 West Center Street, Suite 300
16  Fayetteville, Arkansas 72701
    (479)442-2306
17  jack_schisler@fd.org
    bruce_eddy@fd.org
18

19  ALSO PRESENT:

20  OFFICER TOBEY REELY
    United States Probation Office
21  Western District of Arkansas

22  MS. ROXANA GUERRERO
    Courtroom Deputy
23  Western District of Arkansas

24  MR. DERRICK BALLENTINE
    IT Department, Systems Manager
25  Western District of Arkansas
```

1                              I N D E X

2                                                              Page

3   Rule Invoked ........................................   7

4   SPECIAL AGENT JONATHAN WILLETT

5       Direct Examination by Mr. Fowlkes ...............   9

6       Cross Examination by Mr. Siano ..................  35

7       Redirect Examination by Mr. Fowlkes .............  55

8   Plaintiff Rests .....................................  60

9   JEFFREY HOUPE

10      Direct Examination by Mr. Siano .................  63

11      Cross Examination by Mr. Fowlkes ................  65

12  JAKLYN CHALK

13      Direct Examination by Mr. Siano .................  67

14      Cross Examination by Ms. Harris ................  70

15  JOSE MARTINEZ

16      Direct Examination by Mr. Siano .................  76

17      Cross Examination by Mr. Fowlkes ................  79

18  MARIE HALPIN

19      Direct Examination by Mr. Siano .................  84

20      Cross Examination by Ms. Harris ................  87

21  ASHLEE NEWBURN

22      Direct Examination by Mr. Siano .................  93

23      Cross Examination by Ms. Harris ...............  96

24      Redirect Examination by Mr. Siano .............. 105

25

1                          I  N  D  E  X  (Continued)

2                                                              Page

3  WILLIAM SCROGGIN

4      Direct Examination by Mr. Siano .................. 111

5      Cross Examination by Mr. Fowlkes ................. 113

6  TAMMY NEWBURN

7      Direct Examination by Mr. Siano .................  120

8      Cross Examination by Ms. Harris ................  131

9  Defense Rests ......................................  158

10  Closing Argument by Ms. Harris ....................  158

11  Closing Argument by Mr. Siano .....................  166

12  Court's Ruling ....................................  173

13  Reporter's Certificate ............................  188

14

15

16

17

18

19

20

21

22

23

24

25

1                          E X H I B I T S

2                                                              Page

3      PLAINTIFF:

4      Exhibit No.  1        Video of Defendant entering        12
                            Speaker Pelosi's Office
5
       Exhibit No.  2        Video of Defendant,                12
6                           Speaker Pelosi's Office

7      Exhibit No.  3        Photo of Defendant at              13
                            Speaker Pelosi's Desk
8
       Exhibit No.  4        Defendant Holding up               14
9                           Envelope in Speaker Pelosi's
                            Office
10
       Exhibit No.  5        Defendant Holding Envelope         14
11                          with Taser

12     Exhibit No.  6        Video of Defendant w/Bullhorn   15/29

13     Exhibit No.  7        Wrapper from Walking Stick Taser   16

14     Exhibit No.  8        Receipt from Bass Pro              17

15     Exhibit No.  9        Video of Defendant Purchasing      18
                            Items at Bass Pro
16
       Exhibit No. 10        Photo of Envelope from Speaker     20
17                          Pelosi's Office

18     Exhibit No. 11        Photo of Defendant with Two        20
                            Young Girls with Guns
19
       Exhibit No. 12        News Interview with Defendant      25
20                          at "Stop the Steal" Rally

21     DEFENDANT:

22     Exhibits A-E          Documents Relating to Other         8
                            Defendants Arrested at Protest
23

24

25

 1          MS. GUERRERO:   The United States District Court

 2  for the Western District of Arkansas, Fayetteville

 3  Division, the Honorable Judge Erin L. Wiedemann presiding

 4  is now in session.

 5          THE COURT:   Thank you.   Good afternoon.

 6          MS. GUERRERO:   Good afternoon, Judge.

 7          THE COURT:   Can everyone hear me okay?

 8          THE DEFENDANT:   Yes, ma'am.

 9          MR. SIANO:   Yes, Your Honor.

10          THE COURT:   All right.   At this time, the Court

11  will call up the case of the United States versus Richard

12  Barnett.   We have Mr. Clay Fowlkes and Kim Harris present

13  for the government.   We have Mr. Anthony Siano present

14  representing Mr. Barnett.   We also have participating today

15  Mr. Bruce Eddy and Jack Schisler with our Federal Public

16  Defender's Office.   I asked them to participate today in

17  the event that we have any witnesses that might need

18  standby counsel.

19          All right.   Mr. Barnett, at your initial

20  appearance, I did go over with you your right to have the

21  initial appearance and today's hearing, the detention

22  hearing, conducted in person.   You had submitted a waiver

23  of personal appearance form.   It covered not just your

24  initial appearance, but also the detention hearing.   I just

25  want to make sure today that you are still agreeable to

1  proceeding with your detention hearing by video and waiving

2  your right to an in-person hearing.

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  All right.  And you consulted with

5  your attorney, Mr. Siano, about that?

6          THE DEFENDANT:  I did.

7          THE COURT:  All right.  Thank you.  And I did

8  communicate with the attorneys prior to this hearing about

9  whether the government would like to invoke the Rule as to

10  any witnesses that may testify.  I was advised that they

11  would like to invoke the Rule, so the Court has made

12  arrangements for the witnesses, other than the case agent

13  for the government, but all other witnesses are set up in a

14  breakout room and will only join this hearing when it is

15  their turn to testify.  So the Rule will be considered

16  invoked.

17          MR. FOWLKES:  Thank you, Your Honor.

18          THE COURT:  Also, prior to the hearing, I asked

19  the government's attorney and defense attorney to submit

20  any proposed exhibits and to confer with each other as to

21  whether they would agree and stipulate to the admission of

22  their exhibits.  They have done so.  So the Court will

23  admit for the government, their exhibit list consists of 12

24  exhibits.  They will be deemed admitted at this time.

25          The defense's exhibit list, it's Exhibit A, B, C,

1  D and E, will also be deemed admitted as they have been

2  stipulated to by the government.  So I'll ask the attorneys

3  as we're proceeding through this hearing if you want to

4  refer to any of these exhibits, to refer to it by the

5  exhibit number or letter so that we can all follow along.

6          MR. FOWLKES:  Yes, Your Honor.

7          MR. SIANO:  Thank you, Your Honor.

8          THE COURT:  And I will note, Mr. Siano, the

9  exhibits that you submitted, which are essentially

10  documents from other cases around the country involving

11  defendants that were arrested in relation to the protests

12  at the Capitol, I don't know that you're going to be

13  presenting these through any witness, but the Court has

14  reviewed them and will take notice of the exhibits that you

15  offered.

16          MR. SIANO:  Other than in argument, Judge, I

17  won't be referring to them.  Thank you for the Court's

18  attention to them.

19          THE COURT:  Thank you.  All right.  With that

20  said, are the parties ready to proceed with the detention

21  hearing, for the government?

22          MR. FOWLKES:  Yes, Your Honor.

23          THE COURT:  And Mr. Siano?

24          MR. SIANO:  Yes, Your Honor.

25          THE COURT:  All right.  The government may call

1  its witness then.

2          MR. FOWLKES:  The government calls Special Agent

3  Jonathan Willett to the witness stand.

4          THE COURT:  All right.  Agent Willett, at this

5  time, I'm going to ask you to raise your right hand and be

6  sworn.

7          THE WITNESS:  I'm ready, Your Honor.

8          (Witness Sworn)

9          THE COURT:  All right.  Thank you.  Mr. Fowlkes,

10  go right ahead.

11          JONATHAN WILLETT, having been first duly

12  sworn, testified as follows:

13                    DIRECT EXAMINATION

14  BY MR. FOWLKES:

15  Q.  Please state your name for the Court, and spell your

16  last name for the court record.

17  A.   Jonathan Willett.

18          THE COURT:  I'm sorry, let me interrupt.

19          Mr. Fowlkes, we're getting some feedback from

20  your end.  I don't know -- there's an echo.  I don't know

21  if you can check your audio.

22          MR. FOWLKES:  Can you still hear the echo, Your

23  Honor?

24          THE COURT:  I still -- are you all hearing an

25  echo?  Yes, we're still --

1          THE DEFENDANT:  Your Honor, I'm hearing the echo.

2   I can't understand anything he's saying.

3          THE COURT:  Okay.  I'm not sure, Mr. Fowlkes, if

4   there's anything you can try, or we can give you a minute.

5          MR. FOWLKES:  Can you hear me, Your Honor?

6          THE COURT:  Yes.  There's some static, but it is

7   better.  We can try it that way.

8   Q.   (by Mr. Fowlkes)  All right.  Please state your name

9   for the Court and spell your last name for our court

10  record.

11  A.   Jonathan Willett, W-I-L-L-E-T-T.

12  Q.   How are you employed?

13  A.   I'm employed by the Federal Bureau of Investigation as

14  a special agent.

15  Q.   How long have you been a special agent with the FBI?

16  A.   I've been employed by the FBI in this position since

17  approximately January 2017.

18  Q.   During the course of your duty as a special agent with

19  the FBI, did you work on an investigation involving a

20  person named Richard Barnett?

21  A.   I did.

22  Q.   What was the nature of that investigation?

23  A.   The investigation was initiated on approximately

24  January 6th, 2021, last Wednesday.  So this was stemming

25  from the Capitol riots.  So earlier on on January 6th,

1   President Trump had given a speech in the Capitol.  After

2   that, protestors marched towards the U.S. Capitol building.

3   What was happening at the time at the U.S. Capitol is U.S.

4   Congress was meeting to certify the results of the recent

5   presidential election.  So the Capitol police had erected a

6   restricted area or fencing around the U.S. Capitol

7   building.  And protesters had pushed their way past the

8   U.S. Capitol police barricades up towards the U.S. Capitol

9   where the crowd got even more aggressive and barged into

10  the U.S. Capitol building.  So the investigation was based

11  off of trying to identify the individuals that had engaged

12  in those activities to gain entry into the Capitol.

13  Q.    During the course of your investigation, did you

14  review surveillance videos from the Capitol?

15  A.    Yes, I did.

16  Q.    I'm going to show what's been marked as Exhibit 1.

17          MR. FOWLKES:  Your Honor, can you see this video?

18          THE COURT:  Yes.  Is everyone else --

19          MR. FOWLKES:  I'm going to start the video now.

20          THE COURT:  Is everyone else able to see this?

21          MR. SIANO:  Yes, Your Honor.

22          THE COURT:  Mr. Barnett?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Okay.  Go right ahead.

25          MR. FOWLKES:  This video has no audio, Your

1  Honor.

2          (Exhibit No. 1 played)

3  Q.   (by Mr. Fowlkes)  Special Agent Willett, I'm going to

4  ask you, what does this video depict?

5  A.   So I was able to speak with the U.S. Capitol Police.

6  They provided this and another video we'll see here in a

7  minute.  So what the U.S. Capitol Police told me is, this

8  is showing Mr. Barnett walking into one of several

9  entrances of Speaker Pelosi's office.

10          MR. FOWLKES:  All right.  Your Honor, I'm going

11  to try to share a second video now.  It's going to take me

12  just a second.

13          THE COURT:  Is this Exhibit 2?

14          MR. FOWLKES:  This will be Exhibit 2, Your Honor.

15  And, Your Honor, can you see this video as well?

16          THE COURT:  Yes.  Can everyone else see it?

17          MR. SIANO:  Yes, Your Honor.

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  Go right ahead,

20  Mr. Fowlkes.

21          (Exhibit No. 2 played)

22  Q.   (by Mr. Fowlkes)  All right.  Special Agent Willett,

23  does this video also depict the defendant at the United

24  States Capitol?

25  A.   Yes.

1  Q.   What does this video show?

2  A.   So in speaking with Capitol police, what this shows is

3  yet another entrance to Speaker Pelosi's office.   So

4  Mr. Barnett is imaged -- is in this video wearing a plaid

5  jacket and dark hat.   He is asked by Capitol police to

6  please leave Pelosi's office.   He leaves, looks to be --

7  and it appears that he is videotaping during this.   And

8  then after the Capitol police officer turns their back,

9  Mr. Barnett goes back into Pelosi's office and then leaves

10 one more time.   Something to point out in that video is

11 there's an object that's evident on his hip, and we further

12 identified that as a walking stick taser.

13 Q.   All right.   During the course of your investigation,

14 did you also review some photographs that depicted the

15 defendant inside the Capitol?

16 A.   I did.

17 Q.   I'm going to share with you what's been entered into

18 evidence as Exhibit 3.

19          (Exhibit No. 3 displayed)

20          MR. FOWLKES:   And, Your Honor, can you see this

21 photograph?

22          THE COURT:   Yes, I can.

23 Q.   (by Mr. Fowlkes)   All right.   Special Agent Willett,

24 what does this photograph show?

25 A.   So this shows Mr. Barnett with his feet up on a desk

1   in Speaker Pelosi's office.  Also of note in this photo, he

2   has got a cell phone in his hand and a walking stick taser

3   on his hip.

4   Q.   All right.

5          MR. SIANO:  Excuse me.  Mr. Fowlkes, I didn't

6   hear the exhibit number.  I apologize.

7          MR. FOWLKES:  That was Exhibit Number 3.

8          MR. SIANO:  Thank you.  Sorry to interrupt.

9          MR. FOWLKES:  No problem.

10          (Exhibit No. 4 displayed)

11  Q.   (by Mr. Fowlkes)  Now I'm going to share Exhibit 4.

12  And Special Agent Willett, what does this photograph

13  depict?

14  A.   This shows Mr. Barnett again in the office of Speaker

15  Pelosi holding up a letter from that office.

16          (Exhibit No. 5 displayed)

17  Q.   All right.  And now I'm going to share Exhibit No. 5.

18  And what does this photograph depict?

19  A.   This shows Barnett again holding what appears to be

20  that folded letter in his right hand, and on his hip, he

21  has a walking stick taser.

22  Q.   All right.  Did you also review some photos and videos

23  that depicted the defendant after he left the Capitol

24  offices?

25  A.   Yes, I did.

1          MR. FOWLKES:  All right.  I'm going to try to

2    share Exhibit No. 6 now, Your Honor.  We did have some

3    trouble with the video, or with the audio on Exhibit 6

4    yesterday, so if you have trouble hearing it, please let me

5    know, Your Honor.

6          THE COURT:  All right.  Thank you.

7          MR. FOWLKES:  It will take a second to load.

8    And, Your Honor, can you see the video before I start it on

9    your screen?

10         THE COURT:  Yes.  It's a little blurry, but I'm

11   assuming once you start it, it will be more focused.

12         MR. FOWLKES:  Okay.  I'm going to try to start it

13   now, Your Honor.

14         THE COURT:  All right.

15         (Exhibit No. 6 played; inaudible audio)

16   Q.   (by Mr. Fowlkes)  And Special Agent Willett, what did

17   this video depict?

18   A.   It was kind of choppy on my side, Mr. Fowlkes, so I

19   can go ahead and try to summarize some of the key points if

20   it was for anyone else as well.  But what this video

21   showed, and it was taken right outside the U.S. Capitol

22   after the D.C. protests.  What we can see here is

23   Mr. Barnett getting a bullhorn, speaking about being inside

24   the U.S. Capitol building.  And the important fact to take

25   away from this video is that in his left hand, he is

1  holding the letter from Speaker Pelosi's office as well as
2  the walking stick taser in that hand.
3  Q.   And you've testified previously about the walking
4  stick taser.  During the course of your investigation, did
5  you participate in the execution of a search warrant at the
6  defendant's residence?
7  A.   Yes, I did.
8  Q.   And did you find any evidence regarding the item the
9  defendant is holding that you've described as a walking
10  stick taser?
11  A.   Yes.  We found the packaging for a walking stick taser
12  which is consistent with the item that Mr. Barnett is
13  photographed with.
14         MR. FOWLKES:  And, Your Honor, I'm going to try
15  to share Exhibit No. 7 at this time.
16         (Exhibit No. 7 displayed)
17  Q.   (by Mr. Fowlkes)  Special Agent Willett, can you see
18  this photograph?
19  A.   I can.
20  Q.   Is it a fair and accurate depiction of the item you
21  saw during the execution of the search warrant?
22  A.   It is.
23  Q.   What does it appear to be?
24  A.   It appears to be the wrapper for a walking stick
25  taser, or a ZAP Hike 'n Strike hiking staff.

1  Q.    And did you take steps to confirm where this item was

2  purchased and who purchased it?

3  A.    Yes, we did.

4  Q.    And what did you discover regarding this?

5  A.    Yes.  Other people at the FBI were out looking at

6  various local stores to see who would sell that particular

7  item.  They identified that that item was sold to

8  Mr. Barnett from Bass Pro.

9            MR. FOWLKES:  Your Honor, I'm going to try to

10  show Exhibit No. 9.  Oh, sorry.  It should be Exhibit

11  No. 8.  I got off track.  This is Exhibit No. 8.

12            (Exhibit No. 8 displayed)

13  Q.    (by Mr. Fowlkes)  Special Agent Willett, can you see

14  this on your screen?

15  A.    Yes, I can.

16  Q.    What does it appear to be to you?

17  A.    This is a receipt that was provided by Bass Pro.  So

18  when Mr. Barnett purchased these items, so he purchased

19  them on approximately December 31st, 2020.  He bought two

20  items of pepper spray.  He bought two three-packs of

21  two-way radios and a walking stick taser, the Hike 'n

22  Strike stun gun.

23  Q.    And how can you be certain that this defendant,

24  Mr. Barnett, made this purchase?

25  A.    This was purchased using one of his, either debit card

1  or credit card.

2  Q.   All right.

3          MR. FOWLKES:  Your Honor, it will take me a

4  moment to pull up the next exhibit.

5          THE COURT:  All right.  Let me just ask, Agent

6  Willett, where was this Bass Pro Shop located?

7          THE WITNESS:  Yes, Your Honor.  It was the one up

8  here in Northwest Arkansas, in Rogers, I believe.

9          THE COURT:  All right.  Thank you.

10          MR. FOWLKES:  All right.  Your Honor, I'm going

11  to try to share Exhibit No. 9 with the Court.  All right.

12  Your Honor, can you see this video?

13          THE COURT:  Yes, I can.  Thank you.

14          MR. FOWLKES:  I'm going to play it now.

15          (Exhibit No. 9 played)

16  Q.   (by Mr. Fowlkes)  All right.  Special Agent Willett,

17  what does this video show?

18  A.   This is a security video provided by Bass Pro up here.

19  And what we can see here is, this is a video of the

20  purchase that Mr. Barnett made, which we saw the items

21  purchased from the previous receipt.  So we can see

22  Mr. Barnett in the same hat and jacket that he appeared to

23  be wearing in the U.S. Capitol, and that hat and jacket

24  were both seized at his house as well.  We can see him

25  clearly lay out the walking stick stun gun, as well as the

1  items of mace and the two walkie talkies.  And then he's

2  got his German Shepherd puppy with him at that time as

3  well.

4  Q.   I want to talk to you now about the interview that you

5  conducted with the defendant.  When did this interview take

6  place?

7  A.   This interview took place on January 8th, 2021.

8  Q.   And where did the interview take place?

9  A.   It took place in the interview room located at the

10  Benton County Sheriff's Office.

11  Q.   Did one of your colleagues advise the defendant of his

12  Miranda rights?

13  A.   Yes, he did.

14  Q.   Did he agree that he understood all of his rights that

15  day?

16  A.   Yes.

17  Q.   Did he make a statement to you?

18  A.   Yes.

19  Q.   Did you record that statement?

20  A.   Yes.

21  Q.   During this statement, did Mr. Barnett admit that he

22  was the person depicted in the photos from Speaker Pelosi's

23  office?

24  A.   Yes, he admitted that he was in Speaker Pelosi's

25  office.

1  Q.   During the statement, did Mr. Barnett admit that he

2  took a letter from Speaker Pelosi's office?

3  A.   Yes.

4  Q.   And did he provide you with that letter?

5  A.   Yes, he had the letter with him.

6        MR. FOWLKES:  Your Honor, I'm sharing Exhibit 10

7  now.

8        (Exhibit No. 10 displayed)

9  Q.   (by Mr. Fowlkes)  What does this appear to be to you?

10 A.   This appears to be the letter.  This is the letter

11 that Mr. Barnett had with him, and this appears to be a

12 letter from Speaker Pelosi's office.

13 Q.   In that same statement, did Mr. Barnett tell you that

14 he had some firearms at his residence?

15 A.   He had firearms at his residence, but he had  -- he

16 has recently moved them.

17 Q.   Did you also review a photograph from social media

18 that appeared to depict the defendant holding a firearm?

19 A.   Yes.

20       MR. FOWLKES:  Your Honor, I'm going to try to

21 show Exhibit 11 now.

22       (Exhibit No. 11 displayed)

23 Q.   (by Mr. Fowlkes)  What does this photo appear to be to

24 you?

25 A.   This appears to be a photo of Mr. Barnett with two

1  young children.  And one of the girls is holding what
2  appears to be an AR.  And then Mr. Barnett has what looks
3  to be a (inaudible) gun with possibly some kind of silencer
4  on it.
5  Q.    Did you recover any firearms or silencers from his
6  house?
7  A.    No.
8  Q.    Did the defendant tell you during his interview about
9  a "Save the Children" rally that he had participated in?
10 A.    Yes.
11 Q.    What did he tell you about that rally?
12 A.    During that rally, he just said that he let people go
13 and take photos with some of his antique cars, and then he
14 let them go and take pictures with some of the guns that he
15 had after he unloaded them.
16 Q.    During the same interview, did Mr. Barnett tell you
17 whether he had a cell phone?
18 A.    Yes.
19 Q.    In fact, did you review photographs and video from the
20 Capitol that depicted the defendant holding a cell phone?
21 A.    Yes, I did.
22 Q.    Did you recover a cell phone from the defendant that
23 day?
24 A.    He did not have one on him.
25 Q.    Did you recover a cell phone from his residence during

1  the execution of the search warrant?

2  A.    No, we did not.

3  Q.    I want to talk to you now about the defendant's

4  appearance at other rallies.  Did you receive information

5  from Fayetteville Police Department regarding their

6  interaction with the defendant at a prior rally?

7  A.    Yes.

8  Q.    And what was that information?

9  A.    The information was that Fayetteville P.D. had had an

10 interaction with him sometime in approximately July of

11 2020.  They had a caller gave a description of an

12 individual who had possibly maybe pointed a gun at her.

13 When the police officer showed up, they identified a person

14 matching Richard Barnett's description.  He was causing a

15 little bit of a ruckus at the time, though he did comply

16 with law enforcement.

17 Q.    And did you confirm with the officers by reviewing

18 that report that the defendant was in possession of a

19 firearm during that rally?

20 A.    Yes.

21            MR. FOWLKES:  Excuse me, Your Honor.

22            THE COURT:  Let me ask, while we're on this

23 issue, you said it was a rally in July of 2020?

24            THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

25            THE COURT:  And do you know what type of rally it

1  was and where it was?

2           THE WITNESS:  I do not remember at this time,

3  Your Honor.  It was sometime, I believe either July 25th or

4  July 26th here in Fayetteville, Arkansas.

5           THE COURT:  But you don't recall what the rally

6  was for?

7           THE WITNESS:  I do not, Your Honor.

8  Q.   (by Mr. Fowlkes)  And if you reviewed a report from

9  Fayetteville Police Department, would that refresh your

10  memory on this matter?

11 A.   It would.

12          MR. FOWLKES:  All right.  Your Honor, may Special

13 Agent Willett have just a moment to refresh his

14 recollection?

15          THE COURT:  Yes, that's fine.

16          THE WITNESS:  Yes, Your Honor.  The rally

17 appeared to be in support --

18          MR. SIANO:  Your Honor, before cross, might we

19 find a way to let me have access to that report since the

20 witness is now using it to refresh his recollection before

21 he continues to testify?

22          MR. FOWLKES:  Your Honor, I believe we've already

23 disclosed this to the defense.

24          MR. SIANO:  Well, those discovery materials,

25 Judge, I'm having a little trouble getting them through the

1  system.  So I have the exhibits.  Is this one of your

2  exhibits marked today, Mr. Fowlkes?  I don't think so.

3          MR. FOWLKES:  No, it's part of the discovery that

4  we disclosed.

5          MR. SIANO:  I will tell the Court, I don't --

6  again, I take Mr. Fowlkes and Ms. Harris at face value.  I

7  was able to download the exhibits, but I haven't been able

8  to download the discovery.  And since it's now being used

9  in the hearing, this particular item is of interest to me.

10 So that's the only --

11         MR. FOWLKES:  Well, it's being used to refresh

12 this witness's recollection during the hearing.

13         MR. SIANO:  And the rules say I'm entitled to see

14 it before I begin crossing.

15         MR. FOWLKES:  Certainly.

16         THE COURT:  Okay.  What I will ask is, we can

17 take, once Mr. Fowlkes has completed his direct

18 examination, we can take a brief recess.  And, Mr. Fowlkes,

19 if you can either point Mr. Siano to where this report

20 would be in discovery, or if it might be quicker to just

21 e-mail that one report to him, if you can do that.  And,

22 Mr. Siano, I will give you an opportunity to review that

23 before cross examination.

24         MR. SIANO:  That's fine, Judge.  I will move as

25 fast as I can.

 1              MR. FOWLKES:  We'll do that right now, Your

 2   Honor.

 3              THE COURT:  All right.  Thank you.  You may

 4   proceed, Mr. Fowlkes.

 5   Q.   (by Mr. Fowlkes)  Did you also review a copy of a news

 6   report from November of 2020 in which the defendant gave an

 7   interview?

 8   A.   Yes.

 9              MR. FOWLKES:  And I'd like to publish now

10   Exhibit 12, Your Honor.  And I think that the sound will

11   come through a lot more clearly if everyone is muted except

12   for myself.  And so I just would ask everyone to mute their

13   computers while I try to publish this video.

14              THE COURT:  All right.  If everyone can do that

15   at this time who is not already muted.

16              MR. FOWLKES:  I'm going to play the first part

17   and then ask my colleagues here if the sound is coming

18   through for them.

19              (Exhibit No. 12 begins playing as follows:)

20              REPORTER CRYSTAL MARTINEZ:  A group of people

21   express their support --

22              MR. FOWLKES:  Did the sound come through?  Okay.

23   I'm going to start it over now then.

24              (Exhibit No. 12 played as follows:)

25              REPORTER CRYSTAL MARTINEZ:  A group of people

1  express their support for President Donald Trump with a

2  "Stop the Steal" rally saying the 2020 election isn't over

3  until it's proven to be fair.

4          Good evening and thanks for joining us tonight.

5  I'm Crystal Martinez.  KWA's Samantha Boyd joins us live in

6  studio.  Samantha, you attended the rally.  Why do they

7  believe we need to reevaluate the election results?

8          REPORTER SAMANTHA BOYD:  Crystal, a group called

9  "Engaged Patriots" held the rally this morning in

10 Bentonville protesting what they believe is voter fraud.

11 But a political science expert says most election officials

12 believe votes were more secure than they've ever seen.

13         Richard Barnett was one of many who took part in

14 Saturday's "Stop the Steal" rally in Bentonville.

15         THE DEFENDANT:  And, hey, if you don't like it,

16 send somebody after me, but I ain't going down easy.

17         REPORTER SAMANTHA BOYD:  He supports President

18 Trump's claims of voter fraud and believes that cost him

19 the election.  One major complaint, mail-in voting.

20         THE DEFENDANT:  People are going to vote and find

21 out somebody already used their vote and they're not

22 allowed to vote.  This is insane.

23         REPORTER SAMANTHA BOYD:  William H. Bowen School

24 of Law Professor John Dipippa says otherwise.

25         PROFESSOR DIPIPPA:  The mail-in system has its

1   own verification process, and so there are some people who
2   have made claims, but none of them have ever been verified.
3   There was a woman who showed up in Nevada the night after
4   the election and said people stole the ballot from her
5   mailbox and submitted it.  Turns out that wasn't true.
6   That in fact, she had voted.
7           REPORTER SAMANTHA BOYD:  Jeff Kinard, another
8   protester, believes a common mistake was made inside many
9   polls.
10          MR. JEFF KINARD:  I believe there's been poll
11  watchers that were not allowed to see certain votes count.
12  And according to state laws, they are supposed to be
13  allowed to do that.
14          REPORTER SAMANTHA BOYD:  But Dipippa says the
15  country has put up safeguards to prevent this for years.
16          PROFESSOR DIPIPPA:  So, for example, the voting
17  systems, they're electronic with a paper ballot.  Those are
18  hard to falsify in the first place.  Secondly, when those
19  paper ballots are verified, they're counted in public with
20  observers from both parties and the press.
21          REPORTER SAMANTHA BOYD:  It's an election Dipippa
22  says would need more evidence to prove corruption and
23  protesters say would need more evidence to prove it was
24  trustworthy.
25          THE DEFENDANT:  Whatever it takes.  Whatever it

1  takes.

2          REPORTER SAMANTHA BOYD:  Dipippa says those

3  protesting today do have some ground to stand on because

4  errors occur every election.  But he's convinced even

5  recounts will have little effect on this one.  And the

6  Electoral College will meet December 14th to elect the

7  official president.  Live in studio, Samantha Boyd, KNWA,

8  Northwest Arkansas News.

9          (End of Exhibit No. 12)

10 Q.  (by Mr. Fowlkes)  All right.  Special Agent Willett,

11 do you care to unmute yourself at this time?  So what is

12 your understanding of when and where this video was taken?

13 A.   This video was taken approximately November 14th,

14 2020, in Bentonville.

15         MR. FOWLKES:  And, Your Honor, did the audio play

16 on that video this time for the Court?

17         THE COURT:  Yes, I was able to hear it.  Thank

18 you.

19         MR. FOWLKES:  Your Honor, with the Court's

20 permission, I'd like to go back and try to publish

21 Government's Exhibit No. 6 again with everyone, with their

22 microphone muted, to see if that helps the audio come

23 through on that one a little bit better.

24         THE COURT:  All right.  That's fine.  If

25 everybody will mute their microphones.

1          MR. FOWLKES:  Thank you, Your Honor.  It will

2   take me just a second to pull it up again here.  All right.

3   Your Honor, I'm going to try to publish this video again.

4          (Exhibit No. 6 played as follows:)

5          THE DEFENDANT:  Can you all hear me up there?  I

6   need ya'll to know something.  We took back our house.  And

7   I took Nancy Pelosi's office.  And another thing.  I didn't

8   steal this.  I bled on it and they fucking made me

9   (inaudible) and I still paid a quarter for it.  I put a

10  quarter (inaudible).  I took her stationery and I left her a

11  note.  And that note says, "Nancy, Bigo was here, you

12  bitch."

13          (Repetitive Chanting of "Our House")

14          (End of Exhibit No. 6)

15          MR. FOWLKES:  Your Honor, did that video/audio

16  come through?

17          THE COURT:  Yes, it did.  Thank you.

18          MR. FOWLKES:  Okay.  All right.

19  Q.  (by Mr. Fowlkes)  Special Agent Willett, I would like

20  to go back to the Second Amendment event, the rally that

21  you testified about a few minutes ago.  During the review

22  of the records associated with that Fayetteville Police

23  Department report and their report about what happened at

24  the rally, were you able to determine whether that date of

25  birth was the same date of birth that the defendant

1  provided to you?

2  A.   He didn't provide me a date of birth when we went to

3  interview him, but through the course of the investigation,

4  we determined that Mr. Barnett has possibly been utilizing

5  two separate date of births.

6  Q.   Was the date of birth at the Fayetteville Police

7  Department interaction the same as the date of birth on

8  Mr. Barnett's driver's license?

9  A.   I believe so.

10 Q.   Okay.  What did Mr. Barnett tell you about what you

11 will find if you searched his residence?

12 A.   If I may kind of do a pretty close to verbatim quote

13 from the interview of some key things that Mr. Barnett

14 said.  During the interview of Mr. Barnett, he said, "If

15 ya'll go out there and do a search warrant, you can see all

16 my shit.  You ain't going to find nothing out there."  And

17 then later on, he says, "I assure you, I'm a smart man,

18 there is not anything there."

19 Q.   During the course of the interview, did Mr. Barnett's

20 wife participate in a portion of the interview?

21 A.   Yes, she did.

22 Q.   And how did you view the interaction between

23 Mr. Barnett and his wife during that interview?

24 A.   It appears to be that Mr. Barnett was somewhat

25 controlling of his wife.

1   Q.   And did Mr. Barnett tell you whether or not he had a

2   cell phone with him during his travels to Washington, D.C.,

3   and his return travels to Arkansas?

4   A.   He had made mention about, and the video shown clearly

5   that he had a cell phone that he was either talking on or

6   recording when he was in the Capitol building.  And some of

7   the photos show him having a cell phone in his hand.  He

8   mentioned when he left D.C. that he had turned the location

9   services off on his phone, and, you know, only paid cash

10  for everything and had driven straight back.

11         MR. FOWLKES:  And, Your Honor, may I have just a

12  moment to consult with Ms. Harris before we continue our

13  examination?

14         THE COURT:  Yes, you may.  I'll ask if we can

15  have you and Ms. Harris put into a breakout room.  Would

16  you like Agent Willett put in the room with you?

17         MR. FOWLKES:  We're together, Your Honor.  I just

18  need to mute my screen for just a moment.

19         THE COURT:  Oh, okay.  Go right ahead then.

20         MR. FOWLKES:  Thank you.

21         (pause)

22         THE COURT:  Mr. Fowlkes, are you ready to

23  proceed, or do you need additional time?

24         MR. FOWLKES:  All right.  Yes, we are ready to

25  proceed, Your Honor.  I apologize.  It said the host was

1  not allowing me to unmute myself.  So we just have a few

2  follow-up questions for Special Agent Willett, Your Honor.

3          THE COURT:  Go right ahead.

4  Q.   (by Mr. Fowlkes)  Special Agent Willett, during the

5  interview, you just said that Mr. Barnett and his wife, and

6  you viewed their interactions and you viewed those

7  interactions to be somewhat controlling.  I'd just like you

8  to elaborate on why you believe that.

9          MR. FOWLKES:  Okay.  I don't think it's letting

10  Mr. -- Special Agent Willett unmute himself.

11          THE COURT:  All right.  There we go.

12  Q.   (by Mr. Fowlkes)  There we go.  All right.

13  A.   Yeah, to follow up with that.  It appeared that

14  perhaps Mr. Newburn's (sic) wife, or common-law wife, I'm

15  not sure exactly the entire relationship between him and

16  Tammy Newburn, but she had been receiving some calls or

17  threats which we were concerned about and we were wanting

18  to get some more information while she was in the room.  So

19  we had asked or she had offered to let us go and look at

20  those.  And at that time, Mr. Barnett had taken the phone

21  out of her hands and indicated that he was only going to

22  show what he thought was appropriate and would not let

23  Ms. Newburn go through and interact or show us that stuff

24  directly.

25  Q.   All right.  I want to ask you now, did Mr. Barnett

1  tell you whether or not he traveled with other individuals
2  to Washington, D.C.?
3  A.    Initially on the interview when we asked him that, he
4  said, no, he had not really traveled with anyone and kind
5  of indicated that he had been by himself.  Later on, he
6  kind of indicated that he had been with, met up with
7  several individuals in Washington, D.C., but didn't provide
8  us any further details.
9  Q.    All right.  Did Mr. Barnett tell you anything about
10 excitement and things that he enjoyed?
11 A.    Yeah.  Mr. Barnett kind of indicated that, and kind of
12 a quote from him would be, "I love excitement, that's what
13 got me in trouble," with reference to the events that
14 happened in the U.S. Capitol.
15         MR. FOWLKES:  All right.  Your Honor, can I have
16 just one more moment?  I'm just going to mute myself right
17 here.
18         THE COURT:  Yes, that's fine.
19         (pause)
20         MR. FOWLKES:  All right.  Just a couple more
21 follow-up questions for Special Agent Willett.
22 Q.    (by Mr. Fowlkes)  When Mr. Barnett turned himself in
23 at the Benton County Jail, what items did he have in his
24 possession?
25         MR. FOWLKES:  Okay.  Mr. -- Special Agent Willett

1  is still muted.  I think it says the host -- there we go.

2  Q.   (by Mr. Fowlkes)  All right.

3  A.   Yeah.  The items that Mr. Barnett had on him at the

4  time was a wallet, and he had a hefty amount of money in

5  his wallet, the letter from Speaker Pelosi's office, a

6  medical device, and a coffee cup with him.

7  Q.   No cell phone?

8  A.   He had no cell phone on him.

9        MR. FOWLKES:  And, Your Honor, the government has

10  no additional questions for Special Agent Willett.  I did

11  want to take that brief pause to confirm that we had

12  e-mailed to Mr. Siano the FBI reports, the Fayetteville

13  Police Department reports that he inquired about that

14  refreshed Mr. Willett's recollection.

15        MR. SIANO:  If I might, Your Honor.

16        THE COURT:  Yes.  Go ahead, Mr. Siano.

17        MR. SIANO:  I received two Fayetteville Police

18  reports.  I don't think Mr. Fowlkes meant to describe them

19  as FBI reports.  They appear to be local police reports in

20  Fayetteville.  I did receive two of them and I have had a

21  chance to look them over.  Thank you, Mr. Fowlkes.  And

22  thank you, Ms. Harris.

23        THE COURT:  All right.  So are you ready, then,

24  Mr. Siano, to proceed with your cross examination?

25        MR. SIANO:  Yes, Your Honor.  Thank you.  May I

1   proceed?

2                  THE COURT:  Go right ahead.

3                  MR. SIANO:  Thank you.

4                          CROSS EXAMINATION

5   BY MR. SIANO:

6   Q.   Special Agent Willett, I want to go back and go

7   through these events and try to fill in some dates, times

8   and places.

9   A.   Yes, sir.

10  Q.   Is that all right with you?

11  A.   Yes, sir.

12  Q.   First of all, you testified you have been an agent

13  since January of 2017?

14  A.   Yes, sir.

15  Q.   Did you have any other office assignment other than

16  Fayetteville since the time you became a special agent, or

17  is Fayetteville your first office?

18  A.   Fayetteville is my first office, sir.

19  Q.   Can you tell me your educational background, sir?

20  A.   Yes.  So I've got a undergraduate degree in

21  microbiology and I've got a Ph.D. in microbiology.

22  Q.   And where did you gain those degrees from?

23  A.   So I got an undergraduate degree at Indiana University

24  and I've got my post-doctoral degree in microbiology from

25  the University of Iowa.

1  Q.   Okay.  And the date of your graduation, your diploma,
2  undergraduate?
3  A.   Let's see.  I graduated from there in approximately
4  May or June 2007.
5  Q.   And the post-graduate degree?
6  A.   In approximately December 2012.
7  Q.   Did you have full-time employment after your
8  graduation, undergraduate?
9  A.   I was employed as a graduate assistant, or a graduate
10  researcher full-time, yes.
11  Q.   At Iowa?
12  A.   Yes, sir.
13  Q.   And then I take it did you leave the University of
14  Iowa after you got your graduate degree in December of
15  2012?
16  A.   Yes, sir.
17  Q.   Where did you work between 2012 and when you went into
18  the Academy at Quantico?
19  A.   After I graduated, I worked as a post-doctoral
20  research fellow at the University of Chicago for four
21  years.
22  Q.   That would bring me to about '16.  Any other full-time
23  employment?
24  A.   No, sir.
25  Q.   All right.  Thank you very much.  When were you first

1  assigned the case that led to Mr. Barnett's arrest?

2  A.   The case is not currently assigned to me, sir.

3  Q.   Okay.  Who is it assigned to?

4  A.   Another agent here in the Fayetteville office.

5  Q.   Who might that be?

6  A.   Special Agent Kim Allen.

7  Q.   When is the first time you actually engaged in

8  investigative activity either at your own initiative or at

9  the direction of Special Agent Allen in connection with

10  this matter?

11  A.   On the 6th.

12  Q.   That would be the Wednesday?

13  A.   Yes, sir.

14  Q.   All right.  And can you tell me what that was?

15  A.   Yeah.  On January 6th, I was the relief supervisor for

16  our squad on that day, so I got the initial call that there

17  had been an individual located up here in Northwest

18  Arkansas that was possibly involved in the protest.

19  Q.   And I take it that individual was Mr. Barnett?

20  A.   Yes, sir.

21  Q.   All right.  Now, can you tell me, I want to go through

22  these exhibits.  And the video that's Exhibit No. 1.

23  A.   Yes, sir.

24  Q.   When did you first see that video?

25  A.   I am not sure the exact day that I saw it.  I mean,

1  I've seen it sometime after the 6th, sir.

2  Q.   Okay.  When you say after, you mean the 7th, the 8th

3  or 9th, or at some point at that time?

4  A.   Yes.

5  Q.   Do you know the date/time codes for that video?

6  A.   They are in the title of the video, but I do not know

7  them offhand.

8  Q.   Do you know if that's one continuous piece of video?

9  A.   Each of those snippets?

10 Q.   No.  Each of the exhibits.  I'm not suggesting that

11 all the videos are one continuous.

12 A.   Okay.

13 Q.   But is the video, Exhibit No. 1, which it appears to

14 depict Mr. Barnett entering, is that one continuous video?

15 A.   I did not have that conversation with the U.S. Capitol

16 Police, though I'm assuming so.

17 Q.   Excuse me?

18 A.   I said, though I assume so.

19 Q.   And the second video, the one with what appears to be

20 three different Capitol police officers in and out of the

21 video?

22 A.   Yes, sir.

23 Q.   Do you know the date/time code for that?

24 A.   No.  It is in the title of the video, sir.

25 Q.   All right.  And as far as you know, that's one

1   continuous video?

2   A.   As far as I know.

3   Q.   And in the video, there's a doorway to the left with a

4   little desk, unoccupied desk at the lower corner of the

5   video.  And then there's a hallway to the right, is that

6   correct?

7   A.   I believe you when you say it.  I believe there's

8   actually -- there's a door off to the left and they're

9   actually looking at a hallway.

10  Q.   All right.

11          MR. SIANO:  Mr. Fowlkes, could I ask that the

12  government play its exhibit again so I don't take advantage

13  of Agent Willett in these questions?

14          THE COURT:  Is that Exhibit 2, Mr. Siano?

15          MR. SIANO:  It appears to be Exhibit 2 as best I

16  can -- yes, it's Exhibit 2.  Yes.  Yes, Your Honor.  It's

17  short.

18          MR. FOWLKES:  It will just take me a moment, Your

19  Honor.

20          MR. SIANO:  Take your time.  Excuse me, I'm

21  sorry.

22          MR. FOWLKES:  All right.  I'm ready, Your Honor.

23          THE COURT:  All right.  Go right ahead,

24  Mr. Fowlkes.

25          (Exhibit No. 1 played)

1          MR. FOWLKES:  All right.  And would you like me
2  to play Exhibit 2 as well?
3          MR. SIANO:  Yes.  Yes.
4          MR. FOWLKES:  Okay.  It will take me just a
5  second.  All right.  I'm ready, Your Honor.
6          THE COURT:  Go right ahead.
7          (Exhibit No. 2 played)
8          MR. SIANO:  Thank you, Mr. Fowlkes.
9          MR. FOWLKES:  Yes, sir.
10  Q.  (by Mr. Siano)  Agent, have you had a chance to look
11  at that video again?
12  A.  Yes, sir.
13  Q.  When you testified earlier, I believe, that
14  Mr. Barnett went back into the office.  It's that three or
15  four second period after his first interaction with one
16  Capitol police officer, and then he came out, he went back
17  to the left and then came back out again.  Is that what you
18  were describing?
19  A.  Yes, sir.
20  Q.  All right.  And then he has an interaction with a
21  second Capitol police officer and then proceeds off the top
22  of the video, is that right?
23  A.  Yes, sir.
24  Q.  And that's where the exit was, generally speaking, out
25  the top of the video, is that right?

1  A.   I have no idea in terms of the floor layout of the

2  U.S. Capitol.

3  Q.   Okay.  Did your investigation disclose what the

4  complaint says about the duration of Mr. Barnett's presence

5  inside the Capitol?

6  A.   I have no knowledge of the total duration inside the

7  U.S. Capitol.

8  Q.   How did these two videos come into your possession?

9  A.   We were provided them.  Actually, the U.S. Capitol

10  police provided both these videos.

11  Q.   When?

12  A.   They were provided to a prosecutor out of D.C.  I have

13  no idea what that exact time was.

14  Q.   What day was it?

15  A.   I do not know.

16  Q.   When did you first see them?

17  A.   Like I mentioned previously, I do not remember the

18  specific day that I first saw those videos.

19  Q.   Did you see the videos before you first made contact

20  with anybody in the Barnett household?

21  A.   No.

22  Q.   Okay.  Now, from time to time in this -- in your

23  testimony, you've referred to a letter?

24  A.   Yes, sir.

25  Q.   Has it come to your attention it was actually an empty

1 envelope?

2 A.   I do not know, sir.  It is sealed.  It's a sealed

3 envelope, so there could or there could not be something

4 inside that envelope or --

5             MR. SIANO:  I'd ask the Court to -- again, I know

6 Your Honor has read this, but I believe it's the last two

7 lines of the factual statement of the amended statement of

8 facts which describe this as an empty envelope.

9 Q.   (by Mr. Siano)  When you took possession of the

10 envelope, was there anything in it?

11 A.   Like I said, I do not know.  It's a sealed envelope,

12 sir.

13 Q.   So you didn't open the envelope?

14 A.   I did not.

15 Q.   Thank you, sir.  And when did you first make contact

16 with anybody connected with the Barnett household?

17 A.   Can you repeat your question?  I could not -- you

18 trialed off.

19 Q.   I'm sorry.  I apologize.  I did put my head down.

20 When is the first time, day and time, you made contact with

21 anybody from the Barnett household?

22 A.   The first time I made anyone -- contact with anyone

23 from that household was Friday, December 8th, approximately

24 10:00 a.m.

25 Q.   Okay.  Did you make contact with local police in

1  Bentonville on Thursday?

2  A.   I did not.  Other people of our office were reaching

3  out to a lot of local partners along that time.

4  Q.   So you were aware that the local Benton police were

5  told the FBI was looking for Mr. Barnett on Thursday, isn't

6  that right?

7  A.   Do you mean Benton County Sheriff's Office, sir, or

8  Bentonville Police Department?

9  Q.   Pardon my ignorance in this regard.  Again, the

10 geography is a little new to me.  I'm coming up to speed

11 slowly.

12      But I'm talking about local police.  I mean, your

13 agents reached out to the local police to get their

14 assistance with respect to Mr. Barnett on Thursday, isn't

15 that right?

16 A.   We actually reached out to a lot of agencies, I

17 believe as early as Wednesday, trying to identify the

18 individual in the photo before we knew Mr. Barnett's

19 identity.

20 Q.   Okay.  All right.  Do you have any reason to doubt

21 that the local police on Thursday were looking for

22 Mr. Barnett?

23 A.   They could be.  I have no idea what the local police

24 were doing at that time, sir.

25 Q.   Let's try coming at this another way.

1  A.    Okay.

2  Q.    You were in a local law enforcement premises on Friday

3  morning, isn't that right, 10:00?

4  A.    Yes, sir.

5  Q.    Which one?

6  A.    Benton County Sheriff's Office.

7  Q.    Okay.  Now, was it serendipitous that you were in that

8  police -- Benton County Sheriff's Office at 10:00 a.m. on

9  Friday morning?

10  A.    No, it was not.

11  Q.    Okay.  And you were there because somebody had

12  arranged with Mr. Barnett that he would surrender in the

13  sheriff's office on Friday morning?

14  A.    Yes.

15  Q.    Okay.  Who was that?

16  A.    Who was what?  The person that was --

17  Q.    Well, who made the appointment for you?

18  A.    Yeah.  So a third party had reached out through the

19  Benton County Sheriff, Sheriff Holloway, to coordinate the

20  self-surrender of Mr. Barnett.

21  Q.    And who was that third party?

22  A.    I believe his daughter at one point in time had direct

23  communication with Sheriff Holloway up in Benton County.

24  And there may have been some other individuals too, and

25  kind of like one more step removed.

1  Q.   And that happened on Thursday, isn't that a fact,
2  Special Agent?
3  A.   No, I actually believe it happened on Wednesday night
4  that Mr. Barnett had reached out wanting to -- he had
5  reached out wanting to self-surrender.
6  Q.   Okay.  So Wednesday night, at that point in time,
7  since the last video or photo you have of Mr. Barnett in
8  Washington is sometime in the afternoon, isn't that
9  correct, on Wednesday?
10 A.   I believe so, sir, yes.
11 Q.   All right.  So can we agree that Mr. Barnett was
12 somewhere between the District of Columbia and Western
13 Arkansas when he became aware that he wanted -- that you
14 were looking for him and he wanted to self-surrender?
15 A.   I think Mr. Barnett, my assumption is he assumed that
16 we were looking for him and he had reached out wanting to
17 turn himself in.
18 Q.   What's the basis for your -- what you kindly described
19 as your assumption?
20 A.   We had notified no one that we were trying to go and
21 arrest Mr. Barnett at that time, so if he heard that, that
22 did not come from us.
23 Q.   Nonetheless, he appeared on schedule at that
24 appointment on Friday morning at 10:00?
25 A.   Yes.

1  Q.   And he surrendered?

2  A.   Yes.

3  Q.   Okay.  And at that time, he was in the company of his

4  domestic partner, his common-law wife, Tammy Newburn, isn't

5  that right?

6  A.   Yes.

7  Q.   And have you had occasion in the course of your

8  investigation to see the lobby camera of the Bentonville

9  Sheriff's Office, Special Agent?

10 A.   I know it exists.  I have not watched it fully.

11 Q.   In fact, it depicts my client and his wife walking in

12 together, isn't that right?

13 A.   As I mentioned, I have not --

14 Q.   All right.  Now, at the time you talked to my client

15 in what you describe as an interview, isn't it a fact you

16 told at least Ms. Newburn that you had a search warrant

17 that you wanted to execute at the home, isn't that right?

18 A.   At the time of the interview?

19 Q.   Yes.

20 A.   No.

21 Q.   When did you first make her aware, then?

22 A.   We called her later that day.

23 Q.   You called her?

24 A.   Yes.

25 Q.   On the telephone?

1  A.    Yes.

2  Q.    Where were you?

3  A.    We were in close proximity to her house, a couple

4  miles down the road.

5  Q.    A couple miles down the road.  And you told her you

6  were coming, isn't that right?

7  A.    Yes.

8  Q.    And she was there?

9  A.    Yes.

10 Q.    To let you in the house?

11 A.    Yes.

12 Q.    You executed your search?

13 A.    Yes, sir.

14 Q.    Wasn't there an interaction between you and

15 Ms. Newburn in which you asked to see her phone and she

16 gave it to you?

17 A.    She -- I did not ask her personally.  I talked to her

18 about it.  She gave it to another special agent.  I did not

19 get to see her phone.

20 Q.    Okay.  And which special agent might that be?

21 A.    I believe it is Special Agent Randy Jackson is one of

22 the people that was looking at it.

23 Q.    I see.  So whatever interaction there was between my

24 client and his wife in the Bentonville Sheriff's office,

25 one of your fellow agents nonetheless had Ms. Newburn's

1  phone that same day and went through it, isn't that right?
2  A.   Yes.
3  Q.   Okay.  Now, that's not the only search warrant you
4  executed at the family home, isn't that right?
5  A.   That is correct.
6  Q.   Okay.  So you went in and you took some things and you
7  gave Ms. Newburn an inventory and then you went and applied
8  for another search warrant, isn't that right?
9  A.   I did not apply for the search warrant, but other
10  agents applied for the search warrant, yes, that is
11  correct.
12  Q.   The investigative team that was assigned to
13  Mr. Barnett in Western Arkansas got another search warrant?
14  A.   Yes.
15  Q.   And you went back and Ms. Newburn was there?
16  A.   Yes.
17  Q.   And she let you in the house and you executed a search
18  warrant?
19  A.   Yes.
20  Q.   Now, the pictures, the several images and long video
21  associated with my client's purchase of the walking stick
22  taser, or the walking stick stun gun, this was essentially
23  a purchase from a Bass Pro Shop, isn't that right?
24  A.   Yes.
25  Q.   And it was at the end of December, which is the date

1  depicted on it?

2  A.    That is correct.

3  Q.    And it was, again, a normal commercial purchase, made

4  in plain view, isn't that right?

5  A.    Yes.

6  Q.    And he used his credit card?

7  A.    Credit or debit card, sir.

8  Q.    Non-cash, purchased the items, left.  Isn't that

9  right?

10  A.    That is correct.

11  Q.    Okay.  Now, at any point during your searches was the

12  dog that was in that photo, was it in the Newburn house?

13  A.    Yes, it was.

14  Q.    Was it as friendly to you as it was to the people in

15  the Bass Pro Shop?

16  A.    The dog was, yes, sir.

17  Q.    Thank you.  Now, the photograph of my client with two

18  young people at this rally, did you identify who those

19  people were?

20  A.    No, not at this time.

21  Q.    Did you identify anything outside of the photo?

22  A.    Not at this time.

23  Q.    Not right until now, is that right?

24  A.    We have not as of this time identified the specific

25  photo.

1  Q.   So if I told you that the parent of the child holding

2  the firearm is right outside the frame of that picture, you

3  would have no basis to differ with me about that, would

4  you?

5  A.   I would not.

6  Q.   Okay.  And did you conduct any further investigation

7  of whatever that gathering was?

8  A.   I have not, and I do not believe other members of the

9  investigative team have at this time.

10  Q.   Thank you.  You knew my follow-up question.  Thank

11  you.

12       All right.  Now, I want to go to the events in

13  Fayetteville that involve the two Fayetteville Police

14  Department reports, okay.  Now, was anybody from the FBI

15  called to that event in, what are we in, July of 2002, I

16  mean 2020?

17  A.   If they were, I do not know of it.

18  Q.   Okay.  So when you used this noun "ruckus?"

19  A.   Uh-huh.

20  Q.   You're evaluating the two reports and your

21  conversations with law enforcement, isn't that right?

22  A.   Yes.

23  Q.   Okay.  Is that a term of art in the FBI?

24  A.   You're going to have to explain further.

25  Q.   Well, again, I don't want to say I've never heard that

1  expression before, but I don't think I have ever heard it

2  in connection with FBI testimony.  What is your

3  understanding of what that was?  I mean --

4  A.   So I could use another word, such as "disturbance."

5  Q.   Okay.  And all of this is based on what you told me,

6  the documents and conversations with other law enforcement

7  officials, isn't that right?

8  A.   Yes, sir.

9  Q.   And in that police report, Mr. Barnett is not

10  described as a suspect, is he?

11  A.   No.

12  Q.   And in fact, even the complainant couldn't identify

13  who she was disturbed with, isn't that right?

14  A.   Yes.

15  Q.   Okay.

16  A.   He gave a description that matched Barnett, but --

17  Q.   But the report itself describes another human being

18  similar to Mr. Barnett at that time, isn't that right?

19  A.   I could go and refresh myself or I can take your word

20  for it, whichever you would --

21  Q.   Well, I certainly don't want to take advantage of you.

22  Could you take a look at the report?

23  A.   I'm not familiar with another person.

24  Q.   Okay.  In fact, in that report, the police officers

25  talk to Mr. Barnett and he identified himself, is that

1  right?

2  A.    That is correct.

3  Q.    Is there any indication as to what that -- whether

4  that demonstration was pursuant to a permit or a

5  spontaneous gathering or anything else?

6  A.    I have no idea or knowledge of permitting at this

7  point.

8  Q.    Particularly as to the thing that is in these two

9  police reports, isn't that right?

10 A.    What was your question?

11 Q.    There's no indication, you have no investigative basis

12 to identify either the gathering, whether it was permitted,

13 whose auspices it was under, anything else other than what

14 is in these two police reports?

15 A.    Yes, that's correct.

16 Q.    And where -- the police who actually prepared these

17 reports didn't identify my client as the suspect, isn't

18 that right?

19 A.    That's correct.

20 Q.    All right.  Now, you've described what -- I think you

21 used the word "threats."  And in this instance, would it be

22 fair to say those are threats directed against Mr. Barnett

23 or persons of his household?

24 A.    Yes.

25 Q.    Okay.  And are you also aware that the fact that he

1  has been subject to hate mail and at least one envelope

2  filled with a white powder and postal inspectors are aware

3  of that?

4  A.   I was -- I know the postal inspectors were concerned

5  about items being sent to him.  I was unaware of the

6  specifics of what was being sent to him.

7  Q.   But you're aware that that's ongoing, isn't that

8  right?

9  A.   Yes.

10  Q.   And you're aware that the matter of my client being

11  threatened in various permutations is being investigated by

12  an Assistant United States Attorney in Little Rock,

13  Arkansas, isn't that right?

14  A.   I believe the Assistant U.S. Attorney is located up

15  here in the Western District of Northwest Arkansas, but --

16  Q.   The geography betrays me again, Agent Willett, and I

17  apologize.

18       Now, my client turned himself in.  He had his wallet

19  with him.  He didn't have some of the other things that you

20  were looking for.  It's fair to say from an investigative

21  standpoint, that's disappointing?

22  A.   I don't know if it's disappointing.  It's something

23  we're interested in going and pursuing further.  I wouldn't

24  characterize it as disappointing.

25  Q.   So that's an ongoing aspect of your investigation?

1  A.    I think that would be something that would be -- that
2  we're obligated to look for.
3  Q.    Excuse me?
4  A.    I think that's something that you could say that we're
5  obligated to look for.
6  Q.    That's a yes answer to my question, isn't that right?
7  A.    Yes.
8  Q.    Okay.  No further questions, Special Agent.  Oh, I do
9  have one --
10          MR. SIANO:  Excuse me, I'm sorry.  I apologize to
11  the Court.
12  Q.    (by Mr. Siano)  Special Agent Willett, you and I spoke
13  for less than a minute, was it on -- it was on Saturday,
14  wasn't it?  No, I called you on Saturday.  You called me
15  back on Sunday, isn't that right?
16  A.    I never gave you a call back, but, yes, you reached
17  out to me.  It was either Saturday or Sunday.  It was on
18  the weekend.
19  Q.    And you passed my name and phone number to the office
20  of the United States Attorney in some manner, shape or
21  form, isn't that right?
22  A.    That is correct.
23  Q.    And it was on the weekend?
24  A.    Yes.  Immediately following our conversation, I passed
25  your contact information on.

1   Q.   Thank you very much, Special Agent.

2            MR. SIANO:   I have no further questions.

3            THE COURT:   All right.   Mr. Fowlkes, any

4   redirect?

5            MR. FOWLKES:   Yes, Your Honor.   Just very

6   briefly.

7            THE COURT:   Go right ahead.

8                    REDIRECT EXAMINATION

9   BY MR. FOWLKES:

10  Q.   Special Agent Willett, Mr. Siano asked you some

11  questions about how Mr. Barnett and when Mr. Barnett

12  arrived back in the Western District of Arkansas from

13  Washington, D.C.   I have a couple of follow-up questions

14  for you about that matter.

15  A.   Yes, sir.

16  Q.   What did Mr. Barnett tell you about when he drove back

17  from Washington, D.C.?

18  A.   He said he drove back straight from Washington, D.C.,

19  and it's my understanding through the course of the

20  investigation that he got back sometime on maybe

21  mid-afternoon on the 9th, the day before he turned himself,

22  or the 7th, the day before he turned himself in.

23  Q.   Did Mr. Barnett turn himself in to the Benton County

24  Sheriff's Office immediately upon arriving back in the

25  Western District of Arkansas?

1  A.    No.

2  Q.    What did Mr. Barnett tell you about how he drove back

3  from Washington, D.C.?  Did he give you any details about

4  things that he did during that trip?

5  A.    Yeah.  He indicated that he turned the location

6  services off on his phone.  He paid with only cash and he

7  kept his face covered and drove straight back.

8  Q.    And, again, you've testified just now that Mr. Barnett

9  did not immediately turn himself in.  What again did

10  Mr. Barnett tell you specifically about what you would find

11  during the execution of the search warrant at his

12  residence?

13  A.    Yeah.  I'll read again as close to a verbatim quote as

14  I can get of Mr. Barnett, of what he told us during the

15  interview.  He said, "If you all go out there and do a

16  search warrant, you can see all my shit.  You ain't going

17  to find nothing out there.  I assure you I'm a smart man.

18  There's not anything there."

19  Q.    And he provided that statement to you several hours

20  after he arrived back in the Western District of Arkansas,

21  is that correct?

22  A.    Yes.

23  Q.    Mr. Siano also asked you some more questions about the

24  Second Amendment rally in Fayetteville.  I want to ask you

25  a couple follow-up questions about that as well.

```
 1            Did you conduct more investigation into
 2  Mr. Barnett's travel to that rally?
 3  A.   Yeah.  In reaching out with local law enforcement
 4  agencies, it appears to be on the day that he was heading
 5  down to Fayetteville, he had an interaction with Gravette
 6  P.D.  Speaking with Gravette P.D., it appears that they had
 7  gotten calls up in Gravette about a man parked in a school
 8  zone.  When the police showed up, they encountered
 9  Mr. Barnett.  He had an AR slung on his back and a pistol
10  on his side.
11  Q.   Did those same law enforcement, local law enforcement
12  officers that you reached out to, did they express any
13  concern over Mr. Barnett's release from jail in this
14  matter?
15            MR. SIANO:  Objection.
16            THE WITNESS:  In speaking with some of the local
17  law enforcement --
18            MR. FOWLKES:  Just a minute.  We have an
19  objection.
20            THE COURT:  Just a moment.  Just a moment, Agent
21  Willett.  There is an objection.
22            What is your objection, Mr. Siano?
23            MR. SIANO:  Your Honor, we're now having one law
24  enforcement official testify to his impression of what
25  another law enforcement official was feeling about the
```

1   prospect of Your Honor ruling on bail.

2          THE COURT:  All right.  Your response,

3   Mr. Fowlkes?

4          MR. FOWLKES:  Well, Your Honor, I don't believe

5   it's a question regarding that person's feeling.  It's

6   trying to elicit what that person told Special Agent

7   Willett.

8          THE COURT:  All right.

9          MR. FOWLKES:  As this is a detention hearing, I

10  don't believe the Rules of Evidence apply to this matter.

11         THE COURT:  The normal Rules of Evidence do not

12  apply to this hearing.  And if you will limit the response,

13  Agent Willett, to what you were told by the Gravette Police

14  Department.  Not any impression, but what -- not any

15  impression of your own, but what you were told.

16         MR. FOWLKES:  Thank you, Your Honor.

17         THE WITNESS:  Yes, Your Honor.  So it was not

18  myself.  It was another special agent in our office had

19  reached out.  And the information that was relayed was is

20  that local law enforcement agencies such as Gravette P.D.

21  were concerned.  In one instance, they had someone show up

22  and try to film their police station for an extended period

23  of time before they left.  And there had been -- threats

24  had been received around the area stemming from, or as a

25  result of Mr. Barnett.

```
 1              MR. FOWLKES:  Your Honor, may I have just one
 2    moment?  I'm just going to mute my screen.
 3              THE COURT:  Yes, that's fine.
 4              MR. FOWLKES:  Thank you, Your Honor.
 5              (pause)
 6              MR. FOWLKES:  No further questions at this time,
 7    Your Honor.
 8              THE COURT:  All right.  Mr. Siano, any further
 9    questions?
10              MR. SIANO:  Nothing further for Special Agent
11    Willett.
12              THE COURT:  All right.  Agent Willett, I do have
13    one or two questions for you.
14              THE WITNESS:  Yes, Your Honor.
15              THE COURT:  I believe you said that when you
16    interviewed Mr. Barnett on January 8th, he said that his
17    firearms had been moved from his residence, is that
18    correct?
19              THE WITNESS:  Yes, that's my understanding.
20              THE COURT:  Did he say where they were moved to?
21              THE WITNESS:  He did not tell us.
22              THE COURT:  Okay.  And as far as you know, are
23    all of those firearms, including the firearms that are in
24    the photographs, are they legally possessed by him?
25              THE WITNESS:  As far as I know.
```

```
 1                THE COURT:  Okay.  All right.  That's all of the
 2   Court's questions.
 3                Mr. Fowlkes, any questions as a result of the
 4   Court's questions?
 5                MR. FOWLKES:  No, Your Honor.  Thank you.
 6                THE COURT:  Mr. Siano?
 7                MR. SIANO:  Nothing further, Your Honor.
 8                THE COURT:  All right.  Thank you, Agent Willett.
 9                Does the government have any further witnesses,
10   Mr. Fowlkes?
11                MR. FOWLKES:  No, Your Honor.
12                THE COURT:  All right.  And the Court, I will at
13   this time just advise counsel, I do intend to take notice
14   of all of the information in the initial pretrial services
15   report that was filed on January 12th and the addendum that
16   was filed on January 15th.
17                Is there any objection to the Court taking notice
18   of that information from the government?
19                MR. FOWLKES:  No objection, Your Honor.
20                THE COURT:  Mr. Siano?
21                MR. SIANO:  No objection.
22                THE COURT:  All right.  Mr. Siano, are you ready
23   to proceed with your first witness, or do you need a brief
24   recess?
25                MR. SIANO:  I don't think a brief recess will
```

```
 1   help me, Judge.  I think what I need to do is, whoever is
 2   maintaining the witness electronic holding room, I'm
 3   prepared to call witnesses, but I think I'm going to need
 4   somebody's assistance to, you know, open up their
 5   testimony.  I haven't left the screen so I haven't gone
 6   across to the other participants.  It says here at the
 7   bottom there's 52 participants.  I haven't gone looking for
 8   my witnesses as I might.
 9           THE COURT:  Mr. Siano, they are in a separate
10   breakout room.  They are not participating in the hearing
11   at this time since the Rule was invoked.  Can you tell me,
12   do you know what order you intend to call your witnesses
13   in?
14           MR. SIANO:  I'm going to call Mr. Michael
15   Ratledge first, Judge.
16           THE COURT:  All right.  I will ask our -- I think
17   we've got Mr. Ballentine or Ms. Guerrero that can assist
18   us.  If we can have Mr. Ratledge enter the hearing and
19   unmute him and put his video on.
20           MS. GUERRERO:  Judge?
21           THE COURT:  Yes.
22           MS. GUERRERO:  Mr. Ratledge has left the waiting
23   room a bit ago.  I have followed up with several e-mails
24   and he has not responded to my e-mails.
25           THE COURT:  All right.
```

1          MR. SIANO:  All right.  Let me try another

2    witness.  I will use a break at some point to try to track

3    Mr. Ratledge down, but I don't want to slow the proceedings

4    down.

5          MS. GUERRERO:  And also, Mr. Scroggin also left

6    the waiting room.

7          THE COURT:  Why don't we take a brief recess,

8    Mr. Siano, to let you regroup a minute.  If you want to try

9    to contact Mr. Ratledge and Mr. Scroggin.  Anyone else that

10   is not in the waiting room, Roxana?

11         MS. GUERRERO:  No, ma'am.  Everybody else --

12         MR. SIANO:  Judge, why don't I -- rather than

13   have them have another dose of waiting around, why don't I

14   try to clear the waiting room of the witnesses who are

15   there, then they can go about their business, and then I

16   can take the break and find Mr. Ratledge and Mr. Scroggin.

17         THE COURT:  That's fine.  So who would you like

18   to call, then?

19         MR. SIANO:  Mr. Houpe.

20         THE COURT:  Mr. Houpe.  All right.  So if we can

21   have Mr. Houpe join the hearing.

22         MR. BALLENTINE:  He's coming in.

23         THE COURT:  All right.  Mr. Houpe, can you hear

24   me okay?

25         THE WITNESS:  Yes, ma'am.

```
 1              THE COURT:  Am I pronouncing your name correctly?
 2              THE WITNESS:  No, it's Houpe.
 3              THE COURT:  Houpe, okay.  And if you could adjust
 4   your camera just a little bit, the top of your head is
 5   being cut off.  There you go.
 6              THE WITNESS:  There's no hair up there anyway.
 7              THE COURT:  All right.  Let me ask you,
 8   Mr. Houpe, to raise your right hand at this time and be
 9   sworn.
10              (Witness Sworn)
11              THE COURT:  Go right ahead, Mr. Siano.
12              MR. SIANO:  Thank you, Judge.
13              JEFFREY HOUPE, having been first duly sworn,
14   testified as follows:
15                        DIRECT EXAMINATION
16   BY MR. SIANO:
17   Q.   Mr. Houpe, could you tell me your age and county of
18   residence, please?
19   A.   45.  And Benton County.
20   Q.   Are you aware of the defendant and do you know Richard
21   Barnett?
22              THE COURT:  Let me -- just a moment.  Mr. Houpe,
23   let me back up and ask you to state your full name for the
24   record and to spell your last name.
25              THE WITNESS:  Jeffrey Jack Houpe, H-O-U-P-E.
```

1                THE COURT:  All right.  Thank you.  Go right
2    ahead, Mr. Siano.
3                MR. SIANO:  Thank you, Judge.
4    Q.   (by Mr. Siano)  Do you recognize Mr. Barnett in one of
5    these photos here, one of these images?
6    A.   Yes.
7    Q.   Okay.  And can you tell the Court approximately when
8    you first came to know Richard Barnett?
9    A.   I'm going to say five, six years ago probably.
10   Q.   And have you -- how did you first come to know
11   Mr. Barnett?
12   A.   We were at -- it was a 4th of July get-together at a
13   friend's house, mutual friend's, and that's how I met him.
14   Kids, family, barbecue, all that stuff.
15   Q.   And can you describe the nature of your contact and
16   interactions with Mr. Barnett from that initial meeting
17   about five years ago until recently?
18   A.   I've run into him here and there, same kind of events.
19   Always friendly, you know.  We always hit it off and talk.
20   And, you know, never any issues or anything.
21   Q.   All right.  And have you had occasion to see him at
22   local community events, particularly focused on Gravette
23   Day?
24   A.   Yes.  Yes.
25   Q.   All right.  And have you seen him participating in

1  those events?

2  A.    Yes.

3  Q.    All right.  Have you had an occasion to form an

4  opinion as to his character for honesty?

5  A.    I would say Richard is very honest would be my

6  opinion, yes.

7  Q.    All right.  And have you ever known Mr. Barnett to

8  harm or threaten any person or property during the five

9  years you've known him?

10 A.    No, sir.

11             MR. SIANO:  No further questions, Your Honor.

12             THE COURT:  All right.  Mr. Fowlkes, cross?

13             MR. FOWLKES:  Can I have just a moment, Your

14 Honor?

15             THE COURT:  Yes.

16             (pause)

17             MR. FOWLKES:  I'm ready to proceed, Your Honor.

18             THE COURT:  Go right ahead.

19                      CROSS EXAMINATION

20 BY MR. FOWLKES:

21 Q.    Hey, Mr. Houpe.  My name is Clay Fowlkes.  I'm an

22 Assistant U.S. Attorney here.  I just have a couple quick

23 questions for you.

24 A.    Sure.

25 Q.    You testified that you have known Mr. Barnett for

1  about five or six years, is that correct?

2  A.   Yes.  I met him five or six years ago, yes.

3  Q.   Did you go to Washington, D.C., with him recently?

4  A.   No, sir.

5  Q.   Okay.  So you have no personal knowledge of any of

6  Mr. Barnett's actions last week in Washington, D.C., is

7  that correct?

8  A.   Other than what I have seen on the media, yes.

9  Q.   Have you ever seen Mr. Barnett in possession of

10  firearms?

11  A.   No, sir, I don't believe so.

12  Q.   And so you have no personal knowledge as to how many

13  firearms he has or what kinds he has?

14  A.   I don't, no, sir.

15  Q.   All right.

16          MR. FOWLKES:  No further questions, Your Honor.

17          THE COURT:  All right.  Mr. Siano, any further

18  questions?

19          MR. SIANO:  No, Your Honor.

20          THE COURT:  May this witness be excused, then?

21          MR. SIANO:  Yes, Your Honor.

22          THE COURT:  All right.  Mr. Houpe, you may leave

23  the call at this time.  Thank you.

24          THE WITNESS:  Thank you.

25          MR. SIANO:  Your Honor, the defendant would like

1  to call next Jaklyn Chalk.

2              THE COURT:  All right.  If we can have Ms. Chalk

3  enter the hearing.  All right.  Ms. Chalk, can you hear me

4  okay?

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  All right.  I'm going to ask you to

7  speak up.  And at this time, if you will raise your right

8  hand and be sworn.

9              (Witness Sworn)

10             THE COURT:  Ms. Chalk, if you will state your

11  full name and spell it for the record.

12             THE WITNESS:  Okay.  Jaklyn Chalk.  J-A-K-L-Y-N,

13  C-H-A-L-K.

14             THE COURT:  Thank you.  Go right ahead,

15  Mr. Siano.

16             MR. SIANO:  Thank you.

17             JAKLYN CHALK, having been first duly sworn,

18  testified as follows:

19                        DIRECT EXAMINATION

20  BY MR. SIANO:

21  Q.   Ms. Chalk, how are you?

22  A.   Good.  How are you?

23  Q.   I'm fine.  I'm going to ask you your age and county of

24  residence, please.  Could you tell us?

25  A.   I'm 20 years old, and Washington County.

1  Q.    Thank you.  Are you aware, familiar with the

2  defendant, Richard Barnett?

3  A.    Yes, sir.

4  Q.    Do you see him here in one of the images on the screen

5  today?

6  A.    Yes, sir, I do.

7  Q.    Okay.  Could you tell us just the first four letters

8  up there in the little box where he is situated just so we

9  can confirm that?

10  A.    WCDC.

11  Q.    Thank you.  Can you tell the Court approximately when

12  you first came to know Mr. Barnett?

13  A.    I believe it was approximately the end of 2013, like

14  September or October.

15  Q.    And what was the context of you becoming acquainted

16  with Mr. Barnett?

17  A.    He is my best friend's stepdad.

18  Q.    And would that be Ashlee Newburn?

19  A.    Yes, sir.

20  Q.    Okay.  And at the time you were attending, I believe

21  it was high school with Ms. Newburn, is that right?

22  A.    Well, in 2013, that was middle school.

23  Q.    Wow.  Okay.  Middle school.  And then you attended

24  high school with Ms. Newburn as well?

25  A.    Yes, sir.

1  Q.   And could you tell the Court in what context you had

2  occasion to interact with Richard Barnett during the time

3  that you went to school with his stepdaughter?

4  A.   So we were in a pretty close -- there was about five

5  or six of us that were best friends.  And we spent probably

6  like every other weekend at their house together just for

7  sleepovers and stuff.  And I was also on the cheer team

8  with Ashlee.  And we would have like cheer parties, like

9  little get-togethers at their house pretty often.

10  Q.   And the cheer squad activity, did that lead to

11  attendance at various local sporting events and other such

12  activity?

13  A.   Yes.  I can't really remember a single, like even away

14  game that Richard and Tammy didn't attend.  They were at,

15  like pretty much every game, no matter how far it was.

16  Q.   Okay.  And did -- in these every other weekend, you

17  said you were at the Newburn/Barnett home.  Can you

18  describe the condition of that home for us?

19  A.   It was always super cleanly, and they just kind of

20  made it like a second home to us.  We were all really,

21  really close, especially with Tammy and Richard.  And they,

22  you know, would make meals for us, you know.  Really

23  catered to us.  And we also would have Halloween parties

24  pretty much every October and Richard would always be out

25  there like making bonfires for us, like catering to what we

1  needed, like s'more stuff.  Just pretty much anything that

2  we needed, he would provide for us, so --

3  Q.    An engaged father is what you're saying?

4  A.    Yes, sir, absolutely.

5  Q.    All right.  Do you have an opinion of Mr. Barnett

6  particularly with his character for honesty?

7  A.    I think that he's an honest man and a good man.

8  Q.    Okay.  Have you ever observed Mr. Barnett not to keep

9  his commitments or appointments in any of the activities

10 that you and Ashlee were involved in?

11 A.    No, never.

12 Q.    Okay.  Have you ever known Mr. Barnett to harm or

13 threaten to harm any other person or entity during the time

14 you have known him?

15 A.    No, sir, not at all.

16            MR. SIANO:  No further questions.

17            THE COURT:  Mr. Fowlkes?

18            MR. FOWLKES:  Ms. Harris is going to handle this

19 cross examination, Your Honor.

20            THE COURT:  All right.  Ms. Harris?

21            MR. FOWLKES:  Okay.  She needs to be unmuted,

22 Your Honor.  I apologize.

23            THE COURT:  All right.  If we can -- there we go.

24                        CROSS EXAMINATION

25 BY MS. HARRIS:

```
 1   Q.   Good afternoon, Ms. Chalk.  And so it's your opinion
 2   that Mr. Barnett is a good father, is that correct?  I'm
 3   having trouble hearing you.
 4           THE COURT:  Ms. Chalk, did you hear the question?
 5   Q.   (by Ms. Harris)  I still can't hear you.  Can you hear
 6   me okay?
 7   A.   I can hear you.
 8           MS. HARRIS:  Turn it up so I can hear from you
 9   what she's saying.
10           THE COURT:  All right.  Repeat your question,
11   Ms. Harris.
12           MS. HARRIS:  I asked -- we're trying to deal with
13   some sound issues, Your Honor.
14   Q.   (by Ms. Harris)  Ms. Chalk, it's your opinion that
15   Mr. Barnett is a good father, is that correct?
16   A.   Yes, ma'am.
17           MS. HARRIS:  I'm going to switch computers.
18           THE COURT:  Okay.  That's fine.  All right.  So
19   we need to have -- there we go.  We've got you unmuted now,
20   Ms. Harris.
21           MS. HARRIS:  And can you see me?
22           THE COURT:  Yes, we can.
23   Q.   (by Ms. Harris)  Ms. Chalk, so it's your opinion that
24   Mr. Barnett is a good father, is that correct?
25   A.   Yes, ma'am.
```

1  Q.   And he's been supportive of your best friend, is that
2  correct?
3  A.   Yes, ma'am.
4  Q.   How often do you go to their home now that you're an
5  older person?
6  A.   I want to say like once every couple of months.
7  Q.   When was the last time that you remember that you had
8  direct contact with Mr. Barnett?
9  A.   Ashlee graduated not too long ago and I talked to him
10 and Tammy.  She graduated cosmetology school, so that was
11 about the last time.
12 Q.   Was that in person or was that over the phone, do you
13 remember?
14 A.   That was over the phone.
15 Q.   Do you recall the last time you had direct like
16 face-to-face contact with Mr. Barnett?
17 A.   I'm trying to think of the last time.  Probably like
18 in August, I went over to their house.
19 Q.   So maybe five or six months ago, is that fair to say,
20 you think?
21 A.   Yes, ma'am.
22 Q.   All right.  Does Mr. Barnett have a firing range or a
23 shooting range at his residence?
24 A.   Not that I'm aware of.
25 Q.   Have you ever been to any events at his house?  Other

1  than the cheer ones.  I'm sorry.  Other than the cheer

2  ones.  For instance, like a rally or fundraiser or

3  something of that nature?

4  A.   Never, no.

5  Q.   When did you first learn that Mr. Barnett had gone to

6  the Capitol in January, on January the 6th?

7  A.   The day that everything happened on the news.

8  Q.   So did you see him on the news, is that how you knew?

9  A.   Yes, ma'am.  I saw a picture of him and I sent it to

10  Ashlee and said, you know, "My gosh, this looks like

11  Richard."  And she was like, "It is.  He is in D.C."  And

12  so that was --

13  Q.   And is that the Richard that you knew?  In other

14  words, was that surprising to you that he had forced his

15  way into the Capitol and was apparently posing for

16  photographs in Speaker Pelosi's office?

17        MR. SIANO:  Objection as to the form of the

18  question.

19        THE COURT:  Tell me what exactly the --

20        MR. SIANO:  The word, "forced his way into the

21  Capitol."

22        THE COURT:  All right.  Ms. Harris, if you can

23  rephrase the question.

24  Q.   (by Ms. Harris)  Were you surprised to learn that

25  Mr. Barnett was part of the group of people that breached

1  the secure area of the United States Capitol on January the

2  6th, 2021, and that he had been photographed in Speaker

3  Pelosi's office?

4  A.   I think that Richard is a good man and he's never

5  forced his political opinions ever, so I --

6  Q.   Hang on.  Okay.  So that was surprising to you?

7  A.   Yes, ma'am.

8  Q.   Did you have any discussions with Ashlee about what

9  was going on after you learned that her dad was on the

10 national news?

11 A.   Yes, ma'am, we did have discussions about it.

12 Q.   And what did you tell her?

13 A.   I just told her that I was supportive of her and if

14 she needed anything, she could contact me.  And I was

15 worried about her.

16 Q.   And how was she doing when you talked to her?

17 A.   She was handling it pretty well.  She was -- you know,

18 didn't really need my help for anything, but said that if

19 anything came up, she would let me know, so --

20 Q.   Did she tell you who all was staying at her house the

21 past few days?

22 A.   She did not.

23 Q.   Did you go over there?

24 A.   Yes, ma'am.

25 Q.   When were you last with Ashlee?

```
 1  A.   This morning.
 2  Q.   Were you over there the night, January 6th, that night
 3  after it all happened in Washington?
 4  A.   No, I was not.
 5  Q.   Do you recall if you were there on the 7th?
 6  A.   No, ma'am.
 7  Q.   Do you know any of Mr. Barnett's associates very well?
 8  A.   I don't.
 9            MS. HARRIS:  I'll pass the witness, Your Honor.
10            THE COURT:  All right.  Any further questions,
11  Mr. Siano?
12            MR. SIANO:  No further questions for Ms. Chalk.
13            THE COURT:  All right.  May this witness be
14  excused, then?
15            MR. SIANO:  Yes, Your Honor.
16            THE COURT:  All right.  Thank you, Ms. Chalk.
17  You may be excused and leave the meeting.
18            Your next witness, Mr. Siano?
19            MR. SIANO:  Joseph Martinez.  Is he available?
20            THE COURT:  If we can have Mr. Martinez join the
21  hearing.  Mr. Martinez, can you hear me okay?
22  Mr. Martinez, can you hear me?  I'm not sure that he's
23  hearing.  Mr. Martinez?
24            MR. SIANO:  He seems to be muted.
25            THE COURT:  Is he --
```

1          MR. BALLENTINE:  He's not muted on our end.

2          THE COURT:  He's not muted.  All right.

3          MS. GUERRERO:  He's connected.

4          THE COURT:  It appears he's muted now, looking at

5     the little icon.

6          THE WITNESS:  How's that?

7          THE COURT:  All right.  Can you hear me okay,

8     Mr. Martinez?

9          THE WITNESS:  Yes, ma'am.

10          THE COURT:  All right.  Let me ask you to state

11     your full name for the record.

12          THE WITNESS:  Jose Miguel Martinez.

13          THE COURT:  All right.  And if you will raise

14     your right hand at this time, Mr. Martinez, and be sworn.

15          (Witness Sworn)

16          THE COURT:  All right.  Go right ahead,

17     Mr. Siano.

18          MR. SIANO:  Thank you.

19          JOSE MARTINEZ, having been first duly sworn,

20     testified as follows:

21                    DIRECT EXAMINATION

22     BY MR. SIANO:

23     Q.   Mr. Martinez, good afternoon.  This is Anthony Siano.

24     I'm going to ask you some questions.

25          Can you tell us your age and county of residence,

1 please?

2 A.    51.   Benton County, Arkansas.

3 Q.    Are you familiar with an individual named Richard

4 Barnett?

5 A.    Yes, sir, I am.

6 Q.    And within the limitations of your phone, can you

7 recognize the image of Richard in the hearing here today?

8 A.    I don't see anybody but you, sir.

9 Q.    Okay.

10          MR. SIANO:  Judge, I'd like to proceed.  I don't

11 know whether the government is going to contest

12 identification, but since he's on an iPhone, this is not

13 the most hospitable image under these circumstances.  I

14 don't know whether Mr. Fowlkes or Ms. Harris have an

15 objection on identity of who we are talking about.

16          THE COURT:  Any objection, Mr. Fowlkes or

17 Ms. Harris?

18          MR. FOWLKES:  No objection, Your Honor.

19          THE COURT:  All right.  You may proceed,

20 Mr. Siano.

21 Q.    (by Mr. Siano)  All right, Mr. Martinez.  We're going

22 to continue.

23      Can you tell the Court approximately when you first

24 came to know Richard Barnett?

25 A.    Approximately five, six years ago.

1  Q.   And what were the context and circumstances of you
2  coming to know Mr. Barnett?
3  A.   First time I met Mr. Barnett was at a football game.
4  My son played football and his daughter was a cheerleader.
5  Q.   All right.  And did you -- from that point forward
6  until today, have you from time to time met with him?
7  A.   Yes, on occasion.
8  Q.   Okay.  And what are the general contexts of those
9  interactions, you know, when you met him; he met you?
10 A.   Like I said, you know, football games, some school
11 things that his daughter and my son attended.  His wife, my
12 wife, and some social settings.  We have some neighbors
13 that live close and we have been together at some
14 summertime parties.  Played golf on occasion.
15 Q.   Have you been to his home?
16 A.   I have not been to Richard's home.  I have not.
17 Q.   All right.  Now, do you have an opinion as to
18 Mr. Barnett's character for honesty?
19 A.   As far as I'm concerned, I've never had any issues
20 with Richard, I mean, as far as him being dishonest.  I
21 mean, always been a likable guy.  Always spoke when I seen
22 him.  Nothing negative about Richard.
23 Q.   All right.  And have you ever known Mr. Barnett to
24 harm or threaten to harm, harm or threaten to harm any
25 person or entity?

1  A.    None at all.

2          MR. SIANO:  And I have no further questions of

3  Mr. Martinez.

4          THE COURT:  All right.  Mr. Fowlkes or

5  Ms. Harris?

6          MR. FOWLKES:  I'll be handling this witness, Your

7  Honor.

8          THE COURT:  All right.  Go right ahead.

9                    CROSS EXAMINATION

10 BY MR. FOWLKES:

11 Q.   Good afternoon, Mr. Martinez.  Are you -- were you

12 born in Arkansas?

13 A.   I was, sir.  Yes, sir.

14 Q.   Okay.  I want to ask you some questions about how well

15 you know Mr. Barnett.  It sounds to me like you are casual

16 acquaintances with Mr. Barnett.  How would you classify

17 your friendship with him?

18 A.   I mean, I would say casual.  I know his wife a lot

19 better than I know him.  We went to high school together.

20 Like I say, probably the first time I met Richard was

21 through school functions with our kids.

22 Q.   And you testified that you have never been to his

23 house before?

24 A.   I've never been to his house.  Mainly we met at other

25 peoples' houses and school functions.

1  Q.   And you said you have socialized somewhat outside of
2  school functions as well.  You mentioned that you may have
3  played golf with Mr. Barnett?
4  A.   Yeah.  We have a mutual friend that lives right down
5  the road, kind of between my house and his house that,
6  yeah, we have been over there.  And he's got a golf course
7  at his house and we've played golf and been in the swimming
8  pool and that kind of stuff.  Fourth of July party, I
9  believe.
10 Q.   Have you ever shot guns with Mr. Barnett?
11 A.   I don't believe I have.
12 Q.   Have you ever talked to Mr. Barnett about guns?
13 A.   I'm sure we've talked about guns.  I mean, I've got --
14 I'm a gun owner, and I know he was.
15 Q.   Okay.  Were you aware about his participation in the
16 Second Amendment rally in Fayetteville?
17 A.   I was not.
18 Q.   Okay.  Did you ever see Mr. Barnett ride around on his
19 motorcycle around the Gravette area?
20 A.   Never on a motorcycle, no.
21 Q.   Okay.  Did you ever see him carrying a gun around the
22 Gravette area?
23 A.   No, I never seen him carry a gun.  I know -- I mean,
24 no, I don't -- I never seen him carry a gun.
25 Q.   So you testified just a few minutes ago that you

1  believe he's an honest person, is that accurate?

2  A.    As far as I'm concerned, yes, he's always been honest

3  with me.

4  Q.    Would it surprise you to know that the birthday on his

5  driver's license is not his actual birthday?

6  A.    I have no knowledge of that, but, no.  Yes, it would

7  surprise me.

8  Q.    Have you ever talked to Mr. Barnett about any criminal

9  history that he may have under a different birthday?

10  A.    No, sir.

11  Q.    Were you surprised when you saw Mr. Barnett on the

12  news?

13  A.    I was very surprised.

14  Q.    And that's not the Mr. Barnett that you believe you

15  knew?

16  A.    Not at all.

17  Q.    The one who forced his way into the Capitol with a

18  large crowd?

19             MR. SIANO:  Objection as to form.  Whether it's

20  Ms. Harris or Mr. Fowlkes, it's the same problem, Judge,

21  characterizing as "force his way into the Capitol."

22             THE COURT:  All right.  If you could --

23             MR. FOWLKES:  Your Honor, Mr. Barnett was not --

24  certainly not welcome in the Capitol.  It's well

25  established that the crowd that was there breached the

1  security around the Capitol and were not welcome there.

2  And so "forcing their way in" I believe is an accurate

3  description of that, Your Honor, but I will rephrase the

4  question.

5            THE COURT:  Thank you.

6            MR. FOWLKES:  I apologize.

7  Q.   (by Mr. Fowlkes)  Did it surprise you to see

8  Mr. Barnett in the Capitol in such a way?

9  A.   Yes.

10 Q.   Did it surprise you to see Mr. Barnett on television

11 shouting into a bullhorn?

12 A.   I actually never seen that.  The only thing I seen was

13 the picture.  I never seen any video, but I try not to

14 watch much news.

15 Q.   All right.

16           MR. FOWLKES:  No further questions for this

17 witness, Your Honor.

18           THE COURT:  Any other questions, Mr. Siano?

19           MR. SIANO:  No, Your Honor.

20           THE COURT:  All right.  Thank you, Mr. Martinez.

21 You may be excused.

22           THE WITNESS:  Thank you, Your Honor.

23           MR. SIANO:  Judge, if Mr. Ballentine could give

24 me some guidance as to who else is in the waiting room.

25 I've been on the phone once trying to solicit the return of

1  some people.

2          MR. BALLENTINE:  You have Ashlee Newburn, Tammy

3  Newburn and Marie Halpin.

4          MR. SIANO:  Okay.  All right.  Why don't we try

5  Ms. Halpin first.

6          THE COURT:  All right.  If we can have

7  Ms. Halpin.

8          MR. SIANO:  I think they are all on the same

9  feed, Judge.

10          MR. BALLENTINE:  Yeah, that's what I was going to

11  say.  They are all at the same residence using the same

12  connection, so two of them will have to leave the room.

13          MR. SIANO:  Yeah.

14          THE COURT:  Okay.  All right.  If you can bring

15  them into the hearing, I want to be able to direct

16  Ms. Tammy Newburn and Ashlee Newburn to leave the room

17  while Ms. Halpin testifies.

18          MR. BALLENTINE:  They are coming in right now.

19          THE COURT:  All right.  We're ready to proceed

20  with Ms. Marie Halpin's testimony.  I need to know who is

21  in the room at this point.

22          THE WITNESS:  Just me.

23          THE COURT:  And you're Ms. Halpin?

24          THE WITNESS:  I'm Ms. Halpin, yes.

25          THE COURT:  Okay.  And there was someone that was

1  adjusting the camera for you.  Who was that?

2            THE WITNESS:  That was Ashlee Newburn.  She was

3  fixing the computer for me, yes.  She is out of the room

4  now.  She's locked back there with her mother.

5            THE COURT:  Okay.  So it's just you in the room?

6            THE WITNESS:  And a little dog.

7            THE COURT:  Okay.  And is the door closed,

8  Ms. Halpin?

9            THE WITNESS:  Yes, it is.

10            THE COURT:  Okay.  Thank you.  All right.

11  Ms. Halpin, let me first ask you to state your full name

12  for the record.

13            THE WITNESS:  Marie Halpin.

14            THE COURT:  And how do you spell your last name?

15            THE WITNESS:  H-A-L-P-I-N.

16            THE COURT:  "N?"

17            THE WITNESS:  "N," like in "Nancy."

18            THE COURT:  Okay.  All right.  Ms. Halpin, at

19  this time, if you could please raise your right hand and be

20  sworn.

21            (Witness Sworn)

22            THE COURT:   Go right ahead, Mr. Siano.

23            MARIE HALPIN, having been first duly sworn,

24  testified as follows:

25                     DIRECT EXAMINATION

1  BY MR. SIANO:

2  Q.    Ms. Halpin, how are you this afternoon?

3  A.    I'm fine.   Thank you.

4  Q.    This is Tony Siano.   This is the voice on the other

5  end of the phone.

6        Ms. Halpin, can we agree, you and I, that you're over

7  21 and just tell me what county you live in?

8  A.    Yes, I'm over 21.   And I live in Benton County.

9  Q.    Are you familiar with Richard Barnett?

10  A.    Yes, I am.

11  Q.    And how do you know Mr. Barnett?

12  A.    He's been my daughter's partner for the last 20 years,

13  almost 21 years.

14  Q.    And where is their home in relation to your home?

15  A.    About seven miles from my home.

16  Q.    Okay.   And how long -- so you've known Mr. Barnett

17  continuously for that 20-some-odd years?

18  A.    Yes, I have.

19  Q.    Can you pick out his image here among all of these

20  little postage stamps on the screen?

21  A.    Yes.   He's the one on the far right here.

22             MR. SIANO:   Okay.   Can we agree on

23  identification?   I see Mr. Fowlkes and Ms. Harris nodding,

24  Judge.

25             MR. FOWLKES:   No objection, Your Honor.

1    Q.    (by Mr. Siano)  Ms. Halpin, can you tell the Court the

2    two most, two most significant interactions you've had with

3    Mr. Barnett prior to today?

4    A.    Well, when I was sick with a gallbladder attack, I

5    thought it was a heart attack, he was the one that came,

6    called the ambulance and got me to the hospital.  And then

7    a few years later, I didn't know what was happening to me.

8    I couldn't remember anybody's name or where I was.  And I

9    called and I happened to got my daughter's number.  And he

10   was there with her, and he came down with her, put me in

11   the car and took me up to the hospital.  I got there.  My

12   blood pressure was 185.  So if I would have stayed home

13   much longer, we might not be talking at this time.

14   Q.    And when was the gallbladder attack that might have

15   felt like a cardiac incident, approximately?

16   A.    2005.

17   Q.    And when was the, what I would call symptoms of a

18   stroke?

19   A.    November of 2008.

20   Q.    Thank you.  Have you had occasion over these 20 years

21   to form an opinion as to Mr. Barnett's character for

22   honesty?

23   A.    I think he's a very honest person.  I've never had him

24   lie to me that I know of.

25          MR. SIANO:  No further questions.

```
 1              THE COURT:  All right.  Mr. Fowlkes?

 2              MR. FOWLKES:  I think Ms. Harris is going to

 3   handle this witness.  I apologize, Your Honor.

 4              THE COURT:  Ms. Harris?

 5              MS. HARRIS:  I believe I'm unmuted.  Can you hear

 6   me?

 7              THE COURT:  Yes.

 8                      CROSS EXAMINATION

 9   BY MS. HARRIS:

10   Q.   Ms. Halpin?

11   A.   Yes.

12   Q.   Just a couple of questions for you.  My name is Kim

13   Harris and I'm one of the attorneys with the United States

14   today.

15        When did you first learn that Mr. Barnett had gone to

16   D.C. and participated in the events that happened on

17   January the 6th, 2021?

18   A.   I believe it was on a Monday, maybe.  Tammy told me

19   that he was on his way to Washington, D.C.  And I didn't

20   know about any of the events until I saw them on T.V.

21   Q.   What did you think when you saw what was going on on

22   the T.V.?

23   A.   I couldn't believe it was Richard Barnett.

24   Q.   Do you now believe that it was in fact Richard

25   Barnett?
```

1  A.   Oh, I know it was, but it wasn't his character that I
2  knew and still know.  I don't think he's a violent type
3  person.
4  Q.   Knowing what you know now, does that change that
5  opinion even a little bit?
6  A.   No, I don't think he's that violent.  I don't think he
7  would hurt anybody.  I've never seen him hurt anybody.
8  Q.   Did you know that he was wearing a stun gun on his hip
9  that day?
10 A.   No.  No, I didn't.
11 Q.   Is that surprising to you that he would have been
12 wearing what is considered a dangerous weapon when he went
13 into the Capitol that day?
14 A.   Kind of, yes.
15 Q.   Would that change your opinion of him at all?
16 A.   I've never seen him use a gun, so I don't -- I don't
17 know.
18 Q.   Do you think it's possible that there are two
19 Mr. Barnetts out there; the one that you know and then the
20 other person that he appears to be?
21            MR. SIANO:  Objection as to form.
22            THE WITNESS:  I was going to say, that's a weird
23 question.
24            THE COURT:  Just a moment.  Ms. Harris, I'll just
25 ask if you can rephrase that.

1   MS. HARRIS:  Thank you, Your Honor.

2 Q.   (by Ms. Harris)  Ms. Halpin, do you think it's

3 possible that Mr. Barnett engages in other activities that

4 you are not familiar with?

5 A.   I don't know everything he does because I don't live

6 with him.

7 Q.   About how often do you see him?

8 A.   Whenever I have him at my house or if I go up to his

9 house.  I mean, I've spent weekends at his house and I've

10 never seen any kind of violence or anything.

11 Q.   Prior to his arrest, when was the last time you saw

12 him face to face?

13 A.   Probably -- well, it was the week after Thanksgiving

14 and his niece was here from Nashville.  And we came up and

15 his daughter, Ashlee, he considers her his daughter, she

16 got out of beauty school.  That was when she completed the

17 beauty school.  And we came up for cake and ice cream and

18 everything.  And I was at his house for quite a while that

19 day.  And there was no violence, no anger, no nothing.  I

20 mean, everybody got along.  In fact, my husband and him

21 went outside and walked around and looked at his old

22 vehicles.  No, I didn't see nothing out of the way.

23 Q.   And so that would have been about a month and a half

24 ago, two months ago, was your last face-to-face contact

25 with him?

1  A.   It might have been, yes.  Now, my daughter I see at

2  least once a week.  I don't see him as often.

3  Q.   By any chance did your daughter, Tammy Newburn, bring

4  anything to your house, like firearms or a stun gun?

5  A.   Oh, God no.  No, no.  I have no firearm.  My husband

6  has a little pistol, a 12 gauge, I think it is.  Just a

7  little pocket pistol.  And he don't even use that.  I know

8  where it is, but it's never used.  The last time he used

9  it, he shot a opossum that he caught in a cage, because we

10 have opossums under our trailer.  But no, no.

11 Q.   Thank you, Ms. Halpin.

12          MS. HARRIS:  May I have just a moment, Your

13 Honor?

14          THE COURT:  Yes, that's fine.

15          MS. HARRIS:  I have no additional questions for

16 Ms. Halpin.

17          THE COURT:  All right.  Any further questions,

18 Mr. Siano?

19          MR. SIANO:  No, Your Honor.  No, Your Honor.

20          THE COURT:  All right.  Ms. Halpin, you may be

21 excused, then.  Thank you.

22          THE WITNESS:  Thank you.

23          THE COURT:  I'll ask you, Mr. Siano --

24          MR. SIANO:  Ashlee, Judge, would probably be

25 good.  Why don't we just keep that connection right now and

1  do Ashlee.

2              THE COURT:  All right.  Ms. Halpin, if you can

3  have Ms. Ashlee Newburn enter the room.

4              THE WITNESS:  Okay.  Okay.

5              THE COURT:  Ms. Newburn, can you hear me okay?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  And let me ask you, are

8  you the only one in the room and do you have the door

9  closed?

10              THE WITNESS:  Yes, ma'am.

11              THE COURT:  Okay.  And please state your full

12  name for the record.

13              THE WITNESS:  Ashlee Newburn.

14              THE COURT:  And how do you spell your last name?

15              THE WITNESS:  It's N-E-W-B-U-R-N.

16              THE COURT:  All right.

17              THE WITNESS:  And Ashlee is with two Es.  L-E-E.

18              THE COURT:  Okay.  Thank you.  Let me ask you at

19  this time, Ms. Newburn, if you will raise your right hand

20  and be sworn.

21              (Witness Sworn)

22              THE COURT:  All right.  Before Mr. Siano proceeds

23  with questioning you, Ms. Newburn, I do want to advise you

24  that you must answer all questions truthfully.  And failure

25  to do so can result in you being charged with perjury.  I

1  also want to advise you that anything you say can be used
2  against you.  You do have the right under the Fifth
3  Amendment to not incriminate yourself and you can choose
4  not to answer questions that you think might be
5  incriminating.  I have asked Mr. Bruce Eddy, and I'm not
6  sure if we still have Mr. Schisler in the hearing.
7              MR. SIANO:  I see him, Judge.
8              MR. SCHISLER:  I am here, Your Honor.
9              THE COURT:  Oh, there you are, Mr. Schisler.  All
10 right.  You got moved.  Okay.  They are both, Mr. Schisler
11 and Mr. Eddy, are from our Public Defender's office.  I did
12 ask Mr. Schisler to meet with you and just go over with you
13 your right against self-incrimination.
14             Did you have a chance to visit with him?
15             THE WITNESS:  Yes, I did.
16             THE COURT:  Okay.  And I'm not sure that it's
17 necessary, but I'm going to go ahead and appoint
18 Mr. Schisler for you for today's hearing for the purpose
19 of, if he thinks there's anything in a question or as you
20 start to respond to a question, anything that he feels
21 might be incriminating, again, I don't know that there's
22 any concern for that, but just in case, I'm asking
23 Mr. Schisler to be listening.  And if he feels there is
24 something in which he needs to counsel you about your right
25 against self-incrimination, Mr. Schisler, if you will just

```
 1   stop and alert the Court and we can give you a moment to
 2   confer privately and advise Ms. Newburn, and then Ms.
 3   Newburn can decide whether she wants to answer the question
 4   or not.
 5             MR. SCHISLER:  I will do that, Your Honor.
 6             THE COURT:  All right.  Ms. Newburn, do you
 7   understand that?
 8             THE WITNESS:  Yes.
 9             THE COURT:  All right, then.  All right.
10   Mr. Siano, you may proceed.
11             MR. FOWLKES:  Your Honor, also this is
12   Ms. Harris's witness as well.
13             THE COURT:  All right.  Thank you, Mr. Fowlkes.
14             MR. FOWLKES:  Thank you, Your Honor.
15             ASHLEE NEWBURN, having been first duly sworn,
16   testified as follows:
17                      DIRECT EXAMINATION
18   BY MR. SIANO:
19   Q.   Hi, Ashlee.  How are you?
20   A.   I'm good.  How are you?
21   Q.   Good.  It's good to finally see your face.
22   A.   I know.
23   Q.   Can you tell us your age and the county of residence,
24   please?
25   A.   I am 20 years old and I live in Benton County.
```

1  Q.   All right.  And are you aware of the individual who is

2  the defendant in this case, Richard Barnett?

3  A.   Yes.

4  Q.   Do you see his image on the -- among the postage

5  stamps here on the screen?

6  A.   Let me see.  I can't see all of them.  Let me scroll

7  through.  Yes, I do.

8  Q.   Okay.  Could you tell us the first four little letters

9  in the ID beneath his name?

10  A.   WCDC.

11  Q.   Thank you.  That's all.

12         MR. SIANO:  I'd ask government counsel to

13  acknowledge that she's identified the defendant.

14         MS. HARRIS:  Yes, Your Honor.

15         THE COURT:  All right.  Thank you.  You may

16  proceed, Mr. Siano.

17         MR. SIANO:  Thank you, Judge.

18  Q.   (by Mr. Siano)  Ashlee, can you tell us -- excuse me,

19  that was rude.  Ms. Newburn, can you tell us when is the

20  first time you became familiar with Richard Barnett?

21  A.   Well, I think I was like six months old.

22  Q.   Okay.

23  A.   He's been there my whole life.

24  Q.   And would it be fair to say you consider him a father?

25  A.   Absolutely.

```
 1  Q.    All right.  And does he have a relationship with your
 2  biological mother?
 3  A.    Yes.
 4  Q.    In fact, they're a domestic partnership, to use a
 5  phrase that we use Back East?
 6  A.    Uh-huh.
 7  Q.    Thank you.  All right.  Now, can you tell us -- do you
 8  live in the house with Tammy and Richard?
 9  A.    Yes, I do.
10  Q.    And you've done so for your whole life?
11  A.    Yes.  I moved out going to college, but that was it,
12  and I'm back now.
13  Q.    Okay.  Now, can you describe, in whatever words you
14  wish to use, the nature of your dealings with Richard?
15  A.    I mean, he's always -- like he's -- he's always super
16  supportive of me.  He's always like kind.  He's always -- I
17  mean, if I have any kind of issue at all, he's the
18  number one person I always call.  You know, like he's just
19  always there for me.  He's always just our protector, our
20  everything.
21  Q.    Could I ask you if he had any participation in any of
22  your school activities?
23  A.    Yes, he has.  He was always there for every game and
24  everything, supporting me.
25  Q.    How about specifically with regard to cheer squad
```

1  activities?

2  A.    Yes, always cheer.

3  Q.    Okay.  And over the course of your 20 years, have you

4  had occasion to form an opinion as to Mr. Barnett's

5  character for honesty?

6  A.    Yes, very honest.

7  Q.    Could you tell us that opinion?

8  A.    Yes, he's very honest.  Always honest.

9  Q.    All right.  And have you had occasion to observe

10  whether or not Mr. Barnett keeps his commitments and

11  appointments?

12  A.    Yes, he always keeps his commitments and appointments.

13  Q.    Now, have you ever known him to harm or threaten to

14  harm any other person or entity?

15  A.    No, never.

16              MR. SIANO:  No further questions.

17              THE COURT:  Ms. Harris?

18              MS. HARRIS:  Thank you, Your Honor.

19                         CROSS EXAMINATION

20  BY MS. HARRIS:

21  Q.    Good afternoon, Ms. Newburn.  My name is Kim Harris,

22  and I'm one of the attorneys for the United States.  I just

23  have a few follow-up questions for you this afternoon.

24        When did you learn that the defendant, Mr. Barnett,

25  was heading to Washington, D.C., to be a part of the "Stop

```
 1  the Steal" event?
 2  A.    I believe I was made aware the weekend prior.
 3  Q.    How did you become aware?
 4  A.    We just sat down and talked about it here at the
 5  house.  He just told me he was heading to D.C. because I
 6  hadn't talked to him about it yet.  So he just sat me down
 7  and told me he was heading to D.C. on Monday, I think it
 8  was.
 9  Q.    And do you know what the purpose was for that trip?
10  A.    He -- his main purpose for all of this is to just --
11  he doesn't -- he wants to -- I mean, I don't know how to
12  word -- keep our country -- like he just wanted to support
13  Trump, I think.
14  Q.    Was it your understanding that he was going to the
15  speech and to the Capitol, or what did you think he was
16  doing there?
17  A.    I wasn't quite sure.  In my mind, I just thought there
18  was like a peaceful protest going on, because this is what
19  he told me, that he was just going to a peaceful protest in
20  Washington.
21  Q.    Who did he tell you he was going with?
22  A.    Sorry.  You cut out.
23  Q.    Who did he tell you he was going with to Washington?
24  A.    Mark Hesse and Anthony Lockhart.
25  Q.    Do you know them?
```

1  A.    I do, yes.

2  Q.    And are they friends of your dad, or Mr. Barnett?

3  A.    Yes, they are.

4  Q.    Were they at your house when Mr. Barnett, the

5  defendant, told you he was going to Washington?

6  A.    No, they were not.

7  Q.    Were you aware that he had purchased some walkie

8  talkies and a stun gun and some mace for the trip?

9  A.    No, I was not.

10  Q.    Have you seen those items either around the time

11  before he left or after?

12  A.    I saw the walkie talkies here the other day before --

13  the FBI took them when they did the search, but that's all

14  I saw.

15  Q.    You've never seen the stun gun or the mace?

16  A.    No, ma'am.

17  Q.    Did you have any contact with Mr. -- is it Hesse, or

18  Hesse?

19  A.    Hesse, I believe.

20  Q.    Okay.  Mr. Hesse or Mr. Lockhart prior to the three of

21  them heading to Washington?

22  A.    No, ma'am.

23  Q.    When did you -- and I realize you may not have the

24  exact day and time -- but approximately when did you learn

25  that the defendant, Mr. Barnett --

1  A.    Uh-huh.

2  Q.    -- had made his way into the Capitol and was in

3  Speaker Pelosi's office and had taken something from her?

4  A.    I believe it was Wednesday around -- I got off work

5  around 6:00 is when I saw everything.

6  Q.    And is it fair to say you learned it on the news or

7  you became aware on the news?

8  A.    Yes.

9  Q.    And what went through your mind?

10 A.    Well, I mean, I knew that there was no way.  Like, I

11 don't think he went in there violently or anything.  What

12 came to my mind immediately was just that the wrong story

13 had gotten out and the media was blowing it up everywhere.

14 Q.    Is that what you still believe?

15 A.    Yes.

16 Q.    And are you aware that in those photographs, the

17 defendant, Mr. Barnett, has that stun gun that I've asked

18 you about?  It's on his hip?

19 A.    Uh-huh.  I did see it in the photo, yes.

20 Q.    And so have you wondered why he would be armed with

21 such a weapon?

22 A.    I have no idea.

23 Q.    Do you think that is an altered photo?

24 A.    I'm not sure.  I wouldn't think so.

25 Q.    Once -- let me ask you this.  Have you seen the

1    YouTube videos where the defendant is on a bullhorn yelling

2    at the crowd about what he did in Speaker Pelosi's office?

3    Have you seen any of that --

4    A.    No, ma'am.

5    Q.    -- footage?

6    A.    No.

7    Q.    When did you first speak with the defendant after the

8    incident in Washington?

9    A.    I called him as soon as I got out of work on

10   Wednesday.

11   Q.    Would you say that's around 6:00?  I think that's what

12   --

13   A.    It would have been around 5:30 or 6:00, I believe.

14   Q.    Were you able to get him on the phone?

15   A.    Yes.  We just talked for like a minute.  I just wanted

16   to know if he was safe.

17   Q.    And did you confirm that he was all right?

18   A.    Yes.  And then we didn't -- he got off the phone right

19   away and we didn't talk any further.

20   Q.    When did you talk to him again?

21   A.    Sorry.  You cut out again.

22   Q.    When did you speak with him again?

23   A.    As soon as he got home, I guess it would have been

24   Thursday, I saw him for just a little bit.

25   Q.    Do you know approximately what time he got back to

1  your house?

2  A.    I believe around 3:00.

3  Q.    Was he alone or was he accompanied or with Mr. Hesse

4  and Mr. Lockhart?

5  A.    He was alone.

6  Q.    Did you stick around that afternoon and evening at the

7  house with Mr. Barnett and your mom?

8  A.    Yes, ma'am.

9  Q.    And what happened that night?

10  A.    Well, as soon as he came home, he called -- I had been

11  in contact with the Benton County Sheriff.  And as soon as

12  he came home, he called him off of my phone and called

13  another attorney and everything and then they set up the

14  FBI meeting for 10:00 a.m. the next day.  So we just stayed

15  at home low that night.

16  Q.    And so were you present for the moving of any property

17  out of your residence?

18  A.    No, ma'am.

19  Q.    Would it be surprising to you to know that the

20  defendant told the FBI that when he got home, he moved

21  property out of the residence?

22  A.    No, I don't think so.  No.

23  Q.    How many guns approximately, firearms, does

24  Mr. Barnett own?

25  A.    I am only aware of three or four, I believe.

1  Q.   And are those currently in your house?

2  A.   No, ma'am.

3  Q.   Where are they?

4  A.   I am not sure.

5  Q.   And were you consistently in your house with

6  Mr. Barnett and your mom from 3:00 p.m. until he turned

7  himself in?

8  A.   I left early Thursday morning to go babysit for a

9  friend.

10  Q.   He got back Thursday?

11  A.   I mean, I left early Friday morning.  Sorry, sorry.

12  Before he had left to go turn himself in, I had left early

13  Friday morning.

14  Q.   And it's your testimony you never saw him or your mom

15  move anything out of that house?

16  A.   I did not.

17  Q.   Is it your testimony that you never saw anyone else

18  move any of that property out of your house?

19  A.   I did not see anything.

20  Q.   Have you seen the few firearms that you know him to

21  own in your home since he's been gone in jail?

22  A.   No, they are not here.  I haven't seen them here.

23  Q.   Is your gun still there?

24  A.   No, ma'am.

25  Q.   You have one, right?

1  A.    Yes.   There is one, yeah, but I don't have it in here

2  anymore.

3  Q.    Okay.   Did you see Mr. Barnett give anyone his cell

4  phone when he got back?

5  A.    No, ma'am.

6  Q.    Do you know why he doesn't have his cell phone?

7  A.    I do not.

8  Q.    Did you talk to your mom about that, or Mr. Barnett?

9  A.    No.

10 Q.    Did you try to call him on it and wonder why you

11 couldn't get him on it?

12 A.    Once he got home or -- no, I haven't tried to call him

13 on it.

14 Q.    Who all has been staying at your house since

15 Mr. Barnett has been in jail?

16 A.    We have had Mark Hesse and Anthony Lockhart staying

17 here for a few days.   And then me and my mom just started

18 staying here again.

19 Q.    So those same folks that traveled out to D.C. with

20 him, is that correct?

21 A.    Yes, ma'am.

22 Q.    Have you seen either one of them in possession of

23 Mr. Barnett's phone or the stun gun?

24 A.    No.

25 Q.    Did Mr. Hesse happen to leave a bulletproof vest at

1  your house?

2  A.   I did see it the other day, but it is not here now.

3  Q.   Do you know why he would have had a bulletproof vest

4  at your house?

5  A.   No, ma'am.

6  Q.   How would you say -- how would you characterize who

7  controls your household that you live in?

8  A.   Richard characterizes (sic) the household.

9  Q.   Does your mom, would you say your mom has any control

10 of any day-to-day affairs, or is the household mostly run

11 by Richard?

12 A.   No, I -- I mean, yeah, my mom -- we all kind of

13 just --

14 Q.   Is there someone that you're looking at over there?

15 A.   Oh, no, no, no.  Sorry.  You want me to -- I can move

16 the computer around if you like.  Sorry.

17 Q.   It looked like you were looking off to the side at

18 someone.

19 A.   No.  I can -- no, sorry.

20         MS. HARRIS:  May I have just a moment, Your

21 Honor?

22         THE COURT:  Yes.

23         (pause)

24         MS. HARRIS:  All right.  Just a few more

25 questions and then I will pass the witness.

1  Q.   (by Ms. Harris)  Can you hear me okay?

2  A.   Yes.

3  Q.   If the defendant, Mr. Barnett, were to take some of

4  his prized possessions someplace, who would he give it to?

5  A.   I honestly have no idea who he would give them to.  I

6  believe -- I mean, possibly Mark or Tony who he was with.

7  Q.   Okay.  And let me ask you this.  Why did he need to

8  use your phone to call the sheriff?

9  A.   Because he -- I don't think he had his phone when he

10  got home.

11  Q.   Well, where do you think it is?

12  A.   I have no idea where his phone is.

13             MS. HARRIS:  Pass the witness, Your Honor.

14             THE COURT:  All right.  Mr. Siano, any questions?

15             MR. SIANO:  Thank you, Judge.  All right.  Judge,

16  I'd like for the record, although the cat's already out of

17  the bag, to object to Ms. Harris's characterization of

18  "prized possessions," but since the answer is already

19  given, we'll move on.  I'm prepared to ask some questions.

20             THE COURT:  All right.  Go right ahead.

21                    REDIRECT EXAMINATION

22  BY MR. SIANO:

23  Q.   Ms. Newburn?

24  A.   Yes.

25  Q.   Did Richard Barnett tell you he was discussing going

1    to Washington with other people, or did you actually see

2    him go to Washington with other people?

3    A.    I never saw him go with other people.  I saw him go

4    alone.

5    Q.    Thank you.  Nevertheless, you heard him talk about

6    going with other people?

7    A.    I just saw a picture of him traveling with other --

8    like they had stopped on the side of the road and just

9    taken a picture.  But I know that they were traveling

10   separately.

11   Q.    Thank you.  And in connection with the events after

12   January 6th, have there been either threats or crank phone

13   calls directed toward your home, you and your mother?

14   A.    Yes.

15   Q.    Okay.  And is it in that context that other people

16   have been residing in the house while you relocated

17   temporarily?

18   A.    Yes, that is exactly why.

19   Q.    Thank you very much.

20           MR. SIANO:  No further questions.

21           THE COURT:  All right.  Anything further from the

22   government?

23           MS. HARRIS:  No additional questions for

24   Ms. Ashlee Newburn.

25           THE COURT:  Ms. Newburn, I have a few questions

1  for you.

2              THE WITNESS:  Okay.

3              THE COURT:  Are there any firearms in your home

4  right now?

5              THE WITNESS:  No, ma'am.

6              THE COURT:  And you said you had a firearm, is

7  that correct?

8              THE WITNESS:  Yes.  Yes.

9              THE COURT:  But it's no longer in the home?

10             THE WITNESS:  No, ma'am.

11             THE COURT:  Where is it?

12             THE WITNESS:  I believe Mark Hesse has it.

13             THE COURT:  Did you give it to him?

14             THE WITNESS:  I did not.

15             THE COURT:  Who did?

16             THE WITNESS:  I believe my mom handed them over.

17             THE COURT:  And do you know how far away

18 Mr. Hesse resides from you?

19             THE WITNESS:  I've never been to his house, but I

20 think he just lives a couple minutes away, right down the

21 road.

22             THE COURT:  All right.  And you testified that

23 you and your mother left the home temporarily because there

24 were some threats?

25             THE WITNESS:  Yes.

 1                THE COURT:  Let me ask you, are you concerned if

 2      I release your stepfather on bond about future threats or

 3      your safety at the home?

 4                THE WITNESS:  No, ma'am.  And we have started

 5      staying here again, me and my mom, because the threats have

 6      kind of dissolved a little.

 7                THE COURT:  So you're no longer receiving

 8      threats?

 9                THE WITNESS:  No, ma'am.

10                THE COURT:  Okay.  And if I were to release

11      Mr. Barnett, one of the conditions I might consider is that

12      there be -- that he not be allowed any access to the

13      internet, that all internet capable devices be password

14      protected.

15                THE WITNESS:  Uh-huh.

16                THE COURT:  Is that something you would see any

17      problem with?

18                THE WITNESS:  No, ma'am.  No.

19                THE COURT:  Okay.  So if he asked to use your

20      iPhone to access the internet, you would feel comfortable

21      telling him he could not do that?

22                THE WITNESS:  Absolutely.

23                THE COURT:  All right.  Knowing the dynamic

24      between him and your mother, do you feel like she would be

25      comfortable denying him access?

1               THE WITNESS:  Yes.

2               THE COURT:  Okay.  And is there -- is it just you

3     and your mother that live at the home?

4               THE WITNESS:  Yes.

5               THE COURT:  Okay.  Nobody else comes and stays,

6     is that correct?

7               THE WITNESS:  No.

8               THE COURT:  Okay.  All right.  Mr. Siano, any

9     further questions as a result of the Court's questions?

10              MR. SIANO:  No, Your Honor.  Thank you, Ashlee.

11              THE WITNESS:  Thank you.

12              THE COURT:  Ms. Harris?

13              MS. HARRIS:  No, Your Honor.

14              THE COURT:  All right.  Thank you, Ms. Newburn.

15    You may be excused.

16              Mr. Siano, would you like to call Tammy Newburn

17    next?

18              MR. SIANO:  Judge, I've managed to locate and try

19    to get reconnected to our little universe here Mr. Scroggin

20    and Mr. Ratledge.  I wonder if Mr. Ballentine would be kind

21    enough to tell me if they have been linked back in the

22    witness room.

23              MR. BALLENTINE:  Mr. Scroggin is waiting.

24              THE COURT:  Okay.  Mr. Siano, just while we have,

25    so that we wouldn't have to put Ms. Tammy Newburn back into

1  a waiting room, would you be agreeable to going ahead and
2  calling her as a witness next?
3          MR. SIANO:  Judge, I'm amenable to anything the
4  Court wants, but I'm also -- that's my client's wife.  I
5  don't think it's a burden for her to be in the witness
6  room.  I think these third, non-party citizens, I'm very
7  concerned about them.  And I'd like to get -- Mr. Scroggin
8  will be very quick.  And then Mr. Ratledge, who is not
9  there, you know, I can hold that in abeyance and take my
10 break.  So I'd like to do Scroggin and then go back and do
11 Tammy Newburn.
12         THE COURT:  All right.  That's fine.  So I'm
13 going to ask at this time then, Mr. Ballentine, if you can
14 put the Newburns back into the waiting room.  And then if
15 we can have Mr. Scroggin appear for the hearing.
16         All right.  Looks like he's still connecting.
17 And if we can unmute him.  There we go.  Mr. Scroggin, can
18 you hear me?
19         THE WITNESS:  I can.
20         THE COURT:  All right.  Let me ask you if you
21 will state your full name for the record.
22         THE WITNESS:  William Earl Scroggin.
23         THE COURT:  All right.  Can you spell your last
24 name, please?
25         THE WITNESS:  S-C-R-O-G-G-I-N.

1            THE COURT:  Thank you.  Mr. Scroggin, if you will
2  at this time raise your right hand and be sworn.
3            THE WITNESS:  Okay.
4            (Witness Sworn)
5            THE COURT:  Mr. Siano, go right ahead.
6            WILLIAM SCROGGIN, having been first duly sworn,
7  testified as follows:
8                      DIRECT EXAMINATION
9  BY MR. SIANO:
10 Q.   Mr. Scroggin, thank you for your patience.  Nice to
11 meet you face-to-face for the first time.  I appreciate it.
12 A.   Okay.  Okay.
13 Q.   Mr. Scroggin, could I ask you your age and the county
14 of residence?
15 A.   I am 70 years old.  And I'm in Benton County,
16 Arkansas.
17 Q.   And are you aware of the defendant, Richard Barnett?
18 A.   Yes, I am.
19 Q.   And among these -- in the little photos, can you see
20 Richard in one of the faces?
21 A.   Little photos.  I'm looking for little photos.
22 Q.   The other talking heads.
23 A.   It's just you and me on here.
24            MR. SIANO:  Okay.  Could I ask the government's
25 consent to identity in this circumstance?

1          MR. FOWLKES:  No objection.

2          THE COURT:  All right.

3          MR. SIANO:  Thank you, Mr. Fowlkes.

4  Q.   (by Mr. Siano)  All right.  Mr. Scroggin, would you be

5  kind enough to tell us where your home is in relation to

6  the Newburn/Barnett home?

7  A.   Okay.  I'm about half a mile to the east of them.

8  Q.   All right.  And did you move into your home about five

9  years ago?

10 A.   Yes, I did.

11 Q.   Could you tell us about the incident that led to your

12 meeting Mr. Barnett?

13 A.   We have -- we have some dogs, and I was in the front

14 yard mowing my yard.  And my little dog, my old Pomeranian,

15 was out messing around with me.  And I'm used to, where I

16 lived before was in a real quiet neighborhood, and now I'm

17 out in the country.  And there's a major road out here half

18 a block from me.  And my Pomeranian ran up on the road and

19 disappeared.  And so apparently, he was up there running up

20 and down the road.  And Mr. Barnett was going to work and

21 stopped and picked up my Pomeranian and took him home to

22 his house where he also had a Pomeranian.  And so then he

23 called -- they called me a little bit later and I ran up

24 there, drove up there, and got my Pomeranian.  But

25 Mr. Barnett invited me in the house.  We sat and visited,

1  had a nice visit.  And I was just thankful he didn't --

2  because that's about a 60-mile-an-hour road that cars run

3  up and down and he could have been killed.  My wife would

4  have killed me, so --

5  Q.    And could you describe the home as you observed it at

6  that time?

7  A.    It was a beautiful home up on a hill, just gorgeous.

8  Long, paved, windy driveway up to it out in the country,

9  lots of acreage.  A really pretty area.  A very clean home,

10  and they had a Pomeranian there also.

11  Q.    Based upon the dealings you had with Mr. Barnett, do

12  you have an opinion as to his character for honesty?

13  A.    He just seems like a great guy to me.

14              MR. SIANO:  No further questions.

15              THE COURT:  Mr. Fowlkes or Ms. Harris?

16              MR. FOWLKES:  Yes, Your Honor.  May I proceed,

17  Your Honor?

18              THE COURT:  Go right ahead.

19                      CROSS EXAMINATION

20  BY MR. FOWLKES:

21  Q.    Mr. Scroggin, how many years have you known

22  Mr. Barnett?

23  A.    From five years ago.

24  Q.    Do you ever see Mr. Barnett with firearms?

25  A.    No.

```
 1  Q.   Do you know if Mr. Barnett has a place behind his
 2  house where he can shoot guns?
 3  A.   I don't know that.
 4  Q.   Okay.  You're close enough to be able to hear gunfire.
 5  Do you ever hear gunfire from his house?
 6  A.   I do not hear gunfire from his house.
 7  Q.   Okay.  Have you ever talked to him about firearms?
 8  A.   No.  No.
 9  Q.   He never told you about any assault rifles or any
10  pistols or anything else that he had?
11  A.   Nothing, no.  He didn't have any on display in his
12  home or anything.  I didn't see anything, no.
13  Q.   Okay.  And do you believe that Mr. Barnett is an
14  honest person?  Is that what you testified to?
15  A.   Absolutely.
16  Q.   Would it surprise you to know that the birthday on
17  Mr. Barnett's driver's license is not his actual birthday?
18  A.   Hmm.  I don't know anything about that.
19  Q.   Would it surprise you to know that he has criminal
20  history under a different birthday than the birthday that
21  appears on his driver's license?
22  A.   I know nothing about that.
23  Q.   Did it surprise you when you saw Mr. Barnett at the
24  Capitol in the photographs on television and on the news?
25  A.   Yeah.  That -- yeah, it did.
```

1  Q.   Did it surprise you to know that he had a stun gun
2  when he entered the Capitol on that day?
3  A.   I didn't learn that until about a day ago, so, yeah.
4  Q.   Did you see a video with him shouting into a bullhorn
5  and shouting curse words regarding Speaker Pelosi and
6  bragging that he took a letter from her desk?  Did you see
7  that?
8  A.   No.  All I saw was that picture of him sitting in her
9  desk.
10  Q.   Would it surprise you to know that he had done such a
11  thing?
12  A.   Yes.
13  Q.   That's not the Mr. Barnett that you know, is that
14  correct?
15  A.   Exactly.  Exactly.
16  Q.   Did Mr. Barnett ever talk to you about going to
17  Washington, D.C.?
18  A.   No.  No.
19  Q.   He never told you about his desire to go up there and
20  hear President Trump speak?
21  A.   No.
22  Q.   Did you know he was going to Washington, D.C.?
23  A.   No.
24  Q.   No one else told you that he was going either?
25  A.   Learned it in the news.

1  Q.   Do you know when Mr. Barnett returned from Washington,
2  D.C.; did you see him that day?
3  A.   No.
4  Q.   Did Mr. Barnett ever ask you to hold anything on his
5  behalf or keep anything for him?
6  A.   No.
7  Q.   Would you do that if he asked you to?
8  A.   I don't think so.  Not right now.  I wouldn't hold
9  anything for anybody.
10 Q.   Have you ever talked to Mr. Barnett on his cell phone?
11 A.   No.
12 Q.   You don't know his cell phone number?
13 A.   I do not.
14 Q.   All right.
15         MR. FOWLKES:  Your Honor, may I have just a
16 moment?
17         THE COURT:  Yes.
18         MR. FOWLKES:  Thank you, Your Honor.
19         (pause)
20         MR. FOWLKES:  No further questions for this
21 witness, Your Honor.
22         THE COURT:  All right.  Mr. Siano, any further
23 questions?
24         MR. SIANO:  Nothing further, Your Honor.
25         THE COURT:  All right.  Mr. Scroggin, you may be

1    excused, then.  Thank you.

2              THE WITNESS:  All right.

3              MR. SIANO:  I would like to ask Mr. Ballentine if

4    Mr. Ratledge has reappeared.

5              MR. BALLENTINE:  No, I do not have Ratledge.

6              MR. SIANO:  Okay.  Then, Judge, in the interest

7    of efficiency, I'd like to call Tammy Newburn, and then

8    take a break.  Since I can represent to the Court, after I

9    learned he had left the waiting room, I reached out to him

10   and he told me he was on the road and he was trying to find

11   a place he could get off the highway and then dial back in.

12   So that's a work in progress.  But I don't want to take up

13   a lot of, or create a lot of dead time.  So since we have

14   outside counsel here for her, let's get her on the witness

15   stand, get her testimony.  There we go.

16             THE COURT:  Ms. Newburn?

17             MR. FOWLKES:  Your Honor, this is Ms. Harris's

18   witness also.

19             THE COURT:  All right.  Thank you.  Ms. Newburn,

20   can you hear me okay?

21             THE WITNESS:  Yes, I can hear you.  I can't see.

22   It just says Zoom.

23             THE DEFENDANT:  I'm sorry, Your Honor.  I'm

24   sorry, Your Honor.  Can you hear me?

25             THE COURT:  Yes, I can hear you.

1          THE DEFENDANT:  This is Mr. Barnett.  They are

2    having trouble with my battery charger and my batteries are

3    fixing to die, and I'm going to miss everything.  The

4    officer is trying to get the thing to charge, but it won't

5    charge.  They are going to try to swap me out with another

6    one.  Can we have a few minutes?

7          THE COURT:  Yes, that's fine.  Let's go ahead and

8    take a 10-minute recess.  If the officer can either get a

9    charger or get you another laptop, Mr. Barnett.

10          THE DEFENDANT:  Thank you, Your Honor.

11          THE COURT:  It's about 3:40 now.  We will go back

12    in session -- I'm sorry, it's 3:30 now.  We will go back in

13    session at 3:40.  We'll be in recess.

14          MR. SIANO:  Thank you, Your Honor.

15          (recess taken at 3:30 p.m.)

16          MS. GUERRERO:  The Honorable Judge Erin L.

17    Wiedemann presiding is now in session.

18          THE COURT:  All right.  Mr. Barnett, did they get

19    you a new laptop?  Okay.

20          MR. SIANO:  Answer again, Richard, please.

21          THE DEFENDANT:  Yeah, we're good.

22          THE COURT:  All right.  And -- all right.  If we

23    can have Ms. Tammy Newburn join the hearing.

24          MR. SIANO:  Thank you, Judge.

25          MR. FOWLKES:  And, Your Honor, this is

```
 1  Ms. Harris's witness.

 2              THE COURT:  All right.  Thank you.

 3              MR. FOWLKES:  Thank you, Your Honor.

 4              THE COURT:  All right.  Ms. Newburn, can you hear

 5  me?

 6              THE WITNESS:  Yes.

 7              THE COURT:  All right.  And can you see everyone

 8  or --

 9              THE WITNESS:  I actually just see you, and then I

10  see me up here.  I'm not real computer --

11              THE COURT:  All right.  Well, as long as --

12  Mr. Siano and Ms. Harris, the government's attorney, will

13  be asking you questions, so as long as you can hear them.

14              THE WITNESS:  Okay.

15              THE COURT:  Let us know if you cannot.  Can you

16  state your full name for the record, Ms. Newburn?

17              THE WITNESS:  Tammy Lynn Newburn.

18              THE COURT:  All right.  Ms. Newburn, I do want to

19  advise you that you must answer all questions truthfully.

20  Failure to do so can result in you being charged with

21  perjury.  Anything you do say can be used against you.  You

22  do have the right to not incriminate yourself and you can

23  choose not to answer questions that you feel might be

24  incriminating.

25              I am going to appoint Mr. Jack Schisler, one of
```

1  our Federal Public Defenders for you for the purposes of

2  testifying today.  Did you have a chance to visit with

3  Mr. Schisler about your right to not incriminate yourself?

4           THE WITNESS:  Yes.

5           THE COURT:  And I'm going to ask Mr. Schisler

6  that if he feels that a question is being asked of you or

7  that you're starting to testify to something that might be

8  incriminating, that he alert the Court.  And at that time,

9  if you would like to be put in a breakout room and speak

10 privately with Mr. Schisler and get his advice and then

11 decide from there whether you would like to answer the

12 question, I'll give you that opportunity, okay?

13          THE WITNESS:  Okay.  Thank you.

14          THE COURT:  So you do understand your Fifth

15 Amendment rights, is that correct?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  All right, Ms. Newburn.

18 Then if you will raise your right hand at this time and be

19 sworn.

20          (Witness Sworn)

21          THE COURT:  Thank you.  Go right ahead,

22 Mr. Siano.

23          MR. SIANO:  Thank you, Your Honor.

24          TAMMY NEWBURN, having been first duly sworn,

25 testified as follows:

```
1                    DIRECT EXAMINATION
2   BY MR. SIANO:
3   Q.    Hi, Tammy.
4   A.    Hi.
5   Q.    Can you tell us you're over 21 and what county you
6   live in, please?
7   A.    I am over 21.  I live in Benton County.
8   Q.    All right.  And are you familiar with the defendant,
9   Richard Barnett?
10  A.    Yes, I am.
11  Q.    Can you see his image among the many images here?
12  A.    I can't.  I only -- I only see me.  Is there --
13  there's a little blue arrow.  Should I hit that?  Will that
14  bring them all up?  I don't know.  I'm not into computers.
15              MR. SIANO:  All right.  I take it the government
16  will not object to identification is this.  Mr. Fowlkes is
17  shaking his head no.  Ms. Harris is saying no.
18  Q.    (by Mr. Siano)  So for our purposes, we won't make you
19  scroll through all the postage stamps, all right?
20  A.    Okay.
21  Q.    How long have you known Richard?
22  A.    I have known him 20 plus -- 20 years, almost 21.
23  Q.    Can you describe for the Court the nature of your
24  relationship with Richard Barnett over the last 20 years?
25  A.    We've been partners for the last 20 years.
```

1  Q.    And when you first became domestic partners --

2  A.    Uh-huh.

3  Q.    -- did you have biological children?

4  A.    No.  My children are from my previous marriage.

5  Q.    How old were they at the time that you and Richard

6  came together as a unit?

7  A.    Jessy was -- had just turned five and Ashlee was about

8  three months old.

9  Q.    Okay.

10  A.    Yeah.

11  Q.    Can you describe for the Court the role Richard

12  Barnett has played in the parenting of your daughters

13  since -- in the last 20 years, please.

14  A.    He's been just like a father to them.  Everything that

15  a father would do, that's what he's been.

16  Q.    And to your observation, can you describe whether or

17  not he was actively engaged in their lives and activities?

18  A.    Oh, yes.  Yes, in everything.  Every school function

19  they had, you know, that parents go to, he would -- he

20  would go.  We had kids at our house, you know, sleepovers

21  and cheer parties.  And everything that a dad does, he

22  does, you know.

23  Q.    All right.  Now, before I get into the events of the

24  last couple of weeks, do you have an opinion as to

25  Mr. Barnett's character for honesty?

1   A.   Oh, he's very honest, yeah.

2   Q.   All right.

3   A.   Yeah.

4   Q.   And have you observed whether or not Mr. Barnett

5   honors his appointments and commitments when he makes such?

6   A.   Yes.  Yes.  We all do, uh-huh.

7   Q.   What is your opinion of Mr. Barnett's keeping his word

8   and showing up where he says he's going to show up?

9   A.   I have no doubt.  I have no doubts whatsoever that he

10  will do what he says and he will be where he's supposed to

11  be.

12  Q.   All right.  And have you ever known Mr. Barnett to

13  threaten harm to any person or entity or to actually harm

14  any person or entity?

15  A.   No, not at all.

16  Q.   Not at all that you don't know.  Not at all that it's

17  never happened; it's never happened?

18  A.   It's never happened, no.

19  Q.   And I'm going to ask you some questions about the last

20  week.

21  A.   Okay.

22  Q.   But before I do, did you have occasion to talk to a

23  pretrial services officer?

24  A.   Yes.

25  Q.   She asked you questions?

1  A.    Yes.

2  Q.    And she gave answers?

3  A.    Yes.

4  Q.    And you did that without me as part of the

5  conversation, didn't you?

6  A.    Yes.

7  Q.    Okay.  Now, when did you first become aware that

8  Richard had any intention to go to the rally in Washington,

9  D.C., that was going to be held on January 6th?

10  A.    Probably -- probably sometime the weekend before.

11  Q.    Okay.

12  A.    Yeah.

13  Q.    And you became aware that he was going to go?

14  A.    Yes.

15  Q.    All right.  When did he leave?

16  A.    He left Monday, mid-morning sometime.

17  Q.    Did you see him leave?

18  A.    Yes.

19  Q.    Did he leave alone or with an entourage?

20  A.    He was by himself, yes.

21  Q.    Did you talk to him before he returned to the family

22  home later in the week?

23  A.    I talked to him occasionally on his way down to D.C.

24  He let me know he made it to D.C. okay.  And then after

25  everything that happened, he called me from someone else's

1  cell phone -- his was dead, he said -- and let me know that

2  he was okay.

3  Q.    Okay.  When did he return into the house?

4  A.    Let me see.  It was Thursday.  It was Thursday

5  afternoon sometime that he got home, probably around, I'm

6  going to say around the 3:00 hour in there; 3:00, 3:30.

7  Q.    From the middle of the day on Wednesday until

8  Mr. Barnett returned, did you have occasion to talk to

9  anybody connected to law enforcement?

10 A.    Yeah.

11 Q.    So Wednesday, Thursday.  Go right ahead.

12 A.    Yeah.  Well, Wednesday night before he returned when

13 everything kind of was blowing -- because it blew up so

14 quickly, we talked to a Mr. Holloway that's the Benton

15 County Sheriff.

16 Q.    What did Mr. Holloway say to you and what did you say

17 to him?

18 A.    Well, we were -- we were talking, I believe it was on

19 Ashlee's phone, like speakerphone.  He just said to be sure

20 to have Richard call him the minute that he got into town,

21 that he landed, and they would arrange a meeting, you know,

22 to see each other.

23 Q.    Okay.  When, if ever, did you pass that Holloway

24 conversation along to Richard?

25 A.    I think when he returned.  The minute he returned and

1  showed up.

2  Q.    Yes.

3  A.    Ashlee, me and Ashlee, you know, we met him.  And he

4  said -- we said, you've got to call Sheriff Holloway right

5  away.  Ashlee had the number and everything still on her

6  phone.  He took her phone and called him immediately when

7  we said.

8  Q.    Okay.  And did you hear Mr. Barnett's part of the

9  conversation, or did you hear both parts of the

10  conversation?

11  A.    I think I just heard Mr. Barnett's.  They -- he talked

12  about coming in right away.  And Mr. Holloway said, well,

13  let's just make an appointment for 10:00 in the morning for

14  you to come in, turn yourself in.  And so we made that

15  arrangement.  We went straight home, stayed straight home,

16  and stayed in the house until it was time for us to go the

17  next morning.

18  Q.    Okay.  And what happened the following morning?

19  A.    The following morning, we just kind of got up.  You

20  know, he got showered and ready to go and we headed that

21  way.

22  Q.    He went to the --

23  A.    I'm sorry.  We went to the sheriff's department and he

24  went in and talked to -- they took him in, of course, and I

25  sat out in the lobby.  They took him in.  They had two FBI

1  agents that wanted to speak with him.  So he went in and
2  spoke with them.  They come out at one point.  Well, a
3  sheriff come out at one point and asked me to come in for a
4  minute.  I went in and the FBI agents just talked to me
5  briefly about what was going to happen, that they were
6  going to transport him to Washington County.  They wanted
7  to talk about all the stuff that was already popping up on
8  the internet, all the harassment and threats and our
9  address being everywhere.  They were concerned for our
10 safety.  So they thought maybe it would be a good idea to
11 just find a safer -- a safe place to stay that wasn't in
12 our actual home.
13 Q.   So in other words, FBI agents emit some concern --
14 A.   Uh-huh.
15 Q.   -- about the harassment you had been enduring and
16 suggested --
17 A.   Yes.
18 Q.   -- you might want to leave the house?
19 A.   Yes.
20 Q.   At that time, this is a conversation happening at the
21 sheriff's office?
22 A.   Yeah.  Yeah.
23 Q.   Did they tell you before you left the sheriff's office
24 that they wanted to come by, the FBI wanted to come by and
25 search your house?

1  A.   Yes.  The agent, Jonathan, said that he -- and he took

2  my phone number and gave me his -- that they were going to

3  issue a -- I don't know if he told me then or if he called

4  me right afterwards and said they were going to issue a

5  search warrant and he would be calling me and letting me

6  know what that process was when they got the warrant.

7  Q.   And did they -- did there come a point in time where

8  some FBI agents came by on Friday?

9  A.   Yeah.  Yeah, they called -- he called me later in the

10  evening.  They all came up to the house and had a search

11  warrant and searched the house.

12  Q.   And they searched the house, isn't that right?

13  A.   Yes, uh-huh.

14  Q.   In fact, didn't you tell me that it was only two

15  agents at the sheriff's office, but it was a lot of agents

16  that came to your house on Friday?

17  A.   Yes.  Yes.  It was overwhelming actually, yes.

18  Q.   All right.  Now, at any point, did you speak to the

19  FBI agents?  Did you give an interview?

20  A.   Yeah.  The one agent, Reed, sat in my car with me

21  during the whole search, you know.  He stayed out in the

22  car with me while they searched the house.  And then at one

23  time, the other agent, Kim Allen, got in the car and talked

24  to me also about the harassment and the threats that were

25  going on.

1  Q.   All right.  And did you feel free at that time to

2  answer them or not answer them as you saw fit?

3  A.   Yeah.  It was kind of a casual conversation.  I didn't

4  really feel like -- I didn't really feel like I was being

5  totally questioned or anything.  And I -- I didn't have

6  anything not to answer about, you know.  I didn't have

7  anything to keep.

8  Q.   In fact, they asked you about your cell phone, didn't

9  they?

10  A.   Yeah.  Yeah, they did.

11  Q.   And you gave them your cell phone, isn't that right?

12  A.   Yeah.  They said that it was on the warrant and I was

13  like, oh.  And they said, we don't want to -- we know that

14  that's your only, like that's the only cell phone I have.

15  I don't have a home phone.  And they said, can we look at

16  your phone?  Can we look at your text thread between you

17  and Richard?  And I said yes.  And at that point, we went

18  into the house.  I pulled up my phone and showed them the

19  text thread.  I think they took it.  I don't know if they

20  took pictures or copied it or what they did, but I think

21  they got some, you know, off the phone.

22  Q.   And was there a second visit from the FBI?

23  A.   Yes.  Yes, there was a second visit.

24  Q.   When was that?

25  A.   Let me try to think about what day that was.  Tuesday.

1   Was it Tuesday evening, I believe.

2   Q.    That would be this week.   That would be this week?

3   A.    Yes.   Yes.   Of this week, yes.

4   Q.    All right.   And what happened?   Did they come back

5   with another warrant?

6   A.    They came back with another warrant, yes.

7   Q.    What did they do?

8   A.    They -- they were looking for some things that they

9   said they had seen in some of the photographs they had

10  taken, some packaging and some walkie talkies.

11  Q.    They conducted a search?

12  A.    Yes.

13  Q.    Did they give you an inventory?

14  A.    Yes.   It had the packaging from the stun gun thing,

15  the walkie talkies.   And they found some kind of decal on

16  his -- I don't know what that was.   And I'm not exactly --

17  some other piece of paper thing that they took.   I don't

18  know what it was, so --

19  Q.    Okay.   And at any point did the defendant, did Richard

20  Barnett give you instructions as to what to say to the FBI

21  and to the sheriff's office?

22  A.    No, not at all.   And the second -- the second search,

23  he had no idea that it was even happening, I don't think.

24  I didn't until they showed up, you know, until they called

25  and said they were going to be there in 10 minutes.

1  Q.   Well, why do you think that Richard Barnett knew about

2  the first search?

3  A.   Oh, because I think that they called me while he was

4  in the car taking him to Washington County, so I think he

5  knew that we had it.  And I -- that we were going to have

6  one.

7  Q.   This was a telephone conversation?

8  A.   Uh-huh.  Yes.

9  Q.   Nobody handed you a piece of paper or anything?

10  A.   No.

11  Q.   Okay.

12          MR. SIANO:  No further questions.

13          THE COURT:  Ms. Harris?

14          MS. HARRIS:  Yes, Your Honor.  Thank you.

15                     CROSS EXAMINATION

16  BY MS. HARRIS:

17  Q.   Good afternoon, Ms. Newburn.  My name is Kim Harris,

18  and I'm an attorney for the United States and I have a few

19  follow-up questions for you this afternoon.

20  A.   Okay.

21  Q.   Is it my understanding, then, that you learned that

22  the defendant was traveling to D.C. the weekend before he

23  left, is that correct?

24  A.   Yes.

25  Q.   Were you aware that he had purchased the stun gun and

1  the walkie talkies and mace prior to leaving?

2  A.    Yes.

3  Q.    And when did you learn of that?

4  A.    I think it was probably either -- I think maybe it was

5  Sunday before he left.  Saturday or Sunday, uh-huh.

6  Q.    Did you know why he bought those items for his trip?

7  A.    I think it was because I was worried for his safety.

8  I was -- I knew that he obviously wasn't going to take a

9  gun, you know.  That would -- and I was worried that in a

10  crowd like that, that there would be -- that there would be

11  violence.  I was afraid that he would get hurt.

12  Q.    So you asked him to buy the stun gun, then?

13  A.    I didn't ask him to buy anything, no.

14  Q.    You realize he had it on his person when he was in the

15  Capitol building?

16  A.    Well, I actually didn't realize it until the FBI

17  agents came in and told me that on the second search, that

18  it was -- it was in -- they saw it in -- it's been seen on

19  his belt loop in the pictures.  And I had not even paid

20  attention to that, so --

21  Q.    Was it your understanding that he was only going to

22  attend President Trump's speech?

23  A.    I actually did not know what all was going to take

24  place.  I did not -- I mean, I knew that Trump would have a

25  speech.  That was all I really knew that he was going to do

1  is the speech, you know.

2  Q.   Well, why would you be worried about his safety if he

3  was just going --

4           MR. SIANO:  I can't hear the question.

5           THE WITNESS:  You're cutting out.

6           THE COURT:  Hold on just a moment.  Ms. Harris,

7  you're cutting out just a little bit.

8           MS. HARRIS:  I'll try again, Your Honor.  Our

9  connection is showing that it's fine on our end.  Am I

10 still cutting out?

11          THE COURT:  That's better.

12          THE WITNESS:  It's better.

13          THE COURT:  You can ask the question again.

14 Q.   (by Ms. Harris)  Ms. Newburn, why would you have been

15 concerned for his safety if you only thought he was

16 attending a speech by the president?

17 A.   Because I know in large crowds like that, things get

18 out of hand sometimes.  And I worry about -- I mean, we

19 worry about each other.  If we head on a two-hour trip, we

20 worry about each other.

21 Q.   Did you ask him not to go?

22 A.   No, because it's something he believed in.  He

23 believes in President Trump and he's a patriot.  He

24 believes in us having a free country.

25 Q.   And so you were supportive of what he did?

1  A.   I support him.

2  Q.   Are you supportive of what he did once he unlawfully

3  entered the Capitol and then took Speaker Pelosi's

4  property?

5  A.   No.  No.

6           MR. SIANO:  Objection as to form.

7           THE COURT:  I'm sorry.  Mr. Siano, what was the

8  objection?

9           MR. SIANO:  Objection as to form.  I don't have a

10 question about entering the Capitol.  I have a question as

11 to the legal conclusion Ms. Harris posits in her question.

12          THE COURT:  Well, I'm not sure exactly what

13 you're getting at.  Ms. Harris, can you rephrase your

14 question, or if you want to just ask it again and I can

15 rule on it.

16          MS. HARRIS:  Thank you, Your Honor.

17 Q.   (by Ms. Harris)  So, Ms. Newburn, you're supportive of

18 your significant other, the defendant's conduct in

19 Washington, D.C., on January the 6th, 2021, am I correct?

20 A.   I am not supportive of him in the -- Nancy Pelosi's

21 office necessarily.  But I support -- I support him

22 supporting our country, and that's what he thought he was

23 doing.

24 Q.   By unlawfully --

25 A.   I don't support unlawfully -- I don't support anything

1  that's unlawful.

2  Q.   What do you think would have happened if you asked him

3  not to go?

4  A.   I -- I don't know.

5  Q.   Were you aware that back in July of 2020, the

6  Fayetteville Police Department responded to a rally and had

7  contact with Mr. Barnett, the defendant, and he was -- they

8  observed him to be causing a disturbance with other folks

9  at this event?  Were you aware of that?  Did he tell you

10  about that?

11  A.   No.

12  Q.   Is it normal for him to go to these events armed every

13  time?

14          MR. SIANO:  Objection as to form.

15          THE WITNESS:  I -- I don't know.  I don't know if

16  he goes armed.

17          THE COURT:  Just a moment.  Ms. Newburn, if

18  there's an objection, you need to let me rule on it, okay?

19          THE WITNESS:  Oh, I'm sorry.

20          THE COURT:  Mr. Siano --

21          MR. SIANO:  "These events," Judge.

22          THE COURT:  Mr. Siano, when you raise an

23  objection as to form, I need you to clarify for me.

24          MR. SIANO:  Yes, Your Honor.

25          THE COURT:  I don't know what part of the

1  question you are objecting to.

2           MR. SIANO:  The question is vague because it --

3  that's my objection as to form.  What is "these events?"

4  Ms. Harris identified one event in Fayetteville in July of

5  the prior year, last year, and that morphs into "these

6  events."  That's my objection.

7           THE COURT:  All right.  Ms. Harris, if you can

8  elaborate in your question to specify what types of events

9  you're referring to.

10           MS. HARRIS:  Well, I was referring to rallies.

11  That was what the question was about.  And so again, back

12  in July of 2020, I've asked this witness if she was aware

13  that Fayetteville P.D. had contact with the defendant

14  because he was causing a disturbance at an event and he was

15  armed.  And she testified she was -- she was not aware of

16  that.

17           And so then my next question I will ask this

18  witness is, in November of 2020, was she aware that

19  Fayetteville Police had contact with the defendant again at

20  a rally type event and he was armed again, this time with a

21  rifle and a pistol.

22           THE COURT:  All right.  I'll allow that question.

23  You may answer, Ms. Newburn.

24           THE WITNESS:  I don't -- I don't know anything

25  about that particular --

1   Q.   (by Ms. Harris)  Let me just make sure I understand

2   your answer.  You were not aware that back in July of 2020

3   or November of 2020, Fayetteville Police Department had

4   contact with Mr. Barnett at two different rallies or events

5   and he was armed at both?

6   A.   No, I wasn't at those rallies or events.

7   Q.   Did he tell you about it?

8   A.   Not that I recall.

9   Q.   Were you aware that he was on the news after the

10  election and he did an interview about "Stop the Steal?"

11  Were you aware of that?

12  A.   I'm trying to remember.  I think -- I do remember him

13  being on a news, on an interview.

14  Q.   And he said, "Whatever it takes, whatever it takes,"

15  with regard to overturning the election results?

16  A.   I can't recall what his -- what he said.  I can't

17  recall what he said.

18  Q.   Okay.  Am I correct that you don't recall what he

19  said --

20  A.   I can't -- you're cutting out.  You're cutting out,

21  ma,am.

22  Q.   Am I correct that you don't recall what he said and

23  you're not sure if you know about the interview I'm talking

24  about?

25  A.   I'm not sure which one you're talking about, to tell

1  you the truth.  I've seen him on an interview, but he's had

2  a couple different interviews.

3  Q.   What -- can you explain the two date of births?

4  Without testifying to what the date of birth is, but why

5  does he have two dates of births associated with him?

6  A.   I think it was -- it was just a -- like an error at

7  the DMV, and it never got corrected.

8  Q.   Do you know if he tried to correct that?

9  A.   I think he has tried to correct it.  We've talked

10  about how he's tried to correct it.  When he got his

11  license renewed the last time and when he -- they didn't

12  correct it.

13  Q.   Were you present with him?

14  A.   No, I wasn't present when he got it.

15  Q.   Do you have a firing range at your house?

16  A.   Down in the holler, we do have a firing range to

17  practice.

18  Q.   And were you present for a "Save the Children" rally

19  on your property?

20  A.   Yes, I was.

21  Q.   So what all went on at the "Save the Children" rally?

22  A.   It was a photo shoot for -- to obviously earn money

23  for this cause.  That was about it.  We took photo shoots

24  with his old trucks.  We did take photo shoots with guns.

25  Q.   They were his guns, right?

1  A.   They weren't all his guns, no.  They were guns from --
2  other people brought guns also.
3  Q.   Do you know approximately how many firearms
4  Mr. Barnett owns?
5  A.   I don't.  I don't know how many he owns.  I don't -- I
6  have one little gun he gave me for like if I needed
7  protection in the home.  And my daughter has one just like
8  it.  And I know he has a Ruger that he carries.  And I know
9  of maybe a couple of other guns, but I don't know the
10  number of guns that he has because I don't know really
11  anything about guns.
12  Q.   Would you say he has small guns and also really large
13  guns?
14  A.   Well, yeah, there's small ones and then there's larger
15  ones.
16  Q.   Do you know what a silencer is?
17  A.   Yeah.  I don't think we have a silencer.
18  Q.   You specifically mention just the one firearm to the
19  U.S. Probation Office pretrial services officer.  You
20  mentioned the Ruger.  But are you testifying then that your
21  husband owns multiple other firearms?
22  A.   He does have other firearms.  I don't know what they
23  are, what kind they are.  I don't know how many he owns.
24  Q.   Do you know why you just mentioned -- I guess you
25  singled out the Ruger, and then said you don't know how --

A.    Because I knew that he had the Ruger and I knew that
we had our two, me and my daughter had the two .380s
because I knew specifically that we had those two.

Q.    Where are those guns typically kept?  On your property
at your house?

A.    Yeah, we have them at our house.  We don't have them
at our house now.

Q.    When did you move them?

A.    They were moved when all of this started.  And I just
kept my little handgun and my daughter kept hers because of
the threats and the harassment we've had.  We kept those
with us.  After talking to the probation officer yesterday
when she said that all guns would have to be removed if he
came home, that that was -- I've had them taken out also.
I don't --

Q.    Why were the defendant's guns removed before he went
to see Mr. Holloway, or the police?

A.    They weren't.  They weren't moved before then, and I
removed them because I wasn't in my house.  I had to leave
my house because of the threats.  And I didn't want -- I
didn't want people breaking into my house and using our
guns against us.  I didn't -- I just -- I had Mark take
them.

Q.    Mark Hesse?

A.    Mark Hesse has them.

1  Q.   Okay.  Let me just -- there's something I'm not

2  understanding.  Can you help me understand why Mr. Barnett

3  told the FBI he removed everything from his house before he

4  came in to see them?

5  A.   Okay.  Well, he might have done it before.

6           THE COURT:  Ms. Newburn?

7           THE WITNESS:  Yes.

8           THE COURT:  You're interrupting Ms. Harris when

9  she's asking a question.  Let her complete her question so

10 that you all aren't speaking over each other, okay?

11          THE WITNESS:  Okay.  I'm sorry.

12          THE COURT:  That's okay.  Ms. Harris, if you will

13 restate your question, and I want to make sure you've

14 completed your question.

15          MS. HARRIS:  Thank you, Your Honor.

16 Q.   (by Ms. Harris)  Ms. Newburn, help me understand then

17 why Mr. Barnett told the FBI on Friday -- that would have

18 been a week ago today -- that he had cleaned his house out

19 and they wouldn't find anything.  And he also said he had

20 removed his firearms.

21 A.   I know that we had the firearms removed.  That's all I

22 know.  I don't know why he said that.

23 Q.   So now either he's lying or you're not --

24 A.   No, I'm not lying.  The firearms were removed because

25 he was leaving the house.  And I didn't want them in the

1   house.  I did not want -- I mean, we were already getting
2   threats.  I knew I was going to have to go stay someplace
3   else.
4   Q.   Okay.  Let's back up.  We can maybe work through this.
5   A.   Okay.
6   Q.   You testified that Mr. Barnett got home around 3:00 or
7   3:30 on Thursday, okay.  And I'm talking about the Thursday
8   after everything happened in Washington on Wednesday,
9   correct?
10  A.   Yes.
11  Q.   And it's fine if maybe it was 3:15 or 4:00, but
12  approximately sometime in the afternoon, he got home?
13  A.   Yes.
14  Q.   Could you tell the Court what happened when he got
15  home?  What did you all do?
16  A.   Immediately when he got home, we weren't actually at
17  our house.  We were at a safe house because we were scared.
18  As soon as he came to the safe house, our daughter and me
19  told him, you need to call Sheriff Holloway.  We had spoken
20  to him the night before and he wanted Richard to call him
21  immediately.  My daughter gave him her phone.  She had the
22  phone number and the information.  He called Sheriff
23  Holloway.  Sheriff Holloway had given a time at
24  10:00 Friday morning to come into the Benton County
25  Sheriff's Office and turn himself in.  He said that there

1  would be two FBI agents.

2  Q.   Did you spend the night at your house?

3  A.   Yes, we did go home and spend our night -- the night

4  at our house that night.

5  Q.   Who came over that night?

6  A.   I think maybe Mark did.  I know another young friend

7  of Richard's did, Derek.  He just came over to visit for a

8  little bit.  And then that -- that was pretty much it.  We

9  just kind of spent the night together as a family.

10 Q.   What property did Mr. Barnett give Mark or Derek that

11 night?

12 A.   Excuse me?  He didn't give Derek anything.

13 Q.   Would he give --

14        THE COURT:  Ms. Harris, you're going out a little

15 bit.  If you can repeat your question.

16 Q.   (by Ms. Harris)  What property did Mr. Barnett give

17 Mark Hesse that night?

18 A.   I'm trying to remember back.  It's been a really bad

19 week.  I don't know what was given, to tell you the truth.

20 I can't -- I don't know what was given.

21 Q.   Where were you when they were exchanging property?

22 A.   I was here at the home, but I don't even know if I was

23 in the room with them.  I mean --

24 Q.   Where is Mr. Barnett's phone?

25 A.   I don't -- I have no idea where his phone is.

1  Q.    Is it possible that Mark Hesse has it?

2  A.    I don't know.

3  Q.    Do you not think it's weird that your significant

4  other of 20 years, you don't know where his phone is?

5  A.    I don't know where it is.

6  Q.    Did he tell you who he gave it to?

7  A.    No.

8  Q.    Where is the stun gun?

9  A.    I have -- I don't know.

10 Q.    You don't think that's a little weird that you don't

11 know where that is?  Have you seen it since he got back?

12 A.    I have not seen it since he's got back.  I have not

13 seen the stun gun.  I don't -- I do not know where it is.

14 Q.    Have you seen Mr. Barnett's phone since he's gotten

15 back?

16 A.    No.

17 Q.    You sure about that?

18 A.    Yes.

19 Q.    So what do you think he gave Mark Hesse?

20 A.    I believe Mark Hesse just has our guns that we had in

21 our house.  That's all I know that he has.

22 Q.    And so Mark Hesse, he went down there with Mr. Barnett

23 to D.C., correct?

24 A.    He didn't go with.  Him and his nephew drove a

25 separate vehicle and left after Richard did.  They did not

1  go at the same time.

2  Q.   But they met up (inaudible), correct?

3  A.   Yes.

4  Q.   I want to talk to you a little bit now about the

5  interview, and we've kind of talked about it a little bit

6  before.  But you were there on Friday, a week ago, when

7  Mr. Barnett went to the sheriff's office, right?

8  A.   Yes.  Yes.

9  Q.   At one point during the interview, like you said, they

10 called you out from the hallway and you went inside?

11 A.   Yes.

12 Q.   Were you aware that that interview was audio and video

13 recorded?

14 A.   I don't -- I don't know if it was.

15 Q.   Okay.  Well, I'm telling you it was.

16 A.   It was?  Okay.

17 Q.   Keep that in mind as we go through these questions.

18 It was audio and video recorded.

19 A.   Okay.

20 Q.   Do you recall when you were going to show Special

21 Agent Willett the threats that you had received on your

22 phone?  Do you remember that?

23 A.   I don't -- I don't -- I don't recall.  I mean --

24 Q.   Wasn't the purpose of why you went into the interview

25 in the first place to show them the threats on your phone?

1  A.   Well, to tell them about it and I tried to look on

2  mine.  A lot of the threats were on like Facebook and

3  social media, and I don't have Facebook or social media.  I

4  never have.

5  Q.   Okay.  Do you recall during the time when you came

6  into the interview room and you were going to show those

7  agents what was on your phone that Mr. Barnett stopped you

8  and said, no, he would be the one to show those agents what

9  was on your phone.  Do you remember that?

10  A.   No.

11  Q.   You don't remember that?

12  A.   I -- if it happened, it just happened.  If he asked to

13  show -- I don't -- I'm sorry.

14  Q.   And so do you remember your husband actually wanting

15  to take your phone from you and go through it?

16  A.   Well, if he wanted to, then he could have.  I probably

17  gave it to him to do that.  I don't hide anything on my

18  phone.

19  Q.   You didn't think that was weird that he wouldn't just

20  let you show the agents yourself on your phone?

21  A.   No.

22  Q.   Okay.  Do you recall how he interrupted you several

23  times while you were trying to tell about different events

24  that had gone on and he interrupted you and said, "Let me

25  tell the story."  Do you recall that?

1   A.    He could have.  He -- he could have done that.

2   Q.    Is that normal for him?

3   A.    Yeah.  I mean, yeah, sometimes he will be like, well,

4   let me say it, or let me tell or whatever.

5   Q.    He interrupts you?

6   A.    Yeah, sometimes he interrupts me.

7   Q.    Sometimes he controls the situation, the situations

8   that you're in, is that correct?

9   A.    No, I wouldn't say that.  If I have something to say

10  or if I want, then I'll stand up for myself.

11  Q.    But just not that day?

12  A.    No.  I didn't think -- it wasn't something that was

13  that important for me to show.  He could show.

14  Q.    You're being interviewed in an interview with the FBI,

15  right?  And it's threats about, life threats to your family

16  and your family's life on your phone; not Mr. Barnett's?

17  A.    Uh-huh.  Well, I think he was probably just upset

18  about it all.

19  Q.    Upset about what he had done?

20  A.    The threats that other people were sending our way.

21  Q.    Oh.  And so then you've said that sometimes he

22  interrupts you and that's not uncommon in your relationship

23  if I understand you right?

24  A.    I have interrupted him also.

25  Q.    Do you do what he says?

1  A.   Like in what context?

2  Q.   It appears like during that whole interaction, he

3  ordered you around and that you really had no voice of your

4  own during that conversation with the FBI?

5  A.   No, I have a voice.

6  Q.   Do you think if you would have asked him not to go to

7  D.C., that he would have listened to you?

8  A.   He may have, but I knew he wanted to go so I wasn't

9  going to ask him not to go.

10 Q.   Do you really think you have the ability to report to

11 this Court if he violates any condition if the Court were

12 to release him?

13 A.   Yes.  Yes, because this has been horrible for me so

14 I'm not about to not -- I want him home and I'm not about

15 to -- I will report.  I will do whatever I have to do for

16 him to be home and for it to be legal and right.

17 Q.   What happens the next time when he says, "No, Tammy,

18 let me tell it?"

19 A.   I'll say, "No, Richard, I can tell it."

20 Q.   Okay.  So it's your testimony then that you don't know

21 where his cell phone is and you haven't seen it since he

22 got back.  And do you know why?

23 A.   I don't know -- I don't know why.

24 Q.   You think it's because it has evidence of the crime on

25 it?  Why else would someone hide their phone and get rid of

1  it?

2  A.    What crime?

3         MR. SIANO:   Objection, Your Honor.   Argumentive.

4  There's no jury here.   She says she doesn't know.   She

5  answered that question half a dozen times.   I object.

6  Argumentive.

7         THE COURT:   All right.   Ms. Harris, if you can

8  rephrase it in a way that does not appear to be

9  argumentive.

10        MS. HARRIS:   I apologize for my zealous advocacy,

11 Your Honor, this afternoon.   Just my point was, can she

12 think of a reason why Mr. Barnett would just all of a

13 sudden not have his phone.

14        THE WITNESS:   I can't think of a reason.

15 Q.   (by Ms. Harris)  Were you aware that he had turned his

16 location services off on his cell phone as he drove back

17 from Washington, D.C.?

18 A.    No.

19 Q.    When did you learn that he had done that?

20 A.    Just now.

21 Q.    Were you aware that he had covered his face as he

22 drove home from Washington, D.C.?

23 A.    I've been covering my face all week also because I

24 don't want pictures of it.   I wasn't -- I wasn't aware.   I

25 didn't have -- I didn't have contact with him on the way

1 home.

2 Q.   I need for you to say yes or no.

3 A.   Oh.  No.

4         MS. HARRIS:  May I have just a moment to collect

5 my thoughts, Your Honor, to make sure I haven't missed

6 anything?

7         THE COURT:  Yes.

8         (pause)

9 Q.   (by Ms. Harris)  Ms. Newburn, Mr. Barnett wants to

10 make money off his recent fame, is that correct?

11 A.   No.

12 Q.   You're not aware that he wants to get a copyright on

13 his now famous slogan?

14 A.   Oh.  He -- my cousin actually started that.  He didn't

15 start that, so it wasn't his idea.  It wasn't -- he hasn't

16 -- that was my cousin's idea.

17 Q.   Is he going in on that idea now?

18 A.   What?

19 Q.   Has Mr. Barnett joined in on that and does he think

20 that's a great idea?

21 A.   I don't know.

22 Q.   Do you know whether or not Mr. Barnett recorded the

23 events that happened in Washington on his cell phone?

24 A.   There's a video on my cell phone of him going into the

25 building, of what happened and how he was pushed into the

1 building.

2 Q.   How did you get that?

3 A.   He sent it to me.

4 Q.   From what device?

5 A.   I guess it would have been his phone.

6 Q.   And when did he send that to you?

7 A.   He sent that to me right after it all happened.

8 Q.   Would that be on January the 6th, January --

9 A.   The day that it all happened, just --

10 Q.   Is it still on your phone?

11 A.   Yes.  I've showed it to the FBI agents.

12 Q.   Are there any other videos that Mr. Barnett sent you

13 on your phone?

14 A.   Yes.  He sent me a video of -- there was a small

15 child, a toddler that was kind of playing in the grass.

16 And Richard sent me a video of that because the little boy

17 was interacting with Richard somewhat.

18 Q.   Did you see any of the events on his phone?

19 A.   No.

20 Q.   Did he tell you he had other videos on his phone?

21 A.   Those are the only two videos I'm aware of, the ones

22 that he sent to my phone before he ever got home.  I never

23 saw his phone to see any videos on it.

24 Q.   Does the defendant, Mr. Barnett, leave his house armed

25 regularly?

1   A.    Yes, he wears his gun.  It's his Second Amendment
2   right.
3   Q.    That's not my question.  Like the pistol or the rifle,
4   or both?
5   A.    The pistol.
6   Q.    Who hid his clothing that he was wearing at the
7   Capitol?  The jacket, who hid that?
8   A.    Hid it?  The FBI agents have it.
9   Q.    Right.  But it was recovered from under a dog crate in
10  the back of a vehicle.
11  A.    It was in the -- it was in my trunk.  I did not know
12  that he -- that it was on the search warrant.  And when
13  they asked about it, I said, it's in my trunk.
14  Q.    So then did you put it in your trunk under the dog
15  crate?
16  A.    I put it in my trunk when I was packing my things.  I
17  had my dog crate.  I had my suitcase.  And I had grabbed
18  his flannel jacket that he had.
19  Q.    It is one of his favorite pieces of clothing, is that
20  correct?
21  A.    It is one of his favorite pieces of clothing.  I gave
22  it to him for Christmas last year.
23  Q.    Was it under your dog crate in the back of your truck,
24  or back of your vehicle?
25  A.    It was in my trunk and it was in -- I don't know if it

1   was under the dog crate, above the -- it was just, I had

2   been putting everything in my trunk because we were going

3   to have to leave the house for several days because of the

4   threats.  We wanted to leave the house.  I took the crate

5   and put it in the trunk at the same time because I have a

6   German Shepard puppy.  I have to take the crate with me

7   when I go.

8   Q.   But the dog wouldn't have traveled in the trunk in the

9   crate?

10  A.   No.  But when I got to the house I was staying at, I

11  put him in the crate to sleep, to spend the night.

12  Q.   Did you have any other items of Mr. Barnett's clothing

13  in the back of your trunk?

14  A.   I think his hat was back there, his cap that he had

15  on.

16  Q.   The same cap he wore in Washington?

17  A.   Uh-huh.  Uh-huh.

18  Q.   Why just those two items?

19  A.   Because, I don't know.  I had them -- hello?

20  Q.   Yes, ma'am.

21  A.   Are you still there?

22  Q.   Yes, Ms. Newburn.

23  A.   Okay.  All right.  The picture changed to a different

24  person.  I -- I think I just gathered them up when I was

25  gathering everything up.  I think he actually handed them

1  to me at one point.  And I might have tossed them in the

2  back seat of my car because he wasn't going to wear them

3  into the -- he was all -- he showered and changed into

4  fresh clothes.  And I think that -- yeah.

5  Q.   Okay.  So it's okay to admit they were in your trunk.

6  A.   They were in my trunk.  I admitted that.  I mean, they

7  asked me about his clothing.  I said, I washed his jeans

8  and his T-shirt and all that.  I said, but his jacket and

9  hat are in the back of my car, in the trunk of my car.  And

10  I was sitting in the car at the time.

11          MS. HARRIS:  I'll pass the witness, Your Honor.

12          THE COURT:  Mr. Siano, any other questions for

13  Ms. Newburn?

14          MR. SIANO:  No redirect, Your Honor.

15          THE COURT:  All right.  I have a few questions

16  for you, Ms. Newburn.

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Are there any firearms in your home

19  at this time?

20          THE WITNESS:  No.  I've had them removed.

21          THE COURT:  All right.  What did you do with your

22  firearm?

23          THE WITNESS:  I gave it to Mark Hesse.

24          THE COURT:  And what about your daughter's

25  firearm?

1           THE WITNESS:  The same, Mark Hesse.

2           THE COURT:  Okay.  Are there any other types of

3  dangerous weapons or devices in your home?

4           THE WITNESS:  No, ma'am.

5           THE COURT:  Any large knives, hunting knives,

6  (inaudible), anything like that?

7           THE WITNESS:  No.  Just my kitchen knives, but no

8  hunting or any other kind of knife.

9           THE COURT:  And where was it that your husband

10 normally stored his guns at your home?

11          THE WITNESS:  Some were in our bedroom.  Some

12 were -- I'm trying to think, ma,am.  Some were in the -- we

13 didn't have a gun safe.  Some were in the bedroom.  Some

14 were in the back den room.

15          THE COURT:  And all of those have been removed,

16 correct?

17          THE WITNESS:  Yes.  Yes, ma'am.

18          THE COURT:  Okay.  And if I were to release your

19 husband, if he violated any of the conditions that I put in

20 place, do you feel comfortable contacting probation and

21 reporting that violation knowing that it could result in

22 your husband being rearrested and placed back into custody?

23          THE WITNESS:  Yes.  I have to do the right thing

24 because I do have my daughter in the house.  I will do the

25 right thing.

1          THE COURT:  And are you concerned if I release

2    your husband about any threats or the safety of you and

3    your daughter at home if your husband is also there?

4          THE WITNESS:  So far, the last couple of days,

5    the threats have been nonexistent.  I do have a locked gate

6    at the end of my driveway and I do have driveway alarms set

7    up now that Mark Hesse has set up for me.  So -- and we

8    kind of have a -- like they text me before they come up the

9    driveway so I know that they are coming.  If I -- if I

10   heard the alarms go off and I didn't recognize the vehicle,

11   I would just dial 9-1-1.  So I'm not -- I am not at all

12   concerned.

13         THE COURT:  Okay.  And if I were to impose a

14   condition that your husband not have any internet access

15   and that any internet capable devices that you or your

16   daughter have or that are in the home be password

17   protected.

18         THE WITNESS:  Yes.

19         THE COURT:  Can you assure me that you would not

20   allow your husband to access those devices?

21         THE WITNESS:  Yes.

22         THE COURT:  And if I impose a condition that your

23   husband were not allowed to have contact with certain

24   individuals, with individuals that he knew were also

25   involved in the riot, is that something you can ensure me

```
 1    that you would --
 2              THE WITNESS:  Yes.
 3              THE COURT:  -- see is enforced?
 4              THE WITNESS:  Yes.  Yes.
 5              THE COURT:  All right.  I believe that's all of
 6    the Court's questions.
 7              Mr. Siano, any questions as a result of the
 8    Court's questions?
 9              MR. SIANO:  No, Your Honor.  Thank you.
10              THE COURT:  Ms. Harris?
11              MS. HARRIS:  No, Your Honor.  No further
12    questions.
13              THE COURT:  All right.  Thank you, Ms. Newburn.
14              Mr. Siano, are you going to have any additional
15    witnesses?
16              MR. SIANO:  Only if Mr. Ballentine tells me
17    Mr. Ratledge has arrived.
18              THE COURT:  All right.  Do we know that,
19    Mr. Ballentine?
20              MR. BALLENTINE:  He was here, but he has left.
21              MR. SIANO:  No further witnesses, Your Honor.
22              THE COURT:  All right.  So nothing further other
23    than argument, is that correct, Ms. Harris?
24              MS. HARRIS:  That's correct, Your Honor.
25              THE COURT:  And Mr. Siano?
```

1              MR. SIANO:  That's right, Your Honor.

2              THE COURT:  All right.  Are the parties ready to

3    proceed with their closing arguments, or do you all need a

4    minute to look at your notes or collect your thoughts?

5              MS. HARRIS:  The government is ready, Your Honor.

6              MR. SIANO:  Defendant is ready.

7              THE COURT:  All right.  Go right ahead,

8    Ms. Harris.

9              MS. HARRIS:  Thank you, Your Honor.

10             The United States respectfully submits that it

11   has shown by clear and convincing evidence that no

12   condition or combination of conditions will reasonably

13   assure the defendant's appearance as required and the

14   safety of any other person and the community.  The factors

15   the Court must consider pursuant to Title 18 United States

16   Code 3142(g) as applied to the defendant's case weigh more

17   favorably for his detention.

18             I want to start this afternoon by talking about

19   the nature and circumstances of the offenses at issue,

20   Judge.  And as the Court is aware, there's three charges on

21   the criminal complaint.  Knowingly entering or remaining in

22   any restricted building or grounds without authority while

23   carrying a dangerous weapon.  Violent entry or disorderly

24   conduct on Capitol grounds.  Theft of public money,

25   property or records.

1    On January the 6th, 2021, a Joint Session of the
2  United States Congress convened in Washington, D.C., on our
3  Nation's Capitol in order to certify the vote count of the
4  Electoral College of the 2020 presidential election.  The
5  United States Capitol building, as Your Honor is aware, is
6  a symbol of democracy and freedom, not only in the United
7  States, but across the world.  And on that particular day,
8  the function being performed by this country's elected
9  lawmakers is one of the most important functions undertaken
10  by our government leaders.  United States Senators, members
11  of the House of Representatives and the country's Vice
12  President, Mike Pence, were all inside the building doing
13  the work of the American people, the work that they were
14  elected to do, when this defendant and like-minded
15  individuals broke in, breached, unlawfully entered and
16  remained in this building.  And this defendant did so all
17  armed, while he was armed with a dangerous weapon.
18    He traveled throughout the building where he
19  accessed highly restricted areas, including Speaker
20  Pelosi's office, where he then proceeded to prop his feet
21  up on the desk, take property, and mock her office,
22  essentially, make a mockery of her and her office appearing
23  in all of the photographs that are before this Court in
24  evidence to very much enjoy this moment of fame.
25    Then, after finally exiting the building, the

1    defendant, still reveling in his moment of notoriety, got

2    on a bullhorn and bragged to the mob, the crowd, about what

3    he had done.  And he tried to stir the pot even more, stir

4    up the situation even more by chanting, "Our House, Our

5    House."

6            Eventually, though, he did decide to go back to

7    his truck and head back to the Western District of

8    Arkansas.  However, he was sure to turn off his location

9    services on his phone, pay in only cash, and cover his face

10   where he then hurried home to set about removing any

11   damning items of evidentiary value, including his phone,

12   and then arranging to turn himself in to law enforcement.

13   Make no mistake, by then he knew law enforcement was coming

14   for him.

15           Amongst this backdrop, and as a result of what

16   happened at our Nation's Capitol on January the 6th, 2021,

17   we now know there are five dead people, two of which are

18   police officers, and there are over 50 injured.  And now

19   there are thousands of National Guard troops guarding and

20   protecting our Capitol.  These are the circumstances of

21   this offense.

22           And it's also important, Your Honor, when you

23   look at the nature and circumstances of this offense to

24   also consider the level of planning on the part of the

25   defendant.  This goes back to his interview from November

of 2020 at "Stop the Steal," another rally in Northwest
Arkansas when he made it clear then, quote, "I ain't going
down easy.  Whatever it takes.  Whatever it takes."  He was
really clear about that.  And that was with regard to
whatever it takes to overturn what he perceived to be a
stolen election.

And then the Court can consider that just shy of
a week, four or five days prior to his departure for D.C.,
the defendant went to Bass Pro Shop where he purchased
walkie talkies, mace, and the dangerous weapon that he is
seen carrying on his person while he is in the Capitol
building on January 6th, '21, 2021.  And, again, after the
incident paying in cash, covering his face, turning off his
location services and removing items from his home, all
before turning himself in.

What's interesting too, Your Honor, is that in
his statement to investigators, he shows up to turn himself
in with a wallet full of cash, but no phone.  And made it
clear that he's a smart man, you won't find anything at my
house if you decide to show up with a search warrant.  He
talked about moving guns.  No phone.  No phone, no stun
gun, just some packaging.  No firearms.  He moved it all.
He initially told the investigators that he went alone, all
by himself.  I guess maybe that's nuanced.  Sometime later
in the interview, he then says, well, I might have known

1    some, but he never told him their names.  And now we know,

2    while it's true he might have been alone in his truck,

3    that's not the truth.  He was out there in Washington,

4    D.C., with his buddies, Mark Hesse and Mr. Lockhart.

5           And we also know that the defendant loves

6    excitement and that by his own statements, that's what got

7    him in trouble.  When the Court must look at the weight of

8    the evidence, it couldn't be more clear the weight of the

9    evidence is strong and weighs in favor of detention.  It's

10   incredibly strong.  There's video evidence.  There's

11   surveillance evidence.  There's numerous photos.  There's

12   receipts, a confession.  Obstructive behavior that is

13   corroborative of his consciousness of guilt.

14          The history and characteristics of the defendant,

15   and a lot of what the Court can look at under nature and

16   circumstances can also be looked at by the Court under this

17   section too, his history and characteristics.  It's just

18   not credible that he has two dates of birth and that he's

19   tried to fix it at the DMV, but they won't do it.  I think

20   I feel comfortable saying that you take your records up to

21   the DMV and they change it, because it's important.  It's a

22   government database, the DMV, the driver's license.  That's

23   critical.  That has to be accurate.  Either he didn't try,

24   or he only went once, it's a little bit unclear.  But

25   that's just not a credible, reasonable explanation.

1              We also know that back in July of 2020,

2   Fayetteville P.D. gets called out and they respond.  They

3   make contact with Mr. Barnett, the defendant, and what is

4   he doing?  He's causing a disturbance at a rally while he's

5   armed.  September 2020, Fayetteville Police Department,

6   they again have to respond to a call.  They make contact

7   with the defendant.  This time he's got his rifle and a gun

8   on his hip at another rally.  The Court can also consider

9   the "Save the Children" rally photo where he's pictured

10  with young minors.  One young female is in possession of a

11  very large firearm.  And the defendant is possessing what

12  appears to be a silencer.

13             The Court can consider how he loves excitement

14  and that's what got him in trouble.  And the Court can

15  consider how this defendant treated the United States

16  Capitol on January 6th, 2021, how he treated Speaker

17  Pelosi's office and his conduct afterwards; bragging,

18  proud, enjoying his moment in the spotlight.

19             The Court can consider also the conduct of him in

20  the interview and how he treated Tammy Newburn.  He

21  interrupted her, wouldn't let her show her phone, and he

22  wanted to control exactly what those agents saw.  And, Your

23  Honor, as far as history and characteristics of the

24  defendant, what do the defendant's actions in this case

25  tell this Court about his respect for the law and

deterrence?  Breaching a highly restricted area while armed
with a dangerous weapon in the company of an angry mob and
then bragging about it on a bullhorn later, what does that
say about respect for the law?  If the defendant will
travel across the country and engage in this level of
criminal behavior because he believes that he is right, and
it is the Electoral College that is wrong, what would deter
him?

With regard to the nature and seriousness of the
danger posed to any person or the community that would be
posed by this defendant's release, I would like to make a
record on that as well.  As Your Honor is aware, there has
been a bounty put out on this defendant, and he sits in
protective custody at the jail.  The U.S. Marshals Service
have put him in protective custody.  There have been
threats to his family that began pretty much right after he
committed these criminal acts in Washington, D.C.  And even
today, we now know that the Postal Inspector is
investigating mail, hate mail, coming to this defendant's
address in Gravette.

We also know there are community concerns.  Local
community members are concerned about what it will do in
their communities should this defendant be released today.
And Inauguration Day is right around the corner, and there
are a lot of concerns about the safety of the community in

1    general on those days.  And then you take that with the

2    situation the Court has with all of the other threats, all

3    centered around this defendant and his family.

4           Lastly, I would like to address the defendant's

5    exhibits.  And, Your Honor, every case that is in that

6    packet of documents occurred at the U.S. Capitol on

7    January 6th, 2021, and it has its own set of unique facts,

8    every single case.  Each defendant who comes before a Court

9    on federal charges arising out of his or her criminal

10   conduct that day does so based on their own particular

11   actions and brings to the Court nature and circumstances,

12   history and characteristics unique to them.  And release of

13   each defendant poses a different risk in each case, as Your

14   Honor is aware.  And while it is interesting and

15   informative to look at those records, it's also noteworthy

16   that there is not a single person charged with carrying a

17   dangerous weapon in that packet.  They are all misdemeanors

18   except for one felony theft, and that felony is based on --

19   it's a felony because of the value of the property stolen

20   from the Capitol police.

21          The review of these other criminal complaints is

22   not a factor contemplated in Title 18 United States Code

23   3142 that this Court should consider as this Court is

24   tasked with determining whether detention or release is

25   appropriate for this defendant who is before Your Honor

1    this afternoon.  The defense witnesses, while I know they

2    are all well-intentioned individuals, most of them do not

3    know Mr. Barnett very well.  Some haven't seen him in a

4    while, haven't talked to him in a while, don't even know

5    his phone number.  Certainly, Ashlee Newburn loves him.

6    Certainly, Tammy Newburn loves him.  And they want to see

7    good things happen to him.  Sadly, it is the government's

8    position that Ms. Newburn is not an acceptable third-party

9    custodian.  And that is based on what we now know what

10   happened after he got back from Washington, and how the

11   defendant can manipulate her.  The government has concerns

12   that she would not be able to report any violations to the

13   Court and that she just wouldn't do it.

14           And it is for all these reasons, Your Honor, that

15   the government respectfully requests that Mr. Barnett

16   remain detained pending any further proceedings in this

17   matter.

18           THE COURT:  Thank you, Ms. Harris.

19           All right.  Mr. Siano?

20           MR. SIANO:  Thank you, Your Honor.

21           Your Honor, I'd like to start from the premise

22   that the Bail Reform Statute, when it was initially passed

23   and as it continues to (inaudible), that the Court should

24   seek to try the least onerous set of conditions by which

25   the defendant can be released subject to the conditions in

1   the statute.

2          Now, Mr. Barnett returned home, was told by law

3   enforcement that they wanted to see him on an appointment

4   that was made by his wife, and he kept that appointment on

5   a Friday and voluntarily surrendered.  He did that.  It's

6   an important point because it bears directly on whether or

7   not he's a risk of flight.  All of these colorful

8   presentations and spins on his trip back also say he never

9   took the opportunity to absent himself.  He didn't deflect

10  his return home.  After he came home on Thursday, he didn't

11  go someplace else.  He went down to the sheriff's office

12  and surrendered himself.

13         I tried to present witnesses to this Court, Your

14  Honor, that demonstrate that the individual defendant is

15  fit to be bailed by this Court, to accept the challenge and

16  burden that a release order with conditions would present.

17  I know for a fact pretrial services questioned my client.

18  He answered those questions for about an hour and a half.

19  I know they questioned Ms. Newburn.  And my client stated

20  he's willing to comply with the conditions that were

21  brought up in the interview.  And I will tell you -- and I

22  have discussed with him at length restricted conditions.

23  And in point in fact, not basically to compliment me or my

24  client, but because I could anticipate the concerns of the

25  Court, not just as to the internet, but in other respects

1    as well, that the Court would impose restricted conditions

2    and we're prepared to meet those.

3            The people I have brought here know Mr. Barnett

4    in his ordinary, everyday life.  That's what Your Honor

5    needs to evaluate.  I'm not going to respond to the

6    overstated hyperbole that the Assistant United States

7    Attorney presented.  I'm certainly not going to try the

8    politics of the election, the politics of the

9    demonstrations afterward, even though defense lawyers in my

10   position might be sorely tested to say to the Court that

11   nobody who stepped to the lectern that day, who got on the

12   podium and provoked this event, has been called before the

13   bar of justice to answer for their comment.

14           My client understands the charges against him.

15   These prosecutors told me on Monday morning in the first

16   conversation when my client was charged with three

17   misdemeanors that there was no way they would grant

18   anything other than detention.  Now, I presented five

19   exhibits.  And in those exhibits, I present the charges,

20   which are the same statutes against my client.  The facts

21   are all different.  Every defendants' facts are individual.

22   I presented the arrest warrant.  I presented how the Court

23   treated those defendants.  I went further.  I actually

24   asked the prosecutors to identify for me other cases in

25   which Magistrate Judges or District Court Judges have

confronted these charges and had granted bail on whatever
conditions.  They told me I was not entitled to have that
information.  That's why Your Honor only has five.  But
those five are submitted to Your Honor for a more important
reason, and that is, I tried to do my homework about the
Western District of Arkansas.  And make no mistake about
it, the Court was very generous to enter my admission pro
hac vice.  And while I have tried one case in the Eastern
District of Arkansas, it was a long time ago and I'm not
familiar with the normal caseload and flow of cases before
Your Honor.  And respectfully, I observed that a case of
the type that Mr. Barnett has is not run-of-the-mill,
ordinary, recurring sort of a case.  But not saying it's
more important or it's less important.  But I tried to give
the Court a window on what other judicial officers are
doing in similar circumstances.  And that's why I presented
those to Your Honor.  No two cases are alike.

        Mr. Barnett has a clean and safe home.  He has a
stable home life.  He answers calls for need and people in
need in his community.  He's needed by his family, both
Ms. Newburn and Ms. Halpin.  I think it's just
absolutely -- I'm not going to use the word -- it's
absolutely inappropriate to suggest that the fact that
unknown persons are doing unknown things which lead the
Court to issue a threat assessment to my client and to his

1   wife form a basis for denying bail.  That leads to the

2   question of, who is doing it and why are they doing it?

3   And that's not the issue.

4           The issue here is, can my client be responsible

5   for his compliance with the Court's order.  And the fact

6   that what I will describe as "crackpots and kooks" are

7   using the internet and the U.S. mail to vent their opinions

8   about Mr. Barnett is not an element in Your Honor's

9   consideration.

10          I would ask the Court to look beyond the

11  notoriety and the publicity of this case.  They are serious

12  charges.  The government's proof, the government is

13  euphoric over the fact that they can identify that my

14  client was in the Capitol.  There's no proof laid out here

15  by witnesses other than one FBI agent.  And the fact that

16  he was in the Capitol is not the only element of the

17  charges brought against him, and those charges will be

18  answered at trial.  It's very facile for Ms. Harris to

19  assume my client's guilt beyond a reasonable doubt because

20  they have him in the building.  But there's no evidence as

21  to knowledge, intent, mens rea, permission, lack of

22  permission.  I'm not trying the Capitol police.  I'm not

23  trying who did what, where.  The video Your Honor has

24  indicates that my client was there for a very finite period

25  and left after his interaction with the Capitol police

1    officer.  I offer that not to say anything other than this
2    case isn't being tried here.  There's no argument with
3    regard to these exhibits.  And as far as the fact that --
4    I'm going to put this as broadly as I can -- the fact that
5    my client is outspoken and is a, at base, very, very
6    enthusiastic supporter of Donald J. Trump and is a great
7    believer in the Second Amendment is not the basis for any
8    charge in this case.
9            As far as these two birth dates go, he explained
10   this to pretrial services.  They don't have a criminal
11   record in either birth date.  They have his fingerprints.
12   And as far as I know for the last 47 years, regardless of
13   what name or birth date you use, if you run fingerprints
14   through every law enforcement index, you come out at the
15   other side.  He told pretrial services what happened with
16   his birth date, and I'm not going to try the Department of
17   Motor Vehicles.  That's like me saying to you that in New
18   York State, a trip into the Department of Motor Vehicles is
19   a trip into hell administratively.  That's not what he's
20   charged with.  He's not charged for -- I like Special Agent
21   Willett's phrase -- for whatever "ruckus" took place at any
22   one of these rallies.  He wasn't charged with any offense.
23   He wasn't accused of any offense.  He wasn't identified as
24   a suspect in any of these offenses.  And I suspect to you
25   that there's no weight associated with that.

1            I think Your Honor can shape a release order that
2    provides a sufficient array of conditions that will allow
3    my client to be released, will allow my client to
4    effectively defend himself.  And frankly -- and I say this,
5    Your Honor, not in a provocative way -- but that will allow
6    him to have Your Honor build enough of a quote, unquote,
7    "fence" around him that if he stumbles, Your Honor, it will
8    be brought to Your Honor's attention almost immediately.
9            And I'm particularly offended by the notion that
10   they would attack Ms. Newburn as a third-party supervisor.
11   Now, that term is new to me.  I will admit that to the
12   Court.  I will tell you that in other courts in which I
13   practice, the Court's package up a personal recognizance
14   bond with sureties and they condition the bond on certain
15   obligations of sureties.  I was informed here through the
16   good offices of the Federal Public Defenders that there's a
17   restraint on this with regard to a third-party supervisor.
18   It has to be somebody in the home rather than a third-party
19   surety.  I can assure the Court I could present acceptable
20   sureties, numerous acceptable sureties who will come up and
21   cosign a bond and they will meet whatever obligations Your
22   Honor state.
23           But the reason Ms. Harris attacked Ms. Newburn
24   the way she did, to make her look on the one hand like an
25   abused spouse, which is an utter distortion, or to be

1  submissive to her husband, which is also untrue as

2  demonstrated by the testimony, is because they are trying

3  to defeat the use of Ms. Newburn as a third-party

4  supervisor.  And she said in exactly the words and with the

5  tone that an honest witness would.  She's not enthusiastic

6  about turning her domestic partner in to Your Honor, but as

7  best she could under these electronic circumstances, she

8  looked you in the eye and told you she would do it.

9        Your Honor, I believe the Court can shape a set

10 of conditions that will allow Mr. Barnett to be bailed.

11 And I submit to you that Magistrate Judges similarly

12 situated in similar cases across the country have drawn

13 that conclusion.  And if there were no other cases, the

14 government would not have turned away with the back of its

15 hand my request for the bail determinations of any other

16 defendant.  Thank you, Your Honor.

17       THE COURT:  Thank you, Mr. Siano.

18       All right.  Do I have Ms. Tammy Newburn?  I think

19 she's still participating in the hearing.  I would

20 like her -- if I can have you turn your video on,

21 Ms. Newburn, as I rule.  Can you hear me okay, Ms. Newburn?

22       MS. TAMMY NEWBURN:  Yes.

23       THE COURT:  All right.  Well, I'm hearing an

24 echo.  Okay.  I think it's gone away.

25       The parties gave very good, thorough closing

1    arguments.  I've carefully considered both arguments and
2    all the evidence presented today.  As has been referenced,
3    the Court must look at the applicable statute to determine
4    whether there's any condition or combination of conditions
5    that will reasonably assure the appearance of Mr. Barnett
6    for all court appearances and the safety of any other
7    person and the community.
8            The government has to prove by clear and
9    convincing evidence that there are no conditions that can
10   assure the Court of the safety of other people in the
11   community and by a preponderance of the evidence that there
12   is a risk of nonappearance.  In making this determination,
13   the Court must look at many factors as again has been
14   referenced.
15           First, looking at the nature and circumstances of
16   the offense, Mr. Barnett is charged with very serious
17   offenses, the most serious offense being entering Capitol
18   grounds while carrying a stun gun.  That offense carries up
19   to 10 years' imprisonment.  The other two offenses that he
20   is charged with -- violent entry and disorderly conduct on
21   Capitol grounds -- that carries up to six months'
22   imprisonment.  And theft of public property, that carries
23   up to one-year imprisonment.  So Mr. Barnett is looking at
24   a possible maximum sentence on all three counts of 11 and a
25   half years imprisonment.  So it's certainly a serious

1   offense.

2           Looking at the circumstances of the offense, it

3   certainly turned into a very volatile situation on Capitol

4   grounds that wasn't just created by Mr. Barnett, but many,

5   many other individuals in sort of a mob mentality.

6   However, Mr. Barnett, it appears, was prepared for that

7   type of situation and obtained pepper spray and a stun gun

8   and walkie talkies.  The circumstances got so out of hand

9   that the Senators did have to take cover.  The Vice

10  President had to be evacuated.  And ultimately, five people

11  were killed in the riot at the Capitol, including two

12  officers, and many others were hurt.  So certainly the

13  nature of the circumstances of the offense are very

14  serious.

15          Looking at the weight of the evidence against

16  Mr. Barnett, it is very strong.  There are photos and

17  videos of Mr. Barnett inside Nancy Pelosi's office.  He

18  admitted that he was in her office.  He had the letter that

19  was taken from her office and turned that over to the FBI.

20  He left a note that he was there for Nancy Pelosi.  And

21  then he bragged about it on a bullhorn in a video after he

22  left the Capitol.  So the weight of the evidence is against

23  the defendant.

24          Looking next at the factors that the Court

25  characterizes as the history and characteristics of the

1   defendant, we heard several witnesses say they were

2   surprised by this conduct by Mr. Barnett, that it's not his

3   nature.  I will note he does not have anything more than

4   very minor criminal history.  He appears to be a

5   law-abiding citizen for the most part, although there have

6   been instances that do cause the Court concerns with him

7   being armed at rallies.  However, he has strong family

8   ties, strong community ties.  He has been employed, has

9   financial resources.  He appears to be a family man.  So

10  his history and character in large part weigh in his favor.

11         What I am concerned about, first of all, the fact

12  that Mr. Barnett allegedly turned off his location services

13  when returning to Arkansas and used only cash.  It's not a

14  strong leap to infer from that that he didn't want to be

15  located by law enforcement.  However, when he did return to

16  Arkansas, he turned himself in to law enforcement.  On the

17  other side of that, there are concerns that his phone

18  cannot be located.  A phone doesn't just disappear.  The

19  stun gun cannot be located.  He told law enforcement that

20  they weren't going to find anything.  So there was some

21  effort, it appears, on his part to remove anything from the

22  home that he thought could incriminate him.

23         The Court is also concerned about threats that

24  have been made to Mr. Barnett including, as the government

25  mentioned, a bounty put on him.  I'm concerned that those

1  threats, they are not just a danger to Mr. Barnett, but to

2  his family as well, to neighbors as well and to the

3  community.  There have been threats even to the police

4  department, and as I understand it, even to other

5  individuals in Gravette.  So I do have concerns about the

6  safety of the community.

7          However, looking at all of these factors, what I

8  must determine is whether there is a combination of

9  conditions that I can put in place that would reasonably

10 assure the safety of the community and that Mr. Barnett is

11 not a flight risk.  And I do believe there are conditions

12 that I could put in place.  I am inclined to make these

13 conditions very, very restrictive.  And I want to explain

14 the reason I feel that's necessary is to ensure

15 Mr. Barnett's safety, his family's safety, and the

16 community's safety.  So this isn't the usual type case

17 where I wouldn't find a need to impose such restrictive

18 conditions, but given the nature and volatility of this

19 situation and that threats have been made, I feel like I

20 need to put more restrictive conditions in place than what

21 I would normally, given the types of offenses that are

22 involved in this case.

23          Mr. Siano, I know you noted you're not real

24 familiar with third-party custodians.  That is something

25 that is important to this Court.  I prefer a third-party

1   custodian that's going to assure me, that lives with the

2   defendant and will assure me that they will report any

3   violations to me.  I prefer that over any type of secured

4   bond or money.  Somebody that's going to keep an eye on

5   them and that will report to me.

6               MR. SIANO:  Your Honor, it's nice to know that

7   Your Honor believes I'm not too old to learn something new.

8               THE COURT:  Certainly not.  But the most

9   important thing to me is knowing there's someone there, and

10  that's why I wanted Ms. Newburn, I want to make sure she is

11  listening to me and hearing the conditions that I'm going

12  to impose because I'll hold her accountable as third-party

13  custodian.  She's going to be signing off on this bond, and

14  she's going to be promising the Court that if her husband

15  violates any of these conditions, that she will immediately

16  report it to his probation officer.

17              I know there are some concerns about her

18  suitability of a third-party custodian, and I do understand

19  those concerns by the government.  But I asked her

20  point-blank, will she report violations.  You have assured

21  me, Ms. Newburn, and I'm going to take your word that you

22  will report violations.  So the Court -- here is what the

23  Court would propose doing.  And I don't want to hear

24  argument again that I should not release Mr. Barnett, but

25  I'll certainly allow comments on the proposed conditions,

1  if there's an objection to the conditions or if the
2  government would ask for any additional conditions.
3          The Court will release Mr. Barnett on a $5,000
4  unsecured bond.  I don't feel it necessary to make it a
5  secured bond.  Ms. Tammy Newburn will act as his
6  third-party custodian and he will reside at their residence
7  with her.  I will advise my courtroom deputy, Ms. Guerrero,
8  I would like this bond to remain under seal because I do
9  not want their address on the bond to be a public record,
10 so let's make sure that this bond stays under seal.
11         So he'll be released to the third-party custody
12 of Ms. Newburn.  He must submit to pretrial services
13 supervision.  I intend to place Mr. Barnett on home
14 incarceration and also require that he submit to location
15 monitoring.  Now, that is a very restrictive condition.  It
16 essentially is 24-hour-a-day lockdown.  I want him locked
17 down in his home.  I don't know how much property he has,
18 but I would like him to remain in his home, in the
19 perimeters of his residence.  So it will be 24-hour-a-day
20 lockdown except for court appearances and other activities
21 that are approved in advance, Mr. Barnett, by your
22 probation officer.  You will also be placed on location
23 monitoring so that when you are out to go to a court
24 appearance or other approved outing, that you will have a
25 location monitor that will track where you are.

1              Mr. Barnett, do you have a passport?

2              MR. SIANO:  My client does, Your Honor.

3              THE DEFENDANT:  I do, Your Honor.

4              THE COURT:  All right.  Do you know where that

5    is?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  Okay.  I would like that -- if you

8    can advise your wife as to where it is and I would like

9    that turned over to our probation officer immediately.

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  I'm sorry.  Ms. Newburn?

12             MS. TAMMY NEWBURN:  I have it already in my purse

13   for the probation officer.

14             THE COURT:  Okay.

15             MS. TAMMY NEWBURN:  We talked yesterday.  She

16   told me.

17             THE COURT:  I would like that turned over

18   immediately to the probation officer.

19             MS. TAMMY NEWBURN:  Yes, ma'am.

20             THE COURT:  Mr. Barnett, you are not to obtain

21   another passport or any other international travel

22   document.  Your travel will be restricted to -- you're

23   going to be on home incarceration, but when necessary for

24   outings, your travel will be restricted to the Western

25   District of Arkansas, Fayetteville Division, and the

1 District of Columbia, again, unless you're given prior

2 approval by your probation officer.

3          This next condition is very important,

4 Mr. Barnett.  I want you to avoid all contact, directly or

5 indirectly, with any person who is or may become a witness

6 in the investigation or prosecution.  I'm also going to put

7 in place no contact with anyone, Mr. Barnett, that you know

8 participated in the riot at the Capitol.  And after this

9 hearing, I would like to go into a separate breakout room

10 with the government, defense counsel, Ms. Reely, and my

11 courtroom deputy, and I would like the government, if they

12 have any specific individuals that they would like to

13 identify that Mr. Barnett is not to have contact with, I'll

14 let you privately identify them to the Court and I will

15 make that a condition of bond.  And, again, that document

16 will be under seal.  And I'll ask Mr. Siano as well as the

17 probation office, once we have any specific names, to

18 thoroughly go over that with Mr. Barnett.

19          Mr. Barnett, and everyone in your home, you're

20 not to possess a firearm, destructive device or any other

21 weapon.  You're not to use alcohol excessively.  You're not

22 to use or unlawfully possess any narcotic drug or other

23 controlled substance unless it is prescribed by a licensed

24 medical practitioner.  You are also not to obtain a medical

25 marijuana card and you are prohibited from the use of

1  marijuana.  If deemed warranted, you will be tested for

2  prohibited substances.

3          The location monitoring, I will require you to

4  pay for that, Mr. Barnett.  I do not believe that it's very

5  costly, but I will require you to pay for that.

6  Mr. Barnett, if you have any contact with law enforcement

7  whatsoever, that means a traffic stop on the way to court,

8  any contact with law enforcement, you are to immediately

9  report that to your probation officer.  And I'm also going

10  to put in place a condition that Mr. Barnett have no

11  internet access and that all internet capable devices in

12  the home and owned by Ms. Newburn and her daughter be

13  password protected.  And you are not allowed to permit

14  Mr. Barnett to access those devices.  I feel like that

15  condition is necessary given concerns the government has

16  regarding the upcoming inauguration and the climate that

17  exists right now regarding that.  So I will prohibit

18  Mr. Barnett from having any access to the internet.

19          And I believe, Mr. Barnett, you are to report --

20  I believe you have a court appearance in Washington, D.C.,

21  on March 1st and your attorney can give you the information

22  regarding that.

23          So those are the Court's proposed conditions.

24  Let me first ask the government, any additional conditions

25  or any thoughts on the conditions that the Court has

1  imposed?  Mr. Fowlkes or Ms. Harris?

2          MR. SIANO:  They are muted, Your Honor.

3          THE COURT:  All right.  We need to unmute both

4  Ms. Harris and Mr. Fowlkes.

5          MR. FOWLKES:  No objections to the Court's

6  conditions, Your Honor.

7          THE COURT:  All right.  And, again, Mr. Fowlkes

8  and Ms. Harris, I will meet in a separate breakout room

9  with you all immediately following this hearing to find out

10 if there are any specific individuals you want to prohibit

11 contact with.

12          All right.  Mr. Siano, any objection to the

13 Court's proposed conditions?

14          MR. SIANO:  No objection, Your Honor.

15          THE COURT:  All right.  Those will be the

16 conditions imposed then.

17          Mr. Barnett, I want to advise you that you have

18 every incentive to comply with these conditions.  First of

19 all, let me ask you, do you understand all of these

20 conditions?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  And do you have any concern about

23 your ability to comply with these conditions?

24          THE DEFENDANT:  No, Your Honor.  You will have no

25 problems.

1          THE COURT:  Ms. Newburn, do you understand all of

2     these conditions?

3          MS. TAMMY NEWBURN:  Yes, ma'am.

4          THE COURT:  And, again, can you assure the Court

5     that if these conditions are not complied with, you will

6     immediately report any violation?

7          MS. TAMMY NEWBURN:  Yes, I will.

8          THE COURT:  Mr. Barnett, if you do not comply

9     with any of these conditions, that will be brought to my

10    attention.  I would likely issue a warrant for your arrest

11    and I would likely revoke your bond at that point.  So you

12    have every incentive to comply with these conditions.

13         I also want to advise you that a failure to

14    comply with these conditions could result in more severe

15    punishment on the charges you're now facing if you're

16    convicted on those charges and could even result in new

17    charges being brought against you.  Do you understand that?

18         THE DEFENDANT:  I do understand, Your Honor.

19         THE COURT:  All right.  It will take -- I'm going

20    to meet in a private -- adjourn this hearing and meet in a

21    private breakout room with the government and defense

22    counsel and Ms. Reely.  It will take a few minutes to have

23    that conversation and to have the bond forms prepared.  It

24    is 5:25.  I am not sure that we can process Mr. Barnett's

25    release this evening.  We do have to obtain a GPS monitor.

1   There's a lot that has to be put in place.  So I would

2   propose if we can have until tomorrow morning to get

3   every -- to get the bond forms prepared, to notify the

4   jail, to get the GPS device ready and set up at

5   Mr. Barnett's home.  Is that agreeable with you, Mr. Siano?

6             MR. SIANO:  Judge, I'd suggest that no earlier

7   than noon.  The Court and its personnel, clerks and

8   otherwise, have been extraordinarily courteous to us and I

9   think we and my client would be happy to show reciprocal

10  courtesy.  Noon at the earliest, Judge, as long as it's

11  tomorrow and we're not spilling into Monday, which is what

12  worries me, which worries me tremendously.

13            THE COURT:  Yes.  I will ask, then, that we'll

14  try to shoot for around noon tomorrow to secure his

15  release.

16            All right.  Before we go into a private breakout

17  room, before I adjourn this hearing and go into a private

18  breakout room, is there anything else we need to put on the

19  record from the government?

20            MS. HARRIS:  Yes, Your Honor.  The government

21  would respectfully request for a three-day stay of the

22  release order as our colleagues in D.C. are appealing Your

23  Honor's decision to the Chief Judge in D.C.

24            THE COURT:  All right.  That's something I want

25  to look at.  I'd like to look at the statute.  So I will --

1  we're not set to release Mr. Barnett until noon tomorrow,

2  so I want some time to look at the statute and I will be in

3  contact with you all this evening and let you know whether

4  I'll grant that stay or not.

5            MS. HARRIS:  Thank you, Your Honor.  That's all

6  that we have.

7            THE COURT:  All right.

8            MR. SIANO:  Ms. Guerrero, may I ask, I don't know

9  who the court reporter is, but I want to put on the record

10 we'd like a transcript.  If the government is getting a

11 transcript, we'd like a copy too.  And I see Ms. Guerrero

12 nodding.  Whatever needs to be done.  We managed to

13 navigate my pro hac vice fee without too much delay, so I'm

14 sure I can do whatever it is to advance the transcript

15 costs associated with my side of this, but I will ask for a

16 transcript.  Thank you.

17           THE COURT:  All right.  I believe you can contact

18 Ms. Guerrero and make arrangements to obtain a transcript.

19           MR. SIANO:  Thank you, Judge.

20           THE COURT:  All right.  Mr. Siano, is there

21 anything else we need to put on the record?

22           MR. SIANO:  No, Your Honor.

23           THE COURT:  All right.  The Court, then, is going

24 to adjourn this hearing.

25           Mr. Ballentine, would it be easier to put -- I

1  need myself, Mr. Siano, Mr. Fowlkes, Ms. Harris,

2  Ms. Guerrero and Ms. Reely in a separate breakout room.

3  Would it be easier to just adjourn the hearing and set up a

4  new call?  Or how --

5            MR. BALLENTINE:  No, you can go in a room.

6  That's no problem.

7            THE COURT:  You can put us into a breakout room?

8            MR. BALLENTINE:  Yeah, no problem.

9            THE COURT:  All right.  Okay, then.  This hearing

10  will be adjourned and I will meet privately then with

11  Mr. Siano, Ms. Harris, Mr. Fowlkes, Ms. Reely and

12  Ms. Guerrero.  Thank you all.

13            MR. FOWLKES:  Thank you, Your Honor.

14            MR. SIANO:  Thank you, Judge.

15            MS. HARRIS:  Thank you.

16            (proceedings concluded)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

      I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the proceedings, transcribed from electronic media, held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

      Dated this 18th day of January 2021.

_____
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas