```
                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
---------------------------X

UNITED STATES OF AMERICA

                 v.              Magistrate Case No. 21-13-GMH

RICHARD BARNETT,

            Defendant

----------------------------X
                                       Washington, D.C
                                 Thursday, January 28, 2021
                                       3:15 p.m.


        TRANSCRIPT OF MOTION FOR PRETRIAL DETENTION
          BEFORE THE HONORABLE BERYL HOWELL
           UNITED STATES DISTRICT CHIEF JUDGE
APPEARANCES:

For the Government: Mary Lyle Dohrmann, AUSA
                    U.S. ATTORNEY'S OFFICE FOR D.C.
                    555 4th St, NW
                    Washington, DC 20530
                    (202) 252-7035

For the Defendant:  Anthony J. Siano, Esq.
                    333 Westchester Avenue, Suite S302
                    White Plains, NY 10604
```

```
Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse, Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247
```

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  Matter before the Court,

3     Magistrate Case Number 21-13.  United States of America

4     versus Richard Barnett.

5          Counsel, please state your names for the record,

6     starting with the government.

7          And for the record, Your Honor, the Pretrial

8     Services is Christine Schuck.

9          THE COURT:  Okay.  Thank you.

10          MS. DOHRMANN:  Good afternoon, Mary Dohrmann on

11     behalf of United States.

12          THE COURT:  Good afternoon, Ms. Dohrmann.

13          And for the defense?

14          MR. SIANO:  Good afternoon, Your Honor.  Anthony

15     Siano for the defendant, Richard Barnett.

16          THE COURT:  Mr. Siano, I granted your Pro Hac Vice

17     motion this afternoon.  I wasn't sure you were going to get

18     that done in time.  So I did ask Mr. Lawlor to be here just

19     in case.

20          MR. SIANO:  Mr. Lawlor was kind enough to call me.

21          THE COURT:  Mr. Lawlor, I think I can excuse you.

22          MR. LAWLOR:  My pleasure, Your Honor.  Have a good

23     day.

24          THE COURT:  Thank you.

25          Mr. Siano, I interrupted you.  What were you going

1    to say?

2              MR. SIANO:  Mr. Lawlor was kind enough to call me

3    and tell me that he had been contacted by the Court as

4    stand-by counsel.  That was before we got our papers in

5    today.

6              THE COURT:  All right.  Good.

7              Let me begin, Mr. Barnett, by pointing out also

8    for the record that this hearing is being held remotely by

9    video conference, with the defendant and counsel all

10   participating by video teleconference.  Do you agree after

11   consultation with your counsel to participate in this

12   hearing remotely without being physically present in the

13   courtroom today?

14             THE DEFENDANT:  I do, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             So, pending before the Court is the government's

17   motion for review and appeal of the Magistrate Judge's

18   release order.  I do note that the government did file

19   yesterday evening a memorandum in support of pretrial

20   detention that include several exhibits, including the

21   transcript of the proceedings in the Western District of

22   Arkansas, which I also received from -- I'm not sure if it

23   was from one of the parties or from the District of

24   Arkansas.  So I had reviewed it beforehand.

25             I also reviewed the Pretrial Services Report, all

1   of the exhibits, the amended complaint in the record of the

2   case, as well as defense counsel's letter which, upon

3   receipt, I did docket.  It is docketed now at ECF number 10.

4           So it is the government's motion, so Ms. Dohrmann,

5   I will let you proceed.

6           MS. DOHRMANN:  Thank you, Your Honor.

7           The government's position is that no conditions

8   would ensure the safety of the community and the defendant's

9   appearance in this case.  And that, in fact, all four

10  factors from 18 USC 3142(g) weigh significantly in favor of

11  detention.  Your Honor, the defendant's known behavior alone

12  has shown that he is not going to abide by conditions here

13  for protecting the community from his criminal conduct.

14          First turning to the nature and circumstances of

15  this offense, it involves flouting multiple laws in the most

16  brazen and flagrant manner possible, laws designed to

17  protect the public and to protect our public servants, as

18  well as official proceedings.

19          He broached the U.S. Capitol during a solemn

20  proceeding with both houses of Congress and the Vice

21  President of the United States at the time were then present

22  in the Capitol.  He knew exactly what he was doing.  Your

23  Honor has his post, which is Figure 7 in the government's

24  memorandum in support, stating "It's time" shortly before

25  the breach of the Capitol.  He bought a stun device that he

1   had purchased just days before.  It is clear that he planned

2   his actions.  And actually acted on animus to occupy the

3   office of Speaker Pelosi.

4           THE COURT:  Ms. Dohrmann, you call that a stun

5   device.  Is it a stun device?  Is it a stun gun or something

6   different from a stun gun?

7           MS. DOHRMANN:  Your Honor, it is a stun gun, but

8   it is in the form of a walking stick, like a staff.  So I

9   suppose it's extendible to the length of what one might call

10  a walking stick.  But it can also be collapsed down is my

11  understanding.

12          THE COURT:  That stun gun, walking stick device,

13  has that been recovered?

14          MS. DOHRMANN:  No, Your Honor.  And that is part

15  of the government's concern is Mr. Barnett's statement to

16  law enforcement that they can search his home and they would

17  not find it.  What the government did recover was the box

18  that it came in as well as the receipt.  But the stun device

19  itself, Your Honor, the government has inferred that the

20  defendant has disposed of in some manner.

21          THE COURT:  I was interested, Ms. Dohrmann, that

22  in the transcript of the detention hearing in Arkansas, the

23  partner of the defendant, her name is Tammy Newburn, she

24  said that a number of items that had been removed from the

25  house had been given to Mark Hesse.  So has government

1   tried to recover any of those items from Mark Hesse?

2          MS. DOHRMANN:  Yes, Your Honor.  Let me just get

3   the exact information on that.  The information I have is

4   that a search warrant was conducted at Mark Hesse's home at

5   the same time as the detention hearing that was held January

6   15th.  And though law enforcement did observe firearms, they

7   were unable to determine which, if any, were the

8   defendant's.

9          I'm not certain, Your Honor, if there was an

10  observation of a stun device that they also couldn't

11  conclude was the defendant's.  But I am sure that if it

12  matched the description, it would have been recovered and

13  noted.

14         THE COURT:  I do recall that in the transcript

15  that the defendant's partner was quite vague about being

16  able to identify any of the guns that belonged to

17  Mr. Barnett.

18         Okay.  Please proceed.

19         MS. DOHRMANN:  Thank you, Your Honor.

20         So, as I was talking about Mr. Barnett's

21  disturbing note that he talks about to the media after these

22  events, having left for Speaker Pelosi, in the same sort of

23  vein there are these photographs of him taken where he

24  appears to know and relish that he is being photographed in

25  a way that suggests that this isn't -- the notoriety that he

1    is bringing to himself is something that he welcomes.

2           And of course, after talking to the media about

3    exactly what he has done, being photographed, occupying in

4    what can only be described as a disrespectful manner on top

5    of an unlawful manner, Speaker Pelosi's office, he then

6    attempts to avoid being identified as he flees D.C., turning

7    off location services on his phone and paying cash and

8    covering his face which, as Your Honor will see in the

9    photographs in the government's memorandum, was uncovered

10   previously in his prior actions.

11          THE COURT:  When you are talking about the videos,

12   I know there is a surveillance camera videos from inside the

13   Capitol and I know there were other videos, one of the

14   things that Tammy Newburn said is that the defendant sent

15   her videos that she had on her phone.  Were those videos

16   recovered?

17          MS. DOHRMANN:  Your Honor, I'm sorry.  I don't

18   know the answer to that.  I do know that Mr. Barnett

19   essentially intervened in any sort of -- in the interaction

20   between Ms. Newburn and law enforcement, specifically taking

21   Ms. Newburn's phone from her and saying he would show up as

22   appropriate.  To my knowledge, there has not been a seizure

23   of Ms. Newburn's phone.

24          THE COURT:  Okay.  Thank you.

25          MS. DOHRMANN:  Your Honor, with respect to the

weight of the evidence in this case, it is truly

incontrovertible.  He is in multiple photographs that are

very clear and of very high quality.  He is on video.  His

face is fully uncovered.  He is clearly identifiable to any

layperson.

      We know that he bought the stun gun and the box

that it came in.  We know when he did that based on the

evidence recovered from the home, although we don't have the

stun device itself.  And we know all of this, Your Honor,

despite the defendant somehow ditching or secreting his cell

phone, not having it with him at arrest, Ms. Newburn saying

she has no idea where it is, no doubt that is a source of

potential further information that, unlike all the other

information, the defendant was willing to share with the

media and law enforcement.  What is on his cell phone is

what he doesn't want the government to know.  But despite

not having that electronic evidence, at this time, the

evidence in this case is very strong.

      Your Honor, the government is also very concerned

about this defendant's history and characteristics.  While

he doesn't have a criminal history of felonies, he does have

a recent pattern that this case and this criminal conduct

are a part of.  And that is the two other incidents

described in Attachment A and Attachment B of him using

firearms in a way that drew police attention and, quite

1    frankly, a very public sort of also attracting attention,

2    displayed way, where there is some question about, at least

3    with respect to one of those incidents, whether he was in

4    fact using them in a menacing manner.

5           Certainly, Your Honor, the government's position

6    would be that he appears to be possessing them in a menacing

7    manner.  Whether it was actually a criminal, assaultive

8    manner is clearly not resolved or resolved in the

9    defendant's favor in the case of the incident described in

10   Attachment A.  But nevertheless, Your Honor, those are

11   instances from July and September of 2020.  Then here we are

12   in January of 2021.

13          THE COURT:  Ms. Dohrmann, I think your memorandum

14   and the transcript, the hearing transcript mentioned

15   something happened in November.  Was that just a typo or was

16   it really just something in September?

17          MS. DOHRMANN:  I'm sorry, Your Honor.  That may

18   have been my mistake about when -- Your Honor, you are

19   right, that is my mistake.  That was --

20          THE COURT:  I just wanted to make sure I knew

21   about these incidents because I do have some questions about

22   them.  I appreciate that there was a July 25, 2020

23   Fayetteville police report of 911 caller, complaining about

24   a person turning out to be defendant, pointing a rifle at

25   her car because her car had a Black Lives Matter sticker on

 1    it.

 2              And then there was another incident of a call to

 3    the police on September 20, 2020 regarding protesters for

 4    something called Save the Children that reported the

 5    defendant walking around on the public street in

 6    Fayetteville with a rifle slung on his back and a pistol on

 7    his hip.

 8              I just want to focus a little bit on the September

 9    20, 2020 report because it has a series of observations.  Of

10    course, what caught my attention is that it also mentioned

11    that these observations were made around a courthouse.  So

12    do you know what that is all about?

13              MS. DOHRMANN:  Your Honor, so first just to go

14    back to the November versus September issue.  I believe that

15    actually November is the inaccuracy and it is September

16    based on just looking at the transcript.  The November

17    incident referenced in the transcript is the Save the

18    Children event that is described as having taken place in

19    September.  So that is just to correct that part of the

20    record, at least as far as I am aware.

21              THE COURT:  Because the incident report of an

22    incident on September 20, 2020, which reads that a police

23    officer spoke with Richard Barnett who had a rifle slung on

24    his back, pistol on his hip, and said he was there for the

25    protesters for Save the Children.  So that clearly occurred

1  on September 20, 20, but the report's narrative references a

2  series of observations of the defendant with his rifle and

3  his phone, including references to the courthouse.

4         Was this area where the protest was happening

5  close to a courthouse location?  Is that all that means?

6         MS. DOHRMANN:  I'm sorry, I would have to look

7  into that further, which of course I can do.  My

8  understanding is that this occurred, perhaps it's just a

9  matter I could look at a map of where this occurred and see

10  if it does happen to be near a courthouse.  I wasn't aware,

11  and I hadn't noted the apparent involvement of the

12  courthouse in that matter.  So I'm not able to say precisely

13  how this--

14         THE COURT:  Okay.  It's just, you know, it says

15  there was no answer from the courthouse, the narrative was

16  "behind courthouse" in the plot, it just has mentioned the

17  courthouse.  So I was just curious whether that has anything

18  to do with anything.

19         In any event, the Save the Children rally, does

20  Save the Children rally -- I don't know what that is about.

21  But is that connected in any way to the Q-Anon conspiracy

22  theory?

23         MS. DOHRMANN:  Your Honor, I believe that it very

24  well could be, in that my understanding is that the Save the

25  Children rally is based on a premise that is consistent with

1   that Q-Anon conspiracy theories, espousing the belief that

2   there is an elite group currently in control of the country,

3   consisting of pedophiles who must be stopped.  So yes, Your

4   Honor, without having further information specifically

5   tieing into that, I believe that the evidence about the Save

6   the Children rally supports the inference that it is related

7   to that Q non conspiracy theory.

8        THE COURT:  I was just curious about that.  Okay.

9   Please proceed, Ms. Dohrmann.  Your Honor.

10       MS. DOHRMANN:  Your Honor, just with a little bit

11  of additional information to point to on the history and

12  characteristics.  I think the defendant's characteristics

13  are also notable here, specifically his behavior in the

14  course of the case and in the eyes of -- in front of law

15  enforcement.

16       He has been obstructive and oppositional, even

17  with his significant other, who he has attempted to claim

18  and make sure and ensure the safety of the community by

19  ensuring that he abides by Court orders, even in front of

20  law enforcement.  Your Honor, this behavior is of great

21  concern to the government and also weighs heavily in favor

22  of detention with respect to his history and

23  characteristics.

24       And the government has in its memorandum drawn the

25  Court's attention to specific portions of the transcript

 1    that sort of outline what that behavior from the defendant

 2    looked like with respect to Ms. Tammy Newburn.

 3         Finally, Your Honor, with respect to the 3142(g)

 4    factor, the defendant's danger, Your Honor, he has shown us

 5    how dangerous he is in his complete failure to show respect

 6    for the law, protecting the safety of other people,

 7    including our public servants in that commission of official

 8    proceedings.

 9         He has been not only defiant of those laws but

10    brazen in defying them to the extent of it bringing

11    notoriety to him and to people associated with him,

12    including his family members.

13         Frankly, Your Honor, his behavior seems aimed at

14    attracting attention, and in that sense, having influence

15    over others.  And as far as the government can tell, the

16    defendant does only what he sees as being in his best

17    interest, no more and no less, which includes in this case

18    getting a stun device, coordinating a trip to D.C.,

19    unlawfully entering highly restricted areas, taking a

20    Congresswoman's mail and talking to the media about it.  And

21    then really, turning on a dime to serve his best interests

22    and trying to get away with it, at least in the short run,

23    by turning location services off his phone, hiding somewhere

24    his firearms and stun gun, as well as his cell phone which,

25    as I have already noted, the government can only infer

1   contains additional information that the defendant is very

2   concerned about the government finding out about.

3          Your Honor, the defendant's access to firearms as

4   well as the stun device is just one more reason that this

5   Court has cause for concern about what he would do to enact

6   his will and force it on others.

7          In conclusion, the government simply notes that

8   Pretrial Services in both jurisdictions agreed with -- I

9   shouldn't say agreed with the government.  They provided

10  their own recommendation that he be held because no

11  condition or combination of conditions would ensure the

12  safety of the community.  For all these reasons, the

13  government submits that detention is appropriate in this

14  case and necessary.

15         THE COURT:  Thank you.

16         Mr. Siano, I will be happy to hear from you now.

17         MR. SIANO:  Thank you, Judge.

18         I would like to begin with the last remark that

19  counsel for the government made.  Pretrial Services Report,

20  there is an amended Pretrial Services Report, which is

21  completely contradictory to what Ms. Dohrmann said.

22  Pretrial Services Office has clearly noted that she could

23  recommend release on a series of conditions, all of which

24  the Magistrate Judge noted and enforced in her order in

25  addition to certain other conditions.  So, this is not a

1   universal recommendation of detention.

2          There was a Pretrial Services Report that had not

3   included interviews of Mr. Barnett or Ms. Newburn.  And

4   Pretrial Service conducted a lengthy interview with my

5   client, I believe it was an hour and a half.  And then

6   underscored and unencumbered by anybody else, Pretrial

7   Services spoke to my client's partner.  And after that, made

8   a recommendation that release was possible.

9          I would like to point out, first of all, that my

10  client came home after the events of January 6th, had been

11  called but not visited by law enforcement on the Thursday.

12  And through his wife, made an appointment to surrender on

13  Friday and appeared as he agreed to on Friday morning in the

14  sheriff's office in Bentonville, where he was apprehended.

15          THE COURT:  And wouldn't you agree that that

16  scheduled time gave him enough time, as Tammy Newburn

17  testified, to clear out their house?  Didn't the agent

18  testify about Mr. Barnett essentially saying, "I cleared out

19  my house, go ahead and search it?"  Gave him just enough

20  time to do that, didn't it?

21          MR. SIANO:  Well, it certainly did.  The agent

22  also said that he wasn't going to go out to arrest him on

23  Thursday.  So the level of concern here certainly has a

24  mixed set of characteristics.  My client is not charged with

25  a firearm offense.  Pretrial Services officer in fact told

1   Ms. Newburn and her daughter that their firearms would have

2   to be out of the house so that my client couldn't have

3   access to any firearms.

4        So to the extent that he has had firearms, they're

5   not part of this charge.  And the conditions that were laid

6   out by the Magistrate Judge explicitly exclude him from

7   having any firearms.  So the fact that the firearms were

8   removed, I would submit to Your Honor is consistent with

9   somebody being willing to accept the limitations on his

10  liberty associated with the ban.

11       THE COURT:  Let me ask you something Mr. Siano.

12  There is a Washington Post report that quotes a New York

13  Times reporter, Matthew Rosenberg who was at the scene on

14  January 6th, and Matthew Rosenberg, the New York Times

15  reporter reports that he spoke directly to Mr. Barnett and

16  Mr. Barnett identified himself as himself.  And he is quoted

17  as, Mr. Barnett is quoted as saying, "I wrote her a nasty

18  note, put my feet up on her desk and scratched my balls."

19  Did Mr. Barnett say that to the New York Times reporter?

20       MR. SIANO:  I have not seen either of those

21  articles, Judge.  So I'm not in a position to respond to you

22  with respect to that.  That is frankly a different piece of

23  news coverage than I've been able to see.

24       THE COURT:  It's just the New York Times and the

25  Washington Post.  I'm sure it is not just the people in this

1    community who read those newspapers.

2         MR. SIANO:  I'm not suggesting anything other than

3    that I have not found it, Judge.  I'm not casting aspersions

4    on anybody other than perhaps myself.  I can't respond to it

5    because I have not had in my hands.  I'm taking what Your

6    Honor says and I'll follow it up.

7         It is clear from the information we've received in

8    discovery that my client was politically not in tune with

9    the Speaker.  He did, there are photographs of him in the

10   office.  There are photographs of him with what the FBI

11   agent describes in the Complaint as an empty envelope.  And

12   that empty envelope is in the photo.  So that is the only --

13        THE COURT:  I thought that that was an issue

14   raised at the hearing, whether there was an empty envelope

15   or an envelope with something in it.  And it wasn't clear

16   because the agent had not opened the sealed evidence

17   envelope.

18        MR. SIANO:  The last two lines of the amended

19   complaint, the superseding complaint, described the item as

20   an empty envelope, Your Honor.  The second complaint they--

21        THE COURT:  The amended statements of facts.

22        MR. SIANO:  Yes, the amended statement of facts,

23   the last two lines.

24        THE COURT:  That is supposed to make it better?

25        MR. SIANO:  No, I did not say that, Judge.  We

1    described it as stealing Speaker's mail.

2              (Technical difficulties.)

3              THE COURT:  Mr. Barnett, could you mute --

4              THE DEFENDANT:  Can I say something to my lawyer?

5              MR. SIANO:  You have to go to a break-out room,

6    Richie.

7              THE DEFENDANT:  Okay, thank you.  I'll mute now.

8              MR. SIANO:  The suggestion that my client was

9    taking anything other than what could be described as a

10   minimal piece of empty mail, and it was an envelope so it

11   wasn't even a stamp on it.  That's the only thing taken out

12   of the Speaker's office.  He did say outside, in the

13   materials that the government has given us, essentially that

14   basically he was, you know, he had a political hostility to

15   the Speaker.

16             THE COURT:  All right.  Let me turn to the letter,

17   Mr. Siano, that, as I mentioned, the Court docketed at ECF

18   10 and it raises an issue that I wanted to make clear for

19   the record here about your lack of notice and an opportunity

20   to be heard by this Court before the Court issued the Stay

21   of the Arkansas Magistrate Judge's release order on Friday

22   night, January 15th.

23             As your letter points out, the Magistrate Judge

24   held this detention hearing until very late in the day on

25   January 15th.  And then denied the government's request for

1    a stay of the release order, which created a situation

2    requiring prompt action by both the government and this

3    Court.

4        You have now had since January 15th, almost two

5    weeks, to file in this Court, before this Judge, any papers,

6    briefing papers or whatever relevant to the issue of whether

7    Mr. Barnett should be detained pending trial.  Are you

8    essentially resting in terms of written materials on the

9    transcript of the hearing conducted in Arkansas?

10        MR. SIANO:  No, Your Honor.  No, Your Honor.  I

11    frankly, I'm aware that I couldn't file, despite my attempt

12    to do so, until I was admitted and had filing privileges.  I

13    finally got paperwork submitted to the Court this past

14    Monday.  That's pending.  I frankly thought Your Honor would

15    ask me how much time I would need to put something in

16    writing and to respond to Ms. Dohrmann's papers.   I'm

17    prepared to--

18        THE COURT:  I'm statutorily required to review

19    this and decide it promptly.  Typically in these

20    circumstances, when a defendant has been arrested outside

21    this jurisdiction and is being brought here for an appeal,

22    papers are filed.  If they don't have filing privileges,

23    they send them to me by e-mail or by letter, just as you did

24    your letter.

25        But there are a couple of other things in your

1   letter, Mr. Siano, that I want to have a bit of a discussion

2   about here since I have granted your Pro Hac Vice motion.

3          This is a Court that prides itself on civility in

4   proceedings.  Your letter is very quick to accuse

5   prosecutors of some form of misconduct, citing that -- and I

6   quote: "No where in either of the government's motions for a

7   stay and transfer does the government tell the Court that

8   Mr. Barnett was represented by retained counsel in

9   Arkansas."

10          I want you to be aware and have no fear that this

11  Court was well aware that Mr. Barnett was represented by

12  counsel before the Arkansas Magistrate Judge.  I'm sure that

13  is a responsible federal judicial officer and ensured that

14  Mr. Barnett was represented.  And whether you were retained

15  or whether he was represented by federal public defenders or

16  CJA counsel in the detention hearing in Arkansas is really

17  immaterial.  But I wanted to make it clear to you, this

18  Court was well aware that Mr. Barnett was represented before

19  the Magistrate Judge in Arkansas.

20          You also note in your letter, you were advised by

21  an AUSA that the government was going to seek a stay of the

22  Arkansas Magistrate Judge's release order.  So, that should

23  not have come as any surprise to you when the government did

24  exactly what it said it was going to do, which is seek a

25  stay.

1          Nevertheless, your letter goes on to accuse

2     prosecutors of unethical conduct by not disclosing the

3     transfer motion to you because you suggest the government

4     was trying, and I quote you in your letter "to gain a

5     tactical advantage" of some kind or, I quote you again, "to

6     forum shop Mr. Barnett's detention after we prevailed

7     before" the Arkansas Magistrate Judge.

8          I don't know how you practice in other

9     jurisdictions, Mr. Siano, but I am telling you right now,

10    throwing around accusations of misconduct by opposing

11    counsel is not acceptable here when it is without merit.

12    And that accusation is both frivolous and without merit.

13         The defendant is charged in this District.

14    Therefore, this Court is statutorily required to hear any

15    applications for revocation of a Magistrate Judge order

16    releasing a defendant.  It is plain as day in 18 USC Section

17    3141(a) which states: If a person is ordered released by a

18    Magistrate Judge or by a person other than a judge of the

19    court having original jurisdiction over the offense, the

20    attorney for the government may file with the court having

21    original jurisdiction over the offense a motion for

22    revocation of the order or amendment of conditions of

23    release, the motion shall be a determined promptly.  There

24    is no forum shopping going on here.  And that accusation is

25    wholly meritless.

1          This was not a needless cross country trip, as you

2     put it, for this defendant.  He came here on January 6th for

3     his own purposes.  His presence is now required in this

4     district by the government and for the government's

5     purposes.

6          So the motion to transfer was perfectly

7     appropriate both for the government to make for this Court

8     to issue, to bring the defendant before this Court in this

9     jurisdiction to face the charges against him.

10          If you are going to continue with this case, I

11     caution you about how you conduct yourself because that

12     letter was wholly inappropriate.

13          All right.  Is there any other information, Mr.

14     Siano, that you want to bring to the Court's attention

15     regarding the pending issue of pretrial detention or

16     release?

17          MR. SIANO:  Yes, Your Honor.  In the two

18     Fayetteville police reports, my client was not identified by

19     anybody as the suspect of the complaints.  And I would

20     submit that, in reading it, he was compliant with the

21     Fayetteville police request.  He was not charged with any

22     offense in respect to either one of those police reports.  I

23     wanted to point that out.

24          I also want to point out that it is not just that

25     my client doesn't have any felony convictions, he doesn't

1    have any convictions whatsoever.  There is a 1992 Driving

2    Under the Influence case that doesn't have a resolution,

3    nonetheless, it was 28 years ago.  And the government has

4    had his fingerprints for a substantial period of time and

5    they have not brought forward any other instance of him

6    having violated the law.  So I wanted to --

7            THE COURT:  Does he have the right birthdate on

8    his driver's license in Arkansas?

9            MR. SIANO:  I believe he does, Your Honor.  He

10   only has one set of fingerprints, though.

11           THE COURT:  All right.

12           MR. SIANO:  Again, Judge, to the extent that I

13   would make a submission, could I just inquire of the Court,

14   does Your Honor have both portions of the Pretrial Services

15   Report?

16           THE COURT:  I believe I do.

17           MR. SIANO:  All right.  Then I know that the

18   government filed with its paperwork the full transcript and

19   Your Honor has quoted from it in some respect.  I would note

20   that there were a substantial number of people who testified

21   to Mr. Barnett's role in the community, his behavior in the

22   community and the other aspects of his life.

23           As the Pretrial Services Report notes, he has an

24   ongoing business.  He works productively.  I believe both

25   the FBI agent and Pretrial Services described his home as

1  clean and neat.

2          THE COURT:  I am now aware from reading the

3  transcript that you called seven witnesses.  Other than

4  Tammy Newburn and Ashlee Newburn, most of those individuals,

5  and I guess Tammy Newburn's mother, the other individuals

6  were at best casual acquaintances of the defendant.  No

7  knowledge of his guns.  Some of them did.  Some of them said

8  they had no knowledge of any guns.  They didn't know he was

9  going to D.C.  They were -- it didn't have much relevant

10  evidence to submit in connection with these charges.  I'm

11  looking at the statement, you are welcome to argue with me.

12  You are welcome to point out what I might be missing from

13  that.

14          MR. SIANO:  I would prefer to say I'm discussing

15  it with you, rather than argue.

16          THE COURT:  Fine, discussing.

17          MR. SIANO:  Judge, I think that the focus of those

18  witnesses and it's the argument I made to the Magistrate

19  Judge, was to show that he was not a danger to the

20  community, that he was a person who could be subject to a

21  series of conditions, with a degree of confidence, A, that

22  he would not harm anybody else, and that he would appear as

23  he agrees to appear.

24          THE COURT:  Yes, but that is based on what they

25  knew about him.  Jeffrey Houpe has known him about five

```
1   years, didn't know he was going to D.C.  Had no knowledge of

2   any guns.  Jaklyn Chalk, I guess was the defendant's, his

3   best friend of the daughter.

4              MR. SIANO:  She was his daughter's friend.

5              THE COURT:  She didn't know that much about him

6   either.  Jose Miguel Martinez has known him also about five

7   years.  Never been to his home, only a casual acquaintance.

8   Marie Halpin, that's the mother-in-law, she didn't know much

9   about, you know, didn't know anything about him having a

10  stun gun.

11             Then you have Ashlee Newburn who was put in an

12  uncomfortable position, you know, dissembling and didn't

13  know where the guns were, didn't know they were in the

14  house, didn't know how they got from one place to the next,

15  totally dissembling.

16             William Scroggin, neighbor for five years.  Never

17  saw him with guns, never heard guns, never talked about

18  guns.  I have to say, they knew very little relevant to the

19  factors that this Court has to consider based on the facts.

20             Anything further, Mr. Siano?

21             MR. SIANO:  No, Your Honor.  If Your Honor has the

22  transcript, then the full Pretrial Services Report, then I

23  won't need any time to submit anything further.

24             THE COURT:  Ms. Dohrmann, anything in rebuttal?

25             MS. DOHRMANN:  Your Honor, just very, very
```

1    briefly.

2          The government would note, fine, Mr. Barnett

3    surrendered himself at a time that worked for him.  What

4    else was he going to do after speaking to the media and

5    publicly being -- having his face uncovered, plastered in a

6    newsworthy situation, being brought to everyone's attention.

7          I would just repeat what Your Honor has just

8    pointed out, the people who testified fall into two

9    categories of people, people who do not seem to know him and

10   people who have clearly heavily bias in favor of the

11   defendant to which they were subject to cross examination.

12   That's all, Your Honor.

13         THE COURT:  All right.

14         The Court is ready to rule on the government's

15   motion to the review the Arkansas Magistrate Judge's

16   decision to release the defendant pending trial.

17         At the outset, Mr. Barnett, did you want to say

18   something to your counsel?

19         THE DEFENDANT:  Yes, Your Honor.  I wonder if I

20   could have a consultation with my counsel before you rule

21   about some of the things that the prosecutor mentioned.

22   Some of the things that the prosecution is bringing up, I

23   don't know if my counsel would allow me to, but I have some

24   really honest and simple explanations.  I'm not a bad man,

25   I'm very well involved in my community.  Most people in my

1    community love me.  I raised money for bodycams for my local

2    Police Department, I've worked rallies.  Can I have just a

3    minute to speak with my attorney?

4              THE COURT:  Having a private conversation here is

5    a little bit difficult.

6              I am going to ask my courtroom deputy to have the

7    jail give you a phone to speak with your counsel.

8              THE DEFENDANT:  I appreciate it.  Thank you very

9    much.

10             THE COURT:  Mr. Barnett, you just have to ask the

11   guard in the room with you what the telephone number is so

12   we can tell your counsel to call that number.

13             THE DEFENDANT:  Okay.  Thank you, Your Honor.  I

14   appreciate it.  Thank you very much.

15             (There was a pause in the proceedings.)

16             THE COURT:  Okay.  Mr. Siano, is there anything

17   else you would like to add following your consultation with

18   your client?

19             MR. SIANO:  Yes.  My client points out that the

20   FBI agent that testified at the hearing in the Western

21   District of Arkansas pointed out that --

22             THE COURT:  Agent Willett, yes.

23             MR. SIANO:  Yes, Agent Willett, yes, Your Honor.

24   Agent Willett pointed out in his testimony, that the

25   photographs they had after my client came out of the Capitol

1    building inside did not show that he was still in possession

2    of a stun gun.

3           Secondly, that there is no indication, and my

4    client says that there is no connection with Q-Anon in

5    connection with that Save the Children rally.  And I believe

6    that when his partner, when Ms. Newburn was vigorously

7    questioned on cross examination about whether or not she

8    would do what her husband wanted in connection with being a

9    third-party custodian, in answer to the question, I believe

10   what she said was she wouldn't like doing it but if she

11   promised the Court, she would do it, she would carry out her

12   responsibility as third-party custodian.  That was a point

13   we felt worthy of making, Your Honor.

14          THE COURT:  I did read that.  It was apparently

15   persuasive enough for the Magistrate Judge in Arkansas.

16          MR. SIANO:  Judge, I know that the Court is aware

17   that the witnesses were there, Magistrate Judge was able to

18   see them.  In many instances, the cross examinations were

19   longer than the directs.  And the witnesses continued to

20   respond to questions calmly and respectfully throughout the

21   entire hearing.

22          So, I mean, I again, we found as many people in

23   the community as we could consistent with the period of time

24   we had.  And those are the people who were able to come

25   forward and describe to the Court their connection with the

defendant, specifically with respect to whether or not he
would honor his commitments to come to Court and whether or
not he was a danger to the community.  I just wanted to make
that clear.  I don't have anything further, Your Honor.

THE COURT:  All right.  Thank you.

MR. SIANO:  You're welcome.

THE COURT:  As I mentioned, the Court is ready to
rule on the government's motion to review the Arkansas
Magistrate Judge's decision to release defendant pending
trial.

At the outset, a review of the applicable law is
appropriate.  The Bail Reform Act requires release of a
defendant prior to trial unless a judicial officer
determines after a hearing that no condition or combination
of conditions will reasonably assure the safety of any other
person in the community, 18 USC Section 3142(e)(1).

In determining whether any conditions of release
will reasonably assure the appearance of the person as
required, the Court must take into account the available
information concerning four factors set out in 18 USC
Section 3142(g).  And those factors are, one, the nature and
circumstances of the offense charged.  Two, the weight of
the evidence against the person.  Three, the history and
characteristics of the person, including the person's
character, physical and mental condition, family ties,

1   employment, financial resources, length of residence in the

2   community, community ties, past conduct, history relating to

3   drug or alcohol abuse, criminal history and record

4   concerning appearance at court proceedings.

5           And finally four, the nature and seriousness of

6   the danger to any person or the community that would be

7   posed by the person's release.

8           On an appeal for a Magistrate Judge's order of

9   pretrial release, the District Court must conduct a de novo

10  review.  In this case, I have reviewed the entire hearing

11  transcript, which consists of the testimony of the FBI Agent

12  Willett and seven witnesses called by the defendant.  I have

13  also reviewed the government's submissions and the whole

14  record in the case to date, including defense counsel's

15  letter, which was docketed at ECF 10.

16          In conducting its analysis, the Court examined the

17  available information that touches upon those four statutory

18  factors I just listed.  I'm going to discuss each of those

19  factors starting with the first one, the nature and

20  circumstances of the offenses charged.

21          The nature and circumstances of the offenses

22  charged weigh strongly here in favor of a finding that no

23  condition or combination of conditions will reasonably

24  assure the defendant's appearance or the safety of the

25  community.

1          He has been charged with a serious felony.

2     Knowingly entering or remaining in any restricted building

3     or grounds without lawful authority while carrying a

4     dangerous weapon in violation of 18 USC Section 1752.  This

5     offense alone carries 10 years of imprisonment.

6          He is also charged with two misdemeanor offenses,

7     violent entry and disorderly conduct on Capitol grounds in

8     violation of 40 USC Section 5104(e).  And also theft of

9     Public Money, Property or Records, in violation of 18 USC

10    Section 641.

11         The descriptions and the title, the title of those

12    offenses to my mind don't even properly capture the scope of

13    what Mr. Barnett is accused of doing here.

14         The felony and misdemeanor charges of entering and

15    remaining in the Capitol without lawful authority with a

16    deadly weapon and disorderly conduct on Capitol grounds and

17    theft of property in some ways are too benign-sounding to

18    describe what happened on January 6, 2021 at the U.S.

19    Capitol.

20         What happened on that day at the U.S. Capitol is

21    criminal activity that is destined to go down in the history

22    books of this country, of hundreds of Americans using force

23    and violence against their own government to disrupt what we

24    have been most proud of: A peaceful and Democratic

25    transition of power.

1          On January 6, 2021, there was an assault on the

2    U.S. Capitol during a joint session of Congress, certifying

3    the 2020 presidential election results.  During this

4    assault, scores of individuals forced entry into the Capitol

5    by breaking windows, pushing through the Capitol's doors,

6    breaching closed, highly sensitive and reserved areas,

7    assaulting members of the U.S. Capitol Police and the D.C.

8    police force.

9          This violence disrupted a constitutional function

10   of Congress necessary to the presidential transition and to

11   the functioning of our democracy.  This was not a peaceful

12   protest.  Hundreds of people came to Washington, D.C. to

13   disrupt the transition of power and to thwart Congress, a

14   branch of the federal government in carrying out its duty in

15   fulfilling its constitutional task of officially certifying

16   the votes of the electoral college.

17         During the assault on the Capitol that was

18   intended to disrupt the peaceful transition of power to a

19   new administration, as designed under our U.S. Constitution,

20   five people died and many more were injured.  Members of

21   Congress and the then-Vice President Pence were forced to

22   flee the grounds of the Capitol.  Congressional staffers and

23   members of the media were forced to hide, fearing for their

24   safety, barricading themselves in offices.  Many on the

25   scene, from the Capitol Police to Members of Congress were

1   afraid for their lives.

2         We are still living here in Washington, D.C. with

3   the consequences of the violence in which this defendant is

4   alleged to have participated.  Thousands of National Guard

5   troops were brought into the District of Columbia to ensure

6   that last week's inauguration could proceed peacefully.

7   Thousands of heavily armed members of the National Guard

8   remain in the District of Columbia, just outside this

9   courthouse, which faces the mall with a clear view of the

10  Capitol are visible reminders of the January 6th riot and

11  assault on the Capitol.

12        We see heavily armed National Guard troops still

13  patrolling from my window, behind tall fencing, barbed wire

14  and concrete barriers, all of this is to protect the heart

15  of the federal government and the people of the District of

16  Columbia from the risk of violence.

17        Shockingly, this risk of violence is posed by

18  fellow Americans.  Just yesterday, the Department of

19  Homeland Security issued a National Terrorism Advisory

20  System Bulletin, indicating a heightened risk of violence

21  from ideologically motivated, violent extremists who are

22  emboldened by the January 6th Capitol attack and might

23  target elected officials in government facilities.

24        The government has presented overwhelming evidence

25  that this defendant, Richard Barnett, enthusiastically

participated in this act of assaulting the Capitol and

disrupting the Democratic process.  The government has

presented evidence of videos and photos showing that this

defendant was carrying a weapon, a ZAP Hike 'N Strike

950,000 volt stun gun walking stick, that he carried on his

belt inside the Capitol.

He not only entered the Capitol without a

authority but he strutted into the Office of the Speaker of

the U.S. House of Representatives, Nancy Pelosi, sat behind

her desk and had pictures of himself, smiling and seemingly

enjoying himself.

The government describes his conduct as brazen.

And I would agree that is an accurate description.  He felt

so entitled, he put his feet on the desk.  He felt so

entitled, he picked up her mail and walked off with a piece

of mail.  He felt so entitled that the government has

pictures of this defendant showing off, holding the mail he

took from Nancy Pelosi's 's office when he reached the

outside of the Capitol.

He felt so entitled to do what he did that he

spoke to media outlets on January 6th about the mail he had

taken from Speaker Pelosi's office and said, "I did not

steal it.  I bled on it because they were macing me and I

couldn't fucking see so I figured I am in her office.  I got

blood on her office.  I put a quarter on her desk even

1    though she ain't fucking worth it.  And I left her note on

2    her desk that says 'Nancy, Bigo was here, you Bitch.'"

3              Wow -- brazen, entitled, dangerous.

4              In these pictures and videos, the defendant is

5    wearing a hat, a plaid jacket, blue jeans and brown boots in

6    the photos.  His clothing that day becomes important in

7    evaluating whether he should be detained.  And I'll come

8    back to that.

9              The defendant traveled all the way from his home

10   in Arkansas to Washington, D.C. prepared for this assault on

11   the Capitol.  The government has obtained evidence that one

12   week before his travels to the Nation's Capitol, he went out

13   and bought the stun gun and also walkie-talkies and pepper

14   spray.  He came to the city on a critical day under our

15   constitution, prepared with a weapon and cloaked with

16   entitlement.

17             The nature and circumstances of this offense

18   clearly weigh in favor of pretrial detention.

19             Turning to the second factor, the weight of the

20   evidence against the defendant.  As I said, the weight of

21   the evidence against this defendant is overwhelming.  The

22   government has surveillance videos and many pictures of the

23   defendant from the assault on the Capitol.

24             These pictures show the defendant in the Capitol

25   appearing to carry this stun gun walking stick.  Agents

observed empty packaging at his home on January 8th for the

exact same type of stun gun that he bought and had on his

person when he was unlawfully inside the Capitol and inside

the Speaker's office.

During a custodial interview with law enforcement

on January 8 at the time of his arrest, the defendant

admitted to law enforcement that he had participated in the

Stop the Steal Rally, and that he was inside the Capitol.

It would have been hard for him to deny it since he seemed

to be happy to be one of the stars in this assault,

appearing in videos and in photos, in and around the

Capitol, including in a video where the defendant was

proudly holding up a letter with return address of Speaker

Pelosi, bragging about what he had done in the Speaker's

office.

The weight of the evidence weighs heavily in favor

of pretrial detention.

As to the defendant's history and characteristics,

he does have only a limited criminal history.  He also has a

strong history of employment.  As the Magistrate Judge in

Arkansas who granted pretrial release also noted, he has

strong ties to the area, in which he has lived with his

partner, Tammy Newburn.

At the same time, the government has presented

evidence of other incidents in which defendant's actions

have prompted police scrutiny in Fayetteville, Arkansas on

at least two occasions, one in July 2020 and September 2020,

the police were called to investigate the defendant's

behavior when he was armed in the public and members of the

public felt threatened by his behavior.

These incidents are troubling, not because he got

arrested, not because he may have been engaged in criminal

conduct or not, they're troubling because they suggest a

pattern of engaging in provocative behavior while armed.

And even if these activities on these other occasions did

not cross the line of criminal behavior, they're in line

with the criminal conduct alleged in this case.

On July 25, 2020, a 911 caller described an

individual matching Barnett's description as pointing a

rifle at her when she drove by a protest in her car with a

Black Lives Matter sticker.  Three different police officers

had to investigate this incident.

The defendant was at this protest carrying a rifle

slung across his chest, with one officer stating and

describing his observation of the defendant, creating a

disturbance with several counter protesters when he was

armed with a rifle.

The second incident also in Fayetteville on

September 20, 2020, the defendant had an encounter with what

the law enforcement calls a protest for Save the Children,

1    when a caller describes him as carrying a pistol and a rifle

2    at a rally, and looking suspicious.

3           Most concerning, or very concerning are not only

4    the defendant's actions while he was inside the Capitol but

5    after the assault on the Capitol.  The defendant told the

6    agents that the agents may not find much at his house

7    because he had people packing it up the night before he

8    turned himself in.

9           Indeed, his partner confirmed during her testimony

10   at the Arkansas detention hearing that, after some

11   dissembling about not knowing anything, that they had

12   cleared his house of his guns and given them to a friend,

13   Mark Hesse, who also traveled to Washington, D.C. for the

14   January 6 events.

15          At the same time, she denied knowing how many guns

16   he had or what type of guns he had.  And she is not a naive

17   person about guns.  She admitted she owns her own guns.  She

18   also denied knowing what happened to the defendant's stun

19   gun walking stick or his cell phone, neither of which items

20   have been recovered from his person or in the search of his

21   house.

22          Some items that the FBI did recover were the

23   several items of clothing that the defendant was seen

24   wearing in Washington during the assault on the Capitol, a

25   flannel jacket and a hat.  Where did they find these?  In

the trunk of Tammy Newburn's vehicle hidden under a dog

crate.

Ms. Newburn's 20 year relationship with the

defendant plainly shows her loyalty to him, and her actions

to help clear up the house of evidence, put stuff under a

dog crate in her trunk, dissembling at the hearing about her

activities, to my mind, raises significant questions about

her real ability to be a trustworthy third-party custodian

to ensure the defendant's compliance with any release

conditions.

Also troubling is that, when the defendant drove

back to Arkansas from D.C., he admitted, almost bragged that

he took steps to hide his identity by turning off his

location services on his phone, covering his face and only

using cash, all steps to evade law enforcement, which he

knew, given his fairly brazen conduct while in D.C., were

looking for him.

This history of provoking police attention while

armed in public, compounded by his attempts to evade law

enforcement and hide evidence weighs in favor of detention.

I am aware that the defendant turned himself into law

enforcement.  And this fact does count in his favor.  But

the circumstances surrounding his surrender suggests that

this fact is entitled to very little weight.

He knew the images of him at the riot in the

assault on the Capitol had been widely circulated.  He had

boldly talked to the press right at the scene of the assault

on the Capitol.  Both the New York Times and the Washington

Post have him identified, you know, talking about how he sat

in the Nancy Pelosi's office.

He didn't turn himself in immediately, but instead

arranged for a time for surrender that allowed him to clear

out his house of incriminating evidence.  He bragged about

this to law enforcement, saying, "If you all go out there

and do a search warrant, you can see all my shit.  You ain't

going to find nothing out there, I assure you.  I'm a smart

man.  There's not anything there."

I don't know how smart Mr. Barnett is but he is

certainly a bragger.  Bragging to law enforcement about what

he has done to cover his tracks is not a smart thing to do.

In short, the fact that the defendant turned himself in on a

schedule of his choosing does little to mitigate the heavy

weight of the other factors favoring detention.

As to the fourth factor, the Nature and

Seriousness of the Danger to Any Person or the Community

that Would Be Posed by the Person's Release.

I start with what happened on January 6th.  He was

part of a violent assault on the Capitol in which five

people lost their lives.  He brought a weapon to this event

that he had bought for the occasion.  He brought it all the

1    way from Arkansas to the Nation's Capitol to further efforts

2    of disrupting a constitutional event.

3           Given defendant's participation in the assault on

4    the Capitol and his brazen actions while inside the Capitol

5    Building and private offices of the Speaker of the House of

6    Representatives and perhaps others, the fact that he has

7    prompted police attention the last six months due to his

8    public actions while armed, the fact that he owns an unknown

9    number of firearms which he and his partner removed from his

10   home before he scheduled his time to turn himself in, and

11   before the FBI searched his house, the fact that he has

12   admitted to engaging in evasive conduct upon his return to

13   Arkansas after the assault on the Capitol, and his boldly

14   entitled behavior while unlawfully inside the Capitol, all

15   together make this Court very concerned he poses a danger to

16   the community, not only because of his access to guns, which

17   may now be in the custody of his good friend who traveled to

18   Washington, D.C. with him, and also the missing stun gun,

19   but also because of the entitlement that he reflected in his

20   conduct.

21          The Court does not share the Magistrate Judge's

22   confidence in designating Tammy Newburn as a true

23   third-party custodian responsible for defendant's compliance

24   with any release conditions.  As noted, Ms. Newburn appears

25   to have helped the defendant hide evidence, was highly

1   evasive when asked at the hearing before the Magistrate

2   Judge about whether she put the clothing in his trunk, why

3   she put it in her trunk and hid it below her dog create.

4          The responses regarding the defendant's firearms,

5   when they were removed, how many there were, where they

6   were, were similarly evasive until she was compelled to

7   answer.

8          Just as importantly, the Court finds that there

9   are no conditions or combination of conditions that will

10  assure this defendant's appearance as required or compliance

11  with any release conditions, because of his entitled

12  behavior that he exhibited on videos and in photographs

13  while he was inside the Capitol show a total disregard for

14  the law and for official directives, total disregard for the

15  U.S. Constitution.

16         Upon consideration of the proffered evidence

17  presented and the factors set forth in 18 USC Section

18  3142(g) and the possible release conditions set forth in

19  Section 3142(c), the Court finds that all four statutory

20  factors weigh heavily in favor of pretrial detention.  And

21  the government has met its burden of establishing that there

22  are no conditions or combination of conditions that will

23  reasonably assure the safety of any other person in the

24  community..

25         Magistrate Judge Weidemann did a thorough and

1    thoughtful job considering the evidence but I respectfully

2    disagree.  The charges against this defendant are gravely

3    serious and the evidence is extraordinarily strong.  His

4    brazen conduct both inside the Capitol Building during the

5    assault on the Legislative Branch of our Government, and his

6    evasive conduct once he knew he was under investigation

7    bring into question his willingness to abide by any

8    conditions of release that this Court might impose instead

9    of pretrial detention.

10          The government's motion for pretrial detention is

11   therefore granted.

12          Mr. Barnett is directed to appear before the

13   criminal duty magistrate next Tuesday at 3:00 P.M. unless he

14   is indicted before then.  If the defendant is indicted

15   before then, he will appear when scheduled before the judge

16   to whom this case is randomly assigned.

17          Is there anything further today from the

18   government?

19          MS. DOHRMANN:  No, Your Honor.

20          THE COURT:  Is there anything further from the

21   defendant?

22          MR. SIANO:  No, Your Honor.

23          THE COURT:  All right.  You all are excused.

24          (Whereupon, at 4:26 p.m., the hearing was

25   concluded.)



CERTIFICATE OF REPORTER

     I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of the remotely reported proceedings in the above-entitled matter.

     Please Note: This hearing was held in compliance with the COVID-19 pandemic and the standing orders of this court, and is therefore subject to the technological limitations of court reporting remotely, including static, signal interference and other restrictions.

_____   1-29-2021
Lisa Walker Griffith, RPR          Date