IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

RICHARD BARNETT,

*Defendant*.

Case No. 21-cr-0038 (CRC)

## DEFENDANT RICHARD BARNETT'S MOTION FOR MODIFICATION OF BAIL TO PLACE DEFENDANT ON CONDITIONAL RELEASE PENDING TRIAL

Defendant, Richard Barnett, by and through undersigned counsel, respectfully moves this Court, pursuant to the Bail Reform Act of 1984, 18 U.S.C. 3141 et seq., to release the defendant on personal recognizance. Alternatively, if the Court is not amenable to release defendant on personal recognizance, defendant moves this court to release defendant into the third-party custody of his wife, and commit him to the supervision of a High Intensity Supervision Program (HISP) with GPS monitoring by local Pretrial Services.  The defendant states the following in support of this request.

## I.     PREAMBLE

**America is divided**.  Her citizenry is more distrustful of government than ever before. Brother has turned against brother. Fathers have turned against sons.  Sisters who once embraced, now see each other as mortal enemies. Pleas for equal treatment under the law are met with accusations of false equivalence.  Citizens ask for tolerance with one breath and move to smite those with opposing viewpoints the very next breath. Disinformation abounds.  Peace is no longer given a chance. Common ground is out of sight. Our Constitution -an inspired document, drafted during times like these, foreseeing times like these- can only save us.

1

**Judges- the public face of justice,** must work harder than ever to ensure that the principles of judicial integrity and objectivity consistently overpower the human inclination toward activism in their courts.   When decisions rendered contravene statutory law, legislative intent, and/or controlling precedent- reviewing courts are uniquely positioned to right the wrong.   By doing so, they ensure the integrity of our system of justice and enforceability of our Constitutionally protected rights.

**The presumption against pretrial detention is very strong.** The law is clear: only in a very limited set of circumstances is pretrial detention acceptable.   The courts, therefore, must act swiftly and decisively to overturn pretrial detention orders granted in circumstances, such as here, where the government has objectively failed to overcome the Bail Reform Act's presumption against pretrial detention as a matter of law.

## II.    <u>MOTION FOR BAIL MODIFICATION</u>

Mr. Barnett now moves to revoke the January 29, 2021, ORDER OF DETENTION PENDING TRIAL (Doc. # 16), for the following reasons:

I.   This Court's finding that no Condition or Combination of Conditions will Reasonably Assure Mr. Barnett's Required Appearance, the Safety of any Other Person and the Community was incorrectly decided because:

   a.   Dangerousness was Not Proven by Clear and Convincing Evidence Under the Meaning of the Bail Reform Act and Contravenes Precedent;

   b.   The Conclusion that Richard Barnett possessed a Dangerous Weapon is Unsupported by the Facts of This Case;

   c.   The Offense Charged Does Not Qualify for Detention and is therefore Illegal;

   d.   The Government's Inability to Show of an Ongoing or Future Threat Diminishes its Ability to Prove Dangerousness Under the Meaning of the Bail Reform Act;

   e.   The Government's Did Not Prove Risk of Flight by a Preponderance of the Evidence;

    f.   Detention is Illegal because the Government has Not Proven Risk of Flight;

    g.   Richard Barnett Offered Sufficient Evidence to Rebut the Bail Reform Act's Presumption Against Pretrial Detention;

II.    The Court's Finding that there is No Combination of Conditions as to the Proving of Risk of Flight by a Preponderance was Based on Facts Procured in Violation of the Fourth (4th), Fifth (5th), and Sixth (6th) Amendments of the United States Constitution;

III.    The Fourth Amendment's Reasonable Expectation of Privacy Against Warrantless Searches Contravenes the Notion that a Negative Inference Can be Inferred from a Private Citizen's Refusal to Be Electronically Tracked by the Government;

IV.    No Negative Inference Should be Inferred from Wearing a Protective Mask;

V.    Government Agent's Violated Richard Barnett's Fifth Amendment Rights Against Self Incrimination and Sixth Amendment Right to Counsel.

Each of these points are addressed as separate arguments in the Law and Argument section. *See* Section VI, *infra*.

### III.  <u>INTRODUCTION</u>

1.    The events that took place on January 6, 2021, did not occur in a vacuum.  On May 25, 2020, the world watched as George Floyd was murdered by the government on national television.  Immediately thereafter, protest broke out across the United States.  People simply had enough, and for a moment, the entire world agreed that Black Lives Mattered more than ever before.  The reaction to Mr. Floyd's death was almost universal- abject horror combined with the reality that change needed to happen- now.  Scores of people from all walks of life cried, sang, prayed, hugged, screamed, and mourned together.  As powerful speeches, inspirational protests, and meaningful dialogue began to take center stage, people on both sides began to listen in ways they never had before. Out of tragedy, something very beautiful began to take place. Change was coming- and it would happen through us.

2.    One side complained that they have been abused, under-hired, over-policed, unfairly targeted, mass incarcerated, and murdered by the government, for hundreds of years,

simply for the color of their skin.  Explaining further that their reality of daily existence involves having to perpetually rebut presumptions of suspicion, criminality, poverty, drug use, and old-fashioned racism.  And despite strict adherence to the American's Dream's Rules for Success, elite colleges, medical schools, and financial institutions, do much to exclude them, little to understand them, and just about everything to keep them out. Change had been promised by many, delivered by none, and it the time had come to make it happen.

3.    The other side began to listen, consider, empathize, process, and understand, many for the first time- the unfairness of it all.  And while in no way equivocating their experience to the horrors of racism, they too began to complain how they have been ridiculed and exploited for generations by America's ruling class.  And that as members of the non-college educated working poor, they struggle to pay bills, have no savings, are crippled with debt, and are increasing silenced. Explaining further, how they cannot come to understand how they have been scapegoated for the racist actions of the smug, elitist, condescending members of America's ruling class that despises them, and has made them the constant butt of jokes about needing to shop at Walmart because they are poor- and how they carry a great deal of shame because of it.  Both sides realized, for a moment, that they were not enemies.

4.    Political protests exploded across the United States at a level not seen in a generation.  The previously unimaginable ability to plan, gather, and deploy multitudes of protestors to a specific location in real time was executed flawlessly, graduating from grassroots pop ups with limited, yet understandable displays of violent political protests- to highly organized, para-military-styled assaults on government institutions.  As the weeks progressed, the influx of militant anti-government groups, whose sole purpose was to destabilize peaceful protest and incite violence against government, became an obvious reality.  The vandalization of public and private

buildings, firebombing of police stations and government buildings, and creation of militarized autonomous zones in cities, are but a few of the darker manifestations of political protest in 2020.

5.      Not lost on us, is the recognition that the majority of people protesting at these events were good, well-intentioned-persons, who desired to exercise their rights to peacefully yet vigorously protest the government in the strongest terms possible. Equally not lost on us is the government's proclivity to grab power in the name of combating extremism and violence, at the expense of our constitutionally protected rights, such as when the government gave itself the ability to conduct secret searches of private property without having to give notice to the owner under Section 213 of The Patriot Act.[1]  The National Security Agency's 2001-2007 mass warrantless surveillance of United States Citizens, under the Foreign Intelligence Surveillance Act of 1978.[2] And the creation of the PRISM surveillance program, under which Google and other internet technology companies turn over your communications to the NSA under Section 702 of the FISA Amendments Act of 2008.[3]  All in the name of combating extremism without a warrant issued upon probable cause.

6.      In response to this concerning expansion of the scope of government power, and because the scope of protected speech and protected groups is growing at rapid pace, federal courts have consistently denied government motions for pretrial detention in situations where the government has failed to overcome the presumption against pretrial detention.  And in cases involving political protest, even where people have been arrested for violent crimes, federal courts

---

[1] *See* ACLU, *Surveillance Under the USA/Patriot Act*, available at, https://www.aclu.org/other/surveillance-under-usapatriot-act (visited last on April 1, 2021).

[2] *See* JAMES RISEN AND ERIC LICHTBLAU, *Bush Lets U.S. Spy on Callers Without Courts*, December 16, 2005, available at, https://www.nytimes.com/2005/12/16/politics/bush-lets-us-spy-on-callers-without-courts.html (visited last on March 29, 2021).

[3] *See* Section 702 of Public Law 110-261 known as the FISA Amendments Act of 2008.

have been even more respectful of constitutional safeguards in their denial of motions for pretrial detention.

7.    For example, Elizabeth Ann Duke, member of the radical and extremely violent M19 terrorist group, materially participated in the bombing of the United States Capitol's Senate Chamber on November 7, 1983.  Despite being charged with multiple crimes related to domestic terrorism, including the possession of stolen explosives, possession of instruments of forgery, and falsified identification documents - *Elizabeth Duke was released on bail*.  (*See United States v. Elizabeth Duke*, Case No. 2:58-cr-00222 (MSG); Criminal Docket:  ECF Document No. 69, (filed June 20, 1985) attached hereto **Exhibit A (1)**). A review of the Criminal Docket sheet for Elizabeth Duke highlights that the Court ordered the following: "Bail Hearing re: Courts Bench Opinion, Court grants bail but under specific conditions, filed." (*See* attached hereto **Exhibit A (1)** at p. 2 of 7, Criminal Docket: ECF Document No. 69, at **Entry 14**, dated Jul 24, 1985 (filed June 20, 1985) attached hereto **Exhibit A (1)**). Those specific conditions encompassed "Bond in the sum of $300,000 - surety Real Estate with attached agreement of bail, filed." (*See* **Exhibit A (1)** at p. 3 of 7 (filed July 31, 1985). Elizabeth Duke's case shows how powerful the presumption against pretrial detention applies even to a defendant, accused of bombing the Capitol Building.

8.    Another example of the strength of the presumption against pretrial detention is the *Robinson* case. (*See United States v. Robinson*, Order Setting Conditions of Release, Case #: 0-20-cr-00181 (PJS) (BRT), ECF Doc.#: 12 attached hereto as **Exhibit B**). On May 28, 2020, the U.S District of Minnesota granted pretrial release to Dylan Shakespeare Robinson despite his material participation in a nationally televised coordinated attack on Minnesota's 3rd Precinct, where after breaching the doors, the interior was set ablaze with officers still inside. (*See United States v.*

*Robinson*, Order Setting Conditions of Release, Case #: 0-20-cr-00181 (PJS) (BRT), ECF Doc.#: 12 attached hereto as **Exhibit B**).

9.      Further demonstrating the strength of the presumption of pretrial release is the Second Circuit affirming Defendant's pretrial bond on the *Mattis* Case. *See U.S. v. Mattis*, 963 F.3d 285 (2d Cir. 2020). On May 30, 2020, Utooj Rahman and Colinford Mattis firebombed an NYPD vehicle parked on a Brooklyn, New York street. *Id.*  Defendants Rahman and Mattis were subsequently charged with several violent felonies and faced over forty years in jail if convicted. Even so, the Eastern District of New York granted bond, and the Second Circuit Court of Appeals affirmed. (*See United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020) attached hereto as **Exhibit C**).[4]

10.      Overall, the *Duke-Robinson-Mattis*, line of cases, in conjunction with the recent March 26, 2021, D.C. Circuit's decision in *United States v. Munchel*, No. 1:21-cr-0018-1, underscore the continued enforceability of the Bail Reform Act's presumption against pretrial detention. *Id.*; *United States v. Munchel*, No. 1:21-cr-0018-1, 1:21-cr-0018-2, *consolidated with* Case #: 21-3011 at p. 10 (D.C. Cir., March 26, 2021) attached hereto as **Exhibit D**; *See also* Section V, Legal Standard, *infra*. Especially, during circumstances where in can be reasonably inferred that a person's actions arise from an ardent desire to openly criticize the actions of government.

### IV.    **STATEMENT OF FACTS**

11.      Richard Barnett is a sixty-year-old United States Citizen with no criminal record. Mr. Barnett has been in a committed relationship with his life partner Tammy Newburn for over twenty years.  Richard lives with wife Tammy and daughter Ashlee, whom both depend on him

---

[4] The *Mattis* Court synopsis is as follows: "The United States District Court for the Eastern District of New York, Steven M. Gold, United States Magistrate Judge, released defendants on bail. The District Court, Margo K. Brodie, J., affirmed. United States appealed. **Holding:** The Court of Appeals, Hall, Circuit Judge, held that releasing defendants on $250,000 bond was not clearly erroneous. Affirmed." *See* attached hereto as **Exhibit C,** *United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020).

for financial support.  Richard is a gainfully employed retired fire fighter who is beloved in his community.  He spent the first part of his life in Memphis Tennessee and has been living in Western Arkansas for the past twenty-five-years.  Richard's ties to his community are strong.  He has personal relationships with members of the local business community, law enforcement, friends, and family.  He has no warrant history and has never forged or altered his identification. He agreed to surrender his passport to probation after being granted pretrial release by the Western District of Arkansas.  Nothing about his past or current history supports the conclusion that he is dangerous to anyone, a risk of flight, and/or incapable of complying with court-imposed restrictions designed to assure his return to court and protect the community from future harm.

12.     There are three groups of people that entered and left the Capitol on January 6, 2021.  Group One is comprised of the people who showed up to exercise their constitutionally protected rights to participate in political protest and went home absent any controversy. Group Two is comprised of the people who showed up to incite insurrection and thwart the confirmation process, and did so by materially participating in an attack on the Capitol by committing acts of violence to property and personnel.  Group Three is comprised of the people who showed up to participate in political protest, yet ended up inside the Capitol despite having no premediated intent to do so – nor did they commit acts of violence to property or persons.

13.     Richard Barnett is a member of Group Three, where he freely admits that, like many other Americans, he believes the November 2020 Presidential Election was incorrectly decided. It is undisputed that he set out for Washington, D.C. to participate in political protest, in solidarity with other people who share his views, absent knowledge or suspicion of planned violence, or personal intent to be violent in any way.  Mr. Barnett has never run from the fact that he ended up inside the Capitol.  He has never denied the fact that he sat in Speaker Pelosi's chair, put his feet

up on the Speaker's desk, and smiled for the reporter's camera.  Nor is he denying the fact that he removed an envelope from Speaker Pelosi's office.  Richard Barnett freely admits that these things happened, and argues that the law mandates his release from pretrial detention, nonetheless. At no time did he assault anyone, make threats to anyone, or destroy any property.

14.    Upon information and belief Richard walked over to the Capitol at some point after President Trump's speech along with the other protesters and stood The Capitol doors opened, throngs of people pushed, and Richard, who was approximately thirty yards from the door, was swept inside with a mass wave of people. He could not turn against the crowd, and after a certain point, he witnessed a woman getting trampled. He helped such woman get up, and felt the force of the crowd, knocking him to the ground. It was impossible to go against the tidal wave of people, all moving all in the same direction. Soon thereafter, looking for a restroom, he wandered in Speaker Pelosi's office, along with an Associated Press reporter and several other reporters. He did not break the door to get into the room. It was open and there was no sign on the door. The reporter invited Richard to take a picture at the Speaker's desk, and told Richard "act natural."[5] Richard was asked to leave at some point, and he did not object.   He did not destroy any property;

---

[5] At this juncture, the defense will set forth these facts as only for the purposes of assuming *arguendo* that all the statements made during such custodial interrogation are true. The main reason such statements are addressed herein, is that these statements have now been the subject of two separate bond proceedings. Now that these statements have been, *inter alai*, reasons denying his pretrial bond, the defense is dutybound to address what was actually said during this custodial interrogation, and the difference is this time, we will provide the actual context of such statement. (wherein Richard first mentions, upon information and belief, that he was in Pelosi's office with a Reporter));(*See, eg,* Custodial Interrogation Video at 1 hour, 10 minutes, 45 seconds expressing:

   Question [From - Reporter]: Can I take your picture?

   Answer: Yes

   Q: "Act Natural"
   . . . .    [Richard, thereafter stated] "he asked me for my name and I gave it to him.").

**Richard Barnett hereby reserves his rights to challenge the admissibility of such statements given while he was subject to a custodial interrogation.**

indeed, he told others NOT to do so.[6]  Before leaving, he realized that he was bleeding, and had

bled on an envelope on Speaker Pelosi's desk.  Upon further information and belief, he then

removed the envelope for sanitary reasons, left twenty-seven-cents as compensation, and in an act

of protest, wrote a note that said "WE WILL NOT BACK DOWN." (*See* Government's Exhibit

4, attached hereto as **Exhibit G**).

15.     As set forth during Richard's two prior bond hearings, Richard contacted his local

Sherriff shortly after discovering that his picture had made international headlines.  Richard arrived

home during the late afternoon of January 7, 2021, and immediately set an appointment to

surrender the following morning at 10:00 A.M. The next morning, without any controversy,

Richard surrendered himself. Immediately upon being subject to a custodial interrogation, Richard

invoked his Fifth Amendment right against self-incrimination and Sixth Amendment right to

counsel, but was interrogated for almost two hours by two government agents, nonetheless.[7]

16.     Richard explained to agents that between the time of his leaving the Capitol and

arriving back to home,[8] a series of threats had already been made against his family, including

specific threats to his wife, Tammy Newburn. Richard stated to the FBI that he turned off location

monitoring services on his phone and drove home concerned for his family.  Richard understood

that he would be surrendering the next day, and out of an abundance of caution, entrusted his

firearms to a responsible friend, instructed his family to pack and be prepared to evacuate if the

threats against them elevated to the point of impending danger, and informed law enforcement

who were already aware of the developing situation.[9]

---

[6] *See* Custodial Interrogation Video at 106:00 (involving Richard telling people "Don't break the furniture, we are mad at people not history.")
[7] *See* Custodial Interrogation Video (involving Richard invoking, on at least three separate times, his Fifth and Sixth Amendment rights to counsel and against self-incrimination).
[8] The drive from Washington, D.C., to Richard's home in Arkansas is over sixteen hours long.
[9] *See* Custodial Interrogation Video at 22:00 (involving Richard's informing agents of threats corresponding reasons for packing.)

17.     Respectfully, these are the actions of a rationale, responsible, husband and father, taking anticipatory measures to protect his family from harm, under incredible pressure, during a once in a lifetime circumstance.  The government, however, has spun these facts out-of-control, and completely out-of-context, all in a continued effort to cast Richard in the worst possible light. Unquestionably, the government will do the same to this Court in its opposition.  In the past, the Government has wanted the Courts to believe that Richard Barnett is a radical-domestic-terrorist who actively evaded capture, when he in fact he negotiated his surrender before a warrant was ever issued for his arrest.

18.     The government is betting that a combination of politics, disdain for Trump supporters, and fears stemming from what took place at the Capitol, will provoke a reaction so strong that it overrides constitutional rules and simple logic. And to achieve its end, the government will stop at nothing to perfect its cocktail of mischaracterization of truth and invention of fact, in an effort to continue Richard Barnett's unjustifiable and illegal pretrial detention.  This Court must resist the temptation to consume its cocktail, because it is nothing more than a covert attempt to violate constitutional protections by overzealous prosecutors.

19.     The law mandates Richard Barnett's release, because the government has not proven by a preponderance of the evidence that Richard Barnett poses a risk of flight, and the government has not proven by clear and convincing evidence that Mr. Barnett poses a danger to the community.  Moreover, the offenses charged do not qualify for detention. Without question, a combination of conditions, including GPS monitoring, will reasonably ensure his appearance in court, and the safety of the community.  Because the events that took place at the Capitol on January 6, 2021, are unique to that day and not indicative of a future event, Richard poses no ongoing fear or threat.

20.     The Western District of Arkansas's decision to grant Richard release was properly decided and requires deference under the meaning of the Federal Magistrates Act.  This Court's original decision to grant the government's motion for pretrial detention, is out of line with relevant legal precedent, and is violative of the United States Constitution.

## V.     PROCEDURAL HISTORY

21.     On January 15, 2021, after hours of testimony, and the calling of multiple witnesses, Honorable Erin L. Wiedemann, the Chief Magistrate Judge of the United States District Court Western District of Arkansas (W.D. Ark.), deemed Richard Barnett eligible for pretrial release under a combination of the following conditions:

>     a.   Mr. Barnett was released on a $5,000.00 (Five Thousand Dollar) unsecured bond into the custody of Tammy Newburn, a third-party custodian;
>     b.   Mr. Barnett needed to submit to the supervision of pretrial services;
>     c.   Mr. Barnett would be subject to home incarceration; and
>     d.   Mr. Barnett would be subject to location monitoring services.

22.     This combination of conditions that the United States District Court Western District of Arkansas imposed on Mr. Barnett was deemed sufficiently appropriate to ensure the safety of community members while simultaneously assuring Barnett's return to court, in conformance with 18 U.S.C. § 3142 and 28 U.S.C. § 631-39, under which magistrate judges are "authorized by law" with "the power to... issue orders pursuant to section 3142 of title 18 concerning release or detention of persons pending trial . . .". § 636(2)(2).

23.     The W.D. Ark. Court issued an order on January 15, 2021 expressing the following:

>     At the conclusion of the detention hearing on this date, the Court determined that the Defendant *should be released on bond*. The Government *moved for a three-day stay of the release order* to allow it file an appeal under 18 U.S.C. § 3145(a). **The motion is DENIED**, as the Court believes that the very restrictive conditions of release imposed, including home incarceration and location

monitoring, will ensure that the Defendant will not pose a flight
risk or danger pending any appeal, and that the Defendant can
easily be taken back into custody should the release order be
overturned.

. . . .

IT IS SO ORDERED this 15th day of January, 2021.

(*See* Criminal Complaint, Government's Statement of Facts and Jan. 15, 2021 Order, ECF Doc. 17, 21-cr-0038 (CRC), attached hereto as **Exhibit F**).

24.     However, hours later, on the evening of January 15, 2021, the government filed a Motion for Emergency Stay and Review of release order (ECF Docket Entry No. 5).  The government argued that Richard Barnett was subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(e) because he was charged with a felony involving a dangerous weapon.  Specifically, that he entered and occupied an office inside the United States Capitol restricted for use by a congresswoman while carrying (but not using or brandishing) an inoperable stun gun/combo collapsible cane clipped to his belt.

25.     Then on January 28, 2021, Chief Judge Beryl A. Howell of this Court conducted a *de novo* review of the W.D Ark.'s decision to deny the government's application for pretrial detention and applied the following four factors set out in 18 USC § 3142(g), to the facts of Barnett's case, and made the following corresponding conclusions:

(a) The nature and circumstances of the offense charged;
(b) The weight of the evidence against the Richard Barnett;
(c) The history and characteristics of Mr. Barnett; and
(d) The nature and seriousness of the danger to any person or the community that would be posed by the Barnett's release.

26.     Judge Howell then overruled the W.D Ark.'s ruling in its entirety, despite no material change in fact, despite the government's inability to demonstrate risk of flight by a preponderance of the evidence, despite the government's failing to demonstrate dangerousness by clear and convincing evidence, despite the proving up of a detention qualifying offense, and

despite the production of a plethora of evidence clearly demonstrating why he is eligible for pretrial release. Richard Barnett remains illegally detained as of the date of this motion in dangerous prison conditions and without ready access to counsel to assist in his defense.

## VI.   LEGAL STANDARD REGARDING PRETRIAL DETENTION

27.     In a detailed decision issued March 26, 2021, the *Munchel* Court, highlighted how "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Munchel*, No. 1:21-cr-0018-1, 1:21-cr-0018-2, *consolidated with 21-3011* (D.C. Cir., at p. 10 (decided March 26, 2021) attached hereto as **Exhibit D**) (*citing United States v. Salerno*, 481 U.S. 739, 755 (1987)).

28.     The Bail Reform Act of 1984 authorizes the detention of defendants awaiting trial on a federal offense only under certain, limited circumstances. 18 U.S.C. § 3142(f). Specifically, the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Munchel*, No. 1:21-cr-0018-1 (*citing* 18 U.S.C. § 3142(e)); *see also* 18 U.S.C. § 3142(f). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.' " *Id.* (*quoting United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)). First, the government may seek a defendant's pretrial detention if the charged offenses fall into any of five enumerated categories. 18 U.S.C. § 3142(f)(1). Those categories include:

  a.    A crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

  b.    An offense for which the maximum sentence is life imprisonment or death;

    c.    An offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act ... the Controlled Substances Import and Export Act ... or 46 U.S.C. § 705;

    d.    Any felony if [the person charged] has been convicted of two or more offenses described in [§§ 3142(f)(1)(A)–(C)], or two or more State or local offenses that would have been offenses described in §§ 3142(f)(1)(A)–(C)] if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses; or

    e.    Any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device[4] ... or any other dangerous weapon. (*See United States v. Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079, at (D.D.C. Mar. 8, 2021)).

29.    The government may seek detention or the court may *sua sponte* hold a detention hearing to determine whether pre-trial detention is appropriate—if the case involves "a serious risk" that the defendant will flee or "will or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2); *United States v. Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079, at 5 (D.D.C. Mar. 8, 2021).

30.    There are two types of situations in which the Bail Reform Act establishes a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community. 18 U.S.C. § 3142(e). First, a rebuttable presumption arises if the judicial officer finds that (a) the person has been convicted of certain listed federal offenses, including a "crime of violence," or similar state offenses, (b) that offense was committed while the person was on release pending trial for another offense, and (c) not more than five years has elapsed since the date of conviction of that offense or the release from imprisonment, whichever is later. 18 U.S.C. § 3142(e)(2).

31.     Where there is no rebuttable presumption of detention, the court instead must consider the following factors to determine whether there are conditions that would reasonably assure the defendant's appearance and the public's safety:

1.  the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
2.  the weight of the evidence against the person;
3.  the history and characteristics of the person, such as character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, drug or alcohol abuse, criminal history, and warrant history;
4.  whether, at the time of arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and
5.  the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g)(1) – (4); *See also United States v. Chansley*, No. 21-CR-3 (RCL), 2021.

32.     As the *Munchel* Court highlighted:

To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." Id. § 3142(f). Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

*United States v. Munchel*, No. 1:21-cr-0018-1 at p. 11.

33.     In citing *Salerno*, the *Munchel* Court explained how:

the Supreme Court rejected a challenge to this preventive detention scheme as repugnant to due process and the presumption of innocence, holding that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that,

> consistent with the Due Process Clause, a court may disable the
> arrestee from executing that threat.

*U.S. v. Munchel*, No. 1:21-cr-0018-1 at p. 11 (*quoting United States v. Salerno*, 481 U.S. 739, 751 (1987) (emphasis added)).

34.     If the Bail Reform Act authorizes pre-trial detention, the judicial officer must hold a hearing to determine whether there are conditions of release that would reasonably assure the appearance of the defendant as required and the safety of any other person and the community. *See* § 3142(f). If the judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer *shall* order the person detained pending trial.  § 3142(e)(1). A finding that no condition or combination of conditions would reasonably assure the safety of any other person and the community must be supported by clear and convincing evidence.  § 3142(f). And a finding that no conditions would reasonably assure the defendant's appearance as required must be supported by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

## VII.   <u>ARGUMENTS</u>

### A.   THE COURT'S FINDING THAT THERE IS NO COMBINATION OF CONDITIONS IS BASED UPON AN INSUFFICIENT EVIDENCE OF DANGEROUSNESS BY CLEAR AND CONVINCING <u>EVIDENCE.</u>

The Western District of Arkansas's decision (hereafter referred to as "W.D. Ark.'s decision") to grant Richard Barnett's release is objective proof that (1) the government was unable to prove by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community.  And additional objective proof of that fact that (2) the government was unable to prove by a preponderance of the evidence that no conditions would reasonably assure the defendant's appearance.

The Federal Magistrate's Act, 28 U.S.C §631-639 grants Magistrate Judges the power to issue orders of a defendant's release or detention under Title 18, U.S.C § 3142. Section 636(b)(1)(a) of the Federal Magistrate's Act explicitly authorizes a magistrate judge to either grant pretrial release or inflict pretrial detention. As such, the correct standard of review is a clearly erroneous one, which requires a district court judge to consider whether there is (1) evidence to support that finding, and (2) after reviewing the entirety of evidence, is left with the definite and firm conviction that a mistake has been committed. *Matter of the Search of Information Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.* 13 F. Supp. 3d 157, (D.D.C. 2014).

The Chief Magistrate Judge of Arkansas's determination that Richard Barnett is not a flight risk and that he is not dangerous, is, in and of itself, sufficient grounds for release. The determination that a combination of conditions does exist under the meaning of the Bail Reform Act is supported by precedent, reasonable application of case law, and fact- and therefore, negates the notion that a mistake of any kind has been committed, which in turn means the clearly and erroneous standard has not been met.

In its decision to grant the government's motion for pretrial detention, Judge Howell analyzed the W.D. Ark.'s decision under a *de novo* review standard with zero deference to (1) the Chief Magistrate Judge of the Western District of Arkansas's factual findings or determination, and (2) a line of decisions made by the Supreme Court of the United States, District Court of Appeals, Second Circuit Court of Appeals, D.C. District Court, during which defendant's objectively accused of far more dangerous actions, during protests, have consistently granted pretrial release.

Judge Howell justified her decision via an improper amalgamation of (1) unconstitutional burden shifting; (2) criminalization of generic law-abiding conduct; (3) conflation of general events vs specific conduct; (4) improper conversion of unfounded allegations into a criminal history; (5) material and intentional misrepresentation of statements made outside of the presence of counsel (6) meritless "guilt by association" attempts to ascribe Mr. Barnett with extremism; (7) mischaracterization of a walking stick as a dangerous weapon;  and (8) conclusions regarding future danger absent the presence of any specific articulatable threat.

In justifying its decision in favor of pretrial detention the Court improperly conflates the general events that took place on January 6, 2021, with personal conduct attributable to Mr. Barnett.  For example, the court states:

> What happened that day (January 6, 2021) at this U.S. Capitol is criminal activity that is destined to go down in the history books of this country, of hundreds of Americans using force and violence against their own government to disrupt what we have been most proud of: A peaceful and Democratic transition of power…members of Congress were forced to flee… the media was forced to hide… visible reminders of the January 6th riot (abound)… Just yesterday, the Department of Homeland Security issued a National Terrorism Advisory System Bulletin, indicating a heightened risk of violence from ideologically motivated, violent extremists who are emboldened by the January 6th Capitol attack…

The court then goes on to explain how the:

> government has presented overwhelming evidence that…Richard Barnett, enthusiastically participated in this act of assaulting the Capitol… The government has presented evidence… of (Barnett) carrying a weapon…on his belt inside the Capitol.  He not only entered the Capitol without authority but he strutted into the Office of the Speaker of the U.S. House of Representatives, Nancy Pelosi, sat behind her desk and had pictures of himself, smiling and seemingly enjoying himself.

. . . .

> The government described his conduct as brazen.  And I would
> agree that is an accurate description.  He felt so entitled, he put his
> feet on her desk.  He felt so entitled, he picked up her mail and
> walked off with a piece of mail.  He felt so entitled that the
> government has pictures of (him) showing off, holding the mail her
> took from Nancy Pelosi's office when he reached outside the
> Capitol… Wow-- brazen, entitled, dangerous…The nature and
> circumstances of the offense clearly weigh in favor of pretrial
> detention.[10]

Indeed, the events that took place at the U.S. Capitol on January 6, 2021, are historical. But what relevance is there in mentioning that hundreds of Americans descended upon the Capitol using force against their own government, if no specific allegation of violence is attributable to Richard Barnett?  **The answer is none.**  What weight should be given to members of the media being forced to hide, when it was a member of the Associated Press inside Speaker Pelosi's office with Richard Barnett that invited him to pose and look natural for their now infamous picture?  **The answer is none.**  What nexus is there between Richard Barnett and the National Terrorism Advisory System Bulletin, indicating a heightened risk of violence from ideologically motivated, violent extremists, when there is no evidence of any kind connecting Barnett to violent extremism?  **The answer is none.**

In justifying its decision to overrule the W.D. Ark., Judge Howell concluded that the "government has presented overwhelming evidence that…Richard Barnett, enthusiastically participated in this act of assaulting the Capitol… (he) carried a weapon on his belt inside the Capitol…He not only entered the Capitol without authority but he strutted into the Office of the Speaker of the U.S. House of Representatives, Nancy Pelosi, sat behind her desk and had pictures of himself, smiling and seemingly enjoying himself."  *See* January 28, 2021, Pretrial Detention

---

[10] *See* January 28, 2021, Pretrial Detention Hearing Transcript at p. 31-35 attached hereto as **Exhibit H**.

Hearing Transcript attached hereto as **Exhibit H**. The court goes on to describe Barnett's conduct as "brazen" and "entitled," and talks about the fact that Barnett removed a single piece of mail and then actually quotes a defense to the crime to which he has been charged, "I did not steal it. . . I bled on it [and]. . . put a quarter on her desk. . .". *Id.* Assuming arguendo*,* that the totality of these allegations is true, the D.C. Circuit's decision in *U.S. v. Munchel,* which ruled on facts almost identical to Richard Barnett's, is devastating to any finding that Richard Barnett should be detained pretrial under a finding of dangerousness.

Unlike *Munchel*, Richard Barnett did not wear battle dress uniform, a tactical vest, or go into the Senate Chamber with zip ties; clearly this is a plus one factor in favor of Barnett.  Whereas, similar to the facts in *Munchel*, Barnett's (1) history and characteristics, (2) the nature and seriousness or his alleged crimes, and (3) an utter government failure to identify a specific articulatable threat to the community, also compels release and careful consideration.  It should be noted, that as stated above, the allegation is that Barnett's alleged weapon was "on his belt while inside the Capitol," which clearly means he did not brandish or use it.

There is no legal or logical authority leading to the facile conclusion that allegedly "strutting" (to describe nefariously walking) into someone else's office with a collapsed walking stick attached to one's belt that was not then capable of being used as a stun gun (due to the absence of batteries) nor was it so used, while someone looking cloaked in entitlement- plus sitting behind someone else's desk, while apparently enjoying oneself, constitute sufficient facts for the proving up dangerousness by clear and convincing evidence under the meaning of the Bail Reform Act.

**B. THE COURT'S FINDING THAT THERE IS NO COMBINATION OF CONDITIONS FOR SETTING BAIL CONTRAVENES LEGAL PRECEDENT AS TO THE PROVING OF "DANGEROUSNESS" BY <u>CLEAR AND CONVINCING EVIDENCE.</u>**

That the Court's ruling is entirely out of line with legal precedent is demonstrated by the fact that persons accused of far more egregious crimes under analogous circumstances have consistently been released because the of the strength of the Bail Reform Act's presumption against pretrial detention. As previously noted, a prime example is Elizabeth Ann Duke, a member of the radical and extremely violent M19 terrorist group, who materially participated in the bombing of the United States Capitol's Senate Chamber on November 7, 1983. Despite being charged with multiple crimes related to domestic terrorism, including the possession of stolen explosives, possession of instruments of forgery, and falsified identification documents- Elizabeth Duke was released on bail during a time that the Bail Reform Act did not even exist. (*See United States v. Elizabeth Duke*, Case No. 2:58-cr-00222 (MSG); Criminal Docket: ECF Document No. 69, (filed June 20, 1985) attached hereto **Exhibit A (1)**).

Inexplicably, on June 17, 2009, President Obama's Department of Justice, under the leadership of Attorney General Eric Holder, moved to have Elizabeth Duke's indictment dismissed- despite fact that she jumped bail and successfully evaded capture for twenty-five-years.[11] All this court need do is look to the FBI's current Top 10 List of Most Wanted Domestic Terrorist to verify the fact Elizabeth Duke is still wanted by the FBI.[12] Be that as it may, the Department of Justice's oral motion to dismiss the indictment without stating any reasons and quash the arrest warrant against Elizabeth Duke[13] was granted by United States Magistrate Judge Deborah Robinson on June 17, 2009, [14] which stated in relevant part:

---

[11] *See* attached hereto **Exhibit A (2)**: FBI Most Wanted Poster of Elizabeth Duke.
[12] *See* attached hereto **Exhibit A (5)**:  FBI's Most Wanted List of Domestic Terrorists.
[13] *See* attached hereto **Exhibit A (4)**: Elizabeth Duke Quashed Arrest Warrant
[14] *See* attached hereto **Exhibit A (3)**: Order to Dismiss Indictment & Quash Arrest Warrant.

> Upon consideration of the government's oral motion, to Dismiss the Indictment and Quash Arrest Warrant and the record herein, for the reasons set forth in the government's motion and for good cause shown on this 17th day of June 2009, ORDERED that the case is dismissed…arrest warrant quashed… and the United States Marshals Service cancel and withdraw the warrant from the NCIC database.

(*See United States v.  Elizabeth Duke*, Case No. 2:58-cr-00222 (MSG), attached hereto **Exhibit A (3)**.[15]

Another prime example of the strength of the presumption against pretrial detention, as explained above is the very recent case of *United States v. Robinson*, where on May 28, 2020, Dylan Shakespeare Robinson was granted pretrial release by the U.S District of Minnesota despite materially participating in a nationally televised coordinated attack on Minnesota's 3rd Precinct, where after breaching the doors, the interior was set ablaze with officers still inside.[16] (*See United States v. Robinson*, Order Setting Conditions of Release, Case #: 0-20-cr-00181 (PJS) (BRT), ECF Doc.#: 12 attached hereto as **Exhibit B**).

Another prime example is the incident that occurred on May 30, 2020, where Utooj Rahman and Colinford Mattis firebombed an NYPD vehicle parked on a Brooklyn, New York street, without regard for the safety of thousands of protesters and police.  Rahman and Mattis were subsequently charged with several violent felonies and faced over forty years in jail if convicted.  Even so, the Eastern District of New York granted bond, and the Second Circuit Court of Appeals affirmed.[17] (*See United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020), attached hereto

---

[15] *See* attached hereto **Exhibit A (6):** Inexplicably, then-Chief Judge now Attorney General Merrick Garland sanctioned this unlawful dismissal of an indictment of this indicted terrorist by a Magistrate Judge by dismissing a judicial misconduct complaint against the Magistrate Judge for signing the order as an Article III judge and for stating it was based upon reasons given by DOJ when, in fact, NO reasons were given: *See also* https://nlpc.org/2021/02/20/merrick-garland-must-address-his-role-in-dropping-charges-against-capitol-bomber/
[16] *U.S. v. Robinson*, *Order Setting Conditions of Release* (ECF Document No. 12 July 14, 2020).
[17] *United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020).

as **Exhibit C**). Defendants Rahman and Mattis were subsequently charged with several violent felonies, and nonetheless release on pretrial bond.

More relevant precedent for pretrial release are the orders issued to Barnett's fellow Capitol protesters. *Compare  United States v. Chrestman,* 2021 WL 765662 (D.D.C February 26, 2021), slip op. at 1-2 (ordering detention ordered for Proud Boy defendant who brandished an axe handle; wore a tactical vest, a hard helmet and a gas mask; toppled the metal barriers used by police to hold back the crowd; was on front lines and threatened a police officer, "You shoot and I'll take your fucking ass out"; encouraged others to interfere with police officers' arrest of a protester; and used his axe handle to prevent police from closing barriers to Capitol building); *compare with United States v. Cua*, 2021 WL 918255(D.D.C. March 10, 2021), slip op. at 1 (ordering detention not justified for defendant who previously called for execution of elected officials and "glorified violent protest," and who on January 6, 2021, walked through Capitol building twirling a black baton, attempted to open office doors in the Capitol, thrice shoved aside a police officer to enter the Senate Chamber, sat "atop the Senate dais in the chair previously occupied by former Vice President Mike Pence, with his feet up on. . . the desk," and photographed senators' papers in the chamber); *Compare to United States v. Hunter Ehmke*, 21-cr-29 (TSC) (ordering release for defendant who broke window of Capitol building and did not cease when ordered to do so by police officer); *United States v. Jones*, 21-mj-76 (ZMF) (releasing defendant because government did not seek detention, even though the defendant was alleged to have violently broken the glass doorway to House chamber; (*United States v. Gossjankowski*, 21-cr-123 (PLF) (releasing defendant because government did not request detention for defendant who activated taser in Capitol multiple times); *United States v. Miller*, 21-cr-75 (RDM) (releasing defendant because detention not justified for defendant who discharged fire extinguisher onto police officers and used a crowd barrier fence as

a ladder to scale the Capitol building walls); *United States v. Powell*, 21-cr-179 (RCL) (holding detention not justified despite presumption of detention for crime of violence for defendant who used a battering ram to break a window of the Capitol, climbed in, came back out, used bullhorn to direct others inside with what seemed to be detailed knowledge of the floor plan, and exhorted others to break another window); *United States v. Leffingwell*, 21-cr-5 (ABJ) (releasing defendant because government did not request detention of defendant who repeatedly punched a police officer at Capitol with a closed fist and breached line of officers attempting to keep people out of the building); *United States v. Biggs*, 21-mj-126 (RMM) (releasing defendant because detention not justified for Proud Boy defendant who posted plans on social media before attack, was at front of crowd who breached and entered Capitol building within 20 seconds of breach, and communicated with other Proud Boy members with walkie-talkies during riot); *United States v. Capsel*, 21-mj-122 (RMM) (holing detention not justified for defendant captured on video physically fighting National Guardsmen who were attempting to hold a boundary, and who did not desist until he was sprayed with pepper spray); *United States v. Colt*, 21-cr-74 (TFH) (releasing defendant because government did not request detention of defendant wearing assault gear who scaled the wall of the Senate chamber, later proclaimed on social media that he was the first person to sit in former Vice President Pence's chair, and called Speaker Pelosi a "traitor"); *United States v. DeCarlo/Ochs*, 21-cr-73 (BAH) (releasing defendant because government did not request detention for Proud Boy organizers who planned and fundraised for the riot, one of whom had Proud Boys name tattooed on his body, who posted their obstructionist intent on social media, defaced the Capitol building with the words, "Murder the Media," and took flexicuffs from the Capitol); *United States v. Cudd*, 21-mj-68 (TNM) (releasing defendant because government did not request detention for defendant who livestreamed video from inside Capitol building stating that to gain entrance "we just pushed,

pushed, and pushed, and yelled go and yelled charge," and said "fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes, I am proud of my actions," and later told a new station, "Yes, I would absolutely do it again").

Overall, the *Duke-Robinson-Mattis-Munchel*, line of cases, clearly establish the continued enforceability of the Bail Reform Act's presumption against pretrial detention. *Id.*; *See also* Section III, Introduction, *supra*. Especially, during circumstances where in can be reasonably inferred that a person's actions arise from an ardent desire to openly criticize the actions of government.  The Court's granting of the government's motion for against pretrial release, when viewed in light of the *Duke-Robinson-Mattis-Munchel*, is grossly unjust because the objective facts regarding Richard Barnett's personal history, and lack of criminal record have counted for nothing.  While a meritless concoction of unfounded allegations was weighed against him despite the fact that he was never arrested or given the opportunity to confront his alleged accuser in court.  These unfounded allegations are then intentionally comingled with the violent actions of others, to suggest that Richard Barnett was violent, incited violence, planned violence, is violent, lead violence, when in fact there is no evidence of violence whatsoever.[18]

The fact that Richard Barnett, a sixty-year-old responsible gun owner with no criminal history, left his home in Arkansas and traveled to Washington, D.C. for the specific purpose of peacefully exercising his First Amendment rights to openly criticize government alongside concerned citizens with like-minded views on an important day is not even considered in the Court's analysis.  In the January 28th decision denying Barnett bond the court tells a story about violence and the disruption of constitutional function, armed troops in the streets, fencing and

---

[18] (*See* D.C. Hearing Transcript at p.37, attached hereto as **Exhibit H** (explaining that "These incidents are troubling, not because he got arrested, not because he may have engaged in criminal conduct or not, they're troubling because they suggest provocative behavior while armed.").

barbed wire. *See* D.C. Hearing Transcript attached hereto as **Exhibit H.**  The court then highlights a National Terrorism Advisory indicating a high risk of violence from ideologically motivated, violent extremist. *Id.*  And then, one sentence later, we are told that the government has presented overwhelming evidence that Richard Barnett enthusiastically participated in this act of assaulting the Capitol.[19] This is a lie, unsupported by the facts of this case, that is designed to cast Richard Barnett as a violent extremist, when he is instead a God fearing, U.S.A. loving American that walked into Speaker Pelosi's previously opened-door, put his feet up on the desk, and left a protest note quoting Tom Petty's "I won't back down."

If the government wants to debate the nuances of mass trespassing, fine.  If the government wants to see if it can get Richard Barnett from a Base Offense Level 14 to a Base Level Offense 22, premised upon the alleged fact that he had a dangerous weapon in the form of a walking stick allegedly capable of being a stun gun, but was in fact purposefully disarmed, they must fail.  But what this Court should not allow the government to do is bootstrap Richard's non-violent conduct to those who were violent.  Nor should this Court allow him to be unjustly associated with extremism, terrorism, and conspiracy of any kind.

Moreover, even if all the allegations in this case were accepted as true, his release is still demanded under the *Duke-Robinson-Mattis-Munchel* line of cases.  This line of cases applies because the justified protests that exploded across this country, especially after the murder of George Floyd, generated counter protests in response, and then a cycle of protests, that grew in terms of regularity, popularity, and violence- which then culminated on January 6, 2021 at the Capitol.  And while the reasons for each protest are very different, the fact remains, that these protests are connected, to the extent where a stream of protests is easily identifiable.  Moreover,

---

[19] (*See* January 28, 2021 Bail Hearing Transcript at p. 33-34, attached hereto as **Exhibit H**).

and analogous to cases where a corporation does business in many states, the same groups, led by the same organizers, and financed by the same donors, further demonstrate the interconnectedness, of these events.  As such, the way protesters are treated in Federal Courts across the land qualifies as persuasive authority.

For instance, when the U.S. District Court for the District of Minnesota, grants bond after Dylan Robinson firebombs a police station with officers inside, during a protest.  And then the Eastern District of New York grants bond after Utooj Rahman and Colinford Mattis firebomb the NYPD during a protest.  The logical conclusion is that bond is the standard in these situations. Moreover, the D.C. District Court's history of granting bond in cases where defendants blew up the Capitol and in in these January 6, 2021, Capitol riot related cases involving far more egregious offenses. The fact that Richard Barnett is detained for crimes far less egregious, simply cannot be justified.

### C. THE COURT'S FINDING OF DANGEROUSNESS PURSUANT TO THE "POSSESSION OF A DANGEROUS WEAPON" IS UNSUPPORTED BY THE FACTS OF THIS CASE.

The count of entering Capitol grounds with a dangerous weapon is by far the most serious crime to which Richard Barnett is charged.  Mr. Barnett's "dangerous weapon" charge and further allegations opposing bond all stem from the fact that he purchased a Zap Hike 'n Strike Walking Stick just after Christmas, in December of 2020, at Bass Pro Shop.

Bass Pro Shop's website describes the device as:

(1) a walking stick,
(2) a stun gun, and
(3) a flashlight.

*See* Bass Pro Shops Description of Stun Gun Walking Stick, (available at https://www.basspro.com/shop/en/personal-security-products-hike-n-strike-950-000-volt-stun-gun-hiking-stick, last visited March 30, 2021).

In order for the stun gun or flashlight functions to actually work, three (3) lithium CR123A batteries must be installed.  Absent these batteries, the device is *effectively* reduced to a walking stick.  This clearly begs the question: *Were the batteries installed, and was this device seen on Richard even operable at the time?*  The answer is unequivocally **no**.

Richard Barnett is a responsible gun owner who will testify that he purchased the walking stick stun gun legally in Arkansas to bring to Washington, D.C, because it is legal to carry a stun gun or walking stick in Washington, D.C.  He will also testify that the stun gun function of his walking stick was disarmed before January 6, 2021, thus converting the multiuse device into a nothing more than a collapsible walking stick.

There is no manifesto, no plan, no recording of him brandishing this multiuse device in a way that is consistent with stunning anyone.  The item is a multi-purpose tool, converted to be less dangerous, not more.  Mr. Barnett understood that he was going to be on his feet for multiple hours during the January 6th protests.  A retractable walking stick, therefore, is a perfectly legitimate accessory to help alleviate the physical burden stemming from foreseeable hours of standing, marching, and protesting.  It is reasonable to infer that a sixty-year-old responsible gun owner, with zero criminal history would intentionally disarm the walking stick's stun gun function out of an abundance of caution.  Because sixty-year-old responsible gun owners with zero criminal history do not wake up one day and decide to become violent criminals.  Therefore, drawing the worst possible inference, absent any corroborating behavior or criminal history, does not rise to the level of establishing dangerousness by clear and convincing evidence.

The government has also gone to great lengths to criminalize the perfectly legitimate and legal behavior surrounding Mr. Barnett's December 2020 purchase at an Arkansas Bass Pro Shop. The governments allegations', however, are speculative at best, or intentionally misleading at

worst.  Either way, these allegations were cleverly designed to cast Richard in the most dangerous light possible. The government's theory that the purchase of two cans of pepper spray equates to indicia of premeditative intent for an assault on the United States Capitol has not been corroborated by a modicum of direct or circumstantial evidence.  On the contrary, evidence available at the time of arrest indicates that Barnett purchased the two cans of pepper spray for his wife and daughter's personal protection, and gifted them said pepper-sprays shortly after purchase.  **At no point in time did he bring pepper spray to the rally.**

Mr. Barnett certainly does not concede that he carried a dangerous weapon.  For the sake of argument, however, accepting the allegation as true, the threshold to qualify as a crime of violence is not met, because while the possibility of violence may be present, there is no inherent risk of violence arising from the crime of entering Capitol grounds with a dangerous weapon. *United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999); *United States v Chimurenga*, 760 F.2d 400, 404 (2d. Cir. 1985); *United States v. Munchel*, No. 1:21-cr-0018-1.

Put differently, the government has not charged Richard Barnett with any offense that has an element of the use or attempted use of force against any person or property of another.  Nor has the government charged Mr. Barnett with a felony that by its nature, (arson, assault, burglary, etc...) involves a substantial risk that force against a person or property of another may be used in the course of committing the offense. To be clear, nowhere in the government's papers or the court's analysis is there a single specific reference to Richard Barnett pushing an officer, breaking a door, using a stun gun, waiving a walking stick, or doing anything to suggest that he was actually violent.  Furthermore, of the thousands of videos and pictures taken at the Capitol on January 6, 2021, and their subsequent circulation across the world, there is not a single one showing Richard

Barnett participating in an act of violence.  Not a single one showing him using his walking stick in any menacing way.

Yet, this so-called evidence is somehow *the "*smoking gun", upon which the United States Government and the media has built its case, and a major justification for pretrial detention. Associating the peaceful conduct of Richard Barnett to the violence that took place at the Capitol on January 6, 2021, absent any reasonable showing of specific articulatable facts where Barnett was actually violent, or threatened violence, is not sufficient justification to support the Court's conclusion that the nature and circumstances of the offenses charged do not weigh in favor of finding that no condition or combination of conditions will reasonably assure Mr. Barnett's appearance or safety of the community.

### D.  THE GOVERNMENT'S INABILITY TO SHOW AN ONGOING OR FUTURE THREAT DIMINISHES ITS ABILITY TO PROVE DANGEROUSNESS UNDER THE MEANING OF THE BAIL REFORM ACT.

The events that took place at the Capitol on January 6, 2021, are unique to that day and not indicative of a future ongoing danger or threat.  For instance, the "Stop the Steal" rally, referred the belief that the November 2020 United States Presidential Election was at best incorrectly decided and at worst stolen from the people, by a government conspiring against the people, and that if enough people showed up to express their belief about this wrongdoing- Joe Biden would not be confirmed as the 46th President of The United States.  Clearly, that did not happen and any worry over Biden's confirmation moot, as he is now our President.  Therefore, the argument that an ongoing future threat abides is diminished to the extent that it does not meet the threshold of clear and convincing evidence.

The government has failed to prove dangerousness by clear and convincing evidence because it has not identified at least one specific articulable threat to the safety on any individual

or community stemming from Richard Barnett's prospective release on bail. Neither has there been an adequate demonstration that the crimes under which he has been charged qualify as violent under the meaning of the Bail Reform Act.  Nor has there been any indication that his lack of criminal history, home life, employment history, community ties, or the fact that he self-surrendered were properly balanced against the allegations to which he has been charged.

When one, first, analyses the totality of circumstance of Barnett's case, under the lens of precedent set forth in the *Duke-Robinson-Mattis-Munchel,et al.*, line of cases; and second, applies said precedent to the facts of this case, then the only logical, reasonable, and justifiable conclusion is that Richard Barnett must be released without delay. *See United States v. Munchel*, No. 21-3010 (D.C. Cir. 2021); *U.S. v. Mattis*, 963 F.3d 285 (2020); *U.S. v. Robinson*, *Order Setting Conditions of Release* (ECF Document No. 12, July, 14, 2020); *United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999); *United States v Chimurenga*, 760 F.2d 400, 404 (2d. Cir. 1985); *United States v. Salerno*, 481 U.S. 739; *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Xulamn*, 84 F.3d 441 (DC Circuit 1996).

In light of the above, there must be no delay in Richard Barnett's release.

### E. THE COURT'S FINDING THAT THERE IS NO COMBINATION OF CONDITIONS AS TO THE PROVING OF RISK OF FLIGHT BY A PREPONDERANCE IS UNSUPPORTED BY THE FACT THAT BARNETT EASILY MEETS HIS BURDEN OF PRODUCTION IN THIS CASE.

In assessing the government's ability to demonstrate risk of flight by a preponderance of the evidence, and by doing so justify pretrial detention, federal courts have historically looked to the arrestee's criminal record or lack-thereof, evidence of falsifying a passport, community ties, employment history, residence history, relationship to community, family history, presence of extraordinarily serious charges, likelihood of conviction, and inclination to contemplate flight.

The application of relevant law to the abovementioned facts leads to one glaring conclusion- the government has not proven by a preponderance of the evidence that Richard Barnett is a flight risk.  Truly, this analysis should stop here and a decision favoring Barnett rendered for the government's failure to prove up of risk of flight by a preponderance, because the facts regarding his personal history as laid out in Section 10 meet his burden of production.

Deeply troubling however, is the following: (1) the government's attempt to overcome the litany of objective truths demonstrating the complete and utter lack of facts supporting any cognizable theory of flight; and (2) the Court's acquiescence to the government's flawed and unsettling conclusions.  Deeply troubling because the statements obtained were the result of a custodial interrogation outside of the presence of counsel, and in violation of Richard Barnett's Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel.[20] Deeply troubling because the government has grossly distorted the Fourth Amendment's protection against warrantless searches in such a way that now, a person's refusal to be electronically tracked via their cellphone now serves as justification for pretrial detention.

**F.   THE COURT'S FINDING THAT THERE IS NO COMBINATION OF CONDITIONS AS TO THE PROVING OF RISK OF FLIGHT BY A PREPONDERANCE WAS BASED ON FACTS PROCURED IN VIOLATION OF THE 4TH, 5TH, AND 6TH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

In its Memorandum in Support of Pretrial Detention[21], the government argues that the nature and circumstances of the offense charged, weigh in favor of detention, and sums up with the following statement:

> In sum, the defendant traveled from Arkansas to D.C., carried a dangerous weapon into the U.S. Capitol during a riot obstructing official proceedings, brazenly occupied Speaker Pelosi's office, and took her mail, then bragged about it to members of the media before

---

[20] Richard Barnett reserves his rights, defenses, and protections under *US v Miranda*, 384 U.S. 436.

[21] *See* Government's Memorandum in Support of Pretrial Detention, Case #: 21-cr-0038 (CRC), filed as ECF Docket Entry No. 12).

turning off location services and paying cash to avoid detection as
he fled D.C.   Accordingly, the nature and circumstances of the
offense weigh heavily in favor of detention.

The government has argued and the court accepted a rule which, if not overturned, states

that turning off a cell phone's location services or using cash to travel instead of electronic

currency, can and will be used against you in a detention hearing, to the extent where the

presumption of innocence along with the presumption against pretrial detention, can be dispensed

with for not letting the government track your movements. And if one is said to "brazenly" commit

a non-violent trespass misdemeanor, then somehow that misdemeanor is characterized as showing

dangerousness.  *See* January 28, 2021, Pretrial Detention Hearing Transcript pp. 31-35 attached as

**Exhibit D.**

### G. THE FOURTH AMENDMENT'S REASONABLE EXPECTATION OF PRIVACY AGAINST WARRANTLESS SEARCHES CONTRAVENES THE NOTION THAT A NEGATIVE INFERENCE CAN BE INFERRED FROM A PRIVATE CITIZEN'S REFUSAL TO BE ELECTRONICALLY TRACKED BY THE GOVERNMENT.

In essence, the government has created a rule where a negative inference can be inferred

from a private citizen's refusal to be tracked by the government or its agents.  This rule is

unconstitutional as it shifts the government's burden of needing to obtain a search warrant

supported by probable cause, on to the citizen who must successfully rebut a negative inference or

face pretrial detention.  This is a dangerous leap on to a slope so slippery that if action is not taken,

here now, our Fourth Amendment will be irreparably damaged to the extent where it is no longer

recognizable.

The Fourth Amendment of the United States Constitution, amongst other things, secures

the people's right to be secure in their persons, houses, papers, and effects, against warrantless

searches and seizures.  In the context of the Internet Age, the Fourth Amendment's ambit, without

question, encompasses a reasonable expectation of privacy against warrantless tracking by the government or its agents.  A person's reasonable expectation of privacy is normally at its highest point when they are inside their home with the doors locked.  That same person's expectation of privacy diminishes when they drive their car, to the extent that they implicitly consent to the search of items in plain view and containers within their immediate grabbable area.  However, the warrant requirement continues to apply to the trunk of their car absent a very limited set of circumstances.

A private cellular phone is analogous the threshold of a home with a locked front door and the locked trunk of a car, in that the Fourth Amendment provides a reasonable expectation against warrantless searches of the phone itself and the movement of the person carrying it.[22]  This applies whether the government employs its own surveillance technology or leverages the technology of a wireless carrier.  Either way, an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through cell phone location information.  *See Riley v. California*, 573 U.S. 373 (2014) (determining that neither the need for officer safety nor the threat of the destruction of evidence dispense with the warrant requirement for cell phones); *See also Carpenter v. United States*, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2020).

Richard was identified as the person sitting at Speaker Pelosi's desk on January 6, 2021.[23] This is the first opportunity government had to obtain a search warrant based on probable cause. The line of thinking goes like this: *There is Richard Barnett of Arkansas, let's obtain a search warrant so we can track him down.*  Unfortunately for the government, it either could not prove probable cause, or just never tried to obtain a warrant. Twenty hours later, however, an arrest

---

[22] *See United States v. Jones*, 565 U.S. 400, 410 (2012) (plurality opinion) (holding Government searched a car by attaching a GPS device to the car); *Bond v. United States*, 529 U.S. 334, 337 (2000) (concluding Border Patrol agent searched a bag by squeezing it); *See also Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (holding officer searched stereo equipment by moving it so that the officer could view concealed serial numbers).

[23] Available at, https://lawandcrime.com/2020-election/arkansas-man-identifies-himself-as-trump-supporter-who-sat-in-pelosis-office-claims-he-left-her-a-quarter/ (last visited March 29, 2021).

warrant (not a search warrant) was issued for Richard Barnett by Magistrate Judge G. Michael Harvey January 7, 2021, at 7:49 PM, EST.[24]

Be that as it may, Mr. Barnett had already arrived home, contacted the authorities, and negotiated his surrender by the time the arrest warrant was issued.[25]  Shortly after his January 8, 2021 surrender at 10:00 AM, Barnett stated to government agents that it was hard to travel straight back from D.C., say goodbye to his family and surrender the next day, to which the officer responded yes that is "part of the reason why we pushed (your surrender) off until this morning".[26] Six hours later, at 4:31PM, CST a search warrant issued for Barnett's phone and home, and was subsequently executed approximately 45 minutes later, at 5:15 PM.

At no point did exigent circumstances arise.  At no point did Richard waive his 4th Amendment right to privacy.  Because of this, the burden was on the government to obtain a search warrant based on probable cause to track Richard. The government did not obtain a search warrant. *See* FN 17, *supra* (*citing United States v. Jones*, 565 U.S. 400, 410 (2012) (plurality opinion) (holding Government searched a car by attaching a GPS device to the car); *Bond v. United States*, 529 U.S. 334, 337 (2000) (concluding Border Patrol agent searched a bag by squeezing it); *See also Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (holding officer searched stereo equipment by moving it so that the officer could view concealed serial numbers). With Richard, the FBI therefore "searched" the phone within the meaning of the Fourth Amendment. *See Florida v. Jardines*, 569 U.S. 1 at 5 (2013) And because the FBI conducted the search without a warrant, the search was unconstitutional. *See Vernonia Sch. Dist*., 515 U.S.  646 at 653 (1995).

---

[24] *See* Arrest Warrant ECF Doc.#: 1 attached hereto as **Exhibit F**.
[25] See p.142 of the W.D. Ark. Detention Hearing Transcript, Tammy Newburn discussing Barnett's arrival; *see also* p. 59 of Special Agent Willett discussing his January 8th interview with Mr. Barnett.
[26] *See* January 8, 2021 interrogation video, at the Five (5) minute mark.It should be noted that such recording was never individually produced, in its entirety, but portions, taken out of context, were used against Barnett in the D.C.C. ruling in favor of detention. Such Recording will gladly be made available to the Court upon request for purposes of Barnett's instant application for bond and preserving suppression issues.

The notion that, Richard, a man who freely admits that he set out for Washington, D.C. to participate in political protest premised on the idea that the election was stolen from the people by the government- somehow consented to be tracked by a government that he very obviously does not trust, is devoid of logic, inconsistent with the presumption of innocence, and entirely unsupported by the facts of this case.   The fact that the government weaponized a perfectly legitimate and constitutionally protected desire not to be tracked to the extent that it weighed heavily in favor of pretrial detention, is offensive the most basic sensibilities of the Fourth Amendment, and must be rejected in the strongest possible terms.

It is against all liberty interests to imply that an American citizen is obligated to keep his cell phone's location monitoring services turned on, in order to avoid a negative inference so strong that may lead to pretrial detention.   We also object to the government suggesting an equally powerful negative inference will be inferred for using cash to travel instead electronic currency.   These grave mischaracterizations of perfectly legal behavior undercut a free person's right not to be tracked, searched, monitored, supervised, or looked-after by the prying eyes of an overly intrusive paternalistic government.   These ideas are anti-American, constitutionally repugnant, and have no place in a free democratic society.[27]

### H.  No Negative Inference Should be Inferred from Richard Wearing a Mask During a Time this Nation is Under a Pandemic and Crisis.

According to the Center for Disease Control's guidelines, masks "should be worn any time you are traveling."[28]   After leaving an event where he was crowded alongside thousands of

---

[27]  *See* How America's surveillance networks helped the FBI catch the Capitol mob.  Available at, https://www.washingtonpost.com/technology/2021/04/02/capitol-siege-arrests-technology-fbi-privacy/  (last visited on April 4, 2021)

[28]  Available at,  https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html (last visited on March 29, 2021).

strangers, Richard Barnett covered his face and headed home to see his family.  Not only is his behavior legal, it is actually recommended by the C.D.C.  Despite this, the government has drawn the worst possible inference and the court has agreed that the only reason a sixty-year-old gainfully employed man cloaked in the presumption of innocence with no criminal history to speak of, would wear a mask while traveling to see his family after possibly attending a super-spreader event during a pandemic, is to avoid capture by police that were not yet looking to arrest him.

I. **DETENTION IS ILLEGAL AS GOVERNMENT HAS NOT PROVEN RISK OF FLIGHT**

Under the Bail Reform Act, when government seeks pretrial detention of individual on ground that he poses risk of flight, standard it must prove this risk by a preponderance of evidence. 18 U.S.C.A. § 3142(c).  The Bail Reform Act does not permit detention on the basis of dangerous in the absence of risk of flight, obstruction of justice, or an indictment for the offense enumerated in 18 U.S.C § 3142(f); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Xulamn*, 84 F.3d 441 (DC Circuit 1996).

Similar to the facts in *Friedman*, here the government contends that Richard Barnett presents a serious risk of flight because of the nature of the charges against him, the strength of the government's case, and the long sentence Barnett may receive. *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).  The *Friedman* court reversed a decision in favor of pretrial detention, because the defendant had strong family and community ties, a 25-year work history, no prior criminal record.  Objectively, the threat that someone accused of child pornography (*Friedman's* charges) could reoffend presents an element of serious danger, be that as it may, preponderance factors such as community ties, a 25-year work history, no prior criminal record, were enough to overcome detention.  In reliance upon the abovementioned arguments and facts, Richard Barnett should be released under the precedent set out in *Friedman.*  Furthermore, the above argued and

referenced *Duke-Robinson-Mattis-Munchel* line of cases illustrate indicate a strong history of enforcing the Bail Reform Act's presumption against pretrial detention in far more egregious circumstances.

Therefore, this Court's finding with regarding risk of flight is clearly erroneous because the factual predicates justifying its decision in favor of pretrial detention are clearly insufficient, but rather, the objective application of relevant case law to the abovementioned facts unequivocally demonstrates the Court's failure to consider the totality of circumstances in this case. As such, the government's conclusion that no condition or combination of conditions will reasonably assure Barnett's appearance or the safety of the community should be reversed.

**J.   GOVERNMENT AGENTS VIOLATED RICHARD BARNETT'S FIFTH AMENDMENT RIGHTS AGAINST SELF INCRIMINATION AND SIXTH AMENDMENT RIGHT TO COUNSEL.**

The government introduced statements at the detention hearings and in its papers with the full knowledge that they were the product of an illegal custodial interrogation. Custody is demonstrated by the fact that Barnett negotiated an agreement to surrender the previous night, and did in fact surrender the following morning. Furthermore, after initial introductions were made, government agents made clear that Barnett would be moved from Benton to a federal facility in Washington County where he would eventually see a judge, which clearly means that he was not free to terminate the encounter and/or leave the Benton County Sheriff's Office. Custody, therefore is established.

This interrogation was violative of Barnett's Fifth and Sixth Amendments because he invoked his right to remain silent and right to counsel more than once while in custody. The government will surely argue that Barnett waived or volunteered his statements, but that could not be further from the truth. Now, Mr. Barnett does not present like Atticus Finch, neither is he a polished articulate Washington, D.C. academic. His invocation, therefore, must be judged under

a standard of reasonableness consistent with men of his age, education, and life experience.   Thus "no comment" indicates an invocation of the Fifth Amendment, and "Gee- I really should speak to my lawyer…," indicative of a Sixth Amendment right to counsel.[29]

Upon hearing an invocation, government agents are immediately supposed to stop questioning the accused.   That is, however, not what happened here.   Instead, these highly trained government agents, fluent in the interrogation arts of persuasion, deception, sensemaking, the Reid Technique, the Scharff Technique, Pride-and-ego-down, cognitive interviewing, linguistic cues, eye tracking, and reality monitoring- simply switched gears.[30]   During the times Mr. Barnett invokes or attempts to invoke, you will see Special Agent Willett recoil, rethink, reassess, recalibrate, and reengage.   Special Agent Willett is on the phone texting.   He looks at his phone and then leaves and reenters several times.   Look at how Willet recalibrates and reengages at the one-hour-mark.   None of this is happenstance, all of this is intentional, and all of this is wrong. None of Richard Barnett's statements are voluntary.

Over the course of the next almost two hours, this sophisticated duo of government agents purposefully camouflages questions designed to illicit incriminating information with small talk, in a deliberate effort to get Mr. Barnett to waive his rights against self-incrimination and to counsel, without him knowing or understanding what he is doing. These agents deploy various manipulation tactics, and trickery, to lull an unsuspecting high-school-educated sixty-year-old man with and no criminal record or legal training into a fall sense of friendship for the specific purpose

---

[29] *See* Justice Sotomayor's Dissent in *Berghuis v Thompkins,* 560 U.S 370 (*citing Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602) (Explaining that even when warnings have been administered and a suspect has not affirmatively invoked his rights, statements made in custodial interrogation may not be admitted as part of the prosecution's case in chief "unless and until" the prosecution demonstrates that an individual "knowingly and intelligently waived his rights.").

[30] *See* FBI Interrogation Techniques:  *A Review of the Science* (September 2016), available at, https://www.fbi.gov/file-repository/hig-report-interrogation-a-review-of-the-science-september-2016. Pdf/view#: ~:text=This%20report%20was%20prepared%20by,the%20science%20related%20to%20interrogation (last visited March 31, 2021).

of getting him to confess- with the full knowledge that his Fifth and Sixth Amendment rights have been invoked, which in turn means all of these statements are subject to suppression, none of them should have been weighed against him, and this Court erred in letting that happen.

Troubling, however, is the fact that Mr. Barnett made, at minimum, 20 exculpatory statements to the government.  Statements that when examined in the totality of circumstances appear to be logical, rational, easily verifiable, and entirely consistent with a sixty-year-old man, cloaked in the presumption of innocence, with no criminal history whatsoever.  Why then was every single one of these exculpatory statements omitted by the government in its papers?  One on hand, it is certainly possible that the government overlooked them.  On the other hand, it is more likely that the government wanted to cast Richard Barnett in the worst possible light out of sheer commitment to punish him pretrial for his non-violent and "brazen" trespass.[31]

In addition to omitting every exculpatory statement in its papers and arguments to the court, the government then proceeds to cherry-pick a small group of statements, twist them out of context, repurpose, then, weaponized them, and launch them against Mr. Barnett with devastating effect. Guns have nothing to do with this case.  Even so, the government and the court have artfully used Richard Barnett's lawful ownership of them as indicia of radicalism, and his removal of them from his home as means to justify his pretrial detention.  The government's duplicitousness is as follows:

---

[31] In a press account of Mr. Barnett's case, Clark Neily, vice president for Criminal Justice at the CATO Institute added that "unfairly holding a defendant before trial is not a legal form of punishment for any defendant -- that only comes after their day in court. You don't leave somebody locked up pending trial simply because the public thinks they deserve it....", available at, https://www.ktbs.com/news/arkansas/infamous-capitol-riot-suspect-richard-barnett-says-hes-being-treated-unfairly-and-lashes-out-in/article_30c2d992-7d90-11eb-9ed7-efb51db60703.html

While being interrogated outside the presence of counsel, and when discussing the impending danger to his family, government agents admit they already know about the threats and exhibit what appears to be some level of professional concern.  Barnett explained to them that he started to become aware of an impending threat to his family while traveling home via threats on social media and on the Internet, so he began to think through how he could protect them as any concerned husband and father would. The possibility of danger graduated to impending danger when he realized that he had was being doxed,[32] which is to say that as a consequence of his infamous picture, there was in fact, a concerted effort to gather and publish Personally Identifiable Information (PII) on the Internet for the specific purpose of locating his home so his family could be attacked.  Threats began to pour in from all corners of the Internet.  Knowing full well that he was surrendering the next morning, he instructed his family to pack up and make preparations, because he wanted them to hide in the event that his home address was identified.   Having reason to believe that the location of his prior home had been obtained, and that the people who currently live there were being harassed, Richard Barnett decided that the safest and most effective way to protect his family was to:

> (1)   Alert friends and family about the threat,
> (2)   Instruct the members of his family to pack up and prepare to flee if necessary, and
> (3)   Contact a friend, who he knows to be a responsible gun owner, and entrust his firearms to said friend.

*See* FN 5 at p. 9, *supra*; *See also* January 8, 2020, Interrogation Video between the 20:00-24:00 minute marks.

The government twist, turns, and converts Richard Barnett's perfectly legal and highly responsible actions into indicia of criminality.  First, it is suggested that Barnett is dangerous simply because he is gun owner.  Second, the Court relies upon a government concocted false

---

[32] *See* attached hereto **Exhibit I**: Homeland Security's Explanation of "Doxxing."

narrative regarding two incidents involving a man with a gun at a two separate Arkansas protests that is alleged to be Richard Barnett, despite knowing Richard was never charged, for any gun offense, the Court improperly inculpates Richard.   Third, the Court then calls these unproven incidents "troubling" and weighs these incidents against him in favor of pretrial detention.   Fourth, the Court then reverse comingles these unfounded allegations with a "heightened risk of violence from ideologically motivated extremists … emboldened by the January 6th Capitol attack and might target elected officials in government facilities…" and in doing so, concocts elements of Barnett's dangerousness where none exist.

The Court then attacks Tammy Newburn, Richard Barnett's common-law-wife of 20 years. Ms. Newburn is discredited as a witness, the veracity of her testimony is called into question, and she is deemed to be an unworthy third-party-custodian- despite the fact that she is a loving mother who has done nothing wrong and has every reason to make sure the Mr. Barnett complies with reasonable conditions of bail.   Richard's ability to comply with a combination of conditions is diminished, which of course, weighs in favor of pretrial detention.

> Ms. Newburn's 20-year relationship with the defendant plainly shows her loyalty to him, and her actions to help clear up the house of evidence, put stuff under a dog crate in her trunk, dissembling at the hearing about her activities, to my mind, raises significant questions about her ability to be a trustworthy third-party custodian to ensure the defendant's compliance with any release conditions.

See January 28, 2021, Pretrial Detention Hearing Transcript at p. 39.

The government does not provide proper context about the very real, and extremely concerning ongoing danger to Richard and Tammy's family. The government does not communicate the very real fact that they have been doxed, or that several organized groups have made death threats against them.   Worst of all, no explanation whatsoever, is proffered regarding Richard's decision to pack his family up and turn over his firearms to a responsible friend- all in

the name of avoiding conflict.  The narrative has been proffered by the government and accepted by the court that Richard is an armed and dangerous extremist, prone to violence and hungry for conflict.  The truth, however, is that he avoided conflict by packing up his family.  The truth, however, is that he avoided violence by securing his firearms at another location.  The truth, however, is that this falls in line with his behavior at the Capitol, when before going there, he disarmed the walking stick's stun gun function out of an abundance of caution.  Yet- the narrative the government has proffered, and the court accepted, is one of fabrication and lies.

It cannot, and must not, be used as evidence supporting risk of flight or dangerousness. Nor should it be weighed against the nature and circumstances of the offense, or his ability to comply with a combination on conditions- because it is nothing more than a deliberate effort to cast a sixty-year-old American citizen, entitled to the presumption of innocence, in the most dangerous light possible.

### K. THE GOVERNMENT HAS NOT PROFFERED SUFFICIENT FACTS SUPPORTING THE CONCLUSION THAT NO CONDITION OR COMBINATION OF CONDITIONS CAN REASONABLY ASSURE RICHARD BARNETT'S APPEARANCE OR THE SAFETY OF THE COMMUNITY.

The government's argument in favor of pretrial detention is unsupported by facts demonstrative of risk of flight or danger to the community.  Richard Barnett's personal history, community ties, and lack of criminal history are more than sufficient proof to rebut any presumption of detention, or notion that he is a flight risk of any kind.  Furthermore, the statements weaponized by the government against Barnett were deviously and grossly taken out of context and a product of clear violations of his Fifth and Sixth Amendment rights.

The government's argument that nature and circumstances of the offense charged weigh in favor of pretrial detention contravenes a litany of case law under which federal courts have consistently enforced the Bail Reform Act's presumption against pretrial detention in favor of

defendant's that have been charged with far worse crimes under far worse circumstances. The governments weaponization of perfectly legal conduct is deeply troubling on a multitude of levels. Specifically, the notion that a negative inference strong enough to result in pretrial detention can be drawn from private citizen's decision to either accidentally or purposefully turn off their cell phone location services under circumstances in which the government has not obtained a search warrant based upon probable cause, without question triggers the Fourth Amendment's protection against unwarranted government intrusion in the form of electronic tracking. As such, the negative inferences drawn from Richard Barnett's trip home must be dispensed with, without delay, as they represent an illegal and gross intrusion by the government into the lives of a United States Citizen cloaked with the presumption of innocence, shielded by the presumption against pretrial detention, and protected by the Constitution of these great United States of America.

## VII.   CONCLUSION

WHEREFORE, for the foregoing reasons, and any others which may appear in our reply brief at a full hearing on this matter, and any others this Court deems just and proper, defendant through counsel, respectfully requests that he be released on personal recognizance. If that request is denied, defendant requests as an alternative, that he be released on Third Party Custody and placed into the High Intensive Supervision Program of the Pretrial Services Agency conditioned on reasonable conditions including but not limited to electronic monitoring, work release and curfew.

DATED:  APRIL 5, 2021                      Respectfully Submitted,

                                           /s/ **Joseph D. McBride, Esq.**
                                           _____
                                           Joseph D. McBride, Esq.
                                           Admission Pending
                                           THE MCBRIDE LAW FIRM, PLLC
                                           Attorneys for the Defendant
                                           99 Park Avenue, 25th Floor
                                           New York, NY 10016
                                           *Phone:* (917) 757-9537
                                           *Fax:*    (646) 219-2012
                                           *Email:*  jmcbride@mcbridelawnyc.com


                                           Respectfully Submitted,

                                           /s/ **Steven A. Metcalf II, Esq.**
                                           _____
                                           STEVEN A. METCALF II, ESQ.
                                           Metcalf & Metcalf, P.C.
                                           Attorneys for the Defendant
                                           99 Park Avenue, 25th Floor
                                           New York, NY 10016
                                           (*Phone*)  (646) 253-0514
                                           (*Fax*)     (646) 219-2012