## EXHIBIT LIST

**Exhibit A:**    United States v.  Elizabeth Duke, Case No. 2:58-cr-00222 (MSG)

  **(1)** Criminal Docket:  ECF Document No. 69, (filed June 20, 1985)
  **(2)** FBI Most Wanted Poster of Elizabeth Duke
  **(3)** Order to Dismiss Indictment & Quash Arrest Warrant
  **(4)** Elizabeth Duke Quashed Arrest Warrant
  **(5)** FBI's Most Wanted List of Domestic Terrorists
  **(6)** Chief Judge Merrick Garland's January 25, 2014, Dismissal of Complaint Alleging that
  the June 17, 2009, Magistrate's Dismissal of Elizabeth Duke's Indictment was Unlawful

**Exhibit B:**    *United States v. Robinson*, Order Setting Conditions of Release, DATE
                  Case #: 0-20-cr-00181 (PJS) (BRT), ECF Doc.#: 12

**Exhibit C:**    *United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020)

**Exhibit D:**    *United States v. Munchel* D.C.Cir.  No. 1:21-cr-0018-1 (March 26, 2021)

**Exhibit E:**    Western District of Arkansas Bail Hearing Transcript, January 15, 2021

**Exhibit F:**    Richard Barnett's Arrest Warrant ECF Doc.#:1

**Exhibit G:**    Picture of Richard Barnett at Speaker Pelosi's Desk

**Exhibit H:**    D.C. District Court Bail Hearing Transcript, January 15, 2021

**Exhibit I:**    Department of Homeland Security's Explanation of Doxxing

# EXHIBIT A(1)

**CRIMINAL DOCKET**

DUKE, ELIZABETH ANN · v. Richard Barnett Case No. 1:01-cv-083 (00222)

| | | |
|---|---|---|
| PO | 0313 2 | Assigned 1338 |
| Misd. | | Disp./Sentence |
| Felony X | District Off | Judge/Magistr |

Docket No. 85-0388-M-1

02

**I. CHARGES**

| | |
|---|---|
| 18:1028(a)(5) | Unlawful possession of U.S. identification. Ct. 12 |
| 18:371 | Conspiracy to possess destructive devices not registered as required. Ct. 1 |
| 26:5861(d) | Unlawful possession of firearms & destructive devices Cts. 2,3,4, 5 |
| 18:842(j) | Unlawful storage of explosives. Cts. 5,6,7- 6,7,8,9 |
| 18:842(h) | Storage & concealment of stolen explosives. Ct. 8- 9-10 |
| 18:1028(a)(3)& (c)(1) | Unlawful possession of 5 or more false identification documents. Ct. 9- 10- 11 |
| 42:408(g)(3) | Possession of counterfeit social security cards. Ct. 12- 15 |
| 18:2 | Aiding and abetting. Cts. 2 thru-10- 12 15 |
| 18:1028(a)(5) | Unlawful possession of document-making implement. Ct. 11 13,14 |

**II. KEY DATE**

KEY DATE ———— 6/20/85 APPLICABLE ———— 10/10/85 ———— 11/13/86

INITIAL APPEARANCE DATE 5/24/85 RAP/13AB
PRELIMINARY EXAMINATION Date Scheduled 5/28/85

**III. MAGISTRATE**

| | DATE | INITIAL/NO |
|---|---|---|
| Arrest Warrant Issued | 5/28/85 | EEN/13AC |
| COMPLAINT | 5/28/85 | EEN/13AC |
| Date of Arrest | 5/23/85 | |

OFFENSE (in Complaint) 18 U.S.C. 2, 3, 371, 842(i)(1)(2), 842(j), 842(h), 1028 (a)(3), 26 U.S.C. § 5861(d); Conspiracy, aiding, abetting; shipping, or transporting explosives in interstate commerce;

Show last names and suffix numbers of other defendants on same indictment/information.

**ATTORNEYS**

U.S. Attorney or Asst
KARL LUNKENHEIMER, AUSA

Defense 1 ☐ CJA 2 X Ret 3 ☐ Waived 4 ☐ Self. 5 ☐ Non / Other. 6 ☐ PD. 7 ☐ CD

Susan V. Tipograph, Esquire(local rules 11 and 13
Flood, Holmes & Tipograph    sent 5-31-85)
120 Duane Street
New York, New York 10007
(212) 608-6240

~~Judith Holmes, Esq.~~ (27)
120 Duane St., #400
New York, NY 10007

Julie Shapiro, Esq.
Holly Maguigan, Esq. (12)
1200 Walnut St., Suite 400
Phila., Pa. 19107

Alan Ellis, Esq. (56)
Suite 315, 1420 Walnut St.
Phila., Pa. 19102

(for Albert Vale, Kathleen
Vale, Dr. Mary Weir - Sureties)

**FINE AND RESTITUTION PAYMENTS**

| DATE | RECEIPT NUMBER | C.D NUMBER | DATE | RECEIPT NUMBER | C.D NUMBER |
|---|---|---|---|---|---|
| | | | | | |

Docket Entries Begin On Reverse Side

| DATE | Docket No. | Def | | | |
|------|-----------|-----|---|---|---|
| DOCUMENT NO. | 85 | 00222 | 02 | PROCEEDINGS DOCKET FOR SINGLE DEFENDANT | USA v. Richard Barnett Case No. 21-cr-0038-(CRC) |

**V. PROCEEDINGS**

| | |
|---|---|
| 5/24/85 | INITIAL APPEARANCE: Counsel, Susan V. Tipograph, Esquire, retained, not present. Defendant held without bail pending a detention hearing to be held before Judge Naythons on 5/28/85 at 1:30 P.M. Magistrate's tape of hearing of 5/24/85, RAP-85-19, FILED. |
| 5/28/85 | PRETRIAL DETENTION HEARING: Atty, S. Tipograph, Esq. retained & present; Probable cause found; defendant held for pre trial detention w/o bail; Tape No. EEN-85-43 filed;                                        EEN |
| 5-30-85 | Appearance of Susan V. Tipograph, Esq. for deft, filed. |
| 5-30-85 | Bail status sheet dtd. 5-24-85 re: deft held without bail, filed.                                                                RAP |
| 5-30-85 | GOVT'S MOTION FOR A DETENTION HEARING, CERTIFICATE OF SERVICE, FILED. |
| 5-30-85 | TEMPORARY PRETRIAL DETENTION ORDER POWERS, MAG. THAT THE HEARING ON DETENTION IS CONTINUED UNTIL 5-28-85 AT 1:30 PM BEFORE THE HONORABLE EDWIN E. NAYTHONS; EACH DEFT IS REMANDED TO CUSTODY OF U.S. MARSHAL, ETC., FILED.                                RAP <br> 5-31-85 entered   5-30-85 copies mailed. |
| 5-30-85 | FINDINGS OF FACT NAYTHONS, MAG. AND ORDER THAT DEFTS ARE COMMIT-TED TO CUSTODY OF THE ATTORNEY GENERAL OR HIS DESIGNATED REPRE-SENTATIVE FOR CONFINEMENT, ETC., FILED.                 EEN <br> 5-31-85 entered & copies mailed. |
| 5-31-85 | MOTION AND ORDER THAT THE FBI TAKE AND PRESERVE SAMPLES OF ALL EXPLOSIVES, ETC. FILED.                                      EEN <br> 6-3-85 entered   5-31-85 copies mailed. |
| 6-3-85 | Warrant returned "on 5-28-85 executed" with affidavit of Gregory J. Auld, S/A-FBI, filed. |

| | | 1985 | |
|---|---|---|---|
| - | Jun. | 20 | True Bill. |
| 1 | " | 20 | Records transferred from Mag. 85-0388-M-1 to this case, filed. |
| 2 | Jul. | 1 | Bail Status Sheet dated 7/1/85 re: Deft. is detained; <br> PLEA: NOT GUILTY AS TO CTS. 1 thru 10, filed.        RAP |
| - | " | 3 | Letter dated 7/2/85 from Karl k Lunkenheimer, AUSA re: request for transcript of arraignments of Deft on 7/1/85, etc, filed. (85-222-1) |
| 3 | " | 10 | DEFT'S MOTION FOR REVOCATION OF DETENTION ORDER, MEMORANDUM, CERT. OF SERVICE, FILED. |
| 4 | " | 10 | Deft's index to exhibit A submitted with motion for revocation of detention order, filed. |
| 5 | " | 11 | ORDER DATED 7/10/85 THAT THE U.S. MARSHAL ALLOW CONFERENCES BE-TWEEN THE DEFT. AND DEFENSE WITNESSES IN THE PRESENCE OF DEFENSE COUNSEL WITH CERTAIN CONDITIONS, ETC., FILED.          LP <br> 7/11/85 entered & copies mailed. |
| - | " | 11 | Transcript of 7/1/85 re: Arraignment, filed. (85-222-01) |
| 6 | " | 12 | Govt's response in opposition to Deft's motion for revocation of detention Order, Memorandum, Cert. of Service, filed. |
| 7 | " | 12 | Bail Hearing, filed. |
| 8 | " | 15 | GOVT'S MOTION TO REQUIRE DEFTS TO FURNISH HANDWRITING EXEMPLARS, MEMORANDUM OF LAW IN SUPPORT, CERTIFICATE OF SERVICE, FILED. |
| 9 | " | 16 | Bail Hearing of 7-15-85, filed. |
| 10 | " | 16 | Bail Hearing of 7-16-85, filed. |
| -- | " | 17 | Transcript of 5-28-85, filed (85-00222-01) |

CONTINUED

USA v. Richard Barnett Exhibits  EXH0004

UNITED STATES DISTRICT COURT    U. S. vs    DUKE, ELIZABETH ANN    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)
CRIMINAL DOCKET

| | Yr. | Docket No. | De |
|---|---|---|---|
| | 85 | 00222 | |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELA |
|---|---|---|

| | | (Document No.) | (a) | (b) | (c) | (c |
|---|---|---|---|---|---|---|

**1985**

| | | | |
|---|---|---|---|
| 11 | Jul. | 19 | Bail hearing of 7/18/85 re: Witnesses sworn, filed. |
| 12 | " | 19 | DEFT'S OMNIBUS PRE-TRIAL MOTION, MEMORANDUM, CERT. OF SERVICE, FILED. |
| -- | " | 22 | ORDER THAT EXCLUDABLE TIME BE COMPUTED FROM THE DATE OF FILING OF DEFTS' MOTION FOR OMNIBUS PRETRIAL RELIEF, AND GOVT'S MOTION FOR ELIZABETH ANN DUKE'S HANDWRITING EXEMPLARS, FILED. 7/23/85 entered & copies mailed. (85-222-01) LP/CLK |
| 13 | " | 23 | Bail Hearing of 7/22/85 re: Counsel argument to the Court - C.A.V., filed. |
| 14 | " | 24 | Bail Hearing re: Courts Bench Opinion, Court grants bail but under specific conditions, filed. |
| 15 | " | 24 | RELEASE ORDER POLLAK, J., THAT DEFT. ELIZABETH ANN DUKE IS RELEASE FROM PRETRIAL DETENTION WITH TERMS AND CONDITIONS, ETC., FILED. LP 7/24/85 entered & copies mailed. |
| - | " | 24 | Tape of Hearing of 7/1/85, filed. (M.T. 85-20) RAP |
| 16 | " | 25 | ORDER DATED 7-24-85 THAT DEFTS' MOTIONS FOR EXTENSION OF TIME IN WHICH TO FILE PRETRIAL MOTIONS ARE GRANTED. DEFTS SHALL FILE ALL PRETRIAL MOTIONS ON OR BEFORE 9-4-85. (85-222-1) LP |
| 17 | " | 25 | Deft's answer to Govt's motion to require deft. to furnish handwriting exemplars, Memorandum, Cert. of Service, filed. |
| - | " | 26 | Letter dated 7/23/85 from K. Lunkenheimer, AUSA to Mag. Powers re: request testimony of the hearing of 5/24/85 to be transcribed at the Govt's expense, filed. (85-222-01) |
| 18 | " | 30 | ORDER DATED 7/29/85 THAT AS A PREDICATE TO THE TAKING EFFECT OF THE RELEASE ORDER DATED 7/24/85, MS. VALE AND DR. WEIR SIGNIFY THEIR UNDERSTANDING OF AN ADHERENCE TO THE RELEASE ORDER THROUGH SIGNED, SWORN SUBSCRIPTIONS, IT IS ORDERED THAT THE SAME SUBSCRIPTION BE REQUIRED OF MR. VALE SINCE HE ALSO IS ASSIGNED CERTAIN DUTIES BY AND UNDER THE RELEASE ORDER, FILED. LP 7/30/85 entered & copies mailed. |
| 19 | " | 31 | ORDER DATED 7/29/85 THAT THE CLERK ACCEPT NOTARIZED AFFIDAVITS OF SURETY IN LIEU OF REQUIRING THE PERSONAL APPEARANCE IN THIS DISTRICT OF EACH PERSON NAMED ON THE DEED OF EACH PROPERTY POSTED AS SECURITY FOR THE RELEASE ORDER OF THIS COURT DATED 7/24/85, FILED. LP 7/31/85 entered & copies mailed. |
| - | " | 31 | Bond in the sum of $300,000 - surety Real Estate with attached agreement of bail, filed. |
| - | Aug. | 7 | Transcript of 5/24/85, filed. (85-222-01) |
| 20 | " | 9 | ORDER THAT PARAGRAPH 6a OF THE ORDER OF 7/26/85 IS AMENDED TO READ: "WHEN MS. DUKE ENTERS THE MARSHAL'S AREA, AND BEFORE SHE IS PERMITTED INTO THE CELLBLOCK, THE MARSHAL IS PERMITTED TO SEARCH ANYTHING WHICH SHE IS CARRYING AND TO PAT HER DOWN, AND IS SUBJECT TO A STRIP SEARCH, MS. DUKE WILL NOT BE SUBJECTED TO A BODY CAVITY SEARCH, THIS ORDER REMAINS IN EFFECT UNTIL FURTHER ORDER OF THE COURT, FILED. JK 8/9/85 entered & copies mailed. |
| 21 | " | 9 | Hearing re: Paragraph 6a of the order of 7/26/85 is amended, filed. |

USA v. Richard Barnett Exhibits EXH0005

| Interval (per Section II) | Start Date End Date | Ltr. Code | Tota Days |
|---|---|---|---|

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1985**

| | | |
|---|---|---|
| – Aug. 19 | Appearance of Judith Holmes, Esq., filed. (85-222-01) | |
| 22 " 21 | Govt's Notice of Appeal, Cert. of Service, filed. (copies to: USCA, H. Maguigan, Esq., J. Staniels, Judge Pollak, pre-trial, D. Spitz) | |
| 23 " 21 | Copy of Clerk's Notice to USCA, filed. | |
| – " 21 | DEFTS' JOINT MOTION FOR ADDITIONAL DISCOVERY AND FOR CONTINUANCE OF HEARING ON PRE-TRIAL MOTIONS, CERT. OF SERVICE, FILED. | |
| 24 " 22 | Transcript of 7/12/85, filed. | |
| 25 " 22 | Transcript of 7/24/85, filed. | |
| 26 " 22 | ORDER THAT EXCLUDABLE TIME BE COMPUTED FROM THE DATE OF FILING OF GOVT'S NOTICE OF APPEAL FROM THE COURT ORDER ENTERED ON 7/24/85, RELEASING THE DEFT. FROM CUSTODY UNDER CERTAIN CONDITIONS, FILED.                                          LP/CLK 8/22/85 entered & copies mailed. | |
| 27 " 26 | ORDER DATED 8/23/85 THAT THE LETTER OF 8/20/85, WITH ITS SUPPORT-ING AFFIDAVITS, BE FILED BY THE CLERK AS A PART OF THE RECORD; IT IS FURTHER DIRECTED THAT THE CLERK'S OFFICE DISGREGARD DOCKET ENTRY 12, WHICH PURPORTS TO BE AN ENTRY OF APPEARANCE BY MS. HOLMES, FILED.                                                        LP 8/26/85 entered & copies mailed. | |
| 28 " 26 | Letter dated 8/20/85 from Judith L. Holmes, Esq., with supporting affidavits re: request modifications of conditions of release, filed. | |
| 29 " 26 | Transcript of 7/15/85, filed. | |
| 30 " 26 | Transcript of 7/16/85, filed. | |
| 31 " 26 | DEFT'S MOTION FOR APPOINTMENT OF COUNSEL, MEMORANDUM, CERT. OF SERVICE, AFFIDAVIT IN SUPPORT, FILED. | |
| 32 " 29 | Transcript of 7/18/85, filed. | |
| -- " 29 | Govt's response to Defts' joint motion for additional discovery and for continuance of hearing on pre-trial motions, Cert. of Service, filed. (85-222-01) | |
| 33 " 29 | Govt's joint response and memorandum re: deft's motion for appointment of counsel, Cert. of Service, filed. | |
| 34 " 29 | Govt's rebuttal to Deft's answer to Govt's motion to require deft to furnish handwriting exemplars, Memorandum, Cert. of Service, filed. | |
| 35 " 30 | Govt's answer to Deft's omnibus pre-trial motion, Cert. of Service, filed. | |
| 36 " 30 | Copy of Transcript Purchase Order, filed. | |
| 37 Sept. 4 | REPORT OF SPEEDY TRIAL ACT DELAY, THAT THE APPEAL BY THE GOVT. RE: ORDER BY THE COURT ENTERED ON 7/24/85, RELEASING THE DEFT. FROM CUSTODY WAS REASON FOR DELAY, ETC., FILED.          LP/CLK 0/4/85 entered & copies mailed. | |
| 38 " 18 | DEFT'S APPLICATION FOR ORDER TO SHOW CAUSE WHY THE RELEASE ORDER SHOULD NOT BE MODIFIED, MEMORANDUM, CERT. OF SERVICE, FILED. | |
| 39 " 20 | DEFT'S MOTION FOR A CONTINUANCE, MEMORANDUM, CERT. OF SERVICE, FILED. | |
| 40 " 20 | Deft's supplemental memorandum in support of Deft's request for discovery, Cert. of Service, filed. | |

CONTINUED

| Interval (per Section II) | Start Date | End Date | Ltr. Code | Total Days |
|---|---|---|---|---|

AO 256A

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   *U. S. vs*   DUKE, ELIZABETH ANN   USA v. Richard Barnett Case No. 21-cr-0038 (RC)   00222   0

| Yr. | Docket No. | De |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELA |
|------|-------------|--------------------|
|      | (Document No.) | (a) | (b) | (c) | (d |

**1985**

| 41 Sep. 25 | Govt's response to Deft's application for order to show cause why the release order should not be modified, Cert. of Service, filed. |
| -- " 25 | Govt's supplemental memorandum in opposition to Defts' discovery requests, Cert. of Service, filed. |
| -- " 30 | Hearing of 9/26/85 re: Defts' motion for hearing pretrial motions continued to 10/15/85, motion for additional discovery denied as moot, Deft's order to show cause - Denied, filed. (85-222-01) |
| -- " 30 | ORDER DATED 9/27/85 THAT DEFTS' MOTION FOR A CONTINUANCE OF HEARINGS ON PRE-TRIAL MOTIONS IS GRANTED, HEARINGS SHALL BEGIN ON 10/15/85, DEFTS' MOTION FOR ADDITIONAL DISCOVERY IS DENIED AS MOOT, AND DUKE'S MOTION FOR AN ORDER TO SHOW CAUSE WHY THE RELEASE ORDER SHOULD NOT BE MODIFIED IS DENIED, FILED.     LP  10/1/85 entered & copies mailed.   (85-222-01) |
| 42 Oct. 2 | Signed Statements of Leslie Love Engle, Esq., Edmond A. Tiryak, Esq. Judith Brown Chomsky, Esq. and Theodore M. Lieverman, Esq. accepting reaponsibilities delegated by the release order of 7/24/85, filed. |
| 43 " 2 | DEFT'S MOTION FOR MODIFICATION, FOR OCTOBER 4 -6, 1985 OF RELEASE ORDER, CERT. OF SERVICE, FILED. |
| (42) " 3 | ORDER DATED 10/2/85 THAT THE RELEASE ORDER OF 7/24/85 IS MODIFIED IN THAT THE PORTION OF PARAGRAPH 16 PERTAINING TO "COMPANY OF HER ATTORNEY" IS AMENDED, ETC., FILED.     LP  10/3/85 entered & copies mailed. |
| (43) " 3 | ORDER DATED 10/2/85 THAT THE RELEASE ORDER OF 7/24/85 IS MODIFIED IN THAT, FOR THE WEEKEND OF OCTOBER 4-6, 1985, PARAGRAPH 16 IS AMENDED, ETC., FILED.     LP  10/3/85 entered & copies mailed. |
| 44 " 3 | ORDER THAT THE ORDER OF 7/26/85 PROVIDING FOR JOINT MEETINGS OF DEFTS AND ATTORNEY IS MODIFIED IN THAT THE REQUIREMENTS OF PARAGRAPH 6(b) ARE AMENDED TO PROVIDE THAT ON 10/3/85 MS. DUKE WILL BE ACCOMPANIED BY ONLY ONE OF HER LAWYERS, HOLLY MAGUIGAN, ESQ., FILED.     LP  10/3/85 entered & copies mailed. |
| 45 " 3 | ORDER THAT THE RELEASE ORDER OF 7/24/85 IS MODIFIED IN THAT PARAGRAPH 17 IS AMENDED TO PROVIDE THAT HOLLY MAGUIGAN, ESQ. ET AL MAY SATISFY THE REPORTING REQUIREMENT IMPOSED HEREIN BY TELEPHONE CALL TO THE APPROPRIATE AGENCY DURING THE SPECI- FIED TIME PERIODS, FILED.     LP  10/3/85 entered & copies mailed. |
| 46 " 3 | Copy of appointment of and authority to pay court appointed counsel pursuant to CJA 20, filed. |
| 47 " 7 | DEFT'S MOTION FOR MODIFICATION OF RELEASE ORDER, CERT. OF SERVICE, FILED. |
| 48 " 7 | DEFT'S EX PARTE APPLICATION FOR LEAVE TO HIRE A HANDWRITING EXPERT, FILED. |
| 49 " 7 | DEFT'S EX PARTE APPLICATION FOR LEAVE TO HIRE AN INVESTIGATOR, FILED. |
| 50 " 8 | Transcript of 7/22/85, filed. |
| -- " 9 | RECORD COMPLETE FOR PURPOSES OF APPEAL. |
| -- " 10 | Pretrial conference of 10/9/85 re: hearing on motions set for 10/28/85, filed.   (85-222-01) |

| Interval (per Section II) | Start Date End Date | Ltr. Code | Tota Days |

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

| DATE | | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|---|
| | | | (Document No.) | (a) | (b) | (c) | (d) |
| | 1985 | | | | | | |
| -- | Oct. | 10 | Superseding Indictment, filed. | | | | |
| (47) | " | 11 | ORDER DATED 10/10/85 THAT THE RELEASE ORDER OF 7/24/85 IS MODIFIED IN THAT PARAGRAPH 16 IS AMENDED TO PROVIDE THAT THE PORTION OF PARAGRAPH 16 PERTAINING TO "COMPANY OF HER ATTORNEYS" IS AMENDED, ETC., FILED. LP | | | | |
| | | | 10/11/85 entered & copies mailed. | | | | |
| 51 | " | 15 | GOVT'S MOTION & ORDER THAT A BENCH WARRANT BE ISSUED FOR ARREST OF DEFT; BAIL TO BE ENTERED IN PRETRIAL DETENTION, FILED. Warrant exit | | | LP | |
| | | | 10-15-85 entered and copies mailed | | | | |
| 52 | " | 15 | GOVT'S MOTION TO REVOKE RELEASE ORDER AND ITS MODIFICATIONS, MEMORANDUM, CERT. OF SERVICE, FILED. | | | | |
| 53 | " | 15 | ORDER THAT THE RELEASE ORDER OF 7/24/85 AND THE SUBSEQUENT MODIFICATIONS TO THAT ORDER ARE REVOKED AND DEFT. IS ORDERED HELD IN PRETRIAL DETENTION, FILED. LP | | | | |
| | | | 10/15/85 entered & copies mailed. | | | | |
| 54 | " | 15 | Hearing re: Govt's motion to revoke bail, Deft. failed to re-port to P.T.S. or the U.S. Marshal over the week end, Court Grants motion, filed. | | | | |
| 55 | " | 15 | GOVT'S MOTION TO FORFEIT BAIL, MEMORANDUM, CERT. OF SERVICE, FILED. | | | | |
| (48) | " | 16 | ORDER DATED 10/10/85 THAT DEFENSE COUNSEL IS AUTHORIZED TO RE-TAIN A HANDWRITING EXPERT, DEFENSE IS AUTHORIZED TO EXPEND THE SUM OF $1500.00 WITHOUT FURTHER ORDER OF THE COURT, FILED. LP | | | | |
| | | | 10/16/85 entered & copies mailed. | | | | |
| (49) | " | 16 | ORDER DATED 10/10/85 THAT THE DEFENSE COUNSEL IS AUTHORIZED TO RETAIN AN INVESTIGATOR, DEFENSE IS AUTHORIZED TO EXPEND THE SUM OF $1500.00 WITHOUT FURTHER ORDER OF THE COURT, FILED. LP | | | | |
| | | | 10/16/85 entered & copies mailed. | | | | |
| 56 | " | 25 | Appearance of Alan Ellis, Esq. for Sureties, filed. | | | | |
| 57 | " | 25 | Sureties' response to motion to forfeit bail, Cert. of Service, filed. | | | | |
| 58 | " | 25 | Govt's memorandum in opposition to Defts' pretrial suppression motions, Cert. of Service, filed. | | | | |
| 59 | " | 25 | Transcript of 10/15/85, filed. | | | | |
| -- | " | 28 | Transcript of 9/26/85, filed. (85-222-01) | | | | |
| 60 | " | 28 | GOVT'S MOTION FOR ENTRY OF JUDGMENT OF DEFAULT UNDER RULE 46(e)(3), MEMORANDUM, CERT. OF SERVICE, FILED. | | | | |
| -- | " | 29 | Hearing of 10/28/85 re: Deft. not appearing bail to be forfeited, counsel to file submissions within 10 days and a hearing will be set on 11/15/85, filed. (85-222-01) | | | | |
| 61 | " | 30 | REPORT OF SPEEDY TRIAL ACT DELAY DATED 10/28/85 THAT DEFT. FAILED TO APPEAR FOR A HEARING ON 10/28/85, FILED. LP/CLK | | | | |
| | | | 10/30/85 entered & copies mailed. | | | | |
| -- | Nov. | 4 | Transcript of 10/4/85, filed. (85-222-01) | | | | |
| (60) | " | 5 | ORDER THAT THE PRINCIPAL AND DEFT. AND THE SURETIES, MARY A. WEIR AND KATHLEEN WEIR VALE, APPEAR ON 11/19/85 AT 9:30 A.M. IN COURTROOM 13B, TO SHOW CAUSE WHY ENTRY OF JUDGMENT OF DEFAULT ON THE BAIL BOND SHOULD NOT BE ORDERED, FILED. LP | | | | |
| | | | 11/6/85 entered & copies mailed. | | | | |
| -- | " | 7 | Transcript of 11/4/85, filed. (85-222-01) | | | | |

CONTINUED

Interval Start Date (per Section II) | End Date | Ltr. Code | Total Days

AO 256A

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*    DUKE, ELIZABETH ANN    USA v. Richard Barnett Case No. 21-cr-038 (CRC)    00222    02

Case 2:85-cr-00382-RMS-GD Document 669    Filed 04/25/25    Page 9 of 329

| DATE | PROCEEDINGS (continued) | Yr. | Docket No. | Def. |
|------|------------------------|-----|-----------|------|
| | (Document No.) | V. EXCLUDABLE DELAY | | |
| | | (a) | (b) | (c) | (d) |

**1985**

(55) Nov. 12  ORDER DATED 11/11/85 THAT THE GOVT'S MOTION TO FORFEIT BAIL IS
GRANTED, FILED.                                          LP
   11/12/85 entered & copies mailed.

62  " 20  Govt's reply brief in support of motion to enter Judgment of
Default pursuant to Rule 46(e)(3), Cert. of Service, filed.

63 Dec. 2  Certified copy of Order from USCA, that Appellant's motion to
Dismiss appeal as moot is Granted, filed. (85-1521)

64  " 9  Hearing re: Medical condition of Deft., filed.
65  " 18  Bail Hearing re: Govt's motion to forfeit bail by sureties,
Mr. Ellis moves for the admission of Gerald Goldstein and
Van G. Hilley, for the purpose of representation of the
sureties, Courts Bench Opinion - Bail shall be forfeited
Judgment of Default, filed.

66  " 19  ORDER DATED 12/18/85 THAT THE GOVT'S MOTION FOR ENTRY OF JUDG-
MENT OF DEFAULT IS GRANTED, AND JUDGMENT IS ENTERED IN FAVOR
OF THE U.S. AND AGAINST THE PRINCIPAL, ELIZABETH ANN DUKE,
IN THE AMOUNT OF $300,000, AND AGAINST THE SURETIES, MARY A.
WEIR, KATHLEEN WEIR VALE, AND ALBERT VALE, JOINTLY AND SEVER-
ALLY UP TO THE AMOUNT OF $300,000, TO THE EXTENT THAT SUCH
SUM IS RECOVERABLE FROM THE EQUITY POSSESSED BY EACH SUCH
SURETY IN HER OR HIS HOME IN SAN ANTONIO, FILED.          LP
   12/19/85 entered & copies mailed.

**1986**

67 Jan. 9  Transcript of 12/18/85, filed.

-- Nov. 13  MOTION & ORDER THAT THE SUPERSEDING INDICTMENT BE DISMISSED,
FILED.                                          PBS
   11/13/86 entered & copies mailed.

--  " 13  Second Superseding Indictment, filed.
68  " 13  MOTION & ORDER FOR BENCH WARRANT, FILED.    Warrant Exit.

**1988**
   Preventive Detention.                          PBS

-- Feb. 23  GOVT'S EX PARTE MOTION TO TRANSFER EVIDENCE TO THE JOINT CUS-
TODY OF THE U.S. ATTORNEY FOR DISTRICT OF COLUMBIA AND THE
F.B.I., FILED. (FILED UNDER SEAL) (85-222-01)

--  " 24  ORDER DATED 2/24/88, FILED. (SEALED & IMPOUNDED) (85-222-01)
   2/24/88 entered & copies mailed.

**2012**

69  MAY 15  ORDER AS TO ELIZABETH ANN DUKE REASSIGNING CASE TO THE
HONORABLE MITCHELL S. GOLDBERG. Signed by the Honorable
J. Curtis Joyner on 5/15/2012. 5/15/2012 Entered and copies
forwarded to AUSA.    (ap).

# EXHIBIT A(2)

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

# WANTED BY THE FBI

# ELIZABETH ANNA DUKE

**Unlawful Possession of United States Identification; Conspiracy; Unlawful Storage of Explosives; Unlawful Possession of Firearms and Destructive Devices; Storage and Concealment of Stolen Explosives; Unlawful Possession of Five or More False Identification Documents; Possession of Counterfeit Social Security Cards; Aiding and Abetting; Unlawful Possession of Document-Making Implement**




Photograph taken in 1985



## DESCRIPTION

| | |
|---|---|
| **Aliases:** Betty Ann Duke, Elizabeth Ann Duke, Betty Weir, "Betty Ann" | |

| | |
|---|---|
| **Date(s) of Birth Used:** November 25, 1940, April 20, 1941 | **Place of Birth:** Beeville, Texas |
| **Hair:** Brown (May now be gray) | **Eyes:** Blue |
| **Height:** 5'6" | **Weight:** 120 pounds |
| **Sex:** Female | **Race:** White |
| **Occupation:** Teacher, Philanthropist | **Nationality:** American |
| **Scars and Marks:** Duke has pin holes on the front of her earlobes due to a genetic condition. | **NCIC:** W502404799 |

## REWARD

**The FBI is offering a reward of up to $50,000 for information leading directly to the arrest and conviction of Elizabeth Anna Duke.**

## REMARKS

Duke is known to speak fluent Spanish. She has ties to Texas and is known to travel in the northern United States near the Canadian border.

## CAUTION

Elizabeth Anna Duke is wanted for her alleged involvement in a series of criminal activities during the late 1970's and early 1980's. She was allegedly a member of the radical group known as the May 19th Communist Organization which advocated communism and the violent overthrow of the United States Government. Duke was arrested in Bucks County, Pennsylvania, in May of 1985 for her alleged participation in this group, but was released on bail. She later fled the jurisdiction and has been a fugitive since October of 1985. A federal arrest warrant was issued for Duke in the Eastern District of Pennsylvania on November 13, 1986, charging her with the aforementioned federal charges.

## SHOULD BE CONSIDERED ARMED AND DANGEROUS AND AN ESCAPE RISK

**If you have any information concerning this person, please contact your local FBI office or the nearest American Embassy or Consulate.**

USA v. Richard Barnett Exhibits  EXH0011

**Field Office:** Philadelphia

# EXHIBIT A(3)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No. 88-00145 (DAR)** |
| | : | |
| **v.** | : | |
| | : | |
| **ELIZABETH DUKE,** | : | **FILED** |
| | : | |
| **Defendant.** | : | JUN **1 7** 2009 |

NANCY MAYER WHITTINGTON, **CLERK**
U.S. DISTRICT COURT

**ORDER**

Upon consideration of the government's oral Motion to Dismiss Indictment and Quash Arrest

Warrant and the record herein, for the reasons set forth in the government's motion and for good

cause shown, it is this _____ day of June 2009,

ORDERED that the above case is dismissed without prejudice, and it is

FURTHER ORDERED that the arrest warrant issued for the defendant in this case is hereby

quashed, and it is

FURTHER ORDERED that the United States Marshals Service cancel and/or withdraw the

warrant from the NCIC data base.

_____
DEBORAH A. ROBINSON
United States District Court Judge

# EXHIBIT A(4)

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

## WARRANT FOR ARREST

CO-180
NEW 1/88

| United States District Court | DISTRICT OF COLUMBIA |
|---|---|

UNITED STATES OF AMERICA

v.

ELIZABETH DUKE

DOB: 11/25/40

| DOCKET NO. CR88-0145-07 | MAGISTRATE CASE NO. |
|---|---|

NAME AND ADDRESS OF INDIVIDUAL TO BE ARRESTED

ELIZABETH DUKE
(UNKNOWN)

WARRANT ISSUED ON THE BASIS OF:

☒ Order of Court
☐ Indictment   ☐ Information   ☐ Complaint

**FILED**

TO: ANY UNITED STATES MARSHAL OR ANY AUTHORIZED LAW ENFORCEMENT OFFICER

DISTRICT OF ARREST

**JUN 22 2009**

CITY

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

YOU ARE HEREBY COMMANDED to arrest the above-named person and bring that person before the nearest available magistrate to answer to the charge(s) listed below.

### DESCRIPTION OF CHARGES

FAILURE TO APPEAR FOR ARRAIGNMENT BEFORE JUDGE HAROLD H. GREENE ON MAY 25, 1988 in the UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

AND

Malicious damage of U.S. Property by means of fire and explosives, and aiding and abetting an act to be done.

QUASHED

Deborah A. Robinson
United States Magistrate Judge

IN VIOLATION OF

| UNITED STATES CODE TITLE 18 | SECTION 844(f),2(a) & (b) |
|---|---|

BAIL FIXED BY COURT
HOLD WITHOUT BOND

OTHER CONDITIONS OF RELEASE

ORDERED BY
Judge Harold H. Greene

SIGNATURE (JUDGE/U.S. MAGISTRATE)

DATE
May 25, 1988

CLERK OF COURT
JAMES F. DAVEY

(BY) DEPUTY CLERK

DATE ISSUED
June 02, 1988

### RETURN

This warrant was received and executed with the arrest of the above-named person.

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE EXECUTED | | |

[1] United States Judge or Judge of a State Court of Record

USA v. Richard Barnett Exhibits - EXH0015

# EXHIBIT A(5)

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)



JOSEPH MAHMOUD DIBEE

LEO FREDERICK BURT

JOSEPHINE SUNSHINE OVERAKER

ELIZABETH ANNA DUKE

DONNA JOAN BORUP

CATHERINE MARIE KERKOW

ISHMAIL MUSLIM ALI

JOSE ESPINOSA CABALLERO

EDUARDO GUERRA JIMENEZ

AMBROSE HENRY MONTFORT

# Domestic Terrorism | Federal Bureau of Investigation

USA v. Richard Barnett Exhibits - EXH0017

fbi.gov

# EXHIBIT A(6)

# The Judicial Council

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

In the Matter of

**Judicial Council Complaint No. DC-13-90035
DC-13-90036**

A Charge of Judicial
Misconduct or Disability

Before: GARLAND, Chief Judge of the Circuit

### <u>O R D E R</u>

Upon consideration of the complaint herein, filed against a magistrate judge and a judge of the United States District Court for the District of Columbia, it is

**ORDERED** that the complaint be dismissed for the reasons stated in the attached Memorandum. *See* 28 U.S.C. § 352(b)(1)(A)(ii) and (iii); JUD. CONF. U.S., RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS 11(c)(1)(B) and (D).

The Clerk is directed to send copies of this Order and accompanying Memorandum to the complainant, the subject judges, and the Judicial Conference Committee on Judicial Conduct and Disability. *See* 28 U.S.C. § 352(b); JUD. CONF. U.S., RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS 11(g)(2).

Merrick B. Garland, Chief Judge
District of Columbia Circuit

Date: _____1-15-2014_____

Exhibit "G"

# M E M O R A N D U M

The complainant alleges that a magistrate judge and judge of the United States District Court for the District of Columbia engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts. For the following reasons, the allegations do not warrant action against the subject judges.

The complainant alleges that the magistrate judge "(i) falsified the record, (ii) exceeded [the judge's] jurisdiction and (iii) impersonated an Article III judge in dismissing the Indictment." These allegations arise out of the magistrate judge's 2009 dismissal, at the request of the United States Attorney, of a dormant criminal indictment that had remained outstanding since 1988 and in which the complainant played no role whatsoever. The complainant also objects to the magistrate's denial of the complainant's motion to intervene in those proceedings. Because those allegations are "directly related to the merits of a decision or procedural ruling," the complaint against the magistrate judge "must be dismissed." JUD. CONF. U.S., RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS 11(c)(1)(B); *See* 28 U.S.C. § 352(b)(1)(A)(ii).

The complainant also asserts that the subject district court judge was "repeatedly made aware of this malfeasance of [the magistrate judge], failed to take any action and sought to obfuscate and cover-up further inquiry into" the allegations against the magistrate judge. The district judge sent the complainant a detailed letter that reasonably explained the judge's finding that there was no malfeasance on the part of the magistrate

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

-2-

judge and hence no warrant for further action. Because the allegations "lack[] sufficient evidence to raise an inference that misconduct has occurred" on the part of either the magistrate or the district judge, the complaint against the district judge must also be dismissed. Id. 11(c)(1)(D).[1]

---

[1] Pursuant to 28 U.S.C. § 352(c) and JUD. CONF. U.S., RULES FOR JUDICIAL-CONDUCT AND JUDICIAL -DISABILITY PROCEEDINGS 18(a), the complainant may file a petition for review by the Judicial Council for the District of Columbia Circuit. Any petition must be filed in the Office of the Clerk of the Court of Appeals within 35 days of the date of the Clerk's letter transmitting the dismissal Order and this Memorandum. Id. R. 18(b).

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No.  88-00145 (DAR)** |
| v. | : | |
| | : | |
| **ELIZABETH DUKE,** | : | **FILED** |
| **Defendant.** | : | JUN 1 7 2009 |

NANCY MAYER WHITTINGTON, **CLERK**
U.S. DISTRICT COURT

## ORDER

Upon consideration of the government's oral Motion to Dismiss Indictment and Quash Arrest Warrant and the record herein, for the reasons set forth in the government's motion and for good cause shown, it is this _____ day of June 2009,

ORDERED that the above case is dismissed without prejudice, and it is

FURTHER ORDERED that the arrest warrant issued for the defendant in this case is hereby quashed, and it is

FURTHER ORDERED that the United States Marshals Service cancel and/or withdraw the warrant from the NCIC data base.

DEBORAH A. ROBINSON
United States District Court Judge

Exhibit "B"

USA v. Richard Barnett Exhibits  EXH0022

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,

    v.

ELIZABETH DUKE,

      Defendant.

. . . . . . . . . . .

CR No. 88-0145

Washington, D.C.
Tuesday, June 17, 2009

## TRANSCRIPT OF STATUS CONFERENCE
### BEFORE THE HONORABLE DEBORAH A. ROBINSON
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:

    M. JEFFREY BEATRICE, ESQ.
    U.S. Attorney's Office
    555 Fourth Street, NW
    Room 4104
    Washington, DC 20530
    (202) 353-8831

Transcribed By:

    BRYAN A. WAYNE, RPR, CRR
    Official Court Reporter
    U.S. Courthouse, Room 4704-A
    333 Constitution Avenue, NW
    Washington, DC 20001
    (202) 354-3186

Exhibit "E"

Proceedings electronically recorded and transcribed.

1                          P R O C E E D I N G S

2              THE DEPUTY CLERK:  Criminal case No. 88-145,

3      Elizabeth Duke.  For the government, Mr. Beatrice.

4              THE COURT:  Mr. Beatrice.

5              MR. BEATRICE:  Thank you, Your Honor.  We would orally

6      move to dismiss this case at this time, dismiss the indictment

7      and also to quash the warrant, and we will submit a proposed

8      order today, Your Honor.

9              THE COURT:  Very well.  Thank you, Mr. Beatrice.

10                     (Proceedings adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

USA v. Richard Barnett Exhibits  EXH0024

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

# EXHIBIT B

USA v. Richard Barnett Exhibits  EXH0025

AO 199A (Rev. 12/11) Order Setting Conditions of Release          Dylan Shakespeare Robinson

# UNITED STATES DISTRICT COURT
## for the
## District of Minnesota

| | |
|---|---|
| United States of America, | |
| v. | |
| Dylan Shakespeare Robinson *Defendant* | Case No. 0864 0:20-00401M-001 |

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

    (1)     The defendant must not violate any federal, state, or local law while on release.

    (2)     The defendant must cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a.[1]

    (3)     The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

    (4)     The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the Court may impose. The defendant must appear at _____ on _____ .

              If blank, defendant will be notified of next appearance.

    (5)     The defendant must sign an appearance bond, if ordered.

---

[1] The Director of the FBI is required by law to promptly expunge from the index described in 42 USC Section 14132(a), the analysis of the DNA sample collected from this Defendant upon receipt by the Attorney General of a certified copy of a final court order establishing: 1) that no indictment was returned, or 2) that the charges giving rise to this Order Setting Conditions of Release were dismissed, or 3) that Defendant was acquitted of the charges giving rise to this Order setting Conditions of Release. In the event any of the foregoing occur, Defendant or his or her Attorney should submit a proposed Order to the Court specifying which of the foregoing events occurred, and sufficient information regarding his or her identity and the charges giving rise to this Order Setting Conditions of Release to enable the FBI to match the Order to the DNA sample to be expunged. To accomplish the expungement, once the Order is entered, the Defendant or his or her Attorney must send a certified copy of the Order to:

     Federal Bureau of Investigation
     Laboratory Division
     2501 Investigation Parkway
     Quantico, VA 22135
     Attn: Federal Convicted Offender Program Manager

More information is available at: www.fbi.gov/about-us/lab/biometric-analysis/codis/codis_expungement

AO 199B (Rev. 08/2015) Additional Conditions of Release                     Dylan Shakespeare Robinson

## ADDITIONAL CONDITIONS OF RELEASE

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

☐ (6)   The defendant is placed in the custody of:
Person or organization _____
Address *(Only if above is an organization)* _____
City and State _____
Tel No. *(if organization)* _____

Who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.
Signed: _____   _____
                           *Custodian or Proxy*                            *Date*

☒ (7)   The defendant must:

☒   (a)   submit to supervision by and report for supervision to the U.S. Probation and Pretrial Services Office as directed and ensure your supervising officer has a means to reach you.

☐   (b)   continue or actively seek employment.

☐   (c)   continue or start an education program.

☐   (d)   surrender any passport, Green Card, Visa, Advanced Parole Document, Refugee Travel Permit/Reentry Document, or other foreign travel document to Probation and Pretrial Services as directed.

☐   (e)   not obtain a passport, Green Card, Visa, Advanced Parole Document, Refugee Travel Permit/Reentry Document, or other foreign travel document.

☒   (f)   abide by the following restrictions on personal association, residence, or travel: Travel is restricted to the District of Minnesota unless approved in advance by the U.S. Probation Officer _____

☐   (g)   avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including:
_____
_____

☒   (h)   get medical or psychiatric treatment: The defendant shall complete a mental health assessment and follow the directives of the U.S. Probation Officer.

☐   (i)   return to custody each _____ at _____ o'clock after being released at _____ o'clock for employment, schooling, or the following purpose(s):
_____

## ADDITIONAL CONDITIONS OF RELEASE

☒   (j)   maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary, and observe the rules and regulations of that facility.

☒   (k)   not possess a firearm, destructive device, or other weapon.

☒   (l)   not use alcohol ☒ at all ☐ excessively.

☒   (m)   not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

☒   (n)   submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

☒   (o)   participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

☒   (p)   participate in one of the following location restriction programs and comply with its requirements as directed.

     ☐   (i)   **Curfew.** You are restricted to your residence every day
         ☐ from _____ to _____ or
         ☐ as directed by the pretrial services officer, or

     ☒   (ii)   **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or

     ☐   (iii)   **Home Incarceration.** You are restricted to 24-hour-a-day lockdown at your residence except for medical necessities and court appearances or other activities specifically approved by the court.

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

AO 199B (Rev. 08 2015) Additional Conditions of Release                          Dylan Shakespeare Robinson

## ADDITIONAL CONDITIONS OF RELEASE

[ ]   (q)   submit to location monitoring as directed by the pretrial services office or supervising officer and comply with all of the program requirements and instructions provided.

         [ ]   you must pay all or part of the cost of the program based upon your ability to pay as determined by the pretrial services office or supervising officer.

☒   (r)   report as soon as possible, to the pretrial services office or supervising officer every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

☒   (s)   Comply with Crow Wing County, Minnesota, Probation requirements.

USA v. Richard Barnett Exhibits  EXH0029

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

AO 199C (Rev. 09/08) Advice of Penalties                                    Dylan Shakespeare Robinson

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT:

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.,* in addition to) any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) An offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more - you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) An offense punishable by imprisonment for a term of five years or more, but less than fifteen years – you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) Any other felony – you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) A misdemeanor – you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____     7/14/20
*Defendant's Signature*

_____
*City and State*

USA v. Richard Barnett Exhibits  EXH0030

AO 199C (Rev. 09/08) Advice of Penalties                                              Dylan Shakespeare Robinson

## Directions to the United States Marshal

☒     The defendant is ORDERED released after processing.

☐     The United States Marshal is ORDERED to keep the defendant in custody until
notified by the clerk or judge that the defendant has posted bond and/or
complied with all other conditions for release. If still in custody, the defendant
must be produced before the appropriate judge at the time and place specified.

Date: July 14, 2020        _____

                          *Judicial Officer's Signature*

          U.S. Magistrate Judge Kate M. Menendez
                *Printed Name and Title*

DISTRIBUTION: COURT   DEFENDANT   PRETRIAL SERVICES   U.S. ATTORNEY   U.S. MARSHAL

USA v. Richard Barnett Exhibits EXH0031

# EXHIBIT C

United States v. Mattis, 963 F.3d 285 (2020)

963 F.3d 285
**United States** Court of Appeals, Second Circuit.

**UNITED STATES** of America, Plaintiff-Appellant,
v.
Colinford **MATTIS**, Urooj
Rahman, Defendants-Appellees.

Docket No. 20-1713
|
August Term, 2019
|
Argued: June 23, **2020**
|
Decided: June 30, **2020**

**Synopsis**
**Background:** Defendants were charged with throwing a Molotov cocktail into an unoccupied police vehicle. The **United States** District Court for the Eastern District of New York, Steven M. Gold, **United States** Magistrate Judge, released defendants on bail. The District Court, Margo K. Brodie, J., affirmed. **United States** appealed.

**[Holding:]** The Court of Appeals, Hall, Circuit Judge, held that releasing defendants on $250,000 bond was not clearly erroneous.

Affirmed.

Newman, Senior Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** Appellate Review; Bail or Custody Motion.

West Headnotes (11)

**[1]** **Bail** 🗝 Presumptions and burden of proof
Presumption in favor of pre-trial detention that no condition or combination of conditions will reasonably assure the safety of the community may be rebutted by the defendant, who bears a limited burden of production by coming forward with evidence that he does not pose a danger to the community. 🚩 18 U.S.C.A. § 3142(e)(3).

4 Cases that cite this headnote

**[2]** **Bail** 🗝 Presumptions and burden of proof
Once a defendant has met his burden of production of evidence that he does not pose a danger to the community, the presumption favoring pre-trial detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. 🚩 18 U.S.C.A. § 3142(e)(3).

4 Cases that cite this headnote

**[3]** **Bail** 🗝 Presumptions and burden of proof
Even in a presumption case favoring pre-trial detention, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community. 🚩 18 U.S.C.A. § 3142(e)(3).

2 Cases that cite this headnote

**[4]** **Criminal Law** 🗝 Bail
As a rule, Court of Appeals applies deferential review to a district court's bail determination and will not reverse except for clear error.

1 Cases that cite this headnote

**[5]** **Criminal Law** 🗝 Bail
The clear error standard for review of decision on pre-trial detention applies not only to the factual predicates underlying the district court's decision, but also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release. 🚩 18 U.S.C.A. § 3142(e)(3).

2 Cases that cite this headnote

Metcalf II, Steven 3/22/2021
For Educational Use Only

**United States v. Mattis, 963 F.3d 285 (2020)**

---

**[6]**   **Criminal Law**   Interlocutory, Collateral, and Supplementary Proceedings and Questions

**Criminal Law**   Bail

The determination that a package of bail conditions will protect the public from a purportedly dangerous defendant is a mixed question of law and fact which is reviewed for clear error.

1 Cases that cite this headnote

**[7]**   **Criminal Law**   Bail

Court of Appeals will find clear error in determination that a package of bail conditions will protect the public from a purportedly dangerous defendant only where, on the entire evidence, Court is left with the definite and firm conviction that a mistake has been committed.

4 Cases that cite this headnote

**[8]**   **Bail**   Right to Release on Bail

**Bail**   Evidence

Releasing defendants on $250,000 bond was not clearly erroneous in prosecution for throwing Molotov cocktail into unoccupied police vehicle during nationwide protests of police brutality; bond condition left multiple family members and friends liable if the defendants violated any condition of release, including home detention, neither defendant had a prior criminal record, both defendants had engaged in responsible careers, were dedicated to caring for their families, and had deep ties to the community, they did not engage in extensive surreptitious planning, and nothing indicated that the defendants were likely to engage in similar acts outside the context of that particular night or that they intended to harm people. 18 U.S.C.A. §§ 3142(e)(3), 3142(g).

1 Cases that cite this headnote

**[9]**   **Criminal Law**   Questions of Fact and Findings

The "clearly erroneous" standard does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.

**[10]**   **Criminal Law**   Questions of Fact and Findings

Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous, even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.

**[11]**   **Bail**   Presumptions and burden of proof

Once a defendant meets his limited burden of production by coming forward with evidence that he does not pose a danger to the community or a risk of flight, the presumption favoring pre-trial detention becomes merely one of the factors to be considered among those weighed by the district court. 18 U.S.C.A. §§ 3142(e)(3), 3142(g).

1 Cases that cite this headnote

**\*286**   Appeal from the **United States** District Court for the Eastern District of New York, No. 20-403No. 20-403 – Margo K. Brodie, *Judge*.

**Attorneys and Law Firms**

David K. Kessler (Kevin Trowel, Assistant **United States** Attorneys on the brief), for Richard P. Donoghue, **United States** Attorney, Eastern District of New York, Brooklyn, NY, for Appellant.

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 35 of 329
Metcalf II, Steven 3/22/2021
For Educational Use Only                           USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Mattis, 963 F.3d 285 (2020)

Sabrina P. Shroff, Law Offices of Sabrina P. Shroff, New York, NY, for Appellee Mattis.

Paul L. Shechtman (Margaret E. Lynaugh on the brief), Bracewell LLP, New York, NY, for Appellee Rahman.

Brian A. Jacobs, Morvillo Abramowitz, Grand Iason & Anello PC, New York, NY, Edward Y. Kim, Krieger Kim & Lewin LLP, New York, NY for Amici Curiae Former Federal Prosecutors (joined by Joshua L. Dratel, Dratel & Lewis, P.C., New York, NY for National Association of Criminal Defense Lawyers), in support of Appellees.

Before: Newman, Hall, and Lynch, Circuit Judges.

**Opinion**

Judge Newman dissents in a separate opinion.

Peter W. Hall, Circuit Judge:

 **\*287**  The United States appeals from a June 1, 2020 order of the United States District Court for the Eastern District of New York (Brodie, *J.*), affirming Magistrate Judge Steven M. Gold's release of Colinford Mattis and Urooj Rahman on bail pending trial.

On May 30, 2020, the defendants-appellees were arrested following an incident in which defendant Rahman allegedly threw a Molotov cocktail into an unoccupied police vehicle and Mattis allegedly acted as the getaway driver. [1] Magistrate Judge Gold ordered each defendant released on $250,000 bond with conditions. The government appealed and Judge Brodie affirmed. On June 5, 2020, a panel of this Court granted the government's motion to stay the release order pending resolution of this appeal.

The government contends that the district court clearly erred by not explicitly stating it considered the statutory presumption favoring detention that arises in this case and by ultimately granting release. For the reasons that follow, we affirm the determination of the district court.

I.

According to a complaint filed by the government, in the early morning of May 30, 2020, amidst city and nationwide protests against police brutality, Mattis and Rahman were driving around Brooklyn in Mattis's vehicle. At one point, Rahman exited the vehicle and threw a lit Molotov cocktail into an unoccupied and previously vandalized police vehicle. Rahman then returned to the vehicle, which Mattis was driving, and the pair fled. The government also offered evidence that, earlier that evening, Rahman attempted to distribute Molotov cocktails to other individuals. Shortly after the pair fled, the defendants were apprehended and taken into custody by the New York Police Department. During the arrest of the defendants, the police officers observed in plain view in Mattis's vehicle items that could be used to build a Molotov cocktail, including a lighter, a beer bottle filled with toilet paper and a liquid suspected to be gasoline, and a gasoline tank. The government thereafter filed a complaint charging defendants with violating 🔖 18 U.S.C. § 844(i), which prohibits "maliciously damag[ing] or destroy[ing], or attempt[ing] to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." Mattis and Rahman were then brought before Magistrate Judge Gold for a detention hearing.

Pursuant to 18 U.S.C. § 3154(1), Pretrial Services collected information pertaining to Mattis and Rahman, their risks of flight, and the danger that their releases would pose to another person or the community. The Pretrial Services officers assigned to Mattis and Rahman each recommended that the defendants be released on bond co-signed by financially responsible suretors with additional conditions imposed. These conditions included the defendants surrendering all travel documents, being subject to random home and employment visits, and being subject to home detention with location monitoring.

Colinford Mattis appeared via video conference for the hearing before Magistrate Judge Gold on June 1, 2020. Mattis's counsel emphasized that after a "detailed interview" with Mattis, the Pretrial Services  **\*288**  officer concluded that the proposed bail package would reasonably assure the safety of the community and Mattis's return to court. Gov't App. 18. Mattis's counsel also described Mattis's close family ties, including his three foster children, two of

Metcalf II, Steven 3/22/2021
For Educational Use Only                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

**United States v. Mattis, 963 F.3d 285 (2020)**

whom he is in the process of adopting. Numerous suretors volunteered in support of **Mattis**, including his brother, sisters, and close friends.

The government argued in those proceedings that despite the recommendation of Pretrial Services the bail conditions were inadequate because they assumed **Mattis** would act in a rational manner. The government contended that "Colinford **Mattis** has not demonstrated himself to be a rational person[,]" because **Mattis** was willing to risk his career and the advantage of his education by participating in this crime. Gov't App. 24. As counsel for the government explained:

> [I]t is difficult for me, frankly, to comprehend how somebody in his position with his background would do what he did and I have great difficulty understanding how we can make any assumption about how a bail package like the one that was suggested by Ms. Shroff is actually going to protect the public and is going to ensure that he is going to return to court as required.

Gov't App. 26. During questioning by the magistrate judge, the government conceded that its claim that **Mattis** was irrational and would not comply with the bail conditions was based solely on the facts of the crime.

THE COURT: When you say that you question his rationality, I understand the argument and I don't mean to belittle what happened ... I just want to make sure that I am understanding the scope of your argument and asking you whether there are other aspects of his background or the government's information about him that you're prepared to put on this record other than his behavior on the night in question that demonstrates his lack of attention to incentives, rewards and punishment.

MR. RICHARDSON: Not at this time, Your Honor.

Gov't App. 27. In concluding his argument to the court, counsel for the government emphasized: "I do not believe that he can rebut the presumption that he is a danger to the community and a danger of flight." Gov't App. 27.

**Mattis's** attorney responded, "I believe that the bail package completely addresses any concerns at all and I fairly rebutted this presumption." Gov't App. 27.

After considering the arguments, the magistrate judge rejected the government's contention that **Mattis** is irrational and therefore not entitled to bail:

> I ... believe that one night of behavior is not a basis to reject someone's ability to make rational decisions and that home detention assured by the plaintiff and the well-being of his entire family and several high earning colleagues and friends should be an adequate deterrent for further danger to the community even assuming the accuracy of every allegation of the government in its complaint.

Gov't App. 27–28. The magistrate judge set bond in the amount of $250,000 and imposed the conditions listed in the Pretrial Services report, which include home detention and a requirement that **Mattis** wear a GPS location monitor.

On the same day, Urooj Rahman also appeared via video conference for a bail hearing before Magistrate Judge Gold. As with **Mattis**, Pretrial Services recommended home confinement with GPS monitoring and a $250,000 bond. Numerous family members and friends volunteered to **\*289** be suretors for Rahman, and the government argued that the bail package was insufficient to rebut the presumption that Rahman is a danger to the community and a risk of flight. Before the court, Rahman's attorney described Rahman's work as a public interest lawyer. Her attorney also pointed out her family ties, which include living with and being responsible for the care of her mother whose health is declining. He argued that Rahman is unlikely to commit another crime: "this is her first arrest. She ... has no history of substance abuse or any other risk factor that would suggest any propensity for future criminality or failure to abide by the Court's instructions. Ms. Rahman also comes from a tight, solid and law abiding family." Gov't App. 48–49. In response, the government argued that Rahman's previously

Metcalf II, Steven 3/22/2021
For Educational Use Only

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

**United States v. Mattis, 963 F.3d 285 (2020)**

spotless record weighed in favor of denying bail: "[T]his defendant, who had so much to lose, threw that Molotov cocktail anyhow." Gov't App. 55.

In concluding his argument before the magistrate judge, Rahman's attorney raised the additional consideration of coronavirus spreading in the Metropolitan Detention Center, where Rahman was confined. Gov't App. 55–56 ("The people in federal custody [have] ... six times the rate of infection [of] the U.S. population."). The magistrate judge, having reviewed the Pretrial Services report and the list of suretors and having considered the arguments made by the government and the defense during the video conference, explained:

> It's not an easy case. The conduct of the defendant is extremely grave at least as alleged by the government, but I do take into account the fact that the defendant does not have a prior record and that she has a number, a large number of responsible suretors who are ready to vouch for her.

Gov't App 56. The magistrate judge ruled that the Rahman could be released subject to a $250,000 bond and the conditions recommended in the Pretrial Services report, including home confinement and a requirement that she wear a GPS monitoring device.

The government appealed Magistrate Judge Gold's orders of release to the district court. In a hearing before Judge Brodie, the government again argued that the defendants' backgrounds made them more, rather than less, dangerous: "these aren't people with nothing to lose .... They have education, they have a future, they have careers, and they were willing to throw that all away ...." Gov't App. 73.

Judge Brodie considered the government's argument and asked Rahman's defense counsel why Rahman is not a danger to the community. Noting that she was aware that Rahman had no criminal record and her work representing individuals in housing court, Judge Brodie questioned what made Rahman commit the charged crime, "and what has changed since that day that would prevent her from doing so in the future?" Gov't

App. 78. Rahman's counsel responded that the experience of Rahman's arrest had been "tremendously eye opening" and the conditions of her bail mean that "[e]verything she does now affects her family's financial [security], and it affects her ... mother's health and ability to continue living her life." Gov't App. 79.

Responding to the same question from Judge Brodie, **Mattis's** defense counsel emphasized the restrictions of the bail conditions and **Mattis's** close family ties:

> [H]is family works as moral suasion for him. He lives in the same home as his sister Lyris, who is on the line, and can confirm to the Court she will do everything that is asked of her to make sure that Colin abides by the conditions set **\*290** by this bond. Not only that, he will be under strict Pretrial Services supervision and, of course, he will have an attorney who is dogged in her own perseverance to make sure her client complies with all of the conditions set by this court. It is the conditions itself that ameliorates the danger.

Gov't App. 84–85.

Reviewing the magistrate judge's orders de novo, Judge Brodie found the bail conditions set by Magistrate Judge Gold to be sufficient. Judge Brodie explained that the seriousness of the offense and the strength of the evidence against the defendants cut against release, but that these factors were outweighed by the history and characteristics of the defendants and their ties to their communities.

> [B]ased on the ... fact that they have no prior criminal history, the fact that they were both employed ... the fact that they both live at the same address for almost their entire life ..., the fact that Mr. **Mattis** has foster children at

Metcalf II, Steven 3/22/2021
For Educational Use Only

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Mattis, 963 F.3d 285 (2020)

home that he's responsible for, and that
Ms. Rahman has her own mother that
she is responsible for, and based on
the bail conditions set by Judge Gold,
I find that all of the factors weigh in
favor of release ....

Gov't App. 86.

In sum, Pretrial Services, Magistrate Judge Gold, and Judge Brodie all concluded, notwithstanding the acknowledged seriousness of the charged offense, that bail is appropriate for both Rahman and **Mattis** based on the absence of any criminal records and on their family obligations, their ties to the community and the number of suretors who support them.

Following hearings before Magistrate Judge Gold and Judge Brodie, **Mattis** and Rahman were each released on bonds executed in the amount of $250,000 secured by multiple family members and friends, and subject to a number of conditions, including home detention (to be enforced by location monitoring) with certain limited exceptions for travel outside of the home within only New York City or Long Island. Under the conditions of release, **Mattis** and Rahman are also prohibited from having contact with each other except in the presence of counsel.

On June 2, the government filed an emergency motion to stay the district court's order to release **Mattis** and Rahman, arguing that irreparable harm would result from the defendants' release. After oral arguments on June 5, a panel of this Court granted the government's motion and ordered that this appeal be heard on an expedited basis. Pursuant to that order, **Mattis** and Rahman were remanded into custody and are currently being held at the Metropolitan Detention Center in Brooklyn.

## II.

**[1]  [2]  [3]**  A district court is instructed to order the pretrial detention of a defendant if, after a hearing, the judge "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."

18 U.S.C. § 3142(e)(1). The parties agree, given the nature of the crimes charged, that there is a presumption that "no condition or combination of conditions will reasonably assure ... the safety of the community," which applies to the courts' consideration of the orders before us. 18 U.S.C. § 3142(e)(3). This presumption may be rebutted by the defendant, who "bears a limited burden of production ... by coming forward with evidence that he does not pose a danger to the community." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Once a defendant has met his **\*291** burden of production ... the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court. Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community." *Id.*

In making its determination as to whether a defendant poses a danger to the community, the district court must consider the following factors set forth in 18 U.S.C. § 3142(g):

(1) the nature and the circumstances of the offense charged...;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including [his] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and ...

(4) the nature and seriousness of the danger to any person or to the community that would be posed by the person's release.

*See also Mercedes*, 254 F.3d at 436 ("To determine whether the presumption[ ] of dangerousness ... [is] rebutted, the district court considers" the above factors.).

The government makes two arguments on appeal. First, it contends the district court erred by failing to address the statutory presumption that "no condition or combination

Metcalf II, Steven 3/22/2021
For Educational Use Only
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

**United States v. Mattis, 963 F.3d 285 (2020)**

of conditions will reasonably assure ... the safety of the community." 18 U.S.C. § 3142(e)(3). Second, the government argues that the district court clearly erred when it found that the bail conditions were sufficient to assure the safety of the community and when it found that the statutory factors to be considered weigh in favor of the defendants' detention.

[4] [5] [6] [7] "As a rule, we apply deferential review to a district court's [bail determination] and will not reverse except for clear error." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *see also* *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000) ("We review the district court's determination that a package of bail conditions will prevent danger to the community for clear error."). The clear error standard applies not only to the factual predicates underlying the district court's decision, but "also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release." *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004). That is, "[t]he determination that a package of bail conditions will protect the public from a purportedly dangerous defendant is a mixed question of law and fact which we review for clear error." *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) (citations omitted); *but see United States v. Shakur*, 817 F.2d 189, 197 (2d Cir. 1987) ("[T]he court's ultimate finding may be subject to plenary review if it rests on a predicate finding which reflects a misperception of a legal rule applicable to the particular factor involved."). We will find clear error only where, "on the entire evidence[,] we are left with the definite and firm conviction that a mistake has been committed." *Sabhnani*, 493 F.3d at 75 (quotation marks omitted).

### III.

There is no question that the evidence before the district court demonstrated that the crimes charged are serious and the defendants' conduct on the night of their arrests could well have resulted in significantly **\*292** more harm than it did. By affirming the district court's order to release the defendants on the conditions imposed, we do not seek to minimize the severity of the offense. Rather, we recognize the constraints on our appellate review and the fact that the

gravity of an offense is not the only factor to be considered by the district court in deciding whether the conditions of release are adequate to ensure the defendants will not flee and do not constitute a continuing threat to the community.

We do not find persuasive the government's first argument that, because the district court did not refer explicitly to the presumption during the bail hearing, the court must have failed to address the statutory presumption against releasing the defendants. At oral argument before this panel, the government conceded that its argument for why and how the presumption should apply was presented to the district court in its memorandum advocating detention. The government does not contest that the district court examined the § 3142(g) factors—the precise factors that we have said must be considered to determine whether the presumption is rebutted. *See Mercedes*, 254 F.3d at 436. It is clear from the record, moreover, that the district court grappled with why it should be persuaded that there is adequate assurance the defendants will not engage in this sort of "reckless, ... violent" activity again in light of the dangerous nature of the charged offense, which gives rise to the presumption against release. Gov't App. 78.

In addition, the burden on the defendants is one of production, *not* persuasion, and it is clear from the record that the defendants produced evidence from which the district court could infer that they do not pose a danger to the community. As we have repeatedly noted, albeit in a somewhat different context, we do not require "robotic incantations" by district court judges in order to hold that the obligation to consider statutory factors has been satisfied. *See e.g., United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008) (*en banc*); *cf. Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 336 n.17 (2d Cir. 2006) (explaining that an immigration judge "need not engage in robotic incantations to make clear that he has considered and rejected a petitioner's proffered explanation." (internal quotation marks omitted)). We thus decline to create such an obligation here, where it is clear and undisputed that the magistrate judge and district court judge, both of whom are well-experienced, (1) had before them the government's papers pointing out that the presumption applied, (2) considered each of the factors that would bear on whether the presumption in favor of detention was rebutted, and (3) were not required by law to make explicit factual

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 40 of 329
Metcalf II, Steven 3/22/2021
For Educational Use Only          USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Mattis, 963 F.3d 285 (2020)

findings, *cf.* *United States v. Chimurenga*, 760 F.**2d** 400, 406 (**2d** Cir. 1985) ("[T]he [Bail Reform] Act requires the court to make factual findings only in the event of a detention order, and not when there is a release order." (citations omitted)).

**[8]** **[9]** **[10]** The government's second argument—that the district court clearly erred in granting the defendants bail—presents a closer question, but it is an argument we ultimately reject. In order to reverse on these grounds, we must not only conclude that the government showed, by clear and convincing evidence, that **Mattis** and Rahman present a danger to the community that could not be mitigated by the conditions of release, but also we must be left with a "definite and firm conviction" that it was a mistake for the district court to hold otherwise. *See* *Sabhnani*, 493 F.3d at 75 (citation omitted). We cannot do so on this record. The clearly erroneous standard **\*293** "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.**2d** 518 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* at 574, 105 S.Ct. 1504 (citations omitted). [2] It is not proper, therefore, to inquire as to whether or not we may have decided the bail motion differently were we deciding it in the first instance, as our review is limited to whether the district court committed error in reaching its determination.

In deciding whether the defendants should be released or detained, the district court carefully weighed the facts and evidence before it, including the Pretrial Services reports, which were prepared after extensive interviews with each defendant, and the arguments by both defendants and the government. The district court considered each of the factors set forth in 18 U.S.C. § 3142(g), explaining that, while the first two factors weigh against release because the crime was violent, reckless, and lawless, and the government's evidence is strong, release was warranted on balance. This determination was based not only on the defendants' strong ties to their communities and lack of criminal histories—

the government has submitted no evidence indicating the defendants have ever engaged in activity similar to the charged conduct—but also on the finding that the bond condition provided "sufficient moral suasion" to ensure compliance with the conditions of release. Gov't App. 91. The bond condition notably leaves multiple family members and friends of each defendant liable for a quarter million dollars if the defendants violate any condition of release, including their home detention.

The government's position that the district court committed clear error in granting bail essentially boils down to an argument that the charged criminal conduct is so extreme and aberrant that it represents the new normal for the defendants, such that no set of conditions could reasonably assure the safety of the community. The acts alleged were indisputably dangerous and may have posed a serious risk to individuals in the surrounding areas. As a threshold matter, however, we must observe that the entire system for determining bail is premised on the belief that, at least to some extent, all criminal acts are aberrant. The very reason that Congress directed district courts to consider factors beyond just the severity of the offense is the recognition that an individual is more than the crime of which that individual has been accused.

In seeking to minimize consideration of the positive factors the district court weighed in favor of release, the government asserts that these factors existed before the crime and that it is therefore error to reason that these factors may provide a deterrent to future criminal conduct. Even putting aside that the district **\*294** court was *mandated* to consider factors in addition to the facts of the crimes the defendants are charged with having committed, the district court made clear that the "moral suasion" on which it rested part of its decision was different than that which existed before the criminal action took place. Gov't App. 91. Though **Mattis** and Rahman both had responsibilities to their families and communities before they were charged with this offense, the financial futures of their families and friends were not dependent on their compliance with the law and the other conditions of their release. Now that this associational dependence and the resulting moral obligations are front and center in any behavioral calculus the defendants will undertake, the district court was certainly allowed to consider the effects on the defendants of these changes that have come about as a result of the bond conditions imposed.

Metcalf II, Steven 3/22/2021
For Educational Use Only

**United States v. Mattis, 963 F.3d 285 (2020)**

---

Nor was it clear error for the district court to put the weight it apparently did on the defendants' characteristics and positive past histories. We are aware of no case where the fact that, prior to the offense charged, the defendants lived lives fully in accordance with the law, dedicated those lives to societal betterment, and were employed in a profession that values ethics somehow militates *against* granting bail. If now a defendant's life history and characteristics can support detention, on the one hand, because that history demonstrates the defendant engaged in bad acts, and on the other hand, because the history is so spotless and impressive that the defendant should have "known better," the inquiry into a defendant's background may well become meaningless. We decline to endorse such a "heads I win, tails you lose" zero-sum analysis.

Indeed, our prior caselaw is persuasive that the district court did not clearly err in granting defendants' motions to be released on bail, and this case stands in stark contrast to those cases where we have held a district court clearly erred by releasing defendants. In *United States v. Chimurenga*, for example, we concluded that the district court did not clearly err in ordering defendant Chimurenga released on bail. 760 F.2d at 406. The defendant, who had no criminal record and had been working on a doctorate at Harvard in public policy, was charged with conspiracy to commit armed robbery. *Id.* at 402. The government alleged that Chimurenga was the leader of a group connected to an armed robbery in New York that resulted in the death of an armored truck guard and two police officers. *Id.* At the bail hearing, the government presented strong evidence showing Chimurenga's involvement in the conspiracy. *Id.* Before the district court Chimurenga submitted evidence from his friends and family, including letters indicating their belief that he was not a flight risk, and testimony about Chimurenga's "strong sense of family" and their willingness to post money for bond in the amount of $500,000 as bail. *Id.* at 402–03. The district court ordered Chimurenga released pending trial. *Id.* at 403. On appeal from that decision, we concluded that the district court's determination "that the government failed to demonstrate by clear and convincing evidence that Chimurenga was a danger to the community" was not clearly

erroneous, declining to overrule the "experienced judgment" of the district court. *Id.* at 405.

[11] Here, a number of these same factors exist. Neither defendant had a prior criminal record. As the Pretrial Services reports confirmed, both defendants had engaged in responsible careers and are dedicated to caring for their families. Both demonstrated they had deep ties to the community, and both had friends and **\*295** family explain that they were willing to post $250,000 bonds as bail, for which they would be jointly and severally liable if defendants left their homes in a non-approved manner (a likely predicate to engaging in the type of conduct that may harm the community). And the facts here are arguably more favorable to these defendants' release than in *Chimurenga*. Unlike *Chimurenga*, there is no evidence that these defendants were members of an organized criminal or terrorist organization, who plotted over a period of time to engage in revolutionary acts. Although, as our dissenting colleague points out, their activities cannot be characterized as impulsive or momentary, neither did they engage in extensive surreptitious planning; their actions were undertaken during a massive public protest, in which emotions ran high. There is no indication that the defendants are likely to engage in similar acts outside the context of that particular night. Unlike Chimurenga, who faced evidence that he advised co-conspirators "how to kill armored truck guards," *id.* at 402, here, there is no evidence that the defendants intended to harm people. While evidence was presented that their actions could have endangered individuals, there are no allegations that anybody was injured by their actions and no evidence was presented that they encouraged others to hurt people or that they themselves intended bodily harm to others. [3]

Cases in which we have found clear error offer a useful foil to our reaching that determination here. In *United States v. Ferranti*, for example, we held that the district court clearly erred in granting defendant's motion to be released on bail. 66 F.3d at 544. There, Ferranti was indicted on charges of (1) conspiracy to commit arson and arson resulting in death based on his involvement in a deadly arson of an *occupied* apartment building in which a firefighter died, (2) witness tampering in relation to the arson, (3) mail fraud, and

---

USA v. Richard Barnett Exhibits   EXH0041

Metcalf II, Steven 3/22/2021
For Educational Use Only                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Mattis, 963 F.3d 285 (2020)

(4) possession of a firearm by a convicted felon based on his possession of a loaded gun in a public place. Evidence was also presented to the district court that Ferranti (1) terrorized his tenants (including using a large dog to evict tenants), (2) threatened a mortgagee to whom Ferranti owed money (the mortgagee was later shot in the neck by an unidentified man; he survived), (3) attempted to murder a criminal associate, and (4) ordered the murder of a tenants' rights activist (the activist's body was found dismembered, and Ferranti allegedly later claimed credit for mutilating the corpse).

Our search has revealed no case where we have found that a district court clearly erred when it decided to release a defendant on bail in circumstances analogous to those here.

See 🔖 Mercedes, 254 F.3d at 436-38 (holding that district court clearly erred in granting defendants' pretrial release where defendants were charged with conspiracy **296** to commit armed robbery and possession of a weapon in connection with that offense and where the government proffered evidence that one of the defendants had twice been convicted of possession of a weapon and had previously violated the conditions of a prior release, another defendant had a history of domestic violence, and the final defendant was not a U.S. citizen and was released on a $200,000 bond secured by only a $5,000 cash deposit and therefore was a flight risk); 🔖 *United States v. Jimenez*, 104 F.3d 354 (**2d** Cir. 1996) (reversing the order of the district court releasing defendant from pretrial detention where the defendant was previously convicted of criminal sale of a controlled substance, indicted for conspiracy to murder in aid of racketeering activity and attempted murder in aid of racketeering, and the government presented evidence that the defendant was a member of a violent criminal organization);

🔖 *United States v. Millan*, 4 F.3d 1038, 1046-47, 1049 (**2d** Cir. 1993) (reversing the order of the district court releasing defendants from pretrial detention where both defendants presented a high risk of flight and where one of the defendants had multiple prior convictions, including criminally negligent homicide for shooting his wife, and the other defendant had allegedly "ordered numerous shootings, beatings, and a contract murder, and had issued threats against the families of witnesses who testified adversely to him at trial"); 🔖 *United States v. Dono*, 275 F. App'x 35, 37 (**2d** Cir. 2008) (summary order) (holding that the district court clearly erred in granting

the release of defendants from pretrial detention where the defendants were charged with assault and where the government proffered evidence that the defendants were alleged members of an organized crime family, had violently beat two individuals (including "attempting to or actually putting the barrel of a handgun in a victim's mouth"), and had threatened future physical harm to the victims and their families).

In light of the above, while we would not necessarily have reached the same conclusion as the judges below, we cannot say that the district court committed clear error. The conditions of release contain provisions that impede defendants' ability to engage in criminal activity, and the evidence to which the government points us and which we have otherwise gleaned from the record is inadequate to leave us with a firm conviction that the district court erred in finding those conditions sufficient to assure public safety.

\* \* \*

For the foregoing reasons, we AFFIRM the order of the district court and VACATE the stay previously entered in this matter.

Jon O. Newman, Circuit Judge, dissenting:

On the night of May 29 in Brooklyn, Appellee Urooj Rahman got out of a car driven by Appellee Colinford Mattis, lit an explosive device known as a Molotov cocktail, and tossed it through the broken window of an unoccupied police car, setting the console on fire. Parked where people were nearby, she attempted to distribute bombs to a bystander and others for their use. She then left the scene in Mattis's car, which contained one completed bomb and components for making more bombs. Their thinking was expressed by Rahman on a videotape, about an hour before the crime: "The only way they hear us is through violence." The majority's decision to affirm the release of these Appellees from pretrial detention subjects the community to an unacceptable risk of danger. I respectfully dissent.

**297** 1. Clear Error

The Appellees were arrested for bombing a New York City police department vehicle during a protest sparked by the

Metcalf II, Steven 3/22/2021
For Educational Use Only

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

**United States v. Mattis, 963 F.3d 285 (2020)**

death of George Floyd, an African-American who died after a Minneapolis police officer placed his knee on Floyd's neck for several minutes. A Magistrate Judge found, and a District Judge agreed on review, that the conditions of bail release proposed by the Defendants would "reasonably assure ... the safety of ... the community." 18 U.S.C. § 3142(e)(1). That finding is reviewed for "clear error," *United States v. Ferranti*, 66 F.3d 540, 542 (**2d** Cir. 1995),[1] which the Supreme Court has instructed occurs when a reviewing court has " 'the definite and firm conviction that a mistake has been committed,' " *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.**2d** 518 (1985) (quoting **\*298** *United States v. United States* Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).[2] I have that definite and firm conviction. Here's why:

A judicial officer must detain an arrested person before trial if the officer finds "that no ... combination of conditions will reasonably assure ... the safety of ... the community." 18 U.S.C. § 3142(e)(1). The facts to support such a finding must be supported by "by clear and convincing evidence." *Id.* § 3142(f)(2)(B). In determining whether conditions of release will reasonably assure the safety of the community, the judicial officer is required to consider four factors: the "nature and circumstances of the offense" including whether it involves an "explosive" or "destructive device," *id.* § 3142(g)(1), "the weight of the evidence," *id.* § 3142(g)(2), "the history and characteristics of the person," *id.* § 3142(g)(3), and "the nature and seriousness of the danger to ... the community that would be posed by the person's release," *id.* § 3142(g)(4). Only the third factor favors these Appellees;[3] the first, second, and fourth factors strongly support detention.

Preliminarily, I note that the motions panel, which stayed the release order pending a ruling by the merits panel, pointedly noted that the stay factors to be considered "most critically" were "the likelihood of success and irreparable injury to the movant absent a stay." *United States v. Mattis*, No. 20-1713 (**2d** Cir. June 5, **2020**) (order granting stay pending appeal). Because the injury to the Appellees from granting a stay, their return to custody, was irreparable, the

motions panel, viewing the same record now before this merits panel, obviously thought the Government had shown not only a likelihood of success, but a likelihood sufficiently substantial to outweigh the Appellees' injury. Although that panel's interim assessment of the merits is not binding on this panel, *cf. Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008) (denial of preliminary relief not law of the case), it gives me a significant reason to believe that my dissenting view is correct.

The crime in this case was no "spur of the moment" action, as might occur, for example, if marching in the protest, either of the Appellees had seen a Molotov cocktail accidentally dropped on the sidewalk, **\*299** picked it up, and, without careful thought, immediately threw it into a police car. Such a serious act, though wrongful, might be said to be a momentary lapse of judgment on the part of someone emotionally caught up in the outrage over the event that provoked the protest.

But Rahman's act, assisted by **Mattis**, was carried out after deliberation, planning, and procurement of bomb components, occurring in an interval of at least one hour. Around midnight, she was videotaped walking out of a neighborhood convenience store where she reportedly purchased supplies,[4] and around 1 a.m. she was videotaped throwing the lighted bomb. Although her target was property, people nearby were put at risk. She also compounded her wrongdoing by offering bombs to others, whose targets she could anticipate might well have been bystanders. And the presence of one assembled bomb and bomb components in the car, including a can of gasoline, show that she and **Mattis** were prepared to continue their criminal conduct.

Rahman and **Mattis** are both lawyers, age 31 and 32, respectively. Their counsel contended that their actions were aberrant, and that the chances of their doing a similar act again is unimaginable. In my view, it was unimaginable, before the event, that they would have acted as they did. But we now know that they were susceptible to being provoked to take seriously dangerous actions that night, and they remain a risk to being provoked again to take additional dangerous actions.

I do not contend that it is certain they will act dangerously if released. I do not even say it is highly likely. I do say that the risk of their doing so is unacceptable, a risk no community

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 44 of 329
Metcalf II, Steven 3/22/2021
For Educational Use Only
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

should be asked to bear. That risk creates a danger to the community.

Their lawyers argue that two circumstances render the risk of their future dangerous conduct insufficient to warrant pretrial detention. The first is the shock they experienced by being arrested and placed briefly in jail. The second is the inhibiting effect of awareness that any criminal conduct would be a breach of their bond, subjecting their families to severe financial hardship.

These circumstances might somewhat reduce the risk of a future act of violence. But these Appellees have shown that the prospect of serious adverse consequences like the end of their legal careers, in addition to a substantial prison term, did not deter them from taking dangerous action about which they had ample time to deliberate. I have little doubt that, while sitting in jail the past few weeks, they believe they will not take dangerous action again. The issue, however, is whether there is an unacceptable risk that, despite their likely current **state** of mind, some future event will again stir their outrage and provoke them to take action that risks injury and perhaps even death to members of the community.

As for the bond conditions, our Court has at least twice ruled that, although bonds secured by family members and other sureties sufficed to deter flight, they did not assure the safety of the community. See *United States v. Mercedes*, 254 F.3d 433, 436-37 (**2d** Cir. 2001) [5] ; *United States v. Rodriguez*, 950 F.**2d** 85, 89 (**2d** Cir. 1991). Lawyers willing to risk an end to their legal careers are not likely to be **\*300** deterred from dangerous action by financial loss to family and friends resulting from violation of their bonds. [6] And we have noted that electronic monitoring devices "can be circumvented" and "rendered inoperative." *United States v. Orena*, 986 F.**2d** 628, 632 (**2d** Cir. 1993).

## 2. The Statutory Presumption

Federal law provides that when, as in this case, a judicial officer finds probable cause to believe that a person violated any of a group of statutes including 18 U.S.C. § 844(i), "it shall be presumed" that "no ... combination of conditions will reasonably assure ... the safety of the community." See

18 U.S.C. § 3142(e)(3)(C). [7] That presumption "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial."

*United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). It "represents Congressional findings that certain offenders ... are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions. *United States v. Dominguez*, 783 F.**2d** 702, 707 (7th Cir. 1986).

The presumption is subject to rebuttal, placing on a defendant a burden of production to "com[e] forward with evidence that he does not pose a danger to the community." *See Mercedes*, 254 F.3d at 436. Even if the Appellees' conditions of bail release satisfied their burden of production, we have ruled that "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.* at 436; *United States v. Martir*, 782 F.**2d** 1141, 1144 (**2d** Cir. 1986). [8]

Although neither judicial officer in this case mentioned this presumption in their decisions, it is reasonable to assume that they were aware of a statutory provision applicable to the case before them, which the Government had called to their attention. **\*301** Their bail release rulings may be considered an implicit finding that the Appellees had satisfied their burden of production, although an explicit finding to that effect would have been helpful. See *id.* (trial judge "should have made more detailed findings").

But it is not reasonable to assume that the judicial officers were familiar with the entirety of Second Circuit case law or even decisions of this Court like *Mercedes* applicable to their task in this case. No particular words needed to be expressed or written, but some explicit indication was required, not to acknowledge the existence of the presumption, but to show awareness of, and compliance with, the obligation required by this Court to "consider" the rebutted presumption among the factors to be "weighed" in determining whether release of the Appellees would pose a danger to the community. *Mercedes*, 254 F.3d at

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 45 of 329
Metcalf II, Steven 3/22/2021
For Educational Use Only
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Mattis, 963 F.3d 285 (2020)

436. [9] Although the judicial officers explicitly referred to the four statutory factors of 18 U.S.C. § 3142(g), outlined above, required to be considered in determining whether a defendant's release will pose a danger to the community, there is no indication that they "weighed" the presumption among these statutory factors. Even if we do not reverse for clear error, we should remand to oblige the District Court to comply with its *Mercedes* obligation.

**All Citations**

963 F.3d 285

# Footnotes

1   A Molotov cocktail is an incendiary device that consists of a glass bottle filled with a flammable liquid and an ignition source that is lit before releasing the bottle.

2   We recognize that a bail determination, which involves mixed questions of law and fact, may not be an obvious case in which to apply the traditional "clear error" framework cited in *Anderson*. We think this framework is appropriate here, however, not only because we have applied it in the past in evaluating whether the district court has erred in making a bail determination, but also because we read the government's argument to challenge the way the district court weighed the evidence. *See, e.g.*, *United States v. Baig*, 536 F. App'x 91 (**2d** Cir. 2013) (summary order).

3   While we acknowledge that *Chimurenga* is different from the instant case in that the statutory presumption in favor of detention applies here and did not in *Chimurenga*, this does not alter our analysis in a material way. As we explained in *United States v. Mercedes*, once a defendant meets his limited burden of production—"by coming forward with evidence that he does not pose a danger to the community or a risk of flight"—the presumption favoring detention becomes merely one of the factors "to be considered among those weighed by the district court." 254 F.3d at 436. Thus, concluding that the defendants have produced evidence before the district court from which the district court could find that they do not pose a danger to the community and are not a flight risk, the presumption becomes merely one additional factor that was not considered in *Chimurenga*. The burden of persuasion remains on the government, even in a presumption case. *Mercedes*, 254 F.3d at 436.

1   I accept *Ferranti* as binding precedent of this Circuit that a District Court's determination that the conditions of the pretrial release of a defendant will reasonably assure the safety of the community is reviewed for clear error, but pause to observe that this standard of review is subject to some doubt. The distinction between a finding of fact, reviewed for clear error, and a ruling on a point of law, reviewed *de novo*, sometimes requires careful consideration. *See Antilles Steamship Co. v. Members of the American Hull Insurance Syndicate*, 733 F.**2d** 195, 202 (**2d** Cir. 1984) (Newman, J., concurring). That the determination concerns a prediction about the future does not insulate it from clear error review. *See, e.g.*, *In re Jackson*, 593 F.3d 171, 178 (**2d** Cir. 2010) (finding of future earnings); *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 529 (**2d** Cir. 2004) (finding of future viability of a business). Clear error review, at least in some contexts, applies not only to what will occur in the future but also the degree of likelihood that something will occur. *See Hui Lin Huang v. Holder*, 677 F.3d 130, 134 (**2d** Cir. 2012) (Immigration Judge's finding of likelihood of future persecution for purposes of an asylum claim reviewed for

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 46 of 329
Metcalf II, Steven *3/22/2021*
**For Educational Use Only**                                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Mattis, 963 F.3d 285 (2020)

clear error by Board of Immigration Appeals); *En Hui Huang v. Attorney General*, 620 F.3d 372, 382-83 (3d Cir. 2010) (same).

A determination that conditions of pretrial release will reasonably assure the safety of the community, or a reciprocal determination that such conditions will not reasonably protect the community from danger, involves three components. The first concerns the reasonableness of the requisite assurance of safety or risk of danger. Determining reasonableness is usually a legal determination for a court, *see, e.g.*, *Maryland v. King*, 569 U.S. 435, 448, 133 S.Ct. 1958, 186 L.Ed.**2d** 1 (2013) (reasonableness of scope and manner of execution of warrantless search); *Lore v. City of Syracuse*, 670 F.3d 127, 161 (**2d** Cir. 2012) (reasonableness of public official's belief that action was lawful), although the reasonableness of an alleged tortfeasor's conduct is regularly submitted to a jury as if it were a factual issue. The second is the likelihood that safety will be protected or that danger will ensue. The third is the extent of safety that the community is entitled to enjoy or the extent of danger from which the community is entitled to be protected. The safety need not be guaranteed, but the danger must be more than trivial.

In the asylum context, "persecution," unlike safety or danger, has a well developed meaning, *see Ivanishvili v. U.S. DOJ*, 433 F.3d 332, 341 (**2d** Cir. 2006) (persecution is "infliction of suffering or harm upon those who differ on the basis of a protected statutory ground"), so an Immigration Judge's fact-finding concerns only whether it will occur and how likely is its occurrence. However, the combination of the three components of the bail release determination, especially the one concerning reasonableness, makes that determination arguably an issue of law, or perhaps the application of a legal standard--reasonable assurance of community safety--to the fact of what will happen and the likelihood of its happening. Perhaps that is why *Ferranti* called the determination "a mixed question of fact and law," 66 F.3d at 542, to which, in other contexts, the standard of review depends on whether "answering it entails primarily legal or factual work." *U.S. Bank National Ass'n v. Village at Lakeridge, LLC*, —— U.S. ——, 138 S. Ct. 960, 967, 200 L.Ed.**2d** 218 (2018).

2    This appeal differs from review of the many cases where a bench trial judge, or a judge hearing a pretrial matter, has made findings of fact after hearing witnesses and assessing their credibility. In such cases, we are properly cautious in reviewing for clear error on a cold record. In this case, there were no witnesses at the hearings before the Magistrate Judge or the District Judge, there was no issue of credibility, and the Appellees did not contest, at this stage of the case, the facts presented by the Government, notably the facts of their conduct, which are shown on videotape and a photograph.

3    An amicus curiae brief filed by a group of able lawyers, identifying themselves as "Former Federal Prosecutors," many of whom are also current defense lawyers, contends that the Government improperly urged the judicial officers to disregard the commendably favorable aspects of the Appellees' backgrounds because those aspects existed before the charged offenses. Br. for Amicus Curiae at 4-6. The brief has been joined by The National Association of Defense Lawyers. The amicis' argument overstates the Government's contention. Rather than argue that the Appellees' backgrounds should be disregarded, the Government legitimately contended that in this case, those backgrounds, which obviously existed prior to the charged offenses, did not deter the Appellees and would not "provide moral suasion against future criminal conduct," Br. for Appellant at 12. The Government acknowledged that the Appellees' backgrounds "are certainly relevant to the analysis" of the bail release factors requiring consideration, *id.* at 19, but contended that their familial relationships "do not rebut the statutory presumption that they pose a danger to the community," Reply Br. for Appellant at 12.

4    *See* Nicole Hong & William K. Rashbaum, *The 2 Lawyers, the Anti-Police Protests and the Molotov Cocktail Attack*, N.Y. Times, June 7, **2020**.

United States v. Mattis, 963 F.3d 285 (2020)

5   In *Mercedes*, one of the defendants this Court returned to jail, like the Appellees, had no criminal record, was employed, and had strong tries to his sureties. 254 F.3d at 437.

6   The majority sees a "heads I win, tails you lose" analysis "[i]f now a defendant's life history and characteristics can support detention, on the one hand, because that history demonstrates the defendant engaged in bad acts, and, on the other hand, because the history is so spotless and impressive that the defendant should have 'known better.' " Maj. Op. at 294. But the life history of these Appellees is not what "demonstrates" that either had "engaged in bad acts." Their conduct on the night of May 29 demonstrates their bad acts. And their impressive history is not what creates the risk of future dangerous activity; it is their willingness to risk their legal careers that provides a considerable basis to apprehend future misconduct upon provocation.

7   The full text reads:

> "Subject to rebuttal by the person, it shall be presumed that no condition or combination of circumstances will reasonably assure ... the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed ... an offense listed in section 2332b(g)(5)(B) of title 18, **United States** Code, for which a maximum term of imprisonment of 10 years or more is prescribed."

18 U.S.C. § 3142(e)(3)(C). One of the offenses listed in subsection 2332b(g)(5)(B) is 18 U.S.C. § 844(i), with which the Appellees are charged.

8   Considering the risk of flight, to which the statutory presumption also applies in certain circumstances, in addition to risk of danger to the community, this Court has instructed that "[a] judicial officer conducting a detention hearing should, even after a defendant has come forward with rebuttal evidence, continue to give the presumption of flight some weight by keeping in mind that Congress has found that these offenders pose special risks of flight, and that 'a strong probability arises' that no form of conditional release will be adequate to secure their appearance." *Martir*, 782 F.**2d** at 1144 (quoting S. Rep. No. 225 at 19, 98th Cong., 1st Sess. (1984)).

9   The bail statute requires written findings of fact for a detention order, *see* 18 U.S.C. § 3142(i), but imposes no similar requirement for a release order, *id.* § 3142(h), as this Court has noted. *See* **United States v. Chimurenga**, 760 F.**2d** 400, 406 (**2d** Cir. 1985). But the judicially created obligation in *Mercedes* has nothing to do with findings of fact, and proper appellate review is best achieved when judicial officers provide at least some indication that they have complied with this requirement.

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

Metcalf II, Steven 3/31/2021
**For Educational Use Only**                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

2021 WL 1149196
Only the Westlaw citation is currently available.
United States Court of Appeals,
District of Columbia Circuit.

UNITED STATES of America, Appellee
v.
Eric Gavelek MUNCHEL, Appellant

No. 21-3010
|
Consolidated with 21-3011
|
Decided March 26, 2021

On Appeal of Pretrial Detention Orders (No. 1:21-cr-00118-1) (No. 1:21-cr-00118-2)

**Attorneys and Law Firms**

A. J. Kramer, Federal Public Defender, and Sandra G. Roland, Assistant Federal Public Defender, were on appellant Eric Munchel's Memorandum of Law and Fact.

Gregory S. Smith, Washington, DC, appointed by the court, was on appellant Lisa Eisenhart's Memorandum of Law and Fact.

Elizabeth Trosman and Elizabeth H. Danello, Assistant U.S. Attorneys, were on appellee's Memorandum of Law and Fact.

Before: Rogers, Wilkins and Katsas, Circuit Judges.

**Opinion**

Opinion concurring in part and dissenting in part filed by Circuit Judge Katsas.

Wilkins, Circuit Judge:

**\*1** We consider an appeal of a pretrial detention order issued after a Magistrate Judge had previously ordered the two appellants released pursuant to a lengthy set of stringent conditions. For the reasons stated below, we remand for the District Court to consider anew the government's motion for detention.

**I.**

The facts, as found by the District Court, and as observed in a 50-minute video of much of the incident at the heart of the case, are as follows.

Eric Munchel and his mother, Lisa Eisenhart, participated in the January 6, 2021 incident at the Capitol. Munchel is a thirty-year-old resident of Nashville, Tennessee. He previously worked as a waiter and has twice been convicted for misdemeanor possession of marijuana in Georgia state courts. *See* United States v. Munchel, No. 1:21-CR-118-RCL, 2021 WL 620236, at \*1 (D.D.C. Feb. 17, 2021). Eisenhart is a fifty-seven-year-old resident of Woodstock, Georgia. She has been employed as a nurse for approximately thirty years and has no prior criminal history. *Id.*; Eisenhart Mem. at 13.

On January 6, Eisenhart and Munchel attended President Trump's "Stop the Steal" rally to protest the election results. Both wore tactical vests and Munchel had a taser, holstered on his hip. Munchel also wore his iPhone, mounted on his tactical vest, and used it to take a video of some of the day's events. Following the rally, Eisenhart and Munchel marched towards the Capitol. *See* Munchel, 2021 WL 620236, at \*2–3. As they approached the Capitol, they milled around outside and talked with others. They were members of the Oath Keepers militia and Munchel bumped fists with one of them. *Id.* at \*2; Video at 11:56–12:05.

At some point while Munchel and Eisenhart were standing around, someone yelled out "they broke the line up there" and people began saying "let's go in." Eisenhart told Munchel they should go in, but she added, "[w]e're going straight to federal prison if we go in there with weapons." Video at 12:28–12:40. Munchel responded that he would not go into the Capitol, and Eisenhart suggested that they put "em" in their backpacks. *Id.* Munchel and Eisenhart then moved across the crowd to an area where a backpack was stowed and Munchel stashed a fanny pack in the backpack. *See* Munchel, 2021 WL 620236, at \*2; Video at 16:00–16:25. Munchel contends that the only weapon in the fanny pack was a pocketknife; the government suggests that other weapons could have been

United States v. Munchel, --- F.3d ---- (2021)

inside, perhaps even a firearm. *See* Tr. of Dist. Ct. Detention Hr'g at 10. Munchel kept his taser holstered on his hip. *See* 📄 *Munchel*, 2021 WL 620236, at *2.

Subsequently, Eisenhart encouraged others to enter the Capitol, stating the tear gas "isn't bad" and repeatedly stating, "let's go in." Video at 16:28–17:45. Munchel and Eisenhart pushed their way through the crowd to continue towards the Capitol. Munchel followed Eisenhart, often holding on to a strap on her back. *E.g.*, *id.* at 17:45–23:00. En route, Eisenhart encouraged a man who claimed to have "punched two of them in the face," telling him, "while everyone else is on their couch, you guys are training, and getting ready for it." *Id.* at 23:56–24:12. Munchel told members of the crowd that "we're not playing f___ing nice no god damn more," that he is "f___ing ready to f___ sh___ up," and "I guess they thought we were playing." *Id.* at 25:18, 26:58–27:01, 36:53–36:56; Munchel Mem. at 11. Additionally, when Eisenhart heard that Congress was "shut down" by tear gas she exclaimed that "they got tear-gassed, motherf___ers" and proclaimed it her "best day to know they got tear-gassed." Video at 30:08–30:29. Directly in front of the Capitol and near an entrance, Munchel stated, this is "probably the last time I'll able to enter the building with armor and ... f___ing weapons." *Id.* at 36:29–36:35.

 *2 Munchel and Eisenhart entered the Capitol through an open door and stayed inside for approximately twelve minutes. *Id.* at 38:30–38:50 (entry); Munchel Mem. at 11. Police officers were standing to the right of the door, not blocking their entry. Munchel Mem. at 11 (citing to Video). While walking through the Capitol, Munchel told members of the mob "don't break sh_," "no vandalizing sh__." We ain't no god damn Antifa, motherf___ers," and "you break sh__, I break you." Video at 42:45, 43:20–43:43, 44:13–44:15.

Additionally, while inside, Munchel and Eisenhart spotted plastic handcuffs, known as "zip ties." 📄 *Munchel*, 2021 WL 620236, at *2; Video at 43:43. Upon seeing the zip ties, Munchel shouted "Zip ties! I need to get me some of them motherf___ers." Video at 43:43–43:48. Munchel took several zip ties and Eisenhart took one. *See* Munchel Mem. at 12. Munchel and Eisenhart eventually made their way to the Senate gallery, both still carrying the zip ties, and Munchel still carrying his taser. 📄 *Munchel*, 2021 WL 620236, at *2; Gov't Mem. at 12 (pictures of Munchel in Senate gallery

with zip ties). Inside the gallery, Eisenhart chanted "Treason! Treason!" and Munchel looked down at the dais and said, "I want that f___ing gavel," referring to the Senate's artifact. Video at 45:14–45:17, 47:21–47:23. Munchel made no effort to steal the gavel. *Id.* at 47:21–47:23; 📄 *Munchel*, 2021 WL 620236, at *2.

After leaving the gallery, Eisenhart told Munchel not to carry the zip ties, stating that they "need[ed] to get them out of [their] hands." Video at 48:43–48:48. Later, Munchel took some home with him to Tennessee. *See* 📄 *Munchel*, 2021 WL 620236, at *2. Eisenhart has claimed that she took the zip ties to keep them away from "bad actors." 📄 *Id.*; Eisenhart Mem. at 3.

Eventually, Munchel and Eisenhart left the Capitol. As they were exiting, Munchel said to nearby police officers, "Sorry, guys, I still love you." Video at 49:27–49:29; Munchel Mem. at 13.

On the evening of January 6, a Metropolitan Police Department officer stopped Munchel and seized his taser. *See* 📄 *Munchel*, 2021 WL 620236, at *3.[1] The next day, as they packed their car to go home, both Eisenhart and Munchel spoke to the media. Eisenhart stated:

> This country was founded on revolution. If they're going to take every legitimate means from us, and we can't even express ourselves on the internet, we won't even be able to speak freely, what is America for? ... I'd rather die as a 57-year-old woman than live under oppression. I'd rather die and would rather fight.

Laura Pullman, *Trump*'s *Militias Say They Are Armed and Ready to Defend Their Freedoms*, THE TIMES (of London) (Jan. 10, 2021), https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-their-freedoms-8ht5m0j70https://www.thetimes.co.uk/article/trumps-militias-say-they-are-armed-and-ready-to-defend-

United States v. Munchel, --- F.3d ---- (2021)

their-freedoms-8ht5m0j70 (attached to the Gov't Suppl. Mem. at 26). Munchel told the newspaper:

> We wanted to show that we're willing to rise up, band together and fight if necessary. Same as our forefathers, who established this country in 1776.... It was a kind of flexing of muscles. ... The intentions of going in were not to fight the police. The point of getting inside the building is to show them that we can, and we will.

*Id.*

Later, Munchel and Eisenhart returned to Tennessee, and Eisenhart continued on to her home in Georgia. The FBI posted bulletins on the internet and in the media with photos of Munchel and Eisenhart from January 6, asking for the public's help in identifying them. On the morning of January 10, FBI agents executed a search warrant at Munchel's apartment. The agents found the tactical vest Munchel wore at the Capitol, zip ties, firearms, and a large quantity of loaded magazines. Munchel was licensed to possess those weapons. *See* 📁 *Munchel*, 2021 WL 620236, at *3. Soon after learning about the search, Munchel turned himself in.

📁 *Id.* at *4; Munchel Mem. at 15. Munchel also made arrangements for his attorney to give his iPhone to the FBI. Munchel Mem. at 15. Once Eisenhart learned she was the target of a federal investigation, she spoke to a local FBI agent every day to determine whether there was a warrant for her arrest, and when the warrant issued, she self-surrendered. *See* 📁 *Munchel*, 2021 WL 620236, at *4, *7; Eisenhart Mem. at 3.

*3 Munchel and Eisenhart were charged in a complaint with unlawful entry, violent entry, civil disorder, and conspiracy.

*See* Complaint, 📁 *United States v. Munchel*, No. 1:21-CR-118-RCL, 2021 WL 620236, ECF No. 1 (D.D.C. Feb. 17, 2021). Munchel and Eisenhart had pretrial detention hearings before Magistrate Judge Jeffrey Frensley in the Middle District of Tennessee. Magistrate Judge Frensley concluded that neither Munchel nor Eisenhart were flight

risks nor posed a danger to the community and issued release orders for both appellants with various conditions, including home detention, GPS monitoring, refraining from possessing firearms or dangerous weapons, and supervision by Pretrial Services. *See* Jan. 22, 2021 Transcript ("Munchel Tr.") at 181, 186–89 (included in Munchel Suppl.); Jan. 25, 2021 Transcript ("Eisenhart Tr.") at 163, 164–66 (attached to Eisenhart Mem.).

Magistrate Judge Frensley briefly stayed both of his release orders, *id.* at 171; Munchel Tr. at 198–99, and the government promptly appealed both orders to the United States District Court for the District of Columbia. Chief Judge Beryl A. Howell stayed both release orders pending appeal, *see* Stay Orders, ECF Nos. 4, 7, and ordered both appellants to be transported to D.C., *see* Transport Orders, ECF Nos. 5, 9. COVID-19-related complications slowed the appellants' transport to D.C. *See* Status Report, ECF No. 18. While their transports were pending, Eisenhart moved to rescind the stay or to conduct an immediate review of her detention, which Munchel joined. *See* ECF Nos. 14, 15, 27. Additionally, the government filed motions seeking review of Judge Frensley's release orders. *See* ECF Nos. 3, 6. In the meantime, Munchel and Eisenhart were detained.[2]

Subsequently, on February 12, a grand jury sitting in the District of Columbia returned an indictment charging Munchel and Eisenhart with obstruction of an official proceeding; Munchel with unlawful entry while armed with a dangerous weapon, and violent entry while armed with a dangerous weapon; and Eisenhart with aiding and abetting unlawful entry while armed with a dangerous weapon, and aiding and abetting violent entry while armed with a dangerous weapon. *See* Indictment, ECF No. 21; 📁 *Munchel*, 2021 WL 620236, at *7. On February 17, the District Court arraigned Munchel and Eisenhart on the indictment and the government made an oral motion for pretrial detention. *See* 📁 *id.* at *4. During the detention hearing in the District Court, the government proceeded by proffer rather than calling live witnesses. In addition to what had been presented to Magistrate Judge Frensley, the government introduced the 50-minute videotape into evidence and proffered that after January 6, Munchel was in contact with a suspected member of the Proud Boys and was told that he was too "hot" after

Metcalf II, Steven 3/31/2021
For Educational Use Only

United States v. Munchel, --- F.3d ---- (2021)

he expressed interest in joining the group. *Id.* at *6; Tr. of Dist. Ct. Detention Hr'g at 51.

Following the detention hearing, the District Court ordered both Munchel and Eisenhart to be detained pending trial, denied as moot Munchel and Eisenhart's motions seeking to rescind the stay of Judge Frensley's orders, and denied as moot the government's motion seeking review of Judge Frensley's orders. *See* Detention Orders, ECF Nos. 25, 26; *see also* ECF No. 27. The District Court concluded that both Munchel and Eisenhart were eligible for detention because they were charged with felonies while carrying a dangerous weapon, explaining that the indictment alleges that Munchel carried a dangerous weapon (the taser) and that Eisenhart aided and abetted Munchel and therefore she was liable as if she were the principal. *See Munchel*, 2021 WL 620236, at *5, *7.

*4  Applying *de novo* review, the District Court determined that appellants were not flight risks but that detention was appropriate on the basis of dangerousness. *Id.* at *5–8. The District Court concluded that appellants' history and characteristics weighed against detention but that the nature and circumstances of the charged offenses, the weight of the evidence, and the potential danger appellants pose to the community weighed in favor of detention. *Id.* The District Court further determined that neither appellant was likely to be deterred by release conditions. *Id.* at *7, *8.

Munchel and Eisenhart timely appealed. They contend that the District Court erred in not deferring to Magistrate Judge Frensley's factual findings as to their dangerousness. They also contend that the District Court inappropriately relied on a finding that they were unlikely to abide by release conditions to detain them, because that factor is applicable only to revocation of pretrial release. They also argue that the charged offenses do not authorize detention, claiming that felonies involving possession of a weapon, rather than use, do not qualify for detention and, relatedly, that Munchel's taser is not a "dangerous weapon" within the meaning of the statute. Munchel and Eisenhart also object that several other defendants who participated in the insurrection have been released before trial, arguing that the conduct of those defendants is indistinguishable (or even worse) than their conduct on January 6. Finally, they contend that the District

Court's determinations in support of detention were clearly erroneous.

## II.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

The Bail Reform Act of 1984 authorizes one of those carefully limited exceptions by providing that the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.' " *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). Here, the District Court held that both Munchel and Eisenhart should be detained on the basis of dangerousness.

In assessing whether pretrial detention is warranted for dangerousness, the district court considers four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id.* § 3142(f). Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

In *Salerno*, the Supreme Court rejected a challenge to this preventive detention scheme as repugnant to due process

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 53 of 329
Metcalf II, Steven 3/31/2021
For Educational Use Only                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

and the presumption of innocence, holding that "[w]hen the Government proves by clear and convincing evidence that an arrestee *presents an identified and articulable threat* to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee *from executing that threat*." 481 U.S. at 751, 107 S.Ct. 2095 (emphasis added).

### III.

**\*5** We can readily dispatch with some of the appellants' arguments.

First, we conclude that we need not reach appellants' contention that the District Court erred in not deferring to Magistrate Judge Frensley's factual findings as to their dangerousness. The statute concerning review of a Magistrate Judge's release order says nothing about the standard of the district court's review, *see* 18 U.S.C. § 3145(a), and we have not squarely decided the issue. [3] We need not break new ground in this case, because as the appellants maintain in their briefing, Munchel Reply Mem. 8, n.3, the government submitted substantial additional evidence to the district judge that had not been presented to the Magistrate Judge, including the 50-minute iPhone video, a partial transcript of the video, and several videos from Capitol CCTV. [4] As a result, this was not an instance where the District Court made its dangerousness finding based on the same record as was before the Magistrate Judge. Here, the situation was more akin to a new hearing, and as such, the issue before the District Court was not really whether to defer (or not) to a finding made by the Magistrate Judge on the same evidentiary record. Thus, we conclude that the issue complained of by appellants is not squarely before us in this appeal and we see no need to reach it.

Second, we reject the argument that the District Court inappropriately relied on a finding that appellants were unlikely to abide by release conditions to detain them, because that factor is applicable only to revocation of pretrial release. The District Court's finding as to appellants' potential compliance is relevant to the ultimate determination of "whether there are conditions of release that will reasonably assure ... the safety of any other person and the community."

18 U.S.C. § 3142(f) and (g). Indeed, other courts have found a defendant's potential for compliance with release conditions relevant to the detention inquiry. *See, e.g.,* *United States v. Hir*, 517 F.3d 1081, 1092–93 (9th Cir. 2008) (explaining that release conditions require "good faith compliance" and that the circumstances of the charged offenses indicate "that there is an unacceptably high risk that [the defendant] would not comply... with the proposed conditions"); *United States v. Tortora*, 922 F.2d 880, 886–90 (1st Cir. 1990). While failure to abide by release conditions is an explicit ground for revocation of release in 18 U.S.C. § 3148(b), it defies logic to suggest that a court cannot consider whether it believes the defendant will actually abide by its conditions when making the release determination in the first instance pursuant to 18 U.S.C. § 3142.

**\*6** Third, we reject Munchel and Eisenhart's arguments that the charged offenses do not authorize detention. Under 18 U.S.C. § 3142(f)(1)(E), detention is permitted if the case involves "any felony ... that involves the *possession* or use of a ... dangerous weapon." (emphasis added). Two of the charges in the indictment meet this description: Count Two—entering a restricted building "with intent to impede and disrupt the orderly conduct of Government business ... while armed with a dangerous weapon," in violation of 18 U.S.C. § 1752(a)(1) and (a)(2) and 18 U.S.C. § 2 (aiding and abetting charge for Eisenhart); and Count Three—violent entry or disorderly conduct, again "while armed with a dangerous weapon," in violation of 40 U.S.C. § 5104(e)(1) and (e)(2) and 18 U.S.C. § 2. Indictment, ECF No. 21 at 2. The Bail Reform Act thus explicitly authorizes detention when a defendant is charged with committing certain felonies while possessing a dangerous weapon, as is alleged in this indictment. [5]

### IV.

That leaves us with Munchel and Eisenhart's final two arguments: (1) that the District Court's determinations in support of detention were clearly erroneous; and (2) that several other defendants who participated in the insurrection

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 54 of 329
Metcalf II, Steven 3/31/2021
For Educational Use Only                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

have been released before trial, even though the conduct of those defendants is indistinguishable (or even worse) than their conduct on January 6. The first challenges the District Court's finding that no condition or combination of conditions of release could reasonably ensure the safety of the community while these appellants await trial. Appellants did not raise the latter argument below, so we decline to pass on it in the first instance and without the benefit of full briefing.

## A.

We review the District Court's dangerousness determinations for clear error. *United States v. Smith*, 79 F.3d 1208, 1209 (D.C. Cir. 1996); *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also United States v. Celis*, 608 F.3d 818, 843 (D.C. Cir. 2010). If, upon reviewing the record, it does not appear that the District Court considered substantial countervailing evidence that supported release when analyzing the detention factors, we sometimes remand for reconsideration rather than reverse. *See United States v. Nwokoro*, 651 F.3d 108, 110 (D.C. Cir. 2011) (remanding where the "district court [did not] demonstrate that it considered many of the facts apparent from the record before it").

 **\*7** In this case, the District Court found that because Munchel has limited criminal history and Eisenhart has none, their history and characteristics weighed against a finding that no conditions of release would protect the community. *Munchel*, 2021 WL 620236, at \*6, \*8. However, the District Court found that the nature and circumstances of the charged offenses, weight of the evidence, and danger to the community factors all weighed in favor of finding that no conditions of release would protect the community. *Id.* at \*5–7 (Munchel) [6], \*7–8 (Eisenhart). The crux of the District Court's reasoning was that "the grand jury alleged that [the appellants] used force to subvert a democratic election

and arrest the peaceful transfer of power. Such conduct threatens the republic itself. ... Indeed, few offenses are more threatening to our way of life." *Id.* at \*5. Furthermore, because in media interviews Munchel showed no remorse and indicated that he would "undertake such actions again," while Eisenhart stated that she would rather "fight" and "die" than "live under oppression," the District Court found that both appellants were a danger to the republic and unlikely to abide by conditions of release. *Id.* at \*6, \*8 (quoting Pullman, *supra*). Nevertheless, we conclude that the District Court did not demonstrate that it adequately considered, in light of all the record evidence, whether Munchel and Eisenhart present an identified and articulable threat to the community. Accordingly, we remand for further factfinding. *Cf. Nwokoro*, 651 F.3d at 111–12.

## B.

The crux of the constitutional justification for preventive detention under the Bail Reform Act is that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, ... a court may disable the arrestee from executing that threat." *Salerno*, 481 U.S. at 751, 107 S.Ct. 2095. Therefore, to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence, and may extend to "non-physical harms such as corrupting a union." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988) (quoting S. REP. NO. 98–225, at 3 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3195–96). But it must be clearly identified. *See Salerno*, 481 U.S. at 750, 107 S.Ct. 2095 (noting that the Act applies in "narrow circumstances" where "the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community"); *cf. Tortora*, 922 F.2d at 894 (Breyer, C.J., concurring) (reversing an order of release where the district court failed to "carefully analyze[ ] the danger [the defendant] posed"). Detention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight;

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 55 of 329
Metcalf II, Steven 3/31/2021
For Educational Use Only
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

otherwise the scope of detention would extend beyond the limits set by Congress. As we observed of the Bail Reform Act of 1966, "[t]he law requires reasonable assurance[,] but does not demand absolute certainty" that a defendant will comply with release conditions because a stricter regime "would be only a disguised way of compelling commitment in advance of judgment." *United States v. Alston*, 420 F.2d 176, 178 (D.C. Cir. 1969).

The threat must also be considered in context. *See Tortora*, 922 F.2d at 888 ("Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant. The inquiry is factbound." (internal citations omitted)). It follows that whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant. *Cf. Nwokoro*, 651 F.3d at 110–11 (noting that evidence "favoring appellant's pretrial release" included the fact that appellant had no assets under his control, no ability to flee the country, and "no prior criminal record"). Whether the defendant poses a threat of dealing drugs, for instance, may depend on the defendant's past experience dealing, *see, e.g., United States v. Briggs*, 697 F.3d 98, 102 (2d Cir. 2012), and her means of continuing to do so in the future, *see, e.g., United States v. Henry*, 172 F.3d 921 (D.C. Cir. 1999) (unpublished).

 **\*8** Here, the District Court did not adequately demonstrate that it considered whether Munchel and Eisenhart posed an articulable threat to the community in view of their conduct on January 6, and the particular circumstances of January 6. The District Court based its dangerousness determination on a finding that "Munchel's alleged conduct indicates that he is willing to use force to promote his political ends," and that "[s]uch conduct poses a clear risk to the community." *Munchel*, 2021 WL 620236, at \*6. In making this determination, however, the Court did not explain how it reached that conclusion notwithstanding the countervailing finding that "the record contains no evidence indicating that, while inside the Capitol, Munchel or Eisenhart vandalized any property or physically harmed any person," *id.* at \*3, and the absence of any record evidence that either Munchel or Eisenhart committed any violence on January 6. That Munchel and Eisenhart assaulted no one on January 6; that they did not enter the Capitol by force;

and that they vandalized no property are all factors that weigh against a finding that either pose a threat of "using force to promote [their] political ends," and that the District Court should consider on remand. If, in light of the lack of evidence that Munchel or Eisenhart committed violence on January 6, the District Court finds that they do not in fact pose a threat of committing violence in the future, the District Court should consider this finding in making its dangerousness determination. In our view, those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way. *See Simpkins*, 826 F.2d at 96 ("[W]here the future misconduct that is anticipated concerns violent criminal activity, no issue arises concerning the outer limits of the meaning of 'danger to the community,' an issue that would otherwise require a legal interpretation of the applicable standard." (internal quotation and alteration omitted)). And while the District Court stated that it was not satisfied that either appellant would comply with release conditions, that finding, as noted above, does not obviate a proper dangerousness determination to justify detention.

The District Court also failed to demonstrate that it considered the specific circumstances that made it possible, on January 6, for Munchel and Eisenhart to threaten the peaceful transfer of power. The appellants had a unique opportunity to obstruct democracy on January 6 because of the electoral college vote tally taking place that day, and the concurrently scheduled rallies and protests. Thus, Munchel and Eisenhart were able to attempt to obstruct the electoral college vote by entering the Capitol together with a large group of people who had gathered at the Capitol in protest that day. Because Munchel and Eisenhart did not vandalize any property or commit violence, the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community. Without it, Munchel and Eisenhart—two individuals who did not engage in any violence and who were not involved in planning or coordinating the activities —seemingly would have posed little threat. The District Court found that appellants were a danger to "act against Congress" in the future, but there was no explanation of how the appellants would be capable of doing so now that the

Metcalf II, Steven 3/31/2021
For Educational Use Only

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

specific circumstances of January 6 have passed. This, too, is a factor that the District Court should consider on remand.

### C.

Finally, Munchel and Eisenhart argue that the government's proffer of dangerousness should be weighed against the fact that the government did not seek detention of defendants who admitted they pushed through the police barricades and defendants charged with punching officers, breaking windows, discharging tasers at officers, and with planning and fundraising for the riot. *See* Munchel Reply Mem. at 9–12. Appellants did not raise this claim before the District Court and the government did not substantively respond to it on appeal because Appellants raised it for the first time in Munchel's reply. Whatever potential persuasiveness the government's failure to seek detention in another case carries in the abstract, every such decision by the government is highly dependent on the specific facts and circumstances of each case, which are not fully before us. In addition, those facts and circumstances are best evaluated by the District Court in the first instance, and it should do so should appellants raise the issue upon remand.

\* \* \* \*

It cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community. *Cf.* Salerno, 481 U.S. at 748, 107 S.Ct. 2095 ("[I]n times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous." (citations omitted)). But we have a grave constitutional obligation to ensure that the facts and circumstances of each case warrant this exceptional treatment. Accordingly, we conclude that the appropriate resolution of this case is to remand the detention orders for reconsideration forthwith of the government's oral motion for pretrial detention.

**\*9** *So ordered.*

Katsas, Circuit Judge, concurring in part and dissenting in part:

These appeals present the question whether Eric Munchel and his mother, Lisa Eisenhart, may be detained pending trial for their participation in the riot at the United States Capitol on January 6, 2021. The answer to that question does not turn on any generalized, backward-looking assessment of the rioters or the riot, as the district court erroneously suggested. Instead, it turns on a specific, forward-looking assessment of whether Munchel and Eisenhart as individuals currently pose an unmitigable threat to public safety. My colleagues and I agree on this critical point about the governing legal standard in these appeals. We also agree that the district court failed to justify the detention of Munchel and Eisenhart on the record before it. But whereas my colleagues remand for a do-over, I would reverse outright. [1]

The Bail Reform Act permits pretrial detention in only "carefully defined circumstances." United States v. Simpkins, 826 F.2d 94, 95–96 (D.C. Cir. 1987). To support detention, a court must find that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In assessing public safety and flight risk, courts must consider four factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." Id. § 3142(g). For the public-safety determination, the government must prove all relevant facts "by clear and convincing evidence," id. § 3142(f)(2), and we review all relevant findings for clear error, United States v. Smith, 79 F.3d 1208, 1209 (D.C. Cir. 1996).

In this case, a magistrate judge concluded that neither Munchel nor Eisenhart is a flight risk and that neither would pose a safety risk if subjected to conditions including home detention, GPS monitoring, a ban on possessing firearms, a ban on travel to Washington, D.C., and supervision by the U.S. Pretrial and Probation Services System. Munchel Mag. Tr. at 177, 181, 185–89; Eisenhart Mag. Tr. at 152, 163,

Metcalf II, Steven 3/31/2021
For Educational Use Only

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

164–66. The district court agreed that Munchel and Eisenhart do not present a flight risk, but found that no combination of release conditions would reasonably ensure public safety. *United States v. Munchel*, No. 1:21-CR-118-RCL, 2021 WL 620236, at *1, *5, *7 (D.D.C. Feb. 17, 2021). The court found that all but one of the subsidiary statutory factors weigh in favor of detention. *Id.* at *5–8.

 **\*10** In my view, the district court clearly erred in finding that the government satisfied its burden to prove an unmitigated threat to public safety by clear and convincing evidence. The court's errors infected both its assessment of the individual factors and its ultimate determination that Munchel and Eisenhart must be detained.

The first factor looks to both the "nature" and "circumstances" of the "charged" offense: "the former refers to the generic offense while the latter encompasses the manner in which the defendant committed it." *United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999). Munchel and Eisenhart have been charged with obstructing an official proceeding, *see* 18 U.S.C. § 1512(c)(2); entering a restricted building unlawfully or with the intent to impede government business, *see id.* § 1752(a)(1)–(2), (b); carrying a dangerous weapon on the Capitol grounds, *see* 40 U.S.C. § 5104(e)(1); and entering the Capitol with the intent to disrupt official business, *see id.* § 5104(e)(2). The district court described the charged offenses as "grave," asserted that "few offenses are more threatening to our way of life," and quoted at length from George Washington's Farewell Address. *Munchel*, 2021 WL 620236, at *5–7. But none of the charged offenses is a Class A or Class B felony, *see* 18 U.S.C. § 3559(a), none carries a mandatory minimum sentence, and none gives rise to a rebuttable presumption of detention.

The district court was primarily concerned with how Munchel and Eisenhart committed their offenses. In addition to the descriptions noted above, the court asserted that their conduct showed "a flagrant disregard for the rule of law"—and indeed "threatens the republic itself." *Munchel*, 2021 WL 620236, at *5–6. The court described Munchel as "willing to use force to promote his political ends" and as "[s]torming the

Capitol to disrupt the counting of electoral votes." *Id.* at *6. Further, it found that Munchel's entering the Capitol "carried great potential for violence" because he was "armed with a taser," "carried plastic handcuffs," and "threatened to 'break' anyone who vandalized the Capitol." *Id.* But as the court itself acknowledged, "[t]he record contains no evidence indicating that, while inside the Capitol, Munchel or Eisenhart vandalized any property or physically harmed any person." *Id.* at *3.

A video recorded by Munchel—documenting what he and his mother did on January 6—confirms the more benign assessment. The video shows the following: Munchel and Eisenhart did not organize the election protest or the ensuing march to the Capitol, hatched no advance plan to enter the Capitol, and acted in concert with no other protestors. Nor did they assault any police officers or remove any barricades in order to breach Capitol security. They decided to enter the Capitol only after others had already done so forcibly. By the time they made their way to the building, police were making no attempt to stop or even discourage protestors from entering. To go inside, Munchel and Eisenhart walked through an open door. While there, they attempted neither violence nor vandalism. They searched for no Members of Congress, and they harassed no police officers. They found plastic handcuffs by chance, but never threatened to use them. Munchel's threat to "break" anyone who vandalized the Capitol was intended to prevent destruction and was addressed to no one in particular. *See* Munchel iPhone Video at 43:41. For ten to twelve minutes, Munchel and Eisenhart wandered the halls of the Capitol, with Eisenhart leading the way and Munchel asking his mother what her plan was. At one point, they entered the Senate gallery. At another, as they entered what appears to be a hallway of offices, Munchel told his mother that "[w]e don't want to get stuck in here, this is not a place for us," which caused her to turn around. *Id.* at 42:11–14. Munchel and Eisenhart voluntarily left the building—while many other protestors remained and before the police began to restore order. Their misconduct was serious, but it hardly threatened to topple the Republic. Nor, for that matter, did it reveal an unmitigated propensity for future violence.

 **\*11** Turning to the second factor, the district court found that the "weight of the evidence" supported pretrial detention. *Munchel*, 2021 WL 620236, at *6, *8. The video in

USA v. Richard Barnett Exhibits   EXH0057

United States v. Munchel, --- F.3d ---- (2021)

this case documents exactly what Munchel and Eisenhart did inside the Capitol. It forecloses any contention that pretrial detention is inappropriate because of uncertainty about whether the alleged conduct occurred. But as explained above, the conduct does not show that Munchel and Eisenhart pose an unmitigable future threat to public safety. The second factor thus moves the needle neither one way nor the other.

The district court next found that the defendants' "history and characteristics" do not support detention. *See Munchel, 2021 WL 620236, at \*6, \*8.* The government fails to challenge that finding—and for good reason. Munchel maintained employment until his arrest, has no history of violence, has no prior felony convictions, and is not a member of any anti-government or militia group. He has two prior misdemeanor convictions for possession of marijuana, which are both more than five years old, and there was no proof that he has ever failed to comply with any probation conditions imposed as a result. Munchel Mag. Tr. at 174–75. Eisenhart is 57 years old, has been a nurse for three decades, and has no criminal history. Both appellants voluntarily surrendered to the FBI. Munchel took affirmative steps to preserve the evidence in his cellphone and arranged to provide it to the government. *Id.* at 176. Before her arrest warrant had even issued, Eisenhart established daily contact with the FBI so that she could turn herself in as soon as it did. Eisenhart Mag. Tr. at 152. The third factor thus cuts strongly in favor of release.

In evaluating the "nature and seriousness" of any danger, the district court highlighted statements that Munchel and Eisenhart made to the media on January 7. Munchel said that "[t]he point of getting inside the building is to show them that we can, and we will," *Munchel, 2021 WL 620236, at \*6,* while Eisenhart, invoking the American Revolution, said that she would "rather die and would rather fight" than "live under oppression," *id. at \*8.* To the district court, these statements indicated that the defendants pose "a clear danger to our republic" and that Eisenhart is a "would-be martyr." *Id. at \*6, \*8.* But the defendants' actual conduct belied their rhetorical bravado. During the chaos of the Capitol riot, Munchel and Eisenhart had ample opportunity to fight, yet neither of them did. Munchel lawfully possessed several firearms in his home, but he took none into the Capitol. Munchel Mag. Tr. at 179, 182. Indeed, before entering the Capitol, Munchel and Eisenhart stashed a knife inside a

backpack that they left outside, precisely for fear of ending up in "federal prison." *See Munchel, 2021 WL 620236, at \*2.*

Moreover, even if their comments indicate some willingness to engage in future protests or disruption, the Bail Reform Act permits detention only to prevent an "identified and articulable threat to an individual or the community." *United States v. Salerno, 481 U.S. 739, 751, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).* Here, the district court identified one such threat—that Munchel and Eisenhart would attempt "to stop or delay the peaceful transfer of power." *Munchel, 2021 WL 620236, at \*6, \*8.* But the transition has come and gone, and that threat has long passed. In the district court, the government warned of an upcoming protest scheduled for March 4. But that protest never materialized, and the government produced no evidence that Munchel and Eisenhart had been involved in its planning before their arrest. The government's gesturing towards the possibility of their joining future protests falls well short of any "identified and articulable threat." *Salerno, 481 U.S. at 751, 107 S.Ct. 2095.*

**\*12**   After evaluating the four statutory factors, the district court turned to the ultimate question in the case—whether no release conditions would reasonably ensure public safety. The court worried that a "determined defendant" could "cut off an ankle monitor, ignore travel restrictions, elude a third-party custodian, unlawfully rearm, and endanger his community." *Munchel, 2021 WL 620236, at \*7.* The court found that Munchel was such a defendant given his "brazen actions in front of hundreds of law enforcement officers" and his media comments. *Id.* It found that Eisenhart also qualified, because of her supposed "willingness to die for her cause." *Id. at \*8.*

Yet the record shows otherwise. As explained above, Munchel and Eisenhart chose to trespass—not to engage in violence, much less fight to the death. Afterwards, both voluntarily surrendered to the FBI, as the district court recognized in concluding that neither posed a flight risk. *See Munchel, 2021 WL 620236, at \*5, \*7.* Munchel preserved and voluntarily turned over his cellphone video. Munchel Mag. Tr. at 176. Likewise, even after he was identified as a suspect,

Case 1:21-cr-00038-CRC   Document 26-1   Filed 04/05/21   Page 59 of 329
Metcalf II, Steven 3/31/2021
For Educational Use Only                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

Munchel made no attempt to hide or remove the firearms that he lawfully possessed at his home. *Id.* at 181–82. As for the defendants' attitudes towards law enforcement, the video shows that police did not seek to discourage their entry into the Capitol through an open door, Munchel iPhone Video at 38:48; Munchel and Eisenhart made no attempt to harass officers while inside the Capitol; and, as they were preparing to exit, Munchel encountered an officer and said "Sorry, guys, I still love you," *id.* at 49:26. Finally, contrary to the district court's characterization of Eisenhart as a "would-be martyr," she specifically declined to bring a knife into the Capitol because of her expressed concerns with "federal prison." *See* Munchel, 2021 WL 620236, at *2. The defendants' other personal characteristics—which the district court acknowledged to weigh in favor of release—further indicate that they are likely to comply with release conditions.

In this case, the magistrate judge imposed strict release conditions. For Munchel, he required confinement at the home of a third-party custodian, GPS location monitoring, supervision by Pretrial Services, no possession of firearms, no travel to D.C., no excessive use of alcohol, no possession or use of any controlled substance, and drug testing if ordered by Pretrial Services. Munchel Mag. Tr. at 185–89. For Eisenhart he required home confinement, location monitoring, supervision by a third-party custodian, no possession of firearms, no travel to D.C., and submission to psychiatric treatment if ordered by Pretrial Services. Eisenhart Mag. Tr. at 164–66. The district court gave no plausible explanation for why these stringent conditions would not reasonably ensure public safety.

Of course, we review dangerousness findings only for clear error, Smith, 79 F.3d at 1209, which requires affirmance

if a district court's "account of the evidence is plausible in light of the record viewed in its entirety," Anderson v. City of Bessemer City, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). But while the standard of review here is favorable to the government, both substantive law and the standard of proof favor the defendants. The Bail Reform Act requires a showing that "no condition or combination of conditions" would even "reasonably assure" the safety of individuals or the community. 18 U.S.C. § 3142(e)(1). And it requires this showing to be made by "clear and convincing evidence," id. § 3142(f)(2)—a heightened standard of proof under which the fact finder must "give the benefit of the doubt to the defendant," United States v. Montague, 40 F.3d 1251, 1255 (D.C. Cir. 1994); see Addington v. Texas, 441 U.S. 418, 424, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Putting it all together, because the record strongly suggests that Munchel and Eisenhart would present no safety risk if subjected to strict release conditions, the district court clearly erred in finding that the government had proved its case by clear and convincing evidence.

**\*13**  "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." Salerno, 481 U.S. at 755, 107 S.Ct. 2095. Because the district court clearly erred here, I would reverse its detention order and remand for the setting of appropriate release conditions.

**All Citations**

--- F.3d ----, 2021 WL 1149196

---

**Footnotes**

1    On January 5, a police officer had observed Munchel's taser and allowed him to keep it, ostensibly because it was legal to possess on the street in the District of Columbia. Munchel, 2021 WL 620236, at *1.

2    Even though Magistrate Judge Frensley had found that the government had not met its burden of proving dangerousness by clear and convincing evidence, the government sought and obtained an *ex parte* stay of that release order that resulted in the appellants being detained for three weeks without any court finding of

Metcalf II, Steven 3/31/2021
For Educational Use Only                    USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

United States v. Munchel, --- F.3d ---- (2021)

dangerousness, notwithstanding the statute's mandate that review occur "promptly," 📑 18 U.S.C. § 3145(a), and the statutory and constitutional requirement of a dangerousness finding, *see infra*. While COVID-19 issues caused a delay in the appellants' transport to the District of Columbia, the record does not indicate why a D.C. District Judge could not have heard this matter prior to February 17, even if the appellants were in another location. Ultimately, this issue, while troubling, is not presented as a ground for reversal in this appeal.

3   This court stated long ago, in dictum, in a case arising under the predecessor Bail Reform Act that district courts review such prior determinations with "broad discretion." *Wood v. United States*, 391 F.2d 981, 984 (D.C. Cir. 1968) ("Evaluating the competing considerations is a task for the commissioner or judge in the first instance, and then the judges of the District Court (where they have original jurisdiction over the offense) have a broad discretion to amend the conditions imposed, or to grant release outright, if they feel that the balance has been improperly struck.").

4   Below, the government contended that the 50-minute iPhone video was presented to the Magistrate Judge in Eisenhart's detention hearing. ECF No. 41 at 2 & n.2. However, it does not dispute the appellants' claim that the partial transcript of the video and the videos from Capitol CCTV were not presented to the Magistrate Judge.

5   Eisenhart's argument that a taser is not a dangerous weapon—which Eisenhart raises for the first time in reply, and which Munchel seeks to adopt in his reply—is without merit. The relevant statute, 📑 40 U.S.C. § 5104(a)(2)(B), defines the term "dangerous weapon" to include "a device designed to expel or hurl a projectile capable of causing injury to individuals or property. ..." While the record contains no evidence or proffer as to how Munchel's taser operates, a taser is commonly understood as a device designed to expel a projectile capable of causing injury to individuals. *See Cantu v. City of Dothan*, 974 F.3d 1217, 1224–25 (11th Cir. 2020); 📑 *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) ("[A] taser uses compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the taser by insulated wires— toward the target at a rate of over 160 feet per second. Upon striking a person, the taser delivers a 1200 volt, low ampere electrical charge. The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." (internal alterations and quotation marks omitted)). Thus, at this stage, the evidence sufficiently demonstrates that Munchel's taser is a dangerous weapon under the statute.

6   Although the government presented evidence that Munchel was in contact with a member of the Proud Boys after January 6 and was interested in joining the group, 📑 *id. at *6*, the District Court made no finding as to whether this evidence indicated that Munchel posed a danger to the community. It did, however, consider the evidence of Munchel's contact with the Proud Boys in its analysis of Munchel's history and characteristics, and determined that despite the evidence, Munchel's history and characteristics weighed against detention. 📑 *Id.*

1   I join parts I to III of the Court's opinion. I also agree with much of the legal analysis in part IV, including the proposition that those who assaulted police officers or forcibly breached Capitol security on January 6 "are in a different category of dangerousness" than those who, like Munchel and Eisenhart, only "cheered on" the disruption and "entered the Capitol after others cleared the way." *Ante* at ——— – ———.

**End of Document**                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

USA v. Richard Barnett Exhibits  EXH0060     12

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

# EXHIBIT E

USA v. Richard Barnett Exhibits  EXH0061

1    UNITED STATES DISTRICT COURT
     WESTERN DISTRICT OF ARKANSAS
2        FAYETTEVILLE DIVISION

3

4  UNITED STATES OF AMERICA                    PLAINTIFF

5  v.                         CASE NO. 5:21-MJ-05001-001

6  RICHARD BARNETT                             DEFENDANT

7  _____

8

9        VIDEOCONFERENCE DETENTION HEARING

10              JANUARY 15, 2021

11      BEFORE THE HONORABLE ERIN L. WIEDEMANN

12          UNITED STATES MAGISTRATE JUDGE

13             FAYETTEVILLE, ARKANSAS

14  _____

15

16

17

18

19

20

21

22

23

24

25

Paula Barden, RPR, RMR, Federal Official Court Reporter
35 East Mountain Street, Fayetteville, Arkansas 72701

USA v. Richard Barnett Exhibits  EXH0062

```
 1                    A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3
    MR. CLAY FOWLKES
 4  MS. KIMBERLY NICOLE DAVIS HARRIS
    United States Attorney's Office
 5  414 Parker Avenue
    Fort Smith, Arkansas 72901
 6  (479)783-5125
    clay.fowlkes@usdoj.gov
 7  kimberly.harris@usdoj.gov

 8  FOR THE DEFENDANT:

 9  MR. ANTHONY J. SIANO
    Attorney at Law
10  333 Westchester Avenue, Suite S302
    White Plains, New York 10604
11  (914)997-0100
    tonysiano@aol.com
12

13  FOR TAMMY AND ASHLEE NEWBURN:

14  MR. JOHN B. SCHISLER
    MR. BRUCE D. EDDY
15  Federal Defender's Office
    112 West Center Street, Suite 300
16  Fayetteville, Arkansas 72701
    (479)442-2306
17  jack_schisler@fd.org
    bruce_eddy@fd.org
18

19  ALSO PRESENT:

20  OFFICER TOBEY REELY
    United States Probation Office
21  Western District of Arkansas

22  MS. ROXANA GUERRERO
    Courtroom Deputy
23  Western District of Arkansas

24  MR. DERRICK BALLENTINE
    IT Department, Systems Manager
25  Western District of Arkansas
```

1                         I N D E X

2                                                      Page

3  Rule Invoked ........................................  7

4  SPECIAL AGENT JONATHAN WILLETT

5       Direct Examination by Mr. Fowlkes ..............  9

6       Cross Examination by Mr. Siano ................. 35

7       Redirect Examination by Mr. Fowlkes ............ 55

8  Plaintiff Rests ..................................... 60

9  JEFFREY HOUPE

10      Direct Examination by Mr. Siano ................ 63

11      Cross Examination by Mr. Fowlkes ............... 65

12  JAKLYN CHALK

13      Direct Examination by Mr. Siano ................ 67

14      Cross Examination by Ms. Harris ............... 70

15  JOSE MARTINEZ

16      Direct Examination by Mr. Siano ................ 76

17      Cross Examination by Mr. Fowlkes ............... 79

18  MARIE HALPIN

19      Direct Examination by Mr. Siano ................ 84

20      Cross Examination by Ms. Harris ............... 87

21  ASHLEE NEWBURN

22      Direct Examination by Mr. Siano ................ 93

23      Cross Examination by Ms. Harris ............... 96

24      Redirect Examination by Mr. Siano .............. 105

25

1                    I N D E X (Continued)

2                                                      Page

3  WILLIAM SCROGGIN

4     Direct Examination by Mr. Siano .................. 111

5     Cross Examination by Mr. Fowlkes ................. 113

6  TAMMY NEWBURN

7     Direct Examination by Mr. Siano ................. 120

8     Cross Examination by Ms. Harris ................. 131

9  Defense Rests ...................................... 158

10 Closing Argument by Ms. Harris ..................... 158

11 Closing Argument by Mr. Siano ...................... 166

12 Court's Ruling ..................................... 173

13 Reporter's Certificate ............................. 188

14

15

16

17

18

19

20

21

22

23

24

25

1                          E X H I B I T S

2                                                          Page

3    PLAINTIFF:

4    Exhibit No.  1        Video of Defendant entering      12
                            Speaker Pelosi's Office
5
     Exhibit No.  2        Video of Defendant,              12
6                          Speaker Pelosi's Office

7    Exhibit No.  3        Photo of Defendant at            13
                            Speaker Pelosi's Desk
8
     Exhibit No.  4        Defendant Holding up             14
9                          Envelope in Speaker Pelosi's
                            Office
10
     Exhibit No.  5        Defendant Holding Envelope       14
11                         with Taser

12   Exhibit No.  6        Video of Defendant w/Bullhorn   15/29

13   Exhibit No.  7        Wrapper from Walking Stick Taser  16

14   Exhibit No.  8        Receipt from Bass Pro            17

15   Exhibit No.  9        Video of Defendant Purchasing    18
                            Items at Bass Pro
16
     Exhibit No. 10        Photo of Envelope from Speaker   20
17                         Pelosi's Office

18   Exhibit No. 11        Photo of Defendant with Two      20
                            Young Girls with Guns
19
     Exhibit No. 12        News Interview with Defendant    25
20                         at "Stop the Steal" Rally

21   DEFENDANT:

22   Exhibits A-E          Documents Relating to Other       8
                            Defendants Arrested at Protest
23

24

25

1          MS. GUERRERO:  The United States District Court

2     for the Western District of Arkansas, Fayetteville

3     Division, the Honorable Judge Erin L. Wiedemann presiding

4     is now in session.

5          THE COURT:  Thank you.  Good afternoon.

6          MS. GUERRERO:  Good afternoon, Judge.

7          THE COURT:  Can everyone hear me okay?

8          THE DEFENDANT:  Yes, ma'am.

9          MR. SIANO:  Yes, Your Honor.

10          THE COURT:  All right.  At this time, the Court

11     will call up the case of the United States versus Richard

12     Barnett.  We have Mr. Clay Fowlkes and Kim Harris present

13     for the government.  We have Mr. Anthony Siano present

14     representing Mr. Barnett.  We also have participating today

15     Mr. Bruce Eddy and Jack Schisler with our Federal Public

16     Defender's Office.  I asked them to participate today in

17     the event that we have any witnesses that might need

18     standby counsel.

19          All right.  Mr. Barnett, at your initial

20     appearance, I did go over with you your right to have the

21     initial appearance and today's hearing, the detention

22     hearing, conducted in person.  You had submitted a waiver

23     of personal appearance form.  It covered not just your

24     initial appearance, but also the detention hearing.  I just

25     want to make sure today that you are still agreeable to

1   proceeding with your detention hearing by video and waiving

2   your right to an in-person hearing.

3           THE DEFENDANT:  Yes, Your Honor.

4           THE COURT:  All right.  And you consulted with

5   your attorney, Mr. Siano, about that?

6           THE DEFENDANT:  I did.

7           THE COURT:  All right.  Thank you.  And I did

8   communicate with the attorneys prior to this hearing about

9   whether the government would like to invoke the Rule as to

10  any witnesses that may testify.  I was advised that they

11  would like to invoke the Rule, so the Court has made

12  arrangements for the witnesses, other than the case agent

13  for the government, but all other witnesses are set up in a

14  breakout room and will only join this hearing when it is

15  their turn to testify.  So the Rule will be considered

16  invoked.

17          MR. FOWLKES:  Thank you, Your Honor.

18          THE COURT:  Also, prior to the hearing, I asked

19  the government's attorney and defense attorney to submit

20  any proposed exhibits and to confer with each other as to

21  whether they would agree and stipulate to the admission of

22  their exhibits.  They have done so.  So the Court will

23  admit for the government, their exhibit list consists of 12

24  exhibits.  They will be deemed admitted at this time.

25          The defense's exhibit list, it's Exhibit A, B, C,

1  D and E, will also be deemed admitted as they have been

2  stipulated to by the government.  So I'll ask the attorneys

3  as we're proceeding through this hearing if you want to

4  refer to any of these exhibits, to refer to it by the

5  exhibit number or letter so that we can all follow along.

6          MR. FOWLKES:  Yes, Your Honor.

7          MR. SIANO:  Thank you, Your Honor.

8          THE COURT:  And I will note, Mr. Siano, the

9  exhibits that you submitted, which are essentially

10 documents from other cases around the country involving

11 defendants that were arrested in relation to the protests

12 at the Capitol, I don't know that you're going to be

13 presenting these through any witness, but the Court has

14 reviewed them and will take notice of the exhibits that you

15 offered.

16         MR. SIANO:  Other than in argument, Judge, I

17 won't be referring to them.  Thank you for the Court's

18 attention to them.

19         THE COURT:  Thank you.  All right.  With that

20 said, are the parties ready to proceed with the detention

21 hearing, for the government?

22         MR. FOWLKES:  Yes, Your Honor.

23         THE COURT:  And Mr. Siano?

24         MR. SIANO:  Yes, Your Honor.

25         THE COURT:  All right.  The government may call

1  its witness then.

2        MR. FOWLKES:  The government calls Special Agent

3  Jonathan Willett to the witness stand.

4        THE COURT:  All right.  Agent Willett, at this

5  time, I'm going to ask you to raise your right hand and be

6  sworn.

7        THE WITNESS:  I'm ready, Your Honor.

8        (Witness Sworn)

9        THE COURT:  All right.  Thank you.  Mr. Fowlkes,

10  go right ahead.

11             JONATHAN WILLETT, having been first duly

12  sworn, testified as follows:

13                    DIRECT EXAMINATION

14  BY MR. FOWLKES:

15  Q.  Please state your name for the Court, and spell your

16  last name for the court record.

17  A.  Jonathan Willett.

18        THE COURT:  I'm sorry, let me interrupt.

19        Mr. Fowlkes, we're getting some feedback from

20  your end.  I don't know -- there's an echo.  I don't know

21  if you can check your audio.

22        MR. FOWLKES:  Can you still hear the echo, Your

23  Honor?

24        THE COURT:  I still -- are you all hearing an

25  echo?  Yes, we're still --

1      THE DEFENDANT:  Your Honor, I'm hearing the echo.

2  I can't understand anything he's saying.

3      THE COURT:  Okay.  I'm not sure, Mr. Fowlkes, if

4  there's anything you can try, or we can give you a minute.

5      MR. FOWLKES:  Can you hear me, Your Honor?

6      THE COURT:  Yes.  There's some static, but it is

7  better.  We can try it that way.

8  Q.   (by Mr. Fowlkes)  All right.  Please state your name

9  for the Court and spell your last name for our court

10  record.

11  A.   Jonathan Willett, W-I-L-L-E-T-T.

12  Q.   How are you employed?

13  A.   I'm employed by the Federal Bureau of Investigation as

14  a special agent.

15  Q.   How long have you been a special agent with the FBI?

16  A.   I've been employed by the FBI in this position since

17  approximately January 2017.

18  Q.   During the course of your duty as a special agent with

19  the FBI, did you work on an investigation involving a

20  person named Richard Barnett?

21  A.   I did.

22  Q.   What was the nature of that investigation?

23  A.   The investigation was initiated on approximately

24  January 6th, 2021, last Wednesday.  So this was stemming

25  from the Capitol riots.  So earlier on on January 6th,

1   President Trump had given a speech in the Capitol.  After

2   that, protestors marched towards the U.S. Capitol building.

3   What was happening at the time at the U.S. Capitol is U.S.

4   Congress was meeting to certify the results of the recent

5   presidential election.  So the Capitol police had erected a

6   restricted area or fencing around the U.S. Capitol

7   building.  And protesters had pushed their way past the

8   U.S. Capitol police barricades up towards the U.S. Capitol

9   where the crowd got even more aggressive and barged into

10  the U.S. Capitol building.  So the investigation was based

11  off of trying to identify the individuals that had engaged

12  in those activities to gain entry into the Capitol.

13  Q.   During the course of your investigation, did you

14  review surveillance videos from the Capitol?

15  A.   Yes, I did.

16  Q.   I'm going to show what's been marked as Exhibit 1.

17         MR. FOWLKES:  Your Honor, can you see this video?

18         THE COURT:  Yes.  Is everyone else --

19         MR. FOWLKES:  I'm going to start the video now.

20         THE COURT:  Is everyone else able to see this?

21         MR. SIANO:  Yes, Your Honor.

22         THE COURT:  Mr. Barnett?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Okay.  Go right ahead.

25         MR. FOWLKES:  This video has no audio, Your

1  Honor.

2          (Exhibit No. 1 played)

3  Q.   (by Mr. Fowlkes)  Special Agent Willett, I'm going to

4  ask you, what does this video depict?

5  A.   So I was able to speak with the U.S. Capitol Police.

6  They provided this and another video we'll see here in a

7  minute.  So what the U.S. Capitol Police told me is, this

8  is showing Mr. Barnett walking into one of several

9  entrances of Speaker Pelosi's office.

10          MR. FOWLKES:  All right.  Your Honor, I'm going

11  to try to share a second video now.  It's going to take me

12  just a second.

13          THE COURT:  Is this Exhibit 2?

14          MR. FOWLKES:  This will be Exhibit 2, Your Honor.

15  And, Your Honor, can you see this video as well?

16          THE COURT:  Yes.  Can everyone else see it?

17          MR. SIANO:  Yes, Your Honor.

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  Go right ahead,

20  Mr. Fowlkes.

21          (Exhibit No. 2 played)

22  Q.   (by Mr. Fowlkes)  All right.  Special Agent Willett,

23  does this video also depict the defendant at the United

24  States Capitol?

25  A.   Yes.

1  Q.   What does this video show?

2  A.   So in speaking with Capitol police, what this shows is

3  yet another entrance to Speaker Pelosi's office.  So

4  Mr. Barnett is imaged -- is in this video wearing a plaid

5  jacket and dark hat.  He is asked by Capitol police to

6  please leave Pelosi's office.  He leaves, looks to be --

7  and it appears that he is videotaping during this.  And

8  then after the Capitol police officer turns their back,

9  Mr. Barnett goes back into Pelosi's office and then leaves

10 one more time.  Something to point out in that video is

11 there's an object that's evident on his hip, and we further

12 identified that as a walking stick taser.

13 Q.   All right.  During the course of your investigation,

14 did you also review some photographs that depicted the

15 defendant inside the Capitol?

16 A.   I did.

17 Q.   I'm going to share with you what's been entered into

18 evidence as Exhibit 3.

19         (Exhibit No. 3 displayed)

20         MR. FOWLKES:  And, Your Honor, can you see this

21 photograph?

22         THE COURT:  Yes, I can.

23 Q.   (by Mr. Fowlkes)  All right.  Special Agent Willett,

24 what does this photograph show?

25 A.   So this shows Mr. Barnett with his feet up on a desk

1   in Speaker Pelosi's office.  Also of note in this photo, he

2   has got a cell phone in his hand and a walking stick taser

3   on his hip.

4   Q.   All right.

5           MR. SIANO:  Excuse me.  Mr. Fowlkes, I didn't

6   hear the exhibit number.  I apologize.

7           MR. FOWLKES:  That was Exhibit Number 3.

8           MR. SIANO:  Thank you.  Sorry to interrupt.

9           MR. FOWLKES:  No problem.

10          (Exhibit No. 4 displayed)

11  Q.   (by Mr. Fowlkes)  Now I'm going to share Exhibit 4.

12  And Special Agent Willett, what does this photograph

13  depict?

14  A.   This shows Mr. Barnett again in the office of Speaker

15  Pelosi holding up a letter from that office.

16          (Exhibit No. 5 displayed)

17  Q.   All right.  And now I'm going to share Exhibit No. 5.

18  And what does this photograph depict?

19  A.   This shows Barnett again holding what appears to be

20  that folded letter in his right hand, and on his hip, he

21  has a walking stick taser.

22  Q.   All right.  Did you also review some photos and videos

23  that depicted the defendant after he left the Capitol

24  offices?

25  A.   Yes, I did.

1          MR. FOWLKES:  All right.  I'm going to try to

2    share Exhibit No. 6 now, Your Honor.  We did have some

3    trouble with the video, or with the audio on Exhibit 6

4    yesterday, so if you have trouble hearing it, please let me

5    know, Your Honor.

6          THE COURT:  All right.  Thank you.

7          MR. FOWLKES:  It will take a second to load.

8    And, Your Honor, can you see the video before I start it on

9    your screen?

10          THE COURT:  Yes.  It's a little blurry, but I'm

11    assuming once you start it, it will be more focused.

12          MR. FOWLKES:  Okay.  I'm going to try to start it

13    now, Your Honor.

14          THE COURT:  All right.

15          (Exhibit No. 6 played; inaudible audio)

16    Q.   (by Mr. Fowlkes)  And Special Agent Willett, what did

17    this video depict?

18    A.   It was kind of choppy on my side, Mr. Fowlkes, so I

19    can go ahead and try to summarize some of the key points if

20    it was for anyone else as well.  But what this video

21    showed, and it was taken right outside the U.S. Capitol

22    after the D.C. protests.  What we can see here is

23    Mr. Barnett getting a bullhorn, speaking about being inside

24    the U.S. Capitol building.  And the important fact to take

25    away from this video is that in his left hand, he is

1   holding the letter from Speaker Pelosi's office as well as

2   the walking stick taser in that hand.

3   Q.   And you've testified previously about the walking

4   stick taser.  During the course of your investigation, did

5   you participate in the execution of a search warrant at the

6   defendant's residence?

7   A.   Yes, I did.

8   Q.   And did you find any evidence regarding the item the

9   defendant is holding that you've described as a walking

10  stick taser?

11  A.   Yes.  We found the packaging for a walking stick taser

12  which is consistent with the item that Mr. Barnett is

13  photographed with.

14          MR. FOWLKES:  And, Your Honor, I'm going to try

15  to share Exhibit No. 7 at this time.

16          (Exhibit No. 7 displayed)

17  Q.   (by Mr. Fowlkes)  Special Agent Willett, can you see

18  this photograph?

19  A.   I can.

20  Q.   Is it a fair and accurate depiction of the item you

21  saw during the execution of the search warrant?

22  A.   It is.

23  Q.   What does it appear to be?

24  A.   It appears to be the wrapper for a walking stick

25  taser, or a ZAP Hike 'n Strike hiking staff.

1  Q.   And did you take steps to confirm where this item was

2  purchased and who purchased it?

3  A.   Yes, we did.

4  Q.   And what did you discover regarding this?

5  A.   Yes.  Other people at the FBI were out looking at

6  various local stores to see who would sell that particular

7  item.  They identified that that item was sold to

8  Mr. Barnett from Bass Pro.

9          MR. FOWLKES:  Your Honor, I'm going to try to

10  show Exhibit No. 9.  Oh, sorry.  It should be Exhibit

11  No. 8.  I got off track.  This is Exhibit No. 8.

12          (Exhibit No. 8 displayed)

13  Q.   (by Mr. Fowlkes)  Special Agent Willett, can you see

14  this on your screen?

15  A.   Yes, I can.

16  Q.   What does it appear to be to you?

17  A.   This is a receipt that was provided by Bass Pro.  So

18  when Mr. Barnett purchased these items, so he purchased

19  them on approximately December 31st, 2020.  He bought two

20  items of pepper spray.  He bought two three-packs of

21  two-way radios and a walking stick taser, the Hike 'n

22  Strike stun gun.

23  Q.   And how can you be certain that this defendant,

24  Mr. Barnett, made this purchase?

25  A.   This was purchased using one of his, either debit card

1  or credit card.

2  Q.   All right.

3        MR. FOWLKES:  Your Honor, it will take me a

4  moment to pull up the next exhibit.

5        THE COURT:  All right.  Let me just ask, Agent

6  Willett, where was this Bass Pro Shop located?

7        THE WITNESS:  Yes, Your Honor.  It was the one up

8  here in Northwest Arkansas, in Rogers, I believe.

9        THE COURT:  All right.  Thank you.

10       MR. FOWLKES:  All right.  Your Honor, I'm going

11  to try to share Exhibit No. 9 with the Court.  All right.

12  Your Honor, can you see this video?

13       THE COURT:  Yes, I can.  Thank you.

14       MR. FOWLKES:  I'm going to play it now.

15       (Exhibit No. 9 played)

16  Q.   (by Mr. Fowlkes)  All right.  Special Agent Willett,

17  what does this video show?

18  A.   This is a security video provided by Bass Pro up here.

19  And what we can see here is, this is a video of the

20  purchase that Mr. Barnett made, which we saw the items

21  purchased from the previous receipt.  So we can see

22  Mr. Barnett in the same hat and jacket that he appeared to

23  be wearing in the U.S. Capitol, and that hat and jacket

24  were both seized at his house as well.  We can see him

25  clearly lay out the walking stick stun gun, as well as the

1   items of mace and the two walkie talkies.  And then he's

2   got his German Shepherd puppy with him at that time as

3   well.

4   Q.   I want to talk to you now about the interview that you

5   conducted with the defendant.  When did this interview take

6   place?

7   A.   This interview took place on January 8th, 2021.

8   Q.   And where did the interview take place?

9   A.   It took place in the interview room located at the

10  Benton County Sheriff's Office.

11  Q.   Did one of your colleagues advise the defendant of his

12  Miranda rights?

13  A.   Yes, he did.

14  Q.   Did he agree that he understood all of his rights that

15  day?

16  A.   Yes.

17  Q.   Did he make a statement to you?

18  A.   Yes.

19  Q.   Did you record that statement?

20  A.   Yes.

21  Q.   During this statement, did Mr. Barnett admit that he

22  was the person depicted in the photos from Speaker Pelosi's

23  office?

24  A.   Yes, he admitted that he was in Speaker Pelosi's

25  office.

1  Q.   During the statement, did Mr. Barnett admit that he

2  took a letter from Speaker Pelosi's office?

3  A.   Yes.

4  Q.   And did he provide you with that letter?

5  A.   Yes, he had the letter with him.

6       MR. FOWLKES:   Your Honor, I'm sharing Exhibit 10

7  now.

8       (Exhibit No. 10 displayed)

9  Q.   (by Mr. Fowlkes)  What does this appear to be to you?

10 A.   This appears to be the letter.  This is the letter

11 that Mr. Barnett had with him, and this appears to be a

12 letter from Speaker Pelosi's office.

13 Q.   In that same statement, did Mr. Barnett tell you that

14 he had some firearms at his residence?

15 A.   He had firearms at his residence, but he had  -- he

16 has recently moved them.

17 Q.   Did you also review a photograph from social media

18 that appeared to depict the defendant holding a firearm?

19 A.   Yes.

20       MR. FOWLKES:   Your Honor, I'm going to try to

21 show Exhibit 11 now.

22       (Exhibit No. 11 displayed)

23 Q.   (by Mr. Fowlkes)  What does this photo appear to be to

24 you?

25 A.   This appears to be a photo of Mr. Barnett with two

1   young children.  And one of the girls is holding what

2   appears to be an AR.  And then Mr. Barnett has what looks

3   to be a (inaudible) gun with possibly some kind of silencer

4   on it.

5   Q.   Did you recover any firearms or silencers from his

6   house?

7   A.   No.

8   Q.   Did the defendant tell you during his interview about

9   a "Save the Children" rally that he had participated in?

10  A.   Yes.

11  Q.   What did he tell you about that rally?

12  A.   During that rally, he just said that he let people go

13  and take photos with some of his antique cars, and then he

14  let them go and take pictures with some of the guns that he

15  had after he unloaded them.

16  Q.   During the same interview, did Mr. Barnett tell you

17  whether he had a cell phone?

18  A.   Yes.

19  Q.   In fact, did you review photographs and video from the

20  Capitol that depicted the defendant holding a cell phone?

21  A.   Yes, I did.

22  Q.   Did you recover a cell phone from the defendant that

23  day?

24  A.   He did not have one on him.

25  Q.   Did you recover a cell phone from his residence during

1  the execution of the search warrant?

2  A.    No, we did not.

3  Q.    I want to talk to you now about the defendant's

4  appearance at other rallies.  Did you receive information

5  from Fayetteville Police Department regarding their

6  interaction with the defendant at a prior rally?

7  A.    Yes.

8  Q.    And what was that information?

9  A.    The information was that Fayetteville P.D. had had an

10 interaction with him sometime in approximately July of

11 2020.  They had a caller gave a description of an

12 individual who had possibly maybe pointed a gun at her.

13 When the police officer showed up, they identified a person

14 matching Richard Barnett's description.  He was causing a

15 little bit of a ruckus at the time, though he did comply

16 with law enforcement.

17 Q.    And did you confirm with the officers by reviewing

18 that report that the defendant was in possession of a

19 firearm during that rally?

20 A.    Yes.

21        MR. FOWLKES:  Excuse me, Your Honor.

22        THE COURT:  Let me ask, while we're on this

23 issue, you said it was a rally in July of 2020?

24        THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

25        THE COURT:  And do you know what type of rally it

1  was and where it was?

2          THE WITNESS:  I do not remember at this time,

3  Your Honor.  It was sometime, I believe either July 25th or

4  July 26th here in Fayetteville, Arkansas.

5          THE COURT:  But you don't recall what the rally

6  was for?

7          THE WITNESS:  I do not, Your Honor.

8  Q.   (by Mr. Fowlkes)  And if you reviewed a report from

9  Fayetteville Police Department, would that refresh your

10 memory on this matter?

11 A.   It would.

12         MR. FOWLKES:  All right.  Your Honor, may Special

13 Agent Willett have just a moment to refresh his

14 recollection?

15         THE COURT:  Yes, that's fine.

16         THE WITNESS:  Yes, Your Honor.  The rally

17 appeared to be in support --

18         MR. SIANO:  Your Honor, before cross, might we

19 find a way to let me have access to that report since the

20 witness is now using it to refresh his recollection before

21 he continues to testify?

22         MR. FOWLKES:  Your Honor, I believe we've already

23 disclosed this to the defense.

24         MR. SIANO:  Well, those discovery materials,

25 Judge, I'm having a little trouble getting them through the

1  system.  So I have the exhibits.  Is this one of your

2  exhibits marked today, Mr. Fowlkes?  I don't think so.

3          MR. FOWLKES:  No, it's part of the discovery that

4  we disclosed.

5          MR. SIANO:  I will tell the Court, I don't --

6  again, I take Mr. Fowlkes and Ms. Harris at face value.  I

7  was able to download the exhibits, but I haven't been able

8  to download the discovery.  And since it's now being used

9  in the hearing, this particular item is of interest to me.

10  So that's the only --

11          MR. FOWLKES:  Well, it's being used to refresh

12  this witness's recollection during the hearing.

13          MR. SIANO:  And the rules say I'm entitled to see

14  it before I begin crossing.

15          MR. FOWLKES:  Certainly.

16          THE COURT:  Okay.  What I will ask is, we can

17  take, once Mr. Fowlkes has completed his direct

18  examination, we can take a brief recess.  And, Mr. Fowlkes,

19  if you can either point Mr. Siano to where this report

20  would be in discovery, or if it might be quicker to just

21  e-mail that one report to him, if you can do that.  And,

22  Mr. Siano, I will give you an opportunity to review that

23  before cross examination.

24          MR. SIANO:  That's fine, Judge.  I will move as

25  fast as I can.

1          MR. FOWLKES:  We'll do that right now, Your

2  Honor.

3          THE COURT:  All right.  Thank you.  You may

4  proceed, Mr. Fowlkes.

5  Q.   (by Mr. Fowlkes)  Did you also review a copy of a news

6  report from November of 2020 in which the defendant gave an

7  interview?

8  A.   Yes.

9          MR. FOWLKES:  And I'd like to publish now

10  Exhibit 12, Your Honor.  And I think that the sound will

11  come through a lot more clearly if everyone is muted except

12  for myself.  And so I just would ask everyone to mute their

13  computers while I try to publish this video.

14          THE COURT:  All right.  If everyone can do that

15  at this time who is not already muted.

16          MR. FOWLKES:  I'm going to play the first part

17  and then ask my colleagues here if the sound is coming

18  through for them.

19          (Exhibit No. 12 begins playing as follows:)

20          REPORTER CRYSTAL MARTINEZ:  A group of people

21  express their support --

22          MR. FOWLKES:  Did the sound come through?  Okay.

23  I'm going to start it over now then.

24          (Exhibit No. 12 played as follows:)

25          REPORTER CRYSTAL MARTINEZ:  A group of people

1  express their support for President Donald Trump with a

2  "Stop the Steal" rally saying the 2020 election isn't over

3  until it's proven to be fair.

4          Good evening and thanks for joining us tonight.

5  I'm Crystal Martinez.  KWA's Samantha Boyd joins us live in

6  studio.  Samantha, you attended the rally.  Why do they

7  believe we need to reevaluate the election results?

8          REPORTER SAMANTHA BOYD:  Crystal, a group called

9  "Engaged Patriots" held the rally this morning in

10  Bentonville protesting what they believe is voter fraud.

11  But a political science expert says most election officials

12  believe votes were more secure than they've ever seen.

13          Richard Barnett was one of many who took part in

14  Saturday's "Stop the Steal" rally in Bentonville.

15          THE DEFENDANT:  And, hey, if you don't like it,

16  send somebody after me, but I ain't going down easy.

17          REPORTER SAMANTHA BOYD:  He supports President

18  Trump's claims of voter fraud and believes that cost him

19  the election.  One major complaint, mail-in voting.

20          THE DEFENDANT:  People are going to vote and find

21  out somebody already used their vote and they're not

22  allowed to vote.  This is insane.

23          REPORTER SAMANTHA BOYD:  William H. Bowen School

24  of Law Professor John Dipippa says otherwise.

25          PROFESSOR DIPIPPA:  The mail-in system has its

1    own verification process, and so there are some people who

2    have made claims, but none of them have ever been verified.

3    There was a woman who showed up in Nevada the night after

4    the election and said people stole the ballot from her

5    mailbox and submitted it.  Turns out that wasn't true.

6    That in fact, she had voted.

7              REPORTER SAMANTHA BOYD:  Jeff Kinard, another

8    protester, believes a common mistake was made inside many

9    polls.

10             MR. JEFF KINARD:  I believe there's been poll

11   watchers that were not allowed to see certain votes count.

12   And according to state laws, they are supposed to be

13   allowed to do that.

14             REPORTER SAMANTHA BOYD:  But Dipippa says the

15   country has put up safeguards to prevent this for years.

16             PROFESSOR DIPIPPA:  So, for example, the voting

17   systems, they're electronic with a paper ballot.  Those are

18   hard to falsify in the first place.  Secondly, when those

19   paper ballots are verified, they're counted in public with

20   observers from both parties and the press.

21             REPORTER SAMANTHA BOYD:  It's an election Dipippa

22   says would need more evidence to prove corruption and

23   protesters say would need more evidence to prove it was

24   trustworthy.

25             THE DEFENDANT:  Whatever it takes.  Whatever it

1  takes.

2        REPORTER SAMANTHA BOYD:  Dipippa says those

3  protesting today do have some ground to stand on because

4  errors occur every election.  But he's convinced even

5  recounts will have little effect on this one.  And the

6  Electoral College will meet December 14th to elect the

7  official president.  Live in studio, Samantha Boyd, KNWA,

8  Northwest Arkansas News.

9        (End of Exhibit No. 12)

10 Q.  (by Mr. Fowlkes)  All right.  Special Agent Willett,

11 do you care to unmute yourself at this time?  So what is

12 your understanding of when and where this video was taken?

13 A.   This video was taken approximately November 14th,

14 2020, in Bentonville.

15        MR. FOWLKES:  And, Your Honor, did the audio play

16 on that video this time for the Court?

17        THE COURT:  Yes, I was able to hear it.  Thank

18 you.

19        MR. FOWLKES:  Your Honor, with the Court's

20 permission, I'd like to go back and try to publish

21 Government's Exhibit No. 6 again with everyone, with their

22 microphone muted, to see if that helps the audio come

23 through on that one a little bit better.

24        THE COURT:  All right.  That's fine.  If

25 everybody will mute their microphones.

1          MR. FOWLKES:  Thank you, Your Honor.  It will

2    take me just a second to pull it up again here.  All right.

3    Your Honor, I'm going to try to publish this video again.

4          (Exhibit No. 6 played as follows:)

5          THE DEFENDANT:  Can you all hear me up there?  I

6    need ya'll to know something.  We took back our house.  And

7    I took Nancy Pelosi's office.  And another thing.  I didn't

8    steal this.  I bled on it and they fucking made me

9    (inaudible) and I still paid a quarter for it.  I put a

10   quarter (inaudible).  I took her stationery and I left her a

11   note.  And that note says, "Nancy, Bigo was here, you

12   bitch."

13          (Repetitive Chanting of "Our House")

14          (End of Exhibit No. 6)

15          MR. FOWLKES:  Your Honor, did that video/audio

16   come through?

17          THE COURT:  Yes, it did.  Thank you.

18          MR. FOWLKES:  Okay.  All right.

19   Q.   (by Mr. Fowlkes)  Special Agent Willett, I would like

20   to go back to the Second Amendment event, the rally that

21   you testified about a few minutes ago.  During the review

22   of the records associated with that Fayetteville Police

23   Department report and their report about what happened at

24   the rally, were you able to determine whether that date of

25   birth was the same date of birth that the defendant

1  provided to you?

2  A.   He didn't provide me a date of birth when we went to

3  interview him, but through the course of the investigation,

4  we determined that Mr. Barnett has possibly been utilizing

5  two separate date of births.

6  Q.   Was the date of birth at the Fayetteville Police

7  Department interaction the same as the date of birth on

8  Mr. Barnett's driver's license?

9  A.   I believe so.

10 Q.   Okay.  What did Mr. Barnett tell you about what you

11 will find if you searched his residence?

12 A.   If I may kind of do a pretty close to verbatim quote

13 from the interview of some key things that Mr. Barnett

14 said.  During the interview of Mr. Barnett, he said, "If

15 ya'll go out there and do a search warrant, you can see all

16 my shit.  You ain't going to find nothing out there."  And

17 then later on, he says, "I assure you, I'm a smart man,

18 there is not anything there."

19 Q.   During the course of the interview, did Mr. Barnett's

20 wife participate in a portion of the interview?

21 A.   Yes, she did.

22 Q.   And how did you view the interaction between

23 Mr. Barnett and his wife during that interview?

24 A.   It appears to be that Mr. Barnett was somewhat

25 controlling of his wife.

1  Q.   And did Mr. Barnett tell you whether or not he had a

2  cell phone with him during his travels to Washington, D.C.,

3  and his return travels to Arkansas?

4  A.   He had made mention about, and the video shown clearly

5  that he had a cell phone that he was either talking on or

6  recording when he was in the Capitol building.  And some of

7  the photos show him having a cell phone in his hand.  He

8  mentioned when he left D.C. that he had turned the location

9  services off on his phone, and, you know, only paid cash

10 for everything and had driven straight back.

11          MR. FOWLKES:  And, Your Honor, may I have just a

12 moment to consult with Ms. Harris before we continue our

13 examination?

14          THE COURT:  Yes, you may.  I'll ask if we can

15 have you and Ms. Harris put into a breakout room.  Would

16 you like Agent Willett put in the room with you?

17          MR. FOWLKES:  We're together, Your Honor.  I just

18 need to mute my screen for just a moment.

19          THE COURT:  Oh, okay.  Go right ahead then.

20          MR. FOWLKES:  Thank you.

21          (pause)

22          THE COURT:  Mr. Fowlkes, are you ready to

23 proceed, or do you need additional time?

24          MR. FOWLKES:  All right.  Yes, we are ready to

25 proceed, Your Honor.  I apologize.  It said the host was

1  not allowing me to unmute myself.  So we just have a few

2  follow-up questions for Special Agent Willett, Your Honor.

3            THE COURT:  Go right ahead.

4  Q.   (by Mr. Fowlkes)  Special Agent Willett, during the

5  interview, you just said that Mr. Barnett and his wife, and

6  you viewed their interactions and you viewed those

7  interactions to be somewhat controlling.  I'd just like you

8  to elaborate on why you believe that.

9            MR. FOWLKES:  Okay.  I don't think it's letting

10 Mr. -- Special Agent Willett unmute himself.

11           THE COURT:  All right.  There we go.

12 Q.   (by Mr. Fowlkes)  There we go.  All right.

13 A.   Yeah, to follow up with that.  It appeared that

14 perhaps Mr. Newburn's (sic) wife, or common-law wife, I'm

15 not sure exactly the entire relationship between him and

16 Tammy Newburn, but she had been receiving some calls or

17 threats which we were concerned about and we were wanting

18 to get some more information while she was in the room.  So

19 we had asked or she had offered to let us go and look at

20 those.  And at that time, Mr. Barnett had taken the phone

21 out of her hands and indicated that he was only going to

22 show what he thought was appropriate and would not let

23 Ms. Newburn go through and interact or show us that stuff

24 directly.

25 Q.   All right.  I want to ask you now, did Mr. Barnett

1  tell you whether or not he traveled with other individuals

2  to Washington, D.C.?

3  A.   Initially on the interview when we asked him that, he

4  said, no, he had not really traveled with anyone and kind

5  of indicated that he had been by himself.  Later on, he

6  kind of indicated that he had been with, met up with

7  several individuals in Washington, D.C., but didn't provide

8  us any further details.

9  Q.   All right.  Did Mr. Barnett tell you anything about

10  excitement and things that he enjoyed?

11  A.   Yeah.  Mr. Barnett kind of indicated that, and kind of

12  a quote from him would be, "I love excitement, that's what

13  got me in trouble," with reference to the events that

14  happened in the U.S. Capitol.

15        MR. FOWLKES:  All right.  Your Honor, can I have

16  just one more moment?  I'm just going to mute myself right

17  here.

18        THE COURT:  Yes, that's fine.

19        (pause)

20        MR. FOWLKES:  All right.  Just a couple more

21  follow-up questions for Special Agent Willett.

22  Q.   (by Mr. Fowlkes)  When Mr. Barnett turned himself in

23  at the Benton County Jail, what items did he have in his

24  possession?

25        MR. FOWLKES:  Okay.  Mr. -- Special Agent Willett

1  is still muted.  I think it says the host -- there we go.

2  Q.   (by Mr. Fowlkes)  All right.

3  A.   Yeah.  The items that Mr. Barnett had on him at the

4  time was a wallet, and he had a hefty amount of money in

5  his wallet, the letter from Speaker Pelosi's office, a

6  medical device, and a coffee cup with him.

7  Q.   No cell phone?

8  A.   He had no cell phone on him.

9       MR. FOWLKES:  And, Your Honor, the government has

10  no additional questions for Special Agent Willett.  I did

11  want to take that brief pause to confirm that we had

12  e-mailed to Mr. Siano the FBI reports, the Fayetteville

13  Police Department reports that he inquired about that

14  refreshed Mr. Willett's recollection.

15       MR. SIANO:  If I might, Your Honor.

16       THE COURT:  Yes.  Go ahead, Mr. Siano.

17       MR. SIANO:  I received two Fayetteville Police

18  reports.  I don't think Mr. Fowlkes meant to describe them

19  as FBI reports.  They appear to be local police reports in

20  Fayetteville.  I did receive two of them and I have had a

21  chance to look them over.  Thank you, Mr. Fowlkes.  And

22  thank you, Ms. Harris.

23       THE COURT:  All right.  So are you ready, then,

24  Mr. Siano, to proceed with your cross examination?

25       MR. SIANO:  Yes, Your Honor.  Thank you.  May I

1  proceed?

2          THE COURT:  Go right ahead.

3          MR. SIANO:  Thank you.

4                  CROSS EXAMINATION

5  BY MR. SIANO:

6  Q.   Special Agent Willett, I want to go back and go

7  through these events and try to fill in some dates, times

8  and places.

9  A.   Yes, sir.

10  Q.   Is that all right with you?

11  A.   Yes, sir.

12  Q.   First of all, you testified you have been an agent

13  since January of 2017?

14  A.   Yes, sir.

15  Q.   Did you have any other office assignment other than

16  Fayetteville since the time you became a special agent, or

17  is Fayetteville your first office?

18  A.   Fayetteville is my first office, sir.

19  Q.   Can you tell me your educational background, sir?

20  A.   Yes.  So I've got a undergraduate degree in

21  microbiology and I've got a Ph.D. in microbiology.

22  Q.   And where did you gain those degrees from?

23  A.   So I got an undergraduate degree at Indiana University

24  and I've got my post-doctoral degree in microbiology from

25  the University of Iowa.

1  Q.   Okay.  And the date of your graduation, your diploma,

2  undergraduate?

3  A.   Let's see.  I graduated from there in approximately

4  May or June 2007.

5  Q.   And the post-graduate degree?

6  A.   In approximately December 2012.

7  Q.   Did you have full-time employment after your

8  graduation, undergraduate?

9  A.   I was employed as a graduate assistant, or a graduate

10  researcher full-time, yes.

11  Q.   At Iowa?

12  A.   Yes, sir.

13  Q.   And then I take it did you leave the University of

14  Iowa after you got your graduate degree in December of

15  2012?

16  A.   Yes, sir.

17  Q.   Where did you work between 2012 and when you went into

18  the Academy at Quantico?

19  A.   After I graduated, I worked as a post-doctoral

20  research fellow at the University of Chicago for four

21  years.

22  Q.   That would bring me to about '16.  Any other full-time

23  employment?

24  A.   No, sir.

25  Q.   All right.  Thank you very much.  When were you first

1  assigned the case that led to Mr. Barnett's arrest?

2  A.   The case is not currently assigned to me, sir.

3  Q.   Okay.  Who is it assigned to?

4  A.   Another agent here in the Fayetteville office.

5  Q.   Who might that be?

6  A.   Special Agent Kim Allen.

7  Q.   When is the first time you actually engaged in

8  investigative activity either at your own initiative or at

9  the direction of Special Agent Allen in connection with

10  this matter?

11  A.   On the 6th.

12  Q.   That would be the Wednesday?

13  A.   Yes, sir.

14  Q.   All right.  And can you tell me what that was?

15  A.   Yeah.  On January 6th, I was the relief supervisor for

16  our squad on that day, so I got the initial call that there

17  had been an individual located up here in Northwest

18  Arkansas that was possibly involved in the protest.

19  Q.   And I take it that individual was Mr. Barnett?

20  A.   Yes, sir.

21  Q.   All right.  Now, can you tell me, I want to go through

22  these exhibits.  And the video that's Exhibit No. 1.

23  A.   Yes, sir.

24  Q.   When did you first see that video?

25  A.   I am not sure the exact day that I saw it.  I mean,

1  I've seen it sometime after the 6th, sir.

2  Q.   Okay.  When you say after, you mean the 7th, the 8th

3  or 9th, or at some point at that time?

4  A.   Yes.

5  Q.   Do you know the date/time codes for that video?

6  A.   They are in the title of the video, but I do not know

7  them offhand.

8  Q.   Do you know if that's one continuous piece of video?

9  A.   Each of those snippets?

10 Q.   No.  Each of the exhibits.  I'm not suggesting that

11 all the videos are one continuous.

12 A.   Okay.

13 Q.   But is the video, Exhibit No. 1, which it appears to

14 depict Mr. Barnett entering, is that one continuous video?

15 A.   I did not have that conversation with the U.S. Capitol

16 Police, though I'm assuming so.

17 Q.   Excuse me?

18 A.   I said, though I assume so.

19 Q.   And the second video, the one with what appears to be

20 three different Capitol police officers in and out of the

21 video?

22 A.   Yes, sir.

23 Q.   Do you know the date/time code for that?

24 A.   No.  It is in the title of the video, sir.

25 Q.   All right.  And as far as you know, that's one

1  continuous video?

2  A.   As far as I know.

3  Q.   And in the video, there's a doorway to the left with a

4  little desk, unoccupied desk at the lower corner of the

5  video.  And then there's a hallway to the right, is that

6  correct?

7  A.   I believe you when you say it.  I believe there's

8  actually -- there's a door off to the left and they're

9  actually looking at a hallway.

10  Q.   All right.

11          MR. SIANO:  Mr. Fowlkes, could I ask that the

12  government play its exhibit again so I don't take advantage

13  of Agent Willett in these questions?

14          THE COURT:  Is that Exhibit 2, Mr. Siano?

15          MR. SIANO:  It appears to be Exhibit 2 as best I

16  can -- yes, it's Exhibit 2.  Yes.  Yes, Your Honor.  It's

17  short.

18          MR. FOWLKES:  It will just take me a moment, Your

19  Honor.

20          MR. SIANO:  Take your time.  Excuse me, I'm

21  sorry.

22          MR. FOWLKES:  All right.  I'm ready, Your Honor.

23          THE COURT:  All right.  Go right ahead,

24  Mr. Fowlkes.

25          (Exhibit No. 1 played)

1          MR. FOWLKES:  All right.  And would you like me

2   to play Exhibit 2 as well?

3          MR. SIANO:  Yes.  Yes.

4          MR. FOWLKES:  Okay.  It will take me just a

5   second.  All right.  I'm ready, Your Honor.

6          THE COURT:  Go right ahead.

7          (Exhibit No. 2 played)

8          MR. SIANO:  Thank you, Mr. Fowlkes.

9          MR. FOWLKES:  Yes, sir.

10  Q.   (by Mr. Siano)  Agent, have you had a chance to look

11  at that video again?

12  A.   Yes, sir.

13  Q.   When you testified earlier, I believe, that

14  Mr. Barnett went back into the office.  It's that three or

15  four second period after his first interaction with one

16  Capitol police officer, and then he came out, he went back

17  to the left and then came back out again.  Is that what you

18  were describing?

19  A.   Yes, sir.

20  Q.   All right.  And then he has an interaction with a

21  second Capitol police officer and then proceeds off the top

22  of the video, is that right?

23  A.   Yes, sir.

24  Q.   And that's where the exit was, generally speaking, out

25  the top of the video, is that right?

1   A.   I have no idea in terms of the floor layout of the

2   U.S. Capitol.

3   Q.   Okay.  Did your investigation disclose what the

4   complaint says about the duration of Mr. Barnett's presence

5   inside the Capitol?

6   A.   I have no knowledge of the total duration inside the

7   U.S. Capitol.

8   Q.   How did these two videos come into your possession?

9   A.   We were provided them.  Actually, the U.S. Capitol

10  police provided both these videos.

11  Q.   When?

12  A.   They were provided to a prosecutor out of D.C.  I have

13  no idea what that exact time was.

14  Q.   What day was it?

15  A.   I do not know.

16  Q.   When did you first see them?

17  A.   Like I mentioned previously, I do not remember the

18  specific day that I first saw those videos.

19  Q.   Did you see the videos before you first made contact

20  with anybody in the Barnett household?

21  A.   No.

22  Q.   Okay.  Now, from time to time in this -- in your

23  testimony, you've referred to a letter?

24  A.   Yes, sir.

25  Q.   Has it come to your attention it was actually an empty

1  envelope?

2  A.    I do not know, sir.  It is sealed.  It's a sealed

3  envelope, so there could or there could not be something

4  inside that envelope or --

5              MR. SIANO:  I'd ask the Court to -- again, I know

6  Your Honor has read this, but I believe it's the last two

7  lines of the factual statement of the amended statement of

8  facts which describe this as an empty envelope.

9  Q.    (by Mr. Siano)  When you took possession of the

10  envelope, was there anything in it?

11  A.    Like I said, I do not know.  It's a sealed envelope,

12  sir.

13  Q.    So you didn't open the envelope?

14  A.    I did not.

15  Q.    Thank you, sir.  And when did you first make contact

16  with anybody connected with the Barnett household?

17  A.    Can you repeat your question?  I could not -- you

18  trialed off.

19  Q.    I'm sorry.  I apologize.  I did put my head down.

20  When is the first time, day and time, you made contact with

21  anybody from the Barnett household?

22  A.    The first time I made anyone -- contact with anyone

23  from that household was Friday, December 8th, approximately

24  10:00 a.m.

25  Q.    Okay.  Did you make contact with local police in

1  Bentonville on Thursday?

2  A.   I did not.  Other people of our office were reaching

3  out to a lot of local partners along that time.

4  Q.   So you were aware that the local Benton police were

5  told the FBI was looking for Mr. Barnett on Thursday, isn't

6  that right?

7  A.   Do you mean Benton County Sheriff's Office, sir, or

8  Bentonville Police Department?

9  Q.   Pardon my ignorance in this regard.  Again, the

10 geography is a little new to me.  I'm coming up to speed

11 slowly.

12     But I'm talking about local police.  I mean, your

13 agents reached out to the local police to get their

14 assistance with respect to Mr. Barnett on Thursday, isn't

15 that right?

16 A.   We actually reached out to a lot of agencies, I

17 believe as early as Wednesday, trying to identify the

18 individual in the photo before we knew Mr. Barnett's

19 identity.

20 Q.   Okay.  All right.  Do you have any reason to doubt

21 that the local police on Thursday were looking for

22 Mr. Barnett?

23 A.   They could be.  I have no idea what the local police

24 were doing at that time, sir.

25 Q.   Let's try coming at this another way.

1  A.    Okay.

2  Q.    You were in a local law enforcement premises on Friday

3  morning, isn't that right, 10:00?

4  A.    Yes, sir.

5  Q.    Which one?

6  A.    Benton County Sheriff's Office.

7  Q.    Okay.  Now, was it serendipitous that you were in that

8  police -- Benton County Sheriff's Office at 10:00 a.m. on

9  Friday morning?

10  A.    No, it was not.

11  Q.    Okay.  And you were there because somebody had

12  arranged with Mr. Barnett that he would surrender in the

13  sheriff's office on Friday morning?

14  A.    Yes.

15  Q.    Okay.  Who was that?

16  A.    Who was what?  The person that was --

17  Q.    Well, who made the appointment for you?

18  A.    Yeah.  So a third party had reached out through the

19  Benton County Sheriff, Sheriff Holloway, to coordinate the

20  self-surrender of Mr. Barnett.

21  Q.    And who was that third party?

22  A.    I believe his daughter at one point in time had direct

23  communication with Sheriff Holloway up in Benton County.

24  And there may have been some other individuals too, and

25  kind of like one more step removed.

1  Q.   And that happened on Thursday, isn't that a fact,
2  Special Agent?
3  A.   No, I actually believe it happened on Wednesday night
4  that Mr. Barnett had reached out wanting to -- he had
5  reached out wanting to self-surrender.
6  Q.   Okay.  So Wednesday night, at that point in time,
7  since the last video or photo you have of Mr. Barnett in
8  Washington is sometime in the afternoon, isn't that
9  correct, on Wednesday?
10 A.   I believe so, sir, yes.
11 Q.   All right.  So can we agree that Mr. Barnett was
12 somewhere between the District of Columbia and Western
13 Arkansas when he became aware that he wanted -- that you
14 were looking for him and he wanted to self-surrender?
15 A.   I think Mr. Barnett, my assumption is he assumed that
16 we were looking for him and he had reached out wanting to
17 turn himself in.
18 Q.   What's the basis for your -- what you kindly described
19 as your assumption?
20 A.   We had notified no one that we were trying to go and
21 arrest Mr. Barnett at that time, so if he heard that, that
22 did not come from us.
23 Q.   Nonetheless, he appeared on schedule at that
24 appointment on Friday morning at 10:00?
25 A.   Yes.

1  Q.   And he surrendered?

2  A.   Yes.

3  Q.   Okay.  And at that time, he was in the company of his

4  domestic partner, his common-law wife, Tammy Newburn, isn't

5  that right?

6  A.   Yes.

7  Q.   And have you had occasion in the course of your

8  investigation to see the lobby camera of the Bentonville

9  Sheriff's Office, Special Agent?

10  A.   I know it exists.  I have not watched it fully.

11  Q.   In fact, it depicts my client and his wife walking in

12  together, isn't that right?

13  A.   As I mentioned, I have not --

14  Q.   All right.  Now, at the time you talked to my client

15  in what you describe as an interview, isn't it a fact you

16  told at least Ms. Newburn that you had a search warrant

17  that you wanted to execute at the home, isn't that right?

18  A.   At the time of the interview?

19  Q.   Yes.

20  A.   No.

21  Q.   When did you first make her aware, then?

22  A.   We called her later that day.

23  Q.   You called her?

24  A.   Yes.

25  Q.   On the telephone?

1  A.    Yes.

2  Q.    Where were you?

3  A.    We were in close proximity to her house, a couple

4  miles down the road.

5  Q.    A couple miles down the road.  And you told her you

6  were coming, isn't that right?

7  A.    Yes.

8  Q.    And she was there?

9  A.    Yes.

10  Q.    To let you in the house?

11  A.    Yes.

12  Q.    You executed your search?

13  A.    Yes, sir.

14  Q.    Wasn't there an interaction between you and

15  Ms. Newburn in which you asked to see her phone and she

16  gave it to you?

17  A.    She -- I did not ask her personally.  I talked to her

18  about it.  She gave it to another special agent.  I did not

19  get to see her phone.

20  Q.    Okay.  And which special agent might that be?

21  A.    I believe it is Special Agent Randy Jackson is one of

22  the people that was looking at it.

23  Q.    I see.  So whatever interaction there was between my

24  client and his wife in the Bentonville Sheriff's office,

25  one of your fellow agents nonetheless had Ms. Newburn's

1   phone that same day and went through it, isn't that right?

2   A.   Yes.

3   Q.   Okay.  Now, that's not the only search warrant you

4   executed at the family home, isn't that right?

5   A.   That is correct.

6   Q.   Okay.  So you went in and you took some things and you

7   gave Ms. Newburn an inventory and then you went and applied

8   for another search warrant, isn't that right?

9   A.   I did not apply for the search warrant, but other

10  agents applied for the search warrant, yes, that is

11  correct.

12  Q.   The investigative team that was assigned to

13  Mr. Barnett in Western Arkansas got another search warrant?

14  A.   Yes.

15  Q.   And you went back and Ms. Newburn was there?

16  A.   Yes.

17  Q.   And she let you in the house and you executed a search

18  warrant?

19  A.   Yes.

20  Q.   Now, the pictures, the several images and long video

21  associated with my client's purchase of the walking stick

22  taser, or the walking stick stun gun, this was essentially

23  a purchase from a Bass Pro Shop, isn't that right?

24  A.   Yes.

25  Q.   And it was at the end of December, which is the date

1  depicted on it?

2  A.   That is correct.

3  Q.   And it was, again, a normal commercial purchase, made

4  in plain view, isn't that right?

5  A.   Yes.

6  Q.   And he used his credit card?

7  A.   Credit or debit card, sir.

8  Q.   Non-cash, purchased the items, left.  Isn't that

9  right?

10 A.   That is correct.

11 Q.   Okay.  Now, at any point during your searches was the

12 dog that was in that photo, was it in the Newburn house?

13 A.   Yes, it was.

14 Q.   Was it as friendly to you as it was to the people in

15 the Bass Pro Shop?

16 A.   The dog was, yes, sir.

17 Q.   Thank you.  Now, the photograph of my client with two

18 young people at this rally, did you identify who those

19 people were?

20 A.   No, not at this time.

21 Q.   Did you identify anything outside of the photo?

22 A.   Not at this time.

23 Q.   Not right until now, is that right?

24 A.   We have not as of this time identified the specific

25 photo.

1  Q.   So if I told you that the parent of the child holding
2  the firearm is right outside the frame of that picture, you
3  would have no basis to differ with me about that, would
4  you?
5  A.   I would not.
6  Q.   Okay.  And did you conduct any further investigation
7  of whatever that gathering was?
8  A.   I have not, and I do not believe other members of the
9  investigative team have at this time.
10 Q.   Thank you.  You knew my follow-up question.  Thank
11 you.
12      All right.  Now, I want to go to the events in
13 Fayetteville that involve the two Fayetteville Police
14 Department reports, okay.  Now, was anybody from the FBI
15 called to that event in, what are we in, July of 2002, I
16 mean 2020?
17 A.   If they were, I do not know of it.
18 Q.   Okay.  So when you used this noun "ruckus?"
19 A.   Uh-huh.
20 Q.   You're evaluating the two reports and your
21 conversations with law enforcement, isn't that right?
22 A.   Yes.
23 Q.   Okay.  Is that a term of art in the FBI?
24 A.   You're going to have to explain further.
25 Q.   Well, again, I don't want to say I've never heard that

1  expression before, but I don't think I have ever heard it

2  in connection with FBI testimony.  What is your

3  understanding of what that was?  I mean --

4  A.   So I could use another word, such as "disturbance."

5  Q.   Okay.  And all of this is based on what you told me,

6  the documents and conversations with other law enforcement

7  officials, isn't that right?

8  A.   Yes, sir.

9  Q.   And in that police report, Mr. Barnett is not

10  described as a suspect, is he?

11  A.   No.

12  Q.   And in fact, even the complainant couldn't identify

13  who she was disturbed with, isn't that right?

14  A.   Yes.

15  Q.   Okay.

16  A.   He gave a description that matched Barnett, but --

17  Q.   But the report itself describes another human being

18  similar to Mr. Barnett at that time, isn't that right?

19  A.   I could go and refresh myself or I can take your word

20  for it, whichever you would --

21  Q.   Well, I certainly don't want to take advantage of you.

22  Could you take a look at the report?

23  A.   I'm not familiar with another person.

24  Q.   Okay.  In fact, in that report, the police officers

25  talk to Mr. Barnett and he identified himself, is that

1  right?

2  A.    That is correct.

3  Q.    Is there any indication as to what that -- whether

4  that demonstration was pursuant to a permit or a

5  spontaneous gathering or anything else?

6  A.    I have no idea or knowledge of permitting at this

7  point.

8  Q.    Particularly as to the thing that is in these two

9  police reports, isn't that right?

10  A.    What was your question?

11  Q.    There's no indication, you have no investigative basis

12  to identify either the gathering, whether it was permitted,

13  whose auspices it was under, anything else other than what

14  is in these two police reports?

15  A.    Yes, that's correct.

16  Q.    And where -- the police who actually prepared these

17  reports didn't identify my client as the suspect, isn't

18  that right?

19  A.    That's correct.

20  Q.    All right.  Now, you've described what -- I think you

21  used the word "threats."  And in this instance, would it be

22  fair to say those are threats directed against Mr. Barnett

23  or persons of his household?

24  A.    Yes.

25  Q.    Okay.  And are you also aware that the fact that he

1  has been subject to hate mail and at least one envelope
2  filled with a white powder and postal inspectors are aware
3  of that?
4  A.   I was -- I know the postal inspectors were concerned
5  about items being sent to him.  I was unaware of the
6  specifics of what was being sent to him.
7  Q.   But you're aware that that's ongoing, isn't that
8  right?
9  A.   Yes.
10 Q.   And you're aware that the matter of my client being
11 threatened in various permutations is being investigated by
12 an Assistant United States Attorney in Little Rock,
13 Arkansas, isn't that right?
14 A.   I believe the Assistant U.S. Attorney is located up
15 here in the Western District of Northwest Arkansas, but --
16 Q.   The geography betrays me again, Agent Willett, and I
17 apologize.
18      Now, my client turned himself in.  He had his wallet
19 with him.  He didn't have some of the other things that you
20 were looking for.  It's fair to say from an investigative
21 standpoint, that's disappointing?
22 A.   I don't know if it's disappointing.  It's something
23 we're interested in going and pursuing further.  I wouldn't
24 characterize it as disappointing.
25 Q.   So that's an ongoing aspect of your investigation?

1    A.    I think that would be something that would be -- that
2    we're obligated to look for.
3    Q.    Excuse me?
4    A.    I think that's something that you could say that we're
5    obligated to look for.
6    Q.    That's a yes answer to my question, isn't that right?
7    A.    Yes.
8    Q.    Okay.  No further questions, Special Agent.  Oh, I do
9    have one --
10          MR. SIANO:  Excuse me, I'm sorry.  I apologize to
11   the Court.
12   Q.    (by Mr. Siano)  Special Agent Willett, you and I spoke
13   for less than a minute, was it on -- it was on Saturday,
14   wasn't it?  No, I called you on Saturday.  You called me
15   back on Sunday, isn't that right?
16   A.    I never gave you a call back, but, yes, you reached
17   out to me.  It was either Saturday or Sunday.  It was on
18   the weekend.
19   Q.    And you passed my name and phone number to the office
20   of the United States Attorney in some manner, shape or
21   form, isn't that right?
22   A.    That is correct.
23   Q.    And it was on the weekend?
24   A.    Yes.  Immediately following our conversation, I passed
25   your contact information on.

1  Q.   Thank you very much, Special Agent.

2         MR. SIANO:   I have no further questions.

3         THE COURT:   All right.  Mr. Fowlkes, any

4  redirect?

5         MR. FOWLKES:   Yes, Your Honor.  Just very

6  briefly.

7         THE COURT:   Go right ahead.

8                    REDIRECT EXAMINATION

9  BY MR. FOWLKES:

10  Q.   Special Agent Willett, Mr. Siano asked you some

11  questions about how Mr. Barnett and when Mr. Barnett

12  arrived back in the Western District of Arkansas from

13  Washington, D.C.  I have a couple of follow-up questions

14  for you about that matter.

15  A.   Yes, sir.

16  Q.   What did Mr. Barnett tell you about when he drove back

17  from Washington, D.C.?

18  A.   He said he drove back straight from Washington, D.C.,

19  and it's my understanding through the course of the

20  investigation that he got back sometime on maybe

21  mid-afternoon on the 9th, the day before he turned himself,

22  or the 7th, the day before he turned himself in.

23  Q.   Did Mr. Barnett turn himself in to the Benton County

24  Sheriff's Office immediately upon arriving back in the

25  Western District of Arkansas?

1   A.   No.

2   Q.   What did Mr. Barnett tell you about how he drove back

3   from Washington, D.C.?  Did he give you any details about

4   things that he did during that trip?

5   A.   Yeah.  He indicated that he turned the location

6   services off on his phone.  He paid with only cash and he

7   kept his face covered and drove straight back.

8   Q.   And, again, you've testified just now that Mr. Barnett

9   did not immediately turn himself in.  What again did

10  Mr. Barnett tell you specifically about what you would find

11  during the execution of the search warrant at his

12  residence?

13  A.   Yeah.  I'll read again as close to a verbatim quote as

14  I can get of Mr. Barnett, of what he told us during the

15  interview.  He said, "If you all go out there and do a

16  search warrant, you can see all my shit.  You ain't going

17  to find nothing out there.  I assure you I'm a smart man.

18  There's not anything there."

19  Q.   And he provided that statement to you several hours

20  after he arrived back in the Western District of Arkansas,

21  is that correct?

22  A.   Yes.

23  Q.   Mr. Siano also asked you some more questions about the

24  Second Amendment rally in Fayetteville.  I want to ask you

25  a couple follow-up questions about that as well.

1           Did you conduct more investigation into
2   Mr. Barnett's travel to that rally?
3   A.   Yeah.  In reaching out with local law enforcement
4   agencies, it appears to be on the day that he was heading
5   down to Fayetteville, he had an interaction with Gravette
6   P.D.  Speaking with Gravette P.D., it appears that they had
7   gotten calls up in Gravette about a man parked in a school
8   zone.  When the police showed up, they encountered
9   Mr. Barnett.  He had an AR slung on his back and a pistol
10  on his side.
11  Q.   Did those same law enforcement, local law enforcement
12  officers that you reached out to, did they express any
13  concern over Mr. Barnett's release from jail in this
14  matter?
15           MR. SIANO:  Objection.
16           THE WITNESS:  In speaking with some of the local
17  law enforcement --
18           MR. FOWLKES:  Just a minute.  We have an
19  objection.
20           THE COURT:  Just a moment.  Just a moment, Agent
21  Willett.  There is an objection.
22           What is your objection, Mr. Siano?
23           MR. SIANO:  Your Honor, we're now having one law
24  enforcement official testify to his impression of what
25  another law enforcement official was feeling about the

1  prospect of Your Honor ruling on bail.

2          THE COURT:  All right.  Your response,

3  Mr. Fowlkes?

4          MR. FOWLKES:  Well, Your Honor, I don't believe

5  it's a question regarding that person's feeling.  It's

6  trying to elicit what that person told Special Agent

7  Willett.

8          THE COURT:  All right.

9          MR. FOWLKES:  As this is a detention hearing, I

10 don't believe the Rules of Evidence apply to this matter.

11         THE COURT:  The normal Rules of Evidence do not

12 apply to this hearing.  And if you will limit the response,

13 Agent Willett, to what you were told by the Gravette Police

14 Department.  Not any impression, but what -- not any

15 impression of your own, but what you were told.

16         MR. FOWLKES:  Thank you, Your Honor.

17         THE WITNESS:  Yes, Your Honor.  So it was not

18 myself.  It was another special agent in our office had

19 reached out.  And the information that was relayed was is

20 that local law enforcement agencies such as Gravette P.D.

21 were concerned.  In one instance, they had someone show up

22 and try to film their police station for an extended period

23 of time before they left.  And there had been -- threats

24 had been received around the area stemming from, or as a

25 result of Mr. Barnett.

1              MR. FOWLKES:  Your Honor, may I have just one

2    moment?  I'm just going to mute my screen.

3              THE COURT:  Yes, that's fine.

4              MR. FOWLKES:  Thank you, Your Honor.

5              (pause)

6              MR. FOWLKES:  No further questions at this time,

7    Your Honor.

8              THE COURT:  All right.  Mr. Siano, any further

9    questions?

10             MR. SIANO:  Nothing further for Special Agent

11   Willett.

12             THE COURT:  All right.  Agent Willett, I do have

13   one or two questions for you.

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  I believe you said that when you

16   interviewed Mr. Barnett on January 8th, he said that his

17   firearms had been moved from his residence, is that

18   correct?

19             THE WITNESS:  Yes, that's my understanding.

20             THE COURT:  Did he say where they were moved to?

21             THE WITNESS:  He did not tell us.

22             THE COURT:  Okay.  And as far as you know, are

23   all of those firearms, including the firearms that are in

24   the photographs, are they legally possessed by him?

25             THE WITNESS:  As far as I know.

```
 1              THE COURT:  Okay.  All right.  That's all of the
 2    Court's questions.
 3              Mr. Fowlkes, any questions as a result of the
 4    Court's questions?
 5              MR. FOWLKES:  No, Your Honor.  Thank you.
 6              THE COURT:  Mr. Siano?
 7              MR. SIANO:  Nothing further, Your Honor.
 8              THE COURT:  All right.  Thank you, Agent Willett.
 9              Does the government have any further witnesses,
10    Mr. Fowlkes?
11              MR. FOWLKES:  No, Your Honor.
12              THE COURT:  All right.  And the Court, I will at
13    this time just advise counsel, I do intend to take notice
14    of all of the information in the initial pretrial services
15    report that was filed on January 12th and the addendum that
16    was filed on January 15th.
17              Is there any objection to the Court taking notice
18    of that information from the government?
19              MR. FOWLKES:  No objection, Your Honor.
20              THE COURT:  Mr. Siano?
21              MR. SIANO:  No objection.
22              THE COURT:  All right.  Mr. Siano, are you ready
23    to proceed with your first witness, or do you need a brief
24    recess?
25              MR. SIANO:  I don't think a brief recess will
```

 1  help me, Judge.  I think what I need to do is, whoever is

 2  maintaining the witness electronic holding room, I'm

 3  prepared to call witnesses, but I think I'm going to need

 4  somebody's assistance to, you know, open up their

 5  testimony.  I haven't left the screen so I haven't gone

 6  across to the other participants.  It says here at the

 7  bottom there's 52 participants.  I haven't gone looking for

 8  my witnesses as I might.

 9           THE COURT:  Mr. Siano, they are in a separate

10  breakout room.  They are not participating in the hearing

11  at this time since the Rule was invoked.  Can you tell me,

12  do you know what order you intend to call your witnesses

13  in?

14           MR. SIANO:  I'm going to call Mr. Michael

15  Ratledge first, Judge.

16           THE COURT:  All right.  I will ask our -- I think

17  we've got Mr. Ballentine or Ms. Guerrero that can assist

18  us.  If we can have Mr. Ratledge enter the hearing and

19  unmute him and put his video on.

20           MS. GUERRERO:  Judge?

21           THE COURT:  Yes.

22           MS. GUERRERO:  Mr. Ratledge has left the waiting

23  room a bit ago.  I have followed up with several e-mails

24  and he has not responded to my e-mails.

25           THE COURT:  All right.

 1              MR. SIANO:  All right.  Let me try another

 2    witness.  I will use a break at some point to try to track

 3    Mr. Ratledge down, but I don't want to slow the proceedings

 4    down.

 5              MS. GUERRERO:  And also, Mr. Scroggin also left

 6    the waiting room.

 7              THE COURT:  Why don't we take a brief recess,

 8    Mr. Siano, to let you regroup a minute.  If you want to try

 9    to contact Mr. Ratledge and Mr. Scroggin.  Anyone else that

10    is not in the waiting room, Roxana?

11              MS. GUERRERO:  No, ma'am.  Everybody else --

12              MR. SIANO:  Judge, why don't I -- rather than

13    have them have another dose of waiting around, why don't I

14    try to clear the waiting room of the witnesses who are

15    there, then they can go about their business, and then I

16    can take the break and find Mr. Ratledge and Mr. Scroggin.

17              THE COURT:  That's fine.  So who would you like

18    to call, then?

19              MR. SIANO:  Mr. Houpe.

20              THE COURT:  Mr. Houpe.  All right.  So if we can

21    have Mr. Houpe join the hearing.

22              MR. BALLENTINE:  He's coming in.

23              THE COURT:  All right.  Mr. Houpe, can you hear

24    me okay?

25              THE WITNESS:  Yes, ma'am.

```
1              THE COURT:  Am I pronouncing your name correctly?
2              THE WITNESS:  No, it's Houpe.
3              THE COURT:  Houpe, okay.  And if you could adjust
4   your camera just a little bit, the top of your head is
5   being cut off.  There you go.
6              THE WITNESS:  There's no hair up there anyway.
7              THE COURT:  All right.  Let me ask you,
8   Mr. Houpe, to raise your right hand at this time and be
9   sworn.
10             (Witness Sworn)
11             THE COURT:  Go right ahead, Mr. Siano.
12             MR. SIANO:  Thank you, Judge.
13             JEFFREY HOUPE, having been first duly sworn,
14  testified as follows:
15                        DIRECT EXAMINATION
16  BY MR. SIANO:
17  Q.   Mr. Houpe, could you tell me your age and county of
18  residence, please?
19  A.   45.  And Benton County.
20  Q.   Are you aware of the defendant and do you know Richard
21  Barnett?
22             THE COURT:  Let me -- just a moment.  Mr. Houpe,
23  let me back up and ask you to state your full name for the
24  record and to spell your last name.
25             THE WITNESS:  Jeffrey Jack Houpe, H-O-U-P-E.
```

1            THE COURT:  All right.  Thank you.  Go right

2   ahead, Mr. Siano.

3            MR. SIANO:  Thank you, Judge.

4   Q.   (by Mr. Siano)  Do you recognize Mr. Barnett in one of

5   these photos here, one of these images?

6   A.   Yes.

7   Q.   Okay.  And can you tell the Court approximately when

8   you first came to know Richard Barnett?

9   A.   I'm going to say five, six years ago probably.

10  Q.   And have you -- how did you first come to know

11  Mr. Barnett?

12  A.   We were at -- it was a 4th of July get-together at a

13  friend's house, mutual friend's, and that's how I met him.

14  Kids, family, barbecue, all that stuff.

15  Q.   And can you describe the nature of your contact and

16  interactions with Mr. Barnett from that initial meeting

17  about five years ago until recently?

18  A.   I've run into him here and there, same kind of events.

19  Always friendly, you know.  We always hit it off and talk.

20  And, you know, never any issues or anything.

21  Q.   All right.  And have you had occasion to see him at

22  local community events, particularly focused on Gravette

23  Day?

24  A.   Yes.  Yes.

25  Q.   All right.  And have you seen him participating in

1  those events?

2  A.   Yes.

3  Q.   All right.  Have you had an occasion to form an

4  opinion as to his character for honesty?

5  A.   I would say Richard is very honest would be my

6  opinion, yes.

7  Q.   All right.  And have you ever known Mr. Barnett to

8  harm or threaten any person or property during the five

9  years you've known him?

10  A.   No, sir.

11         MR. SIANO:  No further questions, Your Honor.

12         THE COURT:  All right.  Mr. Fowlkes, cross?

13         MR. FOWLKES:  Can I have just a moment, Your

14  Honor?

15         THE COURT:  Yes.

16         (pause)

17         MR. FOWLKES:  I'm ready to proceed, Your Honor.

18         THE COURT:  Go right ahead.

19                   CROSS EXAMINATION

20  BY MR. FOWLKES:

21  Q.   Hey, Mr. Houpe.  My name is Clay Fowlkes.  I'm an

22  Assistant U.S. Attorney here.  I just have a couple quick

23  questions for you.

24  A.   Sure.

25  Q.   You testified that you have known Mr. Barnett for

1  about five or six years, is that correct?

2  A.    Yes.  I met him five or six years ago, yes.

3  Q.    Did you go to Washington, D.C., with him recently?

4  A.    No, sir.

5  Q.    Okay.  So you have no personal knowledge of any of

6  Mr. Barnett's actions last week in Washington, D.C., is

7  that correct?

8  A.    Other than what I have seen on the media, yes.

9  Q.    Have you ever seen Mr. Barnett in possession of

10  firearms?

11  A.    No, sir, I don't believe so.

12  Q.    And so you have no personal knowledge as to how many

13  firearms he has or what kinds he has?

14  A.    I don't, no, sir.

15  Q.    All right.

16          MR. FOWLKES:  No further questions, Your Honor.

17          THE COURT:  All right.  Mr. Siano, any further

18  questions?

19          MR. SIANO:  No, Your Honor.

20          THE COURT:  May this witness be excused, then?

21          MR. SIANO:  Yes, Your Honor.

22          THE COURT:  All right.  Mr. Houpe, you may leave

23  the call at this time.  Thank you.

24          THE WITNESS:  Thank you.

25          MR. SIANO:  Your Honor, the defendant would like

1  to call next Jaklyn Chalk.

2         THE COURT:  All right.  If we can have Ms. Chalk

3  enter the hearing.  All right.  Ms. Chalk, can you hear me

4  okay?

5         THE WITNESS:  Yes, ma'am.

6         THE COURT:  All right.  I'm going to ask you to

7  speak up.  And at this time, if you will raise your right

8  hand and be sworn.

9         (Witness Sworn)

10        THE COURT:  Ms. Chalk, if you will state your

11 full name and spell it for the record.

12        THE WITNESS:  Okay.  Jaklyn Chalk.  J-A-K-L-Y-N,

13 C-H-A-L-K.

14        THE COURT:  Thank you.  Go right ahead,

15 Mr. Siano.

16        MR. SIANO:  Thank you.

17        JAKLYN CHALK, having been first duly sworn,

18 testified as follows:

19                    DIRECT EXAMINATION

20 BY MR. SIANO:

21 Q.   Ms. Chalk, how are you?

22 A.   Good.  How are you?

23 Q.   I'm fine.  I'm going to ask you your age and county of

24 residence, please.  Could you tell us?

25 A.   I'm 20 years old, and Washington County.

1  Q.   Thank you.  Are you aware, familiar with the

2  defendant, Richard Barnett?

3  A.   Yes, sir.

4  Q.   Do you see him here in one of the images on the screen

5  today?

6  A.   Yes, sir, I do.

7  Q.   Okay.  Could you tell us just the first four letters

8  up there in the little box where he is situated just so we

9  can confirm that?

10 A.   WCDC.

11 Q.   Thank you.  Can you tell the Court approximately when

12 you first came to know Mr. Barnett?

13 A.   I believe it was approximately the end of 2013, like

14 September or October.

15 Q.   And what was the context of you becoming acquainted

16 with Mr. Barnett?

17 A.   He is my best friend's stepdad.

18 Q.   And would that be Ashlee Newburn?

19 A.   Yes, sir.

20 Q.   Okay.  And at the time you were attending, I believe

21 it was high school with Ms. Newburn, is that right?

22 A.   Well, in 2013, that was middle school.

23 Q.   Wow.  Okay.  Middle school.  And then you attended

24 high school with Ms. Newburn as well?

25 A.   Yes, sir.

1  Q.   And could you tell the Court in what context you had

2  occasion to interact with Richard Barnett during the time

3  that you went to school with his stepdaughter?

4  A.   So we were in a pretty close -- there was about five

5  or six of us that were best friends.  And we spent probably

6  like every other weekend at their house together just for

7  sleepovers and stuff.  And I was also on the cheer team

8  with Ashlee.  And we would have like cheer parties, like

9  little get-togethers at their house pretty often.

10 Q.   And the cheer squad activity, did that lead to

11 attendance at various local sporting events and other such

12 activity?

13 A.   Yes.  I can't really remember a single, like even away

14 game that Richard and Tammy didn't attend.  They were at,

15 like pretty much every game, no matter how far it was.

16 Q.   Okay.  And did -- in these every other weekend, you

17 said you were at the Newburn/Barnett home.  Can you

18 describe the condition of that home for us?

19 A.   It was always super cleanly, and they just kind of

20 made it like a second home to us.  We were all really,

21 really close, especially with Tammy and Richard.  And they,

22 you know, would make meals for us, you know.  Really

23 catered to us.  And we also would have Halloween parties

24 pretty much every October and Richard would always be out

25 there like making bonfires for us, like catering to what we

1  needed, like s'more stuff.  Just pretty much anything that

2  we needed, he would provide for us, so --

3  Q.   An engaged father is what you're saying?

4  A.   Yes, sir, absolutely.

5  Q.   All right.  Do you have an opinion of Mr. Barnett

6  particularly with his character for honesty?

7  A.   I think that he's an honest man and a good man.

8  Q.   Okay.  Have you ever observed Mr. Barnett not to keep

9  his commitments or appointments in any of the activities

10 that you and Ashlee were involved in?

11 A.   No, never.

12 Q.   Okay.  Have you ever known Mr. Barnett to harm or

13 threaten to harm any other person or entity during the time

14 you have known him?

15 A.   No, sir, not at all.

16         MR. SIANO:  No further questions.

17         THE COURT:  Mr. Fowlkes?

18         MR. FOWLKES:  Ms. Harris is going to handle this

19 cross examination, Your Honor.

20         THE COURT:  All right.  Ms. Harris?

21         MR. FOWLKES:  Okay.  She needs to be unmuted,

22 Your Honor.  I apologize.

23         THE COURT:  All right.  If we can -- there we go.

24                    CROSS EXAMINATION

25 BY MS. HARRIS:

1  Q.   Good afternoon, Ms. Chalk.  And so it's your opinion

2  that Mr. Barnett is a good father, is that correct?  I'm

3  having trouble hearing you.

4           THE COURT:  Ms. Chalk, did you hear the question?

5  Q.   (by Ms. Harris)  I still can't hear you.  Can you hear

6  me okay?

7  A.   I can hear you.

8           MS. HARRIS:  Turn it up so I can hear from you

9  what she's saying.

10          THE COURT:  All right.  Repeat your question,

11  Ms. Harris.

12          MS. HARRIS:  I asked -- we're trying to deal with

13  some sound issues, Your Honor.

14  Q.   (by Ms. Harris)  Ms. Chalk, it's your opinion that

15  Mr. Barnett is a good father, is that correct?

16  A.   Yes, ma'am.

17          MS. HARRIS:  I'm going to switch computers.

18          THE COURT:  Okay.  That's fine.  All right.  So

19  we need to have -- there we go.  We've got you unmuted now,

20  Ms. Harris.

21          MS. HARRIS:  And can you see me?

22          THE COURT:  Yes, we can.

23  Q.   (by Ms. Harris)  Ms. Chalk, so it's your opinion that

24  Mr. Barnett is a good father, is that correct?

25  A.   Yes, ma'am.

1   Q.   And he's been supportive of your best friend, is that

2   correct?

3   A.   Yes, ma'am.

4   Q.   How often do you go to their home now that you're an

5   older person?

6   A.   I want to say like once every couple of months.

7   Q.   When was the last time that you remember that you had

8   direct contact with Mr. Barnett?

9   A.   Ashlee graduated not too long ago and I talked to him

10  and Tammy.  She graduated cosmetology school, so that was

11  about the last time.

12  Q.   Was that in person or was that over the phone, do you

13  remember?

14  A.   That was over the phone.

15  Q.   Do you recall the last time you had direct like

16  face-to-face contact with Mr. Barnett?

17  A.   I'm trying to think of the last time.  Probably like

18  in August, I went over to their house.

19  Q.   So maybe five or six months ago, is that fair to say,

20  you think?

21  A.   Yes, ma'am.

22  Q.   All right.  Does Mr. Barnett have a firing range or a

23  shooting range at his residence?

24  A.   Not that I'm aware of.

25  Q.   Have you ever been to any events at his house?  Other

1  than the cheer ones.  I'm sorry.  Other than the cheer

2  ones.  For instance, like a rally or fundraiser or

3  something of that nature?

4  A.  Never, no.

5  Q.  When did you first learn that Mr. Barnett had gone to

6  the Capitol in January, on January the 6th?

7  A.  The day that everything happened on the news.

8  Q.  So did you see him on the news, is that how you knew?

9  A.  Yes, ma'am.  I saw a picture of him and I sent it to

10  Ashlee and said, you know, "My gosh, this looks like

11  Richard."  And she was like, "It is.  He is in D.C."  And

12  so that was --

13  Q.  And is that the Richard that you knew?  In other

14  words, was that surprising to you that he had forced his

15  way into the Capitol and was apparently posing for

16  photographs in Speaker Pelosi's office?

17          MR. SIANO:  Objection as to the form of the

18  question.

19          THE COURT:  Tell me what exactly the --

20          MR. SIANO:  The word, "forced his way into the

21  Capitol."

22          THE COURT:  All right.  Ms. Harris, if you can

23  rephrase the question.

24  Q.  (by Ms. Harris)  Were you surprised to learn that

25  Mr. Barnett was part of the group of people that breached

1  the secure area of the United States Capitol on January the

2  6th, 2021, and that he had been photographed in Speaker

3  Pelosi's office?

4  A.   I think that Richard is a good man and he's never

5  forced his political opinions ever, so I --

6  Q.   Hang on.  Okay.  So that was surprising to you?

7  A.   Yes, ma'am.

8  Q.   Did you have any discussions with Ashlee about what

9  was going on after you learned that her dad was on the

10  national news?

11  A.   Yes, ma'am, we did have discussions about it.

12  Q.   And what did you tell her?

13  A.   I just told her that I was supportive of her and if

14  she needed anything, she could contact me.  And I was

15  worried about her.

16  Q.   And how was she doing when you talked to her?

17  A.   She was handling it pretty well.  She was -- you know,

18  didn't really need my help for anything, but said that if

19  anything came up, she would let me know, so --

20  Q.   Did she tell you who all was staying at her house the

21  past few days?

22  A.   She did not.

23  Q.   Did you go over there?

24  A.   Yes, ma'am.

25  Q.   When were you last with Ashlee?

1   A.   This morning.

2   Q.   Were you over there the night, January 6th, that night

3   after it all happened in Washington?

4   A.   No, I was not.

5   Q.   Do you recall if you were there on the 7th?

6   A.   No, ma'am.

7   Q.   Do you know any of Mr. Barnett's associates very well?

8   A.   I don't.

9           MS. HARRIS:  I'll pass the witness, Your Honor.

10          THE COURT:  All right.  Any further questions,

11  Mr. Siano?

12          MR. SIANO:  No further questions for Ms. Chalk.

13          THE COURT:  All right.  May this witness be

14  excused, then?

15          MR. SIANO:  Yes, Your Honor.

16          THE COURT:  All right.  Thank you, Ms. Chalk.

17  You may be excused and leave the meeting.

18          Your next witness, Mr. Siano?

19          MR. SIANO:  Joseph Martinez.  Is he available?

20          THE COURT:  If we can have Mr. Martinez join the

21  hearing.  Mr. Martinez, can you hear me okay?

22  Mr. Martinez, can you hear me?  I'm not sure that he's

23  hearing.  Mr. Martinez?

24          MR. SIANO:  He seems to be muted.

25          THE COURT:  Is he --

```
 1            MR. BALLENTINE:  He's not muted on our end.

 2            THE COURT:  He's not muted.  All right.

 3            MS. GUERRERO:  He's connected.

 4            THE COURT:  It appears he's muted now, looking at

 5   the little icon.

 6            THE WITNESS:  How's that?

 7            THE COURT:  All right.  Can you hear me okay,

 8   Mr. Martinez?

 9            THE WITNESS:  Yes, ma'am.

10            THE COURT:  All right.  Let me ask you to state

11   your full name for the record.

12            THE WITNESS:  Jose Miguel Martinez.

13            THE COURT:  All right.  And if you will raise

14   your right hand at this time, Mr. Martinez, and be sworn.

15            (Witness Sworn)

16            THE COURT:  All right.  Go right ahead,

17   Mr. Siano.

18            MR. SIANO:  Thank you.

19            JOSE MARTINEZ, having been first duly sworn,

20   testified as follows:

21                      DIRECT EXAMINATION

22   BY MR. SIANO:

23   Q.   Mr. Martinez, good afternoon.  This is Anthony Siano.

24   I'm going to ask you some questions.

25        Can you tell us your age and county of residence,
```

1  please?

2  A.    51.   Benton County, Arkansas.

3  Q.    Are you familiar with an individual named Richard

4  Barnett?

5  A.    Yes, sir, I am.

6  Q.    And within the limitations of your phone, can you

7  recognize the image of Richard in the hearing here today?

8  A.    I don't see anybody but you, sir.

9  Q.    Okay.

10         MR. SIANO:  Judge, I'd like to proceed.  I don't

11  know whether the government is going to contest

12  identification, but since he's on an iPhone, this is not

13  the most hospitable image under these circumstances.  I

14  don't know whether Mr. Fowlkes or Ms. Harris have an

15  objection on identity of who we are talking about.

16         THE COURT:  Any objection, Mr. Fowlkes or

17  Ms. Harris?

18         MR. FOWLKES:  No objection, Your Honor.

19         THE COURT:  All right.  You may proceed,

20  Mr. Siano.

21  Q.    (by Mr. Siano)  All right, Mr. Martinez.  We're going

22  to continue.

23      Can you tell the Court approximately when you first

24  came to know Richard Barnett?

25  A.    Approximately five, six years ago.

1  Q.   And what were the context and circumstances of you

2  coming to know Mr. Barnett?

3  A.   First time I met Mr. Barnett was at a football game.

4  My son played football and his daughter was a cheerleader.

5  Q.   All right.  And did you -- from that point forward

6  until today, have you from time to time met with him?

7  A.   Yes, on occasion.

8  Q.   Okay.  And what are the general contexts of those

9  interactions, you know, when you met him; he met you?

10 A.   Like I said, you know, football games, some school

11 things that his daughter and my son attended.  His wife, my

12 wife, and some social settings.  We have some neighbors

13 that live close and we have been together at some

14 summertime parties.  Played golf on occasion.

15 Q.   Have you been to his home?

16 A.   I have not been to Richard's home.  I have not.

17 Q.   All right.  Now, do you have an opinion as to

18 Mr. Barnett's character for honesty?

19 A.   As far as I'm concerned, I've never had any issues

20 with Richard, I mean, as far as him being dishonest.  I

21 mean, always been a likable guy.  Always spoke when I seen

22 him.  Nothing negative about Richard.

23 Q.   All right.  And have you ever known Mr. Barnett to

24 harm or threaten to harm, harm or threaten to harm any

25 person or entity?

1  A.   None at all.

2          MR. SIANO:   And I have no further questions of

3  Mr. Martinez.

4          THE COURT:   All right.   Mr. Fowlkes or

5  Ms. Harris?

6          MR. FOWLKES:   I'll be handling this witness, Your

7  Honor.

8          THE COURT:   All right.   Go right ahead.

9                    CROSS EXAMINATION

10  BY MR. FOWLKES:

11  Q.   Good afternoon, Mr. Martinez.   Are you -- were you

12  born in Arkansas?

13  A.   I was, sir.   Yes, sir.

14  Q.   Okay.   I want to ask you some questions about how well

15  you know Mr. Barnett.   It sounds to me like you are casual

16  acquaintances with Mr. Barnett.   How would you classify

17  your friendship with him?

18  A.   I mean, I would say casual.   I know his wife a lot

19  better than I know him.   We went to high school together.

20  Like I say, probably the first time I met Richard was

21  through school functions with our kids.

22  Q.   And you testified that you have never been to his

23  house before?

24  A.   I've never been to his house.   Mainly we met at other

25  peoples' houses and school functions.

1  Q.   And you said you have socialized somewhat outside of

2  school functions as well.  You mentioned that you may have

3  played golf with Mr. Barnett?

4  A.   Yeah.  We have a mutual friend that lives right down

5  the road, kind of between my house and his house that,

6  yeah, we have been over there.  And he's got a golf course

7  at his house and we've played golf and been in the swimming

8  pool and that kind of stuff.  Fourth of July party, I

9  believe.

10  Q.   Have you ever shot guns with Mr. Barnett?

11  A.   I don't believe I have.

12  Q.   Have you ever talked to Mr. Barnett about guns?

13  A.   I'm sure we've talked about guns.  I mean, I've got --

14  I'm a gun owner, and I know he was.

15  Q.   Okay.  Were you aware about his participation in the

16  Second Amendment rally in Fayetteville?

17  A.   I was not.

18  Q.   Okay.  Did you ever see Mr. Barnett ride around on his

19  motorcycle around the Gravette area?

20  A.   Never on a motorcycle, no.

21  Q.   Okay.  Did you ever see him carrying a gun around the

22  Gravette area?

23  A.   No, I never seen him carry a gun.  I know -- I mean,

24  no, I don't -- I never seen him carry a gun.

25  Q.   So you testified just a few minutes ago that you

1  believe he's an honest person, is that accurate?

2  A.   As far as I'm concerned, yes, he's always been honest

3  with me.

4  Q.   Would it surprise you to know that the birthday on his

5  driver's license is not his actual birthday?

6  A.   I have no knowledge of that, but, no.  Yes, it would

7  surprise me.

8  Q.   Have you ever talked to Mr. Barnett about any criminal

9  history that he may have under a different birthday?

10  A.   No, sir.

11  Q.   Were you surprised when you saw Mr. Barnett on the

12  news?

13  A.   I was very surprised.

14  Q.   And that's not the Mr. Barnett that you believe you

15  knew?

16  A.   Not at all.

17  Q.   The one who forced his way into the Capitol with a

18  large crowd?

19          MR. SIANO:  Objection as to form.  Whether it's

20  Ms. Harris or Mr. Fowlkes, it's the same problem, Judge,

21  characterizing as "force his way into the Capitol."

22          THE COURT:  All right.  If you could --

23          MR. FOWLKES:  Your Honor, Mr. Barnett was not --

24  certainly not welcome in the Capitol.  It's well

25  established that the crowd that was there breached the

1  security around the Capitol and were not welcome there.

2  And so "forcing their way in" I believe is an accurate

3  description of that, Your Honor, but I will rephrase the

4  question.

5          THE COURT:  Thank you.

6          MR. FOWLKES:  I apologize.

7  Q.  (by Mr. Fowlkes)  Did it surprise you to see

8  Mr. Barnett in the Capitol in such a way?

9  A.  Yes.

10 Q.  Did it surprise you to see Mr. Barnett on television

11 shouting into a bullhorn?

12 A.  I actually never seen that.  The only thing I seen was

13 the picture.  I never seen any video, but I try not to

14 watch much news.

15 Q.  All right.

16         MR. FOWLKES:  No further questions for this

17 witness, Your Honor.

18         THE COURT:  Any other questions, Mr. Siano?

19         MR. SIANO:  No, Your Honor.

20         THE COURT:  All right.  Thank you, Mr. Martinez.

21 You may be excused.

22         THE WITNESS:  Thank you, Your Honor.

23         MR. SIANO:  Judge, if Mr. Ballentine could give

24 me some guidance as to who else is in the waiting room.

25 I've been on the phone once trying to solicit the return of

1   some people.

2          MR. BALLENTINE:  You have Ashlee Newburn, Tammy

3   Newburn and Marie Halpin.

4          MR. SIANO:  Okay.  All right.  Why don't we try

5   Ms. Halpin first.

6          THE COURT:  All right.  If we can have

7   Ms. Halpin.

8          MR. SIANO:  I think they are all on the same

9   feed, Judge.

10          MR. BALLENTINE:  Yeah, that's what I was going to

11   say.  They are all at the same residence using the same

12   connection, so two of them will have to leave the room.

13          MR. SIANO:  Yeah.

14          THE COURT:  Okay.  All right.  If you can bring

15   them into the hearing, I want to be able to direct

16   Ms. Tammy Newburn and Ashlee Newburn to leave the room

17   while Ms. Halpin testifies.

18          MR. BALLENTINE:  They are coming in right now.

19          THE COURT:  All right.  We're ready to proceed

20   with Ms. Marie Halpin's testimony.  I need to know who is

21   in the room at this point.

22          THE WITNESS:  Just me.

23          THE COURT:  And you're Ms. Halpin?

24          THE WITNESS:  I'm Ms. Halpin, yes.

25          THE COURT:  Okay.  And there was someone that was

1  adjusting the camera for you.  Who was that?

2          THE WITNESS:  That was Ashlee Newburn.  She was

3  fixing the computer for me, yes.  She is out of the room

4  now.  She's locked back there with her mother.

5          THE COURT:  Okay.  So it's just you in the room?

6          THE WITNESS:  And a little dog.

7          THE COURT:  Okay.  And is the door closed,

8  Ms. Halpin?

9          THE WITNESS:  Yes, it is.

10          THE COURT:  Okay.  Thank you.  All right.

11  Ms. Halpin, let me first ask you to state your full name

12  for the record.

13          THE WITNESS:  Marie Halpin.

14          THE COURT:  And how do you spell your last name?

15          THE WITNESS:  H-A-L-P-I-N.

16          THE COURT:  "N?"

17          THE WITNESS:  "N," like in "Nancy."

18          THE COURT:  Okay.  All right.  Ms. Halpin, at

19  this time, if you could please raise your right hand and be

20  sworn.

21          (Witness Sworn)

22          THE COURT:   Go right ahead, Mr. Siano.

23          MARIE HALPIN, having been first duly sworn,

24  testified as follows:

25                    DIRECT EXAMINATION

```
 1  BY MR. SIANO:

 2  Q.   Ms. Halpin, how are you this afternoon?

 3  A.   I'm fine.  Thank you.

 4  Q.   This is Tony Siano.  This is the voice on the other

 5  end of the phone.

 6       Ms. Halpin, can we agree, you and I, that you're over

 7  21 and just tell me what county you live in?

 8  A.   Yes, I'm over 21.  And I live in Benton County.

 9  Q.   Are you familiar with Richard Barnett?

10  A.   Yes, I am.

11  Q.   And how do you know Mr. Barnett?

12  A.   He's been my daughter's partner for the last 20 years,

13  almost 21 years.

14  Q.   And where is their home in relation to your home?

15  A.   About seven miles from my home.

16  Q.   Okay.  And how long -- so you've known Mr. Barnett

17  continuously for that 20-some-odd years?

18  A.   Yes, I have.

19  Q.   Can you pick out his image here among all of these

20  little postage stamps on the screen?

21  A.   Yes.  He's the one on the far right here.

22            MR. SIANO:  Okay.  Can we agree on

23  identification?  I see Mr. Fowlkes and Ms. Harris nodding,

24  Judge.

25            MR. FOWLKES:  No objection, Your Honor.
```

1  Q.   (by Mr. Siano)  Ms. Halpin, can you tell the Court the

2  two most, two most significant interactions you've had with

3  Mr. Barnett prior to today?

4  A.   Well, when I was sick with a gallbladder attack, I

5  thought it was a heart attack, he was the one that came,

6  called the ambulance and got me to the hospital.  And then

7  a few years later, I didn't know what was happening to me.

8  I couldn't remember anybody's name or where I was.  And I

9  called and I happened to got my daughter's number.  And he

10 was there with her, and he came down with her, put me in

11 the car and took me up to the hospital.  I got there.  My

12 blood pressure was 185.  So if I would have stayed home

13 much longer, we might not be talking at this time.

14 Q.   And when was the gallbladder attack that might have

15 felt like a cardiac incident, approximately?

16 A.   2005.

17 Q.   And when was the, what I would call symptoms of a

18 stroke?

19 A.   November of 2008.

20 Q.   Thank you.  Have you had occasion over these 20 years

21 to form an opinion as to Mr. Barnett's character for

22 honesty?

23 A.   I think he's a very honest person.  I've never had him

24 lie to me that I know of.

25         MR. SIANO:  No further questions.

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

```
 1              THE COURT:  All right.  Mr. Fowlkes?

 2              MR. FOWLKES:  I think Ms. Harris is going to

 3   handle this witness.  I apologize, Your Honor.

 4              THE COURT:  Ms. Harris?

 5              MS. HARRIS:  I believe I'm unmuted.  Can you hear

 6   me?

 7              THE COURT:  Yes.

 8                       CROSS EXAMINATION

 9   BY MS. HARRIS:

10   Q.   Ms. Halpin?

11   A.   Yes.

12   Q.   Just a couple of questions for you.  My name is Kim

13   Harris and I'm one of the attorneys with the United States

14   today.

15       When did you first learn that Mr. Barnett had gone to

16   D.C. and participated in the events that happened on

17   January the 6th, 2021?

18   A.   I believe it was on a Monday, maybe.  Tammy told me

19   that he was on his way to Washington, D.C.  And I didn't

20   know about any of the events until I saw them on T.V.

21   Q.   What did you think when you saw what was going on on

22   the T.V.?

23   A.   I couldn't believe it was Richard Barnett.

24   Q.   Do you now believe that it was in fact Richard

25   Barnett?
```

1  A.   Oh, I know it was, but it wasn't his character that I

2  knew and still know.  I don't think he's a violent type

3  person.

4  Q.   Knowing what you know now, does that change that

5  opinion even a little bit?

6  A.   No, I don't think he's that violent.  I don't think he

7  would hurt anybody.  I've never seen him hurt anybody.

8  Q.   Did you know that he was wearing a stun gun on his hip

9  that day?

10  A.   No.  No, I didn't.

11  Q.   Is that surprising to you that he would have been

12  wearing what is considered a dangerous weapon when he went

13  into the Capitol that day?

14  A.   Kind of, yes.

15  Q.   Would that change your opinion of him at all?

16  A.   I've never seen him use a gun, so I don't -- I don't

17  know.

18  Q.   Do you think it's possible that there are two

19  Mr. Barnetts out there; the one that you know and then the

20  other person that he appears to be?

21          MR. SIANO:  Objection as to form.

22          THE WITNESS:  I was going to say, that's a weird

23  question.

24          THE COURT:  Just a moment.  Ms. Harris, I'll just

25  ask if you can rephrase that.

1          MS. HARRIS:   Thank you, Your Honor.

2  Q.   (by Ms. Harris)   Ms. Halpin, do you think it's

3  possible that Mr. Barnett engages in other activities that

4  you are not familiar with?

5  A.   I don't know everything he does because I don't live

6  with him.

7  Q.   About how often do you see him?

8  A.   Whenever I have him at my house or if I go up to his

9  house.   I mean, I've spent weekends at his house and I've

10  never seen any kind of violence or anything.

11  Q.   Prior to his arrest, when was the last time you saw

12  him face to face?

13  A.   Probably -- well, it was the week after Thanksgiving

14  and his niece was here from Nashville.   And we came up and

15  his daughter, Ashlee, he considers her his daughter, she

16  got out of beauty school.   That was when she completed the

17  beauty school.   And we came up for cake and ice cream and

18  everything.   And I was at his house for quite a while that

19  day.   And there was no violence, no anger, no nothing.   I

20  mean, everybody got along.   In fact, my husband and him

21  went outside and walked around and looked at his old

22  vehicles.   No, I didn't see nothing out of the way.

23  Q.   And so that would have been about a month and a half

24  ago, two months ago, was your last face-to-face contact

25  with him?

1  A.   It might have been, yes.  Now, my daughter I see at

2  least once a week.  I don't see him as often.

3  Q.   By any chance did your daughter, Tammy Newburn, bring

4  anything to your house, like firearms or a stun gun?

5  A.   Oh, God no.  No, no.  I have no firearm.  My husband

6  has a little pistol, a 12 gauge, I think it is.  Just a

7  little pocket pistol.  And he don't even use that.  I know

8  where it is, but it's never used.  The last time he used

9  it, he shot a opossum that he caught in a cage, because we

10 have opossums under our trailer.  But no, no.

11 Q.   Thank you, Ms. Halpin.

12          MS. HARRIS:  May I have just a moment, Your

13 Honor?

14          THE COURT:  Yes, that's fine.

15          MS. HARRIS:  I have no additional questions for

16 Ms. Halpin.

17          THE COURT:  All right.  Any further questions,

18 Mr. Siano?

19          MR. SIANO:  No, Your Honor.  No, Your Honor.

20          THE COURT:  All right.  Ms. Halpin, you may be

21 excused, then.  Thank you.

22          THE WITNESS:  Thank you.

23          THE COURT:  I'll ask you, Mr. Siano --

24          MR. SIANO:  Ashlee, Judge, would probably be

25 good.  Why don't we just keep that connection right now and

1  do Ashlee.

2          THE COURT:  All right.  Ms. Halpin, if you can

3  have Ms. Ashlee Newburn enter the room.

4          THE WITNESS:  Okay.  Okay.

5          THE COURT:  Ms. Newburn, can you hear me okay?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  And let me ask you, are

8  you the only one in the room and do you have the door

9  closed?

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  Okay.  And please state your full

12  name for the record.

13          THE WITNESS:  Ashlee Newburn.

14          THE COURT:  And how do you spell your last name?

15          THE WITNESS:  It's N-E-W-B-U-R-N.

16          THE COURT:  All right.

17          THE WITNESS:  And Ashlee is with two Es.  L-E-E.

18          THE COURT:  Okay.  Thank you.  Let me ask you at

19  this time, Ms. Newburn, if you will raise your right hand

20  and be sworn.

21          (Witness Sworn)

22          THE COURT:  All right.  Before Mr. Siano proceeds

23  with questioning you, Ms. Newburn, I do want to advise you

24  that you must answer all questions truthfully.  And failure

25  to do so can result in you being charged with perjury.  I

1   also want to advise you that anything you say can be used

2   against you.  You do have the right under the Fifth

3   Amendment to not incriminate yourself and you can choose

4   not to answer questions that you think might be

5   incriminating.  I have asked Mr. Bruce Eddy, and I'm not

6   sure if we still have Mr. Schisler in the hearing.

7         MR. SIANO:  I see him, Judge.

8         MR. SCHISLER:  I am here, Your Honor.

9         THE COURT:  Oh, there you are, Mr. Schisler.  All

10  right.  You got moved.  Okay.  They are both, Mr. Schisler

11  and Mr. Eddy, are from our Public Defender's office.  I did

12  ask Mr. Schisler to meet with you and just go over with you

13  your right against self-incrimination.

14        Did you have a chance to visit with him?

15        THE WITNESS:  Yes, I did.

16        THE COURT:  Okay.  And I'm not sure that it's

17  necessary, but I'm going to go ahead and appoint

18  Mr. Schisler for you for today's hearing for the purpose

19  of, if he thinks there's anything in a question or as you

20  start to respond to a question, anything that he feels

21  might be incriminating, again, I don't know that there's

22  any concern for that, but just in case, I'm asking

23  Mr. Schisler to be listening.  And if he feels there is

24  something in which he needs to counsel you about your right

25  against self-incrimination, Mr. Schisler, if you will just

1  stop and alert the Court and we can give you a moment to

2  confer privately and advise Ms. Newburn, and then Ms.

3  Newburn can decide whether she wants to answer the question

4  or not.

5          MR. SCHISLER:  I will do that, Your Honor.

6          THE COURT:  All right.  Ms. Newburn, do you

7  understand that?

8          THE WITNESS:  Yes.

9          THE COURT:  All right, then.  All right.

10  Mr. Siano, you may proceed.

11          MR. FOWLKES:  Your Honor, also this is

12  Ms. Harris's witness as well.

13          THE COURT:  All right.  Thank you, Mr. Fowlkes.

14          MR. FOWLKES:  Thank you, Your Honor.

15          ASHLEE NEWBURN, having been first duly sworn,

16  testified as follows:

17                  DIRECT EXAMINATION

18  BY MR. SIANO:

19  Q.   Hi, Ashlee.  How are you?

20  A.   I'm good.  How are you?

21  Q.   Good.  It's good to finally see your face.

22  A.   I know.

23  Q.   Can you tell us your age and the county of residence,

24  please?

25  A.   I am 20 years old and I live in Benton County.

1  Q.   All right.  And are you aware of the individual who is

2  the defendant in this case, Richard Barnett?

3  A.   Yes.

4  Q.   Do you see his image on the -- among the postage

5  stamps here on the screen?

6  A.   Let me see.  I can't see all of them.  Let me scroll

7  through.  Yes, I do.

8  Q.   Okay.  Could you tell us the first four little letters

9  in the ID beneath his name?

10  A.   WCDC.

11  Q.   Thank you.  That's all.

12        MR. SIANO:  I'd ask government counsel to

13  acknowledge that she's identified the defendant.

14        MS. HARRIS:  Yes, Your Honor.

15        THE COURT:  All right.  Thank you.  You may

16  proceed, Mr. Siano.

17        MR. SIANO:  Thank you, Judge.

18  Q.   (by Mr. Siano)  Ashlee, can you tell us -- excuse me,

19  that was rude.  Ms. Newburn, can you tell us when is the

20  first time you became familiar with Richard Barnett?

21  A.   Well, I think I was like six months old.

22  Q.   Okay.

23  A.   He's been there my whole life.

24  Q.   And would it be fair to say you consider him a father?

25  A.   Absolutely.

1   Q.   All right.  And does he have a relationship with your

2   biological mother?

3   A.   Yes.

4   Q.   In fact, they're a domestic partnership, to use a

5   phrase that we use Back East?

6   A.   Uh-huh.

7   Q.   Thank you.  All right.  Now, can you tell us -- do you

8   live in the house with Tammy and Richard?

9   A.   Yes, I do.

10  Q.   And you've done so for your whole life?

11  A.   Yes.  I moved out going to college, but that was it,

12  and I'm back now.

13  Q.   Okay.  Now, can you describe, in whatever words you

14  wish to use, the nature of your dealings with Richard?

15  A.   I mean, he's always -- like he's -- he's always super

16  supportive of me.  He's always like kind.  He's always -- I

17  mean, if I have any kind of issue at all, he's the

18  number one person I always call.  You know, like he's just

19  always there for me.  He's always just our protector, our

20  everything.

21  Q.   Could I ask you if he had any participation in any of

22  your school activities?

23  A.   Yes, he has.  He was always there for every game and

24  everything, supporting me.

25  Q.   How about specifically with regard to cheer squad

1  activities?

2  A.   Yes, always cheer.

3  Q.   Okay.  And over the course of your 20 years, have you

4  had occasion to form an opinion as to Mr. Barnett's

5  character for honesty?

6  A.   Yes, very honest.

7  Q.   Could you tell us that opinion?

8  A.   Yes, he's very honest.  Always honest.

9  Q.   All right.  And have you had occasion to observe

10  whether or not Mr. Barnett keeps his commitments and

11  appointments?

12  A.   Yes, he always keeps his commitments and appointments.

13  Q.   Now, have you ever known him to harm or threaten to

14  harm any other person or entity?

15  A.   No, never.

16          MR. SIANO:  No further questions.

17          THE COURT:  Ms. Harris?

18          MS. HARRIS:  Thank you, Your Honor.

19                    CROSS EXAMINATION

20  BY MS. HARRIS:

21  Q.   Good afternoon, Ms. Newburn.  My name is Kim Harris,

22  and I'm one of the attorneys for the United States.  I just

23  have a few follow-up questions for you this afternoon.

24      When did you learn that the defendant, Mr. Barnett,

25  was heading to Washington, D.C., to be a part of the "Stop

1  the Steal" event?

2  A.   I believe I was made aware the weekend prior.

3  Q.   How did you become aware?

4  A.   We just sat down and talked about it here at the

5  house.  He just told me he was heading to D.C. because I

6  hadn't talked to him about it yet.  So he just sat me down

7  and told me he was heading to D.C. on Monday, I think it

8  was.

9  Q.   And do you know what the purpose was for that trip?

10  A.   He -- his main purpose for all of this is to just --

11  he doesn't -- he wants to -- I mean, I don't know how to

12  word -- keep our country -- like he just wanted to support

13  Trump, I think.

14  Q.   Was it your understanding that he was going to the

15  speech and to the Capitol, or what did you think he was

16  doing there?

17  A.   I wasn't quite sure.  In my mind, I just thought there

18  was like a peaceful protest going on, because this is what

19  he told me, that he was just going to a peaceful protest in

20  Washington.

21  Q.   Who did he tell you he was going with?

22  A.   Sorry.  You cut out.

23  Q.   Who did he tell you he was going with to Washington?

24  A.   Mark Hesse and Anthony Lockhart.

25  Q.   Do you know them?

1   A.   I do, yes.

2   Q.   And are they friends of your dad, or Mr. Barnett?

3   A.   Yes, they are.

4   Q.   Were they at your house when Mr. Barnett, the

5   defendant, told you he was going to Washington?

6   A.   No, they were not.

7   Q.   Were you aware that he had purchased some walkie

8   talkies and a stun gun and some mace for the trip?

9   A.   No, I was not.

10  Q.   Have you seen those items either around the time

11  before he left or after?

12  A.   I saw the walkie talkies here the other day before --

13  the FBI took them when they did the search, but that's all

14  I saw.

15  Q.   You've never seen the stun gun or the mace?

16  A.   No, ma'am.

17  Q.   Did you have any contact with Mr. -- is it Hesse, or

18  Hesse?

19  A.   Hesse, I believe.

20  Q.   Okay.  Mr. Hesse or Mr. Lockhart prior to the three of

21  them heading to Washington?

22  A.   No, ma'am.

23  Q.   When did you -- and I realize you may not have the

24  exact day and time -- but approximately when did you learn

25  that the defendant, Mr. Barnett --

1 A.    Uh-huh.

2 Q.    -- had made his way into the Capitol and was in

3 Speaker Pelosi's office and had taken something from her?

4 A.    I believe it was Wednesday around -- I got off work

5 around 6:00 is when I saw everything.

6 Q.    And is it fair to say you learned it on the news or

7 you became aware on the news?

8 A.    Yes.

9 Q.    And what went through your mind?

10 A.    Well, I mean, I knew that there was no way.  Like, I

11 don't think he went in there violently or anything.  What

12 came to my mind immediately was just that the wrong story

13 had gotten out and the media was blowing it up everywhere.

14 Q.    Is that what you still believe?

15 A.    Yes.

16 Q.    And are you aware that in those photographs, the

17 defendant, Mr. Barnett, has that stun gun that I've asked

18 you about?  It's on his hip?

19 A.    Uh-huh.  I did see it in the photo, yes.

20 Q.    And so have you wondered why he would be armed with

21 such a weapon?

22 A.    I have no idea.

23 Q.    Do you think that is an altered photo?

24 A.    I'm not sure.  I wouldn't think so.

25 Q.    Once -- let me ask you this.  Have you seen the

1  YouTube videos where the defendant is on a bullhorn yelling

2  at the crowd about what he did in Speaker Pelosi's office?

3  Have you seen any of that --

4  A.   No, ma'am.

5  Q.   -- footage?

6  A.   No.

7  Q.   When did you first speak with the defendant after the

8  incident in Washington?

9  A.   I called him as soon as I got out of work on

10  Wednesday.

11  Q.   Would you say that's around 6:00?  I think that's what

12  --

13  A.   It would have been around 5:30 or 6:00, I believe.

14  Q.   Were you able to get him on the phone?

15  A.   Yes.  We just talked for like a minute.  I just wanted

16  to know if he was safe.

17  Q.   And did you confirm that he was all right?

18  A.   Yes.  And then we didn't -- he got off the phone right

19  away and we didn't talk any further.

20  Q.   When did you talk to him again?

21  A.   Sorry.  You cut out again.

22  Q.   When did you speak with him again?

23  A.   As soon as he got home, I guess it would have been

24  Thursday, I saw him for just a little bit.

25  Q.   Do you know approximately what time he got back to

1  your house?

2  A.    I believe around 3:00.

3  Q.    Was he alone or was he accompanied or with Mr. Hesse

4  and Mr. Lockhart?

5  A.    He was alone.

6  Q.    Did you stick around that afternoon and evening at the

7  house with Mr. Barnett and your mom?

8  A.    Yes, ma'am.

9  Q.    And what happened that night?

10  A.    Well, as soon as he came home, he called -- I had been

11  in contact with the Benton County Sheriff.  And as soon as

12  he came home, he called him off of my phone and called

13  another attorney and everything and then they set up the

14  FBI meeting for 10:00 a.m. the next day.  So we just stayed

15  at home low that night.

16  Q.    And so were you present for the moving of any property

17  out of your residence?

18  A.    No, ma'am.

19  Q.    Would it be surprising to you to know that the

20  defendant told the FBI that when he got home, he moved

21  property out of the residence?

22  A.    No, I don't think so.  No.

23  Q.    How many guns approximately, firearms, does

24  Mr. Barnett own?

25  A.    I am only aware of three or four, I believe.

1   Q.   And are those currently in your house?

2   A.   No, ma'am.

3   Q.   Where are they?

4   A.   I am not sure.

5   Q.   And were you consistently in your house with

6   Mr. Barnett and your mom from 3:00 p.m. until he turned

7   himself in?

8   A.   I left early Thursday morning to go babysit for a

9   friend.

10  Q.   He got back Thursday?

11  A.   I mean, I left early Friday morning.  Sorry, sorry.

12  Before he had left to go turn himself in, I had left early

13  Friday morning.

14  Q.   And it's your testimony you never saw him or your mom

15  move anything out of that house?

16  A.   I did not.

17  Q.   Is it your testimony that you never saw anyone else

18  move any of that property out of your house?

19  A.   I did not see anything.

20  Q.   Have you seen the few firearms that you know him to

21  own in your home since he's been gone in jail?

22  A.   No, they are not here.  I haven't seen them here.

23  Q.   Is your gun still there?

24  A.   No, ma'am.

25  Q.   You have one, right?

1  A.   Yes.   There is one, yeah, but I don't have it in here

2  anymore.

3  Q.   Okay.   Did you see Mr. Barnett give anyone his cell

4  phone when he got back?

5  A.   No, ma'am.

6  Q.   Do you know why he doesn't have his cell phone?

7  A.   I do not.

8  Q.   Did you talk to your mom about that, or Mr. Barnett?

9  A.   No.

10 Q.   Did you try to call him on it and wonder why you

11 couldn't get him on it?

12 A.   Once he got home or -- no, I haven't tried to call him

13 on it.

14 Q.   Who all has been staying at your house since

15 Mr. Barnett has been in jail?

16 A.   We have had Mark Hesse and Anthony Lockhart staying

17 here for a few days.   And then me and my mom just started

18 staying here again.

19 Q.   So those same folks that traveled out to D.C. with

20 him, is that correct?

21 A.   Yes, ma'am.

22 Q.   Have you seen either one of them in possession of

23 Mr. Barnett's phone or the stun gun?

24 A.   No.

25 Q.   Did Mr. Hesse happen to leave a bulletproof vest at

1   your house?

2   A.   I did see it the other day, but it is not here now.

3   Q.   Do you know why he would have had a bulletproof vest

4   at your house?

5   A.   No, ma'am.

6   Q.   How would you say -- how would you characterize who

7   controls your household that you live in?

8   A.   Richard characterizes (sic) the household.

9   Q.   Does your mom, would you say your mom has any control

10  of any day-to-day affairs, or is the household mostly run

11  by Richard?

12  A.   No, I -- I mean, yeah, my mom -- we all kind of

13  just --

14  Q.   Is there someone that you're looking at over there?

15  A.   Oh, no, no, no.  Sorry.  You want me to -- I can move

16  the computer around if you like.  Sorry.

17  Q.   It looked like you were looking off to the side at

18  someone.

19  A.   No.  I can -- no, sorry.

20          MS. HARRIS:  May I have just a moment, Your

21  Honor?

22          THE COURT:  Yes.

23          (pause)

24          MS. HARRIS:  All right.  Just a few more

25  questions and then I will pass the witness.

1  Q.   (by Ms. Harris)  Can you hear me okay?

2  A.   Yes.

3  Q.   If the defendant, Mr. Barnett, were to take some of

4  his prized possessions someplace, who would he give it to?

5  A.   I honestly have no idea who he would give them to.  I

6  believe -- I mean, possibly Mark or Tony who he was with.

7  Q.   Okay.  And let me ask you this.  Why did he need to

8  use your phone to call the sheriff?

9  A.   Because he -- I don't think he had his phone when he

10 got home.

11 Q.   Well, where do you think it is?

12 A.   I have no idea where his phone is.

13          MS. HARRIS:  Pass the witness, Your Honor.

14          THE COURT:  All right.  Mr. Siano, any questions?

15          MR. SIANO:  Thank you, Judge.  All right.  Judge,

16 I'd like for the record, although the cat's already out of

17 the bag, to object to Ms. Harris's characterization of

18 "prized possessions," but since the answer is already

19 given, we'll move on.  I'm prepared to ask some questions.

20          THE COURT:  All right.  Go right ahead.

21                    REDIRECT EXAMINATION

22 BY MR. SIANO:

23 Q.   Ms. Newburn?

24 A.   Yes.

25 Q.   Did Richard Barnett tell you he was discussing going

1  to Washington with other people, or did you actually see

2  him go to Washington with other people?

3  A.   I never saw him go with other people.  I saw him go

4  alone.

5  Q.   Thank you.  Nevertheless, you heard him talk about

6  going with other people?

7  A.   I just saw a picture of him traveling with other --

8  like they had stopped on the side of the road and just

9  taken a picture.  But I know that they were traveling

10 separately.

11 Q.   Thank you.  And in connection with the events after

12 January 6th, have there been either threats or crank phone

13 calls directed toward your home, you and your mother?

14 A.   Yes.

15 Q.   Okay.  And is it in that context that other people

16 have been residing in the house while you relocated

17 temporarily?

18 A.   Yes, that is exactly why.

19 Q.   Thank you very much.

20        MR. SIANO:  No further questions.

21        THE COURT:  All right.  Anything further from the

22 government?

23        MS. HARRIS:  No additional questions for

24 Ms. Ashlee Newburn.

25        THE COURT:  Ms. Newburn, I have a few questions

1  for you.

2              THE WITNESS:  Okay.

3              THE COURT:  Are there any firearms in your home

4  right now?

5              THE WITNESS:  No, ma'am.

6              THE COURT:  And you said you had a firearm, is

7  that correct?

8              THE WITNESS:  Yes.  Yes.

9              THE COURT:  But it's no longer in the home?

10             THE WITNESS:  No, ma'am.

11             THE COURT:  Where is it?

12             THE WITNESS:  I believe Mark Hesse has it.

13             THE COURT:  Did you give it to him?

14             THE WITNESS:  I did not.

15             THE COURT:  Who did?

16             THE WITNESS:  I believe my mom handed them over.

17             THE COURT:  And do you know how far away

18  Mr. Hesse resides from you?

19             THE WITNESS:  I've never been to his house, but I

20  think he just lives a couple minutes away, right down the

21  road.

22             THE COURT:  All right.  And you testified that

23  you and your mother left the home temporarily because there

24  were some threats?

25             THE WITNESS:  Yes.

1          THE COURT:  Let me ask you, are you concerned if

2   I release your stepfather on bond about future threats or

3   your safety at the home?

4          THE WITNESS:  No, ma'am.  And we have started

5   staying here again, me and my mom, because the threats have

6   kind of dissolved a little.

7          THE COURT:  So you're no longer receiving

8   threats?

9          THE WITNESS:  No, ma'am.

10         THE COURT:  Okay.  And if I were to release

11  Mr. Barnett, one of the conditions I might consider is that

12  there be -- that he not be allowed any access to the

13  internet, that all internet capable devices be password

14  protected.

15         THE WITNESS:  Uh-huh.

16         THE COURT:  Is that something you would see any

17  problem with?

18         THE WITNESS:  No, ma'am.  No.

19         THE COURT:  Okay.  So if he asked to use your

20  iPhone to access the internet, you would feel comfortable

21  telling him he could not do that?

22         THE WITNESS:  Absolutely.

23         THE COURT:  All right.  Knowing the dynamic

24  between him and your mother, do you feel like she would be

25  comfortable denying him access?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  And is there -- is it just you

3  and your mother that live at the home?

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.  Nobody else comes and stays,

6  is that correct?

7          THE WITNESS:  No.

8          THE COURT:  Okay.  All right.  Mr. Siano, any

9  further questions as a result of the Court's questions?

10          MR. SIANO:  No, Your Honor.  Thank you, Ashlee.

11          THE WITNESS:  Thank you.

12          THE COURT:  Ms. Harris?

13          MS. HARRIS:  No, Your Honor.

14          THE COURT:  All right.  Thank you, Ms. Newburn.

15  You may be excused.

16          Mr. Siano, would you like to call Tammy Newburn

17  next?

18          MR. SIANO:  Judge, I've managed to locate and try

19  to get reconnected to our little universe here Mr. Scroggin

20  and Mr. Ratledge.  I wonder if Mr. Ballentine would be kind

21  enough to tell me if they have been linked back in the

22  witness room.

23          MR. BALLENTINE:  Mr. Scroggin is waiting.

24          THE COURT:  Okay.  Mr. Siano, just while we have,

25  so that we wouldn't have to put Ms. Tammy Newburn back into

1   a waiting room, would you be agreeable to going ahead and

2   calling her as a witness next?

3           MR. SIANO:  Judge, I'm amenable to anything the

4   Court wants, but I'm also -- that's my client's wife.  I

5   don't think it's a burden for her to be in the witness

6   room.  I think these third, non-party citizens, I'm very

7   concerned about them.  And I'd like to get -- Mr. Scroggin

8   will be very quick.  And then Mr. Ratledge, who is not

9   there, you know, I can hold that in abeyance and take my

10  break.  So I'd like to do Scroggin and then go back and do

11  Tammy Newburn.

12          THE COURT:  All right.  That's fine.  So I'm

13  going to ask at this time then, Mr. Ballentine, if you can

14  put the Newburns back into the waiting room.  And then if

15  we can have Mr. Scroggin appear for the hearing.

16          All right.  Looks like he's still connecting.

17  And if we can unmute him.  There we go.  Mr. Scroggin, can

18  you hear me?

19          THE WITNESS:  I can.

20          THE COURT:  All right.  Let me ask you if you

21  will state your full name for the record.

22          THE WITNESS:  William Earl Scroggin.

23          THE COURT:  All right.  Can you spell your last

24  name, please?

25          THE WITNESS:  S-C-R-O-G-G-I-N.

1           THE COURT:  Thank you.  Mr. Scroggin, if you will

2   at this time raise your right hand and be sworn.

3           THE WITNESS:  Okay.

4           (Witness Sworn)

5           THE COURT:  Mr. Siano, go right ahead.

6           WILLIAM SCROGGIN, having been first duly sworn,

7   testified as follows:

8                    DIRECT EXAMINATION

9   BY MR. SIANO:

10  Q.   Mr. Scroggin, thank you for your patience.  Nice to

11  meet you face-to-face for the first time.  I appreciate it.

12  A.   Okay.  Okay.

13  Q.   Mr. Scroggin, could I ask you your age and the county

14  of residence?

15  A.   I am 70 years old.  And I'm in Benton County,

16  Arkansas.

17  Q.   And are you aware of the defendant, Richard Barnett?

18  A.   Yes, I am.

19  Q.   And among these -- in the little photos, can you see

20  Richard in one of the faces?

21  A.   Little photos.  I'm looking for little photos.

22  Q.   The other talking heads.

23  A.   It's just you and me on here.

24          MR. SIANO:  Okay.  Could I ask the government's

25  consent to identity in this circumstance?

1          MR. FOWLKES:  No objection.

2          THE COURT:  All right.

3          MR. SIANO:  Thank you, Mr. Fowlkes.

4  Q.  (by Mr. Siano)  All right.  Mr. Scroggin, would you be

5  kind enough to tell us where your home is in relation to

6  the Newburn/Barnett home?

7  A.  Okay.  I'm about half a mile to the east of them.

8  Q.  All right.  And did you move into your home about five

9  years ago?

10 A.  Yes, I did.

11 Q.  Could you tell us about the incident that led to your

12 meeting Mr. Barnett?

13 A.  We have -- we have some dogs, and I was in the front

14 yard mowing my yard.  And my little dog, my old Pomeranian,

15 was out messing around with me.  And I'm used to, where I

16 lived before was in a real quiet neighborhood, and now I'm

17 out in the country.  And there's a major road out here half

18 a block from me.  And my Pomeranian ran up on the road and

19 disappeared.  And so apparently, he was up there running up

20 and down the road.  And Mr. Barnett was going to work and

21 stopped and picked up my Pomeranian and took him home to

22 his house where he also had a Pomeranian.  And so then he

23 called -- they called me a little bit later and I ran up

24 there, drove up there, and got my Pomeranian.  But

25 Mr. Barnett invited me in the house.  We sat and visited,

1  had a nice visit.  And I was just thankful he didn't --

2  because that's about a 60-mile-an-hour road that cars run

3  up and down and he could have been killed.  My wife would

4  have killed me, so --

5  Q.   And could you describe the home as you observed it at

6  that time?

7  A.   It was a beautiful home up on a hill, just gorgeous.

8  Long, paved, windy driveway up to it out in the country,

9  lots of acreage.  A really pretty area.  A very clean home,

10 and they had a Pomeranian there also.

11 Q.   Based upon the dealings you had with Mr. Barnett, do

12 you have an opinion as to his character for honesty?

13 A.   He just seems like a great guy to me.

14            MR. SIANO:  No further questions.

15            THE COURT:  Mr. Fowlkes or Ms. Harris?

16            MR. FOWLKES:  Yes, Your Honor.  May I proceed,

17 Your Honor?

18            THE COURT:  Go right ahead.

19                    CROSS EXAMINATION

20 BY MR. FOWLKES:

21 Q.   Mr. Scroggin, how many years have you known

22 Mr. Barnett?

23 A.   From five years ago.

24 Q.   Do you ever see Mr. Barnett with firearms?

25 A.   No.

1  Q.   Do you know if Mr. Barnett has a place behind his

2  house where he can shoot guns?

3  A.   I don't know that.

4  Q.   Okay.  You're close enough to be able to hear gunfire.

5  Do you ever hear gunfire from his house?

6  A.   I do not hear gunfire from his house.

7  Q.   Okay.  Have you ever talked to him about firearms?

8  A.   No.  No.

9  Q.   He never told you about any assault rifles or any

10 pistols or anything else that he had?

11 A.   Nothing, no.  He didn't have any on display in his

12 home or anything.  I didn't see anything, no.

13 Q.   Okay.  And do you believe that Mr. Barnett is an

14 honest person?  Is that what you testified to?

15 A.   Absolutely.

16 Q.   Would it surprise you to know that the birthday on

17 Mr. Barnett's driver's license is not his actual birthday?

18 A.   Hmm.  I don't know anything about that.

19 Q.   Would it surprise you to know that he has criminal

20 history under a different birthday than the birthday that

21 appears on his driver's license?

22 A.   I know nothing about that.

23 Q.   Did it surprise you when you saw Mr. Barnett at the

24 Capitol in the photographs on television and on the news?

25 A.   Yeah.  That -- yeah, it did.

1   Q.   Did it surprise you to know that he had a stun gun
2   when he entered the Capitol on that day?
3   A.   I didn't learn that until about a day ago, so, yeah.
4   Q.   Did you see a video with him shouting into a bullhorn
5   and shouting curse words regarding Speaker Pelosi and
6   bragging that he took a letter from her desk?  Did you see
7   that?
8   A.   No.  All I saw was that picture of him sitting in her
9   desk.
10  Q.   Would it surprise you to know that he had done such a
11  thing?
12  A.   Yes.
13  Q.   That's not the Mr. Barnett that you know, is that
14  correct?
15  A.   Exactly.  Exactly.
16  Q.   Did Mr. Barnett ever talk to you about going to
17  Washington, D.C.?
18  A.   No.  No.
19  Q.   He never told you about his desire to go up there and
20  hear President Trump speak?
21  A.   No.
22  Q.   Did you know he was going to Washington, D.C.?
23  A.   No.
24  Q.   No one else told you that he was going either?
25  A.   Learned it in the news.

1  Q.   Do you know when Mr. Barnett returned from Washington,

2  D.C.; did you see him that day?

3  A.   No.

4  Q.   Did Mr. Barnett ever ask you to hold anything on his

5  behalf or keep anything for him?

6  A.   No.

7  Q.   Would you do that if he asked you to?

8  A.   I don't think so.  Not right now.  I wouldn't hold

9  anything for anybody.

10 Q.   Have you ever talked to Mr. Barnett on his cell phone?

11 A.   No.

12 Q.   You don't know his cell phone number?

13 A.   I do not.

14 Q.   All right.

15          MR. FOWLKES:  Your Honor, may I have just a

16 moment?

17          THE COURT:  Yes.

18          MR. FOWLKES:  Thank you, Your Honor.

19          (pause)

20          MR. FOWLKES:  No further questions for this

21 witness, Your Honor.

22          THE COURT:  All right.  Mr. Siano, any further

23 questions?

24          MR. SIANO:  Nothing further, Your Honor.

25          THE COURT:  All right.  Mr. Scroggin, you may be

1    excused, then.  Thank you.

2              THE WITNESS:  All right.

3              MR. SIANO:  I would like to ask Mr. Ballentine if

4    Mr. Ratledge has reappeared.

5              MR. BALLENTINE:  No, I do not have Ratledge.

6              MR. SIANO:  Okay.  Then, Judge, in the interest

7    of efficiency, I'd like to call Tammy Newburn, and then

8    take a break.  Since I can represent to the Court, after I

9    learned he had left the waiting room, I reached out to him

10   and he told me he was on the road and he was trying to find

11   a place he could get off the highway and then dial back in.

12   So that's a work in progress.  But I don't want to take up

13   a lot of, or create a lot of dead time.  So since we have

14   outside counsel here for her, let's get her on the witness

15   stand, get her testimony.  There we go.

16             THE COURT:  Ms. Newburn?

17             MR. FOWLKES:  Your Honor, this is Ms. Harris's

18   witness also.

19             THE COURT:  All right.  Thank you.  Ms. Newburn,

20   can you hear me okay?

21             THE WITNESS:  Yes, I can hear you.  I can't see.

22   It just says Zoom.

23             THE DEFENDANT:  I'm sorry, Your Honor.  I'm

24   sorry, Your Honor.  Can you hear me?

25             THE COURT:  Yes, I can hear you.

```
 1              THE DEFENDANT:  This is Mr. Barnett.  They are
 2   having trouble with my battery charger and my batteries are
 3   fixing to die, and I'm going to miss everything.  The
 4   officer is trying to get the thing to charge, but it won't
 5   charge.  They are going to try to swap me out with another
 6   one.  Can we have a few minutes?
 7              THE COURT:  Yes, that's fine.  Let's go ahead and
 8   take a 10-minute recess.  If the officer can either get a
 9   charger or get you another laptop, Mr. Barnett.
10              THE DEFENDANT:  Thank you, Your Honor.
11              THE COURT:  It's about 3:40 now.  We will go back
12   in session -- I'm sorry, it's 3:30 now.  We will go back in
13   session at 3:40.  We'll be in recess.
14              MR. SIANO:  Thank you, Your Honor.
15              (recess taken at 3:30 p.m.)
16              MS. GUERRERO:  The Honorable Judge Erin L.
17   Wiedemann presiding is now in session.
18              THE COURT:  All right.  Mr. Barnett, did they get
19   you a new laptop?  Okay.
20              MR. SIANO:  Answer again, Richard, please.
21              THE DEFENDANT:  Yeah, we're good.
22              THE COURT:  All right.  And -- all right.  If we
23   can have Ms. Tammy Newburn join the hearing.
24              MR. SIANO:  Thank you, Judge.
25              MR. FOWLKES:  And, Your Honor, this is
```

1  Ms. Harris's witness.

2           THE COURT:  All right.  Thank you.

3           MR. FOWLKES:  Thank you, Your Honor.

4           THE COURT:  All right.  Ms. Newburn, can you hear

5  me?

6           THE WITNESS:  Yes.

7           THE COURT:  All right.  And can you see everyone

8  or --

9           THE WITNESS:  I actually just see you, and then I

10 see me up here.  I'm not real computer --

11          THE COURT:  All right.  Well, as long as --

12 Mr. Siano and Ms. Harris, the government's attorney, will

13 be asking you questions, so as long as you can hear them.

14          THE WITNESS:  Okay.

15          THE COURT:  Let us know if you cannot.  Can you

16 state your full name for the record, Ms. Newburn?

17          THE WITNESS:  Tammy Lynn Newburn.

18          THE COURT:  All right.  Ms. Newburn, I do want to

19 advise you that you must answer all questions truthfully.

20 Failure to do so can result in you being charged with

21 perjury.  Anything you do say can be used against you.  You

22 do have the right to not incriminate yourself and you can

23 choose not to answer questions that you feel might be

24 incriminating.

25          I am going to appoint Mr. Jack Schisler, one of

1  our Federal Public Defenders for you for the purposes of

2  testifying today.  Did you have a chance to visit with

3  Mr. Schisler about your right to not incriminate yourself?

4            THE WITNESS:  Yes.

5            THE COURT:  And I'm going to ask Mr. Schisler

6  that if he feels that a question is being asked of you or

7  that you're starting to testify to something that might be

8  incriminating, that he alert the Court.  And at that time,

9  if you would like to be put in a breakout room and speak

10  privately with Mr. Schisler and get his advice and then

11  decide from there whether you would like to answer the

12  question, I'll give you that opportunity, okay?

13            THE WITNESS:  Okay.  Thank you.

14            THE COURT:  So you do understand your Fifth

15  Amendment rights, is that correct?

16            THE WITNESS:  Yes.

17            THE COURT:  All right.  All right, Ms. Newburn.

18  Then if you will raise your right hand at this time and be

19  sworn.

20            (Witness Sworn)

21            THE COURT:  Thank you.  Go right ahead,

22  Mr. Siano.

23            MR. SIANO:  Thank you, Your Honor.

24            TAMMY NEWBURN, having been first duly sworn,

25  testified as follows:

DIRECT EXAMINATION

1

BY MR. SIANO:

2

Q.    Hi, Tammy.

3

A.    Hi.

4

Q.    Can you tell us you're over 21 and what county you

5

live in, please?

6

A.    I am over 21.  I live in Benton County.

7

Q.    All right.  And are you familiar with the defendant,

8

Richard Barnett?

9

A.    Yes, I am.

10

Q.    Can you see his image among the many images here?

11

A.    I can't.  I only -- I only see me.  Is there --

12

there's a little blue arrow.  Should I hit that?  Will that

13

bring them all up?  I don't know.  I'm not into computers.

14

             MR. SIANO:  All right.  I take it the government

15

will not object to identification is this.  Mr. Fowlkes is

16

shaking his head no.  Ms. Harris is saying no.

17

Q.    (by Mr. Siano)  So for our purposes, we won't make you

18

scroll through all the postage stamps, all right?

19

A.    Okay.

20

Q.    How long have you known Richard?

21

A.    I have known him 20 plus -- 20 years, almost 21.

22

Q.    Can you describe for the Court the nature of your

23

relationship with Richard Barnett over the last 20 years?

24

A.    We've been partners for the last 20 years.

25

1  Q.    And when you first became domestic partners --

2  A.    Uh-huh.

3  Q.    -- did you have biological children?

4  A.    No.  My children are from my previous marriage.

5  Q.    How old were they at the time that you and Richard

6  came together as a unit?

7  A.    Jessy was -- had just turned five and Ashlee was about

8  three months old.

9  Q.    Okay.

10 A.    Yeah.

11 Q.    Can you describe for the Court the role Richard

12 Barnett has played in the parenting of your daughters

13 since -- in the last 20 years, please.

14 A.    He's been just like a father to them.  Everything that

15 a father would do, that's what he's been.

16 Q.    And to your observation, can you describe whether or

17 not he was actively engaged in their lives and activities?

18 A.    Oh, yes.  Yes, in everything.  Every school function

19 they had, you know, that parents go to, he would -- he

20 would go.  We had kids at our house, you know, sleepovers

21 and cheer parties.  And everything that a dad does, he

22 does, you know.

23 Q.    All right.  Now, before I get into the events of the

24 last couple of weeks, do you have an opinion as to

25 Mr. Barnett's character for honesty?

1  A.   Oh, he's very honest, yeah.

2  Q.   All right.

3  A.   Yeah.

4  Q.   And have you observed whether or not Mr. Barnett

5  honors his appointments and commitments when he makes such?

6  A.   Yes.  Yes.  We all do, uh-huh.

7  Q.   What is your opinion of Mr. Barnett's keeping his word

8  and showing up where he says he's going to show up?

9  A.   I have no doubt.  I have no doubts whatsoever that he

10  will do what he says and he will be where he's supposed to

11  be.

12  Q.   All right.  And have you ever known Mr. Barnett to

13  threaten harm to any person or entity or to actually harm

14  any person or entity?

15  A.   No, not at all.

16  Q.   Not at all that you don't know.  Not at all that it's

17  never happened; it's never happened?

18  A.   It's never happened, no.

19  Q.   And I'm going to ask you some questions about the last

20  week.

21  A.   Okay.

22  Q.   But before I do, did you have occasion to talk to a

23  pretrial services officer?

24  A.   Yes.

25  Q.   She asked you questions?

1   A.    Yes.

2   Q.    And she gave answers?

3   A.    Yes.

4   Q.    And you did that without me as part of the

5   conversation, didn't you?

6   A.    Yes.

7   Q.    Okay.  Now, when did you first become aware that

8   Richard had any intention to go to the rally in Washington,

9   D.C., that was going to be held on January 6th?

10  A.    Probably -- probably sometime the weekend before.

11  Q.    Okay.

12  A.    Yeah.

13  Q.    And you became aware that he was going to go?

14  A.    Yes.

15  Q.    All right.  When did he leave?

16  A.    He left Monday, mid-morning sometime.

17  Q.    Did you see him leave?

18  A.    Yes.

19  Q.    Did he leave alone or with an entourage?

20  A.    He was by himself, yes.

21  Q.    Did you talk to him before he returned to the family

22  home later in the week?

23  A.    I talked to him occasionally on his way down to D.C.

24  He let me know he made it to D.C. okay.  And then after

25  everything that happened, he called me from someone else's

1  cell phone -- his was dead, he said -- and let me know that

2  he was okay.

3  Q.    Okay.  When did he return into the house?

4  A.    Let me see.  It was Thursday.  It was Thursday

5  afternoon sometime that he got home, probably around, I'm

6  going to say around the 3:00 hour in there; 3:00, 3:30.

7  Q.    From the middle of the day on Wednesday until

8  Mr. Barnett returned, did you have occasion to talk to

9  anybody connected to law enforcement?

10 A.    Yeah.

11 Q.    So Wednesday, Thursday.  Go right ahead.

12 A.    Yeah.  Well, Wednesday night before he returned when

13 everything kind of was blowing -- because it blew up so

14 quickly, we talked to a Mr. Holloway that's the Benton

15 County Sheriff.

16 Q.    What did Mr. Holloway say to you and what did you say

17 to him?

18 A.    Well, we were -- we were talking, I believe it was on

19 Ashlee's phone, like speakerphone.  He just said to be sure

20 to have Richard call him the minute that he got into town,

21 that he landed, and they would arrange a meeting, you know,

22 to see each other.

23 Q.    Okay.  When, if ever, did you pass that Holloway

24 conversation along to Richard?

25 A.    I think when he returned.  The minute he returned and

1  showed up.

2  Q.    Yes.

3  A.    Ashlee, me and Ashlee, you know, we met him.  And he

4  said -- we said, you've got to call Sheriff Holloway right

5  away.  Ashlee had the number and everything still on her

6  phone.  He took her phone and called him immediately when

7  we said.

8  Q.    Okay.  And did you hear Mr. Barnett's part of the

9  conversation, or did you hear both parts of the

10  conversation?

11  A.    I think I just heard Mr. Barnett's.  They -- he talked

12  about coming in right away.  And Mr. Holloway said, well,

13  let's just make an appointment for 10:00 in the morning for

14  you to come in, turn yourself in.  And so we made that

15  arrangement.  We went straight home, stayed straight home,

16  and stayed in the house until it was time for us to go the

17  next morning.

18  Q.    Okay.  And what happened the following morning?

19  A.    The following morning, we just kind of got up.  You

20  know, he got showered and ready to go and we headed that

21  way.

22  Q.    He went to the --

23  A.    I'm sorry.  We went to the sheriff's department and he

24  went in and talked to -- they took him in, of course, and I

25  sat out in the lobby.  They took him in.  They had two FBI

1  agents that wanted to speak with him.  So he went in and

2  spoke with them.  They come out at one point.  Well, a

3  sheriff come out at one point and asked me to come in for a

4  minute.  I went in and the FBI agents just talked to me

5  briefly about what was going to happen, that they were

6  going to transport him to Washington County.  They wanted

7  to talk about all the stuff that was already popping up on

8  the internet, all the harassment and threats and our

9  address being everywhere.  They were concerned for our

10 safety.  So they thought maybe it would be a good idea to

11 just find a safer -- a safe place to stay that wasn't in

12 our actual home.

13 Q.  So in other words, FBI agents emit some concern --

14 A.   Uh-huh.

15 Q.  -- about the harassment you had been enduring and

16 suggested --

17 A.   Yes.

18 Q.  -- you might want to leave the house?

19 A.   Yes.

20 Q.  At that time, this is a conversation happening at the

21 sheriff's office?

22 A.   Yeah.  Yeah.

23 Q.  Did they tell you before you left the sheriff's office

24 that they wanted to come by, the FBI wanted to come by and

25 search your house?

1  A.    Yes.   The agent, Jonathan, said that he -- and he took

2  my phone number and gave me his -- that they were going to

3  issue a -- I don't know if he told me then or if he called

4  me right afterwards and said they were going to issue a

5  search warrant and he would be calling me and letting me

6  know what that process was when they got the warrant.

7  Q.    And did they -- did there come a point in time where

8  some FBI agents came by on Friday?

9  A.    Yeah.   Yeah, they called -- he called me later in the

10 evening.   They all came up to the house and had a search

11 warrant and searched the house.

12 Q.    And they searched the house, isn't that right?

13 A.    Yes, uh-huh.

14 Q.    In fact, didn't you tell me that it was only two

15 agents at the sheriff's office, but it was a lot of agents

16 that came to your house on Friday?

17 A.    Yes.   Yes.   It was overwhelming actually, yes.

18 Q.    All right.   Now, at any point, did you speak to the

19 FBI agents?   Did you give an interview?

20 A.    Yeah.   The one agent, Reed, sat in my car with me

21 during the whole search, you know.   He stayed out in the

22 car with me while they searched the house.   And then at one

23 time, the other agent, Kim Allen, got in the car and talked

24 to me also about the harassment and the threats that were

25 going on.

1  Q.   All right.  And did you feel free at that time to

2  answer them or not answer them as you saw fit?

3  A.   Yeah.  It was kind of a casual conversation.  I didn't

4  really feel like -- I didn't really feel like I was being

5  totally questioned or anything.  And I -- I didn't have

6  anything not to answer about, you know.  I didn't have

7  anything to keep.

8  Q.   In fact, they asked you about your cell phone, didn't

9  they?

10 A.   Yeah.  Yeah, they did.

11 Q.   And you gave them your cell phone, isn't that right?

12 A.   Yeah.  They said that it was on the warrant and I was

13 like, oh.  And they said, we don't want to -- we know that

14 that's your only, like that's the only cell phone I have.

15 I don't have a home phone.  And they said, can we look at

16 your phone?  Can we look at your text thread between you

17 and Richard?  And I said yes.  And at that point, we went

18 into the house.  I pulled up my phone and showed them the

19 text thread.  I think they took it.  I don't know if they

20 took pictures or copied it or what they did, but I think

21 they got some, you know, off the phone.

22 Q.   And was there a second visit from the FBI?

23 A.   Yes.  Yes, there was a second visit.

24 Q.   When was that?

25 A.   Let me try to think about what day that was.  Tuesday.

1  Was it Tuesday evening, I believe.

2  Q.   That would be this week.  That would be this week?

3  A.   Yes.  Yes.  Of this week, yes.

4  Q.   All right.  And what happened?  Did they come back

5  with another warrant?

6  A.   They came back with another warrant, yes.

7  Q.   What did they do?

8  A.   They -- they were looking for some things that they

9  said they had seen in some of the photographs they had

10 taken, some packaging and some walkie talkies.

11 Q.   They conducted a search?

12 A.   Yes.

13 Q.   Did they give you an inventory?

14 A.   Yes.  It had the packaging from the stun gun thing,

15 the walkie talkies.  And they found some kind of decal on

16 his -- I don't know what that was.  And I'm not exactly --

17 some other piece of paper thing that they took.  I don't

18 know what it was, so --

19 Q.   Okay.  And at any point did the defendant, did Richard

20 Barnett give you instructions as to what to say to the FBI

21 and to the sheriff's office?

22 A.   No, not at all.  And the second -- the second search,

23 he had no idea that it was even happening, I don't think.

24 I didn't until they showed up, you know, until they called

25 and said they were going to be there in 10 minutes.

1  Q.   Well, why do you think that Richard Barnett knew about

2  the first search?

3  A.   Oh, because I think that they called me while he was

4  in the car taking him to Washington County, so I think he

5  knew that we had it.  And I -- that we were going to have

6  one.

7  Q.   This was a telephone conversation?

8  A.   Uh-huh.  Yes.

9  Q.   Nobody handed you a piece of paper or anything?

10 A.   No.

11 Q.   Okay.

12          MR. SIANO:  No further questions.

13          THE COURT:  Ms. Harris?

14          MS. HARRIS:  Yes, Your Honor.  Thank you.

15                  CROSS EXAMINATION

16 BY MS. HARRIS:

17 Q.   Good afternoon, Ms. Newburn.  My name is Kim Harris,

18 and I'm an attorney for the United States and I have a few

19 follow-up questions for you this afternoon.

20 A.   Okay.

21 Q.   Is it my understanding, then, that you learned that

22 the defendant was traveling to D.C. the weekend before he

23 left, is that correct?

24 A.   Yes.

25 Q.   Were you aware that he had purchased the stun gun and

1  the walkie talkies and mace prior to leaving?

2  A.    Yes.

3  Q.    And when did you learn of that?

4  A.    I think it was probably either -- I think maybe it was

5  Sunday before he left.  Saturday or Sunday, uh-huh.

6  Q.    Did you know why he bought those items for his trip?

7  A.    I think it was because I was worried for his safety.

8  I was -- I knew that he obviously wasn't going to take a

9  gun, you know.  That would -- and I was worried that in a

10  crowd like that, that there would be -- that there would be

11  violence.  I was afraid that he would get hurt.

12  Q.    So you asked him to buy the stun gun, then?

13  A.    I didn't ask him to buy anything, no.

14  Q.    You realize he had it on his person when he was in the

15  Capitol building?

16  A.    Well, I actually didn't realize it until the FBI

17  agents came in and told me that on the second search, that

18  it was -- it was in -- they saw it in -- it's been seen on

19  his belt loop in the pictures.  And I had not even paid

20  attention to that, so --

21  Q.    Was it your understanding that he was only going to

22  attend President Trump's speech?

23  A.    I actually did not know what all was going to take

24  place.  I did not -- I mean, I knew that Trump would have a

25  speech.  That was all I really knew that he was going to do

1  is the speech, you know.

2  Q.   Well, why would you be worried about his safety if he

3  was just going --

4         MR. SIANO:   I can't hear the question.

5         THE WITNESS:   You're cutting out.

6         THE COURT:   Hold on just a moment.   Ms. Harris,

7  you're cutting out just a little bit.

8         MS. HARRIS:   I'll try again, Your Honor.   Our

9  connection is showing that it's fine on our end.   Am I

10 still cutting out?

11        THE COURT:   That's better.

12        THE WITNESS:   It's better.

13        THE COURT:   You can ask the question again.

14 Q.   (by Ms. Harris)   Ms. Newburn, why would you have been

15 concerned for his safety if you only thought he was

16 attending a speech by the president?

17 A.   Because I know in large crowds like that, things get

18 out of hand sometimes.   And I worry about -- I mean, we

19 worry about each other.   If we head on a two-hour trip, we

20 worry about each other.

21 Q.   Did you ask him not to go?

22 A.   No, because it's something he believed in.   He

23 believes in President Trump and he's a patriot.   He

24 believes in us having a free country.

25 Q.   And so you were supportive of what he did?

1  A.    I support him.

2  Q.    Are you supportive of what he did once he unlawfully

3  entered the Capitol and then took Speaker Pelosi's

4  property?

5  A.    No.   No.

6              MR. SIANO:   Objection as to form.

7              THE COURT:   I'm sorry.   Mr. Siano, what was the

8  objection?

9              MR. SIANO:   Objection as to form.   I don't have a

10 question about entering the Capitol.   I have a question as

11 to the legal conclusion Ms. Harris posits in her question.

12             THE COURT:   Well, I'm not sure exactly what

13 you're getting at.   Ms. Harris, can you rephrase your

14 question, or if you want to just ask it again and I can

15 rule on it.

16             MS. HARRIS:   Thank you, Your Honor.

17 Q.    (by Ms. Harris)   So, Ms. Newburn, you're supportive of

18 your significant other, the defendant's conduct in

19 Washington, D.C., on January the 6th, 2021, am I correct?

20 A.    I am not supportive of him in the -- Nancy Pelosi's

21 office necessarily.   But I support -- I support him

22 supporting our country, and that's what he thought he was

23 doing.

24 Q.    By unlawfully --

25 A.    I don't support unlawfully -- I don't support anything

1   that's unlawful.

2   Q.   What do you think would have happened if you asked him

3   not to go?

4   A.   I -- I don't know.

5   Q.   Were you aware that back in July of 2020, the

6   Fayetteville Police Department responded to a rally and had

7   contact with Mr. Barnett, the defendant, and he was -- they

8   observed him to be causing a disturbance with other folks

9   at this event?  Were you aware of that?  Did he tell you

10  about that?

11  A.   No.

12  Q.   Is it normal for him to go to these events armed every

13  time?

14           MR. SIANO:  Objection as to form.

15           THE WITNESS:  I -- I don't know.  I don't know if

16  he goes armed.

17           THE COURT:  Just a moment.  Ms. Newburn, if

18  there's an objection, you need to let me rule on it, okay?

19           THE WITNESS:  Oh, I'm sorry.

20           THE COURT:  Mr. Siano --

21           MR. SIANO:  "These events," Judge.

22           THE COURT:  Mr. Siano, when you raise an

23  objection as to form, I need you to clarify for me.

24           MR. SIANO:  Yes, Your Honor.

25           THE COURT:  I don't know what part of the

1  question you are objecting to.

2          MR. SIANO:  The question is vague because it --

3  that's my objection as to form.  What is "these events?"

4  Ms. Harris identified one event in Fayetteville in July of

5  the prior year, last year, and that morphs into "these

6  events."  That's my objection.

7          THE COURT:  All right.  Ms. Harris, if you can

8  elaborate in your question to specify what types of events

9  you're referring to.

10          MS. HARRIS:  Well, I was referring to rallies.

11  That was what the question was about.  And so again, back

12  in July of 2020, I've asked this witness if she was aware

13  that Fayetteville P.D. had contact with the defendant

14  because he was causing a disturbance at an event and he was

15  armed.  And she testified she was -- she was not aware of

16  that.

17          And so then my next question I will ask this

18  witness is, in November of 2020, was she aware that

19  Fayetteville Police had contact with the defendant again at

20  a rally type event and he was armed again, this time with a

21  rifle and a pistol.

22          THE COURT:  All right.  I'll allow that question.

23  You may answer, Ms. Newburn.

24          THE WITNESS:  I don't -- I don't know anything

25  about that particular --

1  Q.   (by Ms. Harris)  Let me just make sure I understand

2  your answer.  You were not aware that back in July of 2020

3  or November of 2020, Fayetteville Police Department had

4  contact with Mr. Barnett at two different rallies or events

5  and he was armed at both?

6  A.   No, I wasn't at those rallies or events.

7  Q.   Did he tell you about it?

8  A.   Not that I recall.

9  Q.   Were you aware that he was on the news after the

10 election and he did an interview about "Stop the Steal?"

11 Were you aware of that?

12 A.   I'm trying to remember.  I think -- I do remember him

13 being on a news, on an interview.

14 Q.   And he said, "Whatever it takes, whatever it takes,"

15 with regard to overturning the election results?

16 A.   I can't recall what his -- what he said.  I can't

17 recall what he said.

18 Q.   Okay.  Am I correct that you don't recall what he

19 said --

20 A.   I can't -- you're cutting out.  You're cutting out,

21 ma,am.

22 Q.   Am I correct that you don't recall what he said and

23 you're not sure if you know about the interview I'm talking

24 about?

25 A.   I'm not sure which one you're talking about, to tell

1  you the truth.  I've seen him on an interview, but he's had

2  a couple different interviews.

3  Q.   What -- can you explain the two date of births?

4  Without testifying to what the date of birth is, but why

5  does he have two dates of births associated with him?

6  A.   I think it was -- it was just a -- like an error at

7  the DMV, and it never got corrected.

8  Q.   Do you know if he tried to correct that?

9  A.   I think he has tried to correct it.  We've talked

10  about how he's tried to correct it.  When he got his

11  license renewed the last time and when he -- they didn't

12  correct it.

13  Q.   Were you present with him?

14  A.   No, I wasn't present when he got it.

15  Q.   Do you have a firing range at your house?

16  A.   Down in the holler, we do have a firing range to

17  practice.

18  Q.   And were you present for a "Save the Children" rally

19  on your property?

20  A.   Yes, I was.

21  Q.   So what all went on at the "Save the Children" rally?

22  A.   It was a photo shoot for -- to obviously earn money

23  for this cause.  That was about it.  We took photo shoots

24  with his old trucks.  We did take photo shoots with guns.

25  Q.   They were his guns, right?

1  A.   They weren't all his guns, no.  They were guns from --

2  other people brought guns also.

3  Q.   Do you know approximately how many firearms

4  Mr. Barnett owns?

5  A.   I don't.  I don't know how many he owns.  I don't -- I

6  have one little gun he gave me for like if I needed

7  protection in the home.  And my daughter has one just like

8  it.  And I know he has a Ruger that he carries.  And I know

9  of maybe a couple of other guns, but I don't know the

10 number of guns that he has because I don't know really

11 anything about guns.

12 Q.   Would you say he has small guns and also really large

13 guns?

14 A.   Well, yeah, there's small ones and then there's larger

15 ones.

16 Q.   Do you know what a silencer is?

17 A.   Yeah.  I don't think we have a silencer.

18 Q.   You specifically mention just the one firearm to the

19 U.S. Probation Office pretrial services officer.  You

20 mentioned the Ruger.  But are you testifying then that your

21 husband owns multiple other firearms?

22 A.   He does have other firearms.  I don't know what they

23 are, what kind they are.  I don't know how many he owns.

24 Q.   Do you know why you just mentioned -- I guess you

25 singled out the Ruger, and then said you don't know how --

1  A.   Because I knew that he had the Ruger and I knew that

2  we had our two, me and my daughter had the two .380s

3  because I knew specifically that we had those two.

4  Q.   Where are those guns typically kept?  On your property

5  at your house?

6  A.   Yeah, we have them at our house.  We don't have them

7  at our house now.

8  Q.   When did you move them?

9  A.   They were moved when all of this started.  And I just

10  kept my little handgun and my daughter kept hers because of

11  the threats and the harassment we've had.  We kept those

12  with us.  After talking to the probation officer yesterday

13  when she said that all guns would have to be removed if he

14  came home, that that was -- I've had them taken out also.

15  I don't --

16  Q.   Why were the defendant's guns removed before he went

17  to see Mr. Holloway, or the police?

18  A.   They weren't.  They weren't moved before then, and I

19  removed them because I wasn't in my house.  I had to leave

20  my house because of the threats.  And I didn't want -- I

21  didn't want people breaking into my house and using our

22  guns against us.  I didn't -- I just -- I had Mark take

23  them.

24  Q.   Mark Hesse?

25  A.   Mark Hesse has them.

1   Q.   Okay.  Let me just -- there's something I'm not

2   understanding.  Can you help me understand why Mr. Barnett

3   told the FBI he removed everything from his house before he

4   came in to see them?

5   A.   Okay.  Well, he might have done it before.

6            THE COURT:  Ms. Newburn?

7            THE WITNESS:  Yes.

8            THE COURT:  You're interrupting Ms. Harris when

9   she's asking a question.  Let her complete her question so

10  that you all aren't speaking over each other, okay?

11           THE WITNESS:  Okay.  I'm sorry.

12           THE COURT:  That's okay.  Ms. Harris, if you will

13  restate your question, and I want to make sure you've

14  completed your question.

15           MS. HARRIS:  Thank you, Your Honor.

16  Q.   (by Ms. Harris)  Ms. Newburn, help me understand then

17  why Mr. Barnett told the FBI on Friday -- that would have

18  been a week ago today -- that he had cleaned his house out

19  and they wouldn't find anything.  And he also said he had

20  removed his firearms.

21  A.   I know that we had the firearms removed.  That's all I

22  know.  I don't know why he said that.

23  Q.   So now either he's lying or you're not --

24  A.   No, I'm not lying.  The firearms were removed because

25  he was leaving the house.  And I didn't want them in the

1  house.  I did not want -- I mean, we were already getting

2  threats.  I knew I was going to have to go stay someplace

3  else.

4  Q.   Okay.  Let's back up.  We can maybe work through this.

5  A.   Okay.

6  Q.   You testified that Mr. Barnett got home around 3:00 or

7  3:30 on Thursday, okay.  And I'm talking about the Thursday

8  after everything happened in Washington on Wednesday,

9  correct?

10  A.   Yes.

11  Q.   And it's fine if maybe it was 3:15 or 4:00, but

12  approximately sometime in the afternoon, he got home?

13  A.   Yes.

14  Q.   Could you tell the Court what happened when he got

15  home?  What did you all do?

16  A.   Immediately when he got home, we weren't actually at

17  our house.  We were at a safe house because we were scared.

18  As soon as he came to the safe house, our daughter and me

19  told him, you need to call Sheriff Holloway.  We had spoken

20  to him the night before and he wanted Richard to call him

21  immediately.  My daughter gave him her phone.  She had the

22  phone number and the information.  He called Sheriff

23  Holloway.  Sheriff Holloway had given a time at

24  10:00 Friday morning to come into the Benton County

25  Sheriff's Office and turn himself in.  He said that there

1  would be two FBI agents.

2  Q.   Did you spend the night at your house?

3  A.   Yes, we did go home and spend our night -- the night

4  at our house that night.

5  Q.   Who came over that night?

6  A.   I think maybe Mark did.  I know another young friend

7  of Richard's did, Derek.  He just came over to visit for a

8  little bit.  And then that -- that was pretty much it.  We

9  just kind of spent the night together as a family.

10  Q.   What property did Mr. Barnett give Mark or Derek that

11  night?

12  A.   Excuse me?  He didn't give Derek anything.

13  Q.   Would he give --

14        THE COURT:  Ms. Harris, you're going out a little

15  bit.  If you can repeat your question.

16  Q.   (by Ms. Harris)  What property did Mr. Barnett give

17  Mark Hesse that night?

18  A.   I'm trying to remember back.  It's been a really bad

19  week.  I don't know what was given, to tell you the truth.

20  I can't -- I don't know what was given.

21  Q.   Where were you when they were exchanging property?

22  A.   I was here at the home, but I don't even know if I was

23  in the room with them.  I mean --

24  Q.   Where is Mr. Barnett's phone?

25  A.   I don't -- I have no idea where his phone is.

1   Q.   Is it possible that Mark Hesse has it?

2   A.   I don't know.

3   Q.   Do you not think it's weird that your significant

4   other of 20 years, you don't know where his phone is?

5   A.   I don't know where it is.

6   Q.   Did he tell you who he gave it to?

7   A.   No.

8   Q.   Where is the stun gun?

9   A.   I have -- I don't know.

10  Q.   You don't think that's a little weird that you don't

11  know where that is?  Have you seen it since he got back?

12  A.   I have not seen it since he's got back.  I have not

13  seen the stun gun.  I don't -- I do not know where it is.

14  Q.   Have you seen Mr. Barnett's phone since he's gotten

15  back?

16  A.   No.

17  Q.   You sure about that?

18  A.   Yes.

19  Q.   So what do you think he gave Mark Hesse?

20  A.   I believe Mark Hesse just has our guns that we had in

21  our house.  That's all I know that he has.

22  Q.   And so Mark Hesse, he went down there with Mr. Barnett

23  to D.C., correct?

24  A.   He didn't go with.  Him and his nephew drove a

25  separate vehicle and left after Richard did.  They did not

1  go at the same time.

2  Q.   But they met up (inaudible), correct?

3  A.   Yes.

4  Q.   I want to talk to you a little bit now about the

5  interview, and we've kind of talked about it a little bit

6  before.  But you were there on Friday, a week ago, when

7  Mr. Barnett went to the sheriff's office, right?

8  A.   Yes.  Yes.

9  Q.   At one point during the interview, like you said, they

10  called you out from the hallway and you went inside?

11  A.   Yes.

12  Q.   Were you aware that that interview was audio and video

13  recorded?

14  A.   I don't -- I don't know if it was.

15  Q.   Okay.  Well, I'm telling you it was.

16  A.   It was?  Okay.

17  Q.   Keep that in mind as we go through these questions.

18  It was audio and video recorded.

19  A.   Okay.

20  Q.   Do you recall when you were going to show Special

21  Agent Willett the threats that you had received on your

22  phone?  Do you remember that?

23  A.   I don't -- I don't -- I don't recall.  I mean --

24  Q.   Wasn't the purpose of why you went into the interview

25  in the first place to show them the threats on your phone?

1  A.   Well, to tell them about it and I tried to look on

2  mine.  A lot of the threats were on like Facebook and

3  social media, and I don't have Facebook or social media.  I

4  never have.

5  Q.   Okay.  Do you recall during the time when you came

6  into the interview room and you were going to show those

7  agents what was on your phone that Mr. Barnett stopped you

8  and said, no, he would be the one to show those agents what

9  was on your phone.  Do you remember that?

10  A.   No.

11  Q.   You don't remember that?

12  A.   I -- if it happened, it just happened.  If he asked to

13  show -- I don't -- I'm sorry.

14  Q.   And so do you remember your husband actually wanting

15  to take your phone from you and go through it?

16  A.   Well, if he wanted to, then he could have.  I probably

17  gave it to him to do that.  I don't hide anything on my

18  phone.

19  Q.   You didn't think that was weird that he wouldn't just

20  let you show the agents yourself on your phone?

21  A.   No.

22  Q.   Okay.  Do you recall how he interrupted you several

23  times while you were trying to tell about different events

24  that had gone on and he interrupted you and said, "Let me

25  tell the story."  Do you recall that?

1  A.   He could have.  He -- he could have done that.

2  Q.   Is that normal for him?

3  A.   Yeah.  I mean, yeah, sometimes he will be like, well,

4  let me say it, or let me tell or whatever.

5  Q.   He interrupts you?

6  A.   Yeah, sometimes he interrupts me.

7  Q.   Sometimes he controls the situation, the situations

8  that you're in, is that correct?

9  A.   No, I wouldn't say that.  If I have something to say

10  or if I want, then I'll stand up for myself.

11  Q.   But just not that day?

12  A.   No.  I didn't think -- it wasn't something that was

13  that important for me to show.  He could show.

14  Q.   You're being interviewed in an interview with the FBI,

15  right?  And it's threats about, life threats to your family

16  and your family's life on your phone; not Mr. Barnett's?

17  A.   Uh-huh.  Well, I think he was probably just upset

18  about it all.

19  Q.   Upset about what he had done?

20  A.   The threats that other people were sending our way.

21  Q.   Oh.  And so then you've said that sometimes he

22  interrupts you and that's not uncommon in your relationship

23  if I understand you right?

24  A.   I have interrupted him also.

25  Q.   Do you do what he says?

1  A.    Like in what context?

2  Q.    It appears like during that whole interaction, he

3  ordered you around and that you really had no voice of your

4  own during that conversation with the FBI?

5  A.    No, I have a voice.

6  Q.    Do you think if you would have asked him not to go to

7  D.C., that he would have listened to you?

8  A.    He may have, but I knew he wanted to go so I wasn't

9  going to ask him not to go.

10  Q.    Do you really think you have the ability to report to

11  this Court if he violates any condition if the Court were

12  to release him?

13  A.    Yes.  Yes, because this has been horrible for me so

14  I'm not about to not -- I want him home and I'm not about

15  to -- I will report.  I will do whatever I have to do for

16  him to be home and for it to be legal and right.

17  Q.    What happens the next time when he says, "No, Tammy,

18  let me tell it?"

19  A.    I'll say, "No, Richard, I can tell it."

20  Q.    Okay.  So it's your testimony then that you don't know

21  where his cell phone is and you haven't seen it since he

22  got back.  And do you know why?

23  A.    I don't know -- I don't know why.

24  Q.    You think it's because it has evidence of the crime on

25  it?  Why else would someone hide their phone and get rid of

1   it?

2   A.   What crime?

3        MR. SIANO:   Objection, Your Honor.   Argumentive.

4   There's no jury here.   She says she doesn't know.   She

5   answered that question half a dozen times.   I object.

6   Argumentive.

7        THE COURT:   All right.   Ms. Harris, if you can

8   rephrase it in a way that does not appear to be

9   argumentive.

10       MS. HARRIS:   I apologize for my zealous advocacy,

11  Your Honor, this afternoon.   Just my point was, can she

12  think of a reason why Mr. Barnett would just all of a

13  sudden not have his phone.

14       THE WITNESS:   I can't think of a reason.

15  Q.   (by Ms. Harris)  Were you aware that he had turned his

16  location services off on his cell phone as he drove back

17  from Washington, D.C.?

18  A.   No.

19  Q.   When did you learn that he had done that?

20  A.   Just now.

21  Q.   Were you aware that he had covered his face as he

22  drove home from Washington, D.C.?

23  A.   I've been covering my face all week also because I

24  don't want pictures of it.   I wasn't -- I wasn't aware.   I

25  didn't have -- I didn't have contact with him on the way

1  home.

2  Q.   I need for you to say yes or no.

3  A.   Oh.  No.

4       MS. HARRIS:  May I have just a moment to collect

5  my thoughts, Your Honor, to make sure I haven't missed

6  anything?

7       THE COURT:  Yes.

8       (pause)

9  Q.   (by Ms. Harris)  Ms. Newburn, Mr. Barnett wants to

10  make money off his recent fame, is that correct?

11  A.   No.

12  Q.   You're not aware that he wants to get a copyright on

13  his now famous slogan?

14  A.   Oh.  He -- my cousin actually started that.  He didn't

15  start that, so it wasn't his idea.  It wasn't -- he hasn't

16  -- that was my cousin's idea.

17  Q.   Is he going in on that idea now?

18  A.   What?

19  Q.   Has Mr. Barnett joined in on that and does he think

20  that's a great idea?

21  A.   I don't know.

22  Q.   Do you know whether or not Mr. Barnett recorded the

23  events that happened in Washington on his cell phone?

24  A.   There's a video on my cell phone of him going into the

25  building, of what happened and how he was pushed into the

1  building.

2  Q.    How did you get that?

3  A.    He sent it to me.

4  Q.    From what device?

5  A.    I guess it would have been his phone.

6  Q.    And when did he send that to you?

7  A.    He sent that to me right after it all happened.

8  Q.    Would that be on January the 6th, January --

9  A.    The day that it all happened, just --

10  Q.    Is it still on your phone?

11  A.    Yes.  I've showed it to the FBI agents.

12  Q.    Are there any other videos that Mr. Barnett sent you

13  on your phone?

14  A.    Yes.  He sent me a video of -- there was a small

15  child, a toddler that was kind of playing in the grass.

16  And Richard sent me a video of that because the little boy

17  was interacting with Richard somewhat.

18  Q.    Did you see any of the events on his phone?

19  A.    No.

20  Q.    Did he tell you he had other videos on his phone?

21  A.    Those are the only two videos I'm aware of, the ones

22  that he sent to my phone before he ever got home.  I never

23  saw his phone to see any videos on it.

24  Q.    Does the defendant, Mr. Barnett, leave his house armed

25  regularly?

1  A.    Yes, he wears his gun.  It's his Second Amendment
2  right.
3  Q.    That's not my question.  Like the pistol or the rifle,
4  or both?
5  A.    The pistol.
6  Q.    Who hid his clothing that he was wearing at the
7  Capitol?  The jacket, who hid that?
8  A.    Hid it?  The FBI agents have it.
9  Q.    Right.  But it was recovered from under a dog crate in
10  the back of a vehicle.
11  A.    It was in the -- it was in my trunk.  I did not know
12  that he -- that it was on the search warrant.  And when
13  they asked about it, I said, it's in my trunk.
14  Q.    So then did you put it in your trunk under the dog
15  crate?
16  A.    I put it in my trunk when I was packing my things.  I
17  had my dog crate.  I had my suitcase.  And I had grabbed
18  his flannel jacket that he had.
19  Q.    It is one of his favorite pieces of clothing, is that
20  correct?
21  A.    It is one of his favorite pieces of clothing.  I gave
22  it to him for Christmas last year.
23  Q.    Was it under your dog crate in the back of your truck,
24  or back of your vehicle?
25  A.    It was in my trunk and it was in -- I don't know if it

1  was under the dog crate, above the -- it was just, I had

2  been putting everything in my trunk because we were going

3  to have to leave the house for several days because of the

4  threats.  We wanted to leave the house.  I took the crate

5  and put it in the trunk at the same time because I have a

6  German Shepard puppy.  I have to take the crate with me

7  when I go.

8  Q.   But the dog wouldn't have traveled in the trunk in the

9  crate?

10  A.   No.  But when I got to the house I was staying at, I

11  put him in the crate to sleep, to spend the night.

12  Q.   Did you have any other items of Mr. Barnett's clothing

13  in the back of your trunk?

14  A.   I think his hat was back there, his cap that he had

15  on.

16  Q.   The same cap he wore in Washington?

17  A.   Uh-huh.  Uh-huh.

18  Q.   Why just those two items?

19  A.   Because, I don't know.  I had them -- hello?

20  Q.   Yes, ma'am.

21  A.   Are you still there?

22  Q.   Yes, Ms. Newburn.

23  A.   Okay.  All right.  The picture changed to a different

24  person.  I -- I think I just gathered them up when I was

25  gathering everything up.  I think he actually handed them

1  to me at one point.  And I might have tossed them in the

2  back seat of my car because he wasn't going to wear them

3  into the -- he was all -- he showered and changed into

4  fresh clothes.  And I think that -- yeah.

5  Q.  Okay.  So it's okay to admit they were in your trunk.

6  A.  They were in my trunk.  I admitted that.  I mean, they

7  asked me about his clothing.  I said, I washed his jeans

8  and his T-shirt and all that.  I said, but his jacket and

9  hat are in the back of my car, in the trunk of my car.  And

10  I was sitting in the car at the time.

11          MS. HARRIS:  I'll pass the witness, Your Honor.

12          THE COURT:  Mr. Siano, any other questions for

13  Ms. Newburn?

14          MR. SIANO:  No redirect, Your Honor.

15          THE COURT:  All right.  I have a few questions

16  for you, Ms. Newburn.

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Are there any firearms in your home

19  at this time?

20          THE WITNESS:  No.  I've had them removed.

21          THE COURT:  All right.  What did you do with your

22  firearm?

23          THE WITNESS:  I gave it to Mark Hesse.

24          THE COURT:  And what about your daughter's

25  firearm?

1            THE WITNESS:  The same, Mark Hesse.

2            THE COURT:  Okay.  Are there any other types of

3  dangerous weapons or devices in your home?

4            THE WITNESS:  No, ma'am.

5            THE COURT:  Any large knives, hunting knives,

6  (inaudible), anything like that?

7            THE WITNESS:  No.  Just my kitchen knives, but no

8  hunting or any other kind of knife.

9            THE COURT:  And where was it that your husband

10  normally stored his guns at your home?

11            THE WITNESS:  Some were in our bedroom.  Some

12  were -- I'm trying to think, ma,am.  Some were in the -- we

13  didn't have a gun safe.  Some were in the bedroom.  Some

14  were in the back den room.

15            THE COURT:  And all of those have been removed,

16  correct?

17            THE WITNESS:  Yes.  Yes, ma'am.

18            THE COURT:  Okay.  And if I were to release your

19  husband, if he violated any of the conditions that I put in

20  place, do you feel comfortable contacting probation and

21  reporting that violation knowing that it could result in

22  your husband being rearrested and placed back into custody?

23            THE WITNESS:  Yes.  I have to do the right thing

24  because I do have my daughter in the house.  I will do the

25  right thing.

1             THE COURT:  And are you concerned if I release

2    your husband about any threats or the safety of you and

3    your daughter at home if your husband is also there?

4             THE WITNESS:  So far, the last couple of days,

5    the threats have been nonexistent.  I do have a locked gate

6    at the end of my driveway and I do have driveway alarms set

7    up now that Mark Hesse has set up for me.  So -- and we

8    kind of have a -- like they text me before they come up the

9    driveway so I know that they are coming.  If I -- if I

10   heard the alarms go off and I didn't recognize the vehicle,

11   I would just dial 9-1-1.  So I'm not -- I am not at all

12   concerned.

13            THE COURT:  Okay.  And if I were to impose a

14   condition that your husband not have any internet access

15   and that any internet capable devices that you or your

16   daughter have or that are in the home be password

17   protected.

18            THE WITNESS:  Yes.

19            THE COURT:  Can you assure me that you would not

20   allow your husband to access those devices?

21            THE WITNESS:  Yes.

22            THE COURT:  And if I impose a condition that your

23   husband were not allowed to have contact with certain

24   individuals, with individuals that he knew were also

25   involved in the riot, is that something you can ensure me

1  that you would --

2              THE WITNESS:  Yes.

3              THE COURT:  -- see is enforced?

4              THE WITNESS:  Yes.  Yes.

5              THE COURT:  All right.  I believe that's all of

6  the Court's questions.

7              Mr. Siano, any questions as a result of the

8  Court's questions?

9              MR. SIANO:  No, Your Honor.  Thank you.

10             THE COURT:  Ms. Harris?

11             MS. HARRIS:  No, Your Honor.  No further

12 questions.

13             THE COURT:  All right.  Thank you, Ms. Newburn.

14             Mr. Siano, are you going to have any additional

15 witnesses?

16             MR. SIANO:  Only if Mr. Ballentine tells me

17 Mr. Ratledge has arrived.

18             THE COURT:  All right.  Do we know that,

19 Mr. Ballentine?

20             MR. BALLENTINE:  He was here, but he has left.

21             MR. SIANO:  No further witnesses, Your Honor.

22             THE COURT:  All right.  So nothing further other

23 than argument, is that correct, Ms. Harris?

24             MS. HARRIS:  That's correct, Your Honor.

25             THE COURT:  And Mr. Siano?

1          MR. SIANO:  That's right, Your Honor.

2          THE COURT:  All right.  Are the parties ready to

3   proceed with their closing arguments, or do you all need a

4   minute to look at your notes or collect your thoughts?

5          MS. HARRIS:  The government is ready, Your Honor.

6          MR. SIANO:  Defendant is ready.

7          THE COURT:  All right.  Go right ahead,

8   Ms. Harris.

9          MS. HARRIS:  Thank you, Your Honor.

10         The United States respectfully submits that it

11  has shown by clear and convincing evidence that no

12  condition or combination of conditions will reasonably

13  assure the defendant's appearance as required and the

14  safety of any other person and the community.  The factors

15  the Court must consider pursuant to Title 18 United States

16  Code 3142(g) as applied to the defendant's case weigh more

17  favorably for his detention.

18         I want to start this afternoon by talking about

19  the nature and circumstances of the offenses at issue,

20  Judge.  And as the Court is aware, there's three charges on

21  the criminal complaint.  Knowingly entering or remaining in

22  any restricted building or grounds without authority while

23  carrying a dangerous weapon.  Violent entry or disorderly

24  conduct on Capitol grounds.  Theft of public money,

25  property or records.

1         On January the 6th, 2021, a Joint Session of the
2   United States Congress convened in Washington, D.C., on our
3   Nation's Capitol in order to certify the vote count of the
4   Electoral College of the 2020 presidential election.  The
5   United States Capitol building, as Your Honor is aware, is
6   a symbol of democracy and freedom, not only in the United
7   States, but across the world.  And on that particular day,
8   the function being performed by this country's elected
9   lawmakers is one of the most important functions undertaken
10  by our government leaders.  United States Senators, members
11  of the House of Representatives and the country's Vice
12  President, Mike Pence, were all inside the building doing
13  the work of the American people, the work that they were
14  elected to do, when this defendant and like-minded
15  individuals broke in, breached, unlawfully entered and
16  remained in this building.  And this defendant did so all
17  armed, while he was armed with a dangerous weapon.
18        He traveled throughout the building where he
19  accessed highly restricted areas, including Speaker
20  Pelosi's office, where he then proceeded to prop his feet
21  up on the desk, take property, and mock her office,
22  essentially, make a mockery of her and her office appearing
23  in all of the photographs that are before this Court in
24  evidence to very much enjoy this moment of fame.
25        Then, after finally exiting the building, the

1  defendant, still reveling in his moment of notoriety, got

2  on a bullhorn and bragged to the mob, the crowd, about what

3  he had done.  And he tried to stir the pot even more, stir

4  up the situation even more by chanting, "Our House, Our

5  House."

6            Eventually, though, he did decide to go back to

7  his truck and head back to the Western District of

8  Arkansas.  However, he was sure to turn off his location

9  services on his phone, pay in only cash, and cover his face

10 where he then hurried home to set about removing any

11 damning items of evidentiary value, including his phone,

12 and then arranging to turn himself in to law enforcement.

13 Make no mistake, by then he knew law enforcement was coming

14 for him.

15           Amongst this backdrop, and as a result of what

16 happened at our Nation's Capitol on January the 6th, 2021,

17 we now know there are five dead people, two of which are

18 police officers, and there are over 50 injured.  And now

19 there are thousands of National Guard troops guarding and

20 protecting our Capitol.  These are the circumstances of

21 this offense.

22           And it's also important, Your Honor, when you

23 look at the nature and circumstances of this offense to

24 also consider the level of planning on the part of the

25 defendant.  This goes back to his interview from November

1  of 2020 at "Stop the Steal," another rally in Northwest

2  Arkansas when he made it clear then, quote, "I ain't going

3  down easy.  Whatever it takes.  Whatever it takes."  He was

4  really clear about that.  And that was with regard to

5  whatever it takes to overturn what he perceived to be a

6  stolen election.

7          And then the Court can consider that just shy of

8  a week, four or five days prior to his departure for D.C.,

9  the defendant went to Bass Pro Shop where he purchased

10  walkie talkies, mace, and the dangerous weapon that he is

11  seen carrying on his person while he is in the Capitol

12  building on January 6th, '21, 2021.  And, again, after the

13  incident paying in cash, covering his face, turning off his

14  location services and removing items from his home, all

15  before turning himself in.

16          What's interesting too, Your Honor, is that in

17  his statement to investigators, he shows up to turn himself

18  in with a wallet full of cash, but no phone.  And made it

19  clear that he's a smart man, you won't find anything at my

20  house if you decide to show up with a search warrant.  He

21  talked about moving guns.  No phone.  No phone, no stun

22  gun, just some packaging.  No firearms.  He moved it all.

23  He initially told the investigators that he went alone, all

24  by himself.  I guess maybe that's nuanced.  Sometime later

25  in the interview, he then says, well, I might have known

1   some, but he never told him their names.  And now we know,

2   while it's true he might have been alone in his truck,

3   that's not the truth.  He was out there in Washington,

4   D.C., with his buddies, Mark Hesse and Mr. Lockhart.

5           And we also know that the defendant loves

6   excitement and that by his own statements, that's what got

7   him in trouble.  When the Court must look at the weight of

8   the evidence, it couldn't be more clear the weight of the

9   evidence is strong and weighs in favor of detention.  It's

10  incredibly strong.  There's video evidence.  There's

11  surveillance evidence.  There's numerous photos.  There's

12  receipts, a confession.  Obstructive behavior that is

13  corroborative of his consciousness of guilt.

14          The history and characteristics of the defendant,

15  and a lot of what the Court can look at under nature and

16  circumstances can also be looked at by the Court under this

17  section too, his history and characteristics.  It's just

18  not credible that he has two dates of birth and that he's

19  tried to fix it at the DMV, but they won't do it.  I think

20  I feel comfortable saying that you take your records up to

21  the DMV and they change it, because it's important.  It's a

22  government database, the DMV, the driver's license.  That's

23  critical.  That has to be accurate.  Either he didn't try,

24  or he only went once, it's a little bit unclear.  But

25  that's just not a credible, reasonable explanation.

1    We also know that back in July of 2020,

2  Fayetteville P.D. gets called out and they respond.  They

3  make contact with Mr. Barnett, the defendant, and what is

4  he doing?  He's causing a disturbance at a rally while he's

5  armed.  September 2020, Fayetteville Police Department,

6  they again have to respond to a call.  They make contact

7  with the defendant.  This time he's got his rifle and a gun

8  on his hip at another rally.  The Court can also consider

9  the "Save the Children" rally photo where he's pictured

10  with young minors.  One young female is in possession of a

11  very large firearm.  And the defendant is possessing what

12  appears to be a silencer.

13    The Court can consider how he loves excitement

14  and that's what got him in trouble.  And the Court can

15  consider how this defendant treated the United States

16  Capitol on January 6th, 2021, how he treated Speaker

17  Pelosi's office and his conduct afterwards; bragging,

18  proud, enjoying his moment in the spotlight.

19    The Court can consider also the conduct of him in

20  the interview and how he treated Tammy Newburn.  He

21  interrupted her, wouldn't let her show her phone, and he

22  wanted to control exactly what those agents saw.  And, Your

23  Honor, as far as history and characteristics of the

24  defendant, what do the defendant's actions in this case

25  tell this Court about his respect for the law and

1    deterrence?  Breaching a highly restricted area while armed

2    with a dangerous weapon in the company of an angry mob and

3    then bragging about it on a bullhorn later, what does that

4    say about respect for the law?  If the defendant will

5    travel across the country and engage in this level of

6    criminal behavior because he believes that he is right, and

7    it is the Electoral College that is wrong, what would deter

8    him?

9          With regard to the nature and seriousness of the

10   danger posed to any person or the community that would be

11   posed by this defendant's release, I would like to make a

12   record on that as well.  As Your Honor is aware, there has

13   been a bounty put out on this defendant, and he sits in

14   protective custody at the jail.  The U.S. Marshals Service

15   have put him in protective custody.  There have been

16   threats to his family that began pretty much right after he

17   committed these criminal acts in Washington, D.C.  And even

18   today, we now know that the Postal Inspector is

19   investigating mail, hate mail, coming to this defendant's

20   address in Gravette.

21         We also know there are community concerns.  Local

22   community members are concerned about what it will do in

23   their communities should this defendant be released today.

24   And Inauguration Day is right around the corner, and there

25   are a lot of concerns about the safety of the community in

1   general on those days.  And then you take that with the

2   situation the Court has with all of the other threats, all

3   centered around this defendant and his family.

4          Lastly, I would like to address the defendant's

5   exhibits.  And, Your Honor, every case that is in that

6   packet of documents occurred at the U.S. Capitol on

7   January 6th, 2021, and it has its own set of unique facts,

8   every single case.  Each defendant who comes before a Court

9   on federal charges arising out of his or her criminal

10  conduct that day does so based on their own particular

11  actions and brings to the Court nature and circumstances,

12  history and characteristics unique to them.  And release of

13  each defendant poses a different risk in each case, as Your

14  Honor is aware.  And while it is interesting and

15  informative to look at those records, it's also noteworthy

16  that there is not a single person charged with carrying a

17  dangerous weapon in that packet.  They are all misdemeanors

18  except for one felony theft, and that felony is based on --

19  it's a felony because of the value of the property stolen

20  from the Capitol police.

21         The review of these other criminal complaints is

22  not a factor contemplated in Title 18 United States Code

23  3142 that this Court should consider as this Court is

24  tasked with determining whether detention or release is

25  appropriate for this defendant who is before Your Honor

1  this afternoon.  The defense witnesses, while I know they
2  are all well-intentioned individuals, most of them do not
3  know Mr. Barnett very well.  Some haven't seen him in a
4  while, haven't talked to him in a while, don't even know
5  his phone number.  Certainly, Ashlee Newburn loves him.
6  Certainly, Tammy Newburn loves him.  And they want to see
7  good things happen to him.  Sadly, it is the government's
8  position that Ms. Newburn is not an acceptable third-party
9  custodian.  And that is based on what we now know what
10 happened after he got back from Washington, and how the
11 defendant can manipulate her.  The government has concerns
12 that she would not be able to report any violations to the
13 Court and that she just wouldn't do it.
14         And it is for all these reasons, Your Honor, that
15 the government respectfully requests that Mr. Barnett
16 remain detained pending any further proceedings in this
17 matter.
18         THE COURT:  Thank you, Ms. Harris.
19         All right.  Mr. Siano?
20         MR. SIANO:  Thank you, Your Honor.
21         Your Honor, I'd like to start from the premise
22 that the Bail Reform Statute, when it was initially passed
23 and as it continues to (inaudible), that the Court should
24 seek to try the least onerous set of conditions by which
25 the defendant can be released subject to the conditions in

1  the statute.

2          Now, Mr. Barnett returned home, was told by law

3  enforcement that they wanted to see him on an appointment

4  that was made by his wife, and he kept that appointment on

5  a Friday and voluntarily surrendered.  He did that.  It's

6  an important point because it bears directly on whether or

7  not he's a risk of flight.  All of these colorful

8  presentations and spins on his trip back also say he never

9  took the opportunity to absent himself.  He didn't deflect

10  his return home.  After he came home on Thursday, he didn't

11  go someplace else.  He went down to the sheriff's office

12  and surrendered himself.

13          I tried to present witnesses to this Court, Your

14  Honor, that demonstrate that the individual defendant is

15  fit to be bailed by this Court, to accept the challenge and

16  burden that a release order with conditions would present.

17  I know for a fact pretrial services questioned my client.

18  He answered those questions for about an hour and a half.

19  I know they questioned Ms. Newburn.  And my client stated

20  he's willing to comply with the conditions that were

21  brought up in the interview.  And I will tell you -- and I

22  have discussed with him at length restricted conditions.

23  And in point in fact, not basically to compliment me or my

24  client, but because I could anticipate the concerns of the

25  Court, not just as to the internet, but in other respects

1  as well, that the Court would impose restricted conditions
2  and we're prepared to meet those.

3       The people I have brought here know Mr. Barnett
4  in his ordinary, everyday life.  That's what Your Honor
5  needs to evaluate.  I'm not going to respond to the
6  overstated hyperbole that the Assistant United States
7  Attorney presented.  I'm certainly not going to try the
8  politics of the election, the politics of the
9  demonstrations afterward, even though defense lawyers in my
10 position might be sorely tested to say to the Court that
11 nobody who stepped to the lectern that day, who got on the
12 podium and provoked this event, has been called before the
13 bar of justice to answer for their comment.

14       My client understands the charges against him.
15 These prosecutors told me on Monday morning in the first
16 conversation when my client was charged with three
17 misdemeanors that there was no way they would grant
18 anything other than detention.  Now, I presented five
19 exhibits.  And in those exhibits, I present the charges,
20 which are the same statutes against my client.  The facts
21 are all different.  Every defendants' facts are individual.
22 I presented the arrest warrant.  I presented how the Court
23 treated those defendants.  I went further.  I actually
24 asked the prosecutors to identify for me other cases in
25 which Magistrate Judges or District Court Judges have

1  confronted these charges and had granted bail on whatever

2  conditions.  They told me I was not entitled to have that

3  information.  That's why Your Honor only has five.  But

4  those five are submitted to Your Honor for a more important

5  reason, and that is, I tried to do my homework about the

6  Western District of Arkansas.  And make no mistake about

7  it, the Court was very generous to enter my admission pro

8  hac vice.  And while I have tried one case in the Eastern

9  District of Arkansas, it was a long time ago and I'm not

10 familiar with the normal caseload and flow of cases before

11 Your Honor.  And respectfully, I observed that a case of

12 the type that Mr. Barnett has is not run-of-the-mill,

13 ordinary, recurring sort of a case.  But not saying it's

14 more important or it's less important.  But I tried to give

15 the Court a window on what other judicial officers are

16 doing in similar circumstances.  And that's why I presented

17 those to Your Honor.  No two cases are alike.

18          Mr. Barnett has a clean and safe home.  He has a

19 stable home life.  He answers calls for need and people in

20 need in his community.  He's needed by his family, both

21 Ms. Newburn and Ms. Halpin.  I think it's just

22 absolutely -- I'm not going to use the word -- it's

23 absolutely inappropriate to suggest that the fact that

24 unknown persons are doing unknown things which lead the

25 Court to issue a threat assessment to my client and to his

1   wife form a basis for denying bail.  That leads to the

2   question of, who is doing it and why are they doing it?

3   And that's not the issue.

4           The issue here is, can my client be responsible

5   for his compliance with the Court's order.  And the fact

6   that what I will describe as "crackpots and kooks" are

7   using the internet and the U.S. mail to vent their opinions

8   about Mr. Barnett is not an element in Your Honor's

9   consideration.

10           I would ask the Court to look beyond the

11   notoriety and the publicity of this case.  They are serious

12   charges.  The government's proof, the government is

13   euphoric over the fact that they can identify that my

14   client was in the Capitol.  There's no proof laid out here

15   by witnesses other than one FBI agent.  And the fact that

16   he was in the Capitol is not the only element of the

17   charges brought against him, and those charges will be

18   answered at trial.  It's very facile for Ms. Harris to

19   assume my client's guilt beyond a reasonable doubt because

20   they have him in the building.  But there's no evidence as

21   to knowledge, intent, mens rea, permission, lack of

22   permission.  I'm not trying the Capitol police.  I'm not

23   trying who did what, where.  The video Your Honor has

24   indicates that my client was there for a very finite period

25   and left after his interaction with the Capitol police

1  officer.  I offer that not to say anything other than this
2  case isn't being tried here.  There's no argument with
3  regard to these exhibits.  And as far as the fact that --
4  I'm going to put this as broadly as I can -- the fact that
5  my client is outspoken and is a, at base, very, very
6  enthusiastic supporter of Donald J. Trump and is a great
7  believer in the Second Amendment is not the basis for any
8  charge in this case.
9           As far as these two birth dates go, he explained
10  this to pretrial services.  They don't have a criminal
11  record in either birth date.  They have his fingerprints.
12  And as far as I know for the last 47 years, regardless of
13  what name or birth date you use, if you run fingerprints
14  through every law enforcement index, you come out at the
15  other side.  He told pretrial services what happened with
16  his birth date, and I'm not going to try the Department of
17  Motor Vehicles.  That's like me saying to you that in New
18  York State, a trip into the Department of Motor Vehicles is
19  a trip into hell administratively.  That's not what he's
20  charged with.  He's not charged for -- I like Special Agent
21  Willett's phrase -- for whatever "ruckus" took place at any
22  one of these rallies.  He wasn't charged with any offense.
23  He wasn't accused of any offense.  He wasn't identified as
24  a suspect in any of these offenses.  And I suspect to you
25  that there's no weight associated with that.

1           I think Your Honor can shape a release order that
2    provides a sufficient array of conditions that will allow
3    my client to be released, will allow my client to
4    effectively defend himself.  And frankly -- and I say this,
5    Your Honor, not in a provocative way -- but that will allow
6    him to have Your Honor build enough of a quote, unquote,
7    "fence" around him that if he stumbles, Your Honor, it will
8    be brought to Your Honor's attention almost immediately.
9           And I'm particularly offended by the notion that
10   they would attack Ms. Newburn as a third-party supervisor.
11   Now, that term is new to me.  I will admit that to the
12   Court.  I will tell you that in other courts in which I
13   practice, the Court's package up a personal recognizance
14   bond with sureties and they condition the bond on certain
15   obligations of sureties.  I was informed here through the
16   good offices of the Federal Public Defenders that there's a
17   restraint on this with regard to a third-party supervisor.
18   It has to be somebody in the home rather than a third-party
19   surety.  I can assure the Court I could present acceptable
20   sureties, numerous acceptable sureties who will come up and
21   cosign a bond and they will meet whatever obligations Your
22   Honor state.
23           But the reason Ms. Harris attacked Ms. Newburn
24   the way she did, to make her look on the one hand like an
25   abused spouse, which is an utter distortion, or to be

1  submissive to her husband, which is also untrue as

2  demonstrated by the testimony, is because they are trying

3  to defeat the use of Ms. Newburn as a third-party

4  supervisor.  And she said in exactly the words and with the

5  tone that an honest witness would.  She's not enthusiastic

6  about turning her domestic partner in to Your Honor, but as

7  best she could under these electronic circumstances, she

8  looked you in the eye and told you she would do it.

9        Your Honor, I believe the Court can shape a set

10 of conditions that will allow Mr. Barnett to be bailed.

11 And I submit to you that Magistrate Judges similarly

12 situated in similar cases across the country have drawn

13 that conclusion.  And if there were no other cases, the

14 government would not have turned away with the back of its

15 hand my request for the bail determinations of any other

16 defendant.  Thank you, Your Honor.

17        THE COURT:  Thank you, Mr. Siano.

18        All right.  Do I have Ms. Tammy Newburn?  I think

19 she's still participating in the hearing.  I would

20 like her -- if I can have you turn your video on,

21 Ms. Newburn, as I rule.  Can you hear me okay, Ms. Newburn?

22        MS. TAMMY NEWBURN:  Yes.

23        THE COURT:  All right.  Well, I'm hearing an

24 echo.  Okay.  I think it's gone away.

25        The parties gave very good, thorough closing

1  arguments.  I've carefully considered both arguments and

2  all the evidence presented today.  As has been referenced,

3  the Court must look at the applicable statute to determine

4  whether there's any condition or combination of conditions

5  that will reasonably assure the appearance of Mr. Barnett

6  for all court appearances and the safety of any other

7  person and the community.

8          The government has to prove by clear and

9  convincing evidence that there are no conditions that can

10  assure the Court of the safety of other people in the

11  community and by a preponderance of the evidence that there

12  is a risk of nonappearance.  In making this determination,

13  the Court must look at many factors as again has been

14  referenced.

15          First, looking at the nature and circumstances of

16  the offense, Mr. Barnett is charged with very serious

17  offenses, the most serious offense being entering Capitol

18  grounds while carrying a stun gun.  That offense carries up

19  to 10 years' imprisonment.  The other two offenses that he

20  is charged with -- violent entry and disorderly conduct on

21  Capitol grounds -- that carries up to six months'

22  imprisonment.  And theft of public property, that carries

23  up to one-year imprisonment.  So Mr. Barnett is looking at

24  a possible maximum sentence on all three counts of 11 and a

25  half years imprisonment.  So it's certainly a serious

1  offense.

2         Looking at the circumstances of the offense, it
3  certainly turned into a very volatile situation on Capitol
4  grounds that wasn't just created by Mr. Barnett, but many,
5  many other individuals in sort of a mob mentality.
6  However, Mr. Barnett, it appears, was prepared for that
7  type of situation and obtained pepper spray and a stun gun
8  and walkie talkies.  The circumstances got so out of hand
9  that the Senators did have to take cover.  The Vice
10 President had to be evacuated.  And ultimately, five people
11 were killed in the riot at the Capitol, including two
12 officers, and many others were hurt.  So certainly the
13 nature of the circumstances of the offense are very
14 serious.

15        Looking at the weight of the evidence against
16 Mr. Barnett, it is very strong.  There are photos and
17 videos of Mr. Barnett inside Nancy Pelosi's office.  He
18 admitted that he was in her office.  He had the letter that
19 was taken from her office and turned that over to the FBI.
20 He left a note that he was there for Nancy Pelosi.  And
21 then he bragged about it on a bullhorn in a video after he
22 left the Capitol.  So the weight of the evidence is against
23 the defendant.

24        Looking next at the factors that the Court
25 characterizes as the history and characteristics of the

1    defendant, we heard several witnesses say they were

2    surprised by this conduct by Mr. Barnett, that it's not his

3    nature.  I will note he does not have anything more than

4    very minor criminal history.  He appears to be a

5    law-abiding citizen for the most part, although there have

6    been instances that do cause the Court concerns with him

7    being armed at rallies.  However, he has strong family

8    ties, strong community ties.  He has been employed, has

9    financial resources.  He appears to be a family man.  So

10   his history and character in large part weigh in his favor.

11           What I am concerned about, first of all, the fact

12   that Mr. Barnett allegedly turned off his location services

13   when returning to Arkansas and used only cash.  It's not a

14   strong leap to infer from that that he didn't want to be

15   located by law enforcement.  However, when he did return to

16   Arkansas, he turned himself in to law enforcement.  On the

17   other side of that, there are concerns that his phone

18   cannot be located.  A phone doesn't just disappear.  The

19   stun gun cannot be located.  He told law enforcement that

20   they weren't going to find anything.  So there was some

21   effort, it appears, on his part to remove anything from the

22   home that he thought could incriminate him.

23           The Court is also concerned about threats that

24   have been made to Mr. Barnett including, as the government

25   mentioned, a bounty put on him.  I'm concerned that those

1  threats, they are not just a danger to Mr. Barnett, but to

2  his family as well, to neighbors as well and to the

3  community.  There have been threats even to the police

4  department, and as I understand it, even to other

5  individuals in Gravette.  So I do have concerns about the

6  safety of the community.

7         However, looking at all of these factors, what I

8  must determine is whether there is a combination of

9  conditions that I can put in place that would reasonably

10  assure the safety of the community and that Mr. Barnett is

11  not a flight risk.  And I do believe there are conditions

12  that I could put in place.  I am inclined to make these

13  conditions very, very restrictive.  And I want to explain

14  the reason I feel that's necessary is to ensure

15  Mr. Barnett's safety, his family's safety, and the

16  community's safety.  So this isn't the usual type case

17  where I wouldn't find a need to impose such restrictive

18  conditions, but given the nature and volatility of this

19  situation and that threats have been made, I feel like I

20  need to put more restrictive conditions in place than what

21  I would normally, given the types of offenses that are

22  involved in this case.

23         Mr. Siano, I know you noted you're not real

24  familiar with third-party custodians.  That is something

25  that is important to this Court.  I prefer a third-party

1  custodian that's going to assure me, that lives with the

2  defendant and will assure me that they will report any

3  violations to me.  I prefer that over any type of secured

4  bond or money.  Somebody that's going to keep an eye on

5  them and that will report to me.

6          MR. SIANO:  Your Honor, it's nice to know that

7  Your Honor believes I'm not too old to learn something new.

8          THE COURT:  Certainly not.  But the most

9  important thing to me is knowing there's someone there, and

10  that's why I wanted Ms. Newburn, I want to make sure she is

11  listening to me and hearing the conditions that I'm going

12  to impose because I'll hold her accountable as third-party

13  custodian.  She's going to be signing off on this bond, and

14  she's going to be promising the Court that if her husband

15  violates any of these conditions, that she will immediately

16  report it to his probation officer.

17          I know there are some concerns about her

18  suitability of a third-party custodian, and I do understand

19  those concerns by the government.  But I asked her

20  point-blank, will she report violations.  You have assured

21  me, Ms. Newburn, and I'm going to take your word that you

22  will report violations.  So the Court -- here is what the

23  Court would propose doing.  And I don't want to hear

24  argument again that I should not release Mr. Barnett, but

25  I'll certainly allow comments on the proposed conditions,

1  if there's an objection to the conditions or if the

2  government would ask for any additional conditions.

3      The Court will release Mr. Barnett on a $5,000

4  unsecured bond.  I don't feel it necessary to make it a

5  secured bond.  Ms. Tammy Newburn will act as his

6  third-party custodian and he will reside at their residence

7  with her.  I will advise my courtroom deputy, Ms. Guerrero,

8  I would like this bond to remain under seal because I do

9  not want their address on the bond to be a public record,

10 so let's make sure that this bond stays under seal.

11     So he'll be released to the third-party custody

12 of Ms. Newburn.  He must submit to pretrial services

13 supervision.  I intend to place Mr. Barnett on home

14 incarceration and also require that he submit to location

15 monitoring.  Now, that is a very restrictive condition.  It

16 essentially is 24-hour-a-day lockdown.  I want him locked

17 down in his home.  I don't know how much property he has,

18 but I would like him to remain in his home, in the

19 perimeters of his residence.  So it will be 24-hour-a-day

20 lockdown except for court appearances and other activities

21 that are approved in advance, Mr. Barnett, by your

22 probation officer.  You will also be placed on location

23 monitoring so that when you are out to go to a court

24 appearance or other approved outing, that you will have a

25 location monitor that will track where you are.

```
 1              Mr. Barnett, do you have a passport?

 2              MR. SIANO:  My client does, Your Honor.

 3              THE DEFENDANT:  I do, Your Honor.

 4              THE COURT:  All right.  Do you know where that

 5    is?

 6              THE DEFENDANT:  Yes, Your Honor.

 7              THE COURT:  Okay.  I would like that -- if you

 8    can advise your wife as to where it is and I would like

 9    that turned over to our probation officer immediately.

10              THE DEFENDANT:  Yes, Your Honor.

11              THE COURT:  I'm sorry.  Ms. Newburn?

12              MS. TAMMY NEWBURN:  I have it already in my purse

13    for the probation officer.

14              THE COURT:  Okay.

15              MS. TAMMY NEWBURN:  We talked yesterday.  She

16    told me.

17              THE COURT:  I would like that turned over

18    immediately to the probation officer.

19              MS. TAMMY NEWBURN:  Yes, ma'am.

20              THE COURT:  Mr. Barnett, you are not to obtain

21    another passport or any other international travel

22    document.  Your travel will be restricted to -- you're

23    going to be on home incarceration, but when necessary for

24    outings, your travel will be restricted to the Western

25    District of Arkansas, Fayetteville Division, and the
```

1  District of Columbia, again, unless you're given prior
2  approval by your probation officer.
3          This next condition is very important,
4  Mr. Barnett.  I want you to avoid all contact, directly or
5  indirectly, with any person who is or may become a witness
6  in the investigation or prosecution.  I'm also going to put
7  in place no contact with anyone, Mr. Barnett, that you know
8  participated in the riot at the Capitol.  And after this
9  hearing, I would like to go into a separate breakout room
10  with the government, defense counsel, Ms. Reely, and my
11  courtroom deputy, and I would like the government, if they
12  have any specific individuals that they would like to
13  identify that Mr. Barnett is not to have contact with, I'll
14  let you privately identify them to the Court and I will
15  make that a condition of bond.  And, again, that document
16  will be under seal.  And I'll ask Mr. Siano as well as the
17  probation office, once we have any specific names, to
18  thoroughly go over that with Mr. Barnett.
19          Mr. Barnett, and everyone in your home, you're
20  not to possess a firearm, destructive device or any other
21  weapon.  You're not to use alcohol excessively.  You're not
22  to use or unlawfully possess any narcotic drug or other
23  controlled substance unless it is prescribed by a licensed
24  medical practitioner.  You are also not to obtain a medical
25  marijuana card and you are prohibited from the use of

1  marijuana.  If deemed warranted, you will be tested for

2  prohibited substances.

3          The location monitoring, I will require you to

4  pay for that, Mr. Barnett.  I do not believe that it's very

5  costly, but I will require you to pay for that.

6  Mr. Barnett, if you have any contact with law enforcement

7  whatsoever, that means a traffic stop on the way to court,

8  any contact with law enforcement, you are to immediately

9  report that to your probation officer.  And I'm also going

10 to put in place a condition that Mr. Barnett have no

11 internet access and that all internet capable devices in

12 the home and owned by Ms. Newburn and her daughter be

13 password protected.  And you are not allowed to permit

14 Mr. Barnett to access those devices.  I feel like that

15 condition is necessary given concerns the government has

16 regarding the upcoming inauguration and the climate that

17 exists right now regarding that.  So I will prohibit

18 Mr. Barnett from having any access to the internet.

19          And I believe, Mr. Barnett, you are to report --

20 I believe you have a court appearance in Washington, D.C.,

21 on March 1st and your attorney can give you the information

22 regarding that.

23          So those are the Court's proposed conditions.

24 Let me first ask the government, any additional conditions

25 or any thoughts on the conditions that the Court has

1  imposed?  Mr. Fowlkes or Ms. Harris?

2         MR. SIANO:  They are muted, Your Honor.

3         THE COURT:  All right.  We need to unmute both

4  Ms. Harris and Mr. Fowlkes.

5         MR. FOWLKES:  No objections to the Court's

6  conditions, Your Honor.

7         THE COURT:  All right.  And, again, Mr. Fowlkes

8  and Ms. Harris, I will meet in a separate breakout room

9  with you all immediately following this hearing to find out

10  if there are any specific individuals you want to prohibit

11  contact with.

12         All right.  Mr. Siano, any objection to the

13  Court's proposed conditions?

14         MR. SIANO:  No objection, Your Honor.

15         THE COURT:  All right.  Those will be the

16  conditions imposed then.

17         Mr. Barnett, I want to advise you that you have

18  every incentive to comply with these conditions.  First of

19  all, let me ask you, do you understand all of these

20  conditions?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  And do you have any concern about

23  your ability to comply with these conditions?

24         THE DEFENDANT:  No, Your Honor.  You will have no

25  problems.

1          THE COURT:  Ms. Newburn, do you understand all of

2   these conditions?

3          MS. TAMMY NEWBURN:  Yes, ma'am.

4          THE COURT:  And, again, can you assure the Court

5   that if these conditions are not complied with, you will

6   immediately report any violation?

7          MS. TAMMY NEWBURN:  Yes, I will.

8          THE COURT:  Mr. Barnett, if you do not comply

9   with any of these conditions, that will be brought to my

10  attention.  I would likely issue a warrant for your arrest

11  and I would likely revoke your bond at that point.  So you

12  have every incentive to comply with these conditions.

13         I also want to advise you that a failure to

14  comply with these conditions could result in more severe

15  punishment on the charges you're now facing if you're

16  convicted on those charges and could even result in new

17  charges being brought against you.  Do you understand that?

18         THE DEFENDANT:  I do understand, Your Honor.

19         THE COURT:  All right.  It will take -- I'm going

20  to meet in a private -- adjourn this hearing and meet in a

21  private breakout room with the government and defense

22  counsel and Ms. Reely.  It will take a few minutes to have

23  that conversation and to have the bond forms prepared.  It

24  is 5:25.  I am not sure that we can process Mr. Barnett's

25  release this evening.  We do have to obtain a GPS monitor.

1   There's a lot that has to be put in place.  So I would

2   propose if we can have until tomorrow morning to get

3   every -- to get the bond forms prepared, to notify the

4   jail, to get the GPS device ready and set up at

5   Mr. Barnett's home.  Is that agreeable with you, Mr. Siano?

6           MR. SIANO:  Judge, I'd suggest that no earlier

7   than noon.  The Court and its personnel, clerks and

8   otherwise, have been extraordinarily courteous to us and I

9   think we and my client would be happy to show reciprocal

10  courtesy.  Noon at the earliest, Judge, as long as it's

11  tomorrow and we're not spilling into Monday, which is what

12  worries me, which worries me tremendously.

13          THE COURT:  Yes.  I will ask, then, that we'll

14  try to shoot for around noon tomorrow to secure his

15  release.

16          All right.  Before we go into a private breakout

17  room, before I adjourn this hearing and go into a private

18  breakout room, is there anything else we need to put on the

19  record from the government?

20          MS. HARRIS:  Yes, Your Honor.  The government

21  would respectfully request for a three-day stay of the

22  release order as our colleagues in D.C. are appealing Your

23  Honor's decision to the Chief Judge in D.C.

24          THE COURT:  All right.  That's something I want

25  to look at.  I'd like to look at the statute.  So I will --

1  we're not set to release Mr. Barnett until noon tomorrow,

2  so I want some time to look at the statute and I will be in

3  contact with you all this evening and let you know whether

4  I'll grant that stay or not.

5          MS. HARRIS:  Thank you, Your Honor.  That's all

6  that we have.

7          THE COURT:  All right.

8          MR. SIANO:  Ms. Guerrero, may I ask, I don't know

9  who the court reporter is, but I want to put on the record

10  we'd like a transcript.  If the government is getting a

11  transcript, we'd like a copy too.  And I see Ms. Guerrero

12  nodding.  Whatever needs to be done.  We managed to

13  navigate my pro hac vice fee without too much delay, so I'm

14  sure I can do whatever it is to advance the transcript

15  costs associated with my side of this, but I will ask for a

16  transcript.  Thank you.

17          THE COURT:  All right.  I believe you can contact

18  Ms. Guerrero and make arrangements to obtain a transcript.

19          MR. SIANO:  Thank you, Judge.

20          THE COURT:  All right.  Mr. Siano, is there

21  anything else we need to put on the record?

22          MR. SIANO:  No, Your Honor.

23          THE COURT:  All right.  The Court, then, is going

24  to adjourn this hearing.

25          Mr. Ballentine, would it be easier to put -- I

1  need myself, Mr. Siano, Mr. Fowlkes, Ms. Harris,

2  Ms. Guerrero and Ms. Reely in a separate breakout room.

3  Would it be easier to just adjourn the hearing and set up a

4  new call?  Or how --

5            MR. BALLENTINE:  No, you can go in a room.

6  That's no problem.

7            THE COURT:  You can put us into a breakout room?

8            MR. BALLENTINE:  Yeah, no problem.

9            THE COURT:  All right.  Okay, then.  This hearing

10 will be adjourned and I will meet privately then with

11 Mr. Siano, Ms. Harris, Mr. Fowlkes, Ms. Reely and

12 Ms. Guerrero.  Thank you all.

13           MR. FOWLKES:  Thank you, Your Honor.

14           MR. SIANO:  Thank you, Judge.

15           MS. HARRIS:  Thank you.

16           (proceedings concluded)

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E

2

3          I, Paula K. Barden, CCR, RPR, RMR, Federal

4    Official Court Reporter, in and for the United States

5    District Court for the Western District of Arkansas, do

6    hereby certify that pursuant to Section 753, Title 28,

7    United States Code, that the foregoing is a true and

8    correct transcript of the proceedings, transcribed from

9    electronic media, held in the above-entitled matter and

10   that the transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United

12   States.

13          Dated this 18th day of January 2021.

14

15

16

17   _____
     PAULA K. BARDEN, CCR, RPR, RMR #700
18   Federal Official Court Reporter
     Western District of Arkansas
19

20

21

22

23

24

25

# EXHIBIT F

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| Richard Barnett aka "Bigo" | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant*

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     *Richard Barnett aka "Bigo"*                                                              ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment     ☐ Superseding Indictment     ☐ Information     ☐ Superseding Information     ☑ Complaint
☐ Probation Violation Petition     ☐ Supervised Release Violation Petition     ☐ Violation Notice     ☐ Order of the Court

This offense is briefly described as follows:

18 U.S.C. 1752(a)- Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority

40 U.S.C. 5104(e)(2)- Violent Entry and Disorderly Conduct on Capitol Grounds

18 U.S.C. 641- Theft of Public Money, Property, or Records

| | |
|---|---|
| | G. Michael Harvey |
| | 2021.01.07 19:49:39 -05'00' |
| Date:   01/07/2021 | *Issuing officer's signature* |
| | |
| City and state:   Washington, DC | G. MICHAEL HARVEY, U.S. Magistrate Judge |
| | *Printed name and title* |

| Return | | |
|---|---|---|
| This warrant was received on *(date)* 1/7/2021 , and the person was arrested on *(date)* 01/08/2021 | | |
| at *(city and state)* Bentonville, Arkansas . | | |
| | | |
| Date:   01/11/2021 | *Jonathan Willett* | |
| | *Arresting officer's signature* | |
| | Jonathan Willett / Special Agent / FBI | |
| | *Printed name and title* | |

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION
5:21MJ-5001-001
FILED ON JANUARY 8, 2021

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Richard Barnett aka "Bigo" | ) |
| ████████████ | ) |
| | ) |
| _Defendant(s)_ | ) |

Case: 1:21-mj-00013
Assigned to: Judge Harvey, G. Michael
Assign Date: 1/7/2021
Description: COMPLAINT W/ARREST WARRANT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _January 6, 2021_ in the county of _____ in the _____ District of _Columbia_, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1752 (a) | Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority |
| 40 U.S.C. 5104(e)(2) | Violent Entry and Disorderly Conduct on Capitol Grounds |
| 18 U.S.C. 641 | Theft of Public Money, Property, or Records |

This criminal complaint is based on these facts:

See attached statement of facts.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

James Soltes, U.S. Capitol Police
_Printed name and title_

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone (specify reliable electronic means).

Date: _1/7/2021_

G. Michael Harvey
2021.01.07 19:48:32 -05'00'
_Judge's signature_

City and state:   Washington, D.C.

Magistrate Judge G. Michael Harvey
_Printed name and title_

Case 1:21-mj-00013
Assigned to: Judge Harvey, G. Michael
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)
Assign Date: 1/7/2021
Description: COMPLAINT W/ARREST WARRANT

# STATEMENT OF FACTS

On January 6, 2021, your affiant, Special Agent James Soltes of the Capitol Police Department, was on duty and performing my official duties as an Officer in the United States Capitol Police. Specifically, I was detailed and deployed in the surrounding area of the United States Capitol building to provide protective functions for members of Congress and their staff. As a Special Agent in the United States Capitol Police, I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. Specifically, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Vice President Mike Pence was present and presiding in the Senate chamber.

With the joint session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades surround the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. At such time, the joint session was still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, at approximately 2:15 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows. Shortly thereafter, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until approximately 8:00 p.m.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

In the course of my duties, I learned that an individual entered the restricted office area of the Speaker of the House of Representatives Nancy Pelosi and took photographs with his feet propped up on furniture. Those photos were circulated on numerous news media platforms which identified the individual as RICHARD BARNETT of Gravette, Arkansas. Capitol Police searched law enforcement databases including Department of Motor Vehicle records and obtained a photograph and biographical information for BARNETT. These records confirmed that the individual in the news photographs did in fact appear to be RICHARD BARNETT of Gravette, Arkansas DOB 07/12/1960.

The photos circulated by news media depict BARNETT in and around U.S. Capitol property. One photo shows BARNETT seated inside of Nancy Pelosi's office with his feet propped on a desk with an America flag lying on an adjacent credenza. BARNETT is wearing a hat, plaid jacket, blue jeans, and brown boots in the photo. Another photo depicts BARNETT seated holding

an envelope in his left hand addressed to The Honorable Billy Long 2453 Rayburn House Office Building Washington, D.C. 20515 and a digital signature of Nancy Pelosi. In another photo, an individual whose face is blocked by a flag but appears to be BARNETT based on his clothing is seated at a different desk with his feet propped holding an American flag and a cell phone. Another unidentified individual in a brown jacket is sitting next to him on a couch.

Video surveillance from a camera positioned outside of the Speaker's main office door captures individuals entering and exiting the office. At approximately 2:30 p.m., several unidentified individuals appear to try the door to the office however the door is locked. At approximately 2:33 p.m. an unidentified individual pushes in the door to the office. At 2:50 p.m. BARNETT is captured on surveillance video carrying an American flag and a cellular phone while entering the doors which lead to the Speaker's conference room adjoining the main office space. As he is entering it, he is following behind the unidentified individual in the brown jacket. At 2:56 p.m. BARNETT is captured leaving the main office doors of the Speaker's office space with only a phone in his hand.

On the same date, BARNETT spoke to media outlets in a video recording. In the recording, BARNETT is wearing the same hat and plaid jacket as worn inside of the Speaker's office except that BARNETT appears to have removed his shirt. BARNETT is asked by a person off camera how BARNETT obtained an envelope he is holding, which was addressed to The Honorable Billy Long 2453 Rayburn House Office Building Washington, D.C. 20515 with a return address of Office of the Speaker U.S. House of Representatives Washington, D.C. 20515 and a digital signature of Nancy Pelosi. BARNETT states "I did not steal it. I bled on it because they were macing me and I couldn't fucking see so I figured I am in her office. I got blood on her office. I put a quarter on her desk even though she ain't fucking worth it. And I left her a note on her desk that says "Nancy, Bigo was here, you Bitch."

In another photograph which appears to be taken outside on Capitol grounds, BARNETT is depicted holding the envelope he purported to have taken from Speaker Pelosi's office. Based on the writing on the envelope, the envelope appears to be the same envelope BARNETT was photographed holding inside of the office building.

Based on the foregoing, your affiant submits that there is probable cause to believe that BARNETT violated 18 U.S.C. § 1752(a), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; or (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. For purposes of Section 1752 of Title 18, a restricted building includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your affiant also submits that there is probable cause to believe that BARNETT violated 40 U.S.C. §5104(e)(2)(C), (D), and (G), which makes it a crime to willfully and knowingly (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of – (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or (ii) the Library of Congress; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Ground or in any of the Capitol Buildings with the intent to

impede, disrupt or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; or (G) parade, demonstrate, or picket in any of the Capitol Buildings.

Furthermore, your affiant submits, there is probable cause to believe that BARNETT also violated 18 U.S.C. § 641, which makes it a crime to steal or purloin…, a thing of value of the United States or of any department or agency thereof or any property made…for the United States or any department or agency thereof . . ." For purposes of this section, the word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.


_____
SPECIAL AGENT JAMES SOLTES
CAPITOL POLICE DEPARTMENT


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 7th day of January 2021.

G. Michael Harvey
2021.01.07 19:49:19
-05'00'
_____
G.  MICHAEL HARVEY
U.S. MAGISTRATE JUDGE

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Columbia

WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION
5:21MJ-5001-001
FILED ON JANUARY 12, 2021

United States of America

v.

Richard Barnett aka "Bigo"

_____

*Defendant(s)*

)
)
)
)
)
)
)

Case: 1:21-mj-00013
Assigned to: Judge Harvey, G. Michael
Assign Date: 1/12/2021
Description: COMPLAINT W/ARREST WARRANT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 6, 2021 _____ in the county of _____ in the

_____ District of _____ Columbia _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1752 (a)(1)&(2);(b)(1)(A) | Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority While Carrying a Dangerous Weapon |
| 40 U.S.C. 5104(e)(2)(C)(D) & (G) | Violent Entry and Disorderly Conduct on Capitol Grounds |
| 18 U.S.C. 641 | Theft of Public Money, Property, or Records |

This criminal complaint is based on these facts:

See attached statement of facts.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

James Soltes, US Capitol Police
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone (specify reliable electronic means).

Date: _____ 01/12/2020 _____

City and state: _____ Washington, DC _____

G. Michael Harvey
2021.01.12 11:55:30
-05'00'
*Judge's signature*

Magistrate Judge G. Michael Harvey
*Printed name and title*

USA v. Richard Barnett Exhibits  EXH0256

USA v. Harvey, Jr. Michael
USA v. Richard Barnett Case No. 2:1-cr-0038 (CRC)
Assign Date: 1/12/2021
Description: COMPLAINT W/ARREST WARRANT

## STATEMENT OF FACTS

On January 6, 2021, your affiant, Special Agent James Soltes of Capitol Police Department was on duty and performing my official duties as an Officer of the United States Capitol Police. Specifically, I am assigned to the Criminal Investigations Section tasked with investigating criminal activity in and around the Capitol grounds. As a Special Agent of the Capitol Police Department I am authorized by law or by a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

In the course of my duties, I learned that an individual entered the restricted office area of the Speaker of the House of Representatives Nancy Pelosi and took photographs with his feet propped up on furniture. Those photos were circulated on numerous news media platforms which identified the individual as RICHARD BARNETT of Gravette, Arkansas. Capitol Police searched law enforcement databases including Department of Motor Vehicle records and obtained a

photograph and biographical information for BARNETT. These records confirmed that the individual in the news photographs did in fact appear to be RICHARD BARNETT of Gravette, Arkansas DOB 07/12/1960.

The photos circulated by news media depict BARNETT in and around U.S. Capitol property. One photo shows BARNETT seated inside of Nancy Pelosi's office with his feet propped on a desk with an America flag lying on an adjacent credenza. BARNETT is wearing a hat, plaid jacket, blue jeans, and brown boots in the photo. Another photo depicts BARNETT seated holding an envelope in his left hand addressed to The Honorable Billy Long 2453 Rayburn House Office Building Washington, D.C. 20515 and a digital signature of Nancy Pelosi. In another photo, an individual whose face is blocked by a flag but appears to be BARNETT based on his clothing is seated at a different desk with his feet propped holding an American flag and a cell phone. Another unidentified individual in a brown jacket is sitting next to him on a couch.







Video surveillance from a camera positioned outside of the Speaker's main office door captures individuals entering and exiting the office. At approximately 2:30 p.m., several

unidentified individuals appear to try the door to the office however the door is locked. At approximately 2:33 p.m. an unidentified individual pushes in the door to the office. At 2:50 p.m. BARNETT is captured on surveillance video carrying an American flag and a cellular phone while entering the doors which lead to the Speaker's conference room adjoining the main office space. As he is entering it, he is following behind the unidentified individual in the brown jacket. At 2:56 p.m. BARNETT is captured leaving the main office doors of the Speaker's office space with only a phone in his hand.

On the same date, BARNETT spoke to media outlets in a video recording. In the recording, BARNETT is wearing the same hat and plaid jacket as worn inside of the Speaker's office except that BARNETT appears to have removed his shirt. BARNETT is asked by a person off camera how BARNETT obtained an envelope he is holding, which was addressed to The Honorable Billy Long 2453 Rayburn House Office Building Washington, D.C. 20515 with a return address of Office of the Speaker U.S. House of Representatives Washington, D.C. 20515 and a digital signature of Nancy Pelosi. BARNETT states "I did not steal it. I bled on it because they were macing me and I couldn't fucking see so I figured I am in her office. I got blood on her office. I put a quarter on her desk even though she ain't fucking worth it. And I left her a note on her desk that says "Nancy, Bigo was here, you Bitch."

In another photograph which appears to be taken outside on Capitol grounds, BARNETT is depicted holding the envelope he purported to have taken from Speaker Pelosi's office. Based on the writing on the envelope, the envelope appears to be the same envelope BARNETT was photographed holding inside of the office building.



On January 8, 2021, BARNETT waived his Miranda rights and participated in a custodial interview with law enforcement. During the interview, Barnett admitted driving from Arkansas to Washington D.C. to participate in the "Stop the Steal" Rally. During the course of the protests, BARNETT stated he was pushed inside of the Capitol by a large crowd. BARNETT returned the

above pictured envelope to law enforcement during the interview. Law enforcement had previously learned from Speaker Pelosi's staff that the envelope was empty at the time it was taken from Speaker Pelosi's office.

On January 11, 2021, your affiant learned that law enforcement received a tip that in one or more of the photographs of BARNETT seated in Speaker Pelosi's office BARNETT was carrying a stun gun. Your affiant reviewed the photographs again and determined the tip to be accurate. As seen in the zoomed in box in the photograph below, the ZAP brand is clearly visible on the stun gun tucked into BARNETT's pants. Based on the brand on the weapon, and its appearance, the weapon appeared to be a ZAP Hike N Strike 950,000 Volt Stun Gun Walking Stick.



On January 11, 2021, your affiant also learned that law enforcement conducted a search on January 8, 2021, at the residence of BARNETT located on Mount Olive Road, Gravette, Arkansas pursuant to a search warrant issued by Chief U.S. Magistrate Judge Erin L. Wiedemann in the Western District of Arkansas. During the execution of that warrant, law enforcement observed the empty packaging for a ZAP Hike n' Strike Hiking Staff High Voltage Stun Device inside the home. This packaging is shown in the below photograph.



Based on the foregoing, your affiant submits that there is probable cause to believe that BARNETT violated 18 U.S.C. § 1752(a), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; or (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. Your affiant further submits that there is probable cause to believe that BARNETT violated 18 U.S.C. § 1752(b)(1)(A) which makes a violation of 18 U.S.C. § 1752(a) a crime punishable by up to 10 years imprisonment where the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm. For purposes of Section 1752 of Title 18, a restricted building includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

Your affiant also submits that there is probable cause to believe that BARNETT violated 40 U.S.C. §5104(e)(2)(C), (D), and (G), which makes it a crime to willfully and knowingly (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of – (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or (ii) the Library of Congress; (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Ground or in any of the Capitol Buildings with the intent to impede, disrupt or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a

committee of Congress or either House of Congress; or (G) parade, demonstrate, or picket in any of the Capitol Buildings.

Furthermore, your affiant submits, there is probable cause to believe that BARNETT also violated 18 U.S.C. § 641, which makes it a crime to steal or purloin…, a thing of value of the United States or of any department or agency thereof or any property made…for the United States or any department or agency thereof . . ." For purposes of this section, the word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

SPECIAL AGENT JAMES SOLTES
CAPITOL POLICE DEPARTMENT

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 12th day of January 2021.

G. Michael Harvey
2021.01.12 11:55:50
-05'00'

G. MICHAEL HARVEY
U.S. MAGISTRATE JUDGE

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
<u>FAYETTEVILLE</u> DIVISION

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**V.**                          **CASE NO.** 5:21MJ5001-001

RICHARD BARNETT                                               **DEFENDANT**

## WAIVER OF PERSONAL APPEARANCE

    I understand I have the absolute right to appear in person before the Court. After consulting with counsel, however, I choose to waive my right to appear in person for hearings before a Magistrate Judge, including my initial appearance and/or arraignment and detention hearing, and I opt instead to appear via video conference.

Date: _____

_____
Defendant's Signature - Richard Barnett

_____
Signature of Defendant's Attorney

Anthony Siano
_____
Printed Name of Defendant's Attorney

## RENUNCIA A COMPARECER EN PERSONA

    Entiendo que tengo el derecho absoluto de presentarme en persona ante el tribunal. Sin embargo, despues de consultarlo con mi abogado he decidido renunciar a mi derecho de presentarme en persona a mis audiencias ante el Magistrado. Incluyendo mi comparecencia inicial y/o la comparecencia de presentacion de acusaciones, al igual que la audiencia de fianza. En lugar de ello he optado por presentarme por video conferencia.

Fecha: _____

_____
Firma del Acusado

_____
Firma del abogado defensor

_____
Nombra del abrogado defensor

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

## MINUTES

| | |
|---|---|
| USA | JUDGE: Erin L. Wiedemann, U. S. Magistrate Judge |
| PLAINTIFF | |
| ATTY: Clay Fowlkes | REPORTER: Roxana Guerrero, ECRO |
| Kim Harris | CLERK: Roxana Guerrero |
| Richard Barnett | CASE NO. 5:21-MJ-05001-001 |
| DEFENDANT | |
| ATTY: Anthony J Siano | DATE: January 15, 2021 |

ACTION: Detention Hearing

| TIME | MINUTES |
|---|---|
| 12:52 pm | CONVENE-Room 210 |
| | Court sets out purpose of hearing |
| | Government invokes the rule |
| | Government exhibits 1-12 -admitted |
| | Defense exhibits A,B,C,D and E -admitted |
| 2:13 pm | Testimony on behalf of Government begins |
| | Witness identified and sworn |
| | G1.) FBI SA Jonathan Willett |
| | Testimony on behalf of Government continues |
| | Government rests |
| | Testimony on behalf of Defense begins |
| | D1.) Jeff House |
| | Witness identified and sworn |
| | D2.) Jaklyn Chalk |
| | Witness identified and sworn |
| | D3.) Joseph Martinez |
| | Witness identified and sworn |
| | D4.) Marie Halpin |
| | Witness identified and sworn |
| | D5.) Ashlee Newburn |
| | Jack Schisler, FPD appointed |
| | Witness identified and sworn |
| | D6.) Earl Scroggin |

TIME                                        MINUTES

| Time | Minutes |
|---|---|
| 3:30 pm | Recess |
| 3:42 pm | Reconvene |
|  | Testimony on behalf of Defense continues |
|  | Witness identified and sworn |
|  | D.7) Tammy Newburn |
|  | Jack Schisler, FPD appointed |
|  | Defense rests |
|  | Closing arguments by the Government |
|  | Address by Court: details factors weighed in decision |
|  | Court reviews conditions of release |
|  | Defendant to be released on $5,000 unsecured bond subject to the conditions set forth in the Order of Conditions |
| 5:28 pm | ADJOURN |

AO 432
(Rev. 2/84)

**Administrative Office of the United States Courts**

# WITNESS AND EXHIBIT RECORD

| DATE 1/15/2021 | CASE NUMBER 5:21-MJ-05001-001 | OPERATOR Roxana Guerrero | | PAGE NUMBER 1 | |
|---|---|---|---|---|---|

| NAME OF WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | PRESIDING OFFICIAL |
|---|---|---|---|---|---|
| G1.SA Jonathan Willett | X | X | X | | X |
| D1.Jeff Houpe | X | X | | | |
| D2.Jaklyn Chalk | X | X | | | |
| D3.Joseph Martinez | X | X | | | |
| D4. Marie Halpin | X | X | | | |
| D5. Ashlee Newburn | X | X | X | | X |
| D6. Earl Scroggin | X | X | | | |
| D7. Tammy Newburn | X | X | | | X |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| EXHIBIT NUMBER | DESCRIPTION | ID | ADMITTED IN EVIDENCE |
|---|---|---|---|
| Gov. Exhibit 1 | Surveillance Video | X | X |
| Gov. Exhibit 2 | Surveillance Video | X | X |
| Gov. Exhibit 3 | Photo of Barnett (feet on desk) | X | X |
| Gov. Exhibit 4 | Photo of Barnett (holding letter) | X | X |
| Gov. Exhibit 5 | Photo of Barnett (standing with stun gun visible) | X | X |
| Gov. Exhibit 6 | YouTube Video of Barnett | X | X |
| Gov. Exhibit 7 | Photo of stun gun box | X | X |
| Gov. Exhibit 8 | Receipt from Bass Pro | X | X |
| Gov. Exhibit 9 | Video from Bass Pro | X | X |
| Gov. Exhibit 10 | Photo of letter | X | X |

AO 432
(Rev. 2/84)

**Administrative Office of the United States Courts**

# WITNESS AND EXHIBIT RECORD

| DATE 1/15/2021 | CASE NUMBER 5:21-MJ-05001-001 | OPERATOR Roxana Guerrero | | | PAGE NUMBER 1 | |
|---|---|---|---|---|---|---|
| NAME OF WITNESS | | DIRECT | CROSS | REDIRECT | RECROSS | PRESIDING OFFICIAL |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| EXHIBIT NUMBER | DESCRIPTION | ID | ADMITTED IN EVIDENCE |
|---|---|---|---|
| Gov. Exhibit 11 | Photo of Barnett with silencer | X | X |
| Gov. Exhibit 12 | News interview with Barnett (November 2020) | X | X |
| Def. Exhibit A-E | Documents relating to cases to other  Defendants arrested | X | X |
| | in relation to the protests | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

        v.              CASE NO. 5:21-MJ-5001

RICHARD BARNETT                                             DEFENDANT

O R D E R

At the conclusion of the detention hearing on this date, the Court determined that the Defendant should be released on bond. The Government moved for a three-day stay of the release order to allow it file an appeal under 18 U.S.C. § 3145(a). The motion is DENIED, as the Court believes that the very restrictive conditions of release imposed, including home incarceration and location monitoring, will ensure that the Defendant will not pose a flight risk or danger pending any appeal, and that the Defendant can easily be taken back into custody should the release order be overturned.

IT IS SO ORDERED this 15th day of January, 2021.

s/ Erin L. Wiedemann
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

      v.                           No.5:21MJ-5001-001

Corresponding Case No. 1:21-mj-00013
USDC District of Columbia

RICHARD BARNETT aka "BIGO"                                  DEFENDANT

## O R D E R

At the initial appearance conducted on a Complaint from the District of Columbia, the defendant waived the issues of identity and probable cause pending removal of the case to the District of Columbia. The Defendant requested a detention hearing be set in this District. Accordingly, the Defendant is considered detained and remanded to the custody of the United States Marshals Service pending outcome of the detention hearing in this District.

The Detention hearing is scheduled for Friday January 15, 2021 at 12:30 p.m. via zoom.

SO ORDERED this 12th day of January, 2021.

*/s/ Erin L. Wiedemann*

HONORABLE ERIN L. WIEDEMANN
UNITED STATES CHIEF MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

          v.          CASE NO. 5:21-MJ-5001

RICHARD BARNETT                                             DEFENDANT

### O R D E R

The District Court Clerk is directed to file the bond granted by this Court under seal.  The Defendant shall not be released on this bond, as a stay has been issued in the District of Columbia pending an appeal of the release decision.

**IT IS SO ORDERED this 16th day of January, 2021.**


*s/ Erin L. Wiedemann*

HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION
5:21MJ-5001-001
FILED ON JANUARY 19, 2021

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : **MAGISTRATE NO. 21-MJ-13 (GMH)** |
| | : |
| RICHARD BARNETT, | : |
| Defendant. | : |

### TRANSPORT ORDER

Having considered the United States' Motion to have the defendant Richard Barnett transported from the Western District of Arkansas to the District of Columbia for further proceedings on the Complaint filed against him, it is hereby **ORDERED**

That the United States Marshals Service transport the defendant forthwith from the Western District of Arkansas to the District of Columbia for further proceedings in this matter.

DATE:   January 15, 2021        _____

BERYL A. HOWELL
CHIEF JUDGE, UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

1

USA v. Richard Barnett Exhibits  EXH0272

AO 94 (Rev. 06/09) Commitment to Another District

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 5:21-mj-05001 |
| | ) |
| Richard Barnett aka Bigo | ) Charging District's |
| _____ | ) Case No. 1:21-mj-00013 |
| *Defendant* | ) |

## COMMITMENT TO ANOTHER DISTRICT

The defendant has been ordered to appear in the _____ District of Columbia ,

*(if applicable)* _____ division. The defendant may need an interpreter for this language:

N/A .

The defendant: ☑ will retain an attorney.

☐ is requesting court-appointed counsel.

The defendant remains in custody after the initial appearance.

**IT IS ORDERED:** The United States marshal must transport the defendant, together with a copy of this order, to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant. The marshal or officer in the charging district should immediately notify the United States attorney and the clerk of court for that district of the defendant's arrival so that further proceedings may be promptly scheduled. The clerk of this district must promptly transmit the papers and any bail to the charging district.

Date: 01/19/2021

*Judge's signature*

Hon. Erin L. Wiedemann U.S. Magistrate Judge

*Printed name and title*

Case: 21-cr-00038-RCD Document 26-17 Filed 04/05/21 Page 274 of 329
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

Query    Reports    Utilities    Help    What's New    Log Out

CLOSED

# U. S. District Court
## Western District of Arkansas (Fayetteville)
## CRIMINAL DOCKET FOR CASE #: 5:21-mj-05001-ELW All Defendants

---

Case title: USA v. Barnett             Date Filed: 01/08/2021
Other court case number: 1:21-mj-00013 District of Columbia     Date Terminated: 01/19/2021

---

Assigned to: Honorable Erin L. Wiedemann

**Defendant (1)**

| | |
|---|---|
| **Richard Barnett** <br> *TERMINATED: 01/19/2021* <br> *also known as* <br> Bigo <br> *TERMINATED: 01/19/2021* | represented by **Anthony J Siano** <br> Anthony J. Siano, ESQ. <br> 333 Westchester Avenue <br> Suite S302 <br> White Plains, NY 10604 <br> 914-997-0100 <br> Fax: 914-997-0100 <br> Email: tonysiano@aol.com <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* <br> Designation: Retained |

**Pending Counts**             **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**             **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**             **Disposition**

18:1752(a)-KNOWINGLY ENTERING OR
REMAINING IN ANY RESTRICTED
BUILDING OR GROUNDS WITHOUT
LAWFUL AUTHORITY; 40:5104(e)(2)-
VIOLENT ENTRY AND DISORDERLY
CONDUCT ON CAPITOL GROUNDS;

USA v. Richard Barnett Exhibits  EXH0274

18:641-THEFT OF PUBLIC MONEY,
PROPERTY, OR RECORDS

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

## **Plaintiff**

**USA**

represented by **Kimberly Nicole Davis Harris**
United States Attorney's Office
414 Parker Avenue
Fort Smith, AR 72901
(479) 783-5125
Fax: (479) 441-0578
Email: Kimberly.Harris@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/08/2021 | | Arrest (Rule 5) of Richard Barnett.Other District: District of Columbia USDC Case No. 1:21-mj-00013. (rg) (Entered: 01/11/2021) |
| 01/08/2021 | 1 | COMPLAINT as to Richard Barnett. (rg) (Entered: 01/11/2021) |
| 01/08/2021 | 2 | **THE DOCUMENT IS RESTRICTED TO COURT USERS.** Arrest Warrant as to Richard Barnett.(USDC, District of Columbia, Case No. 1:21-mj-00013). (rg) (Entered: 01/11/2021) |
| 01/11/2021 | 3 | Arrest Warrant Returned Executed on 1/8/2021 as to Richard Barnett.(USDC, District of Columbia, Case No. 1:21-mj-00013) (rg) (Entered: 01/11/2021) |
| 01/11/2021 | 4 | **TEXT ONLY ORDER Setting Hearings as to Richard Barnett. This hearing will be accessible via video conference ONLY. Access to the courthouse will not be allowed. Any non-party desiring access to the hearing should contact chambers at ELWinfo@arwd.uscourts.gov by 1/11/2021 5:00 PM and state their interest in the case. Recording of these proceedings by any means is prohibited (see FRCrimP 53 and Local Rule 83.2(a)). Violation of this prohibition may result in sanctions. Disruptive behavior will not be tolerated and may result in automatic removal from the conference. Please keep devices on mute unless asked to speak by the judge. Initial Appearance - Rule 5 set for 1/12/2021 03:00 PM before Honorable Erin L. Wiedemann. Signed by Honorable Erin L. Wiedemann on January 11, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/11/2021)** |
| 01/11/2021 | 5 | WAIVER of PERSONAL APPEARANCE at a Rule 5 Initial Appearance pursuant to the CARES Act of 2020 with the consent of the Defendant, or the Juvenile, after consultation with counsel by Richard Barnett. (rg) (Entered: 01/11/2021) |
| 01/11/2021 | 6 | MOTION for Anthony J. Siano to Appear Pro Hac Vice by Richard Barnett. (src) (Entered: 01/11/2021) |
| 01/11/2021 | | CLERK'S NOTICE REGARDING FILING FEE. The following document was received and filed without the appropriate filing fee as to Richard Barnett : 6 MOTION for Anthony J. Siano to Appear Pro Hac Vice. |

| | | |
|---|---|---|
| | | **You MUST pay the filing fee of $ 100.00 or file a motion to proceed In Forma Pauperis, if appropriate, within 2 business days.** Present your payment to the appropriate Divisional Office or Pay Online, using the **Criminal -> Other Documents -> Filing Fee Submitted** event. (src) (Entered: 01/11/2021) |
| 01/12/2021 | 7 | **ORDER granting 6 Motion to Appear Pro Hac Vice. Anthony Siano appearing for as to Richard Barnett (1). The Court waives the requirement that local counsel be designated.Mr. Siano is directed to immediately register for Pro Hac Vice filer access through PACER and enter his appearance in this matter. Mr. Siano is further directed to immediately pay the requisite Pro Hac Vice fee immediately following the unsealing of this case. Signed by Honorable Erin L. Wiedemann on January 12, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/12/2021)** |
| 01/12/2021 | 8 | NOTICE OF ATTORNEY APPEARANCE: Anthony J Siano appearing for Richard Barnett. (src) (Entered: 01/12/2021) |
| 01/12/2021 | 9 | AMENDED COMPLAINT as to Richard Barnett. (rg) (Entered: 01/12/2021) |
| 01/12/2021 | 10 | **THIS DOCUMENT IS RESTRICTED TO CASE PARTICIPANTS AND COURT USERS.** Penalties as to Richard Barnett. (rg) (Entered: 01/12/2021) |
| 01/12/2021 | 11 | **THE DOCUMENT IS FILED UNDER SEAL WITH THE COURT.** PRETRIAL REPORT in case as to Richard Barnett. (tree) (Entered: 01/12/2021) |
| 01/12/2021 | | Case unsealed as to Richard Barnett. (rg) (Entered: 01/12/2021) |
| 01/12/2021 | 12 | TEXT ONLY Minute Entry for proceedings held before Honorable Erin L. Wiedemann: Initial Appearance in Rule 5 Proceedings as to Richard Barnett held on 1/12/2021. Appearance entered by Anthony Siano, Retained, on behalf of defendant. Defendant waived the issues of identity and probable cause in this district. Defendant requested a Detention Hearing in open court. Defendant remanded to custody of U.S. Marshals Service pending Detention Hearing in this district. (Roxana Guerrero-Digital Recorder) (Proceedings held in Fayetteville-Room 210) (rg) (Entered: 01/12/2021) |
| 01/12/2021 | 13 | **ORDER OF DETENTION as to Richard Barnett. Defendant remanded to the custody of the U.S. Marshals Service pending hearing or release on bond. Detention Hearing set for 1/15/2021 12:30 PM in Fayetteville - 2nd flr (Rm 210) before Honorable Erin L. Wiedemann. Signed by Honorable Erin L. Wiedemann on January 12, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/12/2021)** |
| 01/12/2021 | 14 | **TEXT ONLY ORDER Setting Hearings as to Richard Barnett. This hearing will be accessible via video conference ONLY. Access to the courthouse will not be allowed. Any non-party desiring access to the hearing should contact chambers at ELWinfo@arwd.uscourts.gov by 1/14/2021 12:00 PM and state their interest in the case. Recording of these proceedings by any means is prohibited (see FRCrimP 53 and Local Rule 83.2(a)). Violation of this prohibition may result in sanctions. Disruptive behavior will not be tolerated and may result in automatic removal from the conference. Please keep devices on mute unless asked to speak by the judge Detention Hearing set for 1/15/2021 12:30 PM before Honorable Erin L. Wiedemann. Signed by Honorable Erin L. Wiedemann on January 12, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/12/2021)** |

1/29/2021
Case 2:21-cr-00038-CRC Document 26-17 Filed 04/05/21 Page 277 of 329
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

| 01/13/2021 | | Pro Hac Vice motion filing fee paid as to Richard Barnett re Clerk's Notice Regarding Filing Fee,, : $ 100, receipt number AARWDC-2311682. (Siano, Anthony) (Entered: 01/13/2021) |
|---|---|---|
| 01/15/2021 | 15 | **THE DOCUMENT IS FILED UNDER SEAL WITH THE COURT.** Addendum to PRETRIAL REPORT in case as to Richard Barnett. (tree) (Entered: 01/15/2021) |
| 01/15/2021 | 16 | Minute Entry for proceedings held before Honorable Erin L. Wiedemann: Detention Hearing as to Richard Barnett held on 1/15/2021. (Roxana Guerrero-Digital Recorder) (Proceedings held in Fayetteville-Room 210) (Attachments: # 1 witness/exhibit list) (rg) (Entered: 01/15/2021) |
| 01/15/2021 | 17 | **ORDER DENYING Government's motion for three-day stay of the release order as to Richard Barnett; see order for specifics. Signed by Honorable Erin L. Wiedemann on January 15, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/15/2021)** |
| 01/16/2021 | 18 | **ORDER directing the District Court Clerk to file the bond granted by this Court under seal as to Richard Barnett; see order for specifics. Signed by Honorable Erin L. Wiedemann on January 16, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) Modified text on 1/19/2021 (lgd). (Entered: 01/16/2021)** |
| 01/16/2021 | 19 | *UNDER SEAL* Unsecured Bond Entered as to Richard Barnett in amount of $5,000.00. (rg) (rg). (Entered: 01/16/2021) |
| 01/16/2021 | 20 | *UNDER SEAL* ORDER Setting Conditions of Release as to Richard Barnett (1) $5,000.00 Unsecured Bond. Signed by Honorable Erin L. Wiedemann on January 16, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (rg). (Entered: 01/16/2021) |
| 01/19/2021 | 21 | MOTION for Emergency Stay and Review of Release order to Stay.(USDC, District of Columbia, Case No. 21-MJ-13) by USA as to Richard Barnett. (rg) (Entered: 01/19/2021) |
| 01/19/2021 | 22 | **ORDER as to Richard Barnett GRANTING the governments Motion to Stay. Signed by Chief Judge Beryl A. Howell on January 15, 2021.(USDC, District of Columbia, Case No. 21-MJ-13) (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/19/2021)** |
| 01/19/2021 | 23 | **ORDER, as to RICHARD BARNETT, GRANTING the governments Motion to Transport. Signed by Chief Judge Beryl A. Howell on January 15, 2021.(USDC, District of Columbia, Case No. 21-MJ-13) (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/19/2021)** |
| 01/19/2021 | 24 | COMMITMENT TO ANOTHER DISTRICT as to Richard Barnett. Defendant committed to District of District of Columbia. Signed by Honorable Erin L. Wiedemann on January 19, 2021. (cc via CM/ECF: U.S. Probation Office, U.S. Marshals Service) (rg) (Entered: 01/19/2021) |
| 01/19/2021 | 25 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Detention Hearing as to Richard Barnett held on January 15, 2021, before Judge Erin L. Wiedemann. Court Reporter/Transcriber Paula K Barden, Telephone number paula_barden@arwd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber. After the Release of Transcript Restriction deadline, it, or a redacted transcript, may be obtained through the Court Reporter/Transcriber or PACER A Notice of Intent to Request Redaction of the Transcript MUST be filed within **7 calendar days** of the filing of the transcript and served manually |

| | | on the court reporter/transcriber. Redaction Request due 2/9/2021. Redacted Transcript Deadline set for 2/19/2021. Release of Transcript Restriction set for 4/19/2021. (pkb) (Entered: 01/19/2021) |
|---|---|---|
| 01/19/2021 | [26](#) | Notice to District of Columbia of a Rule 5 or Rule 32 Initial Appearance as to Richard Barnett. Your case number is: 1:21mj-00013. (If you require certified copies of any documents, please send a request to CRinfo_Team@arwd.uscourts.gov.) (If you wish to designate a different email address to notify your court of future criminal case transfers, please send your request to InterDistrictTransfer_TXND@txnd.uscourts.gov.) (rg) (Entered: 01/19/2021) |

# EXHIBIT G

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)



Government's Exhibit 4

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------X

UNITED STATES OF AMERICA

              v.            Magistrate Case No. 21-13-GMH

RICHARD BARNETT,

       Defendant


---------------------------X

                           Washington, D.C
                 Thursday, January 28, 2021
                       3:15 p.m.


TRANSCRIPT OF MOTION FOR PRETRIAL DETENTION
BEFORE THE HONORABLE BERYL HOWELL
UNITED STATES DISTRICT CHIEF JUDGE

APPEARANCES:

For the Government: Mary Lyle Dohrmann, AUSA
                   U.S. ATTORNEY'S OFFICE FOR D.C.
                   555 4th St, NW
                   Washington, DC 20530
                   (202) 252-7035

For the Defendant: Anthony J. Siano, Esq.
                   333 Westchester Avenue, Suite S302
                   White Plains, NY 10604


Court Reporter:     Lisa Walker Griffith, RPR
                   U.S. District Courthouse, Room 6507
                   Washington, D.C.  20001
                   (202) 354-3247

1                        **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3     Magistrate Case Number 21-13.  United States of America

4     versus Richard Barnett.

5              Counsel, please state your names for the record,

6     starting with the government.

7              And for the record, Your Honor, the Pretrial

8     Services is Christine Schuck.

9              THE COURT:  Okay.  Thank you.

10             MS. DOHRMANN:  Good afternoon, Mary Dohrmann on

11    behalf of United States.

12             THE COURT:  Good afternoon, Ms. Dohrmann.

13             And for the defense?

14             MR. SIANO:  Good afternoon, Your Honor.  Anthony

15    Siano for the defendant, Richard Barnett.

16             THE COURT:  Mr. Siano, I granted your Pro Hac Vice

17    motion this afternoon.  I wasn't sure you were going to get

18    that done in time.  So I did ask Mr. Lawlor to be here just

19    in case.

20             MR. SIANO:  Mr. Lawlor was kind enough to call me.

21             THE COURT:  Mr. Lawlor, I think I can excuse you.

22             MR. LAWLOR:  My pleasure, Your Honor.  Have a good

23    day.

24             THE COURT:  Thank you.

25             Mr. Siano, I interrupted you.  What were you going

1    to say?

2              MR. SIANO:  Mr. Lawlor was kind enough to call me

3    and tell me that he had been contacted by the Court as

4    stand-by counsel.  That was before we got our papers in

5    today.

6              THE COURT:  All right.  Good.

7              Let me begin, Mr. Barnett, by pointing out also

8    for the record that this hearing is being held remotely by

9    video conference, with the defendant and counsel all

10   participating by video teleconference.  Do you agree after

11   consultation with your counsel to participate in this

12   hearing remotely without being physically present in the

13   courtroom today?

14             THE DEFENDANT:  I do, Your Honor.

15             THE COURT:  Okay.  Thank you.

16             So, pending before the Court is the government's

17   motion for review and appeal of the Magistrate Judge's

18   release order.  I do note that the government did file

19   yesterday evening a memorandum in support of pretrial

20   detention that include several exhibits, including the

21   transcript of the proceedings in the Western District of

22   Arkansas, which I also received from -- I'm not sure if it

23   was from one of the parties or from the District of

24   Arkansas.  So I had reviewed it beforehand.

25             I also reviewed the Pretrial Services Report, all

1  of the exhibits, the amended complaint in the record of the

2  case, as well as defense counsel's letter which, upon

3  receipt, I did docket.  It is docketed now at ECF number 10.

4          So it is the government's motion, so Ms. Dohrmann,

5  I will let you proceed.

6          MS. DOHRMANN:  Thank you, Your Honor.

7          The government's position is that no conditions

8  would ensure the safety of the community and the defendant's

9  appearance in this case.  And that, in fact, all four

10  factors from 18 USC 3142(g) weigh significantly in favor of

11  detention.  Your Honor, the defendant's known behavior alone

12  has shown that he is not going to abide by conditions here

13  for protecting the community from his criminal conduct.

14          First turning to the nature and circumstances of

15  this offense, it involves flouting multiple laws in the most

16  brazen and flagrant manner possible, laws designed to

17  protect the public and to protect our public servants, as

18  well as official proceedings.

19          He broached the U.S. Capitol during a solemn

20  proceeding with both houses of Congress and the Vice

21  President of the United States at the time were then present

22  in the Capitol.  He knew exactly what he was doing.  Your

23  Honor has his post, which is Figure 7 in the government's

24  memorandum in support, stating "It's time" shortly before

25  the breach of the Capitol.  He bought a stun device that he

1   had purchased just days before.  It is clear that he planned

2   his actions.  And actually acted on animus to occupy the

3   office of Speaker Pelosi.

4          THE COURT:  Ms. Dohrmann, you call that a stun

5   device.  Is it a stun device?  Is it a stun gun or something

6   different from a stun gun?

7          MS. DOHRMANN:  Your Honor, it is a stun gun, but

8   it is in the form of a walking stick, like a staff.  So I

9   suppose it's extendible to the length of what one might call

10  a walking stick.  But it can also be collapsed down is my

11  understanding.

12         THE COURT:  That stun gun, walking stick device,

13  has that been recovered?

14         MS. DOHRMANN:  No, Your Honor.  And that is part

15  of the government's concern is Mr. Barnett's statement to

16  law enforcement that they can search his home and they would

17  not find it.  What the government did recover was the box

18  that it came in as well as the receipt.  But the stun device

19  itself, Your Honor, the government has inferred that the

20  defendant has disposed of in some manner.

21         THE COURT:  I was interested, Ms. Dohrmann, that

22  in the transcript of the detention hearing in Arkansas, the

23  partner of the defendant, her name is Tammy Newburn, she

24  said that a number of items that had been removed from the

25  house had been given to Mark Hesse.  So has government

1    tried to recover any of those items from Mark Hesse?

2         MS. DOHRMANN:  Yes, Your Honor.  Let me just get

3    the exact information on that.  The information I have is

4    that a search warrant was conducted at Mark Hesse's home at

5    the same time as the detention hearing that was held January

6    15th.  And though law enforcement did observe firearms, they

7    were unable to determine which, if any, were the

8    defendant's.

9         I'm not certain, Your Honor, if there was an

10   observation of a stun device that they also couldn't

11   conclude was the defendant's.  But I am sure that if it

12   matched the description, it would have been recovered and

13   noted.

14        THE COURT:  I do recall that in the transcript

15   that the defendant's partner was quite vague about being

16   able to identify any of the guns that belonged to

17   Mr. Barnett.

18        Okay.  Please proceed.

19        MS. DOHRMANN:  Thank you, Your Honor.

20        So, as I was talking about Mr. Barnett's

21   disturbing note that he talks about to the media after these

22   events, having left for Speaker Pelosi, in the same sort of

23   vein there are these photographs of him taken where he

24   appears to know and relish that he is being photographed in

25   a way that suggests that this isn't -- the notoriety that he

1    is bringing to himself is something that he welcomes.

2         And of course, after talking to the media about

3    exactly what he has done, being photographed, occupying in

4    what can only be described as a disrespectful manner on top

5    of an unlawful manner, Speaker Pelosi's office, he then

6    attempts to avoid being identified as he flees D.C., turning

7    off location services on his phone and paying cash and

8    covering his face which, as Your Honor will see in the

9    photographs in the government's memorandum, was uncovered

10   previously in his prior actions.

11        THE COURT:  When you are talking about the videos,

12   I know there is a surveillance camera videos from inside the

13   Capitol and I know there were other videos, one of the

14   things that Tammy Newburn said is that the defendant sent

15   her videos that she had on her phone.  Were those videos

16   recovered?

17        MS. DOHRMANN:  Your Honor, I'm sorry.  I don't

18   know the answer to that.  I do know that Mr. Barnett

19   essentially intervened in any sort of -- in the interaction

20   between Ms. Newburn and law enforcement, specifically taking

21   Ms. Newburn's phone from her and saying he would show up as

22   appropriate.  To my knowledge, there has not been a seizure

23   of Ms. Newburn's phone.

24        THE COURT:  Okay.  Thank you.

25        MS. DOHRMANN:  Your Honor, with respect to the

1   weight of the evidence in this case, it is truly

2   incontrovertible.  He is in multiple photographs that are

3   very clear and of very high quality.  He is on video.  His

4   face is fully uncovered.  He is clearly identifiable to any

5   layperson.

6        We know that he bought the stun gun and the box

7   that it came in.  We know when he did that based on the

8   evidence recovered from the home, although we don't have the

9   stun device itself.  And we know all of this, Your Honor,

10  despite the defendant somehow ditching or secreting his cell

11  phone, not having it with him at arrest, Ms. Newburn saying

12  she has no idea where it is, no doubt that is a source of

13  potential further information that, unlike all the other

14  information, the defendant was willing to share with the

15  media and law enforcement.  What is on his cell phone is

16  what he doesn't want the government to know.  But despite

17  not having that electronic evidence, at this time, the

18  evidence in this case is very strong.

19       Your Honor, the government is also very concerned

20  about this defendant's history and characteristics.  While

21  he doesn't have a criminal history of felonies, he does have

22  a recent pattern that this case and this criminal conduct

23  are a part of.  And that is the two other incidents

24  described in Attachment A and Attachment B of him using

25  firearms in a way that drew police attention and, quite

```
 1    frankly, a very public sort of also attracting attention,

 2    displayed way, where there is some question about, at least

 3    with respect to one of those incidents, whether he was in

 4    fact using them in a menacing manner.

 5            Certainly, Your Honor, the government's position

 6    would be that he appears to be possessing them in a menacing

 7    manner.  Whether it was actually a criminal, assaultive

 8    manner is clearly not resolved or resolved in the

 9    defendant's favor in the case of the incident described in

10    Attachment A.  But nevertheless, Your Honor, those are

11    instances from July and September of 2020.  Then here we are

12    in January of 2021.

13            THE COURT:  Ms. Dohrmann, I think your memorandum

14    and the transcript, the hearing transcript mentioned

15    something happened in November.  Was that just a typo or was

16    it really just something in September?

17            MS. DOHRMANN:  I'm sorry, Your Honor.  That may

18    have been my mistake about when -- Your Honor, you are

19    right, that is my mistake.  That was --

20            THE COURT:  I just wanted to make sure I knew

21    about these incidents because I do have some questions about

22    them.  I appreciate that there was a July 25, 2020

23    Fayetteville police report of 911 caller, complaining about

24    a person turning out to be defendant, pointing a rifle at

25    her car because her car had a Black Lives Matter sticker on
```

1    it.

2          And then there was another incident of a call to

3    the police on September 20, 2020 regarding protesters for

4    something called Save the Children that reported the

5    defendant walking around on the public street in

6    Fayetteville with a rifle slung on his back and a pistol on

7    his hip.

8          I just want to focus a little bit on the September

9    20, 2020 report because it has a series of observations.  Of

10   course, what caught my attention is that it also mentioned

11   that these observations were made around a courthouse.  So

12   do you know what that is all about?

13         MS. DOHRMANN:  Your Honor, so first just to go

14   back to the November versus September issue.  I believe that

15   actually November is the inaccuracy and it is September

16   based on just looking at the transcript.  The November

17   incident referenced in the transcript is the Save the

18   Children event that is described as having taken place in

19   September.  So that is just to correct that part of the

20   record, at least as far as I am aware.

21         THE COURT:  Because the incident report of an

22   incident on September 20, 2020, which reads that a police

23   officer spoke with Richard Barnett who had a rifle slung on

24   his back, pistol on his hip, and said he was there for the

25   protesters for Save the Children.  So that clearly occurred

1    on September 20, 20, but the report's narrative references a

2    series of observations of the defendant with his rifle and

3    his phone, including references to the courthouse.

4         Was this area where the protest was happening

5    close to a courthouse location?  Is that all that means?

6         MS. DOHRMANN:  I'm sorry, I would have to look

7    into that further, which of course I can do.  My

8    understanding is that this occurred, perhaps it's just a

9    matter I could look at a map of where this occurred and see

10   if it does happen to be near a courthouse.  I wasn't aware,

11   and I hadn't noted the apparent involvement of the

12   courthouse in that matter.  So I'm not able to say precisely

13   how this--

14        THE COURT:  Okay.  It's just, you know, it says

15   there was no answer from the courthouse, the narrative was

16   "behind courthouse" in the plot, it just has mentioned the

17   courthouse.  So I was just curious whether that has anything

18   to do with anything.

19        In any event, the Save the Children rally, does

20   Save the Children rally -- I don't know what that is about.

21   But is that connected in any way to the Q-Anon conspiracy

22   theory?

23        MS. DOHRMANN:  Your Honor, I believe that it very

24   well could be, in that my understanding is that the Save the

25   Children rally is based on a premise that is consistent with

1    that Q-Anon conspiracy theories, espousing the belief that

2    there is an elite group currently in control of the country,

3    consisting of pedophiles who must be stopped.  So yes, Your

4    Honor, without having further information specifically

5    tieing into that, I believe that the evidence about the Save

6    the Children rally supports the inference that it is related

7    to that Q non conspiracy theory.

8         THE COURT:  I was just curious about that.  Okay.

9    Please proceed, Ms. Dohrmann.  Your Honor.

10        MS. DOHRMANN:  Your Honor, just with a little bit

11   of additional information to point to on the history and

12   characteristics.  I think the defendant's characteristics

13   are also notable here, specifically his behavior in the

14   course of the case and in the eyes of -- in front of law

15   enforcement.

16        He has been obstructive and oppositional, even

17   with his significant other, who he has attempted to claim

18   and make sure and ensure the safety of the community by

19   ensuring that he abides by Court orders, even in front of

20   law enforcement.  Your Honor, this behavior is of great

21   concern to the government and also weighs heavily in favor

22   of detention with respect to his history and

23   characteristics.

24        And the government has in its memorandum drawn the

25   Court's attention to specific portions of the transcript

1  that sort of outline what that behavior from the defendant

2  looked like with respect to Ms. Tammy Newburn.

3       Finally, Your Honor, with respect to the 3142(g)

4  factor, the defendant's danger, Your Honor, he has shown us

5  how dangerous he is in his complete failure to show respect

6  for the law, protecting the safety of other people,

7  including our public servants in that commission of official

8  proceedings.

9       He has been not only defiant of those laws but

10  brazen in defying them to the extent of it bringing

11  notoriety to him and to people associated with him,

12  including his family members.

13       Frankly, Your Honor, his behavior seems aimed at

14  attracting attention, and in that sense, having influence

15  over others.  And as far as the government can tell, the

16  defendant does only what he sees as being in his best

17  interest, no more and no less, which includes in this case

18  getting a stun device, coordinating a trip to D.C.,

19  unlawfully entering highly restricted areas, taking a

20  Congresswoman's mail and talking to the media about it.  And

21  then really, turning on a dime to serve his best interests

22  and trying to get away with it, at least in the short run,

23  by turning location services off his phone, hiding somewhere

24  his firearms and stun gun, as well as his cell phone which,

25  as I have already noted, the government can only infer

1    contains additional information that the defendant is very

2    concerned about the government finding out about.

3            Your Honor, the defendant's access to firearms as

4    well as the stun device is just one more reason that this

5    Court has cause for concern about what he would do to enact

6    his will and force it on others.

7            In conclusion, the government simply notes that

8    Pretrial Services in both jurisdictions agreed with -- I

9    shouldn't say agreed with the government.  They provided

10   their own recommendation that he be held because no

11   condition or combination of conditions would ensure the

12   safety of the community.  For all these reasons, the

13   government submits that detention is appropriate in this

14   case and necessary.

15           THE COURT:  Thank you.

16           Mr. Siano, I will be happy to hear from you now.

17           MR. SIANO:  Thank you, Judge.

18           I would like to begin with the last remark that

19   counsel for the government made.  Pretrial Services Report,

20   there is an amended Pretrial Services Report, which is

21   completely contradictory to what Ms. Dohrmann said.

22   Pretrial Services Office has clearly noted that she could

23   recommend release on a series of conditions, all of which

24   the Magistrate Judge noted and enforced in her order in

25   addition to certain other conditions.  So, this is not a

1    universal recommendation of detention.

2         There was a Pretrial Services Report that had not

3    included interviews of Mr. Barnett or Ms. Newburn.  And

4    Pretrial Service conducted a lengthy interview with my

5    client, I believe it was an hour and a half.  And then

6    underscored and unencumbered by anybody else, Pretrial

7    Services spoke to my client's partner.  And after that, made

8    a recommendation that release was possible.

9         I would like to point out, first of all, that my

10   client came home after the events of January 6th, had been

11   called but not visited by law enforcement on the Thursday.

12   And through his wife, made an appointment to surrender on

13   Friday and appeared as he agreed to on Friday morning in the

14   sheriff's office in Bentonville, where he was apprehended.

15        THE COURT:  And wouldn't you agree that that

16   scheduled time gave him enough time, as Tammy Newburn

17   testified, to clear out their house?  Didn't the agent

18   testify about Mr. Barnett essentially saying, "I cleared out

19   my house, go ahead and search it?"  Gave him just enough

20   time to do that, didn't it?

21        MR. SIANO:  Well, it certainly did.  The agent

22   also said that he wasn't going to go out to arrest him on

23   Thursday.  So the level of concern here certainly has a

24   mixed set of characteristics.  My client is not charged with

25   a firearm offense.  Pretrial Services officer in fact told

 1   Ms. Newburn and her daughter that their firearms would have

 2   to be out of the house so that my client couldn't have

 3   access to any firearms.

 4          So to the extent that he has had firearms, they're

 5   not part of this charge.  And the conditions that were laid

 6   out by the Magistrate Judge explicitly exclude him from

 7   having any firearms.  So the fact that the firearms were

 8   removed, I would submit to Your Honor is consistent with

 9   somebody being willing to accept the limitations on his

10   liberty associated with the ban.

11          THE COURT:  Let me ask you something Mr. Siano.

12   There is a Washington Post report that quotes a New York

13   Times reporter, Matthew Rosenberg who was at the scene on

14   January 6th, and Matthew Rosenberg, the New York Times

15   reporter reports that he spoke directly to Mr. Barnett and

16   Mr. Barnett identified himself as himself.  And he is quoted

17   as, Mr. Barnett is quoted as saying, "I wrote her a nasty

18   note, put my feet up on her desk and scratched my balls."

19   Did Mr. Barnett say that to the New York Times reporter?

20          MR. SIANO:  I have not seen either of those

21   articles, Judge.  So I'm not in a position to respond to you

22   with respect to that.  That is frankly a different piece of

23   news coverage than I've been able to see.

24          THE COURT:  It's just the New York Times and the

25   Washington Post.  I'm sure it is not just the people in this

1    community who read those newspapers.

2         MR. SIANO:  I'm not suggesting anything other than

3    that I have not found it, Judge.  I'm not casting aspersions

4    on anybody other than perhaps myself.  I can't respond to it

5    because I have not had in my hands.  I'm taking what Your

6    Honor says and I'll follow it up.

7         It is clear from the information we've received in

8    discovery that my client was politically not in tune with

9    the Speaker.  He did, there are photographs of him in the

10   office.  There are photographs of him with what the FBI

11   agent describes in the Complaint as an empty envelope.  And

12   that empty envelope is in the photo.  So that is the only --

13        THE COURT:  I thought that that was an issue

14   raised at the hearing, whether there was an empty envelope

15   or an envelope with something in it.  And it wasn't clear

16   because the agent had not opened the sealed evidence

17   envelope.

18        MR. SIANO:  The last two lines of the amended

19   complaint, the superseding complaint, described the item as

20   an empty envelope, Your Honor.  The second complaint they--

21        THE COURT:  The amended statements of facts.

22        MR. SIANO:  Yes, the amended statement of facts,

23   the last two lines.

24        THE COURT:  That is supposed to make it better?

25        MR. SIANO:  No, I did not say that, Judge.  We

```
1    described it as stealing Speaker's mail.

2              (Technical difficulties.)

3              THE COURT:  Mr. Barnett, could you mute --

4              THE DEFENDANT:  Can I say something to my lawyer?

5              MR. SIANO:  You have to go to a break-out room,

6    Richie.

7              THE DEFENDANT:  Okay, thank you.  I'll mute now.

8              MR. SIANO:  The suggestion that my client was

9    taking anything other than what could be described as a

10   minimal piece of empty mail, and it was an envelope so it

11   wasn't even a stamp on it.  That's the only thing taken out

12   of the Speaker's office.  He did say outside, in the

13   materials that the government has given us, essentially that

14   basically he was, you know, he had a political hostility to

15   the Speaker.

16             THE COURT:  All right.  Let me turn to the letter,

17   Mr. Siano, that, as I mentioned, the Court docketed at ECF

18   10 and it raises an issue that I wanted to make clear for

19   the record here about your lack of notice and an opportunity

20   to be heard by this Court before the Court issued the Stay

21   of the Arkansas Magistrate Judge's release order on Friday

22   night, January 15th.

23             As your letter points out, the Magistrate Judge

24   held this detention hearing until very late in the day on

25   January 15th.  And then denied the government's request for
```

1  a stay of the release order, which created a situation

2  requiring prompt action by both the government and this

3  Court.

4          You have now had since January 15th, almost two

5  weeks, to file in this Court, before this Judge, any papers,

6  briefing papers or whatever relevant to the issue of whether

7  Mr. Barnett should be detained pending trial.  Are you

8  essentially resting in terms of written materials on the

9  transcript of the hearing conducted in Arkansas?

10         MR. SIANO:  No, Your Honor.  No, Your Honor.  I

11  frankly, I'm aware that I couldn't file, despite my attempt

12  to do so, until I was admitted and had filing privileges.  I

13  finally got paperwork submitted to the Court this past

14  Monday.  That's pending.  I frankly thought Your Honor would

15  ask me how much time I would need to put something in

16  writing and to respond to Ms. Dohrmann's papers.   I'm

17  prepared to--

18         THE COURT:  I'm statutorily required to review

19  this and decide it promptly.  Typically in these

20  circumstances, when a defendant has been arrested outside

21  this jurisdiction and is being brought here for an appeal,

22  papers are filed.  If they don't have filing privileges,

23  they send them to me by e-mail or by letter, just as you did

24  your letter.

25         But there are a couple of other things in your

1    letter, Mr. Siano, that I want to have a bit of a discussion

2    about here since I have granted your Pro Hac Vice motion.

3            This is a Court that prides itself on civility in

4    proceedings.  Your letter is very quick to accuse

5    prosecutors of some form of misconduct, citing that -- and I

6    quote: "No where in either of the government's motions for a

7    stay and transfer does the government tell the Court that

8    Mr. Barnett was represented by retained counsel in

9    Arkansas."

10            I want you to be aware and have no fear that this

11    Court was well aware that Mr. Barnett was represented by

12    counsel before the Arkansas Magistrate Judge.  I'm sure that

13    is a responsible federal judicial officer and ensured that

14    Mr. Barnett was represented.  And whether you were retained

15    or whether he was represented by federal public defenders or

16    CJA counsel in the detention hearing in Arkansas is really

17    immaterial.  But I wanted to make it clear to you, this

18    Court was well aware that Mr. Barnett was represented before

19    the Magistrate Judge in Arkansas.

20            You also note in your letter, you were advised by

21    an AUSA that the government was going to seek a stay of the

22    Arkansas Magistrate Judge's release order.  So, that should

23    not have come as any surprise to you when the government did

24    exactly what it said it was going to do, which is seek a

25    stay.

1        Nevertheless, your letter goes on to accuse

2    prosecutors of unethical conduct by not disclosing the

3    transfer motion to you because you suggest the government

4    was trying, and I quote you in your letter "to gain a

5    tactical advantage" of some kind or, I quote you again, "to

6    forum shop Mr. Barnett's detention after we prevailed

7    before" the Arkansas Magistrate Judge.

8        I don't know how you practice in other

9    jurisdictions, Mr. Siano, but I am telling you right now,

10    throwing around accusations of misconduct by opposing

11    counsel is not acceptable here when it is without merit.

12    And that accusation is both frivolous and without merit.

13        The defendant is charged in this District.

14    Therefore, this Court is statutorily required to hear any

15    applications for revocation of a Magistrate Judge order

16    releasing a defendant.  It is plain as day in 18 USC Section

17    3141(a) which states: If a person is ordered released by a

18    Magistrate Judge or by a person other than a judge of the

19    court having original jurisdiction over the offense, the

20    attorney for the government may file with the court having

21    original jurisdiction over the offense a motion for

22    revocation of the order or amendment of conditions of

23    release, the motion shall be a determined promptly.  There

24    is no forum shopping going on here.  And that accusation is

25    wholly meritless.

1          This was not a needless cross country trip, as you

2    put it, for this defendant.  He came here on January 6th for

3    his own purposes.  His presence is now required in this

4    district by the government and for the government's

5    purposes.

6          So the motion to transfer was perfectly

7    appropriate both for the government to make for this Court

8    to issue, to bring the defendant before this Court in this

9    jurisdiction to face the charges against him.

10         If you are going to continue with this case, I

11   caution you about how you conduct yourself because that

12   letter was wholly inappropriate.

13         All right.  Is there any other information, Mr.

14   Siano, that you want to bring to the Court's attention

15   regarding the pending issue of pretrial detention or

16   release?

17         MR. SIANO:  Yes, Your Honor.  In the two

18   Fayetteville police reports, my client was not identified by

19   anybody as the suspect of the complaints.  And I would

20   submit that, in reading it, he was compliant with the

21   Fayetteville police request.  He was not charged with any

22   offense in respect to either one of those police reports.  I

23   wanted to point that out.

24         I also want to point out that it is not just that

25   my client doesn't have any felony convictions, he doesn't

 1    have any convictions whatsoever.  There is a 1992 Driving

 2    Under the Influence case that doesn't have a resolution,

 3    nonetheless, it was 28 years ago.  And the government has

 4    had his fingerprints for a substantial period of time and

 5    they have not brought forward any other instance of him

 6    having violated the law.  So I wanted to --

 7            THE COURT:  Does he have the right birthdate on

 8    his driver's license in Arkansas?

 9            MR. SIANO:  I believe he does, Your Honor.  He

10    only has one set of fingerprints, though.

11            THE COURT:  All right.

12            MR. SIANO:  Again, Judge, to the extent that I

13    would make a submission, could I just inquire of the Court,

14    does Your Honor have both portions of the Pretrial Services

15    Report?

16            THE COURT:  I believe I do.

17            MR. SIANO:  All right.  Then I know that the

18    government filed with its paperwork the full transcript and

19    Your Honor has quoted from it in some respect.  I would note

20    that there were a substantial number of people who testified

21    to Mr. Barnett's role in the community, his behavior in the

22    community and the other aspects of his life.

23            As the Pretrial Services Report notes, he has an

24    ongoing business.  He works productively.  I believe both

25    the FBI agent and Pretrial Services described his home as

1    clean and neat.

2           THE COURT:  I am now aware from reading the

3    transcript that you called seven witnesses.  Other than

4    Tammy Newburn and Ashlee Newburn, most of those individuals,

5    and I guess Tammy Newburn's mother, the other individuals

6    were at best casual acquaintances of the defendant.  No

7    knowledge of his guns.  Some of them did.  Some of them said

8    they had no knowledge of any guns.  They didn't know he was

9    going to D.C.  They were -- it didn't have much relevant

10   evidence to submit in connection with these charges.  I'm

11   looking at the statement, you are welcome to argue with me.

12   You are welcome to point out what I might be missing from

13   that.

14          MR. SIANO:  I would prefer to say I'm discussing

15   it with you, rather than argue.

16          THE COURT:  Fine, discussing.

17          MR. SIANO:  Judge, I think that the focus of those

18   witnesses and it's the argument I made to the Magistrate

19   Judge, was to show that he was not a danger to the

20   community, that he was a person who could be subject to a

21   series of conditions, with a degree of confidence, A, that

22   he would not harm anybody else, and that he would appear as

23   he agrees to appear.

24          THE COURT:  Yes, but that is based on what they

25   knew about him.  Jeffrey Houpe has known him about five

1    years, didn't know he was going to D.C.  Had no knowledge of

2    any guns.  Jaklyn Chalk, I guess was the defendant's, his

3    best friend of the daughter.

4              MR. SIANO:  She was his daughter's friend.

5              THE COURT:  She didn't know that much about him

6    either.  Jose Miguel Martinez has known him also about five

7    years.  Never been to his home, only a casual acquaintance.

8    Marie Halpin, that's the mother-in-law, she didn't know much

9    about, you know, didn't know anything about him having a

10   stun gun.

11             Then you have Ashlee Newburn who was put in an

12   uncomfortable position, you know, dissembling and didn't

13   know where the guns were, didn't know they were in the

14   house, didn't know how they got from one place to the next,

15   totally dissembling.

16             William Scroggin, neighbor for five years.  Never

17   saw him with guns, never heard guns, never talked about

18   guns.  I have to say, they knew very little relevant to the

19   factors that this Court has to consider based on the facts.

20             Anything further, Mr. Siano?

21             MR. SIANO:  No, Your Honor.  If Your Honor has the

22   transcript, then the full Pretrial Services Report, then I

23   won't need any time to submit anything further.

24             THE COURT:  Ms. Dohrmann, anything in rebuttal?

25             MS. DOHRMANN:  Your Honor, just very, very

1    briefly.

2           The government would note, fine, Mr. Barnett

3    surrendered himself at a time that worked for him.  What

4    else was he going to do after speaking to the media and

5    publicly being -- having his face uncovered, plastered in a

6    newsworthy situation, being brought to everyone's attention.

7           I would just repeat what Your Honor has just

8    pointed out, the people who testified fall into two

9    categories of people, people who do not seem to know him and

10   people who have clearly heavily bias in favor of the

11   defendant to which they were subject to cross examination.

12   That's all, Your Honor.

13           THE COURT:  All right.

14           The Court is ready to rule on the government's

15   motion to the review the Arkansas Magistrate Judge's

16   decision to release the defendant pending trial.

17           At the outset, Mr. Barnett, did you want to say

18   something to your counsel?

19           THE DEFENDANT:  Yes, Your Honor.  I wonder if I

20   could have a consultation with my counsel before you rule

21   about some of the things that the prosecutor mentioned.

22   Some of the things that the prosecution is bringing up, I

23   don't know if my counsel would allow me to, but I have some

24   really honest and simple explanations.  I'm not a bad man,

25   I'm very well involved in my community.  Most people in my

1   community love me.  I raised money for bodycams for my local

2   Police Department, I've worked rallies.  Can I have just a

3   minute to speak with my attorney?

4           THE COURT:  Having a private conversation here is

5   a little bit difficult.

6           I am going to ask my courtroom deputy to have the

7   jail give you a phone to speak with your counsel.

8           THE DEFENDANT:  I appreciate it.  Thank you very

9   much.

10          THE COURT:  Mr. Barnett, you just have to ask the

11  guard in the room with you what the telephone number is so

12  we can tell your counsel to call that number.

13          THE DEFENDANT:  Okay.  Thank you, Your Honor.  I

14  appreciate it.  Thank you very much.

15          (There was a pause in the proceedings.)

16          THE COURT:  Okay.  Mr. Siano, is there anything

17  else you would like to add following your consultation with

18  your client?

19          MR. SIANO:  Yes.  My client points out that the

20  FBI agent that testified at the hearing in the Western

21  District of Arkansas pointed out that --

22          THE COURT:  Agent Willett, yes.

23          MR. SIANO:  Yes, Agent Willett, yes, Your Honor.

24  Agent Willett pointed out in his testimony, that the

25  photographs they had after my client came out of the Capitol

1    building inside did not show that he was still in possession

2    of a stun gun.

3          Secondly, that there is no indication, and my

4    client says that there is no connection with Q-Anon in

5    connection with that Save the Children rally.  And I believe

6    that when his partner, when Ms. Newburn was vigorously

7    questioned on cross examination about whether or not she

8    would do what her husband wanted in connection with being a

9    third-party custodian, in answer to the question, I believe

10   what she said was she wouldn't like doing it but if she

11   promised the Court, she would do it, she would carry out her

12   responsibility as third-party custodian.  That was a point

13   we felt worthy of making, Your Honor.

14         THE COURT:  I did read that.  It was apparently

15   persuasive enough for the Magistrate Judge in Arkansas.

16         MR. SIANO:  Judge, I know that the Court is aware

17   that the witnesses were there, Magistrate Judge was able to

18   see them.  In many instances, the cross examinations were

19   longer than the directs.  And the witnesses continued to

20   respond to questions calmly and respectfully throughout the

21   entire hearing.

22         So, I mean, I again, we found as many people in

23   the community as we could consistent with the period of time

24   we had.  And those are the people who were able to come

25   forward and describe to the Court their connection with the

1   defendant, specifically with respect to whether or not he

2   would honor his commitments to come to Court and whether or

3   not he was a danger to the community.  I just wanted to make

4   that clear.  I don't have anything further, Your Honor.

5              THE COURT:  All right.  Thank you.

6              MR. SIANO:  You're welcome.

7              THE COURT:  As I mentioned, the Court is ready to

8   rule on the government's motion to review the Arkansas

9   Magistrate Judge's decision to release defendant pending

10  trial.

11             At the outset, a review of the applicable law is

12  appropriate.  The Bail Reform Act requires release of a

13  defendant prior to trial unless a judicial officer

14  determines after a hearing that no condition or combination

15  of conditions will reasonably assure the safety of any other

16  person in the community, 18 USC Section 3142(e)(1).

17             In determining whether any conditions of release

18  will reasonably assure the appearance of the person as

19  required, the Court must take into account the available

20  information concerning four factors set out in 18 USC

21  Section 3142(g).  And those factors are, one, the nature and

22  circumstances of the offense charged.  Two, the weight of

23  the evidence against the person.  Three, the history and

24  characteristics of the person, including the person's

25  character, physical and mental condition, family ties,

```
 1   employment, financial resources, length of residence in the

 2   community, community ties, past conduct, history relating to

 3   drug or alcohol abuse, criminal history and record

 4   concerning appearance at court proceedings.

 5            And finally four, the nature and seriousness of

 6   the danger to any person or the community that would be

 7   posed by the person's release.

 8            On an appeal for a Magistrate Judge's order of

 9   pretrial release, the District Court must conduct a de novo

10   review.  In this case, I have reviewed the entire hearing

11   transcript, which consists of the testimony of the FBI Agent

12   Willett and seven witnesses called by the defendant.  I have

13   also reviewed the government's submissions and the whole

14   record in the case to date, including defense counsel's

15   letter, which was docketed at ECF 10.

16            In conducting its analysis, the Court examined the

17   available information that touches upon those four statutory

18   factors I just listed.  I'm going to discuss each of those

19   factors starting with the first one, the nature and

20   circumstances of the offenses charged.

21            The nature and circumstances of the offenses

22   charged weigh strongly here in favor of a finding that no

23   condition or combination of conditions will reasonably

24   assure the defendant's appearance or the safety of the

25   community.
```

1        He has been charged with a serious felony.

2   Knowingly entering or remaining in any restricted building

3   or grounds without lawful authority while carrying a

4   dangerous weapon in violation of 18 USC Section 1752.  This

5   offense alone carries 10 years of imprisonment.

6        He is also charged with two misdemeanor offenses,

7   violent entry and disorderly conduct on Capitol grounds in

8   violation of 40 USC Section 5104(e).  And also theft of

9   Public Money, Property or Records, in violation of 18 USC

10  Section 641.

11       The descriptions and the title, the title of those

12  offenses to my mind don't even properly capture the scope of

13  what Mr. Barnett is accused of doing here.

14       The felony and misdemeanor charges of entering and

15  remaining in the Capitol without lawful authority with a

16  deadly weapon and disorderly conduct on Capitol grounds and

17  theft of property in some ways are too benign-sounding to

18  describe what happened on January 6, 2021 at the U.S.

19  Capitol.

20       What happened on that day at the U.S. Capitol is

21  criminal activity that is destined to go down in the history

22  books of this country, of hundreds of Americans using force

23  and violence against their own government to disrupt what we

24  have been most proud of: A peaceful and Democratic

25  transition of power.

1    On January 6, 2021, there was an assault on the

2    U.S. Capitol during a joint session of Congress, certifying

3    the 2020 presidential election results.  During this

4    assault, scores of individuals forced entry into the Capitol

5    by breaking windows, pushing through the Capitol's doors,

6    breaching closed, highly sensitive and reserved areas,

7    assaulting members of the U.S. Capitol Police and the D.C.

8    police force.

9    This violence disrupted a constitutional function

10   of Congress necessary to the presidential transition and to

11   the functioning of our democracy.  This was not a peaceful

12   protest.  Hundreds of people came to Washington, D.C. to

13   disrupt the transition of power and to thwart Congress, a

14   branch of the federal government in carrying out its duty in

15   fulfilling its constitutional task of officially certifying

16   the votes of the electoral college.

17   During the assault on the Capitol that was

18   intended to disrupt the peaceful transition of power to a

19   new administration, as designed under our U.S. Constitution,

20   five people died and many more were injured.  Members of

21   Congress and the then-Vice President Pence were forced to

22   flee the grounds of the Capitol.  Congressional staffers and

23   members of the media were forced to hide, fearing for their

24   safety, barricading themselves in offices.  Many on the

25   scene, from the Capitol Police to Members of Congress were

1    afraid for their lives.

2         We are still living here in Washington, D.C. with

3    the consequences of the violence in which this defendant is

4    alleged to have participated.  Thousands of National Guard

5    troops were brought into the District of Columbia to ensure

6    that last week's inauguration could proceed peacefully.

7    Thousands of heavily armed members of the National Guard

8    remain in the District of Columbia, just outside this

9    courthouse, which faces the mall with a clear view of the

10   Capitol are visible reminders of the January 6th riot and

11   assault on the Capitol.

12        We see heavily armed National Guard troops still

13   patrolling from my window, behind tall fencing, barbed wire

14   and concrete barriers, all of this is to protect the heart

15   of the federal government and the people of the District of

16   Columbia from the risk of violence.

17        Shockingly, this risk of violence is posed by

18   fellow Americans.  Just yesterday, the Department of

19   Homeland Security issued a National Terrorism Advisory

20   System Bulletin, indicating a heightened risk of violence

21   from ideologically motivated, violent extremists who are

22   emboldened by the January 6th Capitol attack and might

23   target elected officials in government facilities.

24        The government has presented overwhelming evidence

25   that this defendant, Richard Barnett, enthusiastically

1   participated in this act of assaulting the Capitol and

2   disrupting the Democratic process.  The government has

3   presented evidence of videos and photos showing that this

4   defendant was carrying a weapon, a ZAP Hike 'N Strike

5   950,000 volt stun gun walking stick, that he carried on his

6   belt inside the Capitol.

7         He not only entered the Capitol without a

8   authority but he strutted into the Office of the Speaker of

9   the U.S. House of Representatives, Nancy Pelosi, sat behind

10  her desk and had pictures of himself, smiling and seemingly

11  enjoying himself.

12        The government describes his conduct as brazen.

13  And I would agree that is an accurate description.  He felt

14  so entitled, he put his feet on the desk.  He felt so

15  entitled, he picked up her mail and walked off with a piece

16  of mail.  He felt so entitled that the government has

17  pictures of this defendant showing off, holding the mail he

18  took from Nancy Pelosi's 's office when he reached the

19  outside of the Capitol.

20        He felt so entitled to do what he did that he

21  spoke to media outlets on January 6th about the mail he had

22  taken from Speaker Pelosi's office and said, "I did not

23  steal it.  I bled on it because they were macing me and I

24  couldn't fucking see so I figured I am in her office.  I got

25  blood on her office.  I put a quarter on her desk even

1   though she ain't fucking worth it.  And I left her note on

2   her desk that says 'Nancy, Bigo was here, you Bitch.'"

3         Wow -- brazen, entitled, dangerous.

4         In these pictures and videos, the defendant is

5   wearing a hat, a plaid jacket, blue jeans and brown boots in

6   the photos.  His clothing that day becomes important in

7   evaluating whether he should be detained.  And I'll come

8   back to that.

9         The defendant traveled all the way from his home

10  in Arkansas to Washington, D.C. prepared for this assault on

11  the Capitol.  The government has obtained evidence that one

12  week before his travels to the Nation's Capitol, he went out

13  and bought the stun gun and also walkie-talkies and pepper

14  spray.  He came to the city on a critical day under our

15  constitution, prepared with a weapon and cloaked with

16  entitlement.

17        The nature and circumstances of this offense

18  clearly weigh in favor of pretrial detention.

19        Turning to the second factor, the weight of the

20  evidence against the defendant.  As I said, the weight of

21  the evidence against this defendant is overwhelming.  The

22  government has surveillance videos and many pictures of the

23  defendant from the assault on the Capitol.

24        These pictures show the defendant in the Capitol

25  appearing to carry this stun gun walking stick.  Agents

1   observed empty packaging at his home on January 8th for the

2   exact same type of stun gun that he bought and had on his

3   person when he was unlawfully inside the Capitol and inside

4   the Speaker's office.

5          During a custodial interview with law enforcement

6   on January 8 at the time of his arrest, the defendant

7   admitted to law enforcement that he had participated in the

8   Stop the Steal Rally, and that he was inside the Capitol.

9   It would have been hard for him to deny it since he seemed

10  to be happy to be one of the stars in this assault,

11  appearing in videos and in photos, in and around the

12  Capitol, including in a video where the defendant was

13  proudly holding up a letter with return address of Speaker

14  Pelosi, bragging about what he had done in the Speaker's

15  office.

16         The weight of the evidence weighs heavily in favor

17  of pretrial detention.

18         As to the defendant's history and characteristics,

19  he does have only a limited criminal history.  He also has a

20  strong history of employment.  As the Magistrate Judge in

21  Arkansas who granted pretrial release also noted, he has

22  strong ties to the area, in which he has lived with his

23  partner, Tammy Newburn.

24         At the same time, the government has presented

25  evidence of other incidents in which defendant's actions

USA v. Richard Barnett Case No. 21-cr-0038 (CRC) 37

1  have prompted police scrutiny in Fayetteville, Arkansas on

2  at least two occasions, one in July 2020 and September 2020,

3  the police were called to investigate the defendant's

4  behavior when he was armed in the public and members of the

5  public felt threatened by his behavior.

6      These incidents are troubling, not because he got

7  arrested, not because he may have been engaged in criminal

8  conduct or not, they're troubling because they suggest a

9  pattern of engaging in provocative behavior while armed.

10  And even if these activities on these other occasions did

11  not cross the line of criminal behavior, they're in line

12  with the criminal conduct alleged in this case.

13      On July 25, 2020, a 911 caller described an

14  individual matching Barnett's description as pointing a

15  rifle at her when she drove by a protest in her car with a

16  Black Lives Matter sticker.  Three different police officers

17  had to investigate this incident.

18      The defendant was at this protest carrying a rifle

19  slung across his chest, with one officer stating and

20  describing his observation of the defendant, creating a

21  disturbance with several counter protesters when he was

22  armed with a rifle.

23      The second incident also in Fayetteville on

24  September 20, 2020, the defendant had an encounter with what

25  the law enforcement calls a protest for Save the Children,

1    when a caller describes him as carrying a pistol and a rifle

2    at a rally, and looking suspicious.

3           Most concerning, or very concerning are not only

4    the defendant's actions while he was inside the Capitol but

5    after the assault on the Capitol.  The defendant told the

6    agents that the agents may not find much at his house

7    because he had people packing it up the night before he

8    turned himself in.

9           Indeed, his partner confirmed during her testimony

10   at the Arkansas detention hearing that, after some

11   dissembling about not knowing anything, that they had

12   cleared his house of his guns and given them to a friend,

13   Mark Hesse, who also traveled to Washington, D.C. for the

14   January 6 events.

15          At the same time, she denied knowing how many guns

16   he had or what type of guns he had.  And she is not a naive

17   person about guns.  She admitted she owns her own guns.  She

18   also denied knowing what happened to the defendant's stun

19   gun walking stick or his cell phone, neither of which items

20   have been recovered from his person or in the search of his

21   house.

22          Some items that the FBI did recover were the

23   several items of clothing that the defendant was seen

24   wearing in Washington during the assault on the Capitol, a

25   flannel jacket and a hat.  Where did they find these?  In

1   the trunk of Tammy Newburn's vehicle hidden under a dog

2   crate.

3         Ms. Newburn's 20 year relationship with the

4   defendant plainly shows her loyalty to him, and her actions

5   to help clear up the house of evidence, put stuff under a

6   dog crate in her trunk, dissembling at the hearing about her

7   activities, to my mind, raises significant questions about

8   her real ability to be a trustworthy third-party custodian

9   to ensure the defendant's compliance with any release

10  conditions.

11        Also troubling is that, when the defendant drove

12  back to Arkansas from D.C., he admitted, almost bragged that

13  he took steps to hide his identity by turning off his

14  location services on his phone, covering his face and only

15  using cash, all steps to evade law enforcement, which he

16  knew, given his fairly brazen conduct while in D.C., were

17  looking for him.

18        This history of provoking police attention while

19  armed in public, compounded by his attempts to evade law

20  enforcement and hide evidence weighs in favor of detention.

21  I am aware that the defendant turned himself into law

22  enforcement.  And this fact does count in his favor.  But

23  the circumstances surrounding his surrender suggests that

24  this fact is entitled to very little weight.

25        He knew the images of him at the riot in the

 1   assault on the Capitol had been widely circulated.  He had

 2   boldly talked to the press right at the scene of the assault

 3   on the Capitol.  Both the New York Times and the Washington

 4   Post have him identified, you know, talking about how he sat

 5   in the Nancy Pelosi's office.

 6          He didn't turn himself in immediately, but instead

 7   arranged for a time for surrender that allowed him to clear

 8   out his house of incriminating evidence.  He bragged about

 9   this to law enforcement, saying, "If you all go out there

10   and do a search warrant, you can see all my shit.  You ain't

11   going to find nothing out there, I assure you.  I'm a smart

12   man.  There's not anything there."

13          I don't know how smart Mr. Barnett is but he is

14   certainly a bragger.  Bragging to law enforcement about what

15   he has done to cover his tracks is not a smart thing to do.

16   In short, the fact that the defendant turned himself in on a

17   schedule of his choosing does little to mitigate the heavy

18   weight of the other factors favoring detention.

19          As to the fourth factor, the Nature and

20   Seriousness of the Danger to Any Person or the Community

21   that Would Be Posed by the Person's Release.

22          I start with what happened on January 6th.  He was

23   part of a violent assault on the Capitol in which five

24   people lost their lives.  He brought a weapon to this event

25   that he had bought for the occasion.  He brought it all the

1    way from Arkansas to the Nation's Capitol to further efforts

2    of disrupting a constitutional event.

3          Given defendant's participation in the assault on

4    the Capitol and his brazen actions while inside the Capitol

5    Building and private offices of the Speaker of the House of

6    Representatives and perhaps others, the fact that he has

7    prompted police attention the last six months due to his

8    public actions while armed, the fact that he owns an unknown

9    number of firearms which he and his partner removed from his

10    home before he scheduled his time to turn himself in, and

11    before the FBI searched his house, the fact that he has

12    admitted to engaging in evasive conduct upon his return to

13    Arkansas after the assault on the Capitol, and his boldly

14    entitled behavior while unlawfully inside the Capitol, all

15    together make this Court very concerned he poses a danger to

16    the community, not only because of his access to guns, which

17    may now be in the custody of his good friend who traveled to

18    Washington, D.C. with him, and also the missing stun gun,

19    but also because of the entitlement that he reflected in his

20    conduct.

21          The Court does not share the Magistrate Judge's

22    confidence in designating Tammy Newburn as a true

23    third-party custodian responsible for defendant's compliance

24    with any release conditions.  As noted, Ms. Newburn appears

25    to have helped the defendant hide evidence, was highly

1   evasive when asked at the hearing before the Magistrate

2   Judge about whether she put the clothing in his trunk, why

3   she put it in her trunk and hid it below her dog create.

4          The responses regarding the defendant's firearms,

5   when they were removed, how many there were, where they

6   were, were similarly evasive until she was compelled to

7   answer.

8          Just as importantly, the Court finds that there

9   are no conditions or combination of conditions that will

10  assure this defendant's appearance as required or compliance

11  with any release conditions, because of his entitled

12  behavior that he exhibited on videos and in photographs

13  while he was inside the Capitol show a total disregard for

14  the law and for official directives, total disregard for the

15  U.S. Constitution.

16         Upon consideration of the proffered evidence

17  presented and the factors set forth in 18 USC Section

18  3142(g) and the possible release conditions set forth in

19  Section 3142(c), the Court finds that all four statutory

20  factors weigh heavily in favor of pretrial detention.  And

21  the government has met its burden of establishing that there

22  are no conditions or combination of conditions that will

23  reasonably assure the safety of any other person in the

24  community..

25         Magistrate Judge Weidemann did a thorough and

```
 1   thoughtful job considering the evidence but I respectfully

 2   disagree.  The charges against this defendant are gravely

 3   serious and the evidence is extraordinarily strong.  His

 4   brazen conduct both inside the Capitol Building during the

 5   assault on the Legislative Branch of our Government, and his

 6   evasive conduct once he knew he was under investigation

 7   bring into question his willingness to abide by any

 8   conditions of release that this Court might impose instead

 9   of pretrial detention.

10           The government's motion for pretrial detention is

11   therefore granted.

12           Mr. Barnett is directed to appear before the

13   criminal duty magistrate next Tuesday at 3:00 P.M. unless he

14   is indicted before then.  If the defendant is indicted

15   before then, he will appear when scheduled before the judge

16   to whom this case is randomly assigned.

17           Is there anything further today from the

18   government?

19           MS. DOHRMANN:  No, Your Honor.

20           THE COURT:  Is there anything further from the

21   defendant?

22           MR. SIANO:  No, Your Honor.

23           THE COURT:  All right.  You all are excused.

24           (Whereupon, at 4:26 p.m., the hearing was

25   concluded.)
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

       I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of the remotely reported proceedings in the above-entitled matter.

       Please Note: This hearing was held in compliance with the COVID-19 pandemic and the standing orders of this court, and is therefore subject to the technological limitations of court reporting remotely, including static, signal interference and other restrictions.

_____   1-29-2021
Lisa Walker Griffith, RPR                 Date

USA v. Richard Barnett Case No. 21-cr-0038 (CRC)

# EXIBIT I



The Privacy Office
USA v. Richard Barnett Case No. 21-cr-0038 (CRC)
**U.S. Department of Homeland Security**
Washington, DC 20528

# HOW TO PREVENT ONLINE HARASSMENT FROM "DOXXING"

---

**What is Doxxing?**
Doxxing refers to gathering an individual's Personally Identifiable Information (PII) and disclosing or posting it publicly, usually for malicious purposes such as public humiliation, stalking, identity theft, or targeting an individual for harassment.

**How Can Doxxing Impact You?**
Doxxers may target government employees for such purposes as identifying law enforcement or security personnel, demonstrating their hacking capabilities, or attempting to embarrass the government.

---

## HOW IS IT DONE?

### Hacking, Social Engineering, or Other Malicious Cyber Activities
Doxxers may use hacking, social engineering, or other malicious cyber activities to access personal information.  One common practice is **getting access to a victim's email account**.  A doxxer could use social engineering to get your password by posing as a representative from the IT helpdesk or your Internet Service Provider.

- Once a doxxer has access to your email account, he or she will attempt to **obtain more personal information from your account or break into other web-based accounts** (e.g., social media, online storage, and financial records) by using email-based password resets or harvesting your information in order to answer website security questions.  The doxxer may also attempt to use the same email address and password combination on other sites to gain access to additional accounts.
- **A doxxer could use your DHS username and password to attempt to access the DHS network.**

### Collecting Publicly Available Information
Doxxers may collect information about you from Internet sources, such as property records, social media postings, obituaries, wedding announcements, newsletters, public conferences, and web forums.

- Most, if not all, of this information is publicly available. The doxxer compiles information from multiple public-facing sources to reveal sensitive information about the victim, such as the victim's home address, family members, photos, workplace, and information about the individual's habits, hobbies, or interests.
- In this "mosaic effect," **the seemingly innocuous information we post or share can be put together to develop a detailed dossier about us**.

### Purchasing Information from Data Brokers
Doxxers may also use "data brokers" or people-search sites that compile information from public and commercial sources and then sell this information to companies or the public.  These **brokers may obtain commercial data from retailers, catalog companies, magazines, and websites (e.g., news, travel).**

## STEPS TO MITIGATE DOXXING

### Limit What You Share Online

- **Be careful about what you choose to share online.** Some of the publicly available information (e.g., public records) may be out of your control, but remember that anything you post on the Internet might be misused, including photos. Once it's online, you cannot take it back.
- **Avoid posting information that may increase your chances of being targeted for doxxing.** Not all information has the same sensitivity level. For example, don't post information about your job on social media, especially sensitive details about your job duties or your physical location.
  - Avoid posting information that might be used to answer website security questions, such as your pet's name or where you were born.
- **Turn on privacy settings** on social media, mobile applications, and other websites, and be careful about the connections or friends you may have on these sites.
- **Limit your use of third-party applications** on social media and the use of social media accounts to log into other websites. These third-party applications receive PII from your profile when you use them.
- **Consider removing yourself from data brokers.** Unfortunately, this can be a time-consuming process, and your information may re-appear when data brokers receive new or updated data sources, so everyone must weigh the potential benefit against the effort required.

### Stay Secure

- **Practice good cyber hygiene.** Set up two-step verification, use complex passwords, and avoid using the same password for multiple accounts to help prevent the hacking or hijacking of your accounts.

### Act Fast

- **If you receive a suspicious email on your DHS account, forward it to DHSSPAM@hq.dhs.gov.**
- If doxxers publish your information on social media, report it immediately and ask that it be taken down.
- Document threats you receive, and if you think you're in danger, call the police. If you believe you are the victim of identity theft, file a report with your local police office. Even if they do nothing, it's good to get a report on file. Ask to speak with an officer who specializes in online crimes.

## FOR MORE INFORMATION

- ➢ The Office of the Chief Security Officer also has a Social Media Safety page with a helpful booklet and many other resources.
- ➢ FBI's Public Service Announcement on doxxing.
- ➢ US-CERT cyber tip sheets.
- ➢ FTC video on Sharing Information: A Day in Your Life and FTC tips on protecting personal information.
- ➢ DHS's Stop. Think. Connect.™