# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-CR-00038 (CRC)** |
| | ) | |
| **RICHARD BARNETT**, | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION TO DISMISS CHARGES AND IN THE ALTERNATIVE TO TRANSFER VENUE

RICHARD BARNETT, through undersigned attorney Joseph Daniel McBride, respectfully moves this court to dismiss all charges in the criminal indictment at ECF No. 19 for the above-captioned case because the government, in the persons of the President and the Congress under the January 6th Select Committee, has intentionally and irreparably poisoned the jury pool.  Alternatively, should this Honorable Court find that the charges should not be dismissed, Mr. Barnett respectfully moves this Honorable Court, pursuant to Federal Rule of Criminal Procedure 21, for a transfer of venue so that he may be tried by an impartial jury outside the D.C. area which has been subject to daily media influence and victimhood, where he may receive a fair trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. He requests a hearing on these matters and asserts the following:

## I.       STATEMENT OF FACTS

Richard Barnett is a sixty-year-old United States Citizen with no criminal record. Mr. Barnett has been in a committed relationship with his life partner Tammy Newburn for over twenty years. Richard lives with wife Tammy and daughter Ashlee, whom both depend on him for financial support.  He is a gainfully employed ex-fire fighter who is beloved in his community. He spent the

first part of his life in Memphis Tennessee and has been living in Western Arkansas for the past twenty-five years. Richard's ties to his community are strong. He has personal relationships with members of the local business community, law enforcement, friends, and family. He has no warrant history and has never forged or altered his identification.

On January 6, 2021, Mr. Barnett walked over to the Capitol at some point after President Trump's speech. He broke through no barriers and assaulted no police. He followed a peaceful crowd. He wound up standing with other protesters in front of the Columbus Doors, which are located at the East side of the Capitol. At some point those doors opened, and as throngs of people behind him pushed, he was swept inside with a mass wave of people. He may have yelled words to the effect of "coming in" because of being shoved forward and concurrent with being unable to turn against the crowd. After a certain point, he witnessed a woman getting trampled. He helped the woman get up, and felt the force of the crowd knocking him to the ground. It was impossible to go against the tidal wave of people, all moving all in the same direction.

Soon thereafter, while looking for a restroom, he wandered in an office. He was not alone, there were protestors and reporters around. He did not break the door to get into the room. It was open and there was no sign on the door. A reporter invited Mr. Barnett to take a picture at the Speaker's desk and told Richard "act natural." Richard was asked to leave at some point—he did not object. He did not destroy any property; indeed, he told others NOT to do so. Before leaving, he realized that he was bleeding and that he had bled on an envelope. He then removed the envelope for sanitary reasons, left twenty-seven-cents as compensation, and in an act of protest, left a note.

As set forth during Richard's prior bond hearings, Richard contacted his local Sheriff shortly after discovering that his picture had made international headlines. Richard arrived home during the late afternoon of January 7, 2021, and immediately set an appointment to surrender the

following morning at 10:00 A.M. The next morning, without any controversy, Richard surrendered himself. Immediately upon being subjected to a custodial interrogation, Richard invoked his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel but was interrogated for almost two hours by two government agents, nonetheless.

Mr. Barnett agreed to surrender his passport to probation after being granted pretrial release by the Western District of Arkansas Magistrate Judge.  The Government appealed the Magistrate Judge's decision to release. The DC District Court ruled against Mr. Barnett and issued an order for his detention on January 29, 2021 (See ECF No. 16).  Mr. Barnett was detained at the DC Jail until he was granted release by this Honorable Court after an April 27, 2021 Bond Modification hearing.  Mr. Barnett has been on pretrial release since that time.

Mr. Barnett has never run from the fact that he ended up inside the Capitol. He has never denied the fact that he wound up in the office suite belonging to the Speaker of the House and put his feet up on a desk. He has never denied the fact that he removed an envelope from that office because he bled on it.  Mr. Barnett's position is simple, he showed up to the Capitol to protest.  The protest began outside and then proceeded inside.  Everything he did inside was grounded in political protest:  the feet on the desk; the flag in his hand; the irritation in his voice; the note he left.  It was all protest, protest, protest.

Mr. Barnett understands that his actions have offended people.  He understands that he has been accused of serious crimes and that he must defend himself in court.  Mr. Barnett respectfully submits that President Biden's continued defamatory statements about January 6th Defendants and MAGA Republicans in conjunction with the actions of the January 6th Committee, have prejudiced him to the extent that dismissal of his indictment is warranted.  Mr. Barnett respectfully submits,

in the alternative, that a change of venue is warranted because it is impossible for him to receive a fair trial in the District of Columbia.

## II.        MOTION TO DISMISS ALL CHARGES

Richard Barnett, like all other January 6th Defendants who came to the United States Capitol to support President Trump on January 6, 2021, is clearly a MAGA Republican.  Mr. Barnett's right to choose to be a MAGA Republican is constitutionally protected and sacred.  As is his right to protest the Federal Government for the redress of grievances.

President Biden's attack on Mr. Barnett's political affiliation is unprecedented. The fact, however, that the group of people targeted by President Biden is also the group being prosecuted by his Attorney General, is unconscionable. Never in the history of this great country has a sitting President publicly accused members of the opposition political party of treason and/or classified them as extremists for their constitutionally protected beliefs.  Never has a sitting President scapegoated and subsequentially encouraged his government to relentlessly round-up and every single person who dared to protest his certification.  Never has a President encouraged his citizens to act against his political enemies in the way Joe Biden did during his September 21, 2022, prime-time address to the nation. Nor is there any case law to reference for when the top U.S. law enforcement official declares untried defendants guilty of insurrection and for being extremist threats to the nation.

Over 94% of D.C. voters cast ballots for this President and almost as large a percent either work for the federal or D.C. government or have family and friends who do. The President's words are akin to an order for D.C. juries to find the defendants guilty of any and every charge because they are insurrectionists and terrorists. The January 6th Select committee has mirrored those remarks.

On September 1, 2022, Joseph R. Biden, Jr., the President of the United States of America, addressed the nation in a prime-time television address, which began at 8:03 PM EDT and concluded at 8:27 P.M EDT. During this 24-minute speech, President Biden made the following thirty-one statements about MAGA Republicans:

1. Donald Trump and the **MAGA Republicans** represent an extremism that threatens the very foundations of our republic.

2. Now, I want to be very clear — (applause) — very clear up front: Not every Republican, not even the majority of Republicans, are **MAGA Republicans**.  Not every Republican embraces their extreme ideology.

3. But there is no question that the Republican Party today is dominated, driven, and intimidated by Donald Trump and the **MAGA Republicans**, and that is a threat to this country.

4. These are hard things. But I'm an American President — not the President of red America or blue America, but of all America. And I believe it is my duty — my duty to level with you, to tell the truth, no matter how difficult, no matter how painful. And here, in my view, is what is true: **MAGA Republicans** do not respect the Constitution.

5. **They** do not believe in the rule of law.

6. **They** do not recognize the will of the people.

7. **They** refuse to accept the results of a free election.

8. And **they're** working right now, as I speak, in state after state to give power to decide elections in America to partisans and cronies, empowering election deniers to undermine democracy itself.

9. **MAGA forces** are determined to take this country backwards — backwards to an America where there is no right to choose, no right to privacy, no right to contraception, no right to marry who you love.

10. **They** promote authoritarian leaders, and they fan the flames of political violence that are a threat to our personal rights, to the pursuit of justice, to the rule of law, to the very soul of this country.

11. **They** look at the mob that stormed the United States Capitol on January 6th — brutally attacking law enforcement — not as insurrectionists who placed a dagger to the throat of our democracy, but they look at them as patriots.

12. And **they** see their **MAGA** failure to stop a peaceful transfer of power after the 2020 election as preparation for the 2022 and 2024 elections.

13. **They** tried everything last time to nullify the votes of 81 million people.

14. This time, **they're** determined to succeed in thwarting the will of the people.

15. That's why respected conservatives, like Federal Circuit Court Judge Michael Luttig, has called Trump and the **extreme MAGA Republicans**, quote, a "clear and present danger" to our democracy.

16. But while the **threat to American democracy** is real, I want to say as clearly as we can: We are not powerless in the face of these threats.  We are not bystanders in this ongoing attack on democracy.

17. There are far more Americans — far more Americans from every — from every background and belief who reject the **extreme MAGA ideology** than those that accept it.

18. And, folks, it is within our power, it's in our hands — yours and mine — to stop the **assault on American democracy.**

19. **MAGA Republicans** have made their choice.

20. **They** embrace anger.

21. **They** thrive on chaos.

22. **They** live not in the light of truth but in the shadow of lies.

23. Democrats, independents, mainstream Republicans: We must be stronger, more determined, and more committed to saving American democracy than **MAGA Republicans** are to — to destroying American democracy.

24. Ladies and gentlemen, we can't be pro-ex- — pro-ex- — **pro-insurrectionist** and pro-American.  They're incompatible.

25. Democracy cannot survive when one side believes there are only two outcomes to an election: either they win or they were cheated.  And that's where **MAGA Republicans** are today.

26. **They** don't understand what every patriotic American knows: You can't love your country only when you win.

27. I will not stand by and watch elections in this country stolen by people who simply refuse to accept that **they** lost.

28. **MAGA Republicans** look at America and see carnage and darkness and despair.

29. **They** spread fear and lies –- lies told for profit and power.

30. The **MAGA Republicans** believe that for them to succeed, everyone else has to fail.

31. **They** believe America — not like I believe about America.[1]

At the conclusion of his speech, backlit in red, and flanked by two unmoving Marines, the President exhorts all Americans to put their hatred into action: "It's within our power to stop the assault on American democracy."  What better place to begin than in the jury box?

The President has incited the entire nation to hate the January 6th defendants as a patriotic duty.  The President, the holder of National Command Authority, has charged the American Public with protecting democracy against MAGA Republicans, at any cost.  He has made it clear, 'it's us against them.'  President Biden demands betrayal of a juror's oath by anyone sitting in judgment of

---

[1] See White House Official Transcript of President Biden's Speech: *The Continued Battle for the Soul of the Nation* @ *https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/09/01/remarks-by-president-bidenon-the-continued-battle-for-the-soul-of-the-nation/* (last visited on September 8, 2022).

a January 6th defendant, and therefore a juror's impartiality will not become evident at *voir dire*. A demand from a person with such authority tends "to deprive the accused of his right to a forum where impartiality is not impaired." *United* States *v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986).]

Therefore, and for the reasons stated above, Defendant Richard Barnett moves to have the indictment dismissed in its entirety because it is no longer possible for him to receive a fair trial because both the legislative branch and executive branch have declared him to be an enemy of the state. His rights under the U.S. Constitution to a fair trial with impartial jury have been "reverse nullified" - so as to be found guilty regardless of evidence that he should be acquitted - by the U.S. President and U.S. Congress.

## CONCLUSION

The Court should dismiss all charges because the "reverse jury nullification" by the U.S. President and Congress will not be evident during *voir dire*, and contrary to Mr. Barnett's rights in the U.S. Constitution under the Fifth and Sixth Amendments, and despite the Article II duty of the President to faithfully execute the law and support and uphold the U.S. Constitution, the jurors were given the duty by the President's message to find Mr. Barnett guilty.

## III.    MOTION TO TRANSFER VENUE

Richard Barnett incorporates and re-alleges the forgoing paragraphs by reference.

### A.    Federal Rule of Criminal Procedure 21(a)

The Fifth and Sixth Amendments of the United States Constitution entitle criminal defendants to a fair trial by an impartial jury. *See In re Murchison*, 349 U.S. 133, 136 (1955). "The theory in our system of law is that conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence[.]" *Patterson v. Colorado*, 205 U.S. 454, 462 (1907). Justice Hugo Black observed that the American justice system "has always endeavored to prevent even the probability of unfairness." *Id.* Accordingly, Federal Rule of Criminal Procedure

21(a) instructs that district courts "must transfer the proceeding if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

In some cases, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City (Western District of Oklahoma) would be constitutionally unfair) (*see also Murphy v. Fla*., 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during *voir dire*] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."). "[W]here there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell,* 384 U.S. 333, 362-363 (1966).

When the threatened harm is prejudice to a fair trial, a number of alternatives less restrictive of expression may be available, which include:

> (a) change of trial venue to a place less exposed to intense publicity; (b) postponement of the trial to allow public attention to subside; (c) searching questioning of prospective jurors to screen out those with fixed opinions as to guilt or innocence; (d) the use of emphatic and clear instructions on the sworn duty of each juror to decide the issues only on evidence presented in open court(;) (e) sequestration of jurors (to) enhance the likelihood of dissipating the impact of pretrial publicity and emphasize the elements of the jurors' oaths.

*In re Halkin,* 598 F.2d 176, 195, (D.C. Cir. 1979) (citing *Nebraska Press Ass'n*, 427 U.S. at 563-64; *see also Sheppard*, 384 U.S. at 333). In *Irving v. Dowd*, the Supreme Court stated:

> In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. *Cf. Thompson v. City of Louisville*, 362 U.S. 199. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.

*Irvin v. Dowd,* 366 U.S. 717, 722 (1961); but *see Patton v. Yount*, 467 U.S. 1025, 10311032 (1984) (distinguishing *Irvin v. Dowd*'s holding on the grounds that the second jury trial took place four years later after pretrial publicity had long subsided).

The Court further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. QuilesOlivo*, 684 F.3d 177, 182 (1st Cir. 2012); *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429-430 (1991) (citing *Patton, supra*, at 1035) ("Under the constitutional standard, on the other hand, 'the relevant question is not whether the community remembered the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant.'").

When examining a Rule 21 motion to transfer venue, a court should consider (1) the size and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the proximity between the publicity and the trial; and (4) presumed prejudice. *Skilling v. United States*, 561 U.S. 358, 378-81 (2010). In *Rideau v. Louisiana*, 373 U.S. 723 (1963), the Supreme Court held that a murder defendant's due process rights were violated where pretrial publicity included an interview broadcast three times locally. *Id.* The Court in *Skilling* set forth the above-mentioned factors for determining the presence "presumed juror prejudice" which requires a transfer of venue. *Skilling*, 561 U.S. at 381-382.

A review of the *Skilling* factors makes apparent that the Court should transfer the Defendant's case from the District of Columbia because of "presumed juror prejudice." Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; see also *Skilling*, 561 U.S. at 378. The importance of an impartial jury is so fundamental to Due Process that,

notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court must transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378. In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias).

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue[2], an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool.

Mr. Barnett respectfully submits that these concerns are pressing in this case. Additionally, facts show that the District of Columbia jury pool is already tainted and with each passing day and the

---

[2] Though not relevant to the instant motion, the Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilty.

media coverage of the January 6th House Select Committee hearings, there is no hope that Mr. Barnett can obtain a fair and impartial jury in the District of Columbia.

**B.     Size and Characteristics of the Community**

The first *Skilling* factor to consider is the size and characteristics of the community in which the alleged crimes occurred. *Skilling*, 561 U.S. at 382. In *Skilling,* the Court found that Houston was the fourth most populace city in the United States with 4.5 million people eligible for jury service, a much greater number than the District of Columbia that has only a total of 499,789 registered voters.[3] Additionally, the District of Columbia is one of the more transient areas in the country, due to the large number of interns, political appointees, and students.[4] This has an effect of further diminishing an already small jury pool as residents registered to vote may no longer live in the District.

When considering the characteristics of the community, *Skilling* held that with careful identification and inspection of prospective jurors' connections to the defendant, a jury with non-existent or attenuated links to the defendant could be seated. *Skilling*, 561 U.S. at 384-85. In this unique case, the data already exists that shows that it would be impossible to find a jury in the District of Columbia that has a "non-existent or attenuated links" to the events of January 6, especially when compared to other regions.

Several January 6th Defendants, not Barnett, commissioned a Multi-District Survey. See Exhibit A "Multi-District Study". This extensive survey was conducted in four regions: the District of Columbia, the Middle District of Florida (Ocala Division), the Eastern District of North Carolina,

---

[3] D.C. Board of Elections, *Monthly Report of Voter Registration Statistics City Wide Registration Summary as of August 31, 2022*, https://dcboe.org/CMSPages/GetFile.aspx?guid=fd3f232f-851c-4a71-a4ba-ef5964118891 (last visited Sept. 23, 2022).

[4] *Yes, D.C. Is A City Of Transients (But The Married And The Rich Tend To Stay)*, WAMU.com (Jan. 28, 2015), wamu.org/story/15/01/28/if_youre_rich_and_married_youre_more_likely_to_stay_in_dc/ (Last visited Sept. 23, 2022).

and the Eastern District of Virginia. (*Id*. at p.1, fn. 2). While the non-D.C. test areas registered reliably similar results to each other, the survey found that D.C. respondents were an outlier and had a "decidedly negative" attitude towards J6 defendants. (*Id*. at 2). Shockingly, "91% of DC Community respondents who answered all of the prejudgment test questions admit making at least one prejudicial prejudgment on issues related to the case, while other [areas] admit doing so at rates from 49% to 63%." *Id*. A whopping 30% of D.C. residents admitted to making every prejudicial prejudgment, double the rate of the next highest area. *Id.*



A significant finding in the survey was the elevated concern by D.C. residents vis-a-vis their safety concerns in light of J6. Respondents were asked: Have you experienced increased concern about your own safety or the safety of people important to you due to the events of January 6th? The difference between the D.C. and the other areas is astounding:



The survey included four questions as to the personal impact J6 had on the respondents; the responses confirming personal impact on D.C. residents was almost double that of those surveyed in the Eastern District of Virginia. See Ex. A at 4.  As the Court undoubtedly recalls, the National Guard was deployed in D.C. for more than four months after the J6. Mayor Bowser declared a state of emergency and implemented a 6 p.m. curfew for weeks subsequent to J6. The District implemented significant road and public space closures in direct response to J6.[5] The Department of Homeland Security declared that government offices were potential targets of violent domestic extremists who were allegedly emboldened by the "mob assault" on the Capitol.[6] Additionally, nearly 15,000 individuals work for Congress directly, and many more D.C. residents have friends and family who work on the Hill. Finally, many D.C. residents have friends and family employed by law enforcement groups who took part in responding to J6.

The majority of potential jurors in the District of Columbia were personally impacted in some

---

[5] DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed; NBC4 Washington, https://www.nbcwashington.com/news/local/dc-inauguration-updates-fridayclosuresthreatsnational-mall/2542719/ (last visited March 28, 2022).

[6] DHS Warns of Heightened Threats from Violent Domestic Extremists, NPR, https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent-domestic- extremists (last visited March 28, 2022).

way by the events on Capitol Hill on J6. See Ex. A at 4. This factor weighs heavily in favor of transferring the instant cases to the Eastern District of Virginia or some other District. D.C. is a city that, as a whole, feels that it has been the victim of a crime because of the events of J6. Clearly, J6 was a substantially more impactful event than Enron's collapse, the subject of *Skilling*, which personally affected a few hundred families in a city of 4.5 million residents, who could easily be stricken from the jury pool.

### C.    Nature and Extent of Pretrial Publicity

The next Skilling factor pertains to the adverse publicity against the former Enron executive. *Skilling*, 561 U.S. at 382. Generally, the nature and extent of pretrial publicity related to the events of J6 weigh heavily in favor of transferring venue, and in the case of Richard Barnett, the nature and extent of pretrial publicity related to J6 weighs arguably heavier in his favor than it does for any other January 6th defendant.



The above picture is far and away the most notorious photograph associated with the events of January 6th. It has been covered in news outlets in all 50 states and every major city. This picture is synonymous with media labels of insurrection and domestic terrorism the world over. But in no place is this picture more triggering, and anger-provoking, than the District of Columbia. Residents

take it personally whereas they are not aware the photographer set up Mr. Barnett to be a model for how he and the media wanted to depict January 6th.

The following three examples are representative of the multitude of negative articles depicting Richard Barnett as the face of an insurrection.  Washington Post Headline for January 7, 2021: "Man who posed at Pelosi desk said in a Facebook post that he is prepared for violent death."[7]  NPR headline: January 6, 2022, "Photos: A look back at the Jan. 6 insurrection" Richard Barnett, a supporter of President Donald Trump, sits inside the speaker of the House Nancy Pelosi's office after breaking into the Capitol."[8] Washington Post Headline for January 28, 2021:  D.C. judge jails Richard Barnett, man who was photographed in Pelosi's office.  The article describes statements made by the Hon. Beryl A. Howell, Chief Judge of the DC District Court, in the following manner:

> "Expressing not just concern but disgust, a federal judge in D.C. on Thursday ordered a man who was photographed with his foot up on a desk in House Speaker Nancy Pelosi's office during the Capitol insurrection to remain behind bars pending trial.
>
> Chief U.S. District Judge Beryl A. Howell repeatedly described Richard Barnett, 60, of Gravette, Ark., as "entitled," "brazen" and "a braggart." In her first public remarks related to the events at the Capitol, she said Barnett "showed a total disregard for the law" and "total disregard for the U.S. Constitution."

District residents have been exposed to thousands of comments from local and national leaders regarding J6, related arrests, criminal charges, Congressional hearings and, prosecutorial outcomes. Unlike the Enron prosecution, J6 is an ongoing event, with prosecutors continuing to charge defendants. The negative publicity loop never stops, whereas in *Skilling*, four years went by before the trial took place, with little negative publicity.

Negative press coverage is guaranteed to continue perhaps forever. The January 6 Select

---

[7] See Washington Post Article from January 7, 2021:  https://www.washingtonpost.com/investigations/man-who-posed-at-pelosi-desk-said-in-facebook-post-that-he-is-prepared-for-violent-death/2021/01/07/cf5b0714-509a-11eb-83e3-322644d82356_story.html (last visited on September 22, 2022).
[8] See NPR Article from January 6, 2022: https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-a-look-back-on-the-jan-6-insurrection (last visited on September 22, 2022)

Committee has released a number of public statements about alleged "insurrectionists," "white supremacists," and "domestic terrorists." All of these labels are falsely attached to Mr. Barnett before any evidence has been presented.

Specifically related to Mr. Barnett, Speaker Pelosi went so far as to declare that Donald Trump was an accessory to murder. Speaker Pelosi's fellow congresswoman Alexandria Ocasio-Cortez tweeted to her 13.4 million followers on Twitter that she had a near death experience in her Congressional office. These statements, that have nothing to do with Mr. Barnett's actions on January 6th, were made to conjure up a prejudicial image of the "insurrectionists," especially of Mr. Barnett because of the widely circulated photograph of him.

Respectfully, Barnett does not agree that J6 was an "act of domestic terror," "a white supremacist attack," or an "insurrection" on his part. In fact, unlike D.C. residents, most Americans, as the three attached surveys show, believe that J6 was a very large protest that got out of hand and turned into a riot by a select few that were there. One of the Capitol policemen[9] Aquilino Gonell, wrote a guest essay in the New York Times on July 11, 2022, describing how President Trump and his followers beat him on January 6 as he defended "our democracy." He was then highlighted in the J6 hearing July 12, 2022 by Jamie Raskin.[10] This type of inflammatory press will only continue to have adverse effects on Richard Barnett because of the familiarity with his likeness, above all other January 6th defendants.

The January 6th Committee's deliberate targeting of January 6th Defendants has made it impossible for Mr. Barnett to get a fair trial in Washington, DC. Moreover, if this Honorable Court were to excuse on *voir dire* all prospective jurors who have any substantial recollection of the January

---

[9] See Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release) (emphasis added).

[10] https://www.nytimes.com/2022/07/10/opinion/capitol-police-jan-6.html.

6th Committee's hearings, no jurors would be left.  (*See United States v. North*, 910 F.2d 843, Section I of Chief Judge Wald's Dissent referencing the fact that Judge Gesell excused on *voir dire* all prospective jurors who had any substantial recollection of North's immunized testimony).

The January 6th Committee has publicly stated that it will continue its hearings into the Fall of 2022.  The January 6 Select Committee just authored a book, with a forward by Committee Chair Rep. Adam Schiff, that is available for preorder on Amazon, and is already ranked #1 in "New Releases" before it becomes available in November of 2022.  The description, presumably written by a member of the committee, reads:

> On January 6, 2021, the United States came perilously close to losing its democracy. A mob instigated by the president of the United States violently attacked the Capitol Building in Washington, D.C., seeking to disrupt the certification of the electors in the presidential election and prevent the peaceful transfer of power for the first time in American history. The attack was the culmination of a plot organized and driven by a defeated president, attempting to remain in power through a complex web of deceit, intimidation, and violence.
>
> This is the official report of the investigation into the attack—perhaps the most vital congressional investigation in American history—with exhibits, witness testimony, and an exclusive foreword by Congressman Adam Schiff, who offers critical insights into this harrowing chapter in American history.

The fact that the Committee would release its findings before Mr. Barnett has his day in court sends a clear message to Mr. Barnett that his right to a fair trial is secondary to the Committee's quest for truth, and a clear message to the public at large that the case is already closed.

This is not the first time Congress has thwarted the judicial process in Washington DC.  Oliver North's conviction was subsequentially overturned by the DC Circuit for similar behavior by Congress.  At issue in North's case was the fact that grand juries and trial witnesses were "thoroughly soaked in North's immunized testimony."  *North*, 910 F.2d at 863.  The TV and media cycle that soaked the world in North's immunized testimony in 1987 or the Enron scandal in 2001 took place in a drastically different world, before the existence of ubiquitous smartphones, addictive social media websites like Facebook, Twitter, and YouTube, and the inescapable pervasiveness of viral

internet clips and memes. Under those circumstances, combined with the level of negative media coverage that Mr. Barnett has received, with the January 6th Committee's actions, and President Biden's continued characterization of January 6th Defendants as Insurrectionists and Terrorists, and MAGA Republicans as extremists, it is accurate to say that the prejudicial information about Mr. Barnett is not "of the type readers viewers could not reasonably be expected to shut from sight."

## D.      Proximity of Publicity to Trial

The *Skilling* Court distinguished Rideau, where a trial was conducted in close proximity to prejudicial news coverage, with Skilling's trial, where "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. Again, this factor weighs heavily in favor of relocating the trial from D.C. The ongoing negative publicity generated by the House Select Committee Hearings creates presumed prejudice for defendant Barnett and it is ongoing. The committee has not announced when it will end its fact-finding mission. In fact, Barnett respectfully submits that requiring him to go to trial in the District in the dark shadow of the Select Committee's investigation, would be highly prejudicial. The Court of Appeals for the First Circuit, for example, addressed the prejudicial effect of contemporaneous congressional hearings in *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952). In Delaney, the trial judge refused to grant a lengthy defense continuance request, which was based upon ongoing congressional hearings into the "scandal" involving the defendant. *Id.* at 114. The Delaney Court ruled that the trial judge abused his discretion in not granting the continuance, noting that the actions of Congress in generating adverse publicity were equivalent to prosecutors doing the same:

> [I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm.

*Id.* at 114.

The Court of Appeals for the District of Columbia dealt with a similar issue during Watergate. Former Nixon official Robert Ehrlichman sought a continuance of his trial date based upon the Senate Watergate hearings, which was denied by the trial judge. Upholding the trial court's ruling, the Court of Appeals distinguished *Delaney* on the grounds that Ehrlichman was not indicted at the time of the Senate hearings, because it was a full year in the rear-view mirror:

> Similarly, a continuance in the circumstances at bar is not required by *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), where legislative hearings were held concerning the criminal activity to be tried. In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings.

*United States v. Ehrlichman*, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

The non-stop negative publicity requires the Court to either grant a lengthy continuance or transfer of venue to a federal district that is not satiated by the Select Committee's work. The instant case is far worse than *Delaney* and *Ehrlichman*. On top of the Select Committee hearings, J6 is reported on every day in local news channels and in newspapers online and in print. On the day of this filing, nearly two years after the event, the events of January 6 appear on the websites of major news organizations including CCN, NBC, PBS, CBS, ABC, Fox News, the New York Times, and countless smaller national and local publications.

The one-year anniversary of the event, as well as recent sentencings of high-profile J6 defendants, have kept the matter in the forefront of local discourse and no doubt the 2nd anniversary will be much the same. And on and on each year. Indeed, with former President Trump suggesting he may run again for President, the impact of these hearings, and the political fallout, cannot be underestimated. There are daily stories about the congressional investigation into the events of J6, revealing new details, with a political spin and a decidedly one-sided taint. Multiple Trump Administration officials have refused to testify before the Select Committee for various reasons, creating an aura of suspicion in the minds of potential D.C. jurors that they may be hiding

incriminating information.

Most recently, Ms. Cassidy Hutchinson testified before the select committee and ratings were through the roof.[11]  According to the Nielson company, the testimony was viewed by 13.17 million people, almost as many as watched the last Academy Awards and Baseball World Series.  D.C. came to a screeching halt as everyone tuned in to her testimony before the J6 committee. The fallout of this hearing has caused even more witnesses to be subpoenaed. From June 28, 2022 to July 9, 2022, The Washington Post ran at least 31 pieces, both news and opinion, on Ms. Hutchinson's testimony and its aftermath. The headlines continued to sensationalize the story calling her testimony a "smoking gun" and "explosive" and hyping her as the aide who shattered the White House's "code of silence."[12] The sensationalized and hyped prime-time and day time hearings have only added to the publicity and prejudice the J6 defendant's like have continued to experience. According to news sources, Ms. Hutchison's testimony reached the largest live audience of the daytime J6 hearings.[13]

The Committee's billing of it as a "surprise hearing" shrouded in secrecy, no doubt played a huge role in those ratings. This was despite the fact that Ms. Hutchinson sat for four videotaped interviews with the select committee previously, including one earlier in the month of June.

On January 7, 2021 Rep. Bennie Thompson (D-MS), now the Chairman of the Select Committee to Investigate the J6, stated in an official statement, that [w]hat occurred yesterday at our nation's Capitol was – pure and simple – domestic terrorism incited by President Trump, his enablers, and those seeking to overturn the results of a legitimate election. January 6, 2021, will go down in history as the date that an angry mob of domestic terrorists and insurrectionists illegally tried to prevent our

---

[11] Cassidy Hutchinson's Jan. 6 Testimony Hits Television Ratings Gold (July 9, 2022) https://www.huffpost.com/entry/cassidy-hutchinson-television-ratings-gold-jan-6-donald-trump_n_62c9efc5e4b0aa392d3f95e6.  (Last visited Sept. 23, 2022) ("Audience jumped 28% from previous hearing to tune into riveting testimony about Donald Trump on insurrection day.")
[12] https://www.washingtonpost.com/opinions/2022/06/28/cassidy-hutchinson-breaks-trump-white-house-code-of-silence/.
[13] https://news.yahoo.com/cassidy-hutchinson-testimony-set-audience-225925410.html

elected representatives from fulfilling their constitutional duty in the orderly transfer of power. It was a sad day for our democracy[.][14]

On July 21, 2021 Speaker Pelosi released her statement on Republican recommendations to serve on the House Select Committee to Investigate the January 6th Attack on the United States Capitol. In the Speaker's statement, without any due process beforehand, she pronounced definitively that "January 6th [was an] "Insurrection" and authorized the Select Committee to "investigate and report upon the facts and causes of the terrorist mob attack." The Select Committee has also provided information it obtained through its contemporaneous investigation on an individual named Ray Epps, before the Department of Justice made any specific production to any defendants.[15] On April 8, 2022,[16] it was reported that: The House Select Committee Investigating the violent breach of the U.S. Capitol building on January 6, 2021, has reportedly uncovered evidence that shows that there was coordination between two white supremacist militias during that event — and that those militias may have also coordinated with organizers of the "Stop the Steal" rally that proceeded the attack on Congress.[17]

---

[14] The Hon. Bennie Thompson's Official Statement:
https://homeland.house.gov/news/pressreleases/chairman-thompson-statement-on-domestic-terroristhttps://homeland.house.gov/news/press-releases/chairman-thompson-statement-on-domestic-terrorist- attack-on-capitolattack-on-capitol

[15] After senators brought Epps up in a hearing, a Jan. 6 committee spokesperson released a statement last week, saying Epps "informed us that he was not employed by, working with, or acting at the direction of any law enforcement agency on January 5th or 6th or at any other time and that he has never been an informant for the FBI or any other law enforcement agency." Select committee member Rep. Adam Kinzinger, an Illinois Republican, said that Epps "didn't enter the Capitol on Jan. 6 and was removed from the most wanted list because, apparently, he broke no laws."

[16] See Press Release, Nancy Pelosi, Speaker, House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA (Pelosi Press Release) (emphasis added).

[17] Report: Jan. 6 Committee Finds Connections Between Militias & Rally Organizers By Chris Walker, TruthOUT.com April 8, 2022 https://truthout.org/articles/report-jan-6-committeehttps://truthout.org/articles/report-jan-6-committee-finds-connections-between-militias-rally- organizers/findsconnections-between-militias-rally-organizers/ (emphasis added).

And the New York Times has reported that "[t]he House committee investigating the Jan. 6 attack on the Capitol said on Wednesday that there was enough evidence to conclude that former President Donald J. Trump and some of his allies might have conspired to commit fraud and obstruction by misleading Americans about the outcome of the 2020 election and attempting to overturn the result."[18] The Select Committee's one-sided perspective on the events of J6 has caused significant prejudice for the Defendant and these statements, released before a full investigation has been concluded demonstrate the political nature of the investigation rather than a true attempt to seek truth for the American people.

Likewise, multiple statements made by Attorney General Merrick Garland have tainted the District of Columbia's jury pool. General Garland, for instance, has repeatedly compared J6 to the Oklahoma City bombing case, alleging at his confirmation hearing that "there was a line that connected the January insurrection to the Oklahoma City bombing and back to the battles of the original Justice Department against the Ku Klux Klan."[19] In a June speech to DOJ officials, the Attorney General "compared the 1995 Oklahoma City bombing to the Capitol riot of January 6 when unveiling the Justice Department's response to the Biden Administration's new antidomestic terrorism strategy."[20]

---

[18] Jan. 6 Committee Lays Out Potential Criminal Charges Against Trump By Luke Broadwater and Alan Feuer, New York Times, March 2, 2022,
https://www.nytimes.com/2022/03/02/us/politics/trump-criminal-charges-jan-6.html

[19] Zoe Tillman, Merrick Garland pledged to investigate the Capitol insurrection, Buzzfeed (Jun. 15, 2021),         https://www.buzzfeednews.com/article/zoetillman/merrick-garlandinvestigate-capitol-riotshttps://www.buzzfeednews.com/article/zoetillman/merrick-garland-investigate-capitol-riots-attorney-"compared the 1995 Oklahoma City bombing to the Capitol riot of January 6 when unveiling the Justice Department's response to the Biden Administration's new anti- domestic terrorism strategy."

[20] Jerry Dunleavy, Merrick Garland ties Oklahoma City bombing to Capitol Riot, Wash. Examiner (Jun. 15, 2021), *https://www.washingtonexaminer.com/news/garland-oklahomacity-bombing-capitol-riot*. Wash. Post (Feb. 21, 2021) (video of testimony of AG confirmation hearing), https://www.washingtonpost.com/video/politics/garland-we-are-facing-a-moredangerousperiodhttps://www.washingtonpost.com/video/politics/garland-we-are-facing-a-more-dangerous-periodthan-we-faced-in-oklahoma-city-at-that-time/2021/02/22/ceebcd88-5d4c-4c01-b07e-6b937d75b3d8_video.htmlthan-we-faced-in-oklahoma-city-at-that-

The Attorney General's repeated comparisons of the Oklahoma City bombing to J6 is particularly relevant to this motion as the Attorney General, a senior DOJ official at the time, supervised the prosecution of Timothy McVeigh and his co-conspirators. During his prosecutorial leadership, Garland agreed with defense attorneys that the Eastern District of Oklahoma could not provide the Oklahoma City defendants a fair trial and consented to a transfer of venue. *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla 1996) ("There is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary.")[21]  If the events of J6 are comparable to the Oklahoma City case in the opinion of the Attorney General, who in 1995 agreed to a transfer of venue in the latter case, logically a comparable transfer of venue in the instant case would comport with consistent treatment of defendants.

It is indisputable that no other event - not Enron, not Oliver North, not the Oklahoma City bombing – has generated more media coverage in the two years since its occurrence than the events of January 6th, with perhaps the exception of September 11.  Due to continued public comments by President Biden, Attorney General Garland, and other high level federal officials, the memory of January Sixth, and the prejudicial perception has remained fresh in the mind of the public, and because of the Congressional Committee widely viewed hearings, the focus is concentrated in the District of Columbia.  This is clearly distinguishable from *Skilling* where the Court found that the passage of time between the events at issue and the trial had allowed the "decibel level" of media

---

time/2021/02/22/ceebcd88-5d4c-4c01b07e-6b937d75b3d8_video.html.  See also Dana Milbank, Merrick Garland lets domestic terrorists know there's a new sheriff in town, Wash. Post (Feb. 22, 2021) ("Garland . . . prosecuted the Oklahoma City bombingperpetrators before becoming a federal judge[.]").

[21] The Government's suggestion that McVeigh prosecutors agreed to transfer the case from Oklahoma City because the "federal courthouse was itself damaged during the bombing" is not accurate. The McVeigh court clearly indicated that the Government agreed that McVeigh's ability to receive a fair trial in Oklahoma City was "chancy." McVeigh, 918 F. Supp. at 1470.

attention to drop.  Here, the media is stilling playing the events at full volume, and therefore considering this factor, the Court must find that there is a presumption of prejudice that requires a change of venue.

**E.     Presumed Prejudice**

In *Skilling*, the Supreme Court explained presumed prejudice, and explained why it was lacking in that case.

> Finally, and of prime significance, Skilling's jury acquitted him of nine insider trading counts. Similarly, earlier instituted Enron-related prosecutions yielded no overwhelming victory for the Government. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions run counter to that presumption.

*Skilling*, 561 U.S. at 383.

Unlike the defendants in *Skilling*, to date, all of the J6 trials before juries have resulted in unanimous jury verdicts promptly returned against the defendant: The first trial summary, according to the N.Y. Post: "[T]he first jury trial for a Capitol protestor from January 6, 2021 led to Guy Reffitt, a 49-year-old member of the "Texas Three Percenters" militia group, was found guilty on all five of the felony charges he faced, including bringing a gun onto the Capitol grounds and obstructing an official proceeding. A federal jury in Washington, DC, handed down the unanimous verdict against Reffitt after just two hours of deliberation." See "Guy Reffitt found guilty in first Capitol riot trial, By Emily Crane and Jorge Fitz-Gibbon, New York Post, March 8, 2022,"[22]

On April 14, 2022, "[a]fter less than three hours of deliberations, a Washington, D.C., jury found Dustin Thompson guilty of multiple charges stemming from his participation in the January 6, 2021, Capitol assault, including obstructing Congress' certification of the Electoral College votes and stealing liquor and a coat rack from the Capitol building. He likely faces a maximum sentence of 20

---

[22] https://nypost.com/2022/03/08/guy-reffitt-found-guilty-in-first-capitolriot-trial.

years in prison."[23]

Every other case that's gone to trial has resulted in a guilty verdict. *See, e.g., U.S. v. Cusanelli*. 21 CR 37 (TNM); *U.S. v. Robertson*, 21 CR 34 (CRC); U.S. *v. Griffin*, 21 CR 92(TNM); and *U.S. v. Williams*, 21 CR 377 (BAH).

**F.       The Multi-District Study**

The Multi-District Study found that while the tested areas differ from each other in geographic location, demographic composition and political party alignment, the non-D.C. areas produced reliably similar results to each other on most questions in the survey, with the D.C. standing apart. *See* Ex. A at 2. Notably, the Eastern District of Virginia is consistently more in line with North Carolina and Florida than the District:

> **"Q3.** 72% of DC Community respondents said that they are likely to find Defendants guilty – even when given the choice, "It is too early to decide." The median in the Study was 48%.
>
> **Q5.** 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.
>
> **Q6.** 71% of the DC Community believes that all who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.
>
> **Q9**. Over 40% of the DC Community stated they believe all the Events of January 6th were racially motivated, even when offered options to reserve judgment on that question. (Emphasis added) The median in the Study was 20%.

Also noteworthy are the results on preconceived beliefs that the J6 defendants preplanned to

---

[23] Ohio man who argued he was "directed" by Trump to join the Jan. 6 Capitol riot convicted on all counts, CBSNews, Robert Legare, (April 14, 2022).

go into the Capitol:



(Exh. A, fig. 1). Well over the majority, 71% of D.C. residents believe that J6 was preplanned, whereas discovery has produced no evidence that the Defendant planned the Capitol breach or even planned to march to the Capitol that day. This result is significant on the issue of intent, which is an essential element of a number of the charges. The Defendant would face a jury in the District of Columbia that overwhelming doubts his major defense, *i.e.*, that there was no preplanning of J6.

The Multi-District survey also confirms substantial bias in D.C.'s potential jury pool:



(Exh. A, fig. 2). Again, this survey shows the significant percentage with which the District of Columbia surpasses the three other jurisdictions by well beyond the margin of error: This bias is not only more prevalent in the DC Community, but it is also more intense. The DC Community also admits making more than one prejudicial prejudgment at a much higher rate than respondents from the other Test Areas. In fact, 30% of DC Community respondents admit that they have already made every prejudicial prejudgment tested for in the survey – double the rate of the next highest Test Area. (Ex. A at p. 2).

## G.    Analysis by the Federal Public Defenders' Office:

Significant majorities of potential jurors in DC have prejudged the January 6 defendants. The D.C. Federal Defender's Office (the "PD Survey") commissioned a survey of potential jurors. The PD Survey shows that a significant percentage of D.C.'s potential jurors harbor negative attitudes of J6 defendants and have already concluded that they are guilty. (Case No. 1:21-cr00024-EGS, ECF 101-1, Select Litigation Report commissioned for the PD, D.C., with appendices), and hereby

incorporated for these Defendants. Attached hereto as Exhibit B.

The PD Survey polled 400 potential D.C. jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia, similar in a few factors to the District of Columbia. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. See Ex. B. The PD Survey found that most District of Columbia residents prejudged the defendants as generally "guilty" and prejudged the element essential to intent. Id. at ¶¶14, 10, 15,

Significant majorities in the District would characterize J6 protestors as "criminals" (62%) and have already formed the opinion that these individuals are people are "guilty" of the charges brought against them (71%). Id. at ¶¶ 14, 10.

Typically, one would expect most respondents to reserve judgement on guilt or innocence. Yet over half of the District's survey respondents were willing to admit that they are more likely to vote "guilty" if they find themselves on a jury in a J6 case (52%). Id. at ¶ 1. And potential D.C. jurors (85%) believe that J6 protestors were "insurrectionists" (72%) and entered the Capitol to try "to overturn the election and keep Donald Trump in power." Id. at ¶ 15, 18. Those surveyed have prejudged these key elements of the Defendant's central defenses. In the PD Survey, in reviewing the same questions asked of 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, significantly fewer potential jurors have the bias against January 6th defendants when compared to the District of Columbia. Id. at ¶ 19-23.

## H.      Analysis by Zogby Polling Co.

One J6 Defendant, Garcia, filed a Motion to Transfer Venue and attached a Survey for the District of Columbia by Zogby, Inc., a well-regarded polling company. Case 1:21-cr-00129-ABJ, ECF 54-1 Filed 02/01/22, attached hereto as Exhibit C. This survey polled 400 D.C. residents in January of 2022. The Zogby poll and Garcia filing is hereby incorporated into this filing. The Zogby

poll found that:

    a.  88% of registered D.C. voters believe that if Garcia went inside the Capitol building on January 6, 2021, he should be convicted of obstruction of justice and civil disorder

    b.  73% of respondents believed that anyone who merely entered the Capitol building on J6 is guilty of insurrection;

    c.  A majority (64%) of respondents believe that anyone who entered the Capitol building on J6 is responsible for other protestors' violence and destruction of property;

    d.  70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.

The findings on the Multi-District Study show results that are in line with both the PD and Zogby surveys showing evidence of prejudgment bias as to overall guilt and on the element of intent, even when compared with the closest neighboring jurisdiction, the Eastern District of Virginia. In *Skilling*, Justice Sotomayor, J. wrote:

> I respectfully dissent, however, from the Court's conclusion that Jeffrey Skilling received a fair trial before an impartial jury. Under our relevant precedents, the more intense the public's antipathy toward a defendant, the more careful a court must be to prevent that sentiment from tainting the jury. In this case, passions ran extremely high. The sudden collapse of Enron directly affected thousands of people in the Houston area and shocked the entire community. The accompanying barrage of local media coverage was massive in volume and often caustic in tone. As Enron's onetime chief executive officer (CEO, Skilling was at the center of the storm. Even if these extraordinary circumstances did not constitutionally compel a change of venue, they required the District Court to conduct a thorough voir dire in which prospective jurors' attitudes about the case were closely scrutinized. The District Court's inquiry lacked the necessary thoroughness and left serious doubts about whether the jury empaneled to decide Skilling's case was capable of rendering an impartial decision based solely on the evidence presented in the courtroom. Accordingly, I would grant Skilling relief on his fair-trial claim.

*Skilling*, 561 U.S. at 427. (Justice Sotomayor, J. concurring in part and dissenting in part).

### III.      CONCLUSION

Therefore, and for the reasons stated above, in addition to the reasons set forth in the Motion to Change Venue, Richard Barnett respectfully submits, that the Western District of Arkansas is the only place where he has any chance of selecting a fair and impartial jury of his peers, which is his right under the Sixth Amendment of United States Constitution.

September 23, 2022
New York, NY

Respectfully submitted,

/s/ Joseph D. McBride, Esq.
Joseph D. McBride, Esq.
Bar ID:  NY0403
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
p: (917) 757-9537
e: jmcbride@mcbridelawnyc.com

### CERTIFICATE OF SERVICE

I hereby certify on the 23[nd] day of September 2022, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Joseph D. McBride, Esq.
Joseph D. McBride, Esq.