## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| *v.* | ) | **1:21-cr-00038 (CRC)** |
| | ) | |
| **RICHARD BARNETT,** | ) | |
| **Defendant** | ) | |
| | ) | |

### DEFENDANT'S POST VERDICT RULE 33 MOTION FOR A NEW TRIAL

Defendant Richard Barnett, by and through undersigned counsel, pursuant to the Federal Rules of Criminal Procedure Rule 33, submits this Motion for a New Trial.

Justice requires a new trial because over the course of Mr. Barnett's two-week trial, all the key witnesses presented by the Government in support of the Government's case-in-chief testified to material facts that are verifiably and objectively false.  The Government also surprised the defense by performing not one but two demonstrations of the Hike 'N Strike before the jury after the Defense was led to believe that no demonstration would occur.

### LEGAL STANDARD

The court may grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). The court, however, should not grant a Rule 33 motion based on insufficiency of evidence unless the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Walker,* 899 F. Supp. 14, 15 (D.D.C. 1995) (quoting *United States v. Martinez,* 763 F.2d 1297, 1313 (11th Cir. 1985)). "This power should be exercised with caution, and is invoked only in those exceptional cases in which the evidence weighs heavily against the verdict." *United States v. Edmunds,* 765 F. Supp. 1112, 1118 (D.D.C. 1991). Moreover, "[e]ven where errors occur, a new trial should be granted only if the moving party has shown that the error was substantial, not harmless, and that the error `affected the defendant's substantial rights.'" *Walker,* 899 F. Supp. at 15 (quoting *United States v. Johnson,* 769 F. Supp. 389, 395-96 (D.D.C. 1991)). In considering a Rule 33 motion, the court "may weigh the testimony and may consider the credibility of the witnesses." *United States v. Edmunds,* 765 F. Supp. 1112, 1118 (D.D.C. 1991).

*U.S. v. Jemal*, Criminal Action No.: 05-0359 (RMU), Document Nos.: 306, 307, at *14-15 (D.D.C. Mar. 12, 2007).

Relief in the form of a new trial is available when the government "deliberately presented a false picture of the facts, either by knowingly using perjured testimony [or] failing to correct testimony when it became apparent that it was false[.]" *Levin v. Katzenbach*, 363 F.2d 287, 290 (D.C. Cir. 1965) (citing *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Napue v. Illinois*, 360 U.S. 264, 269 (1059)).

## ARGUMENT

**I.   THE TESTIMONY OF THE GOVERNMENT'S KEY WITNESSES WAS VERIFIABLY AND OBJECTIVELY FALSE**

The Government brought eleven witnesses to prove its case against Mr. Barnett. The key witnesses that provided the bulk of the evidence required to support a guilty verdict on all counts included FBI special agents Loel Skoch, Jonathan Willett, and Kimberly Allen, Capitol Police Captain Carneysha Mendoza, Nancy Pelosi's executive assistant Emily Berret, and Metropolitan Police Department Officers Quenterra Carey and Terrance Craig.  Each of these witnesses provided material testimony that was demonstrably false based on other available video evidence, publicly available information, common knowledge, and common sense.  Accordingly, the testimony of these witnesses should be put aside. *Agelli v. Burwell*, 164 F. Supp. 3d 69, 76 (D.D.C. 2016) ("The Court of Appeals has instructed that "[j]udges may, under certain circumstances, lawfully put aside testimony that [has been] so undermined as to be incredible." *Johnson v. Wash. Metro. Area Trans. Auth.* , 883 F.2d 125, 128 (D.C.Cir.1989)").

**A. The FBI Special Agents brought to provide evidence of Mr. Barnett's intent to commit the alleged crimes provided false testimony and therefore their testimony should be put aside as a matter of law.**

The three FBI special agents each lied about a material fact or provided misleading testimony that went to the heart of the charges against Mr. Barnett, specifically, to Mr. Barnett's intent to commit the alleged crimes.

### 1. Special Agent Jonathan Willett

Special Agent Willett testified about his interview with Mr. Barnett on January 8, 2021. At the end of a line of questioning designed to impeach the credibility of the allegations against Mr. Barnett, Special Agent Willett was asked on cross-examination if he took a selfie with Mr. Barnett after the interview.   Jonathan Willett, in his capacity as a Special Agent of the Federal Bureau of Investigation, knowingly made the following false statement while under oath:

> Q:    At the conclusion of the interview, you went out with Mr. Barnett to a vehicle; isn't that correct?
>
> A:    Yes, we went out to a vehicle.
>
> Q:    Do you recall taking a selfie with him?
>
> A:    I did not take a selfie with Mr. Barnett.
>
> Tr. 918:24-919:3.

That night, Special Agent Willett called the Government to retract his denial. The following exchange took place in court the next day, on the morning of January 18, 2023:

> MR. GORDON:    Speaking of Special Agent Willett, last night, Special Agent Willett called me on whether he took a selfie with the defendant. He further reflected on his testimony, which people are wont to do, and unlike yesterday where he definitively said no, I did not do that, he wanted to clarify his testimony that he does not recall one way or the other whether he did. He doesn't remember exactly what happened after the interview.

So defense and I—defense and the Government are in agreement that Your Honor will need to cure that with the jury somehow. There are two proposals that we see pros and cons of, and we're going to kind of throw both to you and see what you thought.

One was for Your Honor just to give a very short instruction to the jury before we resumed questioning Special Agent Allen and just say something to the effect of: Last night Special Agent Willett further reflected on his testimony and wished to clarify to your, the jury, that unlike yesterday, where he said definitively no, he did not take a selfie, on further reflection, he does not remember one way or the other.

That's kind of—

THE COURT:      Well, he doesn't remember one way or the other, or he remembers having taken one?

MR GORDON:      He says he does not remember one way or the other.

THE COURT:      Well, he doesn't remember one way or the other, or he remembers taking one?

MR. GORDON:     He says he does not remember one way or the other.

THE COURT:      Did he take one or not?

MR. GORDON:     He doesn't remember.

THE COURT:      That wasn't my question.  Did he take one or not?

MR. GORDON:     I don't know.  The defense says he did.

Tr. 1096-14-25-1097:1-20

. . .

THE COURT:      Ladies and gentlemen, before we get started with Special Agent Allen's cross-examination, you will recall yesterday that Agent Willett testified, and on cross-examination he was asked whether he recalled taking a selfie with the defendant after a custodial interview that we saw clips of yesterday, and Agent Willett responded that he did not take a selfie with Mr. Barnett.

4

> Upon further reflection of his testimony overnight, Agent Willett would like to clarify that if he were asked the same question again, his testimony in response would be, "I do not have a memory either way."

The conclusion of any fair-minded reasonable person is that Special Agent Willett did recall the selfie after the interview and decided it was better to testify that he did not recall rather than a denial that could be verified as false. This material falsehood proffered to the jury by Agent Willet calls into question the veracity of his entire testimony and strongly suggests the taint of outcome-determinative prejudice because Mr. Barnet was not able to cross-examine Agent Willet on Willet's inconsistent statements, which ultimately contributed to a conviction in this case.  Consequentially, Agent Willet's statements are incredible as a matter of law, and should be set aside.

### 2.  Special Agent Loel Skoch

Similarly, Special Agent Loel Skoch discredited himself with false testimony and misrepresentations meant to support the elements of intent to commit the charged crimes. Specifically, Special Agent Skoch testified that during the search of Mr. Barnett's home he discovered eight-inch zip ties and he insinuated to the jury that Mr. Barnett intended to use them as "restraints for people." Tr. 834:8-12 ("It's almost like carrying a bunch of pairs of handcuffs with you.").  There was not a shred of evidence that Mr. Barnett carried zip ties with him on January 6, or that he ever intended to use zip ties as restraints, or that eight-inch zip ties are physically capable of being used for restraints, or that zip ties played any role in any of the events on January 6.  Special Agent Skoch's testimony was knowingly false in portraying zip ties as a nefarious or dangerous item, as he surely knows that zip ties are used in construction and home repairs, and from his extensive investigation of Mr. Barnett, his social media, and his home, Agent

Skoch knew that Mr. Barnett is regularly engaged in such activities.  The testimony was clearly a ploy to falsely insinuate to the jury that Mr. Barnett may have carried multiple deadly or dangerous weapons into the Capitol and that Mr. Barnett is a sadistic and dangerous character who restrains people with zip ties.

His false testimony regarding the zip ties was material to the central element of all Counts that required the jury to find that Mr. Barnett carried a dangerous weapon.  There is know way of knowing if Mr. Skoch's false testimony contributed to the jury's decision relating to those counts.

Mr. Skoch also lied about his role in designating Mr. Barnett as a Tier One Domestic Terrorist Operator.  On cross examination, Mr. Skoch was asked if he recalled that Mr. Barnett was designated a Tier One Domestic Terrorist Operator on January 7, 2021, and like Mr. Willett, he replied that he did not recall.  Tr. 851:2-4.  Mr. Skoch was then presented with a report with his name on it generated by him on January 7, 2021, designating Mr. Barnett as a Tier One Terrorist (attached as Exhibit A) and conveniently Mr. Skoch's memory was refreshed.

### 3.  Special Agent Kimberly Allen

Special Agent Kimberly Allen's testimony on direct examination included a line of questions about the group Antifa.

Q Have you heard the term Antifa before?

A I have.

Q What is Antifa?

Q Are you familiar with any -- well, first of all, have you ever encountered a member of Antifa?

A I have not.

Q Have you -- are you aware of any members of Antifa being identified in your area of responsibility?

A No.

Q Are you aware of any members of Antifa having been identified in your work in
   domestic terrorism generally?

A No, I'm not.

Q What is the significance of Antifa with respect to January 6?

A So I believe you heard in the video, I think there are many people who think that
   there were potentially members of Antifa or other organizations that may have
   come to the events on January 6 to cause trouble for the more right-wing groups
   that were present that day.

Q Special Agent Allen, in your work on January – reviewing January 6 evidence,
   have you come across any evidence whatsoever, a single piece anywhere, that
   there was anyone connected with Antifa involved in the events of January 6?

A No, I haven't.

Tr. 1049:13-1050:14.

Special Agent Allen testified that she works "primarily violations of domestic and international terrorism" (Tr. 1004:6-7) and that she has been involved with the investigation of the events of January 6 to such an extent that she "couldn't count the number of hours I spent reviewing video" (1164:22-23). Yet Special Agent Allen claimed ignorance regarding the well-known Antifa member John Earl Sullivan, also known by his antifa code name Jayden-X, who was present at the shooting of Ashli Babbitt, one of the most famous and significant incidents that occurred on January 6.[1] It is not credible that an FBI Special Agent who works primarily on domestic terrorism and who has been tasked with investigating the events of January 6 has zero knowledge of Antifa's relationship to January 6, yet that is exactly what Special Agent Allen testified. Tr. 1165:3-12.

---

[1] Exhibit B, Katie Pavlich, *Utah Man with a History of Organizing Violent Antifa, BLM Protests, Was Inside the Capitol,* townhall.com, Jan. 7, 2021,
https://townhall.com/tipsheet/katiepavlich/2021/01/07/utah-man-with-a-history-of-organizing-blm-protests-was-inside-the-capitol-n2582766 (last visited Jan. 24, 2023).

Moreover, it is impossible that an FBI Agent who works generally on domestic terrorism is unaware of "any members of Antifa having been identified" in any of her work in domestic terrorism generally.  Antifa riots are so common and well known, that even while the trial was ongoing there was an Antifa riot in Georgia that made national news.[2]  Yet Special Agent Allen's testimony was that she is not aware of any members of Antifa having been identified and has never encountered Antifa in her investigation of January 6 or otherwise.  This was a material misrepresentation as it goes to the heart of Mr. Barnett's intent to commit the alleged crimes charged.

### B.  Captain Mendoza falsely testified that she could identify the Hike 'N Strike.

Captain Mendoza falsely testified that she could identify the Hike 'N Strike from viewing a video of Mr. Barnett.  A central feature to the Government's case was that Officer Terrance feared for his life because he recognized the stick hanging from Mr. Barnett's belt to be a stun device.  Officer Craig's testimony is not credible on its face as Officer Craig was wearing a riot helmet with a face shield, on top of a gas mask, on top of a face shield for COVID, and he stands a head taller than Mr. Barnett, and he was only granted a glimpse of the device when Mr. Barnett lifted his shirt for a split second, such that the Government could only make its case by showing a still photo of the video.  Further, it was established that it was only discovered that he had a Hike 'N Strike on January 11, 2021, after an extensive investigation including scrutiny of a famous photo viewed by millions of people; before January 11, 2021, nobody, including Officer Terrance Craig, had reported seeing Mr. Barnett with a Hike 'N Strike.  Yet, Captain Mendoza claims that

---

[2] Exhibit C, Ari Blaff, *Six Antifa Extremists Arrested, Charged with Domestic Terrorism in Fiery Atlanta Riots,* yahoo.com, (Jan. 23, 2023), https://news.yahoo.com/six-antifa-extremists-arrested-charged-151301053.html (last visted Jan. 24, 2023).

from watching a video clip marked Government Exhibit 780, she was able to identify the device at a glance.  Tr. 296:14-21.

In her testimony, Captain Mendoza acted as if she was uninformed about a significant detail of the most famous January 6 case that she was called to testify about: specifically, Captain Mendoza unconvincingly feigned ignorance before the jury regarding Mr. Barnett's Hike 'N Strike.  On direct examination, Captain Mendoza was shown a video marked as Government Exhibit 208.  When asked to identify the object in Mr. Barnett's hand she said, "I can't say with 100 percent certainty. It looks like a knife."  Tr. 292:23-24.  After viewing a few more seconds of the same video, Captain Mendoza said "I just saw the electrodes on the top of the device.  [It could be] Some sort of electrical device, stun gun, taser."  Tr. 293:23-25.  She was then shown Government Exhibit 780, and when asked to identify what was in Mr. Barnett's hand, she said "Well, an envelope and the taser."  Tr. 296:14-21.

First, her testimony is not credible because it is objectively obvious from viewing Government Exhibit 208 and 780 that it is impossible to identify "the electrodes" on the Hike 'N Strike unless the viewer was coached in advance and knew what to look for.  The electrodes that Captain Mendoza claimed to see on the video are three tiny points that appear on the video as three tiny grey dots on top of the handle of the walking stick and are barely visible.  If Captain Mendoza sincerely thought that the Hike 'N Strike could be a knife at first, it is impossible that she then suddenly realized that it was a stun device because she saw three tiny grey dots.  Captain Mendoza was not noticed, presented, or qualified by the Court as an expert on hiking sticks with or without electrodes and should not have been allowed to testify to recognizing one.

Further, during the trial, the manufacturer of the Hike 'N Strike, Billy Pennington, testified to the substantial differences in appearances between a stun device like the Hike 'N Strike and a

taser.  Unlike the Hike 'N Strike which only creates a surface shock and does not penetrate the skin, a taser is a projectile weapon that penetrates the skin.  Tr. 453:16-19; 455:6-8.  Pennington also testified that tasers unlike stun guns, are used by law enforcement, so Captain Mendoza must know the difference.

It is not credible that Captain Mendoza was called to testify in this case and was unaware that Mr. Barnett was accused of carrying a stun device or that she would confuse a stun device with a taser.  Obviously, she feigned ignorance about the device so that she could disingenuously show the jury that a law enforcement officer can identify a Hike 'N Strike by simply glancing at it for a split second.  This evidence laid the foundation for Officer Craig's fantastic testimony that he recognized the Hike N' Strike at a glance and therefore feared for his life.

### C. Emily Berret falsely testified to facts and circumstances to undermine Mr. Barnett's defense that he had legitimate cause to fear Antifa, that other items were missing from her desk aside from the single bloody envelope, that her desk was covered in blood, and that Mr. Barnett was the first protestor to ever enter Nancy Pelosi's office.

Nancy Pelosi's executive assistant Emily Berret made numerous material misrepresentations in her testimony.

The Government accused Mr. Barnett of purchasing the Hike 'N Strike and brining it from Arkansas to Washington, D.C. for the express purpose of storming the Capitol and using it as an offensive weapon against law enforcement and Congresswoman Nancy Pelosi.  The truth, as shown in his numerous social media posts from prior to January 6 is that Mr. Barnett purchased the Hike 'N Strike as a defensive weapon because he legitimately feared that Antifa would be present at the peaceful protest to attack peaceful protestors, including senior citizens like Mr. Barnett.  He researched and learned that the Hike 'N Strike is legal in the District, and he had no intention of entering the Capitol.

To undermine Mr. Barnett's defense, the Government sought to show that prior to the events of January 6 there were no legitimate fears of violent protestors, and it was just another ordinary day in the District.  Accordingly, Berrett testified to that effect no less than eight times. *E.g.,* Tr. 44: 21-22 ("Q: Did anything noteworthy happen, let's say, before noon? A: No."); Tr. 45:3 ("nothing out of the ordinary."); Tr. 45:18 ("It just looked like a normal day."); Tr. 45:24 ("It was a normal day."); Tr. 53:24 ("Nothing was out of the ordinary at that point."); Tr. 54:23-25 ("Q: But at 1:00, the procession, you say you didn't perceive any danger?  A: No, not at that time."); Tr. 55:11-14 ("Nothing was out of the ordinary to the members, to the Speaker, to anyone in the chamber.").

To emphasize that it was business as usual with no indication of danger, she testified to how she came to work, including where she parked her car.  Tr. 41:17-20.  But on cross examination, she was impeached by the answer she gave to the same question asked by the FBI shortly after the events of January 6.  She told the FBI that she walked to work on January 6 based on intel that violent agitators would be present in the District that day and could potentially cause damage to her new vehicle.  Tr. 150:5-8.  Ms. Berret attempted to cure her testimony by saying she misremembered, but only after her repeated implied assurances to the jury that Mr. Barnett had no legitimate fear of violent Antifa agitators that warranted bringing a Hike 'N Strike for protection.

Ms. Berret also falsely testified and deliberately mislead the jury into believing that valuable items had been stolen from her workstation, when in fact, nothing was taken except for the single bloody envelope.  She testified "I noticed things that were stolen or missing."  Tr. 76:17-20.  On cross examination she was impeached by her prior statement to the FBI that nothing was stolen or missing.  Tr. 178: 21-25.  She also testified that she called her husband and instructed

him to cancel her credit cards, but neglected to mention that nothing was taken.  Tr. 72: 2-5.  This was a material misrepresentation because Mr. Barnett was accused of theft of the single bloody envelope.

Ms. Berret also misrepresented the extent of the blood in her office.  Mr. Barnett only had a small cut on his hand which left a few smudges of blood on the envelope and on his flag, but Ms. Berret gave the jury the impression that her workstation and her office were covered in blood like a slaughterhouse.  Tr. 76:23-25 ("There was a lot of blood. That flag was there. That flag was in that same location, and there was blood over it, all over it."); 82:3 ("So mostly I noticed all the blood."); Tr. 95:25-96:5 ("So the first thing I did was I moved my chair into the hallway and decided to have a standing desk because there was blood on the chair. There was blood on the flag on the credenza and on my desk. So I started cleaning, found some Lysol wipes and started wiping everything down, and then I threw out these letters.").

Ms. Berret also testified falsely by implying that Mr. Barnett was responsible for the publicity created by the news media of the photographs that the Associated Press took of Mr. Barnett and her desk.  Mr. Barnett did not publicize any personal information about Barnett, the Associated Press did, but Berret testified as if Mr. Barnett did.

Among Ms. Berret's other false statements was that January 6 was the first time that protestors had occupied Congresswoman Nancy Pelosi's office, which was demonstrably false.  Publicly available news articles show that the Sunrise Movement, a left-wing climate change activist group, occupied Nancy Pelosi's office and obstructed official proceedings on multiple occasions.  In December of 2018, while Ms. Berret was already a veteran employee at Ms. Pelosi's office, "Hundreds of young protesters stormed Capitol Hill on Monday, taking over the offices of three House Democratic leaders [including Congresswoman Pelosi] to call for an immediate

climate change plan."[3]  This false testimony was obviously material and severely prejudiced Mr.

Barnett.  Despite impeachment on cross-examination, the bell could not be un-rung.

### D.  In closing arguments, the Government falsely stated that Mr. Barnett testified that the Hike 'N Strike was shorted by the rain.

During closing arguments, the Government falsely claimed that Mr. Barnett had testified

that his Hike 'N Strike had been shorted out due to rain.  The Government boasted to the jury that

it caught Mr. Barnett in a lie by showing an absence of precipitation in the weather report on

January 6.  Mr. Barnett had never testified about rain, but the Government told the jury that he did

so that the Government could paint Mr. Barnett as a liar in the eyes of the jury.  This unethical

tactic severely prejudiced Mr. Barnett and justifies a new trial.

### E.  Officer Carey's testimony was demonstrably, verifiably, and objectively false and should be set aside in its entirety.

Metropolitan Police Department Officer Quenterra Carey's testimony blatantly

contradicted the video evidence to such an extent that her testimony should be disregarded in its

entirety as a matter of law.  *Cf. Scott v. Harris*, 550 U.S. 372, 372 (2007) (holding that when

undisputedly reliable video footage captures the relevant events, the evidence should be viewed in

"the light depicted by the videotape").

---

[3] *See* Exhibit D, Miranda Green and Timothy Cama, More protesters storm Pelosi's office demanding climate change action, thehill.com, Dec. 18, 2018, https://thehill.com/policy/energy-environment/420588-second-round-of-capitol-protests-demand-climate-change-action/ (last visited Jan. 24, 2023) ("The protests are the second wave organized by the Sunrise Movement to disrupt the Capitol since the midterm elections. Protesters in early November organized a sit-in inside Pelosi's office in conjunction with Rep.-elect Alexandria Ocasio-Cortez (D-N.Y), who is leading the organization's call for the creation of a climate change committee and for a 'Green New Deal.'"); *see also,* Polina Firozi, The Energy 202: Green protests at Pelosi's office signal rift over Democratic climate strategy, The Washington Post, Nov. 14, 2018, https://www.washingtonpost.com/news/powerpost/paloma/the-energy-202/2018/11/14/the-energy-202-green-protests-at-pelosi-s-office-signal-rift-over-democratic-climate-*strategy/5beb28131b326b39290547cc/ (last visited Jan. 24, 2023).*

Officer Carey's body camera footage was marked and entered as Government Exhibit 201.[4] She testified that when she entered the Capitol she saw "officers pushing citizens back to basically get them out of the Capitol on the opposite side."  The video shows when she entered the Capitol a few protestors were peaceful meandering in the Rotunda and were being monitored by a crowd of Metropolitan Police Officers.

She testified that citizens were resisting police officers and they were "basically pushing back, and some of them even used spray, pepper spray and bear mace...against the police officers." Tr. 553:17-554:5. In fact, when she entered the Capitol, none of this was occurring, and at no point ever did citizens in the Rotunda use chemical weapons against the police.  In fact, it was the police who used chemical weapons against the citizens after a female police officer provoked the citizens by punching an elderly man in the face.

Government Exhibit 205, which the Government neglected to admit at trial, is the body camera footage of the unnamed female officer who, without provocation or justification, punched the elderly man.  The incident was clearly captured on her body camera and was witnessed by dozens of citizens who immediately pulled out their phones and began recording the incident and verbally documenting what happened.  Officer Carey should know this because her body camera footage shows her attempting to restrain the unnamed female officer, who was clearly out of control, after the female officer punched the elderly man.  Officer Carey lied about the incident and instead blamed the elderly man, testifying that the elderly man struck the female officer in the face with his fist.  Tr. 568:7-15.  This is demonstrably false, as the elderly man can be seen on the

---

[4] Government Exhibit 201 only provided a short clip of Officer Carey's body camera.  Her full body camera footage is attached as Exhibit E to provide the full context of her interaction with Mr. Barnett.

unnamed female officer's body camera holding his camera in his right hand and a cane – using it for balance – in his left hand. *See* Government Exhibit 205.

Officer Carey also lied about her interaction with Mr. Barnett. First, she said she encountered him "several times that day," which is false. Tr. 559:10-11. Officer Carey only encountered Mr. Barnett one time for a brief second in the office suite hallway. She testified that when she was in the office suite she saw "someone being in a particular room, a few, actually, citizens in some of the rooms scrambling through papers within the desk. And we had them leave the - we asked them to leave the room and get outside, get out of the Capitol." Tr. 555:3-10. When asked specifically about her encounter in the office suite with Mr. Barnett, she testified that "he was refusing to leave. When I asked him to leave several times, he still refused to leave the Capitol." Tr. 559:1-2.

Her body camera footage tells a story completely at odds with her testimony. When she entered the Capitol, she saw three citizens who were in the hallway between the office suites and the Rotunda. The citizens were already on their way to the Rotunda, per the officers' directions. They were not resisting and required no extra encouragement. She then proceeded to the office suites and saw three citizens in the hallway of the office suite already making their way out to the Rotunda as instructed. Officer Carey did not go into any offices in the suite, rather she went straight to a balcony where she encountered three citizens, two were taking pictures and one looks as though he was silently praying. The citizens do not look dangerous and did not resist when told to leave, but Officer Carey can be seen applying unjustifiably physically force to a female citizen who posed no threat to anyone and was following instructions.

Officer Carey saw Mr. Barnett who was already on his way to the Rotunda as he told Officer Carey "You need to give up communism." Other than his remark, he complies without

15

resistance.  Officer Carey then goes back to the balcony, but as she does so, out of the corner of her body camera Mr. Barnett can be seen turning around and returning to Ms. Pelosi's office to retrieve his flag.  Officer Carey does not say anything to him or follow him, instead she proceeds to the terrace.  Though the body camera captured Mr. Barnett at that moment, it is objectively obvious from the video that Officer Carey did not see him because she was focused on chasing a single protestor to the balcony where she proceeded to use unjustifiable physical force on another peaceful protestor.

After she and another officer identified as Officer Smiley[5] successfully cleared the office suite halls and the balcony of the handful of protestors - none of which were violent, and none of which resisted, and all of which complied with instructions - Officer Carey proceeded to enter the offices for the first time.  In the offices, she and Officer Smiley encounter exactly zero protestors. Nobody is sitting at desks or "scrambling through papers."

Officer Carey's objectively and verifiably false testimony was, along with the testimony of Officer Craig, was the entire foundation upon which the allegations against Mr. Barnett. Accordingly, in the interest of justice, Mr. Barnett should be granted a new trial.

### F.  Officer Craig's testimony was demonstrably, verifiably, and objectively false and should be set aside in its entirety.

Officer Terrance Craig - the Government's most important witness because the charge of Civil Disorder was predicated entirely on Mr. Barnett's interaction with Officer Craig - like Officer Carey, made several significant material misrepresentations in his testimony that are verifiably false from viewing his body camera footage, which was entered into evidence in its entirety as Defense Exhibit B.

---

[5] Officer Smiley's body camera footage is attached as Exhibit F.

Right off the bat, Officer Craig lied about what he saw when he approached the Capitol that day.  He said he encountered "a whole mob of rioters and protesters just fighting and throwing stuff at us," and that rioters threw objects directly at him and other officers, including "metal pipes, bricks, stones.  Anything that can be used as a weapon, they were throwing at us, anything."  He also testified that he saw some officers get injured at that time.  Tr. 609:20-610:5. This is a lie.

Craig's body camera footage shows him arrive at the Capitol at exactly 2:26 p.m. to an area where no protestors were visible, where he and his team were instructed to don gas masks.  He encountered exactly zero protestors, and he immediately ascended to a safe position on the western terrace of the Capitol where he looked down from a safe distance at a crowd that was large, but not discernably violent.  Nothing was thrown at him, and no officers were injured.

Officer Craig's team was ordered to don gas masks not because of the protestors but because of his fellow Metropolitan Police Department Officers.  At exactly the same time Craig arrived, at 2:26 p.m., Officer Daniel Thau ordered Officer Rich Khourny to shoot a cannister of dangerous noxious gas, either OC or CS gas, out of an M40 grenade launcher towards a group of peaceful protestors who had peacefully climbed the scaffolding on the western side of the Capitol. Defense Exhibit A, Thau Body Camera Footage.  By God's grace alone, Officer Khourny misfired and instead of shooting the gas into the peaceful protestors on the scaffolding as he was ordered, which would have surely caused the protestors to plumet to their deaths, he shot the cannister directly into the police line. *Id.*

Captain Mendoza testified at trial that prior to Officer Thau's order to gas the protestors, the crowd of protestors appeared to be "properly controlled" by the police who were holding the line. Tr. 329:18-20, 332:14-16.  After Officer Thau's order went wrong and the police accidentally gassed themselves, the video shows the police abandon the line and retreat towards the Capitol,

while coughing and retching from the effects of the gas.  Defense Exhibit A.  Officer Craig's material representation that is easily and objectively verified as false by watching his body camera video, went to the heart of the issue of Officer Craig's credibility as to whether he truly feared for his life when he encountered Mr. Barnett just 30 minutes later in the Rotunda.  It also questions the premise that the underlying "civil disorder" was caused by the protestors, instead of the police, at least with respect to the events that occurred in the immediate aftermath of the police gassing themselves and the protestors.

Officer Craig further lied that he was engaged in actual fighting with protestors before he entered the Rotunda.  This is also verifiably and objectively false based on his body camera footage.  From the time Officer Craig arrived at 2:26 until he entered the Capitol building 25 minutes later, the camera shows him engaging with exactly zero protestors while he climbed stairs to get further away from the gas discharged by his fellow officers. Officer Craig testified under oath that "we were there fighting with the rioters and protestors" while he was in front of the Capitol on the left side of the staging area, and that it was the rioters, not the police, who were initiating the fighting.  "They were acting obnoxious and throwing stuff at us and saying all kinds of words towards us."  Tr. 610:15-611:3.

According to his body camera footage Officer Craig only saw one single protestor up close, from a distance of at least 20 feet away, if not further.  The protestor can be seen desperately trying to escape from the gas, just as Officer Craig and his fellow officers were doing.  The protestor is unarmed and not wearing a gas mask and he can be heard and seen yelling to the police, "why are you doing this to us?  Go home!"  The protestor did not throw anything or come within 20 feet of Officer Craig or any other officers.  Officer Craig yelled something at the protestor that cannot be discerned because Officer Craig was wearing two layers of face shield and a gas mask.  Tr. 698:22-

24. Then Officer Craig turned to enter the Capitol building where he eventually encountered Mr. Barnett.

Officer Craig falsely testified that when he entered the Rotunda "I noticed there was a couple other officers, and all I saw was rioters and protestors coming towards us, dressed in armored gear and different kind of body armor covering their jacket just screaming and yelling at us." Tr. 612:17-22. This is objectively and verifiably a lie. His body camera shows that from the time he entered the building until he reached the Rotunda, he saw exactly zero protestors. When he entered the Rotunda there were between 20 and 30 protestors in the Rotunda, which can easily hold hundreds of people. The protestors are seen meandering around the eastern side of the Rotunda and are objectively acting peacefully. Officer Craig and his fellow MPD officers entered from the western side of the Rotunda and congregated by the door, far away from the protestors. Officer Craig only encountered two elderly protestors who were sitting on a bench. They told him that they were only resting their backs and that they were not causing trouble, so Officer Craig gestured with his hand that they could stay. No protestors approached him. No protestors can be seen at that time wearing body armor. The protestors' behavior can objectively be described as peaceful; most were either waving flags or taking pictures.

Another Officer approached and asked Officer Craig if he was able to see through the multiple layers of protection covering his face, obviously because it appeared that Officer Craig could not see. Many times over the course of the day, as captured on Officer Craig's body camera, Officer Craig needed to adjust his many layers of face shields. Another elderly man approached Officer Craig and said, "I am a non-violent protestor." Officer Craig can be seen giving the man a thumbs up. Another protestor said, "we are not here to cause damage, we love this place." Officer Craig can be seen waiving at him.

19

As the Rotunda continued to fill up with protestors who were being pushed in through the east door, just like Mr. Barnett, the police do nothing but stand by the door in the west that leads to the office suite.  No instructions are given to clear out the Rotunda.  No police engage with protestors, and no protestors engage with the police.  An elderly man with a camera in one hand and a stick for balance in the other started lecturing the police about the constitution and civil disobedience.  The elderly man and several other protestors emphatically expressed that they had no intentions of fighting with the police and were peaceful protestors. Another elderly protestor asked Officer Craig, "who beats on American citizens?  Are you going to beat on American citizens?"

As the Rotunda continued to fill up from the east, more and more protestors took seats on the benches next to Officer Craig until the benches were filled.  Neither Officer Craig nor any other officer instruct the protestors to leave.  The eastern door can be seen to be jammed with protestors filtering in from the eastern door, and the western door is blocked by Officer Craig and the other MPD officers.  It is not apparent from the video that there is an exit available for the protestors, and at no time does officer Craig or any other MPD officer give instructions as to how to leave.

At 2:57, Mr. Barnett can be seen passing through the police line from the office suites into the Rotunda, in compliance with Officer Smiley's and Officer Carey's instructions.   Mr. Barnett is not given instructions by Officer Craig or anyone as to how to leave the Rotunda.  Mr. Barnett asked other officers to retrieve his flag from Nancy Pelosi's staffer's office, and can be heard repeatedly asking other Officers, not officer Craig, to "be a Patriot and get my flag."

At 2:58, Mr. Barnett asked Officer Craig to retrieve his flag and said, "I will stand over here."  Mr. Barnett can be seen moving to the side away from the crowd and looking at his phone.

It is at exactly this time that the Government alleges, and Officer Craig testified, that Mr. Barnett brandished his Hike 'N Strike.  No such thing can be seen from Officer Craig' body camera footage, which suggests that Officer Craig did not see the split second when the Hike 'N Strike was revealed, before Mr. Barnett immediately covered it with his shirt.  The Government's entire case was predicated on the false testimony that Officer Craig saw the Hike 'N Strike.

A female officer approached Officer Craig and said, "this is the only way out and we have to find another way out of here."  At 2:59 the unnamed female officer standing far away from Officer Craig and Mr. Barnett punched the elderly man in the face.  Neither the elderly man nor the unnamed female officer who punched him can be seen on Officer Craig's body camera, suggesting that Officer Craig did not see it and was not aware of it.  Officer Craig does not make any movement to assist, and if he did, Mr. Barnett was not standing in Officer Craig's way and did and said nothing that would obstruct Officer Craig from assisting.  Mr. Barnett stood quietly and held his camera to film.  Shortly thereafter Mr. Barnett made the statements that the Government alleges were threats, but within one minute of him making those statements the protestors and Mr. Barnett were blinded by chemical spray from the police, for conduct unrelated to Mr. Barnett.

Officer Craig's testimony bears no resemblance to what happened according to the body camera footage.  Officer Craig testified that a female citizen struck a female officer, no such thing happened.  Officer Craig testified that the crowd tried to rush the police, no such thing happened.  Officer Craig testified that the unnamed female officer was pushed down the stairs, no such thing happened – this is verifiable from the unnamed female's body camera footage and from Officer Carey's body camera footage.  Tr. 657:19-658:15.

Officer Craig lied that he could not assist the unnamed female officer who punched the elderly man in the face and did not fall down the steps "Because I had to keep my eye on the guy

with the black hat [Mr. Barnett] to stop him from going past me. That was my main attention because, you know, it seemed like he was up to something -- up to something no good. So I had to keep my eyes on him to make sure, because I don't know what he was up to." Tr. 657:19-658:15. The entirety of the Government's case to charge Mr. Barnett for obstructing a police officer rested on this objectively and verifiably false testimony by Officer Craig.

Officer Craig's long testimony was so fantastical and obviously false that it should be struck in its entirety. For example, Officer Craig testified "I thought that maybe Nancy Pelosi was in her office, because that's the main attraction." Tr. 674:2-4. First, Officer Craig testified that he had never been in the Capitol before, he did not enter through the office suites, and he had no way of knowing that Nancy Pelosi even had an office there. Further, the Government imputes perfect knowledge on every protestor, including Mr. Barnett, that they knew the intricacies of the "official procedure" that occurred on January 6, such that Mr. Barnett and all the rest had the requisite "knowledge" to support a charge of 18 U.S.C. 1512(c)(2), yet Officer Craig and the Government expect the Court to believe that he thought that Nancy Pelosi was in her office instead of presiding over the official proceeding that was being obstructed. Officer Craig and the Government either expect the Court to believe that Officer Craig was completely ignorant of the official proceeding that transpired that day while Mr. Barnett and hundreds of protestors had perfect knowledge, or in the alternative, that Officer Craig was aware of the official proceeding, but thought that Nancy Pelosi left the proceeding and decided to go to her office. This fantastical lie is one of many examples told by Officer Craig from the witness stand. It is worth noting that if the Government contends that Mr. Barnett thought Nancy Pelosi was in her office, he could not possibly have known that there was an official proceeding taking place that he sought to obstruct.

On cross examination, Officer Craig was caught in many material lies.  Officer Craig lied that Trump supporters wearing MAGA hats rioted and started fires in Downtown D.C. in the nights leading up to January 6. Tr. 683:3-11.  This is verifiably false from the absence of any news reports. Officer Craig was asked if he fist bumped or hugged any of the protestors, to which he said, "not to my knowledge." Tr. 722:19-22.  That is verifiably and objectively false, as he can be seen doing both on his body camera footage at 3:02 p.m. when a protestor who was just maced by the police says to Officer Craig, "I love you, brother," and Officer Craig accepts a hug and a fist bump from the man.  Finally, when asked about the death of Rosanne Boyland who is seen dying at 4:30 p.m. on Officer Craig's body camera, Officer Craig was asked if he saw some of the other protestors giving her CPR, to which Officer Craig lied and said, "No.  They just brought her and said, 'Hey, do your job and take care of her.'"  This is verifiably and objectively false from the video footage. The protestors can be seen trying to save Rosanne Boyland as she lay dying, until the police grabbed her ankle and dragged her by her ankle across the police line.

Without Officer Craig's testimony, Mr. Barnett could not be charged with 18 U.S.C. 231(a)(3).  His testimony was so riddled with obvious and verifiable lies that it should be disregarded in its entirety and Mr. Barnett should be granted a new trial in the interest of justice.

## II.   THE GOVERNMENT SURPRISED THE DEFENSE BY PERFORMING NOT ONE BUT TWO DEMONSTRATIONS OF THE HIKE 'N STRIKE BEFORE THE JURY AFTER THE DEFENSE WAS LED TO BELIEVE THAT NO DEMONSTRATION WOULD OCCUR.

Early in the Government's case in chief, the Government presented testimony from the manufacturer of the Hike 'N Strike, and from an employee of the retailer where Mr. Barnett purchased his Hike 'N Strike.  Both witnesses testified extensively on the device's capabilities. Neither witness performed a demonstration of the Hike 'N Strike for the jury.

23

After both witnesses were excused and not in the presence of the jury, the Court discouraged the Government and the Defense from presenting any further evidence about the Hike 'N Strike.  *See* Tr. 622:20-624:17.  The Government had initially stated its intention to bring a weapons expert who would demonstrate the capabilities of the Hike 'N Strike.  The Court asked the Government "Are we going to forego the expert on the stun gun now that we all know what it does and how it's used?"  To which the Government responded, "We are not calling one on our case in chief.  We have him on reserve for rebuttal depending on the defenses case."  This justifiably led the defense to believe that the Government would not present a demonstration of the Hike 'N Strike before the jury.

In this context, the Court then immediately asked the defense, "Okay. Mr. Geyer, do we need an expert on the stun gun now that we all know what it is, how it operates, what its capabilities are, what its intended and unintended uses are?"  To which the defense responded, that it still intended to bring a weapons expert in its case in chief testify that the Hike 'N Strike is not a dangerous weapon, and to show a demonstration of the device to the jury.  The Court continued to press the defense:

> THE COURT: All right, for expert testimony. So whoever is the stun gun expert, my question is what are we going to learn from him that we don't already know through the manufacturer of the stun gun?
>
> MR. GEYER: He's actually -- I believe he's tested the stun gun. And I think it's very important. He's a legitimate expert on –
>
> THE COURT: I don't doubt that. My question is, whether he's tested it or not, what is this jury going to learn from him that they already don't know from their –
>
> MR. GEYER: They are going to learn his opinion that it's not a dangerous weapon.
>
> THE COURT: That it's not a –
>
> MR McBRIDE: A moment to confer, Your Honor.

THE COURT: Please.

MR. GEYER: We are going to take a really hard look at that tonight, Your Honor, and see if we can accommodate everybody on the stun gun issue.

THE COURT: Particularly if it's expert testimony, you need to convince me that there's something additional that is going to be put before the jury.

MR. GEYER: We are going to work hard to try to sidestep the whole issue, Your Honor.

Tr. 623:19-624:17.

Under the impression that the Government would not be presenting any more witness testimony regarding the Hike 'N Strike, the next day the defense informed the Court of its decision to cancel its expert witness.

MR. GEYER: I also wanted to mention that we can now confirm that, under the guidance -- well, no experts. We do anticipate we will have a summation witness. We also hope to give a firm idea about the number of witnesses. But if I understand what the government's case is, I think we're still on track for next week being done.

Tr. 787:25-788:5.

Earlier in the Government's case in chief, during the direct examination of Secret Service Agent Elizabeth Glavey, the Government attorney approached the witness and handed her the Hike 'N Strike. Anticipating that the Government would ask the witness to perform a demonstration of the device to the jury, the defense immediately objected that the Secret Service Agent was not qualified as an expert. The Government assured the Court that he would only ask her "if that is a weapon and the kind of thing that would be pulled off by Secret Service or not allowed through their perimeter." Tr. 467:18-468:13. This gave the defense the impression that only a qualified expert could perform a demonstration of the Hike 'N Strike, and therefore, after the Court stated that there was nothing more for the jury to learn about the Hike 'N Strike, and after both sides

25

agreed to cancel their respective weapons experts, the defense did not expect for the Government to have a witness demonstrate the device before the jury.

For those reasons, the defense was taken by complete surprise when the Government had its final witness, FBI agent Kimberly Allen, act as an unqualified weapons expert and perform a demonstration of the Hike 'N Strike before the jury.  Without any qualification or warning, she was asked by the Government to demonstrate the electric shock capabilities by discharging the device for five full seconds.  Tr. 1146:14-19.  Later, in the presence of the jury, Mr. Gordon, the Government attorney discharged the Hike 'N Strike a second time without warning, claiming that it was an accident.

Moreover, the Government should not have been permitted to perform the demonstration even with an expert.  Discharging the Hike 'N Strike so that the jury could see the light and hear the noise was not relevant evidence of anything, because neither the light nor the sound are relevant to whether the Hike 'N Strike is actually dangerous.  Only a demonstration of a person being shocked by the Hike 'N Strike would be relevant.  Allowing the jury to hear the Hike 'N Strike without any demonstration of how the device actually affects a person is not only irrelevant, but it was substantially prejudicial because, as the manufacturer testified, the sound is designed to be scary to scare people and animals, and that was the exact effect – the jury was scared.  Accordingly, the jury attributed more danger to the actual effect of a shock.  The defendant's planned expert had prepared a video shocking himself and showing that the effect was no more than being bit by a horsefly, but as set forth above, the Defendant was lulled into canceling its witness.

Both demonstrations were performed after it had been established that only experts could perform demonstrations, after the Government canceled its expert, and after the Court encouraged the defense to do the same.  These two demonstrations were both performed on the same day that

Government rested his case, giving the defense no time to arrange for an expert on such short notice.  The prejudice of the two surprised demonstrations is incalculable, and by itself justifies a new trial in the interest of justice.

## CONCLUSION

Wherefore, for the foregoing reasons, Mr. Barnett respectfully requests that this Court vacate the jury verdict and grant Mr. Barnett a new trial in the interest of justice.

Dated: February 5, 2023

Respectfully,

/s/ Jonathan S. Gross
Jonathan S. Gross
Bar ID:  MD0162
2833 Smith Ave, Suite 331
Baltimore, MD 21209
p: (443) 813-0141
e: jon@clevengerfirm.com

/s/ Joseph D. McBride, Esq
Joseph D. McBride, Esq.
Bar ID: NY0403
THE MCBRIDE LAW FIRM, PLLC
99 Park Avenue, 6th Floor
New York, NY 10016
e: jmcbride@mcbridelawnyc.com

/s/ Bradford L. Geyer
Bradford L. Geyer
FormerFedsGroup.com, LLC
141 I Route 130, Suite 303
Cinnaminson, NY 08077
e: Brad@FormerFedsGroup.com

/s/ Carolyn Stewart
Carolyn Stewart
Stewart Country Law, PA
1204 Swilley Rd
Plant City, FL 33567
e: Carolstewart_esq@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify on this 5th day of February 2023, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Jonathan Gross
Jonathan Gross, Esq.