# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| *v.* | ) | **1:21-cr-00038 (CRC)** |
| | ) | |
| **RICHARD BARNETT,** | ) | |
| **Defendant** | ) | |

### DEFENDANT'S POST VERDICT RULE 29 MOTION FOR A JUDGMENT OF ACQUITTAL, WITH INCORPORATED MEMORANDUM OF LAW

Defendant Richard Barnett, by and through undersigned counsel, pursuant to the Federal Rules of Criminal Procedure Rule 29 submits this Motion with Memorandum of Law for a Judgment of Acquittal now after the jury verdict. Mr. Barnett through his attorneys submitted an oral motion at the conclusion of the evidence and renewed it as the jury was to be charged. Mr. Barnett requests a judgement of acquittal for Counts One through Eight in the Indictment at ECF No. 96 in the above styled case because among other factors Mt. Barnett had a non-indicted charge added to jury instructions over attorney objections; and the government did not provide proof of every element for any crime charged in the indictment; lied that aiding and abetting is the same as "attempting," was deficient in relevant, honest evidence for any charge, to include witnesses' testimony; provided only legal conclusions not founded in evidence to the jury; presented two separate demonstrations before the jury of a Zap Hike 'N Strike after agreeing that neither side would present a weapons expert qualified to perform a demonstration; deliberately demonstrated a Zap Hike 'N Strike for five seconds to misrepresent the non-dangerous item and to unfairly scare the jury with the sound; falsely called the Hike 'N Strike a deadly weapon in closing argument despite creator Mr. Pennington's testimony and science to the contrary that the item lacks lethal capability; showed no intent by Mr. Barnett to violate the law for any count; declared Mr. Barnett

guilty because of acts of others he knew nothing about; and misapplied the law in its prosecution

of innocent acts by Mr. Barnett, where no reasonable, impartial, fair jury could have found guilt

for any charge. Mr. Barnett submits the below memorandum of law in support:

## I.   <u>INTRODUCTION AND FACTUAL BACKGROUND</u>:

 Mr. Barnett's initial indictment was entered on February 2, 2021 at ECF No. 19. The ECF

No. 19 indictment did not include 18 U.S.C. Section 231(a)(3) and stood until December 22, 2022,

when the government's superseding indictment was entered on the record within nine business

days before trial start and over the Christmas holiday period. The government purposefully made

no mention to the Defense Team or Court any time before December 19, 2022, that it was definitely

adding a new charge to the indictment.  Prior to filing the superseding indictment, the government

only made a single vague passing comment during an informal telephone conference call on

December 19, 2022 about a possibility that it may supersede, without identifying any specific

charge or factual basis for the charge.

 The superseding indictment added the new charge of 18 U.S.C. Section 231(a)(3) Civil

Disorder that became Count One, and also made substantial changes to the language of the prior

Count One that became Count Two: 18 U.S.C. Section 1512(c)(2). Mr. Barnett was additionally

indicted in ECF No. 96 as he was in ECF No. 19 for alleged violations of 18 U.S.C. § 1752(a)(1)

and (b)(1)(A), Entering and Remaining in a restricted building or grounds with a deadly or

dangerous weapon;[1] 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Disorderly and Disruptive Conduct in

a restricted building or grounds with a deadly or dangerous weapon; 40 U.S.C. § 5104(e)(2)(C)

Entering and Remaining in Certain Rooms in the Capitol Building; 40 U.S.C. § 5104(e)(2)(D)

---

[1] Charges for 18 U.S.C. § 1752 (b)(1)(A) are sentence enhancements where: "**(b)** The punishment
for a violation of subsection (a) is **(1)** a fine under this title or imprisonment for not more than 10
years, or both, if **(A)** the person, during and in relation to the offense, uses or carries a deadly or
dangerous weapon or firearm." The statute does not define deadly or dangerous weapon or firearm.

Disorderly Conduct in a Capitol Building; 40 U.S.C. § 5104(e)(2)(G) Parading, Demonstrating, or Picketing in a Capitol Building; and 18 U.S.C. § 641 Theft of Government Property.

Mr. Barnett filed a motion for continuance on December 30, 2022 (ECF No. 112), due to the unfair interference and specific impairments to the Defense caused by the eleventh hour superseding indictment entered on December 22, 2022.   At the January 4, 2023 Pretrial Conference, the Defense listed specific impairments that had already occurred given the superseding indictment. The Court in error denied the motion.  The Speedy Trial Act shield for 30 days does not apply to a superseding indictment, but the U.S. Supreme Court made clear as contained in the continuance motion that the judge has broad discretion to grant a continuance as the proper solution for an indictment that adds a new charge or makes substantial changes to an existing charge close to trial. The Defense continued to be unfairly prejudiced and impaired through trial by the indictment's newly added charge of 18 U.S.C. Section 231(a)(3) Civil Disorder and substantial changes to the Section 1512(c)(2) charge.  The Defense first learned of the basis for this new charge at the Pretrial Conference, five days before trial.  In support of the new charge, the government presented body camera clips from the Rotunda, where the alleged violation took place.  The Defense had no time in the lens of the newly filed Civil Disorder charge to show a truthful picture because all police body camera from the Rotunda, and other video was buried within terabytes of global discovery that was not marked "Rotunda" and not readily searchable.

Mr. Barnett's attorneys made an oral motion for acquittal under Rule 29 before the close of all evidence. On January 20, 2023, defense attorney Mr. Bradford Geyer renewed the motion upon close of the defense's case and prior to the jury being charged. The Court reserved judgment. (Transcript at 1798: 7-13).

## MEMORANDUM OF LAW

**II.**   **LEGAL STANDARD:**

   **A.   Rule 29, Fed R. of Crim P. Allows a Judgment of Acquittal Upon a Motion**:

     **(a) Before Submission to the Jury**. This part of the rule allows the motion after the government closes its case in chief or after the close of all evidence. The court must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

     **(b) Reservation of Decision on Motion**. The court may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. . . .

     **(c) Motion After Jury Verdict or Discharge**.
     (1)   Time for a Motion. A defendant may move for a judgment of acquittal , or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.
     (2)   Ruling on the Motion. If the jury has returned a guilty verdict, the court may set aside the verdict and return an acquittal.
   . . .

  18 APPENDIX U.S.C. § 29

  **B.   Fed R. Crim P. Rule 29 States That a Court May Grant a Judgment of Acquittal When the Prosecution Fails to Prove All Elements of a Crime Charged**.

  **1.   The prosecution must state all elements of the crime with specificity and then prove beyond a reasonable doubt each element of every crime charged.**

Evidence is insufficient to sustain a conviction when it goes no further than to "raise a question [of guilt] in a reasonable man's mind" or "create suspicion." *Cooper v. United States*, 218 F.2d 39, 42 (D.C. Cir. 1954). Even when evidence raises a "grave suspicion" in the reasonable juror's mind as to guilt, it is insufficient to support a verdict, unless proof of guilt beyond "a reasonable doubt" is possible on the evidence. *Scott v. United States*, 232 F.2d 362, 364 (D.C. Cir. 1956). In other words, *"some* evidence of guilt" is not enough. *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (emphasis added).

4

**2**.  **In considering a Rule 29 motion this Court must grant it if the jury was confused by the government's case and engaged in speculation.**

"The court may not permit a jury to render a guilty verdict based on 'ambiguous evidence' from the government, which encourages the jury to 'engage in speculation.' *Bailey v. United States*, 416 F.2d 1110, 1116 (D.C. Cir. 1969).

**3**.  **Restated, the Court must grant a motion for judgment of acquittal if "a reasonable juror must necessarily have had a reasonable doubt as to the defendant[']s guilt**."

*See United States v. Weisz*, 718 F.2d at 437 (emphasis in original) (*citing United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)). *See also United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for judgment of acquittal] must be granted."), *cert denied*, 331 U.S. 837 (1947). *United States v. Jabr*, 2019 U.S. Dist. LEXIS 238718, *9-10, 2019 WL 13110682 (D.D.C., May 16, 2019).

**4**.  **This Court must make a reasonable assessment and give the government the benefit of only "*legitimate inferences*."** *United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983).

A court should not speculate or rescue the government by reconstructing the indictment or bending statutes to lend credence to the government's narrative that invents guilt from innocence.

> **Moreover, Rule 29 does not require the Court to view the evidence through dirty windowpanes and assume that evidence which otherwise can be explained as equally innocent must be evidence of guilt.** *See Curley*, 160 F.2d at 233 (if "a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained"). Rather, in order to find a legitimate and nonspeculative inference of guilt the government must articulate a rational basis in the evidence upon which that inference can arise.

*United States v. Recognition Equip., Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989).

**5**.  **I**f a reasonable trier of fact **would have a reasonable doubt as to the existence of any of the essential elements of the crime, the Court must acquit.** *United States v. Durant*, 208 U.S.

App. D.C. 374, 648 F.2d 747 (D.C. Cir. 1981); *see also United States v. Foster*, 251 U.S. App. D.C. 272, 783 F.2d 1087, 1088 (D.C. Cir. 1986).

**6.** "**No essential element of the crime can be omitted without destroying the whole pleading. The omission cannot be supplied by intendment, or implication, and the charge must be made directly and not inferentially, or by way of recital**." *United States v. Hess*, 124 U.S. 483, 486 (1888). (Emphasis added).

The government cannot testify through questions and recital arguments. Criminal law like civil law does not allow inferences upon inferences upon inferences to be considered "evidence" or proof of an act, such as obstruction of a proceeding or commerce.

**C.  Intent Must be Proven for Every Crime Except Those for Strict Liability. The U.S. Supreme Court Made This Clear**:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to,' and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Morissette v. United States*, 342 U.S. 246, 250-51 (1952).

**D.  The Court Cannot Create or Modify an Indictment Under the Law Without Violating Mr. Barnett's Due Process Rights Under the Fifth Amendment of the U.S. Constitution.**

This includes jury instructions. "Due process bars courts from applying a novel construction of a criminal statute that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 268 (1997).

The **Court cannot invent intent of the Grand Jury to add a crime** to an indictment. "The *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960). See also *United States v. Norris*, 281 U.S. 619, 622. Cf. Clyatt v. United States, 197 U.S. 207, 219, 220. "Deprivation of such a basic right is far too serious to be

treated as nothing more than a variance and then dismissed as harmless error. . . The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Stirone v. United States*, 361 U.S. 212, 217-18 (1960).

"Ever since *Ex Parte Bain*, 121 U.S. 1, was decided in 1887 it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). Additionally:

> If it lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer,' may be frittered away until its value is almost destroyed.

*Stirone v. United States*, 361 U.S. 212, 216 (1960) citing Bain, 121 U.S. 1, 10.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Mostofsky*, 579 F. Supp. 3d 9, 14-15 (D.D.C. 2021) ((citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

The jurisprudence against extending a criminal statute is rooted in our founding and history:

> It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute unless clearly within its terms. 'There can be no constructive Offences, and before a man can be punished, his case must be plainly and Unmistakably within the statute.' *United States v. Lacher*, 134 U.S. 624; Endlich on the Interpretation of Statutes, sec. 329, 2d ed.; Pomeroy's Sedgwick on Statutory and Constitutional Construction, 280.

*Todd v. United States*, 158 U.S. 278, 279 (1895)

No jury can convict legitimately when presented with a DOJ or court-altered indictment.

III.   <u>ARGUMENT</u>.

   **A.  The Court Must Acquit on Count One Because the Non-Indicted Crime of 18 U.S.C. § 2 Was Added to Jury Instructions After Evidence Closed and No Element of 18 U.S.C. § 231(a)(3)  Was Proved by Evidence Beyond a Reasonable Doubt if at All.**

   The charged subsection of the statute for Civil Disorder reads:

> (a)(3) Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function - Shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3) Civil Disorder

   The elements of the § 231(a)(3) crime require (1) intent to impede police during a civil disorder; (2) an act or attempt to obstruct, impede, or interfere with a fireman or law enforcement officer (3) lawfully engaged in official duties during a civil disorder and where (4) the civil disorder obstructs, delays, or adversely affects commerce or the movement of articles in commerce or (4) conduct of a federally protected function. Civil disorder requires violence by three or more persons. At the January 4, 2023 Pretrial Commerce and elsewhere the government said it was not pursuing the "federally protected function" since none was involved. No element was proven by evidence.

   **1.  <u>Mr. Barnett was not charged in the indictment with 18 U.S.C. Section 2, Aiding and Abetting for § 231(a)(3) and the jury convicted, given an instruction for Section 2</u>.**

   The Count One superseding indictment by the grand jury reads:

> On or about January 6, 2021, within the District of Columbia and elsewhere, RICHARD BARNETT, also known as "Bigo Barnett," committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer, that is, an officer from the Metropolitan Police Department, lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce and the conduct and performance of any federally protected function.
> **(Civil Disorder, in violation of Title 18, United States Code, Section 231(a)(3)**

ECF No. 96 Count One

The addition of a crime by the Court outside the grand jury indictment violates the legal standards in Section II. *supra*. This is irreversible error and was driven by the government's false argument that 'Aiding and Abetting' is inherent in all crimes. The guilty verdict by the jury for Count One cannot be ascertained as to whether it was for only § 2 and must be assumed as such.

The government specified that Mr. Barnett was charged with impeding MPD Officer Craig under 18 U.S.C. § 231(a)(3). January 4, 2021 Transcript at 12:8-21. During the January 4 Pretrial Conference, the <u>government referenced only Mr. Barnett's actions</u> (January 4 transcript at 13:5-15) as being prosecuted for the new charge (where the Court then denied the continuance motion after the government argued there was no change in evidence). There was no evidence of aiding and abetting provided in discovery; and was a government fabricated narrative after evidence closed. The government's misrepresentation to this Court about only using previously alleged conduct while hiding its illicit goal to prosecute an uncharged crime gave the Court an excuse to deny the continuance. Mr. Barnett was never alleged in the initial indictment to have aided and abetted anyone in the Rotunda. Yet the government claimed (*id*.) that there was nothing new. The Defense had no time given the eleventh hour indictment to find any supposed discovery for Mr. Barnett's actions, or imagine a defense for uncharged crimes, and here again the government impeded the Defense by misrepresenting facts to the Court and conducting trickery during trial.

In addition to the Legal Standards in section II. above, such as *Ex Parte Bain* and other cases, "[w]ere the prosecutor able to request an instruction on an offense whose elements were not charged in the indictment, this right to notice would be placed in jeopardy." *Schmuck v. United States*, 489 U.S. 705, 717-18 (1989). Yet, in the January 20, 2023 jury instruction meeting with the Court, the government misrepresented law by stating there is ample caselaw that "Aiding and Abetting" is inherent in crimes and § 2 must be added as part of Section 231(a)(3). This was false.

18 U.S.C. § 2 is a distinct crime with its own elements that must be tied to facts and proven. § 2 is not a lesser crime such as "attempt," but the government in the new world of January 6 jurisprudence incredibly equated § 2 with "attempt." And the government said in its closing argument without ever having provided any proof of aiding and abetting that "[a]ny one of these three theories -- did, attempted, or aided and abetted -- any of those made him guilty." (Trial Transcript, January 20, 2023 at 1850:23-25).

Settled caselaw states that an "attempted crime" is inherent in the accomplishment of the charged crime because a person has to attempt the crime in order to accomplish it. The lesser crime of "Attempt" is logically proven when the crime's accomplishment is proven. Aiding and abetting is nothing like "attempt."  The government's Orwellian statement to the Court, that "aiding and abetting" is just like "attempt" and is naturally part of crimes was false. There is no caselaw where the DOJ may assert that without proof every defendant is automatically an accomplice who becomes a principal to a crime that was attempted somewhat nearby (undefined) by unknown people without any intent or act by the defendant, in a DOJ fabricated story as was the case in the government's unconstitutional prosecution here. The defendant must intend a willful act or cause someone else to commit the act that violates the law, where violation of the law must also be proved. The government provided no evidence, and <u>the jury instructions did not clarify elements for "aiding and abetting," or the requirement for evidence of each element in the § 2 crime</u>.

The DOJ's own guidance states [2]:

> The first provision one finds in Title 18 of the United States Code regards **accessories to crime**. Title 18, United States Code § 2 now provides:
> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

---

[2] See DOJ from October 1998 https://www.justice.gov/archives/jm/criminal-resource-manual-2471-18-usc-2

> Aider and abettor liability is distinct from accessory after the fact under 18 U.S.C. § 3. *United States v. James*, 998 F.2d 74, 80 (2d Cir.), *cert. denied*, 510 U.S. 958, 114 S.Ct. 415, 126 L.Ed.2d 362 (1993). An aider and abettor, unlike an accessory after the fact, is punishable as a principal. *Id.*

The government provided no evidence that Mr. Barnett was an accessory to another person's act.

From the above there clearly must be specific facts for each element that must be proven for § 2 which involves "accessory." The government without calling it "aiding and abetting" asserted that Mr. Barnett's wave to a videographer was a call for the crowd of strangers to do something. Even so, the government showed no act by anyone in response where a "wave" aided the imaginary actors created by the government. Because the government did not prove any fact or directly refer to any element of § 2 tied to who was directed and then accomplished a crime, or who was aided by Mr. Barnett by what, where and when; then no reasonable, rational, impartial, fair juror could find guilt beyond a reasonable doubt that Mr. Barnett was an accessory; and Mr. Barnett must be acquitted.

And since Mr. Barnett had no opportunity to defend when the § 2 charge was added to jury instructions after evidence was closed, Mr. Barnett must be acquitted because he was completely denied Due Process under the Fifth Amendment. The Court erred in accepting the government falsehood that § 2 was intended by the grand jury and by adding it to jury instructions.

Outside of conspiracy or an agreed plan by accomplices, under the Section II Legal Standards *supra*, 18 U.S.C. § 2 must be charged with specificity in the indictment. The Defendant must have the ability to defend during trial, and each element of § 2 must be proved beyond a reasonable doubt before a rational, impartial jury can convict. All this was missing in the trial. The government just recited in closing that Mr. Barnett was guilty. The jury did not even deliberate for 90 minutes and cannot have had any fair and impartial deliberation about Count One or any Count. Without the charge being in the indictment, the Court must now acquit.

There was no scrivener's error since there are three places in the Count One indictment at ECF No. 96 where no mention of § 2 was made. The first was in the top right of the indictment that listed all the charges. The second place was below the Count where the exact crimes charged are listed. The third is within the count's narrative specifications for what is being charged. The government cannot claim that the grand jury intended to charge § 2 as shown in the Legal Standards when it omitted § 2 in the three places it should be reflected.  The U.S. Supreme Court was clear in the cases in Section II, Legal Standard above, that the Court cannot infer grand jury intent and cannot add to the indictment. The government deliberately blocked any preposterous claim of scrivener's error when prior to trial it refused to provide grand jury testimony, and the Court approved of the refusal.[3] There is nothing in the record or discovery to show any falsely claimed scrivener's error. The Court may not, according to Section II Legal Standards *supra*, add to an indictment as was done in this case. This was error that was not harmless.

The government deliberately eliminated any possible evidence of why the jury convicted Mr. Barnett under Section 231(a)(3) when the government blocked Mr. Barnett's proposed, detailed jury verdict form with all the elements of the crimes for all counts. The Court denied the Defense's proposed, detailed verdict form with elements. See ECF No. 119 Proposed Jury Verdict Form by Mr. Barnett. Thus, the Court cannot assume the guilty verdict was not for Section 2, which is not an element of § 231(a)(3). A section 2 conviction must be presumed since there was next to no deliberation by this jury in the 90 minutes it took to convict in eight counts. The Court must acquit because in violation of the U.S. Constitution's Fifth Amendment, Mr. Barnett was denied Due Process and where he had no notice or opportunity to be heard by defending.

---

[3] See January 4, 2023 Pretrial Conference transcript at 9-10 followed by AUSA denial when Grand Jury transcript was directly requested.

As described in the Legal Standards, the Court may not add to the indictment, yet that happened here. There were no elements presented for § 2 Aiding and Abetting during the government's case in chief. Officer Craig testified that Mr. Barnett obstructed him because he had to watch Mr. Barnett, and with no touch or blocking of Craig's movement. Craig said there was obstruction because Mr. Barnett invaded his personal space was invaded. Craig, the sole officer involved in the charge, never said, and never testified to a single fact that Mr. Barnett aided or abetted another in obstructing him.  The government illegitimately invented "aiding and abetting."

Because of Court error and where no reasonable, rational, impartial jury can have found guilt beyond a reasonable doubt given the lack of evidence, and because addition of a charge not in the indictment occurred after evidence closed violated Mr. Barnett's Fifth Amendment Due Process rights, the Court must acquit Mr. Barnett for Count One.

**2.   The government never showed intent or an act by Mr. Barnett that impeded or obstructed Officer Craig.**

The jurisprudence standard of a crime requiring a *mens rea* and actus reus applied at trial but was disregarded by the government and the jury. On January 4, 2023 at the Pretrial Conference (see Transcript), the government stated that its case for Section 231(a)(3) *solely involved only Officer Craig in the Rotunda*. Missing elements not in any discovery that the government was required to prove were argued as cause for dismissal in the motions at ECF Nos.123 and 147; and were then erroneously denied by ECF No. 138 (and minute order) after the government claimed the new charge involved *only Mr. Barnett's conduct* in the Rotunda. Count One must be dismissed because the government never showed proof of Mr. Barnett having intent and impeding Officer Craig in the Rotunda. Officer Craig stated that Mr. Barnett never touched him. Instead, the rather imposing Officer Craig stated that Mr. Barnett entered his "personal space," and that Officer Craig took it upon himself to watch Mr. Barnett, who had yelled that he wanted his flag retrieved. The

government provided no evidence of intent and no act that impeded or obstructed Craig. The government misled the jury, for example by claiming that when Mr. Barnett adjusted the position of the hiking staff on his belt that he was "brandishing it." Officer Craig admitted that at the time he had no idea what was on Mr. Barnett's person. The new world of January 6 jurisprudence was afire during the trial with new January 6 English meanings of words such as "brandishing." Officer Craig was never impeded by Mr. Barnett and without government unfair prejudice of the jury, no jury could have found any intent or act to impede or obstruct.

**3. The government never showed evidence of a civil disorder when and where Mr. Barnett was located inside the Rotunda or Capitol building.**

The government admitted Mr. Barnett was not accused of violence. (See Transcript January 4, 2023 Pretrial Conference). The government stated in correspondence and at the Pretrial Conference it was not going to pursue the element of a government function being impeded. Mr. Barnett is the first non-violent January 6 defendant charged with violating Section 231(a)(3).  He moved to dismiss the charge because an essential element of the offense used as the standard in the Eighth Circuit holding is that the defendant acted in a "violent manner." *United States v. Casper*, 541 F.2d 1275, 1276 (8th Cir. 1976) (citing *United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971)). The Court denied the motion and ruled that Mr. Barnett did not have to be violent. The government was still required to show the jury violence by three or more others in the Rotunda. The government did not show three or more persons whose violence in the Rotunda impeded police for a civil disorder. Instead, in its guise of showing "context," the government showed violence on the west that was nowhere near Mr. Barnett's location and not visible to anyone in the Rotunda.

The government merely concluded and asserted there was Civil Disorder. The government misled the jury by often interchanging the word "riot" for "civil disorder" when a "riot" is a

separate, distinct crime that does not include simultaneous obstruction of interstate commerce.[4] The United States Capitol Police (USCP) never declared a Civil Disorder anywhere on the Capitol grounds or in the building. No Civil Disorder was declared in the Rotunda when Mr. Barnett was present. Police pushed and herded people into the Rotunda, and caused a crowd crush, where no voluntary acts were shown where violence by three or more persons happened and that impeded police in response to civil disorder and obstruction of commerce. The entirety of the government's case lacked evidence that a Civil Disorder with violence by three or more persons existed in the Rotunda and was related to any act by Mr. Barnett. Officer Craig never stated that he was in the Rotunda to stop a Civil Disorder. He said he was there to prevent intrusion further into the building. He said he was not assaulted in the Rotunda. No USCP or D.C. MPD orders were ever issued for officers to stop a Civil Disorder that was obstructing commerce. Because the government showed no proof of Civil Disorder where three or more persons took violent action, and with no proof of any action by Mr. Barnett to impede Officer Craig, the Court must acquit because there was no evidence that a civil disorder involving Mr. Barnett and Officer Craig existed.

**4. The government showed no evidence of obstructed interstate or other commerce.**

The United States Constitution gives Congress broad enumerated power to regulate interstate commerce while restricting states from burdening or impairing interstate commerce. Yet Section 231(a)(3) appears to refer to "commerce" as if Congress can write laws about commerce that is not interstate commerce. Congress can write laws for the District of Columbia that fall under the same conditions as state - and not federal - law. But then something specific only to crime in D.C. does not belong in federal law. Any government argument to assert 231(a)(3)'s jurisdiction solely related to the District of Columbia fails constitutionally unless the commerce in D.C. is

---

[4] 18 U.S.C. §§ 2101, 2102.

shown to have a substantial effect on interstate commerce. The sale of a bar drink or beer from a tapped keg at a pub along the Potomac cannot be said to affect interstate commerce, substantially or not, since the goods were no longer in commerce.

According to Section 232, the term "commerce" means commerce "(A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia." 18 U.S.C.S. § 232(2). The definition if taken outside of settled law on commerce would assert wrongly that Congress allowed § 231(a)(3) to mean any retail sales in D.C. While Congress within its enumerated power is allowed to legislate for the District of Columbia, any federal legislation on commerce requires "interstate," or "substantial impact on interstate commerce" when addressing commerce in D.C. alone. Noneconomic intrastate activity may not be federally regulated unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995).

In determining what is interstate commerce that Congress can regulate and make laws about, courts look to practical considerations:

> All that was decided there was that the local business of commission merchants was not commerce among the States, even if what the brokers were employed to sell was an object of such commerce. The brokers were not like the defendants before us, themselves the buyers and sellers. They only furnished certain facilities for the sales. Therefore, there again the effects of the combination of brokers upon the commerce was only indirect and not within the act.

*Swift & Co. v. United States,* 196 U.S. 375, 397 (1905).

There is no interstate commerce after movement of goods to the retail seller, and commerce middlemen are out of the process.  If everything equals interstate commerce, then nothing could be taxed. The U.S. Supreme Court only made allowance for a *federal tax for specific sales* that involve the start of movement in one state and the end in another, such as for airline tickets where

people's movement is commerce. People cannot be taxed at a state border. The general rule is that where transportation has acquired an interstate character it continues at least until the load reaches the point where the parties originally intended that the movement should finally end." *Binderup v. Pathe Exch., Inc*., 263 U.S. 291, 309 (1923). The basic principle remains that "the States cannot tax interstate commerce, either by laying the tax upon the business which constitutes such commerce or the privilege of engaging in it, or upon the receipts, as such, derived from it." *Lemke v. Farmers Grain Co*., 258 U.S. 50, 59 (1922). Retail activity involves state tax.

In *Lopez*, the Supreme Court limited federal commerce power to three categories of activity: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "those activities that substantially affect interstate commerce." 514 U.S. at 558-59. ((See also *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1068–69 (D.C. Cir. 2003)). Therefore, irrelevant evidence presented by the government to confuse the jury, such as the decision by a local restaurant not on an interstate road to close its bar, or the decision by a Safeway manager approximately five miles from the Capitol to close the store is not interstate commerce. Whether a Safeway sold a can of beans on January 6, 2021 or on January 7, 2021 had no substantial effect on interstate commerce. Unlike the Black Lives Matter riots in the spring and summer of 2020, on January 6 there were no businesses set on fire; there were no raids to break store windows and loot; and there were no mobs assaulting drivers.[5]

---

[5] The government's practice of charging peaceful non-violent protestors like Mr. Barnett for violating Section 231(a)(3) is a new practice apparently designed for targeting American citizens that President Biden classifies as "MAGA Republicans." When Washington, D.C. and dozens of other American cities burned in the spring and summer of 2020 during the season of Black Lives Matter riots, the government did not charge hundreds of non-violent protestors with Section 231(a)(3). The only case identified in this Court where a non-violent protestor was charged with violating Section 231(a)(3) is the case of Abbie Hoffman when he was charged "for erecting a barricade to obstruct police during the 1971 May Day protests." ECF No. 138. But "erecting a barricade" can hardly be said to be "non-violent" given the setting and goal. Thus, no non-violent cases were identified, and the practice was introduced after January 6 for "MAGA Republicans."

A private business management decision to close when there is no threat of theft and damage is not obstruction of commerce. Moreover, there is no allowance in Section 231(a)(3) for the obstruction of commerce to be hours, days, or weeks removed from the act of impeding police. The crime of civil disorder (three or more persons being violent and where they impede police while commerce is obstructed) must directly obstruct commerce at the time of the civil disorder. The tense of language in the law cannot be ignored just for new January 6 jurisprudence.

Prosecution under Section 231(a)(3) for January 6 alleged offenses is deliberate overcharging and an abomination of the justice system. The caselaw is clear: "**We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on** that conduct's aggregate effect on interstate commerce. **The Constitution requires a distinction between what is truly national and what is truly local.**" *United States v. Morrison*, 529 U.S. 598, 617-18 (2000) (quoting *Lopez,* 514 U.S. at 568 and citing *Jones & Laughlin Steel*, 301 U.S. at 30) (Emphasis added). And more recently, "We have held that activities in this third category — those that "substantially affect" commerce — may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal." *Taylor v. United States*, 579 U.S. 301, 306 (2016). The government made no showing of substantial impact on interstate commerce. It showed unauthenticated lower daily retail sales while hiding the cause as being Mayor Bowser. The violent crime must either obstruct interstate commerce right then and there, or the crime must be one of economic activity. Impeding police in and of itself is not economic activity.

The U.S. Supreme Court was clear: "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is  economic in nature." *United States* v. *Morrison*, 529 U.S. 598, 613, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000).

In deciding whether a law against marijuana was related to commerce the Court held, "But there can be no question that marijuana trafficking is a moneymaking endeavor — and a potentially lucrative one at that." *Taylor v. United States*, 579 U.S. 301, 306-07 (2016). Impeding police, if shown is not economic activity.

The government presented no evidence of the crime's elements. All the hotels remained booked, where hotels could be considered as having an impact on interstate commerce according to *Heart of Atlanta Motel v. United States*. The Court decided in that case that:

> any inn, hotel, motel, or other establishment which provides lodging to transient guests affects commerce *per se*. Restaurants, cafeterias, etc., in class two affect commerce only if they serve or offer to serve interstate travelers or if a substantial portion of the food which they serve or products which they sell have 'moved in commerce.' . . . And the establishments listed in class four affect commerce if they are within, or include within their own premises, an establishment 'the operations of which affect commerce.'

*Heart of Atlanta Motel v. United States*, 379 U.S. 241, 247-48 (1964)

No rational, reasonable, fair, and impartial jury can have convicted when the element of interstate commerce being obstructed was never proven at all, lest beyond a reasonable doubt. The government did not provide evidence that anything that qualified as interstate commerce was obstructed. The government showed violence on the west but did not provide any evidence that anything there obstructed interstate commerce. The government's mass of confusion in showing a low-level hotel manager's decision to close the bar and only allow take-out meals obfuscated that there was nothing that affected interstate commerce. The use of the word "commerce" never entered the trial during the first week. The word "commerce" first entered the trial on January 18, 2023 on page 1175 of the trial transcript. The word "commerce" was raised by the Defense, after the government used an FBI agent from Arkansas with no expertise in economics or forensic accounting to talk about unauthenticated *sales* figures for the D.C. area on January 6, 2021. "Sales" do not equal "commerce."

Section 231(a)(3) is not a crime of negligence such as where one fire causes another fire hours later and should have been foreseen by the arsonist. During the period Mr. Barnett was in the Capitol there was no obstruction of and no substantial impact on interstate commerce. The Count must be dismissed because not a shred of evidence was presented to show obstruction of commerce, and nothing was shown to obstruct or negatively impact interstate commerce when Mr. Barnett was in or at the U.S. Capitol on January 6, 2021. No rational, impartial, reasonable, fair juror could find Mr. Barnett to be guilty since no evidence showed a Civil Disorder in the Rotunda; no evidence showed Officer Craig was impeded from his job in the Rotunda; and no evidence showed that interstate commerce was obstructed at the very same time. There were no sit-ins on roads. There was no obstructive action at an airport, bus depot, seaport, or truck transfer site for commerce goods. Nothing was set afire. No business was attacked in the mid-afternoon period while Mr. Barnett was at the Capitol. Instead, Mr. Barnett was far away from D.C. on his drive back to Arkansas when a hotel manager decided not to open the bar, and when a Safeway store closed for curfew.

Whether local retail sales on January 6, 2021 in D.C. were lower than other days is irrelevant to interstate commerce. Whether the single Safeway store or the Hyatt sold a bottle of beer or not on January 6, 2021 was not shown as occurring during a civil disorder or having any substantial impact on interstate commerce. Nobody burned a beer truck or hotel. The government contended here that Mr. Barnett did not even have to be involved in violence or know about violence. Then every person within blocks of the looting during Black Lives Matter 2020 summer riots is still guilty of Civil Disorder. Any person protesting - where police had to close and guard streets from traffic that could harm protestors in a 5-mile vicinity of window smashing and looting of retail stores in San Francisco and New York in the past several years - is guilty of Section 231(a)(3)

Civil Disorder, whether the looting was of shoes, jewelry, or pretzels from a retail store.

In this case, the Court erred in allowing the government's accusation that a hotel's or Safeway store's decision to close when there was no threat at the locations miles from the U.S. Capitol, and sales were stopped by managers after the Capitol was cleared of protestors. The jury was falsely led to believe that guilt for Section 231(a)(3) Civil Disorder happens when: anyone out of eyesight or control of, and unknown to a defendant, impedes police; and the DOJ after the fact declares a civil disorder existed when neither police nor a local agency with authorization declared such; and no three people violently impeding police are identified to the jury; and somewhere in an unlimited distance and hours or days after the police were allegedly impeded a business decides to close early despite no local threat; then the defendant is guilty of civil disorder. **This is an absurd construction of the law but in short it is what happened in this case with government fabricated narrative and inferences upon inferences.** The Court must acquit on Count One.

**5. <u>The government showed no required nexus for: intent by Mr. Barnett to impede police; police responding to civil disorder with violence by three or more persons in the Rotunda when Mr. Barnett was there; and simultaneous obstruction of commerce</u>.**

The charge requires the above nexus. Since the individual elements were not proven by evidence, the nexus cannot be proven. After denying pretrial motions for a continuance and to dismiss § 231(a)(3); and with trial  objections, the Court allowed the government to create a novel construction of § 231(a)(3). In this novel January 6 jurisprudence, there was no showing of intent by Mr. Barnett to impede Officer Craig. There were only unprofessional government false declarations that Mr. Barnett was a liar. Mr. Barnett's speech demanding his flag was unconstitutionally equated to thought crime intent. The government presented no proof of violence by at least three persons let alone by Mr. Barnett at his location. There was no showing that there was any simultaneous interference with commerce, where any police in the Rotunda were impeded from responding. There was no commerce in the Capitol building and the government showed no

related obstruction of commerce anywhere when Mr. Barnett was in the Rotunda. Prosecution under the statute was absurd and worthy of a third world country without laws and jurisprudence.

(i) The government claimed that Mr. Barnett had intent just because he was pushed inside, did not subject himself to injury or death by attempting an impossible push out against the crowd, and used protected speech to ask for his flag. In its case-in-chief, the government failed to introduce evidence of any intent by Mr. Barnett to impede police, cause anyone else to impede police, or violate any law. Instead, the government fabricated a narrative of inferences upon inferences to put words in his mouth and assert an unstated, non-existent thought crime.

(ii) The government showed no evidence Officer Craig was impeded. The government was allowed to claim that Mr. Barnett did not have to be violent while after evidence closed adding unindicted § 2 to claim he was an accessory to other unspecified violent people.  The Court also allowed the jury to be told without evidence that a civil disorder occurred while the government identified no three specific people located with Mr. Barnett who caused violence or impeded police simultaneous to an ongoing obstruction of commerce. The Court over objections allowed the government to confuse the jury by presenting witness testimony and videos of the west outside of the Capitol, as if the violence totally divorced from Mr. Barnett's speech inside the building satisfied the "three or more persons" requirement for violence and Civil Disorder. Officer Craig claimed he was scared but not assaulted in the Rotunda. He was assaulted on the west outside - where and when Mr. Barnett was not present. No three persons were ever identified as being a cause of any violent civil disorder in the Rotunda. The police forced protestors into the Rotunda and caused a large crowd and a noisy crush of people.

(iii)  There was no proof of obstruction of commerce while Mr. Barnett was in the Rotunda. The Court allowed the government to use an incompetent witness as to the subject matter

of "commerce" to tell the jury that a decrement in sales receipts equaled obstruction of commerce. The Court over objection allowed the government to allege the essential element of an adverse effect of interstate commerce through the testimony of an FBI agent from Arkansas, with no expertise in economics or forensic accounting, who reviewed a document generated by a Safeway store that the FBI agent from Arkansas had never visited, and which was located at the outskirts of D.C., over four miles away from the Capitol.  The FBI agent from Arkansas concluded that a Safeway store miles away from the Capitol suffered a loss in sales because it closed given a management decision to send employees home.  The FBI agent was not qualified to testify on matters of interstate commerce. The government also hid the D.C. mayor's COVID-19 closure orders and advertising that people not go into D.C. on January 6. The Court should have sustained the Defendant's objections to the witness's irrelevant and incompetent testimony.

But even if the FBI agent from Arkansas was a qualified expert in economics or forensic accounting, she testified to an adverse effect on sales receipts that allegedly occurred according to an unauthenticated document for January 6, 2021 in total.  Section 231(a)(3) can only be violated if the police officer is impeded while responding to a civil disorder – i.e., a civil disorder must be occurring at the time of the alleged obstruction and simultaneously there is an obstruction of or substantial local impact on interstate commerce.  Civil disorder requires a simultaneous adverse obstruction of interstate commerce, but the Government did not even show obstruction of interstate commerce or obstruction of local commerce that had a substantial effect on interstate commerce at the time that Mr. Barnett was in the Rotunda.  The Government failed to produce evidence that a civil disorder was occurring at the time of any alleged obstruction of commerce. Because Mr. Barnett could not have violated Section 231(a)(3) based on the lack of evidence for the elements,

no reasonable, rational, fair, and impartial juror could have found him guilty under the law; and therefore, he must be acquitted on Count One.

(iv) The jury instructions were completely deficient by not requiring proof that a civil disorder with violence by three or more persons must have co-existed in the Defendant's presence and that he intended to impede police, even given the Court's decision that Mr. Barnett did not have to be violent. All that was shown was that Mr. Barnett wanted the police to retrieve his flag and they did not. The *government made no effort at proof that Mr. Barnett had the intent to impede law enforcement*. The government worked to confuse the jury to accept suspicion and inference - which is counter to Section II's Legal Standards. No proof was entered to show Officer Craig was impeded from forming and holding a line that he claimed was his mission - and where that line was never tied to any concurrent obstruction of commerce. The government stated multiple times the U.S. Capitol was closed to the public, so there cannot remotely have been commerce at the Capitol either while Mr. Barnett was present or if ever in January 2021.

The confusing jury instructions listed violence only under the buried definition of civil disorder. The instructions did not require the jury to determine based upon evidence in the Rotunda that there was violence as required for Civil Disorder. The jury instructions were deficient - over the Defense's objections. The government's misleading of the jury involved showing acts elsewhere and at different times where Mr. Barnett was not a party. The Court precluded the Defense from showing the police's provocative assault on peaceful protestors that led to defensive responses to impermissible violence by the government. In their total ninety minutes of deliberation, the jury cannot have read the instructions and looked at any evidence.

The government was required to show that interstate commerce was obstructed *during* the alleged civil disorder. Instead, the government misrepresented lower sales receipts in D.C. on

January 6 as "evidence." The claim of lower sales receipts was never correlated with acceptable definitions of "commerce." The local retail sale of a hamburger or a martini is not "commerce," and was not obstructed by anything other than Mayor Bowser's standing Covid-19 mandates, her proclamation on January 3, 2021 that nobody should visit downtown D.C. on January 6, her curfew, and a local manager who that night decided to close a bar or grocery store.

The government hid the facts and provided no discovery which under Brady was exculpatory. Exculpatory information was hidden, where the defense had no time prior to trial to gather (after the denial of its motion for a continuance based on the eleventh hour indictment for Section 231), involved standing orders by the D.C. mayor and her publicized January 2-3, 2021 guidance for January 5-6, 2021 to stay away from downtown. Mayor Bowser said, "I am asking Washingtonians and those who live in the region to stay out of the downtown area on Tuesday and Wednesday and not to engage with demonstrators who come to our city seeking confrontation, and we will do what we must to ensure all who attend remain peaceful."[6] Mayor Bowser reduced sales by telling people not to enter downtown D.C. and her statements predicting violence caused stores to close and board up by January 5, 2021 in fear of Black Lives Matter protest violence as happened in the summer of 2020 and November 2020. The government fabricated a story that Mr. Barnett caused a reduction in sales - where said sales were never shown by the government to fall under any legitimate definition of interstate commerce that Congress may regulate. The "sales" figures were misrepresentative since hotels were fully booked when that was not normally true.

---

[6] Published by the following and over a dozen more local outlets:
https://www.washingtonpost.com/dc-md-va/2021/01/03/bowser-dc-trump-supporters-january-6/;
https://wjla.com/news/local/mayor-bowser-residents-avoid-downtown-planned-pro-trump-demonstration; https://www.bizjournals.com/washington/news/2021/01/04/bowser-urges-residents-to-avoid-pro-trump-events.html

The Government and its witnesses merely recited the government's unproven allegation that there was civil disorder and rioting - as if the two were the same. The government interchanged the terms over Defense objections that rioting not be used since that was not a charged crime. No reasonable, fair juror could find evidence provided by the government that Mr. Barnett impeded police by yelling for one officer to go get his flag and that there was simultaneous obstruction of commerce. No officer left the Rotunda to retrieve the flag. The Government showed no intent by Mr. Barnett to impede law enforcement, such as striking, barricading, or pushing. Mr. Barnett instead was in the place police directed him to wait. Officer Craig's testimony showed he accomplished what he believed was his duty of "holding the line" despite claiming fear because he was outnumbered by protestors. He was afraid because of speculation that he might be attacked - and not because he was attacked in the Rotunda. Not a word was mentioned about commerce.

Significantly, the government showed absolutely no nexus between Officer Craig having to listen to shouting, where speech was not an act to impede, and a concurrent obstruction of interstate commerce. **The law's elements when not under this case's January 6 special construction require that police be impeded during a violent civil disorder that is at the very time obstructing interstate commerce**. There is no separation in time and space between civil disorder and obstruction of interstate commerce within the tense on the statute. Not a shred of evidence was presented to show that concurrent with any act by Mr. Barnett that allegedly impeded police, that interstate commerce was at the same time obstructed by the alleged civil disorder.

 Because the government did not present any evidence of intent, or that either Mr. Barnett or three people with him did anything violent at the U.S. Capitol on January 6, 2021 to impede any police officer and where concurrently nothing by or around Mr. Barnett had any relation right then and there to a civil disorder's impact on any interstate commerce, the Court must acquit.

**6.  The Court violated Mr. Barnett's Due Process rights under the Fifth Amendment when it added 18 U.S.C. Section 2, Aiding and Abetting to the jury instructions after the close of evidence when 18 U.S.C. Section 2 was not in the indictment**.

The Court cannot assume and insert grand jury language where aiding and abetting becomes part of Count One without violating Fifth Amendment Due Process for Mr. Barnett. (See Section II Legal Standards above). It is outside American jurisprudence for a court to expand the grand jury indictment. The government showed no aiding and abetting of any specific persons who impeded police after the government falsely claimed to this Court and the jury that "aiding and abetting" is the same as "attempt" (which is by law and precedent a lesser crime inherent in any crime committed). "Aiding and abetting" is not the same as "attempt" and is not inherent as a lesser crime. That is why "aiding and abetting" has its own statute, specifically 18 U.S.C. Section 2. The indictment excluded 18 U.S.C. Section 2 from Count One while adding it to Count Two. Aiding and abetting may be added to any number of 18 U.S.C. criminal counts *in an indictment or information*, and then its elements must be proven on their own. That was not done here.

No person was named or identified as having been aided and abetted in violence to impede Officer Craig in a civil disorder that concurrently obstructed interstate commerce. The government proved nothing for aiding and abetting any person - which requires a showing of intent, an act, the people aided and abetted (who, what, where, and where) and the belief that the act would and did accomplish the goal of impeding police while a civil disorder was underway and was simultaneously impacting interstate commerce.

**7.  The D.C. Mayor caused the reduction in sales for January 6, 2021.**

In violation of *Brady,* the government knew but did not provide in discovery that Mayor Bowser advertised starting on January 3, 2021 that Washingtonians and regional people should stay out of downtown D.C. on January 6, (See subparagraph 3 *supra*). The government

misrepresented through a non-forensic accountant witness that lower sales receipts on January 6 were directly attributable to First Amendment protestors including Mr. Barnett while omitting that the direct cause was the D.C. mayor. Worse was that the government allowed Hyatt House manager Zachary Wendel to present falsehoods to the jury on January 12, 2023 as to being allowed to keep the bar open past 10:00 pm. but shutting down early on January 5, 2021. Trial Transcript at 395, 403-5. Mr. Wendel stated that he could shut down between 11:00 p.m. and midnight. The government failed to provide discovery that Mr. Wendel was operating outside Mayor Bowser's COVID-19 orders that all bars MUST close by 10:00 pm. The Defense was denied a continuance and could not have known this by trial since the restrictions were not in discovery as anyone could have found earlier than the superseding indictment. The government allowed its witness to tell falsehoods, where the government having its home in D.C. would have known Mayor Bowser's orders. See Exhibit for Mayor Bowser's orders and policy found after trial.

According to Mayor Bowser's order 2020-127 dated December 18, 2020, she extended the standing COVID-19 Public Health Emergency. By this order, effective until March 2021, restaurants could have no indoor dining. Yet the Hyatt House manager said they had full dining on January 5 but not on January 6, 2021. The Mayor's December 2020 order said:

III.  RESTRICTED ACTIVITIES
A. Restaurants shall return to having no indoor dining. They may continue outdoor dining and carry out and delivery services.

EFECTIVE DATE AND DURATION
A. The restrictions imposed by Section III of this Order shall be effective at 10:00 p.m. on Wednesday, December 23, 2020, and shall continue to be in effect until 5 a.m. on Friday, January 15, 2021.

The Mayor's 2020-119 Order dated November 23, 2020 was more lenient and read:

1. Restaurants and other licensed food establishments may continue to operate for patrons until midnight, but alcohol sales, service, and consumption (excluding carryout and delivery) must end at 10:00 p.m.

2. The indoor occupancy of restaurants is hereby reduced from fifty percent (50%) to twenty-five percent (25%) as of 12:01 a.m. on Monday, December 14, 2020, so as to reduce the frequency of high-risk exposure.

This Order shall be effective at 12:01 a.m. on Wednesday, November 25, 2020, and shall continue to be in effect through December 31, 2020, or until the date to which the COVID-19 public health emergency is extended, whichever is later.

The December order extended November's order so that the Hyatt House bar could not stay open past 10 pm. if at all. The December 2020 order made no mention of bars, but one might assume that language in the November order allowed bars to stay open until 10 pm. Regardless, Mr. Wendel insisted falsely that he might keep the bar open until midnight because allegedly five patrons were seated outdoors having limited drinks. He falsely asserted that on January 6 he could have provided indoor dining rather than just take-out. See Exhibit orders.

That the jury, consisting of D.C. residents who suffered under Mayor Bowser's restrictions, took only 90 minutes or so to find Mr. Barnette guilty on all eight counts, and cannot have deliberated on Count One as to whether "commerce" could have been obstructed by Mr. Barnett when Mayor Bowser was responsible, adds to the need for this Court to acquit on Count One.

Because no elements were proven beyond a reasonable doubt with no evidence in truth, including none showing intent, aiding and abetting, or obstruction of commerce, and with an unreasonable jury, the Court must acquit.

**B.  The Government Did Not Provide Evidence Where Any Reasonable, Impartial, Fair Jury Could Convict on Count Two, 18 U.S.C. § 1512 (c)(2).**

§ 1512(c) provides:

> Whoever corruptly (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned. . . .

The grand jury indictment charged:

On or about January 6, 2021, within the District of Columbia and elsewhere;
RICHARD BARNETT, also known as "Bigo Barnett," attempted to, and did,
corruptly obstruct, influence, and impede an official proceeding, that is, a
proceeding before Congress, specifically, Congress's certification of the
Electoral College vote as set out in the Twelfth Amendment of the Constitution
of the United States and 3 U.S.C. §§ 15-18.

1:21-cr-00038 ECF No. 96

**1.  The Court changed the meaning and words of the indictment to salvage the government's case.**

"Even if the indictment mirrors the elements of the offense in the statute, the indictment must specifically identify the particular proceeding that the government will prove was the object of the obstruction." *United States v. Schmitz*, 634 F.3d 1247 (11th Cir. 2011). The grand jury indictment named the specific proceeding obstructed as "Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18." There is no such proceeding and there can be no crime, despite the Court's denying the motion to dismiss at ECF No. 124 and the motion for mistrial at ECF No. 150. The Court cannot add intent to a grand jury indictment or create a novel construction of the law as stated in the Legal Standards in Section II. above.

**2.  The government never showed that Mr. Barnett knew that any proceeding was underway before he was pushed inside the building.**

The law requires intent, and intent to obstruct requires "knowing" about a proceeding underway where a defendant could believe the act(s) to obstruct could achieve his goal. No reasonable, impartial jury can have convicted in light of the dearth of evidence presented, where nothing showed any intent by Mr. Barnett. He never tried to find a chamber and instead was looking for a bathroom after being forced inside by the crowd.

The government asserted by inferences upon inferences that First Amendment protected political speech with mostly re-posts on Facebook of posts by others prior to January 6 - such as

"Stop the Steal" rally fliers at state capitols must have meant that Mr. Barnett intended to stop the electoral count process in D.C.  The government fabricated a non-existent thought crime.

In testimony, the AUSA made a point of eliciting that Mr. Barnett did not know anything about the Twelfth Amendment and the Electoral College Count Act. At Transcript 15921:10-11 Mr. Barnett answered he knew nothing about Electoral College certification at the Capitol. The government never showed anything contrary. Mr. Gordon went so far as to ask Mr. Barnett if he loved the Constitution to which he answered "yes." In the Trial Transcript at 1606:3-10 the exchange was:

> Q  How about the Twelfth Amendment, Mr. Barnett? You love
> the Twelfth Amendment?
> A  I have mainly focused on the First and Second Amendments,
> and I love my Constitution because I know my forefathers wrote
> it to keep our country free.
> Q  You wouldn't do anything to interfere with the
> Constitution, would you?
> A  No.

Mr. Gordon then asked if Mr. Barnett was aware of what the Twelfth Amendment lays out for certification. Mr. Barnett answered: "Yeah, honestly, I'm not familiar with how the certification looks -- I mean works. I guess I didn't even realize that day having gotten pushed into the Capitol." Transcript at 1606-07.  The government provided NO EVIDENCE that Mr. Barnett knew of the Electoral Vote Count proceeding (or the non-existent proceeding named in the indictment). Because there was no intent and there was no act shown, and because no reasonable, rational, fair, or impartial jury could have deliberated to note that the government provided no evidence before voting to convict, the Court must acquit Mr. Barnett for Count Two.

The government presented Count Two as a strict liability crime where without intent or an act where Mr. Barnett believed he could stop the electoral count, the government used closing arguments to falsely claim Mr. Barnett intended to violate Section 1512(c)(2). Even so, counting

was stopped before Mr. Barnett was pushed into the building, where the sessions were in recess. U.S. Secret Service Agent Glavey testified that the clearing process and time to restart the session were based upon the first unauthorized person's entry and the last protestor's exit. when clearing could take place.  (see Transcript 498, 540). Once pushed inside, there was nothing Mr. Barnett did or did not do that could have changed the timeline with the required search of all offices and closets, and where explosives clearing could only start after the last unauthorized person left the building. Ms. Glavey made clear that "we clear the building of all people and then have our K9 and EOD teams do a sweep of the building. And once that's complete, we bring all the individuals back in." (Transcript at 541:1-3.) Mr. Barnett was not the first or last, and he did not delay clearing, if "delaying clearing" is remotely the same as "obstruction of Congress." Further, the 1512(c)(2) law is not about someone accidentally (after being pushed in) being indirectly part of a delay in a proceeding. Mr. Barnett never intended to obstruct the proceeding and his being pushed in, even given he did not immediately depart, had no effect on the time the proceeding would restart. He cannot have obstructed anything.

Mr. Barnett highlights again that 1512(c)(2) is not to be used to punish peaceful, political, grievance speech. President Bush defined "corruptly" in scienter terms upon signing H.R. 37631 (the umbrella for Section 1512) and indicated the law was to stop business fraud and corruption.

> To ensure that no infringement on the constitutional right to petition the Government for redress of grievances occurs in the enforcement of section 1512(c) of title 18 of the U.S. Code, enacted by [§ ] 1102 of the Act, which among other things prohibits corruptly influencing any official proceeding, the executive branch shall construe the term "corruptly" in section 1512(c)(2) *as requiring proof of a criminal state of mind on the part of the defendant*.

GEORGE W. BUSH
THE WHITE HOUSE,
July 30, 2002. (Emphasis added)

Significantly, the Supreme Court held in *United States v. Aguilar*, 515 U.S. 593, 599 (1995),

"if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." In *Aguilar*, the Court held that a violation of "§ 1503 require[s] ... a 'nexus' between the obstructive act and the proceeding." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-708 (2005). While *Aguilar* analyzed § 1503, the Second Circuit held that "§ 1512(c)(2) incorporates a 'nexus requirement' as articulated in *Aguilar*." *United States v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007). See also *United States v. Gray*, 642 F.3d 371, 376 (2d Cir. 2011) where "§ 1512(c)(2), which proscribes corruptly obstructing a judicial proceeding or attempting to do so, requires proof of a nexus between the defendant's conduct and the proceeding."

A Congressional Research Service report with the purpose of looking at specific legislation, describes Section 1512 by stating that it applies to the obstruction of federal proceedings—judicial, congressional, or executive.

> It consists of four somewhat overlapping crimes: use of force or the threat of the use of force to prevent the production of evidence (18 U.S.C. 1512(a)); use of deception or corruption or intimidation to prevent the production of evidence (18 U.S.C. 1512(b)); destruction or concealment of evidence or attempts to do so (18 U.S.C. 1512(c)); and witness harassment to prevent the production of evidence (18 U.S.C. 1512(d)). The offenses have similar, but not identical, objectives and distinctive elements of knowledge and intent.

CRS Report "Obstruction of Justice: An Overview of Some of the Federal Statutes That Prohibit Interference with Judicial, Executive, or Legislative Activities" at 1.

The government did not show any evidence that Mr. Barnett took any actions related to evidence or even the proceeding itself. The government could not show any such evidence because it does not exist. Because of this alone, the Court should acquit on Count Two.

The government failed to present a scintilla of evidence that Mr. Barnett knew that Congress was counting electoral votes from states when he was pushed in the building involuntarily, when he was in any office, or when he was in the Rotunda. The government showed no attempt to

obstruct any proceeding, including the non-existent "Congress's certification of the electoral college votes."

Congress had recessed and then left the building when Mr. Barnett was pushed in. Mr. Barnett cannot have caused recess or interfered with the resumption of any proceeding because the Secret Service and USCP established timelines that could not have been shortened according to Secret Service testimony that said clearing time was set when the first unauthorized person entered. Mr. Barnett was not the first to enter and he left the Capitol not long after entry. He cannot have obstructed an unidentified proceeding by sitting at a staff aide's chair or demanding his flag. Since there was no intent shown, and no act with evidence showing that Mr. Barnett believed he could obstruct the electoral vote count (or the indictment's non-existent certification proceeding), and where he was unaware of the vote count, the Court should acquit for Count Two because no reasonable, rational, impartial, or fair jury could have convicted given lack of evidence by the government that Mr. Barnett violated the law.

**C.  The Court Must Acquit for Counts Three and Four Because the Government Failed to Show Any Evidence of Willful, Knowing Presence on Restricted Grounds or a Building.**

### 1.  The crime of § 1752, Restricted building or grounds requires elements not proven:

(a) Whoever—
(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions

In addition to Section II. Legal Standards above, the government must prove all, and especially the essential elements of the crime and allegations of "overt acts [constituting the offense] with sufficient specificity." *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995).

The relevant conduct includes <u>knowingly and unlawfully entering or remaining in a restricted area,</u> § 1752(a)(1), and engaging in <u>disorderly or disruptive conduct</u> that <u>impedes or disrupts government business in that area</u>, § 1752(a)(2).

**2.   The Government failed to show *knowing* entry into or remaining in a restricted building or grounds.**

The crime requires intent to enter and notice of restricted or closed grounds. The government showed neither. The government had a USCP witness, Captain Carneysha Mendoza, who was not even at work when protestors arrived at the Capitol, testify that there were signs showing the area was closed. She could not possibly have known that and at best this was speculation whereas it appeared to be fabrication. She saw signs before departing the Capitol area around 6:30 am on January 6. The signs were torn down and removed prior to Mr. Barnett arriving - where video shows the tens of thousands approaching the Capitol and no visible "area closed" sign. The government then provided a map with a red line drawn around the exterior of the grounds. This map was never published to the public, nor was it authenticated as to what day it was created, or even if it was drawn after January 6. It could not be found on the USCP web site at the end of January 2021, and it could not be found in any web archive before trial.

The government purported to read minds. It claimed that Mr. Barnett must have known he could not be on the grounds. This ignores the published, public information that there were permitted rallies at the Capitol on January 6. This ignores precedents that to be guilty, there must be notice that the grounds were restricted or closed. Signs torn down by others before Mr. Barnett arrived do not count as notice. Further, this is not a strict liability crime. or mere trespass.

Mr. Barnett testified that he was horrified when he saw police assaults on peaceful protestors on the west side, and he and two friends went to the east side which was a way back to lodging. Nowhere was he told to exit the grounds even when he was near police when headed to the east.

He did not push down or see barriers. Instead, video showed a professional team removing barriers in about 40 seconds. Mr. Barnett went on the steps to try to spot his two friends. He was pushed inside. The government provided no counterevidence and instead maliciously called him a liar. The government had to prove that Mr. Barnett knowingly entered a restricted area. It did not and no reasonable jury could have found the government proved this element of the crime for either Count Three or Four.

**3.  The government did not show refusal to leave.**

Mr. Barnett was made aware that he should not be in the office area and tried to retrieve his flag. He was prevented from this and departed to the Rotunda, where he was told to go. No exits were visible, and the police did not try to point any protestor to an exit. Not once did the USCP activate the working intercom system inside to tell protestors to leave. According to Officer Craig, initially there were only about thirty protestors (and he was scared). The intercom would have been loud and clear if the USCP had wanted to order people out. At no time does any recording show that Mr. Barnett was told to depart the building because it was restricted. He was only able to exit after being maced and begging to be let out.

**4.  The jury saw no evidence that Mr. Barnett intended to disrupt government business and there was no government business to disrupt when he was forced into the building.**

Ms. Berret's testimony showed that she was staying with Mrs. Pelosi and was not going to return to her office. She and Mrs. Pelosi departed the Capitol before Mr. Barnett was pushed in. Both chambers went into recess and relocated to another building where Mr. Barnett's involuntary entry had no impact on whether any business was being conducted. The persons hiding in the locked conference room chose to hide when they were never personally threatened. They could have locked their office doors and stayed at work.  There was not a single incident on January 6 where any civilian staff was injured by a protestor. Any work by Pelosi's staff was stopped by their

own fear, and not by anything Mr. Barnett said or did. In fact, Ms. Berret was the one responsible according to her testimony for the staff stopping their work and then cowering in fear in a locked conference room. Photographers were moving freely throughout the Capitol. The Court should acquit because no reasonable, fair, rational, impartial jury could have convicted when the government provided no evidence that Mr. Barnett had intent to disrupt business or that he disrupted any business. Business had stopped and would not restart until the building was cleared and secured after the last unauthorized person departed. Mr. Barnett was not the last to leave.

**D.  The Court Should Acquit the Dangerous Weapon Charge 1752(b)(1)(A) in Counts 3 and 4 Because a Zap Hike 'N Strike is not Deadly or Dangerous Weapon.**

The (b)(1)(A) addition to Counts Three 1752(a)(1) and Four (a)(2) in the indictment means:

"**(b)** The punishment for a violation of subsection (a) is **(1)** a fine under this title or imprisonment for not more than 10 years, or both, if **(A)** the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm . . . " 18 U.S.C. § 1752.

**1.  <u>The Zap Hike N Strike is not a deadly weapon</u>**.

The business owner, device seller, and patent designer testified that the stun device is non-lethal. Transcript at 445:2-4.  It is mostly a deterrent based on sound, which is where the 950,000 volts comes into play. Transcript at 445. The device cannot kill because the amperage is only 8 milliamps. Transcript at 447:1-11. The effect of use is a surface shock that is not internal like a taser that shoots and breaks the skin. Transcript at 453:16-19. The owner and company have never been sued for any injury from the device. Transcript at 449. The government could not show that Mr. Barnett had a deadly weapon because more milliamps would be required to reach one amp where the electric shock might kill.

**2.  <u>The Zap Hike N Strike is not an inherently dangerous device</u>**.

According to Mr. Pennington the developer, the device if used against a person causes no permanent damage. Someone could abuse the very short prongs to dig into a person's skin but that

would cause a cut. A person could cut himself on the prongs if the cap is off and he grabbed the top handle wrong. The short prongs could not penetrate a winter coat or police armor. The armored officer would not even feel a surface shock. The Zap Hike N Strike is a walking stick, flashlight, and defensive stun device. It was not designed for and is not sold for offensive use. It is not a weapon. It is largely used by hikers, and for defense against animals. The sound provides a powerful deterrent. The packaging contains no age requirement for use. State law determines whether a required age such as 18 years old must be met for device purchase. Transcript at 448. There is no permit required for legal use in D.C. Transcript at 448:17.

Since the Zap Hike N Strike is not an inherently dangerous weapon, and is a somewhat flimsy hiking staff, with a flashlight, deterrent sound, and defensive non-lethal electric shocker, the device should be only considered dangerous if used to cause injury. Under USSG §1B1.1  the Hike N Strike does not qualify as a dangerous weapon:

(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (wrapping one's hand in a towel to look like a gun during a robbery).

Because Mr. Barnett never used the legal stun device and assaulted nobody, the Court should acquit. Had Mr. Barnett entered an open visitor's center, he would not have been charged.

**3.  Jury Instruction Number 21 for Count Three was judicial error since it declared that the Zap Hike N Strike was a deadly or dangerous weapon where the Defendant is guilty if he carried it in a restricted area**. ECF 158 at 16.

The jury instruction declared the Hike N Strike a deadly or dangerous weapon and made what is an enhancement, an essential element of Section 1752(a)(1). The instruction stated that to find guilt for Count 3, the jury must find "Third, that the defendant used or carried a deadly or dangerous weapon, namely, the Zap Hike 'n Strike Hiking Staff, during and in relation to the

offense." This does not leave open for discussion whether the Hike N Strike was deadly or dangerous. After Mr. Barnett admitted carrying the Hike N Strike with no batteries, the Court issued this jury instruction that did not require the Hike N Strike to be used or to be functional, but declared that it was a deadly or dangerous weapon where Mr. Barnett was guilty of he carried it.

This instruction requires the jury to only have heard Mr. Barnett's testimony that became incriminating after the fact, where normally an item that is not inherently deadly or dangerous must have either been used or intended to be used as a weapon. The instruction declared it a deadly or dangerous weapon. Nowhere in the instruction was the government required to show intent to use the device for any assault. Intent should always be an essential element listed for the crime. Nowhere did the government show the device was inherently dangerous and could cause permanent injury, serious injury, or death. The government never even showed the device worked or had batteries. The jury instruction clearly declared the Hike N Strike to be a deadly or dangerous weapon despite the developer's testimony to the contrary.

The conflicting definition that was well after the instruction, that no juror appears to have read during the mere 90 or less minutes the jury took to convict on all eight counts, generated no question being sent to the Court to clarify the conflict from the buried definition where:

> The last element the government must prove beyond a reasonable doubt is that the defendant **used or carried** a deadly or dangerous weapon during and in relation to the offense. Whether the object specified in the indictment, that is, a ZAP Hike 'n Strike Hiking Staff, is a deadly or dangerous weapon depends on the facts of the particular case. It is for you to decide, on the facts of this case, whether the ZAP Hike 'n Strike Hiking Staff allegedly carried by the defendant was, in fact, a deadly or dangerous weapon.

ECF 158 at 17-18

Since the Court refused to declare a mistrial after AUSA Gordon's demonstration where he deliberately held the stun function for at least five seconds to terrify the jury with the sound, rather than show any one of the YouTube videos where people test the device on themselves multiple

39

times with no injury, the jury had no reason to look at the definitions when the Court declared the device deadly and dangerous in the instruction. The definition was even more confusing and overly broad, where "obviously dangerous" is vague:

> An object may be considered a "deadly or dangerous weapon" for one of two reasons. First, an object is a deadly or dangerous weapon if it is inherently or *obviously* dangerous or deadly. Second, an object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person **and** the defendant carries it with the intent that it be used in a manner capable of causing serious bodily injury. The defendant need not have actually used the object in that manner.

ECF 158 at 18

The requirement for intent cannot have been read because at no time did the government show any intent by Mr. Barnett to use the stun device. Because of the buried requirement for "intent to use," with the Court's conflicting declaration in the instruction as written that the Hike N Strike is a deadly or dangerous weapon, and the fact that the stun device cannot kill or cause serious bodily injury without use any more than a ballpoint pen could, the Court must acquit on Count Three. Intentionally or not, the Court in the jury instruction declared Mr. Barnett guilty for mere possession of the Hike N Strike.

**4.  Jury Instruction Number 22 for Count Four is not consistent with Instruction 21 but contained error where the Court must acquit Mr. Barnett.**

(i) Number 22 states: "Fourth, that the defendant carried a deadly or dangerous weapon during and in relation to the offense." ECF No. 158 at 19. And in the definitions, "The term "deadly or dangerous weapon" has the same meaning as described in the instructions for Count Three." *Id*. at 20. The error here is that Instruction 21 cannot be unseen and was used for Instruction 22. The Court did not name the Hike N Strike in Number 22 or declare it a deadly or dangerous weapon - but instead referred the jury back to Instruction 21 where the jury was told that the Court considered the Hike N Strike to be deadly or dangerous, and Mr. Barnett admitted carrying it.

(ii) For both Instruction 21 - 22, the stun device cannot be a deadly weapon because that is outside its capabilities. The stun device portion of the Hike N Strike is a defensive device and is not sold as a weapon. Just as a hammer, ice pick, baseball bat, and many utility items in daily life are not sold as dangerous weapons, the Hike N Strike is a hiking staff with flashlight where the stun device begins with deterrent sound, cannot kill, would break if attempted to be used like a bat, and could only cause superficial cuts if used to stab at someone who was unable to move away. Many utility and sporting items could be *used* to cause pain, but here the stun device producer testified that it cannot cause permanent injury, whereas a baseball bat or hockey stick can do so and are not inherently dangerous weapons. Thousands of people carry Hike N Strikes legally when hiking in parks and on trails.

(iii) The government never showed any intent by Mr. Barnett to use the device offensively, or even that the device had batteries inserted. Not a single frame of video showed the red light on to indicate the stun or flashlight could even be used. The evidence showed that the device never left Mr. Barnett's belt when he was inside the building. He did not turn it on. He did not brandish it as the government falsely asserted. Officer Craig did not know what it was prior to government coaching. The device is legal in D.C. and requires no permit. After Mr. Barnett admitted carrying the Hike N Strike, where without requiring the government to prove attempted or actual use, and without making intent to use the device an essential element of the alleged crime, the Court declared Mr. Barnett guilty in issuing the jury instructions. The Court made carrying the device a strict liability crime by not stating upfront that the government had to show intent to use as a dangerous weapon or actual use as a dangerous weapon. Jury instructions 21-22 went against caselaw and precedent where evidence of intended use by the defendant of an item not inherently dangerous must be shown.

Because of the errors and conflicts listed above for Jury Instructions 21-22, where the government showed no intended harmful use and no use of the stun device, while the instructions asserted the Hike N Strike is definitively a dangerous or deadly weapon, the Court must acquit on Counts Three and Four.

**E.  The Court Should Acquit for Counts Five Through Seven Because the Government Provided no Evidence of Intent to Knowingly Violate the Law**

The arguments here are similar to Counts Three and Four, less the Hike N Strike. These counts require knowing conduct with the intent to disrupt Congress and business (where Congress and business was in recess such that Mr. Barnett could not have interrupted it), remain in offices, and parade and demonstrate in the Capitol.  Mr. Barnett did not voluntarily enter the building. The recorded audio showed the push inside where it was not possible to just turn around and walk out. Because the acts of being inside or yelling to get his flag back came from no intent to disrupt anything in the Capitol or outside, and the government showed no evidence where a reasonable, rational, impartial, and fair jury could convict, the Court should acquit.

**F.  The Court Should Acquit for Count Eight Because the Government Did Not Provide Evidence of Intentional Theft or That the Envelope Had Value.**

In order for Mr. Barnett to be convicted of violating 18 U.S.C. 641, the jury must find that the envelope that Mr. Barnett is accused of stealing had some value. It is undisputed that the envelope was from Ms. Berret's desk, and that Ms. Berret was using the envelope as a sticky note. It is undisputed that the envelope had Mr. Barnett's blood on it.  It is undisputed that Mr. Barnett left a quarter on Ms. Berret's desk. Ms. Berret testified that she threw the quarter in the garbage because it had blood on it and was contaminated.  It stands to reason that she would have also discarded the envelope with Mr. Barnett's blood in the trash as well, and accordingly, the envelope had no value. The bloodied envelope was a biohazard not suitable for mailing according to USPS

regulations. The envelope would have required biohazard packaging and marking if it were to be sent by USPS using government franking or a plain stamp to anyone. Because the envelope held no value, the Court must acquit Count Eight.

Additionally, there was no theft. Mr. Barnett left money. He also returned the envelope to the FBI. He was open in social media posts in showing that he had bled on the empty envelope and left money. He demonstrated the belief that no crime was committed. He did not save the envelope as a secret trophy. The *Morissette* case*,* for example, involved an individual who had taken spent shell casings from a government bombing range, believing them to have been abandoned. "Morissette, as he had at all times told investigating officers, testified that from appearances he believed the casings were cast-off and abandoned, that he did not intend to steal the property, and took it with no wrongful or criminal intent." *Morissette v. United States*, 342 U.S. 246, 248-49 (1952). "We hold that mere omission from § 641 of any mention of intent will not be construed as eliminating that element from the crimes denounced." *Id*. 342 U.S. at 263. The answer for a conversion **where the intent is innocent is restitution**. "If one takes property which turns out to belong to another, his innocent intent will not shield him from making restitution or indemnity, for his well-meaning may not be allowed to deprive another of his own." *Id*. 342 U.S. at 270. The Court reversed conviction because of the instructions to the jury. The difference here is that the government falsely and without evidence alleged that Mr. Barnett was lying, but similar to *Morissette* inferred in its questions and closing that a bad intent was presumed. The *Morissette* court overturned the conviction. The Court should acquit.

IV.    <u>**CONCLUSION**</u>.

Because the government did not present evidence to prove every element for any count, where a rational, fair, and impartial jury could find guilt beyond a reasonable doubt, the Court should acquit on all counts. No intent to commit any crime was shown by any evidence. Mr. Barnett had no dangerous or deadly weapon. Mr. Barnett was pushed into the building against his will, he committed no violence, he did not impede any police activity, he was unable to exit until police cleared an exit from the Rotunda after telling those present to remain in one area, there was no impact on any interstate commerce if an alleged civil disorder had occurred in the Rotunda, and the government failed to show Mr. Barnett obstructed any proceeding.

Wherefore, Mr. Barnett respectfully requests that this Court issue a judgment of acquittal on all counts for good reason shown, or to acquit any count individually as the Court sees fit.

Dated: February 5, 2023
   Respectfully,

/s/ Jonathan S. Gross
Jonathan S. Gross
Bar ID:  MD0162
2833 Smith Ave, Suite 331
Baltimore, MD 21209
p: (443) 813-0141
e: jon@clevengerfirm.com

/s/ Joseph D. McBride, Esq
Joseph D. McBride, Esq.
Bar ID: NY0403
THE MCBRIDE LAW FIRM, PLLC
 99 Park Avenue, 6th Floor
New York, NY 10016
e: jmcbride@mcbridelawnyc.com

/s/ Bradford L. Geyer
Bradford L. Geyer
FormerFedsGroup.com, LLC
141 I Route 130, Suite 303
Cinnaminson, NY 08077
e:  Brad@FormerFedsGroup.com

/s/ Carolyn Stewart
Carolyn Stewart
Stewart Country Law, PA
1204 Swilley Rd
Plant City, FL 33567
e:  Carolstewart_esq@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify on this 5th day of February 2023, a copy of the foregoing was served upon all

parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Carolyn Stewart, Esq.
   Carolyn Stewart, Esq.