# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-CR-38 (CRC)** |
| **v.** | : | |
| | : | |
| **RICHARD BARNETT** | : | |
| **also known as "Bigo Barnett,"** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S POST-VERDICT RULE 29 AND RULE 33 MOTIONS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this combined opposition to the Defendant's Post Verdict Rule 29 Motion for a Judgment of Acquittal (the "defendant's Rule 29 motion" or "Def.'s R. 29 Mot."), ECF No. 175, and the Defendant's Post Verdict Rule 33 Motion for a New Trial (the "defendant's Rule 33 motion" or "Def.'s R. 33 Mot."), ECF No. 174.[1] While the defendant raises a litany of claims about the credibility of the evidence, the propriety of the jury instructions, the Court's prior rulings, the testimony of witnesses, and other matters, all of his allegations and arguments are meritless. Accordingly, the Court should deny both motions.

---

[1] Although the defendant styles his filings as separate Rule 29 and Rule 33 motions, he raises a number of arguments in his Rule 29 motion that do not concern the sufficiency of the trial evidence "to sustain a conviction," *see* Fed. R. Crim. R. 29(a), and a number of arguments in his Rule 33 motion that implicate Rule 29. Moreover, the defendant rehashes several arguments, particularly regarding Counts One and Two, that the Court already considered and rejected, both before and during trial. In these instances, the defendant simply "restates many previously-denied arguments, and his new arguments [should] not persuade the Court to adopt a different interpretation." *United States v. Hale-Cusanelli*, No. 1:21-CR-37 (TNM), 2022 WL 4300000, at *1 (D.D.C. Sept. 19, 2022). The government addresses all of the defendant's arguments in this combined brief.

**TRIAL EVIDENCE**

Richard Barnett was aware of the significance of January 6, 2021, feared that the United States would be overtaken by communism if President-Elect Biden became president, and prepared to take action to prevent that from happening. On January 6, 2021, Barnett followed through on this preparation. He invaded the U.S. Capitol building while carrying a dangerous stun device, penetrated the offices of the Speaker of the House of Representatives, stole government property, threatened law enforcement officers with violence, interfered with their efforts to quell the riot, and obstructed Congress's official proceeding to certify the results of the presidential election. The trial evidence is summarized below.

Barnett believed that the results of the 2020 election were illegitimate, Trial Transcript ("Tr.") at 1611:19–21, and the product of Chinese communist infiltration into the political system, *see, e.g.*, Tr. at 558, 894, 1438:17–1439:16; Government Exhibits ("GEX") 109, 208, 503, 521. For weeks in advance, he prepared to be in Washington, D.C., on January 6, 2021, to fight against this threat. Following the presidential election in November 2020, Barnett made multiple statements, both in person and on social media, indicating his willingness to engage in violence to achieve his political goals, including "I ain't going down easy," GEX 773, "Whatever it takes. Whatever it takes," *id.*, and "I came into this world kicking and screaming, covered in someone else's blood. I'm not afraid to go out the same way," GEX 547. In another Facebook post, Barnett wrote, "Anyone, and I mean anyone, that does not support the constitution of the United States of America is my enemy and will be treated as such! Civilian, law enforcement or military." GEX 502. Barnett's own testimony at trial indicated that he regarded people supporting the certification of the 2020 presidential election as equivalent to "not support[ing] the constitution" and thus "his enemy." Tr. at 1618:11-1619:2, GEX 502 at 1.

Barnett also posted messages on Facebook demonstrating his specific knowledge of the Congressional certification scheduled for January 6, 2021, and his intent to disrupt it. For example, Barnett shared a promotional flyer on Facebook for an event titled "Operation Occupy The Capitol" and subtitled "Taking back our country from corrupt politicians" that was advertised as occurring on "Jan 6th, 2021" in "All 50 States" at "12:00 pm." GEX 522. The call-to-arms Barnett distributed used an image of the U.S. Capitol building being struck by lightning as a backdrop along with hashtags "#WeAreTheStorm," "#1776Rebel," and "#OccupyCapitol." *Id.* The event advertisement also featured a quote attributed to Abraham Lincoln justifying action to "overthrow the men who pervert the Constitution." *Id.*

On December 31, 2020, Barnett purchased a "Zap Hike 'n Strike Hiking Staff," that is, a stun device concealed in a walking stick, as well as cannisters of pepper spray, GEX 410–413, specifically for his upcoming trip to D.C., *see* GEX 523, 530, 530A. On January 3, 2021, Barnett posted a video of himself on Facebook demonstrating the stun device, bragging that if he needed to, he could use it to "light you up with 950,000 volts." GEX 530A. Barnett also proclaimed that the stun device would provide protection in the "concrete jungle," meaning an urban environment. *Id.*; *see* GEX 440. Barnett also posted about using "rhino liner" to reinforce a signpost, GEX 529; Tr. at 1040–41, and later recorded video of himself attaching a flag to a ten-pound steel pipe to bring to the Capitol on January 6, GEX 531A. He brought this flag on the steel flagpole with him into the Capitol, along with the stun device. *E.g.*, GEX 101.

On January 4, 2021, Barnett traveled to D.C. from his home in Gravette, Arkansas. Tr. at 891, 1010, 1687:11–13. On the night of January 5, 2021, after arriving at his hotel, the Hyatt House at the Wharf in Washington, D.C., with two associates, the defendant demonstrated the stun device to a crowd of onlookers by discharging it in the bar area of the hotel. GEX 420, 421. On the

morning of January 6, 2021, Barnett posted a photo to Facebook of himself with those two associates while wearing the stun device on his hip. GEX 542. The caption of the photo reads, "It's time." *Id.* He also shouted, "We own this motherfucker . . . bring it on," which was captured on video, as he left his hotel that morning. GEX 781.

On January 6, 2021, Barnett and his two associates attended the "Stop the Steal" rally and then walked to the Capitol. *See, e.g.*, Tr. at 1443:5, 1463–64, 1514–1518; GEX 372, 380, 382. Barnett carried his flagpole and stun device. GEX 372, 380, 382. At some point, Barnett was separated from his two associates. As he approached the Capitol building, Barnett pursued and harassed a group of law enforcement officers retreating from the West front of the Capitol by walking around the north side of the building to the East front. GEX 741. As Barnett moved toward the East front, he kept his phone out, frequently filming his actions. *Id.*; *see* GEX 401. Barnett passed multiple indicia that the area was restricted, including barriers, officers, attempted arrests, fighting, and "Area Closed" signs. *See, e.g.*, GEX 100, 401; Tr. at 215–241.

Once on the East front, the defendant ascended the central staircase leading to the East Rotunda Doors, otherwise known as the Columbus Doors, which were closed. *See, e.g.*, GEX 401, 740. Barnett joined a large crowd of rioters who were gathered outside those doors and agitating to get inside, and he maneuvered to the center of that crowd, directly in front of the doors. *See id.* . At approximately 2:37 p.m., a rioter opened the doors from the inside and the crowd began streaming in. At or just before 2:42 p.m., Barnett, continuing to film his progress, pushed forward with the crowd through the doors and entered the Capitol building GEX with the stun device still secured to his hip, as alarms loudly rang. GEX 112, 113, 401, 740. He stumbled to the ground as he entered with a fast-moving crowd of rioters behind him, but readily picked himself up, pulled out his phone, resumed filming, and walked straight into the Capitol Rotunda. GEX 112, 113. The

defendant would later be unable to resist laughing at his empty and dishonest claim that he was "pushed" into the Capitol. GEX 770.

Barnett then proceeded to the offices set aside for use by the Speaker of the House, Congresswoman Nancy Pelosi, GEX 101, 105, 108, 109, where Barnett irreverently threw his feet up on the desk used by the Speaker's Director of Operations, Emily Berret. *See, e.g.*, GEX 704–09, 720–22; Tr. at 77–84. He posed for pictures in that position as he held an official envelope from the Speaker that he took from on top of the filing cabinet behind Berret's desk. GEX 704–09, 720–22. Barnett also left a menacing note for Speaker Pelosi, writing, "Nancy, Bigo was here you Biatch." GEX 153–55; Tr. at 97:18–25. Barnett then stole the official envelope he had been holding for photographs, carrying it with him when officers intercepted him and other rioters that had breached the Speaker's suite, and ultimately taking it all the way back to his home in Arkansas. *E.g.* GEX 201, 202, 720–22, 730, 731; Tr. at 917:19–23, 1553:16–1554:4, 1593:10–11.

Police officers ordered Barnett to leave the Speaker's suite but he did not comply. After being told by Metropolitan Police Department (MPD) Officer Quenterra Carey that he needed to leave, Barnett retorted, "You need to give up communism is what you need to do." GEX 201, 202. When that officer was distracted by other rioters, Barnett took advantage of her diverted attention and went right back inside Berret's office, where he had posed for the pictures and stolen an envelope. GEX 109, 201, 202. Another officer then caught up to Barnett in the office and redirected him out into the Rotunda. GEX 109, 201, 202. Barnett eventually complied with the directive, but not before warning the officer to "be a patriot," and telling her not to be on the "wrong side" or she would "get hurt." GEX 202.

Barnett then entered in the Rotunda, where—rather than following officer directives to leave the Capitol building—he joined a mob confronting a line of officers who were using their

bodies to block rioters from accessing the hall leading to the Speaker's suite. *See* GEX 203, 204D, 205, 207; Tr. at 618:19–619:6. Barnett incessantly and with increasing aggression shouted at the officers to "be a patriot" and retrieve his flag, which he had left in the Speaker's suite. GEX 203A, 204D, 205, 207. Insisting that he needed to return to the office to collect his abandoned flag, Barnett threatened MPD Officer Terrence Craig, who was part of that police line. GEX 203A, 204D, 205, 207; Tr. at 615:24–618:13, 663:12–670:14. Barnett threatened to "make it real bad" for Officer Craig, claiming "I'm fixin' ta bring 'em in," meaning to lead the mob to charge Officer Craig and his fellow officers in the police line. GEX 203A. Barnett at one point flashed his stun device at Officer Craig with the cap removed to expose the device's sharp spike electrodes, and he also waved other rioters over to join the mob. GEX 203, 204A, 204B, 204C, 204D. Barnett warned Officer Craig that the mob would "shove [Barnett] right through" the police line. GEX 203A. Eventually, some members of the mob, including Barnett, did breach the police line, but were eventually repelled back. GEX 203, 744, 745. In the process, Barnett was hit with chemical spray, GEX 744, 745; Tr. at 1573:2–4, after which he exited the Capitol through the Senate Wing Doors at approximately 3:13 p.m., thirty minutes after he entered, GEX 101, 102, 750.

Once outside, Barnett, still carrying his stun device, approached a line of officers and shouted "We're American citizens, we're patriots. Your boys maced me. This is my house, y'all maced me in my own house. This is gonna get real bad, not necessarily today, we're going to calm down and leave, but y'all gotta remember something. Y'all gotta pick a fucking side. This civil war, this isn't 'oh, somebody broke the law'—the fucking Communists have declared war on us, boys." GEX 208. Barnett later gave multiple interviews and speeches as he remained on Capitol grounds, during which he repeatedly admitted to entering the Capitol, entering Speaker Pelosi's office, taking an envelope from Speaker Pelosi's office, and leaving a menacing note for Speaker

Pelosi. GEX 770, 771, 780. Barnett at one point used a bullhorn to give a speech to the crowd outside the Capitol, declaring, "We took back our house, and I took Nancy Pelosi's office!" GEX 780.

While driving home from D.C. back to Arkansas, Barnett turned off the location services on his phone, hid his face, and paid cash. GEX 356–60; Tr. at 891–93. Barnett got rid of his phone and stun device, and the FBI never found them despite conducting multiple searches of Barnett's residence and the home of his associates. Tr. at 897.

Upon returning to Arkansas and learning that the authorities had identified him as the man with his feet on a desk in Speaker Pelosi's office, Barnett agreed to surrender to the FBI on January 8, 2021. Tr. at 872. After turning himself in, Barnett participated in a voluntary interview with FBI agents, during which he turned over the envelope that he stole and admitted to entering the Capitol and Speaker Pelosi's office. Tr. at 872–873. Barnett commented that the FBI would not find much at his house if they searched it because he was "a smart man." Tr. at 899:1–7.

Barnett testified at trial. During his testimony, Barnett repeatedly undermined his credibility by providing farfetched excuses and contrived justifications for his actions. Barnett claimed that he had dropped the Hike 'n Strike in the shower after demonstrating it the night of January 5, 2021, and that the Hike 'n Strike was also not functional on January 6, 2021, because he took the batteries out. Tr. at 1471–1474. Barnett did not deny taking the stun device into the Capitol and keeping it on his person for the entire day, however. Tr. at 1688–90. He further claimed that he bought the device because he was "excited" about its capabilities as a walking stick, Tr. at 1684:12, yet all of the video evidence established that he never once used the device as a walking stick on January 6.

Barnett also testified that he was pushed into the Capitol and stumbled by happenstance upon Speaker Pelosi's office suite while looking for a bathroom, Tr. at 1728:15–1731:3, yet he admitted on cross-examination that he never used a bathroom inside the Capitol, asked an officer for directions to one, or relieved himself in a corner or in his clothes. Barnett also claimed that he only took the envelope because he bled on it and was trying to remove a "biohazard," Tr. at 1750:12–1755:5, but he admitted on cross-examination that he never disposed of the envelope in a trash can or secured it in a plastic bag; instead, he carried this supposed biohazard loose with him until he casually handed it to the FBI agents at the time of his arrest. Barnett also testified that his phone simply "fell off a truck," Tr. at 1692:18–21, despite telling the FBI on January 8, 2021, that he gave it to an attorney, Tr. at 898:8–899:9. Overall, Barnett gave evasive testimony that was often inconsistent with his prior statements and/or the direct evidence in the case, including video and photographic evidence. When confronted with these inconsistencies on the stand, Barnett at times became combative, even talking over the Court and counsel, and he repeatedly deflected, chalking up the contradictions to "head trauma." *See, e.g.*, Tr. at 1676:23, 1685:8, 1704:9.

## PROCEDURAL BACKGROUND

On December 21, 2022, the defendant was charged in the Superseding Indictment with eight counts: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Three); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Four); Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C) (Count Five); Disorderly Conduct in a Capitol

Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Seven); and Theft of Government Property, in violation of 18 U.S.C. § 641 (Count Eight). Superseding Indictment at 1, ECF No. 96. On December 30, 2022, the defendant moved to continue the trial or, in the alternative, to dismiss the Superseding Indictment. ECF Nos. 112, 113. On January 4, 2023, the Court held a pretrial conference, during which the Court denied the defendant's request for a continuance after having previously granted the defendant multiple other continuances. *See* Minute Entry for Jan. 4, 2023.

On January 9, 2023, after approximately two years of litigation, jury selection for the defendant's trial began. On January 10, 2023, the parties selected a jury, and the jury was sworn. That same day, the government gave its opening statement and began presenting its case-in-chief. The following witnesses testified for the government: (1) Emily Berret, former Speaker of the House Nancy Pelosi's then-Director of Operations; (2) U.S. Capitol Police (USCP) Captain Carneysha Mendoza; (3) Gerald Stutte, asset protection lead for Cabela's/Bass Pro Shop in Rogers, Arkansas; (4) Zachary Wendel, area director of food and beverage for Concord Hospitality; (5) Billy Pennington, president and owner of Personal Security Products; (6) U.S. Secret Service Special Agent ("SA") Elizabeth Glavey; (7) MPD Officer Quenterra Carey; (8) MPD Officer Terrence Craig; (9) FBI Special Agent Loel Skoch; (10) FBI Special Agent Jonathan Willet; (11) Kyle Jones, former assistant parliamentarian of the United States House of Representatives; and (12) FBI SA Kimberly Allen. The government rested on January 18, 2023.

Also on January 18, 2023, the defendant gave his deferred opening statement and began his case-in-chief. The following witnesses testified for the defense: (1) Dr. Mark Snell, a summary

witness; (2) Eileen Halpin, a friend of the defendant's; (3) Tammy Newburn, the defendant's domestic partner; and (4) the defendant—Richard Barnett.

On January 20, 2023, the defendant rested his case, the jury received final instructions, and the parties gave their closing arguments. On January 23, 2023, the jury began its deliberations and returned its verdict, finding the defendant guilty on all eight counts of the Superseding Indictment. ECF Nos. 154, 172. The defendant timely filed his post-trial motions on February 5, 2023. Def.'s Rule 29 Mot., Def.'s Rule 33 Mot.

## LEGAL STANDARDS

### I.      Federal Rule of Criminal Procedure 29

A judgment of acquittal under Federal Rule of Criminal Procedure 29 may be granted 'only when there is no evidence upon which a reasonable mind might find guilt beyond a reasonable doubt.'" *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009) (quoting *United States v. Byfield*, 928 F.2d 1163, 1165 (D.C. Cir. 1991)). The Court must consider the evidence "in the light most favorable to the government" to determine if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) (emphasis in original) (citations omitted); *see also United States v. Olbres*, 61 F.3d 967, 975 (1st Cir. 1995) (holding that a court must draw inferences hospitable to government's theory of the case before judging the strength of the defendant's alternative hypotheses of innocence), *cert. denied* 516 U.S. 991.

The Court must grant the jury substantial deference. When considering a Rule 29 motion after a verdict, the Court "must view the evidence in the light most favorable to the verdict[] and must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702

F.2d 262, 264 (D.C. Cir. 1983). The court may not second-guess credibility determinations made by the jury when deciding a motion under Rule 29. *United States v. Williamson*, 81 F. Supp. 3d 85, 89 (D.D.C. 2015); *see also Glasser v. United States*, 315 U.S. 60, 80 (1942) (courts should not "weigh the evidence or determine the credibility of witnesses"). A defendant's Rule 29 burden at the post-verdict stage is "very high," in-part because evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015). Indeed, the Court owes "tremendous deference to a jury verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990). The defendant cannot surmount that demanding standard here.

## II.     Federal Rule of Criminal Procedure 33

A motion for new trial should be granted "only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Wheeler,* 753 F.3d 200, 208 (D.C. Cir. 2014) (quoting *United States v. Rogers,* 918 F.2d 207, 213 (D.C. Cir. 1990)). In considering a new trial motion based on a challenge to the sufficiency of the evidence, the court "weighs the evidence and evaluates the witnesses' credibility and decides whether a 'serious miscarriage of justice may have occurred.'" *United States* v. *Dale,* 991 F.2d 819, 838 (D.C. Cir. 1993) (internal citations omitted). To be entitled to a new trial, the defendant bears the high burden of demonstrating that "(1) there was substantial error and (2) the error affected the defendant's substantial rights." *United States v. Williamson*, 81 F. Supp. 3d 85, 89 (D.D.C. 2015); *see also United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982) (noting the defendant bears the burden of proving a new trial is warranted). To make this showing, the defendant must "overcome a strong presumption . . . in favor of upholding the jury verdict." *United States v. Rogers*, 918 F.2d at 213 (citations and internal quotation marks omitted). Alleged errors that are sufficiently "substantial, not harmless[,]" *United States v. Williams*, 825 F. Supp. 2d 128, 132 (D.D.C. 2011),

must have a "substantial and injurious effect or influence in determining the . . . verdict." *United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007).

"Motions for a new trial are not favored and are viewed with great caution." *United States v. Borda,* 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (internal citations and quotation marks omitted). "Despite the court's broad authority to order a new trial, it should be exercised sparingly and limited to situations presenting a serious danger that a miscarriage of justice has occurred-that is, that an innocent person has been convicted." *Id.* at 32 (internal quotations and citations omitted); *see also United States v. Edmonds,* 765 F. Supp. 1112, 1118 (D.D.C. 1991) (The power to grant a new trial under Rule 33 "should be exercised with caution, and . . . invoked only in . . . exceptional cases."); *United States v. Cook,* 526 F. Supp. 2d 10, 14 (D.D.C. 2007), *aff'd,* 330 F. App'x 1 (D.C. Cir. 2009) (finding that where defendant asserted a constitutional *Brady* violation, to be entitled to a new trial under Rule 33, defendant had to demonstrate that the violation resulted "in a verdict [not] worthy of confidence"); *United States v. Howard,* 245 F. Supp. 2d 24, 30 (D.D.C. 2003) ("In order to grant a new trial, the evidence must preponderate heavily against the verdict." (citations and internal quotation marks omitted)). The defendant similarly cannot meet this high burden.

## ARGUMENT

### I.    The Government Presented Sufficient Evidence for the Jury to Convict the Defendant on All Charges.

The defendant asks the Court to set aside the jury's verdict based on a battery of sufficiency-of-the-evidence arguments, several complaints about the jury instructions, and a handful of legal arguments. The defendant's scattershot sufficiency-of-the-evidence arguments read like a closing argument, re-arguing credibility and inferences, and ignoring large swaths of evidence. *See generally* Def.'s Rule 29 Mot., Def.'s Rule 33 Mot. The defendant fails to acknowledge, let alone apply, the proper Rule 29 standard, which requires viewing the evidence

in the light most favorable to the government. *Shi*, 991 F.3d at 198, 205. Similarly, his challenges to the jury instructions and other legal arguments lack legal authority and ignore relevant precedent. Under the applicable legal standard, not a single argument advanced by the defendant comes close to meeting the high bar required to disturb the jury's verdict or grant a new trial, and the Court should deny the defendant's Rule 29 and Rule 33 motions accordingly.

### A. The Court Should Not Set Aside the Defendant's Conviction on Count One: Civil Disorder.

A rational jury could have found—as one did here—that the defendant violated 18 U.S.C. § 231(a)(3). Section 231(a)(3) provides:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—

*Id.* The Court instructed the jury as to each element of the offense, specifying that the applicable "law enforcement officer" was MDP Officer Terrence Craig. Final Jury Instructions at 9, ECF No. 158. The government admitted sufficient evidence for a "rational trier of fact" to find each element of the offense proven beyond a reasonable doubt. *Shi*, 991 F.3d at 198, 205.

The defendant argues that the government offered no evidence that (1) the defendant aided and abetted anyone in the Rotunda, (2) the defendant intended to obstruct or impede Officer Craig, or (3) Officer Craig was in fact obstructed or impeded. *See* Def.'s Rule 29 Mot. at 13-14. But the combination of officer body worn camera (BWC) footage admitted into evidence and Officer Craig's own testimony established that the defendant intentionally obstructed, interfered with and impeded Officer Craig by making threats while also summoning the crowd, refusing to exit,

invading Officer Craig's personal space, brandishing a weapon, and attempting to breach the police line, all in the middle of a riot within the U.S. Capitol.

Officer Craig extensively described the defendant's words and actions while they both were in the Rotunda, face-to-face, as Officer Craig—along with other officers—was physically blocking one of the doorways to prevent rioters in the Rotunda, like the defendant, from accessing the south side of the Capitol, including the Speaker's office suite. Officer Craig detailed how the defendant invaded his personal space and made repeated threats to set the mob on him and the other officers in that police line. *See, e.g.*, Tr. at 615:24–616:2 ("Yeah, he's pretty much in my face, my personal space, making all kind of threats to me, telling me that he left his flag in Nancy Pelosi's office, and directed me and telling me to go get it. If not, he's going to do something to me."). This conduct required Officer Craig to devote his full attention to the defendant. *See* Tr. at 658:9-17. Even the defendant acknowledged, on direct examination no less, that he threatened Officer Craig to try to achieve his goal of getting past the officers and back into the Speaker's office suite to retrieve his flag. *See* Tr. at 1566:21–25 ("I just went nuts over wanting my flag"), 1567:10–24 ("I started acting like a four-year-old and making stupid nonsensical threats[.]").

Additionally, during his confrontation with Officer Craig in the Rotunda, the defendant flashed something that Officer Craig recognized could be a weapon. Tr. at 671:15-672:4. BWC evidence corroborated Officer Craig's testimony; it captured the defendant's acts and words, including when he waved rioters forward to bolster the mob and when he reached for and flashed his stun device at Officer Craig. *See, e.g.*, GEX 203A, 204A, 204B, 204C, 204D, 205, and 207.

As Officer Craig testified, the defendant's conduct forced Officer Craig to focus his attention solely on the defendant, which prevented Officer Craig from assisting his fellow officers in maintaining their protective line, such as by helping another officer in the line who was pushed

by a rioter, knocking the officer down the stairs. *See, e.g.*, Tr. at 618:18–619:2 ("At this time we pretty much formed a line to hold the crowd back."); 657:19–658:17 ("[A]t that point, for me to leave my position to assist the officer, that wouldn't be a smart tactical decision to do."). Ultimately, the police line failed. Indeed, video evidence showed that eventually rioters pushed through it, leading to officers deploying a chemical irritant, which affected the defendant. A rational trier of fact could have found—by crediting Officer Craig's testimony and watching the video evidence—that the defendant obstructed and impeded Officer Craig himself, that he aided and abetted others in doing so (such as by distracting Officer Craig, thus weakening the police line and facilitating the rioters' successful efforts to breach it), and that he intended to do so.

The defendant also argues that the government failed to prove that there was a civil disorder specifically occurring in the Rotunda while Officer Craig was there.[2] Def.'s Rule 29 Mot. at 24. But this argument, for which the defendant provides no legal support, misstates the law and thus inappropriately heightens government's burden.

The civil disorder statute requires only that the defendant interfered with an officer engaged in his official duties "incident to and during a civil disorder." 18 U.S.C. § 231(a)(3). Civil disorder is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). Officer Craig's testimony regarding his official law enforcement response to the Capitol Rotunda, combined with the accompanying BWC evidence, was sufficient, alone, to demonstrate that: the riot on January 6,

---

[2] The defendant also asserts that he was the first non-violent rioter to be charged with violating 18 U.S.C. § 231(a)(3). This is not correct. *See, e.g.*, *United States v. Hazelton*, 1:21-cr-30 (JDB); *United States v. Reffitt*, 1:21-cr-32 (DLF); *United States v. LaRocca, et al.*, 1:21-cr-317 (TSC); *United States v. Evans*, 1:21-cr-337 (RCL); *United States v. Gerwatoski*, 1:22-cr-125 (JMC). Of course even if the defendant's claim were true, it would provide no basis for the relief sought.

2021, qualified as a civil disorder, the civil disorder involved rioters invading the U.S. Capitol building, the Rotunda was one of the areas the rioters occupied, and that Officer Craig was in the Rotunda engaging in duties incident to that civil disorder, specifically assisting the USCP by attempting to contain and then expel the rioters. But the government's evidence did not solely rely on BWC footage or Officer Craig's testimony. Every single witness called by the government who was present at the Capitol on January 6, as well as defense summary witness Mark Snell, provided testimony from which a rational trier of fact could reasonably find the existence of a civil disorder to which Officer Craig was responding. For example, Captain Mendoza testified at length about the full extent of the civil disorder, which spread across essentially the entire Capitol grounds, and the government introduced through Captain Mendoza a video montage of different moments of the civil disorder that showed rioters violently overtaking MPD and USCP officers in numerous locations throughout the Capitol grounds, both outside and inside the U.S. Capitol building, and on both the east and west sides. GEX 100. Even the defendant testified about the chaos and violence he observed.[3] Contrary to the defendant's implied argument, 18 U.S.C. § 231(a)(3) does not set any limit on how big a civil disorder can be, in time, space, or distance. Indeed, it is the sheer size of the entire riot, in which the jury reasonably found that the defendant participated, that easily established this element of the offense. *See Grider*, 2022 WL 17829149, at *9 ("Thousands of individuals rioted that day, injuring others. As such, [the defendant] was clearly involved in a civil disorder.").

---

[3] In another red herring argument, the defendant asserts that the government failed to identify three or more people engaged in violent conduct to whom officers were responding. On the contrary, the government's video and testimonial evidence established that far more than three people were engaged in violence, and that the MPD and USCP officers who responded to the Capitol on January 6 were there to restore peace—both inside and outside the Capitol building—and to safely clear the Capitol building of such rioters.

Next, the defendant argues that the government failed to provide sufficient evidence to satisfy the jurisdictional element of 18 U.S.C. § 231(a)(3). Specifically, the defendant baselessly asserts that the government was required to show a "simultaneous interference with commerce" while the defendant was in the Rotunda. Def.'s Rule 29 Mot. at 21, 23. He is wrong. The statute only requires the government to prove that the civil disorder on January 6, 2021, *in any way* or degree obstructed, delayed, or adversely affected <u>either</u> commerce <u>or</u> the conduct or performance of any federally protected function. *See* 18 U.S.C. § 231(a)(3) (emphasis added). As the government explained to the jury during its closing, the evidence showed *five* ways through which this element was established, two based on the commerce prong and three based on the federal protected function prong. Tr. at 1840.

With respect to the commerce prong, "the jurisdictional element in § 231(a)(3) requires a showing that the regulated conduct "interferes with or otherwise affects commerce"— namely, that the individual civil disorder at issue 'obstructs, delays, or adversely affects commerce or the movement of *any* article or commodity in commerce.'" *United States v. Mostofsky*, 579 F. Supp. 3d 9, 19 (D.D.C. 2021) (emphasis added). To satisfy the commerce prong, SA Allen presented and explained certified business records from Albertson's, Inc. showing that the city-wide curfew order, issued in response to the January 6 civil disorder, forced Washington, D.C.-area Safeway grocery stores to close at 4 p.m., hours earlier than expected, and thus caused those stores to (1) lose sales and (2) be unable to receive resupply shipments from their Pennsylvania warehouse.[4]

---

[4] The defendant asserts that SA Allen was "incompetent" and "not qualified" to testify about the Safeway records. Def.'s Rule 29 Mot. at 22-23. But there is nothing improper about showing any witness exhibits that have been properly entered into evidence. At trial, the Court confirmed that the defendant was free to make any point about SA Allen's knowledge of the Safeway records through cross-examination (Tr. at 1177 ("The Court: If you want to question her about the Safeway projections and the stuff that she testified to from Safeway, then go for it.")), and the defendant

The government presented financial records that were clear on their face and, contrary to the defendant's contention, *see* Def.'s Rule 29 Mot. at 23, did not require expert or specialized knowledge to interpret. *See* GEX 1001, 1002, 1003, and 1004. Third, Hyatt House hotel food and beverage supervisor Zachary Wendel testified that the hotel where the defendant was staying had to shut down food and drink operations early. A rational trier of fact could have found that any one of these avenues established that the riot at the Capitol adversely affected interstate commerce, or commerce within Washington, D.C., *in some way* on January 6, 2021.

But even if the Court credited the defendant's commerce argument, it would not be sufficient grounds to grant the defendant's motion; the government met the jurisdictional element on "federally protected function" grounds as well, which the defendant does not challenge. The government presented evidence of two different ways in which the civil disorder at the Capitol affected federally protected functions. First, via the testimony of Captain Mendoza, the government showed that the riot interfered with the USCP's protection of the Capitol. Second, through SA Glavey's testimony, the government presented evidence that the riot disrupted the Secret Service's protection of the Vice President and his immediate family. A rational trier of fact could have found that the riot at the Capitol negatively impacted either of these federally protected functions on January 6, 2021.

Beyond Mr. Wendel's testimony concerning the Hyatt House hotel, which is so far unique to this case, these avenues have proved sufficient in other Capitol riot matters to demonstrate the requisite effect on commerce or a federally protected function, *see, e.g.*, *United States v. Grider*,

---

did so. *See* Tr. at 1172 ("Q. It's fair to say that you were just reading and confirming somebody else's predications about what may happen in the future? A. That's correct.").

No. 21-cr-22 (CKK), 2022 WL 17829149, at *9 (D.D.C. Dec. 21, 2022), and the jury appropriately found the same in this case.

Because a rational juror could conclude based on the evidence that the government established all of the elements of Count One beyond a reasonable doubt, the defendant's Rule 29 motion should be denied.

### B. The Court Should Not Set Aside the Defendant's Conviction on Count Two: Obstruction of an Official Proceeding.

A rational jury could have found—as one did here—that the defendant violated 18 U.S.C. § 1512(c)(2). Section 1512 provides in relevant part that:

> (c) Whoever corruptly— . . .
>
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c). The Court instructed the jury as to each element of the offense, Final Jury Instructions at 14, ECF No. 158, and the jury reasonably found sufficient evidence of every element.

The defendant argues that the government failed to provide the jury with sufficient evidence that the defendant knew that Congress was meeting to certify the 2020 presidential election on January 6, 2021. Based on the evidence admitted, a rational trier of fact could have rejected—and indeed, the jury did reject—this argument. For example, the government presented numerous social media posts and statements by the defendant that established the significance of January 6 to the defendant, his belief that Joe Biden's election was illegitimate and would lead to communism, and his conviction that taking the Capitol on January 6—by any means necessary— would accomplish the defendant's goals. *See* GEX 502-506, 510, 511, 521-525, 530- 534A, 536,

541, 542, 545, 547, and 548; *see also* GEX 773 at 2:12 ("Whatever it takes, whatever it takes.").

In particular, a rational trier of fact could have relied on Government's Exhibit 522, the promotional image shared by the defendant on Facebook for "Operation Occupy The Capitol" occurring on "Jan 6th, 2021," to conclude that the defendant knew that the certification proceeding was happening on January 6, 2021, and that he intended to disrupt it. Moreover, a rational trier of fact could have viewed the videos capturing the defendant's statements during the riot on January 6 and found that they establish that the defendant had the requisite knowledge and intent for Count 2. *See, e.g.*, GEX 201 (at 2:05: "You need to give up communism is what you need to do."), 202 (at 2:34: "We're at war so pick a side" . . . "don't be on the wrong side, you're gonna get hurt."), and 208 (at 0:23: "Ya'll better pick a fucking side. This is war. This is no, oh, somebody broke the law."). Additional examples include (1) the defendant waving rioters toward the police line while he was in the Rotunda, which was intended to assist and encourage others to use unlawful means to breach that police line; and (2) giving interviews outside the Capitol that simultaneously boasted about portions of his conduct while minimizing others, which demonstrated consciousness of guilt. *Cf. United States v. Reffitt*, 602 F. Supp. 3d 85, 93 (D.D.C. 2022).

The defendant also argues that the Court should set aside the jury's verdict and acquit him on Count Two because his presence in the Capitol building from approximately 2:42-3:12 p.m. could not have affected the certification proceeding, given that it was suspended *before* he entered and not resumed until long after the last unauthorized person left, which was not him. The defendant made a version of this same argument in closing, Tr. at 1889:3-15, and the evidence is sufficient for a rational trier of fact to have rejected it and found the opposite. Indeed, the evidence and testimony introduced through multiple witnesses, including Speaker Pelosi's then-Director of Operations Emily Berret, Captain Mendoza, SA Glavey, and former assistant parliamentarian Kyle

Jones, demonstrated overwhelmingly that the defendant's participation in the riot did, in fact, contribute to the disruption of Congress's certification of the Electoral College vote. Testimony established that the defendant's presence in the building contributed to the prolonged suspension of the proceedings. Both Captain Mendoza and SA Glavey provided testimony to this effect. *See, e.g.*, Tr. at 498:4-20 ("Q. If there was still one member of the public in the building, would you have considered it secure? A. No."). In addition, Ms. Berret and Mr. Jones both testified about how the mob immobilized the administrative functioning of the legislative offices that were central to the operation of the certification. *See, e.g.*, Tr. at 101:3-15; 975:8-982:20. As Judge Kollar-Kotelly explained in *United States v. Rivera*, No. 21-cr-60 (CKK), "proceedings could not recommence until the entire building was secured and cleared of rioters[, and] even the presence of one unauthorized person in the Capitol is reason to suspend Congressional proceedings." 2022 WL 2187851, at *6 (D.D.C. June 17, 2022).

The defendant thus acted corruptly both by using unlawful means and by acting with an unlawful purpose. Because a rational juror could conclude based on the evidence that the government established all of the elements of Count Two beyond a reasonable doubt, the Court should not set aside the jury's verdict.

> ### C. The Court Should Not Set Aside the Defendant's Convictions on Counts Three and Four: Entering or Remaining in a Restricted Building or Grounds and Disorderly or Disruptive Conduct in a Restricted Building with a Dangerous or Deadly Weapon.

A rational jury could have found—as one did here—that the defendant violated 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), as well as 1752(a)(2) and (b)(1)(A). Section 1752 provides in relevant part that:

(a)     Whoever
        (1) knowingly enters or remains in any restricted building or
            grounds without lawful authority to do so;

        (2) knowingly, and with intent to impede or disrupt the orderly
            conduct of Government business or official functions, engages
            in disorderly or disruptive conduct in, or within such proximity
            to, any restricted building or grounds when, or so that, such
            conduct, in fact, impedes or disrupts the orderly conduct of
            Government business or official functions;

            [. . .]

        or attempts or conspires to do so, shall be punished as provided in
        subsection (b).

(b)     The punishment for a violation of subsection (a) is—
        (1) a fine under this title or imprisonment for not more than 10 years,
            or both, if—
            (A) the person, during and in relation to the offense, uses or
                carries a deadly or dangerous weapon or firearm;

*Id.* The Court instructed the jury as to each element of the offense, Final Jury Instructions at 16-

19, ECF No. 158, and the jury reasonably found sufficient evidence of every element.

The defendant raises four arguments about the sufficiency of the evidence as to Counts

Three and Four. Two of those arguments relate to *both* Counts Three and Four: he contends the

Court should disregard the jury's verdict and acquit him because the government failed to provide

sufficient evidence for a rational juror to conclude that (1) the defendant knew the Capitol grounds

and building were restricted areas at the time he entered them, *see* Def.'s Rule 29 Mot. at 35-36;

and (2) the Hike 'n Strike Hiking Staff was a dangerous weapon, *see id.* at 37-38. Relevant to

Count Three only, the defendant also argues (3) that the government failed to provide sufficient

evidence for a rational juror to find that the defendant refused to leave the Capitol building when

directed to do so. *See id.* at 36. Finally, for Count Four, the defendant alleges the government failed

to provide sufficient evidence that (4) the defendant intended to disrupt government business and

that government business was disrupted by his actions. *See id.* at 36-37. The government addresses these arguments in turn below.

In general, each of the defendant's arguments fail, in part because he ignores the relevant standard. Instead of acknowledging that at this post-trial stage, the Court must evaluate the evidence in the light most favorable to the government, *Shi*, 991 F.3d at 205, the defendant argues his points as if delivering a written closing argument at the conclusion of a bench trial. Based on the evidence presented at trial, a rational trier of fact reasonably could reject each of the defendant's arguments, as the jury did, and conclude that the government proved each element of Counts Three and Four beyond a reasonable doubt.

1. *The defendant knew that the Capitol grounds and building were restricted areas when he entered them.*

The defendant's first argument goes to the *mens rea* element for both Counts Three and Four, challenging whether he knowingly <u>entered</u> a restricted building or grounds. However, the defendant completely ignores that even if he had no knowledge that the U.S. Capitol grounds and building were restricted areas at the time he *entered* them, the *mens rea* element for both Counts Three and Four is satisfied if the defendant knew that the grounds or building were restricted at the time he *remained* there. Thus even if the Court credited the defendant's argument with respect to his entry, it would not be sufficient to grant the defendant's motion for acquittal on Counts Three and Four. BWC footage from Officer Carey, GEX 201, and Officer Smiley, GEX 202, show that they both directly instructed the defendant to leave and yet he remained inside the Capitol building. The BWC footage from Officer Craig, GEX 203, and Officer Matthew Lapitsky, GEX 204, show that the defendant encountered a line of police officers physically blocking him from returning to the south wing of the Capitol building, another clear indication that the building was a restricted area. Lastly, the deployment of a chemical irritant when rioters, including the defendant, penetrated

their line further underscored that the building was restricted. From this evidence, a rational trier of fact could conclude that the defendant knew that the Capitol building was a restricted area yet opted to remain inside of it.

While the negative effects of that chemical irritant finally caused the defendant to leave the building, he still did not leave the restricted Capitol grounds. Instead, he stayed on the upper west terrace and gave multiple defiant interviews in which he acknowledged that the police "maced" him, GEX 770, 771, said he "took over Nancy Pelosi's office," GEX 771, a tacit admission that his presence in Speaker Pelosi's office was unlawful, and told a line of officers standing on the grounds that "this is war." GEX 208; *see also* GEX 209 (showing the defendant still remaining on Capitol grounds as of 3:52 pm). Based on the defendant's own statements, a rational trier of fact could conclude that the defendant knew that the Capitol grounds were a restricted area yet opted to remain on them.

At any rate, even if the government had been required to prove that the defendant knew that the building or grounds were restricted when he entered, the government presented substantial evidence establishing that the defendant knew that the U.S. Capitol grounds and building were restricted areas on January 6, 2021, *i.e.*, that members of the public—like him—were not lawfully allowed to enter. While testifying, the defendant acknowledged that after the rally on the Ellipse concluded, he walked to the Capitol down one of the main streets, likely Pennsylvania Avenue, approaching the Capitol grounds from the west. From the moment the defendant approached the Capitol, he became exposed to indications that the grounds and building were restricted. *See, e.g.*, GEX 15, 100, 101, 821. Captain Mendoza testified that bike rack barricades, snow fencing, and other barriers surrounded the entirety of the Capitol grounds, and that those barriers were marked with "Area Closed" signs at regular intervals. Photographs admitted by the government

24

corroborated Captain Mendoza's testimony. A rational trier of fact could thus infer that the defendant had visual notice that the Capitol grounds were restricted or closed to the public when he first reached them. While the defendant claimed that those barriers had all been removed by other by the time he reached the Capitol grounds, a rational trier of fact could have disbelieved him, particularly given the defendant's performance on cross-examination.

Once on the U.S. Capitol grounds, the defendant walked past further indications that his presence was unlawful and unwelcome. According to his own testimony, he knew something was "not right" when he heard "loud bangs" and saw "people panicking." Tr. at 1525:24-1526:2. He saw smoke and smelled chemical gas, which he thought was tear gas. Tr. at 1701:23-1702:5. He "heard someone scream the police are attacking us" and another person "yelled somebody's on fire." Tr. at 1526:8-9, 1527:3-4. He saw police in riot gear or heavy armor, looking like Star Wars storm troopers, "the most armor [he had ever] seen on a person." Tr. at 1702:12-1703:6. He saw that they were heavily outnumbered by the crowd, Tr. at 1703:12-13, and that when they tried to arrest someone, they were surrounded by the crowd, which forced them to retreat, Tr. at 1704:4-21. A rational trier of fact could infer from this evidence, which was corroborated by video, that even if the perimeter barriers and "Area Closed" signs had been torn down by the time the defendant arrived on Capitol grounds, once there he observed sufficient indicia for him to know that he was in a restricted area.

Similarly, the government presented evidence that the defendant had notice that the U.S. Capitol building itself was restricted and closed to the public on January 6. As the defendant admitted and video evidence confirmed, that East Rotunda Doors (also known as the Columbus Doors) were closed when the defendant ascended the exterior center stairs on the east side of the Capitol and stood in front of them. Tr. at 1713:19-21. Video evidence showed, and the defendant

acknowledged, that the defendant stood outside for at least five minutes before the doors were opened from the inside, Tr. at 1713:22-1714:5, that rioters outside were banging on the doors, Tr. at 1714:0-14, that rioters broke one of the East Rotunda Doors' windows, GEX 740, Tr. at 1715:13-14, and that when he was finally able to enter the building amidst a sea of other rioters, alarms blared, *see, e.g.*, GEX 401, 740. From this evidence, a rational trier of fact could infer that the defendant knew the building was closed to the public, *i.e.*, a restricted area, at the time he entered.

 2. *The Hike 'n Strike stun device qualifies as a dangerous weapon.*

 The penalty enhancements to both Counts Three and Four required the government to prove that "the defendant used or carried a deadly or dangerous weapon, namely, the Zap Hike 'n Strike Hiking Staff, during and in relation to the offense." *See* Final Jury Instructions at 16–19, ECF No. 158. The government could have satisfied this element <u>either</u> by proving that the Hike 'n Strike stun device was inherently dangerous <u>or</u> that it was capable of causing serious bodily injury and the defendant intended to use it in such a manner. *See id*; *see also* discussion *infra* at 30. The defendant raises three alternative sufficiency of the evidence arguments[5] in support of his claim that the government failed to prove this element beyond a reasonable doubt.[6] First, the defendant asserts that the Hike 'n Strike stun device is not inherently dangerous. Second, he argues that the Hike 'n Strike stun device does not fit the definition of "dangerous weapon" found in the Sentencing Guidelines. Finally, he argues that (assuming the Court agreed that the Hike 'n Strike

---

[5] In attacking his conviction on Counts Three and Four, the defendant's Rule 29 motion raises two other arguments concerning what he contends are flaws in the jury instructions related to the Hike 'n Strike. These arguments, even if true, would not support a judgment of acquittal, but rather a new trial. The government addresses them separately below.

[6] Again, the defendant applies the wrong legal standard. The question as this post-trial stage is whether the government failed to provide sufficient evidence for any rational trier of fact to find the element proven, even viewing the evidence in the light most favorable to the government. *See Shi*, 991 F.3d at 205; "Legal Standard" section, *supra* (citing cases).

was not inherently dangerous) the evidence also did not prove that he intended to use the Hike 'n Strike as a dangerous weapon. The United States addresses each of these arguments in turn below.

A.   The Hike 'n Strike stun device is inherently dangerous.

As the Court instructed the jury, "[a]n object may be considered a 'deadly or dangerous weapon' for one of two reasons." Final Jury Instructions at 18, 20, ECF No. 158. The first of these is if the jury finds the object to be "inherently or obviously dangerous or deadly." *See id*. An object is "inherently or obviously dangerous" if it "is capable of causing serious bodily injury or death to another person." *Id.*

The evidence at trial was sufficient for a rational trier of fact to find that the ZAP Hike 'n Strike Hiking Staff that the defendant carried on the Capitol grounds and into the Capitol building was "inherently or obviously dangerous." The creator of the device, Billy Pennington, testified that it was designed to be used as both a walking stick and as a weapon, Tr. at 425:18–25, and that its sharp spike electrodes were designed to penetrate the fur of aggressive animals. *Id.* at 419:9-11. Mr. Pennington further testified that the device could render someone unconscious if they were stunned for ten seconds. Tr. at 452:18-23. The manual stated that it "induces intense pain," GEX 440 at 1, and that can "immobilize an attacker, causing disorientation, loss of balance [and] falling to the ground." *Id.* at 2. FBI SA Kimberly Allen testified that a person could use the Hike 'n Strike as a weapon in three different ways: (1) by using the weight and shape of the stick to strike someone, potentially in the head; (2) by using the sharpness of the four "extreme spike electrodes" like a knife to stab or cut someone, potentially in a vital organ like the eyes; (3) and by using the electrical shock feature to stun someone. Tr. at 1145:24-1146:13.

A rational trier of fact could have found that either or both of the latter two potential uses were sufficient to make the Hike 'n Strike "inherently or obviously . . . *capable* of causing serious

bodily injury or death to another person." Final Jury Instructions at 18, 20, ECF No. 158 (emphasis added). In closing argument, the government compared the Hike 'n Strike to a spoon. Tr. at 1858:23-1860:5; *see also* Tr. at 528:9-25 (SA Glavey, on cross-examination, acknowledging that a spoon could be used as a weapon). The jury was free to infer, as the government argued, that the Hike 'n Strike is more like a knife than a spoon. A knife is designed to penetrate and cut, which makes it "inherently or obviously" capable of inflicting a serious injury, even if used to slice vegetables. A spoon, by contrast, is round and blunt, designed to scoop, not cut. While it *could* be used creatively to cause a serious injury, such as digging into someone's eye, such a use is not "inherent[] or obvious[]." Here, Mr. Pennington testified that the "extreme spike electrodes," Tr. at 423:19–21, were designed to penetrate fur, skin, or clothing, *id.* at 419:5–23. Indeed, the defendant himself emphasized that the spike electrodes were so sharp that he cut himself multiple times on January 6 just by inadvertently brushing his hand against them. *See* Tr. at 1160:12-19, 1285:6-7 ("He's cut. He's bleeding all over the place from those spiky electrodes."), 1544:11-19. As such, the sharp spike electrodes were "inherently or obviously" capable of being used by the defendant to stab or cut someone, and had he done so in a particularly sensitive area, such as the eyes or throat, he could have caused serious bodily injury to that person.

Similarly, a rational trier of fact could have found that the electric shock feature of the Hike 'n Strike made it "inherently or obviously . . . capable of causing serious bodily injury or death to another person." Final Jury Instructions at 18, 20, ECF No. 158. The defendant argues that the Hike 'n Strike is not capable of causing death because it only delivers 8 milliamps. Def.'s Rule 29 Mot. at 27 (citing Tr. at 447:1-11). But the defendant's argument completely ignores that the statute can also be satisfied with proof that the device could cause serious bodily injury. *See* Def.'s Rule 29 Mot. at 37-38. Equally important, the risk of death or serious bodily injury from the defendant's

use of the device need not be direct. The manual for the Hike 'n Strike explains that the impact of the electrical shock on the target depends on how long the user keeps it in contact with the target's skin. *See* GEX 440 at 2.

> [. . .]
>
> A MODERATE BLAST (1 – 4 seconds) can cause attacker to fall and can cause mental confusion. It may make the assailant unwilling to continue attack, but they will be able to get up almost immediately.
>
> A FULL BLAST of 5 seconds can immobilize an attacker, causing disorientation, loss of balance, falling to the ground, weakness, and leav[e] them dazed for several minutes afterwards.
>
> [. . .]

GEX 440 at 2; Tr. at 426:13–16. As Mr. Pennington testified, a blast of 10 seconds could cause even greater harm, including rendering the subject unconscious. If a law enforcement officer were caused to fall to the ground, or were rendered unconscious in a compromised position, such as while standing at the top of the Rotunda stairs or in front of a crowd of rioters charging through the East Rotunda Doors, it is easy to foresee the extreme physical danger that officer would face. A rational trier of fact could have found this evidence sufficient to find that the electrical shock function of the Hike 'n Strike made it "inherently or obviously . . . capable of causing serious bodily injury or death to another person." Final Jury Instructions at 18, 20, ECF No. 158.

    B.  <u>The Sentencing Guidelines definition of "dangerous weapon" was not provided to the jury and is not controlling, as the Court already determined.</u>

The defendant argues that the Court should throw out the jury's convictions on Counts Three and Four because the Hike 'n Strike does not qualify as a "dangerous weapon" under the Sentencing Guidelines definition of the term, USSG § 1B1.1. Def.'s Rule 29 Mot. at 38. But definitions from the Sentencing Guidelines do not set the meaning of statutory language. *DePierre v. United States*, 564 U.S. 70, 87 (2011) (rejecting defendant's argument that when interpreting a

term in a criminal statute, deference is warranted to the Sentencing Commission's definition of the same term in the Guidelines). Indeed, after an extensive conference with the Court, *see* Tr. at 1656:7-1666:8, the defendant <u>agreed</u> that the Sentencing Guidelines definition did not apply, and approved of the definition used in the Court's instructions. Tr. at 1663:13-1664:17. The defendant's argument is further puzzling because the Guidelines' definition of dangerous weapon is substantially *broader* than the definition the Court gave to the jury; it includes not just objects "capable of inflicting death or serious bodily injury," but also objects that merely "closely resemble" dangerous weapons, 1B1.1, App. Note 1(E), and the trial evidence easily satisfied its requirements.

## C. The defendant intended to use the Hike 'n Strike as a dangerous weapon.

Finally, the defendant argues that not only did the evidence fail to prove that the Hike 'n Strike was "obviously or inherently" a dangerous weapon, but it also failed to prove that the defendant intended to use it as such. Def.'s Rule 29 Mot. at 40.[7] The government, however, presented copious evidence on this point. First, the government showed that the defendant knew of the Hike 'n Strike's capabilities as a weapon—based on the information on the packaging and in the instruction manual, as well as his own experimentation with it—and chose to buy and carry it, in part, due to these features. *See* GEX 12 (Hike 'n Strike packaging seized from the defendant's home); Tr. at 1681:16-1684:22; GEX 412 (video of defendant choosing the Hike 'n Strike at the Bass Pro store); GEX 420 (video of the defendant demonstrating the Hike 'n Strike on January 5, 2021). Second, the government presented evidence that the defendant intended to use the Hike 'n

---

[7] Although the defendant appears to argue these points in the alternative, he would need to prevail as to both points for the Court to set aside the jury's felony verdict as to Counts Three and Four, because evidence of dangerousness—*either* by the device's inherent dangerousness *or* by the defendant's intent to use the device that way—may satisfy the statute's requirement.

Strike on *people* in the "concrete jungle," if he deemed it necessary. *See* GEX 530 ("If it got really rough I could pop the end of this thing and light you up with about 950,000 volts"). Third, the government presented evidence that the defendant regarded anyone, even "law enforcement officers" as "my enemy" and intended to "treat them as such" if they did "not support the Constitution," GEX 502, Tr. at 1105:19-1106:9, and that he regarded facilitating the certification of the 2020 presidential election as tantamount to opposing the Constitution and supporting communism, *see* Tr. at 894:18-22, GEX 201 (To Officer Carey: "You need to give up communism, that's what you need to do."). Fourth, the government presented video evidence showing the defendant growing increasingly belligerent with Officer Craig and threatening him with violence from the mob when Officer Craig refused to retrieve, or allow the defendant to retrieve, his flag. *See* GEX 203, 204. Finally, the government showed that—in the midst of that escalating confrontation with Officer Craig—the defendant flashed the Hike 'n Strike stun device, which Officer Craig recognized as a weapon. *See* GEX 204B. While the defendant may disagree with the government's interpretation of that evidence, collectively it was more than sufficient to allow a reasonable trier of fact to draw the inference that the defendant intended to use the Hike 'n Strike as a dangerous weapon.

3. *The defendant refused to leave the Capitol building when directed to do so.*

The defendant's argument on this point appears to challenge the *mens rea* requirements of both Counts Three and Four but is a red herring. The government was not required to prove that the defendant refused to leave the Capitol building after being directed to do so in order to satisfy the elements of either Count Three or Count Four.

Nonetheless, his argument is also directly contradicted by the BWC footage of Officers Carey and Smiley, GEX 201, 202, and the CCTV footage of the Speaker's office suite hallway,

GEX 109, which collectively captured the officers' interactions with the defendant. The video evidence shows that Officer Carey, dressed in uniform, encountered the defendant in the hallway of Speaker Pelosi's office suite and told him, unequivocally, "Sir, you need to get out. You need to get out," while turning her body and pointing at the door, which was marked with an "Exit" sign and led to the Rotunda. GEX 201 at 2:00-2:05; GEX 823. Instead of complying, the defendant retorted, "You need to give up communism is what you need to do. You need to give up communism and protect these people. We're patriots." Rather than exit, when Officer Carey was distracted by another rioter and disengaged with the defendant, the defendant seized the opportunity to turn around, walk the opposite direction from the exit, and reenter Ms. Berret's office. GEX 109 at 1:09-1:23. Officer Smiley, dressed in uniform, followed the defendant into Ms. Berret's office and directed him to leave as well. GEX 202 at 2:20-2:25 ("Sir, you have to come on out"). This time, Barnett complied, warning Officer Smiley as he left that "We are in a war" and that if she was "on the wrong side" she would "get hurt." *Id.* at 2:25-2:41. Instead of leaving the Capitol building, however, the defendant remained in the Rotunda, where he spent a several minutes agitating to get his flag back and ultimately penetrated the police line. GEX 203. Based on this evidence, a rational trier of fact could find that the defendant refused to leave the building despite being directed to do so.

> 4. *Evidence established that government business was disrupted by the defendant's presence in the Capitol building.*

The defendant argues that he is entitled to a judgment of acquittal as to Count Four because insufficient evidence proved that his presence in the Capitol building disrupted government business.[8] The government proved that the defendant's presence in the Capitol building, and

---

[8] While the defendant fails to distinguish between the elements of Counts Three and Four, Count Three only required proof that the defendant entered or remained in a restricted building. It has no

specifically in the House Speaker's office suite, disrupted government business both by delaying the resumption of the Joint Session of Congress, and by interfering with the House Speaker's staff's ability to continue working. While the jury's verdict could be sustained by proof of just one type of disruption, as set forth below, trial evidence proved both. In addition, the government presented sufficient evidence for a rational juror to find that the defendant's presence in the Capitol building disrupted the U.S. Capitol Police's business of protecting the Capitol building, members of Congress, and their staffs.

      a.  <u>Government business was disrupted by the defendant's presence even though the Joint Session had already been suspended and Speaker Pelosi and Ms. Berret had already evacuated the building.</u>

The defendant's argument essentially restates his objection to his conviction for Count Two, *see* Section I(B), *supra*, and applies it to Count Four. The reasons the defendant's argument fails are the same for both counts. Indeed, as described in Section I(B), *supra*, the testimonies of Ms. Berret, Captain Mendoza, SA Glavey, and Mr. Jones, as well as the video compilation of C-SPAN footage from the House and Senate Chambers, established that Speaker Pelosi and Ms. Berret were evacuated at approximately 2:13 p.m. when rioters first entered the Capitol building, Congress's Joint Session to certify the results of the 2020 presidential election was suspended at approximately 2:16 p.m., and the Joint Session did not resume until approximately five hours later. *See* GEX 804. Meanwhile, the defendant entered the Capitol building at approximately 2:42 p.m., GEX 101, 117, 118, and exited at approximately 3:12 p.m., GEX 101, 750. The Joint Session could not resume until every last rioter had been expelled from the building and law enforcement had conducted a safety sweep for bombs or other threats. Tr. at 233:6-25. The defendant does not

---

requirement that government business was disrupted. Thus this argument is irrelevant to Count Three.

dispute these facts or this timeline. *See generally* Def.'s Rule 29 Mot., Def.'s Rule 33 Mot., Tr. at 1870:1-1897:21.

Additionally, Ms. Berret testified that the rioters invasion of the U.S. Capitol building forced her to evacuate and her staff to stop their work and hide in silence under the table in a conference room, which interrupted her and Speaker Pelosi's other staff members' work on government business such as the certification of the presidential election, planning for the upcoming Inauguration Day, and negotiations over the American Rescue Plan, as well as traumatized some members of Speaker Pelosi's staff so much that they left their jobs, some quitting government service altogether. Tr. at 27:12-29:24, 101:3-102:22.

As such, a rational trier of fact could credit Captain Mendoza's assessment that "[a]ny person that was in the building unauthorized was a disruption to Congress that day," Tr. 233:9-10, reject the defendant's arguments to the contrary, and find that the defendant's presence inside the Capitol building disrupted government business, despite the fact that Speaker Pelosi and Ms. Berret had already evacuated by the time he entered. *See also United States v. Rivera*, No. 1:21-cr-60 (CKK) (D.D.C. 2022) ("just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field").

      b. <u>The defendant's physical presence in Speaker Pelosi's office suite disrupted government business; her staff could not merely have locked their doors and continued working.</u>

While the defendant's unauthorized presence in any part of the Capitol building contributed to the disruption of Congress's Joint Session and the delay in resuming it, *see* Section I(B) and (C)(4), *supra*, his presence in the further-restricted area of Speaker Pelosi's office suite also disrupted the work of the approximately eight members of Speaker Pelosi's staff who were

working in the office suite on January 6, 2021. *See* Tr. 47:18-25. The defendant audaciously argues

that his presence in Speaker Pelosi's office suite did not need to disrupt government business

because the Speaker's staff could have just "locked their doors and stayed at work." Def.'s Rule

29 Mot. at 36. The suggestion that Ms. Berret and Speaker Pelosi's staff members overreacted,

that it is *their* fault that their work was interrupted—and thus the Court should overturn the jury's

verdict on Count Four—is absurd and ignores the evidence. When the head of Speaker Pelosi's

security detail team learned the rioters were on the brink of forcing entry into the U.S. Capitol

building, he instructed Ms. Berret—who was on the House Chamber floor with Speaker Pelosi—

to prepare to activate emergency protocols and "take the Speaker down" from the rostrum so that

she (and Ms. Berret) could be evacuated for their safety. Tr. at 55:12-58:21. Ms. Berret in turn

instructed her deputy, who remained in the Speaker's office suite, to "go on lockdown," meaning

"lock all the doors in the office suite, and everyone stay together." Tr. at 59:4-12. When rioters

entered the building, the head of Speaker Pelosi's security team returned to Ms. Berret and together

they evacuated the Speaker from the House Chamber and ran to their secure location. Tr. at 59:15-

60:6. Along the way, Ms. Berret called her deputy and instructed her to move the staff to the safe

room, Tr. 60:12-63:11, where the staff silently hid for hours, terrified as rioters were "taking over

the Capitol . . ." and "breaking into the [Speaker's] suite," which prevented the Capitol Police from

being able to rescue the staff members in hiding there, Tr. at 64:1-6, 66:7-24.

The defendant argues that the staff members in the Speaker's office suite could have merely

locked their doors and gone about their normal daily work as unauthorized people who had gone

through zero security screening roamed the hallways within the Speaker's office suite. A rational

trier of fact could find, based on the evidence, that Speaker Pelosi's staff members took reasonable

precautions for their own safety under the circumstances and that rioters like the defendant who invaded their workspace disrupted their work on government business.

Because a rational jury could conclude based on the evidence that the government established all of the elements of Counts Three and Four beyond a reasonable doubt, the defendant's Rule 29 motion should be denied.

        **D.**  **The Court Should Not Set Aside the Defendant's Convictions on Counts Five, Six, and Seven: Entering and Remaining in Certain Rooms in a Capitol Building; Disorderly Conduct in a Capitol Building; and Parading, Demonstrating, or Picketing in a Capitol Building.**

Counts Five, Six, and Seven charged the defendant with violations of 40 U.S.C. §§ 5104(e)(2)(C), (e)(2)(D), and (e)(2)(G). The Court instructed the jury as to each element of each of these three offenses, Final Jury Instructions at 21-23, ECF No. 158, and the jury reasonably found sufficient evidence of every element for each offense.

The defendant's only challenge to his convictions for Counts Five, Six, and Seven is his claim that the government did not carry its burden to prove[9] that he acted willfully and knowingly and with the intent to disrupt government business.[10] He claims that his entry was involuntary and that he was unable to freely exit the building once inside. But, as explained above, in the face of the video footage of the defendant and his own testimony, the jury simply did not believe him.

Additionally, after exiting the U.S. Capitol building but while still on the grounds, the defendant bragged that he "took over Nancy Pelosi's office." GEX 771. It would be implausible for a rational juror to conclude that someone who invaded and "took over" the offices of the

---

[9] Again, the defendant fails to apply the appropriate legal standard, which requires interpreting the evidence in the light most favorable to the government and granting deference to the jury's verdict, including its credibility findings.

[10] Counts Five and Six require a showing that the defendant acted with an intent to disrupt government business but Count Seven does not.

Speaker of the House of Representatives, including putting his feet on the desk he believed belonged to the Speaker and stealing an envelope addressed to another Congressperson, did not act with the intent to disrupt government business. The jury appropriately concluded that the defendant acted both knowingly and willfully in accordance with the elements of Counts Five, Six, and Seven, and that he intended to disrupt government business.

Ultimately, because a rational jury could conclude based on the evidence that the government established all of the elements of Counts Five, Six, and Seven beyond a reasonable doubt, the defendant's Rule 29 motion should be denied as to those Counts.

### D.  Count Eight: Theft of Government Property

A rational jury could have found—as one did here—that the defendant violated 18 U.S.C. § 641, which provides, in relevant part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof

commits a federal crime. *Id.* The Court instructed the jury as to each element of the offense, specifying that the applicable "thing of value" or government property that the defendant was alleged to have stolen was an envelope. Final Jury Instructions at 24, ECF No. 158.

The defendant—over and over again—admitted that he took the envelope from Speaker Pelosi's office. *See, e.g.*, GEX 770, 771, 780; Tr. at 895:6–10. Accordingly, the defendant raises only two challenges to this count. First, he argues that the stolen envelope had no value, but the jury disagreed. The defendant conflates *low* value with *some* value. The envelope plainly had *some* value. Indeed, even the defendant felt the need to leave behind 25 cents, which he believed to be just compensation for his crime. Tr. at 1786:2–3. Even 25 cents represents a sum of economic

value; while 25 cents might be a relatively small value, that is all the statute requires. Moreover, the defendant's own actions of (1) showing off the envelope to as many rioters and members of the media as possible once he exited the Capitol, and (2) bringing it all the way back to Arkansas rather than simply tossing it a trash can, further supported the jury's conclusion that it had some value. *See* GEX 770, 771. Moreover, Ms. Berrett testified that the envelope was "specially made" as part of Congress's franking procedure, separate from the postal service, and that it could not be obtained by the regular public, indicating that the envelope had some degree of special value, the kind that makes something a collector's item. Tr. at 92:17–24. Obviously, the jury did not credit the defendant's ridiculous "biohazard" justification, *see* Tr. at 1750:12–1751:20, 1754:14–21, 1760:2, and found that the envelope had value, *see id.* at 1554 ("I thought, cool, you know.").

Second, the defendant contends that taking the letter was not theft because he left behind 25 cents as compensation. For starters, this dishonest excuse undercuts his argument that the envelope had no value. Further, the gesture was transparently calculated from the moment of the theft to attempt to thwart future accountability; it did not cast serious doubt on his intent to deprive the government of the use or benefit of the envelope, and the jury was within its rights to disregard it. Finally, it is legally irrelevant. The defendant's cited authority, *Morissette v. United States*, 342 U.S. 246 (1952), is inapplicable. Unlike Barnett, Morissette testified that he did not intend to steal government property because he believed it to be "cast-off and abandoned," though in actuality it was not. *Id.* at 248–249. Barnett did not leave the Capitol with "property which *turns out to belong to another*." *Id.* (emphasis added) at 263. On the contrary, Barnett took property that he *knew* belonged to another and proudly announced that he had removed the trophy from Speaker Pelosi's office in multiple recorded interviews immediately after leaving the Capitol building, three of which the government played for the jury. The jury was entitled to conclude that Barnett "t[ook]

away from one in lawful possession *without right* with the *intention to keep wrongfully*." *Id.* at 271 (emphasis added).

Because a rational jury could conclude based on the evidence that the government established all of the elements of Count Eight, the jury's verdict should stand.

## II.    The Jury's Verdict Should Not Be Vacated Because the Court Properly Instructed the Jury.

In addition to claiming insufficiency of the evidence, the defendant asks the Court to vacate the jury's verdict due to allegedly incorrect jury instructions as to Counts One, Three, and Four. *See* Def.'s Rule 29 Mot. at 8-13, 27, 38-42. In all instances, the defendant's arguments fail because the Court's final instructions were accurate statements of the law.

### A.  The Court Correctly Instructed the Jury on Aiding and Abetting with the Civil Disorder Jury Charge.

The defendant argues that the Court improperly instructed the jury on Aiding and Abetting for Count One even though 18 U.S.C. § 2 was not specifically cited in Count One of the Superseding Indictment. *See id.* at 8-13. The Court made no error because "it is well-established that aiding and abetting is a lesser-included offense that need not be separately charged." *United States v. Palfrey*, 499 F. Supp. 2d 34, 42 (D.D.C. 2007). At trial, the Court overruled the defendant's objection on this point, and he presents no authority for the Court to now decide otherwise. As such, this holding is now the law of the case and it "should continue to govern the same issues in subsequent stages" of the case. *Musacchio v. United States*, 577 U.S. 237, 244-45 (2016); *see also Messenger v. Anderson*, 225 U.S. 436, 444 (1912) ("courts generally . . . refuse to reopen what has been decided."); *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) ("the same issue presented a second time in the same case in the same court should lead to the same result") (emphasis in original). The defendant's assertion that the government "misrepresented

law" and made "false" argument on this point is contrary to established precedent. During the discussion of jury charges at trial, counsel for the government stated, "there's a body of case law in a variety of circuits that essentially aiding and abetting is an implied theory in essentially every criminal charge" and then directed the Court to *United States v. Martin*, 893 F.2d 1404 (D.C. Cir. 1990) which held that "[a]iding and abetting is implicitly charged in all indictments, and an aider and abettor is liable as a principle." Tr. at 1307, 1309. Indeed the D.C. Circuit has expressly held that an "indictment need not specifically charge a violation of 18 U.S.C. § 2[, *and a]n aiding and abetting instruction may be given in a case where the indictment does not allege violation of the aiding and abetting statute*." *United States v. Kegler*, 724 F.2d 190, 200–201 (D.C. Cir. 1983) (emphasis added). The defendant identifies no contrary legal authority whatsoever to support his assertion that the jury instructions somehow violated his Due Process rights, Def.'s Rule 29 Mot. at 27.

### B. The Court Correctly Defined "Deadly or Dangerous Weapon" in the 1752 Charges.

The defendant alleges that the instructions for Counts Three and Four were defective for two reasons related to the "deadly or dangerous weapon" element common to both counts. First, the defendant contends that the instruction as to Count Three created a prejudicial error because it "declared the Hike 'n Strike a deadly or dangerous weapon and made what is an enhancement, an essential element of Section 1752(a)(1)." Def.'s Rule 29 Mot. at 38. Apparently, the defendant complains about the instruction that reads, "And third, that the defendant used or carried a deadly or dangerous weapon, namely the ZAP Hike 'n Strike Hiking Staff, during and in relation to the offense." Tr. at 1823. But the defendant's argument simply ignores the Court's very next sentence, which made crystal clear that the *jury* needed to decide whether the Hike 'n Strike was a dangerous weapon:

And, third, that the defendant used or carried a deadly or dangerous weapon, namely the ZAP Hike 'n Strike Hiking Staff, during and in relation to the offense.

Now, I'm going to, in a minute, give you a definition of what a dangerous hiking -- what a dangerous weapon -- deadly or dangerous weapon is. So when I read that third element, I did not mean to suggest that the Court has already determined that the ZAP Hike 'n Strike is a deadly or dangerous weapon. That is for you to decide -- okay? -- based on the definition that we will give you.

Tr. at 1823:23–1824:7. The Court restated this admonition while providing applicable definitions: "It is for you to decide on the facts of this case whether the ZAP Hike 'n Strike Hiking Staff allegedly carried by the defendant was, in fact, a deadly or dangerous weapon." Tr. at 1826, And if those two clear instructions left any room for confusion, the Court's explanation of the lesser included offense of entering or remaining in a restricted building without lawful authority [without using or carrying a deadly or dangerous weapon] left no room for doubt as to the jury's role in deciding whether the Hike 'n Strike was a deadly or dangerous weapon. Tr. at 1824-25.

Second, the defendant argues that the alleged error in the instruction as to Count Three was imported into Count Four when the Court instructed the jury that "The term 'deadly or dangerous weapon' has the same meaning as described in the instructions for Court Three." Def.'s Rule 29 Mot. at 40; Tr. at 1829. But as explained above, the Court made clear that the jury needed to determine whether the Hike 'n Strike was a dangerous weapon in the Count Three instructions, so referring to those instructions for Count Four was not error. [11]

---

[11] The defendant assumes, without support, "that no juror appears to have read during the mere 90 minutes or less the jury took to convict on all eight counts, generated [sic] no question being sent to the Court to clarify the conflict[.]" Def.'s Rule 29 Mot. at 39. If anything, the efficiency of the jury's time to reach a verdict and lack of questions demonstrates the instructions' clarity.

III.    **The Defendant's Disagreement with the Evidence and Testimony Does Not Justify a New Trial.**

The defendant's primary basis for his Rule 33 motion for a new trial is his disagreement with the jury's assessment of the evidence and the credibility of the government's witnesses. Indeed, the defendant focuses the majority of his arguments on alleged inconsistences in the testimony of the government's witnesses. *See* Def.'s Rule 33 Mot. at 2-23. However, the record fails to support the claimed inconsistencies. Video and other exhibits corroborate most of the statements with which the defendant takes issue; and his claims that the evidence *contradicts* the witnesses' testimony are simply false or based on the defendant's strained interpretations of the evidence. Ultimately, the defendant's vehicles for addressing any alleged inconsistencies by witnesses were cross-examination and his closing argument. His failure to convince the jury that the government's witnesses lacked credibility and to adopt his interpretations of the evidence is no ground for a new trial.

### A. There Is No Evidence that Any Government Witness Committed Perjury.

Without evidence, the defendant baldly asserts that seven government witnesses all committed perjury on the stand. These grave allegations are not just wholly unsupported but facially frivolous:

i) <u>*FBI Special Agent Jonathan Willett*</u>: The defendant claims with no evidence that SA Willett testified to a "material falsehood" because after testifying that he did not take a "selfie" photograph with the defendant, he clarified his testimony the next day that he "d[id] not have a memory either way." Def.'s Rule 33 Mot. at 4-5. The defendant has not shown either statement to be false. Indeed, they are not even inconsistent, let alone "material" to any issue in the case. More importantly, the defendant cross-examined SA Willett about his initial "selfie" testimony, Tr. at 919:2–3, and could have chosen

to cross-examine SA Willett about his clarification, but instead the parties jointly agreed to have the Court read SA Willett's clarification to the jury, Tr. at 1147:24-48:10; 1354:13-14 (Defense counsel: "We worked out an arrangement with Agent Willett's testimony.").

ii) _FBI Special Agent Loel Skoch_: The defendant claims without evidence that SA Skoch gave "knowingly false" testimony when he testified that he found zip ties in the defendant's home by "insinuat[ing] to the jury that Mr. Barrett intended to use them as "restraints for people." Def.'s Rule 33 Mot. at 5. In reality, SA Skoch testified that the zip ties he found "can be used for restraints. They can be used for a lot of different things." Tr. at 781. When asked on direct whether they could be used for lawful purposes, he responded, "Absolutely." _Id_. And when asked on cross, "Isn't it true that people who live in a rural environment, live in a chicken house, make lots of uses of zip ties? Isn't that correct?" he responded, "Yes." Tr. at 862. In short, SA Skoch provided no false testimony whatsoever.[12]

iii) _FBI Special Agent Kimberly Allen_: The defendant claims with no evidence that SA Allen's testimony that she was unfamiliar with "the well-known Antifa member John Early Sullivan" and with "Antifa's relationship to January 6" was "not credible" and was a "material misrepresentation." Def.'s Rule 33 Mot. at 7-8. The defendant has no support whatsoever to suggest that SA Allen lied, let alone that the defendant's statements about Anifa are even true.

---

[12] The defendant also claims that SA Skoch's statement that he did not recall whether the defendant was designated a "Tier One Domestic Terrorist Operator" was a lie. Def.'s Rule 33 Mot. at 6. The defendant oddly argues that the evidence of the lie is that a document refreshed SA Skoch's recollection. The defendant's argument is frivolous on its face.

iv) <u>*USCP Captain Carneysha Mendoza*</u>: The defendant asserts with no evidence that Captain Mendoza "falsely testified" that she could identify the Hike 'n Strike stun device in a video of the defendant. Def.'s Rule 33 Mot. at 8. In the referenced testimony, Captain Mendoza identifies "an envelope and the Taser" in the defendant's hand in one of a series of videos that had just been viewed. Tr. at 296: 14-21. The defendant ignores that Captain Mendoza had just reviewed a series of other videos of the defendant, which would have facilitated her recognizing what was in his hand. Further, the defendant ignores that Captain Mendoza testified that she was a "less lethal instructor" and oversaw the United State Capitol Police's less lethal team. Tr. at 229. Captain Mendoza also was personally familiar with the specific USCP Directive governing carrying stun guns into the Capitol. Tr. at 206-207; *see also* GEX 116. Thus, Captain Mendoza had specialized training and experience to recognize weapons like stun guns. Captain Mendoza's testimony identifying "some sort of electrical device, stun gun, taser," Tr. at 293:25, was well-within the range of her knowledge and experience. The defense could have cross-examined Captain Mendoza to challenge her reliability but made the strategic decision not to do so. In short, the defendant has no basis whatsoever for his claim that Captain Mendoza lied.

v) <u>*Ms. Emily Berret*</u>: The defendant claims without evidence that Ms. Berret made "numerous material misrepresentations" including that she drove to work instead of walking, and that "things were stolen or missing" from her office. Def.'s Rule 33 Mot. at 11-12. But the defendant notes that he successfully impeached her as to both facts during cross-examination, establishing that she "misremembered" driving to work and that she had previously told the FBI that "nothing was stolen or missing." *Id.* In other

words, Ms. Berret responded truthfully during cross-examination and properly acknowledged her faulty memory as to certain details, which a rational juror could have concluded were immaterial or insignificant and still credited her testimony on other more substantive matters. Separately, the defendant claims that Ms. Berret "misrepresented the extent of the blood in her office," but provides no support for this assertion other than to rely on the defendant's claim that he only had a small cut on his hand. Def.'s Rule 33 Mot at 12. Even if that were true (and a rational juror could have concluded that the defendant repeatedly lied on the stand and thus disregarded his claim), that would not establish that Ms. Berret's statement was in any way untruthful. In short, although the defendant quibbles with Ms. Berret's testimony and cross-examination, no evidence whatsoever supports his claim that Ms. Barret lied.[13]

vi) _MPD Officer Quenterra Carey_: The defendant asserts that MPD Officer Quenterra Carey lied about an incident involving a physical clash between a rioter and an officer in the Rotunda by falsely asserting that the rioter punched the officer. Def.'s Rule 33 Mot. at 14. The defendant claims that a BWC video that was never admitted at trial— but that the defendant received well in advance of trial in discovery—proves that Officer's Carey testimony was a "lie." _Id_. It is unclear what specific moment the defendant is referring to in his motion, but what is clear is that the unadmitted BWC footage does not show Officer Carey's field of vision and thus does not establish that her testimony was a lie. Moreover, the defendant was free to cross-examine Officer

---

[13] "[T]he D.C. Circuit has rejected defense claims that testimony must be set aside as inherently incredible based upon lack of clarity in timing or chronology of events or inconsistencies, which 'are not so glaring that the . . . testimony must be a fabrication.'") _United States v. Bikundi_, No. 14-cr-30 (BAH), 2016 WL 912169, at *21 (D.D.C. Mar. 7, 2016), _aff'd_, 926 F.3d 761 (D.C. Cir. 2019). (quoting _United States v. Streater_, 70 F.3d 1314, 1318 (D.C. Cir. 1995).

Carey with the video to make his point but chose not to do so. Nor did he seek to admit it during his case-in-chief. The defendant quibbles with other parts of Officer Carey's testimony as well, but her admitted properly BWC, GEX 201, corroborates her testimony. The defendant, again, offers no evidence whatsoever supports his claim that Officer Carey lied.

vii) *MDP Officer Terrence Craig*: The defendant devotes seven pages to his arguments that Officer Terrence Craig made "significant material misrepresentations" during his testimony. Def.'s Rule 33 Mot. at 16-23. However, most of the defendant's argument address irrelevant tangents, including one about an unrelated officer deploying chemical spray in an area of the Capitol grounds nowhere near the defendant. *See id*. at 17-18. Defendant then claims that Officer Craig "lie[d]" that when he entered the Rotunda, he saw rioters coming toward him and other officers, dressed in gear and yelling at them. Officer Craig's BWC video, GEX 203, and BWC footage from his fellow officers, *see, e.g.*, GEX 204, 207, corroborates that rioters moved toward them and yelled at them, and some of those rioters can be seen wearing gear of various sorts. The defendant also asserts that Officer Craig lied that he saw the defendant brandish his stun device. Def.'s Rule 33 Mot. at 21. Yet video evidence captured the defendant displaying the stun gun while standing directly in front of Officer Craig, again corroborating Officer Craig's testimony. GEX 204; 204B. The defendant takes issue with numerous other aspects of Officer Craig's testimony as well, ultimately concluding that Officer Craig's testimony "was so fantastical and obviously false that it should be struck in its entirety." Def.'s Rule 33 Mot at 22. The defendant had a full opportunity to challenge the reliability of Officer Craig's testimony during cross-

examination and to argue about Officer Craig's credibility in his closing argument. He did both but failed to persuade the jury. His view of Officer Craig is not proper grounds for a new trial under Rule 33, particularly given that Officer Craig's testimony was roundly corroborated by video evidence.

The defendant should be rebuked for recklessly accusing both members of law enforcement and private citizens of perjury simply because he takes issue with their testimony. As for his motion for a new trial, the defendant has not asserted any cognizable claim that a witness testified so "inherently incredible" that the testimony or trial must be set aside, *see Johnson v. United States*, 426 F.2d 651, 654 (D.C. Cir. 1970), and the Court should reject the defendant's bare assertions that these witnesses provided "objectively false" testimony, *see, e.g.*, Def.'s Rule 33 Mot. at 13. Instead, the Court must "presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983). Rule 33 does not, as the defendant wishes, "invite[] a free-ranging judicial inquiry into witness's credibility." *United States v. Green*, No. 19-cr-19 (RDM), 2022 WL 16961127, at *9 (D.D.C. Nov. 15, 2022).

Here, "[s]et against these legal principles, the defendant[ is] unable to demonstrate anything in the testimony of the government's [ ] witnesses that is inherently improbable or simply too incredible for a rational juror to accept." *See United States v. Bikundi*, No. 14-cr-30 (BAH), 2016 WL 912169, at *22 (D.D.C. Mar. 7, 2016), *aff'd*, 926 F.3d 761 (D.C. Cir. 2019). The defendant's bid for a new trial on this basis should be denied.

### B. The Government's Demonstration of the Hike 'n Strike for the Jury Was Properly Authorized by the Court and Made Without Any Defense Objection.

The defendant complains that the Government's demonstration of the Hike 'n Strike stun device was improper for two reasons: (1) because it surprised him; and (2) because the device was

not demonstrated by an expert. Def.'s Rule 33 Mot. at 23–27. Both claims lack any legal authority and are without merit.

As to the defendant's claim that he was surprised when the government asked its lead case agent, SA Allen, to demonstrate the stun device, this is belied by the record, which reflects the government notifying both the Court and the defendant of its intention to demonstrate the device with a future witness. Specifically, after the testimony of Billy Pennington, the designer of the Hike 'n Strike, the Court expressed surprise that the government had not asked Mr. Pennington to demonstrate the use of the stun device. Government counsel informed that the Court that it intended to perform a demonstration of the device later in its case, and defense counsel expressed the *opposite* of surprise. Instead, he responded that he *expected* that "we'd be seeing it again":

> THE COURT: All right. I was expecting a demo, Ms. Prout.
>
> MS. PROUT: We'll be asking the Court's indulgence for that later in our case.
>
> THE COURT: Okay. I figured you would.
>
> MR. GEYER: *I had a feeling we'd be seeing it again, Your Honor.*

Tr. at 431-32 (emphasis added). There is simply no basis for the defense to claim surprise when the United States asked SA Allen, the government's final witness, to demonstrate the device. Equally importantly, the government was under no obligation to provide advance notice to the defense of the questions it would ask its witnesses.

Nor was anything improper about having SA Allen, rather than an expert witness, demonstrate the Hike 'n Strike. An exemplar of the device was properly admitted into evidence via Mr. Pennington without objection. Tr at 420; GEX 17. SA Allen testified that she had personal knowledge of the exemplar device, having personally purchased it before trial. Tr. at 1138. Moreover, the government again provided explicit, on the record notice to the Court and defense

counsel immediately before asking Special Agent Allen to perform the demonstration. Tr. at 1144 (Government's counsel: "at this time we're going to do the demonstration we discussed."). Yet the defendant still raised no objection.[14]

As for his second argument, the defendant identifies no authority supporting his assertion that only an expert witness could have demonstrated a properly admitted exhibit for the jury. This argument is meritless as well.

Separately, the defendant suggests that he was somehow tricked into not calling his stun device expert, Mr. Steve Hill, when in reality the defendant simply made the choice—strategic, logistical, financial, or otherwise—to forego calling his expert. Before trial, the defendant provided notice of his intention to call Mr. Hill to testify about multiple matters including the "use-of-force by the defendant and the use-of-force by police officers . . ." ECF No. 111, Attachment 3 at 2. In a *Daubert* motion, the government acknowledged that Mr. Hill "might be an appropriate rebuttal witness on one or more issues surrounding . . . the two charges that allege the defendant carried an energy weapon . . . capable of causing serious bodily injury" but noted that the defendant had failed to provide adequate notice of the anticipated substance of Mr. Hill's testimony. ECF No. 111 at 15, n.3. The defendant never supplemented his expert notice, and the Court ultimately did not rule on the government's *Daubert* motion because the defendant opted not to call his expert.

Indeed, before the government performed its demonstration of the device via SA Allen, defense counsel requested a bench conference and, raising no objection to the impending demonstration, simply informed the Court that he wanted to "fly our expert out . . . or introduce

---

[14] Nor did the defendant object when the government asked Special Agent Allen to demonstrate the electrical shock feature for five seconds, stating "Can you hold it down, and can you count to five your head please." Tr. at 1146. With no objection raised, the government had no opportunity to cure any theoretical prejudice.

the video where it's like getting bit by a horsefly." Tr. at 1144. The Court invited the defendant to take up the matter after SA Allen finished testifying, *id.*, but the defendant never did. The following day, the defendant moved for a mistrial based on the demonstration of the device. Tr. at 1351:7-1354:16, 1357:1-1358:14. In denying the motion for a mistrial, the Court reminded the defendant "that after Mr. Pennington's testimony the Court inquired whether experts would still be necessary" and the defendant's "Counsel said that they would think about that." *Id.* at 1358:18-23. The Court underscored for the defendant that "the Court has still not ruled and has never ruled on any expert notices," highlighting for the defendant that he could still pursue expert witness testimony if he wished. *See* Tr. at 1358:24-25. Yet defense counsel never raised the issue again and never sought to introduce a stun gun expert.

Apparently the defendant regrets this decision, but that is not valid grounds for a new trial pursuant to Rule 33. The defense team was comprised of four experienced, competent attorneys. The defense team's choice to address the government's Hike 'n Strike evidence in ways other than seeking to admit a qualified stun device expert does not justify overturning the jury's verdict and granting a new trial.

## IV.    The Defendant's Other Allegations of Error Are Meritless.

The defendant raises multiple additional meritless arguments that fail to meet the high burdens necessary to warrant a judgment of acquittal or a new trial.

### A.  The Government Committed No *Brady* Violation.

In his Rule 29 motion, the defendant contends that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose orders issued by Washington, D.C. Mayor Muriel Bowser in the days leading up to January 6, 2021, including the mayor's December 2020

COVID-19 order that put certain restrictions on the hours that businesses, specifically restaurants, were permitted to operate. Def.'s Rule 29 Mot. at 27-29. The government did not violate *Brady*.

Under *Brady*, *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, the government must timely disclose to the defense favorable evidence that is "material" either to guilt or to punishment. *Brady*, 373 U.S. at 87. Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness. *Giglio*, 405 U.S. at 154; *see Smith v. Cain*, 565 U.S. 73, 76 (2012). "[T]he question is not whether the defendant would more likely than not have received a different verdict, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *United States v. Clarke*, 767 F. Supp. 2d 12, 40 (D.D.C. 2011) (quoting *United States v. Oruche*, 484 F.3d 590, 597 (D.C. Cir. 2007)); *accord Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

To begin, the defendant's claim that the government violated *Brady* by failing to produce legal orders issued by the D.C. mayor is meritless because there is no *Brady* requirement to produce legal authority. Lawyers for the government and the defense are equally capable of researching federal, state, and local law and locating authority on which they wish to rely. Nor is there a *Brady* requirement to produce publicly available information: "[T]here cannot be a *Brady* violation for failure to disclose public documents which the Defendant[] could have found on [his] own." *United States v. Borda*, 941 F. Supp. 2d 16, 25 (D.D.C. 2013). The defense plainly had access to the D.C. mayor's orders, since the defendant attached four of them to his Rule 29 motion. *See* Def.'s Rule 29 Mot., Ex. 1 at 5-18. He does not even allege that he only came into possession of the orders after trial, rather than sometime in the two years while the case was pending before trial. Indeed, anyone can read the text of the D.C. mayor's orders by searching the D.C. government's website or Google. The defendant thus cannot show a *Brady* violation.

Even if the defendant did not have equal access to the D.C. mayor's orders, the substance of the orders do not exculpate the defendant. The defendant indirectly makes two separate arguments, neither of which withstand scrutiny. First, he argues that the D.C. mayor's orders refute the government's evidence that the riot adversely affected commerce. *See* Def's Rule 29 Mot. at 27 (arguing that "The D.C. Mayor caused the reduction in sales for January 6, 2021"). Second, he argues that the orders undercut Mr. Wendel's credibility because they suggest that the Hyatt House was violating a D.C. order in operating its bar.

The defendant's first argument—that the mayor's orders refute the evidence that the riot adversely affected comment, specifically at the Hyatt House—fails both factually and legally. From a factual standpoint, the defendant's argument boils down to timing: he contends that the riot in general and the defendant in particular could not have cost the Hyatt House revenue between 10:00 p.m. and midnight on January 5 or 6, 2021, because the hotel was not allowed to do food and beverage business then. *See id.* But Mr. Wendel's testimony concerning the hotel's revenue losses was not limited to the hours between 10:00 p.m. and midnight. The riot at the Capitol took place during the *afternoon*, not the late evening. Mr. Wendel did not specify the time at which the Hyatt House decided to shut down its restaurants[15] in response to the riot, but a rational juror could have inferred that the decision occurred in the afternoon, long before 10:00 p.m., particularly in light of the curfew order the mayor issued at approximately 4:00 p.m. *See* GEX 1001, 1002. The mayor's order that the defendant found on his own through publicly available searches thus does not contradict Mr. Wendel's testimony.

---

[15] *See* Tr. at 398:6-25 (Wendel testifying that on January 6, 2021, the Hyatt House "shut down all three restaurants," keeping one "open for to-go food only," due to the riot at the Capitol, causing the hotel to earn only a quarter of its normal daily food and beverage revenue, and affecting the bottom line of the national business).

From a legal standpoint, the argument fails because even if the orders somehow did show that the Hyatt House's revenues were unaffected by the riot, they still do not tend to exculpate the defendant because they do not undermine the government's evidence that the civil disorder at the Capitol on January 6, 2021, had an adverse effect on commerce or a federally protected function. The orders relate, at most, to only one of the five avenues through which the government proved Count One's jurisdictional element and are wholly unrelated to the federally protected function evidence. In other words, the defendant fails to establish "a reasonable probability that," had he been aware of the mayor's prior orders before trial (assuming that he, in fact, was not), "the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Nor can he demonstrate that any probability of a different outcome would be "high enough to 'undermine confidence in the verdict.'" *United States v. Johnson*, 592 F.3d 164, 170 (D.C. Cir. 2010) (quoting *Kyles*, 514 U.S. at 435).

The defendant's second argument is that the mayor's orders somehow show that Mr. Wendel was dishonest because it proves that he "insisted falsely that he might keep the bar open until midnight because allegedly five patrons were seated outdoors having limited drinks." Def.'s Rule 29 Mot. at 29. As evidence of this supposed "lie," the defendant cites portions of one order that apply only to indoor dining at "[r]estaurants and other licensed food establishments," not bars. *See id*. at 29 (acknowledging that "[t]he December 2020 order made no mention of bars"). Nothing in the cited language prohibited *outside bar service*; even restaurants were explicitly permitted to continue "outdoor dining." *Id*. As Mr. Wendel explained, the hotel had outdoor seating areas with two firepits. Tr. at 405. At bottom, the defendant makes unsupported interpretations of the mayor's orders, and makes sweeping assumptions about the Hyatt House's compliance with those orders that are outside the record, to draw the attenuated conclusion that Mr. Wendel must have lied.  And

after all that, the defendant still fails to show how any purported lie about a matter that was tangential to the case could "undermine confidence in the verdict," *Johnson*, 592 F.3d at 170, particularly given that the government proved the jurisdictional element of Count One through four additional means, *see supra* at 17-18.

### B. The Defendant's Already-Rejected Definition of "Official Proceeding" Does Not Support Setting Aside His Conviction for Count Two: Obstruction of an Official Proceeding.

The defendant briefly renews his repeatedly rejected claim that the Electoral College certification was not an "official proceeding" under Count Two in the Superseding Indictment and that the Superseding Indictment in some other nebulous way failed to state what official proceeding was disrupted. Def.'s Rule 29 Mot. at 30. The government incorporates its previous responses to those arguments here. *See, e.g.*, ECF No. 125. The Court has already issued multiple rulings denying previous motions to this effect, Opinion and Order, ECF No. 90; Opinion and Order, ECF No. 138; Minute Order (January 23, 2023); *see also* Tr. at 154:16-21, and the defendant provides no reason to suggest the Court ought to act differently now. Moreover, the Court's ruling on this issue is the law of the case. *Musacchio*, 577 U.S. at 244-45; *Messenger*, 225 U.S. at 444; *LaShawn A.*, 87 F.3d at 1393. It is not a proper ground for a new trial pursuant to Rule 33.

### C. The Government's Closing Did Not Violate Any Rules.

The defendant briefly argues that the government improperly claimed during closing arguments that the defense was previously pursuing a theory that the Hike 'n Strike was shorted by the rain at some point. Def.'s R. 33 Mot. at 13. The defendant's contention is contradicted by the record. The government's statement was based on testimony that was properly admitted through the cross-examination of Billy Pennington and therefore was proper to reference in

closing. *See United States v. Small*, 74 F.3d 1276, 1280 (D.C. Cir. 1996) ("[S]tatements made in opening and closing arguments to the jury [must be] supported by evidence introduced at trial."). Specifically, on cross-examination, defense counsel Mr. McBride elicited the following testimony from Mr. Pennington regarding rain's effect on the Hike 'n Strike:

> A. . . . Fair to say that water and a stun gun don't go together?
> A. Do not.
> Q. What about water and a stun device? Do they go together?
> A. No.
> Q. How come?
> A. The water can short out the device until it completely dries out.
> Q. So if I -- if it's raining outside and I'm walking around just happy on the trigger and water and the rain and the electrodes, they interact, could it short out in that situation?
> A. Yes.
> Q. Could it short out the -- in the shorting-out process, would it -- could it potentially affect the batteries as well?
> A. Not the batteries, I don't believe. It would be the components inside.

Tr. at 449:15–450:8. In response to this testimony, on redirect, the government elicited the following from Mr. Pennington:

> Q. You were asked some questions about the device potentially shorting out in the rain.
> MS. PROUT: Ms. Rouhi, could we see Government's 703.
> Q. Mr. Pennington, does it appear to be raining in this picture?
> A. No.

*Id.* at –457:21–458:2. Accordingly, the government's reference to this testimony in its closing argument was appropriate.

Even if the government's statement was not sufficiently rooted in the defendant's evidence from trial, the defendant cannot show that he was prejudiced. Here, the Court must analyze three factors: "the severity of the [alleged] misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks." *United States v. Monaghan,* 741 F.2d 1434, 1444 (D.C. Cir. 1984). First, the government relied on properly admitted evidence, so

there was no misconduct, let alone severe misconduct. Second, any error resulting from the statement was cured by the Court's instruction that "[t]he statements and arguments of the lawyers are not evidence." *See* Final Jury Instructions at 3, ECF No. 158. Third, based on the overwhelming weight of the evidence, the jury would have arrived at the same guilty verdicts, even if the relevant statement had never been made by the prosecution. For each of these reasons, the defendant has not demonstrated that he is entitled to a new trial based on any alleged misconduct during the closing argument, and his Rule 33 motion on this basis should be denied.

### D. The Defendant's Supplemental Brief Does Not Support Setting Aside His Conviction for Count One: Civil Disorder.

In a supplemental filing, the defendant renews his claim that Count One, the charge of civil disorder in violation of 18 U.S.C. § 231(a)(3), should be "dismissed" because it is overbroad. ECF No. 177. This argument should be rejected for four reasons. First, the supplemental motion is untimely. The jury rendered its verdict on January 23, 2023, and thus the defendant's post-trial motions were due on February 6, 2023. *See* ECF No. 154; Fed. R. Crim. P. 29, 33. No extension was sought and there must be finality to this litigation. Second, his arguments have been previously litigated, *see* ECF Nos. 123, 147, and rejected by the Court, *see* ECF Nos. 138, Tr. at 1508:6-13, and are thus barred by the law of the case. *Musacchio*, 577 U.S. at 244-45; *Messenger*, 225 U.S. at 444; *LaShawn A.*, 87 F.3d at 1393. Third, the defendant uses a procedurally improper vehicle to argue the statute's overbreadth. Rule 29 concerns sufficiency of the evidence, while Rule 33 concerns due process. Neither is a proper vehicle for the defendant to raise post-trial challenges to a statute's constitutionality; such arguments belong in pre-trial motions to dismiss, an avenue the defendant already tried unsuccessfully. *See* ECF Nos. 123, 138, 147, Tr. at 1508:6-13. Rules 29 and 33 do not provide another bite at that constitutional apple. Fourth, the argument that 18 U.S.C.

§ 231(a)(3) is unconstitutionally overbroad is legally incorrect for the reasons set forth in the government's prior briefs, and the Court's prior orders. *See* ECF Nos. 125, 138.

## CONCLUSION

In sum, under Rule 29, a judgment of acquittal may not be granted unless no rational tried of fact could have found the essential elements of the crimes when the evidence is viewed in the light most favorable to the government. *Shi*, 991 F.3d at 205. And under Rule 33, a new trial is only appropriate where there was a miscarriage of justice so severe that it compromises the jury verdict. *Borda*, 786 F. Supp. at 31–32. This is true even where a defendant asserts a constitutional error in the trial court proceedings. *See, e.g.*, *Cook*, 526 F. Supp. 2d at 14. Here, the defendant falls far short of meeting either burden and the Court should deny both of the defendant's post-trial motions accordingly.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:    */s/ Alison B. Prout*
ALISON B. PROUT
Assistant United States Attorney
Georgia Bar No. 141666
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
alison.prout@usdoj.gov
(404) 581-6000

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Assistant United States Attorney
Florida Bar No. 1026025
400 N. Tampa St., Suite 3200
michael.gordon3@usdoj.gov
(813) 274-6370

*/s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
D.C. Bar No. 1601102
601 D Street, NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7035