**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| v. | ) | 1:21-cr-38 |
| | ) | |
| **BARNETT** | ) | |
| _____ | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Richard Barnett, by and through his attorneys, respectfully submits this sentencing memorandum and respectfully requests a departure and/or a variance from the applicable Sentencing Guidelines range, and is required by applicable law, and says as follows:

### INTRODUCTION

Ricahrd Barnett is one of the most famous January 6 cases because of a picture of him sitting with his foot on a desk in the office suite of the Speaker of the House. Mr. Barnett is a 63-year-old retired firefighter and bull rider from rural Arkansas who came to DC for his very first time to peacefully protest and was unfortunately caught up in the events that turned an ordinary Wednesday into what will forever be known as "January 6."

It is undisputed that Mr. Barnett was not part of any planned insurrection and did not commit any violence. Even though the Government admits that he committed no violence, the Government is seeking to disproportionately punish him by seeking a sentence of years of incarceration, as if he were part of an insurrection or committed violence, simply because his case is famous. The worst accusations against Mr. Barnett amounted to 20 minutes of nonviolence in the Capitol, a stolen envelope, and literally seconds of verbal altercation with a police officer. To justify its harsh sentence recommendation, the Government focuses almost

entirely on things that Mr. Barnett said and worse believes.  They continue to slander Mr. Barnett as a domestic terrorist, Government Sentencing Memo at page 36, even though he is not charged with terrorism and there is literally zero evidence that he is a domestic terrorist.  The Government failed to produce any evidence that Mr. Barnet intended to commit violence on January 6, or that he intends to do so in the future.  Yet the Government continues to make bald allegations against him, even alleging that he perjured himself simply because the prosecutors personally claim to not find his testimony credible.

Accordingly, Mr. Barnett respectfully requests that this Honorable Court consider the totality of the circumstances and apply a variance to the sentencing guidelines so that Mr. Barnett's sentence is commensurate with other nonviolent January 6 defendants who came to peacefully protest, and impose a fair sentence of no more than 12 months of incarceration.

## SUMMARY OF ARGUMENT

Twelve months of incarceration is a fair sentence for Mr. Barnett based on the totality of the circumstances of his case.  Not all January 6 cases are equal.  Mr. Barnett did not engage in violence, did not assault police, did not destroy property, and did not use a deadly weapon against another person.  Mr. Barnett was in the Capitol from approximately 2:43 to 3:04, just over 20 minutes.  Mr. Barnett had attached to his belt a Hike N' Strike - a retractable walking stick with a stun component at the handle - which is legal to carry in Washington, DC, which Mr. Barnett brought to the city for protection.  Mr. Barnett is not accused of using the Hike N' Strike, or even holding the Hike N' Strike in his hand while he was in the building.

For the first 14 minutes in the Capitol building, from 2:43 to 2:57, he peacefully meandered around the office suites and posed for the now famous picture taken by an Associated Press news reporter.  He had ample opportunity to steal or vandalize valuable objects including a

collection of gold coins, but he damaged nothing and took nothing other than an envelope that had his blood on it, for which he left a quarter.  He also left a short note addressed to a congresswoman that said "Bigo was here," and called the Congresswoman a derogatory name.

At approximately 2:55 PM, after Mr. Barnett had been in the building for about 10 minutes, and in the offices for about 5 to 7 minutes, two female police officers began instructing protesters to clear the office suites.  Mr. Barnett complied.  When the first female officer asked him to leave, he initially complied with the instructions, but then, realizing he forgot his American flag in the office, he turned back to retrieve it, reasonably thinking it was ok to do so. But when the second officer told him to leave, he immediately turned and followed her directions.

From the office suites, he was directed into the Rotunda.  He was not instructed on how to leave the building, and it was far from obvious how to do so.  He asked several officers to retrieve his flag.  At the same time, a group of nearby protesters got into a pushing match with police, until the police deployed tear gas at the crowd, including Mr. Barnett.  This all transpired from approximately 2:58 to 3:01.  During these three minutes, Mr. Barnett did not engage in any violence or assault.

The worst conduct that the Government accused Mr. Barnett of occurred during those three minutes: (1) from 2:59:08 to 2:59:28, he said to an MPD officer, "I'm going to make it real bad if you don't get my flag, I am going to get them to help me get it,"  "I am going to come and get it and they will follow me," and "I am going to call them in."  According to the Government, these three statements were meant to be and were perceived by the MPD officer as credible physical threats of violence; (2) for 4 seconds from 2:28:50 to 2:58:54, he waved his hand towards the crowd as if gesturing them to come over to him. According to the Government, this

wave was Mr. Barnett's attempt to act on his threat to call the crowd to follow him; and (3) for 2 seconds from 2:58:03 to 2:58:05, Mr. Barnett allegedly lifted his sweater. According to the Government, Mr. Barnett lifted his sweater to reveal the Hike N' Strike to the MPD officer signaling a threat to use the Hike N' Strike against the officer if the officer declined to retrieve Mr. Barnett's flag from the office suite, and it was perceived by the officer as such.

It is impossible to know if the jury found these accusations credible because Mr. Barnett was charged with 18 U.S.C. 231(a)(3) and 18 U.S.C. 1512(c)(2), and pursuant to the broad jury instructions, Mr. Barnett's mere presence in the building, or even on the Capitol grounds, could have been the basis for his conviction.

Regardless, the Government designated him a tier one domestic terrorist on January 6[1] and now seeks a sentence of 7 years for what amounts to less than 30 seconds of ambiguous conduct and a single bloody envelope for which Mr. Barnett left a quarter.  To build its case, the Government shows a few still photos of Mr. Barnett looking angry and yelling at police officers, including the 2 seconds when he adjusted his sweater in the Rotunda, and a collection of cherry picked social media posts that the Government considers to be the absolute worst of Mr. Barnett's social media posts leading up to the fateful day.  In doing so, the best the Government could come up with were innocuous ambiguous statements such as, "I'll do whatever it takes." There are absolutely zero posts suggesting that Mr. Barnett planned on entering the Capitol building on January 6, or that he was planning a seditious insurrection to take over the Capitol and/or the U.S. Government.  Mr. Barnett's posts are consistent with his history of peacefully protesting the government, and support for law enforcement.

---

[1] **EXHIBIT 1.**

Mr. Barnett is a 63-year-old retired firefighter and former bull rider from North Western Arkansas with no significant criminal history,[2] and a history of supporting law enforcement.  Mr. Barnett is a proud American who loves his country and its Constitution, including the First Amendment.   Mr. Barnett regularly exercised his First Amendment Right to attend political rallies, assemblies, and speeches and never once engaged in or advocated violence, including on January 6.

On January 6, 2021, Mr. Barnett was labeled a tier one domestic terrorist by the FBI before they knew anything of the circumstances simply because of the famous picture of him. He immediately surrendered to the authorities on his drive back to Arkansas and agreed to turn himself in.   After he was arrested, he was released by a federal judge, but the Government insisted on his pretrial detention, even though he was neither a flight risk nor a danger to the community.   He spent four months in the DC Jail before he was released in April of 2021.  He has since been on home detention and has not violated his conditions of release.  During that time, he lost his job and had to sell his possessions to pay living expenses.

The Government's relentless pursuit to punish Mr. Barnett left him no choice but to go to trial because the Government's plea offer was 70 months to 87 months, potentially 7 years in prison, which at Mr. Barnett's age would be a life sentence.[3]  The Government now ruthlessly asks the Court to impose the maximum sentence of 87 months, a longer sentence than other January 6 defendants who committed actual violence, assault, and destruction.  The Government cites irrelevancies such as the fact that Mr. Barnett believes that the election was stolen, that President Biden is beholden to China, or that police acted violently on January 6.  Mr. Barnett is

---

[2] Mr. Barnett has a completely clean criminal history without even a traffic ticket orther than 3 DUIs in 1989, 1992, and 2002, respectively, but nothing else in the last 20 years.  In the presentence report his total criminal history score is zero.
[3] **EXHIBIT 2.**

permitted to believe whatever he wants. The question before the Court is whether the few minutes of conduct deserve over seven years in prison - what will surely be a life sentence for Mr. Barnett given his age and health.

Mr. Barnett asks for 12 months incarceration with credit for time served, which is a fair sentence given Mr. Barnett's history and the circumstances of his offense, and is commensurate with the sentences given to similar Defendants in January 6 cases and in other civil disorders in DC.

## SENTENCING POST BOOKER

Sentencing courts are no longer constrained solely by the federal sentencing guidelines. *United States v. Booker,* 543 U.S. 220 (2005). The guidelines are now advisory and are but one of many factors. The sentencing Court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 39 (2007). An appropriate sentence is one that is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Aside from the guidelines, Section 3553(a)(2) looks to other factors such as the nature and circumstances of the offense, personal history and characteristics, the need for the sentence to reflect the seriousness of the offense and promote respect for the law, the need for adequate deterrence, and the need for unwarranted sentencing disparities.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

January 6 is unique in American history for many reasons, including the Government's relentless pursuit of American citizens who were present at the Capitol on January 6. As a result, over the last two-and-a-half years, over one thousand protesters have been charged and hundreds of sentences have been imposed on January 6 defendants ranging from no incarceration to ten

years or more.  When comparing Mr. Barnett's circumstances to those along the wide spectrum of other January 6 defendants, Mr. Barnett's conduct on January 6 is not remotely similar to those who received sentences of seven years or more.  At worst, he is analogous to those who received six to twelve months of incarceration.

**The jury's "findings" do not provide a basis to establish particular facts.**

A jury convicted Mr. Barnett of four felonies and four misdemeanors, but due to the broad nature of the charges, especially the felonies, the jury's verdict cannot be used to establish the particular facts or circumstances of Mr. Barnett's conduct.  It is also impossible to know which evidence or testimony the jury found credible.  In the extensive corpus of January 6 sentences, defendants convicted of similar charges, whether by jury or plea, have been given a wide range of sentences based on detailed assessments by the sentencing judges of the defendants' particular circumstances and individualized conduct.

Regarding Count I, Civil disorder, the jury was only asked to find the following three elements beyond a reasonable doubt: (1) the defendant knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with an MPD Officer.; (2) at the time of the defendant's actual or attempted act, the law enforcement officer was engaged in the lawful performance of his official duties incident to and during a civil disorder; and (3) the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.  The first element tells us almost nothing about what the jury believed about the particulars of Mr. Barnett's conduct, and the latter elements have nothing to do with Mr. Barnett and only relate to an unspecified MPD Officer and to a hypothetical Safeway store miles from the Capitol.  Further, the verdict does not specify if

they found him guilty from actually committing the offense or merely aiding and/or abetting another to commit the offense.

Count II, obstructing an official proceeding, is even less specific as according to the Government Mr. Barnett was guilty of this offense for his mere presence in the vicinity of the Capitol, with nothing more.

Count III only required the jury to find that the Hike N' Strike was a dangerous weapon and that he knowingly "remained" in the Capitol with it, and accordingly, the jury may have credited the video evidence and Mr. Barnett's testimony that he was pushed in against his will, but convicted him for remaining in the building. Count IV only required that he possessed the Hike N' Strike "in proximity to" the Capitol.

The Government seeks to portray Mr. Barnett in the most unfavorable light by pointing to the jury's verdict as if it established specific facts, when in reality the jury gave zero specifics about Mr. Barnett's conduct and circumstances and nothing useful for sentencing can be divined from the verdict.

Further, the Government's repeated and vociferous allegations that Mr. Barnett perjured hismelf should be disregarded because the Government has no evidence that Mr. Barnett perjured hismelf and the jury did convict Mr. Barnett of perjury.

**Outside the Capitol**

Mr. Barnett is not accused of any criminal activity outside of the Capitol. At worst, the Government presented as evidence a picture of Mr. Barnett yelling at Capitol Police officers while recording with his phone sometime after 2:00 and before 2:43. At trial, Mr. Barnett testified that he was reacting to witnessing what he believed to be unjustified police brutality against peaceful protesters, including flash bombs and tear gas grenades being lobbed into

crowds of protesters.  As a lifelong supporter of law enforcement, this shocked him to his core. His reaction was legal and constitutionally protected.  He was not accused of obstructing or interfering with the Capitol Police outside of the building, he did not physically threaten any of the Capitol police, and he did not engage in any of the rioting or assaulting that occurred outside the Capitol that day.

**Entering the Capitol**

Government exhibit 401 shows Mr. Barnett being pushed into the Capitol as he yelled "we are being pushed in, we have no choice!"   The Government also presented Government Exhibit 740, which shows another protester who was right in front of Mr. Barnett.  The video clearly shows Mr. Barnett's terrified face as he is carried by a tidal wave of people.  It also shows other protesters who were, to say the least, enthusiastic about entering the Capitol. Unlike Mr. Barnett who shouted contemporaneously that he was being pushed in against his will, other protesters expressed a desire to make their way into the Capitol.

The Government insinuates that Mr.Barnett was lying when he yelled "we are being pushed in, we have no choice."  The Government instead claims that Mr. Barnett's cries were feigned as part of an ingenious plot by Mr. Barnett to create plausible deniability in the event that he would be charged by the Government for entering the Capitol.  The terrified look on Mr. Barnett's face in Government exhibit 740 tells a different story.

Mr. Barnett had no motive to create contemporaneous exculpatory video evidence because he could not possibly have foreseen at that moment that he would be charged with multiple felonies for entering the building, especially given the recent history of protests in Washington, DC and throughout the country in the six months prior to January 6, and the Government's response or lack thereof.

On October 4, 2018, during the confirmation hearings of Justice Brett Kavanaugh,

A throng of protesters pushed past a police line, storming up steps to pound on the doors of the U.S. Supreme Court on Saturday after the Senate confirmation of Brett Kavanaugh.  "Hey, hey! Ho, ho! Kavanaugh has got to go," the protesters chanted as they flooded the steps of the court, many with fists raised in the air, others with arms linked.  Police eventually were able to form a line between the door and the group of protesters and later shepherded them back down the steps before erecting a barricade.  The protest at the Supreme Court came shortly after Vice President Mike Pence walked down the steps of the U.S. Senate to chants of "shame" after the vote to confirm Kavanaugh. Droves of protesters pressed up against metal barricades outside the Capitol Building to shout at Pence, who was forced to face their chants as he left.[4]

300 protesters including Hollywood celebrities were arrested by Capitol Police and charged with "Crowding, Obstructing, or Incommoding" for illegally entering the Capitol's Hart Senate building, and were subject to a $50 fine.[5]  In May and June of 2020, thousands of violent protesters rioted throughout the country, including in Washington, DC, yet there were no reports of masses of protesters being charged with felonies for non-violent participation.

None of this would be an excuse if Mr. Barnett had willingly entered the Capitol; it is evidence of Mr. Barnett's state of mind on that day at that time, and dispels the Government's theory that he entered willingly while shouting "we have no choice!"  At 2:43 on January 6, 2021, given the information that was available to Mr. Barnett at that time, he could not have believed that illegally entering a Capitol building would result in more than a $50 fine, as it did for those who did the same during the Kavanaugh hearings.  It was not foreseeable to him at that time that he would later that day be designated as a tier one domestic terrorist and face years in prison for entering the Capitol. Nothing about the circumstances leading up to that moment indicate that Mr. Barnett was concerned about preserving a record to establish plausible

---

[4] https://www.nbcnews.com/politics/supreme-court/protests-build-capitol-hill-ahead-brett-kavanaugh-vote-n917351
[5] https://www.yahoo.com/news/penalty-amy-schumer-emily-ratajkowski-004137475.html

deniability. The Government's theory that in the midst of a chaotic moment he had the presence of mind to create fake exculpatory video evidence in preparation for his trial does not hold water.

The preponderance of the evidence shows that his contemporaneous shouts that he was being pushed in against his will were genuine. It is the Government's burden to prove otherwise, but the Government has nothing but a bald accusation to the contrary without any supporting evidence. It does not follow from the guilty verdict that the jury did not believe that Mr. Barnett was pushed in against his will because the jury could have believed that he entered against his will but convicted him for other reasons.

Regardless of whether he entered intentionally or against his will, the circumstances of Mr. Barnett's entering the Capitol are unlike others who forcibly entered through broken windows. Mr. Barnett entered through a door that was opened from the inside. He did not and could not have known that the door would open, so it cannot be said that Mr. Barnett had premeditated his entrance into the building. When he entered, the police stood by and waved protesters through, even giving protesters fistbumps, as shown in Government exhibit 740.

As set forth below, as soon as Mr. Barnett encountered officers Smiley and Carey, he followed instructions and moved in the direction he was instructed. He remained in the Capitol for only approximately 20 minutes, from 2:43 to 3:04. The Government admits that while he was in the office suites from 2:43 to 2:57, he did not engage in any violence, he did not injure anyone, he did not damage anything, and he did not steal anything other than a single envelope, for which he left compensation.

For those reasons, the circumstances of his entrance are similar to the least culpable January 6 defendants who received sentences of months not years.

**His foot on the desk and the stolen envelope**

Mr. Barnett became unwittingly famous for putting his foot on a desk, however, this conduct was not criminal by itself.  At the same time that Mr. Barnett sat at one desk, a female protester sat at the adjacent desk.  She was interviewed by the FBI but was never arrested for identical conduct.[6]  The note Mr. Barnett left at the desk was not threatening.  Mr. Barnett has regretted what he now considers a juvenile joke made in bad taste from the moment he left DC, but it was not a crime.  The joke simply indicated that he was there and called the Congresswoman a bad word.  One can only assume that all elected officials routinely receive similar letters.

The fact that the Government included the theft of a single envelope in the charges against Mr. Barnett is the strongest evidence that, despite its rhetoric, the Government considers Mr. Barnett to be a petty trespasser deserving at most a few months in prison.  The fact is, Mr. Barnett unintentionally bled on the envelope rendering it worthless and a health hazard.  Had Mr. Barnett left the envelope in the office, the staffer who sits at the desk would have thrown it straight in the garbage, just like she threw out the quarter Mr. Barnett left in its place.

**His encounters with officers Smiley and Carey in the office suites**

The body camera footage of officers Morgan Smiley and Quenterra Carey show that Mr. Barnett complied with law enforcement when asked to leave.  When Officer Carey asked him to leave he began to do so, only turning back because he realized he forgot his flag and reasonably believed at the time that under the circumstances he would have been permitted to do so.  But the instant Officer Smiley directed him to leave, he turned on a dime and left without retrieving his flag.  Even though he quite obviously wanted to get that flag, he left the instant Officer Smiley told him to leave and it was no longer reasonable to believe retrieving his flag was permitted. .

---

[6] **EXHIBIT 3**.

On his way out the door into the Rotunda, he made comments to the officers, but his comments were constitutionally protected and not, so-called, "fighting words.".

> [W]ords may or may not be "fighting words," depending upon the circumstances of their utterance. It is unlikely, for example, that the words said to have been used here would have precipitated a physical confrontation between the middle-aged woman who spoke them and the police officer in whose presence they were uttered. The words may well have conveyed anger and frustration without provoking a violent reaction from the officer. Moreover, as noted in my previous concurrence, a properly trained officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words." 408 U.S. 913. See Model Penal Code § 250.1, Comment 4 (Tent. Draft No. 13, 1961).

*Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) (Powell, J. concurring).

**His encounter with officer Craig in the Rotunda**

When Mr. Barnett entered the Rotunda at 2:57:01, he asked several police officers to retrieve his flag until he encountered officer Terrance Craig, at 2:57:39.  At 2:58:03, Mr. Barnett was simultaneously pushed from behind and pushed by Officer Craig, and in that instant, Mr. Barnett adjusted his sweater so that the Hike N' Strike became visible for less than 3 seconds. Officer Craig was wearing a gas mask and stands a full head taller than Mr. Barnett.  It is impossible that Officer Craig saw the Hike N' Strike at all, much less recognized it as a weapon. Officer Craig testified that he took steps to protect himself when he supposedly spotted the Hike N' Strike, but the video tells a completely different story.  As Mr. Barnett adjusted his sweater, he said, "I need my flag. Ok. Promise me. I'll stand here until someone gets my flag," and he moved to the side away from Officer Craig and away from the crowd, and began checking his phone.  Officer Craig then turned his back to Mr. Barnett and directed his attention to someone else.  This directly contradicts Officer Craig's false testimony that Officer Craig believed that Mr. Barnett was reaching for what he thought was a weapon and was thinking about his "next step to protect [him]self."  Tr. 671-72.  It is clear from the fact that Officer Craig immediately

turned his back on Mr. Barnett - unlike his false testimony - that Officer Craig did not see the Hike N' Strike and did not believe it to be a weapon.  This is supported by the fact that Officer Craig did not mention the Hike N' Strike in his interview with the FBI before the trial.[7]  Mr. Barnett did not brandish the Hike N' Strike, as the Government claims, and Officer Craig was not aware of the Hike N' Strike at the time.

From 2:59:08 to 2:59:28, he said to Officer Craig, "I'm going to make it real bad if you don't get my flag, I am going to get them to help me get it,"  "I am going to come and get it and they will follow me," and "I am going to call them in."  At one point, he also gestured to people behind him.  These words are the worst things that Mr. Barnett is accused of saying in the Rotunda, and if they cross the line into the realm of a "true threat" or "fighting words," it is a close call at best, because given the circumstances, it is objectively unreasonable to believe that Mr. Barnett had the ability to call in the crowd.  Mr. Barnett maintains, and it is apparent from the video, that Mr. Barnett was reacting to what appeared to him to be unjustified police brutality against protester and his intention was to beckon more people to film the police with their phones and cameras.  In fact, just as Mr. Barnett beckons with his hand, dozens of protesters raise their phones to film.

Regardless, a "true threat" is more than a vaguely menacing statement or hyperbole or venting. The United States Supreme Court made it clear in *Virginia v. Black*, 538 U.S. 343, 359 (2003), that "[t]rue threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." (Emphasis added; internal quotation marks omitted.)

As Justice Powell stated in *Lewis, supra,* "It is unlikely, for example, that the words said to have been used here would have precipitated a physical confrontation between the

---

[7] **EXHIBIT 4.**

middle-aged woman who spoke them and the police officer in whose presence they were uttered. The words may well have conveyed anger and frustration without provoking a violent reaction from the officer." This is particularly true of Mr. Barnett who was sixty years old at the time and directed his words to Officer Craig. Officer Craig testified that he is an experienced officer of 18 years, and as Justice Powell stated, "a properly trained officer may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerent to 'fighting words.'"

But even if these few words were "fighting words," this is the worst thing that Mr. Barnett is accused of on January 6. The very fact that the Government has made the incident with Officer Craig the centerpiece of its case in chief against Mr. Barnett is because that is the absolute worst thing the Government could find. In fact, after two full years of intensive scrutiny of this man designated as a tier one domestic terrorist, the Government couldn't find anything more substantive, so at the last minute, two weeks before trial, the Government superseded the indictment and charged Mr. Barnett with Civil Disorder based on the incident in the Rotunda with Officer Craig. As a result, defense, prosecution, jury, and the Court have been forced to hyperfocus on split seconds of footage to determine what Mr. Barnett intended when he waved his hand. This Court has seen hundreds of January 6 cases and countless other cases of actual violence. The worst cases do not require this type of scrutiny to determine guilt, and are not based on the determination of the intent of a hand gesture.

Mr. Barnett should be given a sentence commensurate with other non-violent January 6 defendants, not the years of incarceration that the Government seeks.

**Mr. Barnett brought the Hike N' Strike to DC for protection from Antifa and had no intention of bringing it into the Capitol.**

Mr. Barnett is charged with illegally possessing a Hike N' Strike in the Capitol building. There is no denying that he did.  The question before the Court is the nature and circumstance of that offense and the appropriate punishment.

It is undisputed that stun devices are permitted in DC and that Mr. Barnett did nothing wrong by purchasing a stun device and bringing it to DC.[8]  Government Exhibit 530A is a video of Mr. Barnett posted by Mr. Barnett where he explains why he bought the Hike n' Strike. "There are times in life when you just want to get out in the jungle and you might be in a situation where you can't carry a gun or anything, you don't want to be attacked by ravenous wolves…. With a swing or two I can fend something off, and if it got really rough I can pop the end up and light you up with 950,000 volts.  So if you think you will be in the jungle, concrete or otherwise, and you are a little bit concerned about carrying a firearm, you might consider this little walking stick."  The video clearly indicates that the purpose of the walking stick was for protection.

The Government produced no evidence that Mr. Barnett's intention in going to DC was to commit a violent insurrection, storm the Capitol, obstruct an official proceeding, riot, or assault law enforcement.  In a facebook post marked as Government Exhibit 521, Mr. Barnett clearly stated his intention.  "I'll be in DC on the 6th.  Prepared to peacefully protest, defend, protect the innocent, whatever.  My country will not be socialist as long as I am alive to fight.  Who's in?  If not now when?  Live free or die.  Message me."  Mr. Barnett intended to peacefully protest and to protect other innocent peaceful protesters from Antifa.

Mr. Barnett was justified in believing he needed to bring protection against Antifa and other far-left activist groups that are known to routinely and brazenly target Republicans around

---

[8] https://mpdc.dc.gov/page/mace-pepper-spray-self-defense-sprays-and-stun-guns#:~:text=A%20 person%2018%20years%20or,protect%20themselves%20or%20their%20property.

the country and specifically in or near Washington, DC.  For instance, on July 14, 2017, far-left anti-Trump activist James T. Hodgkinson carried out one of the worst attacks on American democracy when he tried to murder dozens of Republican Congressman at a baseball field near DC.[9]  On September 11, 2018, the DC police investigated a threat to commit a mass shooting at a Donald Trump rally in DC, after a far-left activist tweeted, "I am coming with a gun and expect to get numerous bloodstained MAGA hats as trophies."[10]   In August of 2020, just one block away from the White House after president Donald Trump's acceptance speech for the Republican National Convention, attendees, including Senator Rand Paul, were attacked and nearly killed by a mob of over 100 far-left activists.[11]   It was reasonable and legal for Mr. Barnett to bring an over-the-counter consumer protection device with him to Washington, DC.

It is also worth noting that Mr. Barnett's choice of protection is markedly different from the violent protesters who came to the Capitol with tactical gear and gas masks.  The Government claims that Mr. Barnett came "prepared for combat,"[12] but knows better.  The Hike N' Strike is not a "combat" weapon, and there is absolutely zero evidence that Mr. Barnett ever used it or intended to use it as such.

Under ordinary circumstances, according to official policies, if Mr. Barnett as a tourist in DC tried to enter the Capitol carrying a gun, he would be arrested on the spot.  By contrast, if he tried to enter with a Hike N' Strike he would have been subjected to routine screening, and asked by security to either surrender his Hike N' Strike or else abandon his plans to tour the building and go along his way. But the circumstances on January 6 were not ordinary.  Mr. Barnett ended

[9] www.cnn.com/2017/06/14/homepage2/james-hodgkinson-profile/index.html
[10] www.dailymail.co.uk/news/article-6157305/DC-police-respond-mass-shooting-threat-MAGA-event-Trump-Hotel.html.
[11] https://www.nbcnews.com/politics/congress/sen-rand-paul-says-he-was-attacked-angry-mob-after-n1238670
[12] Government memo, page 4.

up in the building, and there was no screening.  Mr. Barnett contends that the device was inoperable on that day, and the government presented no evidence to the contrary.  But regardless, no harm was caused and there was no victim by Mr. Barnett having the Hike N' Strike in the building as Mr. Barnett did not use or threaten to use the device while he was in the building or at any time on January 6.

When the Government designated Mr. Barnett a tier one domestic terrorist, it was before they were aware that he had the Hike N' Strike.  When the FBI interviewed Officer Craig, he failed to mention the Hike N' Strike.  There is no indication that Officers Smiley or Carey or anyone was aware that Mr. Barnett possessed a Hike N' Strike.  The Government only learned about the Hike N' Strike after the fact from carefully analyzing the famous picture of Mr. Barnett in the office suite.  Without that picture, would never had known that he had it and certainly would not have accused him of "brandishing: it.

The Government is being disingenuous.  No doubt the Government celebrated when someone noticed the Hike N' Strike because it could be used retroactively to justify the tier one terrorist designation - though it does not - and the Government could then use the fact that he had the Hike N' Strike to supercharge a famous January 6 defendant with extra felony charges, when in reality the Hike N' Strike was incidental to Mr. Barnett's offenses on that day.  There is no way of getting around the fact that strictly speaking he broke the letter of the law by crossing the threshold of the building with the Hike N' Strike, but Mr. Barnett did not use the Hike N' Strike as a weapon inside or outside of the building, and should be sentenced accordingly to at most months in prison, not years.

**Mr. Barnett's public statements when he exited the Capitol.**

Like most people who were present at the Capitol on January 6, Mr. Barnett experienced and witnessed traumatic things that he had never experienced before in his life, and accordingly, he experienced a wide mix of intense emotions.  Among those emotions was anger, and he lost his temper a number of times, including in front of Officer Craig, but unlike many others who were present, even the Government admits that Mr. Barnett only expressed his anger verbally, never physically.  Even when he expressed his anger, he never made overt physical threats or overt threats to overthrow the Government.

When he left the building, he expressed his anger to another Officer, caught on body camera and presented as Government Exhibit 208.

> We're American citizens.  We're patriots.  You boys maced me.  You don't mace me in my house.  This is my house.  This is going to get real bad.  Not necessarily today, we are going to calm down and leave.  But you'all gotta remember something.  You all gotta pick a f***ing side.  This is war.  This isn't "oh, somebody broke the law."  The f***ing communists have declared war on us boys.  I hope you get that.  Tell your families what you did.  You took patriots and you f***ing maced em.  I want you all to tell em about it.

This statement was made moments after he was sprayed with mace when his passions were high, yet his rhetoric is restrained and lacks any direct physical threats.  The most important point he made was "*we are going to calm down and leave.*"  That was his intent, and that is what he did.  The Government will undoubtedly claim that because he said "this is going to get real bad" and used "civil war" rhetoric, it shows that he wants to overthrow the Government.  But that is just rhetoric.  It is routinely used in contemporary political discourse, for better or for worse.  Mr. Barnett's rhetoric is no more a direct threat to so called "communists," then President Biden's rhetoric was to so called MAGA Republicans when he said:

> But there is no question that the Republican Party today is dominated, driven, and intimidated by Donald Trump and the MAGA Republicans, and that is a threat to this country….And here, in my view, is what is true: MAGA Republicans do not

respect the Constitution.  They do not believe in the rule of law.  They do not recognize the will of the people.[13]

Shortly after he left the building, he can be seen on the east side of the building, where it does not appear to be violent, yelling into a megaphone.  Government Exhibit 760.  His rhetoric again is angry yet restrained.  He reiterates his position that he was shoved into the building against his will, and he makes light of what he did in Nancy Pelosi's office.  No calls for violence.  No calls for actual war.

Compare Mr. Barnett's rhetoric with January 6 defendant Thomas Robertson who the Government believes is analogous to Mr. Barnett.  Mr. Robertson posted on January 8, "The next revolution started 1/6, and I'm standing by, if you guys missed it."  *Robertson,* 1:21-cr-34, ECF149, at 61.  Mr. Robertson also used Civil War rhetoric, but he said, "Civil War is anything but civil.  I'll take the fight to their homes and their fireside.  Never F*** with someone who is prepared to do battle.  Call me an insurrectionist, and I will oblige you."  *Id.*

Mr. Barnett never called for violence.  Never called for insurrection.  He was mad, but even in his anger his rhetoric was restrained and he never called for actual violence, not on January 6 and not for any time in the future.

**Mr. Barnett's social media posts do not show intent to commit crimes on January 6.**

After intense Government scrutiny of Mr. Barnett's social media posts, the Government was unable to produce any evidence that Mr. Barnett intended to commit crimes or violence in Washington, DC on January 6.   The Government was forced to resort to innocuous and ambiguous statements such as, "I'll do whatever it takes," and pictures of pickup trucks with Trump banners.   Government Exhibit 524. The Government also points to a post quoting a science fiction novel, but cannot point to any specific threats.   On the contrary, Mr. Barnett

---

[13]https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/09/01/remarks-by-president-bidenon-the-continued-battle-for-the-soul-of-the-nation/

expressly stated that his intent was to peacefully protest and protect the innocent.  Government

Exhibit 521.

The Government points to only four specific posts to try and show that Mr. Barnett is a

domestic terrorist.

- "I ain't going down easy."

- "[I'll do] Whatever it takes. Whatever it takes."

- "I came into this world kicking and screaming, covered in someone else's blood. I'm not afraid to go out the same way."

- "Anyone, and I mean anyone, that does not support the constitution of the United States of America is my enemy and will be treated as such! Civilian, law enforcement or military."

The fact that this is the absolute worst that the Government could find after scouring Mr.

Barnett's voluminous social media posts speaks volumes.  The Government is disingenuous to

claim that these posts advocate for violence.  If posting "Whatever it takes" and "I ain't going

down easy" makes someone a domestic terrorist, then every politician is a terrorist, including Joe

Biden, Michelle Obama, and Liz Cheney.[14]  The third was not posted in the context of January 6

and is just a quotation from a science fiction novel.  The fourth simply states that anyone who

does not support the Constitution is his enemy.  Neither are direct threats or calls for violence,

especially in the absence of any other evidence.

The Government's attempt to paint Mr. Barnett as a terrorist based on his social media

posts failed, and should count in his favor, not to his detriment.

**His immediate surrender to law enforcement.**

Mr. Barnett had local law enforcement notified that he was on his way back to Arkansas

on the evening of January 6.  He was instructed to head straight home.  Mr. Barnett turned

himself in as soon as he returned to Arkansas.  The fact that on the drive home he turned off his

_____

[14] https://youtu.be/kIavWsU3kBc, https://youtu.be/TlxgDfFPQpk, https://youtu.be/5v4JkhhdJrk

phone, covered his face, and paid in cash is not evidence that he sought to evade law enforcement.  Mr. Barnett lost his phone before he could turn it into the police.  There is no evidence to the contrary, and there was no motive for Mr. Barnett to hide his phone.  Mr. Barnett is accused of entering the Capitol and the entire episode was recorded by the Government.  The Government never even suggested what evidence it hoped to retrieve off of Mr. Barnett's phone or what Mr. Barnett was allegedly attempting to hide.

In *Robertson,* the Government charged Mr. Robertson with destroying evidence, including his phone, and the jury convicted him of the same.  The Government did not charge Mr. Barnett because it cannot prove that he didn't lose his phone.  The Government would claim that it is "convenient" for Mr. Barnett that he "lost" his phone.  It is exactly like a scene in the classic film, *The Shawshank Redemption*, when the protagonist is on trial and the prosecutor makes the same claim that it was "convenient" that the protagonist's gun was never found so that the police could not compare it to the bullets of the murder, to which the protagonist responds, "since I am innocent of this crime, sir, I find it decidedly inconvenient."[15]  It is decidedly inconvenient for Mr. Barnett that he lost his phone because he has nothing to hide.

## PERSONAL CHARACTERISTICS AND ABSENCE OF CRIMINAL HISTORY

Mr. Barnett is a 63-year-old retired firefighter and bull fighter with no criminal history. He lives in rural Arkansas in a mobile home that is owned by his significant other, Tammy Newburn.  Richard and Tammy have lived together for 20 years and raised two daughters together.  Attached as exhibits are many letters attesting to Richard's outstanding character.[16]  For example, his daughter Ashlee wrote:

> I am writing this letter to honor the character of my step father, Richard Barnett. I have known Richard for almost all of my 23 years of life and have lived with him

---

[15] https://www.youtube.com/watch?v=dsLSE5mOKh4.
**[16] EXHIBIT 5.**

for over 18 years. He is the most honest, genuine, giving and reliable person I know.

When I was just three months old Richard came into my life and has treated me and loved me like his very own when he didn't have to. He has raised me to be responsible, independent, educated and most importantly a child of God.

While I was growing up Richard was always the "bonus dad" to all my friends and team members. Our house was always the house my friends would want to come to. We would have my entire cheer team of 16 girls over often and Richard always had the best activities for us to do. I know everyone of those girls would still say, to this day, that he was the best dad and a great person to be around.

Richard loved to help people in our community. One of my favorite memories with Richard is going around to houses and churches collecting things like coats, clothing and food to give to the less fortunate. Every single Christmas, we would get a list of children and items on their wishlists and we would go to the store as a family and gather a few of these items for the children and the joy it would bring them was indescribable. These moments have taught me very valuable life lessons.

Richard has given me an incredible life and has taught me so many worthy lessons. I could not imagine a life without him in it and I am forever grateful that God places him in my life to be my father. I hope his authentic self has been made evident to you.

Several letters reference his charitable work, including how he collects coats to distribute to poor children for the winter.

Mr. Barnett loves the Constitution and the founding fathers. He loves and supports law enforcement. In October of 2020, Mr. Barnett led an effort to collect funds to provide new equipment for local police officers. When Mr. Barnett presented the check to the police department he said, "we are a group that backs the blue. We step up in trying times to support our local police."[17] Attached as an exhibit is a letter from Chief Jarod Morgan of the Sulphur Springs Police Department to state the good deeds that Mr. Barnett has done for the Sulphur Springs Police Department, including organizing a fundraiser for the Police department to purchase Body cameras and donating coats for children. The extent to which Mr. Barnett is

[17]https://www.nwahomepage.com/news/sulphur-springs-community-donates-money-to-local-police-department/

known for supporting law enforcement is evident from the fact that when the FBI designated Mr. Barnett as a tier one terrorist, one FBI field officer "advised that multiple contacts at the Benton COunty Sheriff's Office believe that Barnett was and/or is a police officer at the Sulphur Springs Police Department." Exhibit 1, page 3.

Before January 6, 2021, Richard sold windows for Window World. He made a modest living and used it to share living expenses with Tammy, who is on disability. Over the last 2 years, he has been unemployed. Prior to January 6, his hobby was collecting and dealing rusty old trucks, but he had to sell his collection to cover living expenses and legal fees.

The Court can have confidence that he will not be a danger to the community if released because he has been released now for two years and has not been a danger and has not violated his conditions. When Mr. Barnett spent four months in the DC Jail awaiting trial, the jail appointed him as a trustee, an honor only given to the most well behaved prisoners.

Mr. Barnett has not expressed a desire to repeat the events of January 6. He is not waiting to be called to duty to join an insurrection. During the trial he was permitted to stay at a DC hotel. Every morning, while waiting for his attorneys to pick him up to take him to court, Mr. Barnett would sit in the lobby. The hotel provided free breakfast to law enforcement, so the hotel was always filled with police in the morning. Mr. Barnett would always engage the police in friendly conversation, as he has his entire life, because he admires and respects law enforcement.

His intent in going to Washington, DC on January 6 was to peacefully protest and to check off an item on his bucket list. As a patriotic American, he has long desired to visit his Nation's Capital, but has never had the time. Mr. Barnett is outspoken about his political views and has attended dozens of rallies in his life, but was always peaceful, never violent. On January

6, he was shocked to his core when he saw what he believed and still believes was a disproportionate response by the police.  He saw and heard the sounds of war as flash bombs were fired into the crowd and protesters screamed.  It was traumatic and conjured flashbacks to his worst experiences as a firefighter.   It made him angry, and he expressed his anger nonviolently, though he deeply regrets how he acted that day, particularly in front of Officer Craig in the Rotunda.   Yet despite his intense feelings, he never lifted a hand towards a law enforcement officer that day, or ever in his life.  Though he found himself in the Capitol, he did not cause any damage, and though he was in proximity to valuables, he didn't take anything but a bloody envelope.

Mr. Barnett is known by his family, friends, and community to be of high moral character.  The events of January 6 were an aberration in his long life of caring for others, obeying the law, and supporting law enforcement.  If the Court sees fit to impose a sentence without incarceration, the Court need not be concerned that Mr. Barnett will repeat offend or will be a danger to the community.

### THE NEED FOR UNWARRANTED DISPARITIES

Mr. Barnett was a non-violent protester and should receive a similar sentence to others who committed comparable offenses.

This Court compared Mr. Barnett's conduct in the Rotunda to the famous activist Abbie Hoffman's conduct during the 1971 May Day riots in Washington, DC.  Hoffman was also charged with 18 U.S.C. 231(a)(3) for nonviolent conduct, but Hoffman's charges were ultimately dismissed and he did not serve any time for that conduct.

When considering a sentence for Mr. Barnett, the Court should also take into account the sentences imposed for the rioters in Washington, DC just months before January 6, 2021.  As an

example, Mr. Barnett's conduct was far less serious than that of Antifa activist Jason Charter. *United States v. Charter*, 1:20-cr-135.   On June 19-20, 2020, during a civil disorder in Washington, DC, Charter was dressed in signature Antifa attire - all black with a dark covering over his face - and participated in the destruction of an historical statue belonging to the United States Park Services.[18]   *See id.,* ECF 1-1.  Charter was caught on video pouring fuel on the statue and lighting it on fire.

This was all committed within a restricted area in Washington, DC, adjacent to the White House complex, where the president resides.  *Id.* ECF 38.  To access the statue that he set ablaze, Charter had to dismantle multiple fences.  Charter was carrying a large stick.   "Dozens of law enforcement officers from the United States Park Police and the Metropolitan Police Department [were required] to respond to Lafayette Park to secure the park and the safety of the persons and property therein."  *Id.*  This all occurred in the midst of a larger civil disorder that the dozens of officers were responding to.   For these offenses, Charter was sentenced to probation without incarceration.

Charter's conduct was objectively far more egregious than Mr. Barnett, yet Mr. Barnett was initially incarcerated pretrial in the DC Jail for four months, whereas Charter was released to home confinement.   During his release, Mr. Charter was arrested not once but twice - for assaulting police.  The first arrest was also for an assault on a right wing activist a few days after Charter blew up the historic monument.  The second arrest was for assaulting another police officer a few months later while "counter-protesting" a right wing rally.  Despite being a serial assaulter of police and attacker of right-wing protesters, Charter was never ordered incarcerated pretrial as Mr. Barnett was and he was not sentenced to any prison time for blowing up a historic

---

[18] https://www.youtube.com/watch?v=rLCFfGcFQ5w

monument in a restricted area near the White House.  Apples for apples, based on cases like

Charter, Mr. Barnett should also be sentenced to probation.

The Government seeks to impose the same punishment that this Court imposed on

January 6 defendant Thomas Robertson.[19]   But there are significant differences between Mr.

Barnett's case and Mr. Robertson's.  As the Court stated at Mr. Roberton's sentencing:

> You brought a gas mask; you brought a gun, which I think you had the good sense
> to leave in your car, if I'm not mistaken; and you brought that big old stick that
> we've talked so much about that you had used before as a police officer, not for a
> walking stick, but for crowd control. You were one of the first ones up the West
> Terrace stairs, which was one of the most chaotic and violent scenes of that day,
> and we watched those videos many times, and they're very jarring and Disturbing.
> You are also one of the first -- you were among the first wave of people in the
> Capitol. Only three minutes, about, after someone broke through the Senate Wing
> doors at 2:13 p.m. You stayed in for a number of minutes and proceeded further
> into the Crypt of the Capitol.

Mr. Robertson was also accused of being a leader who conspired, planned, and

coordinated his activities in advance.  During his home confinement, Mr. Robertson was accused

of violating his conditions by "trafficking in firearms" by ordering 34 "very dangerous

weapons."

The Court of Appeals for the District of Columbia expressly differentiated between cases

like Robertson on the one hand, and those like Mr. Barnett who "entered the Capitol after others

cleared the way."  *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  Accordingly,

*Robertson* is not an appropriate comparator when considering Mr. Barnett's sentence.

Nevertheless, when Robertson was sentenced, this Court stated:

> Now, as to that eight-level enhancement, we all agree that there was no actual
> physical violence, no verbal threats. Your conduct, I have found, was threatening
> as contemplated by that particular provision, but it was not the most aggressive
> and violent thing that the Court has ever seen, and I'll just leave it at that. As I
> said before, that enhancement encompasses a wide range of conduct from mere
> threats to extreme violence. I think your conduct probably falls somewhere in

---

[19] Sentencing hearing transcript 1:21-cr-34, ECF 149.

maybe towards the lower end of that continuum. So if I were just assessing your conduct at the Capitol, I would conclude that that eight-level enhancement, which, again, more than doubles your potential sentence, overstates your -- the seriousness of your activity, and I would likely give you a below guidelines sentence.

If anything, Mr. Barnett should be compared to Robertson's accomplice Jacob Fracker, 1:21-cr-34-CRC, ECF 68.   Mr. Fracker donned a gas mask and approached the lower west terrace, "where he joined an advancing mob of rioters."   Mr. Fracker is also accused of deliberately standing in the path of MPD officers to impede the officers from assisting the Capitol Police from holding off the mob.   Then Fracker joined rioters "engaged in destructive and violent behavior."   Mr. Fracker was sentenced to no incarceration and just 12 months probation.

A comparator that demonstrates the unjustness of the Government's recommendation is the case of James McGrew, *United States v. McGrew*, 1:21-cr-398.[20]   Mr. McGrew entered the Capitol at the same time as Mr. Barnett at approximately 2:45, but unlike Mr. Barnett who shouted, "we are being pushed in! We have no choice!" McGrew shouted "let's go!" approximately 14 times.   Mr. Barnett entered through the east, but Mr. McGrew entered through the more violent west.   Like Mr. Barnett, McGrew also moved to the Rotunda, but when Mr. Barnett was asked to leave at approximately 3:05, Mr. Barnett followed instructions immediately and exited the building.   Mr. McGrew resisted for almost 20 minutes.   According to the Government, Mr. McGrew "pushed one officer and struck another officer" and then pushed another officer and lunged for the officer's baton, and then engaged in an altercation with yet another officer.   The officers were eventually able to push Mr. McGrew by force from the building by 3:22, almost 20 minutes after Mr. Barnett had left.

---

[20]https://www.justice.gov/usao-dc/pr/mississippi-man-sentenced-assaulting-law-enforcement-offi cers-during-jan-6-capitol-breach

After Mr. Barnett exited the Rotunda, he made a few statements and then left the Capitol and headed straight home.  According to the Government, Mr. McGrew left the Rotunda and then "joined in an attack against officers attempting to secure the Lower West Terrace tunnel entrance to the building.  At approximately 4:13 p.m., another rioter in the crowd handed McGrew a wooden handrail with metal brackets attached, almost the same height as McGrew. McGrew positioned the handrail over his head and launched it into the tunnel, throwing the end with the metal brackets towards the law enforcement officers. The handrail appeared to hit the shield or visor of an officer. McGrew then joined in more pushing, gaining access into the tunnel area until being pushed out by officers at approximately 4:20 p.m."

The Government recommended and the Court sentenced Mr. McGrew to 78 months, the same sentence the Government now seeks for Mr. Barnett, but the two cases could not be more different.  The two men entered the building approximately the same time and were in the Rotunda together at the same time,, but Mr. Barnett left after 20 minutes when asked to leave, while Mr. McGrew left after 40 minutes after being forcibly removed.  Both are accused of having weapons, but Mr. Barnett is accused of "brandishing" a six inch handle of his Hike N' Strike for 2 seconds, while Mr. McGrew is accused of launching a large wooden and metal projectile directly at law enforcement.  Mr. Barnett went home after the incident in the Rotunda, while Mr. McGrew went back and engaged in further altercations with police.  Mr. Barnett is only accused of yelling at a single police officer and "getting in his personal space."  Mr. McGrew was accused of assaulting multiple officers.  It is senseless that Mr. Barnett should receive a longer sentence.

Another comparator that demonstrates the unjustness of the Government's recommendation of 87 months is the case of David Lee Judd, *United States v. Judd,* 1:21-cr-40.

Unlike Mr. Barnett, Mr. Judd was accused of violently clashing with police in the Lower West Terrace tunnel, the most violent altercation of January 6.  According to the Government:

> Judd was at the mouth of the tunnel, waving other rioters into the tunnel. He participated in the heave-ho against the police line. Judd then stood directly outside the tunnel, receiving police riot shields from rioters inside the tunnel and passing them back to other rioters. Judd entered the tunnel at 3:07 p.m. and lit an object that appeared to be a firecracker. He threw it at the police line, where officers were fighting with other rioters to keep them out of the building. Later, after law enforcement officers cleared the tunnel, Judd joined in an attempt to push against a newly established police line.[21]

For engaging in violence in the Lower West Terrace Tunnel and hurling a firecracker at police Mr. Judd was sentenced to 32 months in prison, yet the Government seeks more than double the incarceration time for Mr. Barnett who is accused of stealing an envelope and yelling at Officer Craig.

January 6 defendants accused of violence have received sentences of less than 12 months. For instance, Glen Mitchell Simon, 1:21-cr-346, ECF 52, was accused of "pushing against law enforcement officers on Capitol Grounds using a metal bike rack" and "actively resisting officers' efforts to clear the Rotunda."  Simon's conduct was far worse than Mr. Barnett who was non-violent and left the Rotunda when asked to do so.  Simon was sentenced to 8 months incarceration.  Mathew Wood, 1:21-cr-223, ECF 1, entered and remained in the Capitol for an hour and seventeen minutes, entered Speaker Pelosi's chamber, and displayed uncooperative behavior, yet received no jail time at all, and only 12 months of home detention.

The circumstances of Mr. Barnett's time in the Capitol is no different from that of January 6 defendants Loammi and Abigail Yazdani-Isfehani who entered the building at 2:37 and exited at 3:14 without committing any violence or assaulting police.  Both were given 24 months' probation, 100 hours' community service, and $500 restitution, and Loammi was also

---

[21]http://www.justice.gov/usao-dc/pr/texas-man-sentenced-assaulting-officers-during-jan-6-capitol-breach.

given 14 days incarceration.  Mr. Burnett concedes that his sentence should be slightly harsher because he yelled at Officer Craig and possessed the Hike N' Strike.  Accordingly, 12 months of incarceration with credit for time served, 24 months of probation, 100 hours of community service, and $500 restitution is sufficient and fair.

## RECOMMENDATION FOR SENTENCING

Mr. Barnett requests that this Court apply a variance to the Guidelines and sentence Mr. Barnett to 6 months of incarceration with credit for time served, 24 months of probation, 100 hours of community service, and $500 restitution.

Mr. Barnett has already paid a hefty price.  On January 6, Mr. Barnett became infamous throughout the country as the face of the insurrection because he had the misfortune of being photographed by a reporter for the Associated Press.  For the rest of his life he will bear that mark. There is even a wikipedia page about him.[22]  He was fired from his employment after January 6.  For the rest of his life he is a famous convicted felon, and it will make it difficult for him to find employment.

The Government points to Mr Barnett's FBI interview on January 8, 2021, when the FBI cajoled him into speaking with them without a lawyer present, after Mr. Barnett had been awake for over 72 hours straight after his trip back to Washington, DC to Arkansas. The Government argues that Mr. Barnett made light of the situation and therefore deserves to be incarcerated for 7 years.  But it is a fact that FBI Aegent Jonathan Willet, after the interview, asked Mr. Barnett if he could take a selfie with him.  When confronted with this fact on the witness stand under oath, Agent Willet lied and said he did not ask Mr. Barnett if he could take a selfie with him.  The next day, the Government announced that their witness Agent Willet changed his testimony.  It turns out, after some thought Agent Willet decided that "he did not recall" whether or not he asked Mr.

---

[22] https://en.wikipedia.org/wiki/Richard_Barnett_(Capitol_rioter).

Barnett to take a selfie.  One supposes that Seal Team Six would recall whether or not they had taken a selfie with Osama Bin Ladin.  This is further evidence that the Government and the FBI are disingenuous when they designated and continue to slander Mr. Barnet as a tier one domestic terrorist.

The Government may argue that he should be punished for choosing to go to trial rather than accept a plea, but the Government left him no choice as they offered him a plea deal of 70 to 87 months in prison.  At 63 years old he could not possibly accept a plea deal of that length as it would be tantamount to a life sentence.  When the plea deal was offered he had already spent four months in the DC Jail, and had the Government had its way, he would have been imprisoned until trial and between trial and sentencing.  The Government's plea offer was unreasonable and accordingly, Mr. Barnett should not be punished for rejecting it.  Other defendants who were accused of far more egregious conduct were offered more favorable plea deals.

As this Court stated at the Robertson sentencing hearing,

I'm focusing on acceptance of responsibility not just for its own sake, all right? It's not my job to make you remorseful. It's not my job to bring you to heel somehow. You make your own choices. You think however you want to think, and that's not my concern. It's not about compliance, but it's about deterrence; the need for me, which is my primary responsibility, to protect the public. And that's the most striking and concerning part about this case from my perspective, is your conduct after the arrest.
…
And I sincerely believe that you would likely answer a call to duty if you were called to go do something like this again, and that's the biggest consideration that this Court has to consider.

Prior to January 6, Mr. Barnett did not set out to illegally enter the Capitol, with or without a Hike N' Strike.  He did not set out to yell at Officer Craig, to steal an envelope, or to put his foot up on someone else's desk.  Government exhibit 400 shows what Mr. Barnett expected when he came to Washington, DC on that fateful winter day over two years ago.  The

video taken by Mr. Barnett, clearly before the day spun out of control, shows a crowd of American citizens of all ages carrying American flags and peacefully strolling to and fro in an open grassy area in their Nation's Capital, where they came to peacefully air their grievances. John Lennon's song "Imagine" is playing in the background, most likely from a speaker set up by a family picnicking, or a vendor selling food or American flags. There may have been bad actors in DC that day, but none are present in this scene. At that moment, Richard saw something that made him pull out his phone and capture the moment to share with his friends on social media. He saw an adorable toddler bundled tight in a blue winter coat with a white ski hat innocently wodling about carefree like a happy baby penguin. Just as John Lennon sings, "Imagine all the people, living life in peace yoo-hoo!" Richard says:

> You know what people? I want to tell you all something, this right here this is why we're doing all this. We're doing this for you baby. We love you baby. Stand strong!

> When Richard said, "doing all this," he was referring to that moment. When Richard said, "stand strong" he meant speak up strong but peacefully, the American way. This is what Richard expected to do when he traveled to DC. He did not expect what followed. He was not prepared for what happened. The day spun out of control. If presented with the same situation again, he would do things differently. The Court does not need to impose a sentence of years of incarceration to deter Mr. Barnett or to protect the public.

If all January 6 defendants had acted like Mr. Barnett - even when his conduct is painted in the Government's most unfavorable light - it would have been an entirely different day. He was not among the people who turned an ordinary Wednesday into the fateful day it became, and it is unjust to give him the same punishment.

**CONCLUSION**

WHEREFORE the Defendant, RICHARD BARNETT, prays this Court will grant the relief sought herein, and make a departure from and also grant a variance downward to the lowest end of the applicable Guidelines Range, and as required by applicable law, and sentence Mr. Barnett within ZONE A, to such a sentence that avoids any and all confinement, or else confinement of no more than 6 months.

DATED: May 17, 2023

Respectfully submitted,

/s/ Jonathan Gross
Jonathan Gross
Bar ID: MD0162
2833 Smith Ave, Suite 331
Baltimore, MD 21209
(443) 813-0141
jonathansgross@gmail.com

/s/ Brad Geyer
Bradford L. Geyer, PHV
PA 62998
NJ 022751991
Suite 141 Route 130 S., Suite 303
Cinnaminson, NJ 08077
**Brad@FormerFedsGroup.Com**
(856) 607-5708

**CERTIFICATE OF SERVICE**

I hereby certify on this 17 day of May 2023, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Jonathan Gross

Jonathan Gross