# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| v. | Case No. 21-cr-38 (CRC) |
| **RICHARD BARNETT**, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Defendant Richard Barnett traveled from his home in Gravette, Arkansas to participate in the protest-turned-riot at the U.S. Capitol on January 6, 2021.  After two weeks of trial, a jury convicted Mr. Barnett on eight counts related to his conduct that day.  He now moves for a judgment of acquittal and, separately, for a new trial, raising a variety of challenges to each conviction.  Among other claims, Barnett asserts that: there was insufficient evidence to convict him of any count, the jury instructions contained a number of prejudicial errors, the government committed a <u>Brady</u> violation, the government's demonstration at trial of the electric stun device that Barnett brought to the Capitol was improper, a portion of the government's closing argument was unsupported by evidence, and every key government witness committed perjury. Rejecting each challenge, the Court will deny the motions and sustain the convictions.

## I.    Background

An eight-count superseding indictment charged Barnett with Interfering with Law Enforcement During or Incident to a Civil Disorder in violation of 18 U.S.C. § 231(a)(3) (Count 1); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and (2) (Count 2); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A)

(Count 3); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count 4); Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C) (Count 5); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 6); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 7); and Theft of Government Property, in violation of 18 U.S.C. § 641 (Count 8). The alleged "deadly or dangerous weapon" was a walking stick that also functions as a flashlight and a stun device, marketed as the Zap Hike 'n Strike Hiking Staff ("Hike 'n Strike").

At trial, the jury heard testimony from twelve government witnesses, including former Speaker of the House Nancy Pelosi's Director of Operations, various law enforcement personnel, the former Assistant Parliamentarian of the U.S. House of Representatives, the owner of the company that manufactures the Hike 'n Strike, an employee from the store where Barnett purchased the device, and the food and beverage manager for the hotel where Barnett stayed during his visit to Washington. The government also introduced nearly 200 pieces of evidence, including videos and images from the events on January 6th, interviews Barnett gave to law enforcement and others, social media posts authored or shared by Barnett, and an exemplar of the Hike 'n Strike that Barnett carried into the Capitol.

At the close of the government's case, Barnett moved for a judgment of acquittal. The Court reserved decision on the motion until after the jury verdict. The defense then put on its case, introducing fourteen exhibits and calling four witnesses, including Barnett himself. After both sides rested, the jury was instructed on the law, deliberated, and returned a verdict of guilty

2

on all counts.  The jury also found the Hike 'n Strike to be a deadly or dangerous weapon, which

enhanced Counts 3 and 4 from misdemeanors to felonies.

Barnett timely renewed his motion for acquittal under Federal Rules of Criminal

Procedure Rule 29 and moved for a new trial under Rule 33.

## II.   Legal Standards

### A.  Rule 29 Motion for Acquittal

Federal Rule of Criminal Procedure 29(a) governs motions for acquittal.  Under the rule,

"the court on the defendant's motion must enter a judgment of acquittal of any offense for which

the evidence is insufficient to sustain a conviction."  In reviewing the sufficiency of the

evidence, the court "must accept the jury's guilty verdict if [it] conclude[s] that '*any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

United States v. Branham, 515 F.3d 1268, 1273 (D.C. Cir. 2008) (quoting United States v.

Arrington, 309 F.3d 40, 48 (D.C. Cir. 2002).  The "evidence is to be viewed in the light most

favorable to the government . . . and giving full play to the right of the jury to determine

credibility, weigh the evidence and draw justifiable inferences of fact."  Branham, 515 F.3d at

1273 (quotation omitted).

### B.  Rule 33 Motion for New Trial

Federal Rule of Criminal Procedure 33(a) permits a court to "vacate any judgment and

grant a new trial if the interest of justice so requires."  "The rules do not define 'interest of

justice' and courts have had little success in trying to generalize its meaning."  United States v.

Wheeler, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation omitted).  Instead, trial courts

have "broad discretion in ruling on a motion for a new trial."  Id.  To obtain a new trial, the

defendant must "overcome a strong presumption . . . in favor of upholding the jury verdict."

United States v. Rogers, 918 F.2d 207, 213 (D.C. Cir. 1990) (quotation omitted).  A new trial is "warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'"  Wheeler, 753 F.3d at 208 (quoting Rogers, 918 F.2d at 213).

## III.  Analysis

Barnett's Rule 29 and Rule 33 motions overlap substantially and raise arguments implicating each other.  For clarity, the Court will review Barnett's arguments count-by-count rather than motion-by-motion.  For each count, the Court will first consider the sufficiency of evidence before turning to Barnett's other challenges.  It will conclude by addressing Barnett's argument that the government's key witnesses gave false testimony.

### A.  Count 1: Interference with Law Enforcement During a Civil Disorder

Barnett's conviction for interfering with law enforcement during a civil disorder, in violation of 18 U.S.C. § 231(a)(3), arises from his interactions with Washington, D.C. Metropolitan Police Department ("MPD") Officer Terrence Craig.  Officer Craig was one of several officers attempting to maintain a police line in the Rotunda of the U.S. Capitol to prevent rioters from venturing further into the building.  Tr. at 614 (Jan. 12, 2023 p.m.).  Barnett challenges the sufficiency of the evidence necessary to sustain the conviction.  He also asserts that giving a jury instruction for aiding and abetting a civil disorder was prejudicial error, that the civil disorder statute unconstitutionally restricts free speech, and that the government withheld Brady evidence relevant to Count 1.

#### 1.  Sufficiency of the Evidence

In order to find Barnett guilty of Count 1, the jury was instructed that it must find three elements were satisfied beyond a reasonable doubt: (1) Barnett "knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering"

with Officer Craig; (2) Officer Craig was, at the time, "engaged in the lawful performance of his official duties incident to and during a civil disorder"; and (3) the civil disorder "in any way or degree obstructed, delayed, or adversely affected either commerce . . . or performance of any federally protected function."  Final Jury Instr. No. 19, at 9.  The statute defines a civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).  And it defines "commerce" as commerce "between" or "through" any states or the District of Columbia, or "wholly within the District of Columbia." Id. at § 232(2).

Barnett asserts that the government failed to prove *any* element of the offense.  The Court will thus review the sufficiency of the evidence for each element, beginning with the third, jurisdictional element and ending with Barnett's interference with Officer Craig.

a.  Civil Disorder Affecting Commerce or a Federally Protected Function

A reasonable jury could have found, based on the evidence at trial, that the riot at the Capitol on January 6, 2021 was a civil disorder that adversely affected commerce or a federally protected function.  The jury saw video evidence and heard testimony that the protest involved acts of violence by multiple rioters and resulted in damage to the Capitol and injury to officers tasked with defending it.  See, e.g., Gov. Ex. 100 (montage video); Tr. at 553–554 (Jan. 12, 2023 p.m.) (testimony of MPD Sergeant Quenterra Carey that protestors used chemical spray against law enforcement); Tr. at 670 (Jan. 13, 2023 a.m.) (testimony of MPD Officer Craig that he saw officers injured while responding to the riot at the Capitol).  The government also presented evidence that the civil disorder affected commerce by causing the Safeway grocery chain to close its stores early across D.C., resulting in decreased sales and preventing the stores from receiving

product shipments.  Tr. at 1019–1026 (Jan. 17, 2023 p.m.); Gov. Ex. 1003–1004 (Safeway business records).  In addition, the jury heard testimony that the riot interfered with federally protected functions of the U.S. Capitol Police ("USCP") and the U.S. Secret Service ("USSS").  See Tr. 191–192, 232–234, 250–251 (Jan. 11, 2023 a.m.) (USCP Captain Carneysha Mendoza's testimony that rioters interfered with the USCP's ability to secure the Capitol); id. at 462–463, 477–478, 492–497 (Jan. 12, 2023 a.m.) (USSS Special Agent Elizabeth Glavey's testimony that rioters interfered with the USSS's ability to secure Vice President Pence and his family).

Barnett fails to show otherwise.  As an initial matter, he only challenges the evidence supporting the "commerce" prong of this element; he offers no substantive rebuttal to the government's evidence that the riot interfered with a federally protected function.  Instead, Barnett asserts, without citation, that "[a]t the January 4, 2023 Pretrial Commerce [sic] and elsewhere the government said it was not pursuing the 'federally protected function' since none was involved."  Def.'s Mot. for Acquittal at 8 ("Rule 29 Mot.").  Yet the record reveals no such concession.[1]  To the contrary, both parties proceeded as if the federally protected function theory

---

[1] At the pretrial conference, the defense urged the Court to continue the trial due to the recent issuance of the superseding indictment.  See Mot. to Continue Tr., ECF No. 112.  In response, the government explained that the only "substantive addition" to its case due to the new indictment was the "jurisdictional element of the civil disorder, which requires the government to show a nexus with interstate commerce."  Pretrial Conf. Tr. at 10.  While the government did not reference the alternative "federally protected function" prong of the jurisdictional element, this was not a concession to forego reliance on that prong.  Instead, the government explained that the interstate commerce evidence was the only evidence new to the case, and any evidence related to federally protected functions, including securing the Capitol grounds and protecting the Vice President, remained relevant to other counts in the indictment. Id. at 11 ("[I]t's our position that the surrounding events of the riot, including the breach of the grounds and the breach of the building and the events that led to the evacuation of the vice president . . . all were part and parcel of the government's case[.]").  While the Court later characterized the jurisdictional element as "the alleged civil disorder affect[ing] interstate commerce," id. at 15–16, the government never indicated that it would only pursue the commerce theory to satisfy the element.

was in play, with neither side objecting to final jury instructions that included that prong in the elements of the offense.  And based on the testimony of Captain Mendoza and Special Agent Glavey cited above, a jury could have reasonably found the element satisfied without considering the government's commerce theory.

Barnett's challenges to the evidence supporting the commerce prong of the jurisdictional element founder in any event.  He asserts that the government failed to prove that commerce was obstructed, arguing that "[w]hether a Safeway sold a can of beans on January 6, 2021 or on January 7, 2021 had no substantial effect on interstate commerce."  Rule 29 Mot. at 15–17.  But the evidence was not that *a* sale was halted, but that *all* sales and evening shipments were halted for *all* Safeway stores across Washington, D.C.  Gov. Ex. 1002.  A reasonable jury could find that the store closures affected commerce.

Barnett also asserts that the government did not met its burden because it failed to show "there was any simultaneous interference with commerce, where any police in the Rotunda were impeded from responding."  Rule 29 Mot. at 21.  Any potential adverse effect on commerce, he argues, occurred hours after and miles away from his actions at the Capitol.  This framing misreads the statute, which only requires that a civil disorder "in any way or degree obstruct[], delay[], or adversely affect[] commerce."  18 U.S.C. § 231(a)(3).  It does not require that the defendant's actions implicate commerce directly.  Barnett provides no legal authority to support his contrary reading, nor did he propose a jury instruction that captures this supposed nexus requirement.

Lastly, Barnett suggests that a reasonable jury could not have credited the government's commerce evidence because it was based on "unauthenticated" sales figures and testimony from the government's case agent, FBI Special Agent Kimberly Allen, who is not an expert in forensic

accounting.  Rule 29 Mot. at 19, 23.  To the first point, the records were authenticated under

Federal Rule of Evidence 902(11) and accompanied by a certificate of authenticity from an

authorized custodian of Safeway records.  Gov.'s Notice of Intent to Introduce Business Records,

ECF No. 93, Ex. 8 at 14.  As for Agent Allen's testimony, the Court overruled the same

objections at trial because no accounting expertise was required to explain the sales figures to the

jury.  Tr. at 1024–1025 (Jan. 17, 2023 p.m.).  Agent Allen simply compared business records

showing the daily sales of Safeway's D.C. stores on January 5, 6, and 7, 2021 to the business's

own projections for those dates based on prior sales, and determined that sales on January 6 were

well below those projected for each store location in D.C.  Tr. at 1021–1026 (Jan. 17, 2023

p.m.).  Such basic comparisons are well within the ken of a lay witness, and a reasonable jury

could have credited Agent Allen's testimony.

## b.  Incident to or During a Civil Disorder

The jury heard ample evidence to support a finding that Officer Craig was engaged in

duties incident to and during a civil disorder when he was confronted by Barnett in the Capitol

Rotunda.  Officer Craig testified that he reported to the Capitol on January 6 as part of an MPD

Civil Disturbance Unit responding to the riot.  Tr. at 603, 607–609 (Jan. 12, 2023 p.m.).  Once

there, Officer Craig respond to a call for assistance in the Rotunda, where he joined outnumbered

officers in a "line formation" to block rioters from proceeding to sensitive areas of the Capitol,

including the House Speaker's offices.  Id. at 612, 618–619.  Officer Craig explained that his

objective was "[t]o get the rioters out of the Rotunda and to stop anyone from going any farther.

Push the crowd on back.  Clear the room."  Tr. at 674 (Jan. 13, 2023 a.m.).

Barnett contends that his conviction must be vacated because the statute defines "civil

disorder" as "any public disturbance involving acts of violence by assemblages of three or more

persons," 18 U.S.C. § 232(1), and the government failed to show that there was any violence in the Rotunda while Barnett was interacting with Officer Craig. But this heightens the government's burden beyond what the statute requires. Section 231(a)(3) prohibits interference with a law enforcement officer's official duties "incident to and during the commission of a civil disorder." The evidence clearly established that Officer Craig was in the Rotunda "incident to" and "during" a civil disorder taking place across the Capitol complex. It also established that Officer Craig was attempting to prevent additional violence by blocking rioters from reaching further into the Capitol. That is sufficient to satisfy this element. Nothing in the statute suggests that the violence must take place in the specific room where the officer is impeded, and Barnett offers no other authority for this reading. Accordingly, a reasonable jury could have found that the riot at the Capitol, which included numerous acts of violence throughout the building and grounds, constituted a civil disorder, and that Officer Craig was responding to that unrest when he reported to the Capitol and joined the line of officers in the Rotunda.

c.   Intentional Interference with Officer Craig

Finally, the government presented substantial evidence that Barnett interfered with Officer Craig's ability to respond to the civil disorder. Officer Craig described how Barnett belligerently invaded his personal space, requiring his attention and preventing him from addressing other threats or aiding fellow officers. Tr. at 615–616 (Jan. 12, 2023 p.m.); id. at 657–658, 664 (Jan 13, 2023 a.m.); see also Gov. Ex. 203A (Officer Craig's BWC). Evidence also showed that Barnett repeatedly threatened to instigate the crowd to push through the police line if Officer Craig did not leave his post to retrieve Barnett's American flag, which was affixed to a ten-pound metal pole, from the Speaker's offices. See Gov. Ex. 203A ("I'm gonna make it real bad if you don't get my flag."); Tr. at 665–667 (Jan 13, 2023 a.m.). Barnett admitted as

9

much in his own testimony.  Tr. at 1567 (Jan. 19, 2023 p.m.) ("[A]fter I begged [Officer Craig] a little bit, I started acting like a four-year-old and making stupid nonsensical threats[.]").  By the Court's count, Barnett threatened Officer Craig at least fifteen times; the jury could have found any one of those threats sufficient for a conviction.  Barnett was also seen in body-worn camera footage making what appears to be a "come here" gesture to the crowd.  Gov. Ex. 204D; Tr. at 670 (Jan. 13, 2023 a.m.).  While Barnett testified that he was gesturing to a photographer to capture a "major scuffle" occurring between protestors and the police, Tr. at 1580 (Jan. 19, 2023 p.m.), a reasonable juror easily could have credited the government's alternative theory that he was carrying out his threat to call over more protestors, Tr. at 670 (Jan. 13, 2023 a.m.).  Lastly, Barnett could be seen lifting his shirt, briefly exposing the Hike 'n Strike to Officer Craig.  Gov. Exs. 204A, 204B.  Officer Craig testified that he noticed "a black thing" which he believed "could have been a weapon."  Id. at 671.  A reasonable jury could have interpreted that action as brandishing the Hike 'n Strike, particularly in the context of Barnett's other threats and overall belligerent behavior.

Barnett offers competing interpretations of the evidence, but they carry little weight in the context of motions for post-trial relief.  See Branham, 515 F.3d at 1273 (Under Rule 29, the Court must review the evidence "in the light most favorable to the government."); Rogers, 918 F.2d at 213 (When considering a Rule 33 motion, the Court applies a "strong presumption . . . in favor of upholding the jury verdict.").  Barnett also baldly asserts that the government "provided no evidence of [his] intent" to impede or obstruct Officer Craig.  Rule 29 Mot. at 14.  But the jury could well have inferred from the evidence that Barnett threatened Officer Craig in order to get him to leave the police line and that he waved over other protestors so that they would push him through the line of officers.

*        *        *

Viewing all the evidence presented at trial in the light most favorable to the government, there was more than sufficient evidence to support the jury's verdict that Barnett impeded a law enforcement officer during a civil disorder.

### 2. Legal Challenges

Barnett also raises a number of legal challenges to his conviction on Count 1.  First, he argues that the Court's aiding and abetting instruction was improper because he was not explicitly charged with aiding and abetting in the superseding indictment.  Rule 29 Mot. at 27; see Tr. at 1100–1101 (Jan. 18, 2023 a.m.).  Not so.  As the Court explained at trial, aiding and abetting is a lesser-included offense that need not be separately charged.  Tr. at 1801 (Jan. 20, 2023); see, e.g., United States v. Kegler, 724 F.2d 190, 201 (D.C. Cir. 1983) ("An aiding and abetting instruction may be given in a case where the indictment does not allege violation of the aiding and abetting statute."); United States v. Palfrey, 499 F. Supp. 2d 34, 42 (D.D.C. 2007).[2]

Next, Barnett maintains that the civil disorder statute exceeds Congress's authority by regulating commerce "wholly within the District of Columbia."  18 U.S.C. § 232(2); see Rule 29 Mot. at 15.  This argument is both untimely and incorrect.  Congress has express constitutional authority to regulate conduct within the District of Columbia and need not rely on its Commerce Clause authority when doing so.  See U.S. CONST., art I, § 8, cl. 17; United States v. Carson, 455 F.3d 336, 368 (D.C. Cir. 2006) ("Congress has plenary authority in the District of Columbia.").  While Barnett may believe that laws written by Congress using that authority "do[]

---

[2] Barnett also contests the sufficiency of the evidence to convict him of aiding and abetting a civil disorder.  Because the Court has found that a reasonable jury could have convicted Barnett on Count 1 based on a principal theory of liability, it need not analyze whether there was also sufficient evidence to support conviction under an aiding and abetting theory.

not belong in federal law," Rule 29 Mot. at 15, there is little question that Congress was acting

within its authority to regulate the conduct at issue.  See Palmore v. United States, 411 U.S. 389,

397 (1973) ("[Congress's authority under Article I, Section 8, clause 17] is plenary.  Not only

may statutes of Congress of otherwise nationwide application be applied to the District of

Columbia, but Congress may also exercise all the police and regulatory powers which a state

legislature or municipal government would have[.]").

      Barnett also asserts that his civil disorder conviction should be vacated because he was

selectively targeted for prosecution based on his political beliefs.  Def.'s Suppl. to Rule 29 Mot.

at 1–5.  This and other courts in this district have uniformly rejected similar contentions of

selective prosecution based on comparisons between January 6 defendants and other protestors in

different contexts.  See, e.g., United States v. Alberts, No. 21-cr-26-CRC at 15–16, ECF No. 77

(D.D.C. Nov. 23, 2022) (collecting cases).  Same here.

      Next up, Barnett renews his assertion that the civil disorder statute is unconstitutionally

overbroad.  The Court has already considered and rejected this argument, and it adopts its prior

reasoning here.  See Order, No. 21-cr-38, ECF. No. 138 at 3 (D.D.C. Jan. 10, 2023).  Barnett

urges the Court to reconsider its earlier ruling in light of the Supreme Court's decision in City of

Houston v. Hill, 482 U.S. 451 (1987), which "recently became known to the Defendant."  Def.'s

Suppl. to Rule 29 Mot. at 1.  The Court remains unconvinced.  In City of Houston, the Supreme

Court invalidated a local ordinance that prohibited "in any manner oppos[ing], molest[ing],

abus[ing] or interrupt[ing] any policeman in the execution of his duty," which the Court

understood as "prohibit[ing] verbal interruptions of police officers."  482 U.S. at 461.  But the

federal civil disorder statute is narrower in scope, criminalizing "any *act* to obstruct, impede, or

interfere" with an officer responding to a civil disorder.  18 U.S.C. § 231(a)(3) (emphasis added).

It does not implicate mere speech, at least in the vast majority of its potential applications.  See

Virginia v. Hicks, 539 U.S. 113, 124 (2003) ("Rarely, if ever, will an overbreadth challenge

succeed against a law or regulation that is not specifically addressed to speech or to conduct

necessarily associated with speech (such as picketing or demonstrating).").  Fellow courts in this

district have similarly rejected overbreadth challenges to Section 231(a)(3).  See, e.g., United

States v. McHugh, 583 F. Supp. 3d 1, 29 (D.D.C. 2022); United States v. Mostofsky, 579 F.

Supp. 3d 9, 22–23 (D.D.C. 2021); United States v. Dennis, No. 21-cr-679 (JEB), 2022 WL

17475401, at *2 (D.D.C. Dec. 6, 2022); United States v. Gillespie, No. 22-cr-60 (BAH), 2022

WL 17262218, at *2–3 (D.D.C. Nov. 29, 2022); United States v. Williams, No. 21-cr-618 (ABJ),

2022 WL 2237301, at *6 (D.D.C. June 22, 2022); United States v. Nordean, 579 F. Supp. 3d 28,

57–58 (D.D.C. 2021).

Finally, Barnett argues that the government violated its Brady obligations by failing to

disclose a press release issued by District of Columbia Mayor Muriel Bowser urging

"Washingtonians and those who live in the region to stay out of the downtown area [on January

5 and 6, 2021.]"  Rule 29 Mot. at 25, 27–29.  According to Barnett, it was the Mayor's

instructions, not the riot, that are to blame for any effect on commerce on January 6.  Id.  Putting

aside the dubious merit of that theory, Barnett cannot establish a Brady violation based on the

non-disclosure of a publicly available document.  See United States v. Borda, 941 F. Supp. 2d

16, 25 (D.D.C. 2013) ("[T]here cannot be a Brady violation for failure to disclose public

documents which the Defendants could have found on their own.").  Nor can he establish "a

reasonable probability that the result of the trial would have been different if the suppressed

documents had been disclosed to the defense."  See Strickler v. Greene, 527 U.S. 263, 289

(1999) (internal quotation omitted).  And even assuming the jury was persuaded by Barnett's

commerce argument, it still could have found the jurisdictional element of the statute satisfied because the Secret Service and Capitol Police were inhibited in performing their federally protected functions.

Accordingly, there was sufficient evidence to support the jury's verdict on Count 1 and upholding the conviction would not be a miscarriage of justice.

B. Count 2: Obstruction of an Official Proceeding

The jury convicted Barnett of intentionally and corruptly obstructing or attempting to obstruct an official proceeding, specifically Congress's certification of the electoral vote. Barnett attacks the sufficiency of the evidence supporting the conviction and also raises several legal challenges.

*1. Sufficiency of the Evidence*

Barnett contends that the trial evidence was insufficient to show that he was aware of the Congressional certification proceeding taking place on January 6 or that his actions interfered with it. Not so. Barnett testified that he attended former President Trump's speech on January 6, Tr. at 1429 (Jan. 19, 2023 a.m.), where the election and certification were discussed. The government also introduced social media posts reflecting Barnett's beliefs that the election was illegitimate and action on January 6, 2021 was necessary to correct the injustice. See, e.g., Gov. Exs. 502, 503 ("Regardless I am fighting until death for our country and constitution. I'll be in DC for a few days including the 6th." and "Be in Washington DC on the 6th."), 504, 509 (video uploaded the morning of January 6, 2021 captioned "In DC fighting for our freedom."), 511, 521. One of the posts Barnett shared about January 6, titled "Operation Occupy the Capitol: taking back our country from corrupt politicians," depicted the U.S. Capitol building being struck by lightning. Gov. Ex. 522. While Barnett offers alternative interpretations of his posts, a

reasonable jury could have inferred from this and other evidence that he was aware of the certification proceeding taking place on January 6.

As for whether Barnett interfered with the certification, he argues that he could not have done so because he entered the Capitol after Congress had recessed and left before the riot had concluded. As an initial matter, Barnett's unauthorized presence in the Capitol could have constituted an attempt to obstruct the certification, regardless of any actual effect his conduct had on the proceedings. Regardless, Barnett's argument hinges on the mistaken belief that only the first and last protestor into the Capitol were disruptive to the proceeding. As Capitol Police Captain Mendoza explained, "[a]ny person that was in the building unauthorized was a disruption to Congress that day." Tr. at 233 (Jan. 11, 2023 a.m.). Secret Service Agent Glavey and then-Assistant Parliamentarian of the U.S. House of Representatives Kyle Jones testified similarly. Tr. at 498 (Jan. 12, 2023 a.m.) (Glavey); Tr. at 982 (Jan. 17, 2023 p.m.) (Jones). Based on that testimony and the undisputed fact that Barnett spent about 30 minutes inside the Capitol building on January 6, 2021, the jury had ample reason to conclude that he obstructed the proceeding to certify the electoral count.

### 2. *Legal Challenges*

Barnett's legal challenges to Count 2 fare no better. First, he revives his arguments, initially raised in pretrial motions to dismiss, that Count 2 was defective because (1) the indictment mischaracterizes Congress's role as "certifying" the electoral vote rather than simply "counting" votes that were certified by the States and (2) conviction under 18 U.S.C. § 1512(c)(2) requires "actions related to evidence." Rule 29 Mot. at 30, 33. The Court rejected these arguments pre-trial, and does so again here for the same reasons. Order at 4-7, ECF No. 138 (Jan. 10, 2023); Op. & Order at 6–7, ECF No. 90 (Nov. 23, 2022). As to the second

argument, the Court's conclusion was confirmed by the D.C. Circuit's recent holding in United States v. Fischer that 18 U.S.C. § 1512(c)(2) "encompasses all forms of obstructive acts," not just those involving tangible evidence.  64 F.4th 329, 335, 337 (D.C. Cir. 2023).

Barnett also insists that his conviction should be vacated because he did not act "corruptly" as required by § 1512(c)(2).  Def.'s Suppl. to Rule 33 Mot. (ECF No. 193).  The Court instructed the jury on the definition of "corruptly" without objection by the defense.  The instruction, the first paragraph of which parallels those given in other January 6th cases in this district, stated:

> To act "corruptly," the defendant must use unlawful means or have a wrongful or an unlawful purpose, or both.  The defendant must also act with "consciousness of wrongdoing."  "Consciousness of wrongdoing" means with an understanding or awareness that what the person is doing is wrong.
>
> Not all attempts to obstruct or impede an official proceeding involve acting corruptly.  For example, a witness in a court proceeding may refuse to testify by invoking his constitutional privilege against self-incrimination, thereby obstructing or impeding the proceeding, but he does not act corruptly.  In contrast, an individual who obstructs or impedes a court proceeding by bribing a witness to refuse to testify in that proceeding, or by engaging in other independently unlawful conduct, does act corruptly.

Final Jury Instr. No. 20, at 15; see, e.g., United States v. Gillespie, No. 22-cr-60, Final Jury Instr. at 11 (ECF No. 62); United States v. Williams, No. 21-cr-618, Final Jury Instr. at 29 (ECF No. 122); United States v. Strand, No. 21-cr-85, Final Jury Instr. at 11–12 (ECF No. 112); United States v. Jensen, No. 21-cr-6, Final Jury Instr. at 25 (ECF No. 97).  A reasonable jury could have found Barnett's actions met this definition.  As discussed above, the evidence supported the jury's finding that Barnett obstructed the certification proceeding, and his conduct in doing so was independently unlawful under several federal statutes.

Barnett further suggests that the D.C. Circuit's discussion of § 1512(c)'s "corruptly" *mens rea* element in Fischer requires the application of a more stringent definition of the term

which his conduct did not satisfy.  <u>Fischer</u> left open precisely what definition of "corruptly" should be applied in § 1512(c)(2) prosecutions.  But members of the panel expressed concern that the statute would sweep too broadly if "corruptly" were defined in a way that encompassed the benign actions of, for example, "advocates, lobbyists, and peaceful protesters."  <u>Fischer</u>, 64 F.4th at 339–41 (Op. of Pan, J.)  ("The requirement of 'corrupt' intent prevents subsection (c)(2) from sweeping up a great deal of conduct that has nothing to do with obstruction—for instance, lobbyists who know they advocate for morally wrongful causes."); <u>id.</u> at 360–61 (Op. of Walker, J.) ("An innovatively broad definition of 'corruptly' could raise serious concerns that § 1512(c) is a vague provision with a breathtaking scope.").  Alighting on this concern, Barnett argues that his conviction should be vacated because he was simply a "peaceful protester" on January 6.

Even if <u>Fischer</u> had adopted a binding definition of "corruptly" in § 1512(c)(2) prosecutions, which it did not, the evidence established that Barnett was no mere "peaceful protester."  He unlawfully carried a dangerous stun gun into the Capitol and interfered with law enforcement's ability to control the riot by threating an officer and refusing orders to leave the building.  Barnett's conduct therefore does not implicate the concerns noted in <u>Fischer</u>.

In any case, Barnett did not object to the Court's definition at trial (and offers no alternative definition now).  He therefore would have to show that the Court's instruction was plain error to be entitled to a new trial.  <u>See</u> Fed. R. Crim. P. 30(d) ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."); Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").  Because the Court's

instruction hewed to the definition of the term "corruptly" repeatedly used in this jurisdiction and contradicted no precedent, Barnett cannot make that showing.

C.  Counts 3 & 4: Entering and Remaining in a Restricted Building and Disorderly or Disruptive Conduct in a Restricted Building with a Dangerous Weapon

Barnett was also convicted of entering or remaining in a restricted building or grounds (Count 3) and disorderly or disruptive conduct in a restricted building (Count 4).  The jury further found that he committed these crimes while using or carrying "a deadly or dangerous weapon," which increases the violations from misdemeanors to felonies.  See 18 U.S.C. § 1752(b)(1)(A).  Barnett contests the sufficiency of the evidence to convict him of the underlying offenses and raises both evidentiary and legal challenges to the jury's "deadly or dangerous weapon" finding.  The Court reviews the evidence supporting the underlying offenses before turning to the enhancement for carrying the Hike 'n Strike.

1.  *Sufficiency of the Evidence for Underlying Offenses*

Barnett asserts there was insufficient evidence for a jury to determine that he knowingly and intentionally entered a restricted building and that he disrupted government business.  The Court disagrees.

The jury was presented with considerable evidence that Barnett knew the Capitol was closed to the public on January 6th.  The government introduced evidence that the Capitol grounds were secured by bike-rack barricades, and that restricted areas were demarcated by snow fencing and warning signs.  See, e.g., Gov. Exs. 18, 100, 821, 824, 825; Tr. at 211-213 (Jan. 11, 2023 a.m.).  While Barnett testified that he did not see the barriers and signs because they had been moved by the time he arrived, the jury could reasonably have rejected Barnett's testimony in light of the government's evidence.  Moreover, he testified to seeing police officers in riot gear, observing explosions and chemical gas, and witnessing protestors banging on closed doors

to the Capitol shortly before he entered.  Tr. at 1701-1704, 1713-1714 (Jan. 20, 2023).  Plus, video evidence showed that alarms were blaring when Barnett entered the Capitol.  Gov. Exs. 401, 740.  Reviewing that evidence, a reasonable jury could have determined that Barnett knew the Capitol building was not open to the public and that his presence was unauthorized.

A reasonable jury also could have determined that Barnett intentionally entered or remained in the Capitol.  While Barnett testified that he was pushed into the Capitol after ascending to the top of the East Terrace steps to look for several friends, Tr. at 1549, 1590–1591 (Jan. 19, 2023 p.m.) ("I wasn't part of that protest. I got pushed in."); Tr. at 1713 (Jan. 20, 2023), a jury could have rejected that explanation given the existence of other vantage points Barnett could have chosen that were not in the middle of a dense mass of protestors attempting to enter the Capitol, id. at 1717-1718.  And even if Barnett somehow entered unintentionally, the jury could have found that his extended foray in the Capitol was an intentional effort to remain in the restricted building.  In particular, the jury could have credited the body-worn camera footage and testimony from Officer Carey that Barnett was instructed to leave but refused.  Gov. Ex. 201 (Officer Carey BWC) (Carey: "You have to get out." Barnett: "You need to give up communism." Carey: "Please get out."); Tr. at 558-559 (Jan. 12, 2023 p.m.) ("[Barnett] was refusing to leave. When I asked him to leave several times, he still refused to leave the Capitol."); see also Gov. Ex. 109 (hallway camera footage of Barnett ignoring instructions to leave).[3]  Accordingly, there was sufficient evidence for the jury to convict Barnett of Count 3 for entering or remaining in a restricted building or grounds.

---

[3] Barnett protests that he was unable to leave the Capitol upon entering the Rotunda and that he was only permitted to leave "after being maced and begging to be let out."  Rule 29 Mot. at 36.  Even assuming this was supported by evidence at trial, a reasonable juror still could have found that Barnett's exploration of the Capitol, including his extended stay in Speaker Pelosi's offices, demonstrated an intent to remain in the restricted building.

Count 4 additionally required the jury to find that Barnett acted "with intent to impede or disrupt the orderly conduct of Government business or official functions" and that his disorderly conduct "in fact, impede[d] or disrupt[ed] the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2). Barnett advances the rather remarkable argument that his actions did not interfere with government business because those working at the Capitol "could have locked their office doors and stayed at work," rather than "cowering in fear in a locked conference room." Rule 29 Mot. at 36–37 (suggesting that Speaker Pelosi's staff could simply have worked through the riot on January 6th). The Court need not linger on this argument. The evidence clearly established that Barnett's actions, along with those of others in the unauthorized and uncontrollable mob, disrupted the work of Congressional staffers as well as the certification of the electoral vote.

### 2. *Hike 'n Strike as a Deadly or Dangerous Weapon*

As noted above, Counts 3 and 4 included an enhancement if Barnett "use[d] or carrie[d] a deadly or dangerous weapon or firearm" during and in relation to the offenses. 18 U.S.C. § 1752(b)(1)(A). It was uncontested that Barnett carried a Zap Hike 'n Strike Hiking Staff into the Capitol building, along with a ten-pound metal flagpole, but did not use either object to harm anyone. It was also uncontested that the Hike 'n Strike was capable of functioning as a walking stick, flashlight, and electric stun device.

The Court instructed the jury that it could find the Hike 'n Strike was a "deadly or dangerous weapon" if it was either "inherently or obviously dangerous or deadly" or if it was "capable of causing serious bodily injury or death to another person and the defendant carrie[d] it with the intent that it be used in a manner capable of causing serious bodily injury." Final Jury Instr. No. 21, at 17–18. This jury instruction was designed to reflect the device's multipurpose

nature and the fact Barnett did not "use" it as a weapon.  Tr. at 1656-1666 (Jan. 20, 2023); see

also United States v. Jensen, 21-cr-6, Jury Instr. at 36, ECF No. 97 (D.D.C. Sept. 23, 2022)

(similar instruction given for January 6 defendant charged with carrying a "folding knife" into

the Capitol).  Both parties agreed to the instruction.  Tr. at 1799 (Jan. 20, 2023).

The jury determined that the Hike 'n Strike was a deadly or dangerous weapon.  Barnett

disputes the evidence to support that determination.  He also challenges the Court's uncontested

instructions to the jury regarding the enhancement, an in-court demonstration of the Hike 'n

Strike, a second, inadvertent discharge of the device, and more.  Barnett's arguments fail.

a.  Sufficiency of the Evidence

Sufficient evidence supported the jury's finding that the Hike 'n Strike was a deadly or

dangerous weapon.  The manual for the Hike 'n Strike instructs that the device "induces intense

pain" and can "immobilize an attacker, causing disorientation, loss of balance, [and] falling to

the ground."  Gov. Ex. 440.  The president of the company that manufactures the device, Billy

Pennington, testified that its "spike electrodes" were designed to penetrate fur, skin, or clothes.

Tr. at 419, 423 (Jan. 12, 2023 a.m.); see Gov. Ex. 347 (Hike 'n Strike packaging advertising

"EXTREME Spike Electrodes").  He also explained that a ten-second shock from the device

could render someone unconscious.  Id. at 452.  In addition, the government's case agent, FBI

Special Agent Kimberly Allen, testified that she could use the device as a weapon by swinging it

as a club, stabbing or cutting someone with the spike electrodes, or using the electric shock

feature.  Tr. at 1145–1146 (Jan. 18, 2023 a.m.).  Agent Allen also demonstrated how the device

functioned by activating the shock feature for five seconds to simulate the delivery of a "full

blast," as described by the manual.  Id. at 1146–1147; Gov. Ex. 440.

The jury also heard evidence that Barnett intended to use the device as a weapon.  For example, the government presented a video of Barnett showcasing the Hike 'n Strike on social media and touting it as protection for the "jungle, concrete or otherwise" where firearms are not permitted, presumably referring to Washington, D.C.  Gov. Ex. 530A.  In the video, Barnett explains how he would use the device as a weapon: "I figure, you know, with a swing or two I could fend something off, or if it got really rough I could just pop the end off this thing [demonstrating shock feature] and I could light you up with about 950,000 volts."  Id.  Taken collectively, there was more than sufficient evidence for a jury to find that the Hike 'n Strike was either inherently dangerous or that it was capable of causing serious bodily injury and Barnett carried it with the intent to use it in that manner.

Barnett cannot escape this conclusion.  He insists acquittal is required because no evidence showed that the Hike 'n Strike is deadly, or that he actually used it as a weapon.  Rule 29 Mot. at 37 ("The government could not show that Mr. Barnett had a deadly weapon[.]"); id. at 38 ("Because Mr. Barnett never used the legal stun device and assaulted nobody, the Court should acquit.").  But those elements are not necessary for a conviction under the charged statute, which penalizes a person who "uses *or* carries" a "deadly *or* dangerous" weapon.  18 U.S.C. § 1752(b)(1)(A) (emphasis added).  Barnett also asserts that the conviction was unwarranted because the Hike 'n Strike "is not a weapon."  Rule 29 Mot. at 38.  But while the Hike 'n Strike has other uses, the evidence clearly established that the device is also capable of being used as a weapon.  Indeed, Barnett himself admits in his Rule 33 motion that he purchased the device to be used as a "defensive weapon" because he purportedly feared he would be attacked while in D.C.  Def's Rule 33 Mot. for New Trial at 10 ("Rule 33 Mot.").  The statute does not differentiate

between weapons carried for an offensive or defensive purpose, so this distinction is irrelevant to the conviction.

b. Jury Instructions

Although Barnett agreed at trial to the jury instruction defining "deadly or dangerous weapon," he now raises two challenges to those instructions. His first jab is that the instruction was improper because it "declared" the Hike 'n Strike met the definition and did "not leave open for discussion whether the [device] was deadly or dangerous." Rule 29 Mot. at 38–39. Not so. The instruction expressly told the jury that "[i]t is for you to decide, on the facts of this case, whether the Zap Hike 'n Strike Hiking Staff allegedly carried by the defendant was, in fact, a deadly or dangerous weapon." Final Jury Instr. No. 21, at 17–18. The Court even paused reading the prepared instruction to clarify this point for the jury:

> when I read that third element, I did not mean to suggest that the Court has already determined that the ZAP Hike 'n Strike is a deadly or dangerous weapon. That is for you to decide—okay?—based on the definition that we will give you.

Tr. at 1824 (Jan. 20, 2023). Next, Barnett now insists the Court's definition of "deadly or dangerous weapon" was "confusing," "overly broad," and "vague." Rule 29 Mot. at 40. He implies the Court should have used the U.S. Sentencing Guidelines definition of a dangerous weapon, which he posits the Hike 'n Strike would not meet.[4] This argument misses the mark.

---

[4] The Sentencing Guidelines define a dangerous weapon as "(i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun)." U.S. Sent'g Guidelines Manual § 1B1.1, cmt. n.1(E). This definition is broader than the one used by the Court insofar as it includes instruments that are not capable of inflicting serious bodily injury. The Court, therefore, struggles to see how Barnett was prejudiced by its use of a narrower definition.

First, the time for objecting to jury instructions is "before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Barnett agreed to the instruction at trial. Tr. at 1799 (Jan. 20, 2023). He cannot now object to the instruction because he disagrees with the jury's verdict. In the same vein, Barnett proposed, then withdrew, a definition of dangerous weapon based on the sentencing guidelines. See Def.'s Mot. to Include a Definition of Dangerous Weapon (ECF No. 148); Tr. at 1663–1664 (Jan. 20, 2023) (withdrawing proposed instruction). The Court abided and gave the instruction to which all parties agreed. Barnett does not explain how it was a serious miscarriage of justice that he received exactly the instruction he requested. See Fed. R. Crim. P. 33(d); cf. United States v. Long, 997 F.3d 342, 353 (D.C. Cir. 2021) ("It is settled that a defendant may not complain about invited error on appeal." (internal quotation omitted)). Nor has he shown that the Court owes any deference to the sentencing guidelines when interpreting terms in criminal statutes. See DePierre v. United States, 564 U.S. 70, 87 (2011) ("We have never held that, when interpreting a term in a criminal statute, deference is warranted to the Sentencing Commission's definition of the same term in the Guidelines.").

c.   Other Challenges

Barnett raises three other challenges to the weapon enhancement in his Rule 33 motion: (1) that the government's demonstration of the Hike 'n Strike to the jury, as well as a brief unintentional discharge, were improper; (2) that he was not permitted to call an expert to testify about the Hike 'n Strike; and (3) that the government misled the jury during closing.

First, Barnett asserts that Agent Allen's five-second demonstration of the Hike 'n Strike merits a new trial because it was given "[w]ithout any qualification or warning," startled the jury, and was not necessary because "neither the light nor the sound are relevant to whether the Hike 'n Strike is actually dangerous." Rule 33 Mot. at 26. Barnett previously moved for mistrial on

the same basis, which the Court denied.  Tr. at 1351–1359 (Jan. 19, 2023 a.m.).  As before, the

Court declines to find the brief demonstration improper.  To start, the demonstration was not an

unplanned surprise to the defense.  The government notified both the Court and the defense at

the pretrial conference and again at trial that it intended to have its case agent demonstrate the

device, and defense counsel acknowledged as much.  Pretrial Conf. Tr. at 86–87, ECF No. 142;

Tr. at 431–432 (Jan. 12, 2023 a.m.) ("Court: I was expecting a demo, Ms. Prout.  Gov.: We'll be

asking the Court's indulgence for that later in our case.  Court: Okay. I figured you would.  Def.:

I had a feeling we'd be seeing it again, Your Honor.").  Further, the Court held a brief bench

conference at Barnett's request shortly before the demonstration occurred.  Tr. at 1144 (Jan. 18,

2023 a.m.).  Barnett did not use that opportunity to object to the demonstration.  Id.  Nor did he

object when the government instructed Agent Allen to "hold it down, and . . . count to five in

your head, please."  Id. at 1146.  He cannot now claim surprise.

Further, the demonstration was neither excessive nor irrelevant.  Agent Allen operated

the device for a five-second count, which constitutes a "full blast" according to the manual.  Id.

at 1146–1147; Gov. Ex. 440.  While loud, the jury was warned that it would be.  Tr. at 1146.  As

for relevance, the jury had to determine whether the device was a dangerous or deadly weapon.

To make that determination, the jury could have found it helpful to observe how the device

functions from a close, but safe distance, including how the electric current is emitted and how

far the device's shock emanates.

Lastly, Agent Allen was fit to operate the device, and there was no objection to her doing

so.  The defense had an opportunity to cross-examine Agent Allen and could have used that

opportunity to establish that the demonstration was not particularly relevant to the dangerousness

of the device.  Barnett also could have called his own witness to offer contrary testimony (which is discussed in more detail below).  The brief planned demonstration did nothing to taint the trial.

Barnett also challenges a momentary, inadvertent discharge of the Hike 'n Strike by a member of the government's trial team.  During a demonstration by one of the prosecutors that a red light on the device indicating that it is "armed" could be difficult to observe, counsel inadvertently activated the device, causing a brief crackle.  Tr. at 1263–1266 (Jan. 18, 2023 p.m.).  As with the intentional demonstration, this quick, harmless discharge was not prejudicial to Barnett, let alone unduly so.

Second, Barnett complains that he was not permitted to call an expert witness to offer contrary evidence about the capabilities of the Hike 'n Strike.  Rule 33 Mot. at 26 ("Defendant was lulled into canceling its witness.").  This argument is peculiar because the Court never barred Barnett from calling his expert.  During trial, Barnett broached the subject of bringing his own stun gun expert, whom he had previously noticed.  When the Court asked what new information the jury would learn from the witness, now that the device's manufacturer had testified, Barnett said he would re-evaluate whether calling the expert was necessary.  Tr. 623–624 (Jan. 12, 2023 p.m.).  Immediately before Agent Allen's demonstration, Barnett again mentioned calling his expert witness.  Tr. at 1144 (Jan. 18, 2023 a.m.).  The Court noted that it had not ruled on the issue but indicated that counsel could revisit the matter after Agent Allen concluded her testimony.  Id.  Counsel never followed up on that invitation.  The Court returned to this point when denying Barnett's oral motion for a mistrial following the government's demonstration:

> The Court will deny the motion for a mistrial.  I'll just make one more point, too, about the experts.  I believe the record will reflect that after Mr. Pennington's testimony the Court inquired whether experts would still be necessary given that he testified as to the operation and the potential effects and the design of the

device.  Counsel said that they would think about that. And so the Court has still
not ruled and has never ruled on any expert notices.

Tr. at 1358.  Barnett cannot now claim prejudice after having declined to call his expert witness

when invited to do so at trial.

Third and finally, Barnett asserts that he was "severely prejudiced" when the government

"boasted to the jury that it caught Mr. Barnett in a lie" about rain shorting out the Hike 'n Strike.

Rule 33 Mot. at 13.  During closing, government counsel stated:

> [The Hike n' Strike] shorted out because it rained.  Well, they abandoned that
> after we proved that it wasn't raining between the time he used it on the 5th and
> when he brought it on the 6th.

Tr. at 1908 (Jan. 20, 2023).  The prosecutor's statement was not improper.  Contrary to Barnett's

interpretation, nothing in the statement suggested that Barnett falsely testified about rain causing

the Hike 'n Strike to malfunction.  Rather, the comment was a reference to *defense counsel's*

cross examination of the creator of the Hike 'n Strike, which elicited testimony that the device

could have been shorted by rainfall:

> Q: So if I--if it's raining outside and I'm walking around just happy on the trigger
> and water and the rain and the electrodes, they interact, could it short out in that
> situation?
>
> A: Yes.

Tr. at 449–450 (Jan. 12, 2023 a.m.).  And, if Barnett found that statement so hazardous to his

case, he could have addressed it during his closing, which he did not do.

\*        \*        \*

The evidence presented at trial fully supports both the underlying convictions on Counts

3 and 4, and the enhancements for carrying a "deadly or dangerous weapon."

D.  Count 8: Theft of Government Property

The jury also convicted Barnett of theft of government property, namely an envelope he took from then-Speaker Pelosi's offices.  To do so, the jury had to find that Barnett intentionally stole government property and that the property had some value.  See 18 U.S.C. § 641; Final Jury Instr. No. 26, at 24.  Barnett contests the sufficiency of the evidence that he intentionally stole the property and that the property had value.  Reviewing the evidence in the light most favorable to the government, the conviction must stand.

There is no dispute that Barnett deliberately took an envelope from Speaker Pelosi's offices.  Gov. Exs. 770, 771.  This was not stealing, Barnett posits, because he left behind a quarter.  Rule 29 Mot. at 42–43.  But leaving token compensation does not automatically excuse theft, particularly when the stolen item was never for sale.  As Speaker Pelosi's Director of Operations testified, the envelope taken from her desk was not for sale, nor could someone purchase a similar envelope from the government.  Tr. at 93 (Jan. 10, 2023 p.m.).  A reasonable jury could have determined—and did so here—that Barnett took the envelope with the intent to deprive the United States government of its use, despite the quarter he left behind.[5]

Barnett also insists that he should be acquitted because he bled on the envelop, which eliminated any conceivable value it had.  While the envelope may not have been particularly prized, Barnett's own actions supported a finding that it had at least some value.  For starters, the

---

[5] Barnett also invokes the Supreme Court's decision in Morissette v. United States.  342 U.S. 246 (1952).  There, the defendant was convicted of stealing used shell casings from a government bombing range, even though he believed the casings were abandoned.  Id. at 247–48.  The Supreme Court overturned his conviction because the government had not been required at trial to prove that Morissette intended to steal.  Id. at 274 ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury.").  Here, by contrast, the jury was instructed that it must find that Barnett "intended to deprive, without right, the United States government of the use or benefit of the envelope."  Final Jury Instr. No. 26, at 24.  Morissette is thus inapplicable.

jury could have interpreted the quarter left behind as Barnett's estimation of the envelope's worth.  Further, Barnett did not discard the envelope, as one typically would of a soiled item. Instead, he proudly displayed it to fellow rioters outside the Capitol and carried it all the way from the District of Columbia back home to Arkansas.  Gov. Exs. 770, 771; Tr. at 917 (Jan. 17, 2023 a.m.) (Special Agent Willett's testimony that Barnett turned over the envelope to the FBI when he was interviewed in Arkansas).  The jury was free to weigh that evidence and determine that the envelope had at least some value, and it did so here.

    E.  <u>Remaining Counts</u>

In a single paragraph, Barnett contests his conviction on the remaining counts—Entering and Remaining in Certain Rooms in the Capitol (Count 5), Disorderly Conduct in a Capitol Building (Count 6), and Parading, Demonstrating, or Picketing in a Capitol Building (Count 7)— on grounds that there is insufficient evidence to show that he intentionally entered or remained in then-Speaker Pelosi's office, or that he intended to disrupt any official business or a session of Congress.  Rule 29 Mot. at 42.  The Court has already rejected these challenges, or similar ones, elsewhere in this opinion.  In short, a reasonable jury could have found that Barnett's extended stay in Speaker Pelosi's offices, including doubling back after being instructed to leave, constituted illegally remaining in the Speaker's offices.  <u>See, e.g.</u>, Gov. Ex. 109 (hallway camera footage of Barnett returning to the Speaker's offices after being instructed to leave).  Further, there was ample evidence for the jury to conclude that Barnett intended to disrupt official business, including the session of Congress to certify the electoral votes.  <u>See, e.g.</u>, Gov. Exs. 201 ("You need to give up communism is what you need to do."), 202 ("We're going to war so pick a side" and "don't be on the wrong side, you're gonna get hurt."), 208 ("Y'all better pick a fucking side.  This is war.  This is no, oh, somebody broke the law."), 503 ("Regardless I am

fighting until death for our country and constitution.  I'll be in DC for a few days including the 6th." and "Be in Washington DC on the 6th."), 509 (video uploaded the morning of January 6, 2021 captioned "In DC fighting for our freedom."), and 771 ("I took over Nancy Pelosi's office.").  As with the other counts, there was sufficient evidence for the jury to convict Barnett of Counts 5, 6, and 7.[6]

      F.  <u>Credibility of Witnesses</u>

In a final salvo, Barnett complains that key government witnesses testified to "material facts that are verifiably and objectively false" and requests that their testimony be set aside.  Rule 33 Mot. at 1–2.  Barnett takes umbrage with various statements, such as Speaker Pelosi's Director of Operations misstating how she arrived to work on January 6 and whether any protests had previously occurred in the Speaker's offices, an FBI agent not remembering whether he took a selfie with Barnett, another agent testifying that zip ties could be used as restraints, and the government's case agent testifying that she was not familiar with an alleged member of "Antifa." <u>Id.</u> at 3–8, 10–12.  Barnett also asserts that Officer Craig's testimony was not credible.  <u>Id.</u> at 16–23.

Generally, it is the purview of the jury to evaluate the credibility of witnesses.  <u>United States v. Eiland</u>, 738 F.3d 338, 353 (D.C. Cir. 2013).  The Court may consider the credibility of witnesses when resolving a Rule 33 motion, but a new trial is only warranted if the witnesses were so lacking in credibility that it would be a serious miscarriage of justice to let the verdict stand.  <u>United States v. Green</u>, No. 19-cr-19 (RDM), 2022 WL 16961127, at *9 (D.D.C. Nov. 15, 2022) ("Rule 33 does not invite[] a free-ranging judicial inquiry into witness's credibility; in

---

[6] Count 7 only requires that the defendant willfully and knowingly parade, demonstrate, or picket in any of the U.S. Capitol buildings.  Barnett does not advance any argument directly challenging those elements.

general, it is not the Court's role to second guess the jury's credibility determinations."). The Court found the government's witnesses generally credible and defers to the jury's assessment of their testimony. Barnett's concerns raise, at best, minor issues of memory and perception that are appropriately addressed through cross-examination, not a new trial. Barnett was permitted to confront the government's witnesses about these areas of testimony and often did so. It was for the jury to decide whether the testimony, corroborated by other evidence, justified a conviction. The Court discerns no colorable credibility concerns on the part of the government's witnesses, let alone a miscarriage of justice requiring reversal of the jury verdict. [7]

## IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that [175] Defendant's Motion for Acquittal is DENIED. It is further

**ORDERED** that [174] Defendant's Motion for New Trial is DENIED.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: May 23, 2023

_____

[7] While Barnett raises this issue in his Rule 33 motion, his arguments could also be considered a challenge to the sufficiency of evidence under Rule 29. In evaluating a Rule 29 motion, the Court must "presume that the jury has properly carried out its functions of evaluating the credibility of witnesses," United States v. Campbell, 702 F.2d 262, 264 (D.C. Cir. 1983), and acquittal is only proper if the testimony for conviction was so "inherently incredible" that no reasonable factfinder could have credited it. Johnson v. United States, 426 F.2d 651, 654 (D.C. Cir. 1970). The Court has already found sufficient evidence for each conviction and credited the government's witnesses, so acquittal is not warranted.